FILED

JUL 2 7 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROMELLA J. ARNOLD                     )
2107 Wagon Trail Place                )
Silver Spring, Maryland 20906         )
(301) 871-7465                        )
                    Plaintiff,

CASE NUMBER  1:05CV01475

JUDGE: Richard W. Roberts

DECK TYPE: Employment Discrimination

DATE STAMP: 07/27/2005

GALE A. NORTON, SECRETARY
U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240                )
                                      )
                                      )
                    Defendant.        )

JURY ACTION

COMPLAINT FOR MONETARY DAMAGES
AND OTHER RELIEF (DISCRIMINATION)

I.    JURISDICTION.

1.    This Court has jurisdiction pursuant to Section 717(c) and Section 706(f)(3) of Title VII of the Civil Rights Act of 1964, as amended by Public Law 92-261 of 1972, 42 U.S.C. 2000e-16(c) and 2000e-5(f)(3) and 28 U.S.C. 1331 and 1343(a)(4) and Public Law 102-166 of 1991, 42 U.S.C. 1981a(c), and Sections 633a and 631(b) of the Age Discrimination in Employment Act.(ADEA) of 1967 as amended by Public Law 93-259 of 1974.

2.    The unlawful employment practices described herein concern actions taken by the Department of the Interior, (DOI), Bureau of Land Management (BLM) located in Washington, D.C. Venue in the Court is proper pursuant to Section 706(f)(3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(f)(3) and 42 U.S.C. 1981a(c).

1

II.    PARTIES.

3.    Plaintiff Romella J. Arnold is an African-American female, born May 9, 1952, a citizen of the United States and a resident of the State of Maryland. Plaintiff is a person aggrieved and a federal employee within the meaning of Section 701(f) and Section 717(a) of Title VII, 42 U.S.C. 2000e-5(f) and 16(a), and Section 633a of the ADEA.

4.    Defendant Gale A. Norton is Secretary, United States Department of the Interior.(DOI). She is sued in her official capacity as head of the Department and, as such, is amenable to suit as provided in Section 717(c) of Title VII, 42 U.S.C. 2000e-16(c).

III.    NATURE OF CASE; CLAIM

5.    This action seeks compensatory damages and other relief for continual intentional discrimination against the Plaintiff based on her race, sex, and age, and reprisal for involvement in protected EEO activities and opposition to violations of equal employment opportunity law, and creation of a hostile work environment (pursuant to Section 102(a)(1) and (b) of the Civil Rights Act of 1991), and declaratory, injunctive and other equitable relief from discrimination in employment against the Plaintiff based on race, sex, age, reprisal and hostile environment.

6.    Defendant took adverse employment actions against Plaintiff on the basis of race, sex, age, reprisal, and hostile environment, in violation of Section 703(a)(1) and (2) and Section 704(a) of Title VII, 42 U.S.C. 2000e-2(a)(1) and (2) and 42 U.S.C. 2000e-3, and Section 2302 of

Title One of the Civil Service Reform Act of 1978, as amended, 5 U.S.C. 2302(b) et seq, and 5 C.F.R. 4.2 and Section 633a of the ADEA.

IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES.

7.    On August 4, 2003, Plaintiff timely contacted an EEO counselor pursuant to 29 C.F.R. 1614.105. Plaintiff complained to the counselor that she had been discriminated against on the basis of her age, sex, reprisal, and hostile work environment.

8.    On October 15, 2003, Plaintiff timely filed a formal administrative complaint of discrimination with the Defendant, Case No. BLM-04-002.

9.    On March 2, 2004, Plaintiff's complaint was amended to include race as one of the bases of Plaintiff's claim.

10.    Defendant assigned Plaintiff's EEO complaint to an investigator. The Report of Investigation (ROI) was issued to the Plaintiff on or about July 9, 2004.

11.    Plaintiff requested an administrative hearing before the U.S. Equal Employment Opportunity Commission (EEOC). The EEOC Administrative Judge issued the Acknowledgement And Order on January 6, 2005 and assigned Case No. 100-2004-00843X.

12.    It has been more than 180 days since Plaintiff filed her formal complaint with the Agency. Pursuant to 42 U.S.C. 2000e-16(c), Plaintiff has exhausted her administrative remedies.

V.    FACTS.

13.    Plaintiff is a career federal employee employed by the U.S. Department of the Interior since November 1975. In approximately April 1997, Plaintiff was hired by the Bureau of Land Management, DOI, Office of Equal Opportunity (OEO) as an EEO Specialist. In March 1998 Plaintiff was reassigned to the position of BLM's National Student Education Employment Program (NSEEP) Manager in the Office of Human Resource Management. In October 2001, Plaintiff was assigned the additional duties and responsibilities of the BLM's Historically Black Colleges and Universities (HBCU) Program Manager. In her capacity as NSEEP/HBCU Program Manager, Plaintiff reported to BLM's Associate Director, Human Resource Management (AD/HRM).

14.    Marilyn Johnson is an African-American female, born August 15, 1950, with no prior participation in protected EEO activity or opposition to violations of EEO law. Since June 2003, Johnson has served as the Associate Director, Human Resource Management (AD/HRM). In Summer 2002, Johnson was reassigned from her position as BLM's Director, Phoenix Training Center located in Phoenix, Arizona, to the position of BLM's AD/HRM located at the BLM's headquarters in Washington, D.C. From 1994 through 1996 Johnson had served as BLM's AD/HRM and was responsible for the overall management of the NSEEP/HBCU programs. Johnson had a pattern of actions and reprisals against EEO program advocates and GS-13 and above African-American employees.

4

15.    Plaintiff was well-known within BLM and DOI as an advocate for EEO and diversity programs, and as an opponent of violations of EEO laws and regulations. In 1995, Plaintiff served as Vice President of the National Association for the Advancement of Black Federal Employees (NAABFE), an organization dedicated to the elimination of systemic discrimination within DOI. In Fall 1995, BLM's equal employment opportunity program was the subject of a Congressional Inquiry by U.S. Representative Albert Wynn. A Departmental report, (referred to as the Wynn Report), issued in response to the Inquiry, found there was a negligible number of African-American college graduates hired by the BLM and no viable affirmative action program to recruit students from the HBCU's into permanent positions. On September 10, 1997, Plaintiff, in her capacity as an officer of NAABFE, was called to testify before a Congressional Committee on Government Reform and Oversite, on issues involving EEO and diversity within the DOI in general and specifically within BLM. Plaintiff's testimony focused on BLM's EEO program which was under Johnson's management as BLM's AD/HRM during the time period preceding the Inquiry. In October 1997, Plaintiff was quoted extensively in a <u>Federal Times</u> article titled "Interior Officials Admit Need For Attention To Racial Discrimination". In 1998, Plaintiff brought to the attention of the Secretary, DOI, a racial incident at the BLM Phoenix Training Center that resulted in disciplinary action against the offending managers, which appeared in the Phoenix press. As a result of Plaintiff's reassignment in 1998 to the position of NSEEP Manager, the program realized demonstrative improvement and progress. Similarly, after Plaintiff was assigned the duties of HBCU Program Manager, the number of student hires within BLM significantly increased. Both programs managed by Plaintiff

5

were highlighted as model programs by both DOI and the Office of Personnel Management. Plaintiff has continued her involvement in NAABFE and continued to bring incidents of racial harassment and violations of EEO laws to the attention of senior management within the DOI. Plaintiff has continued to advocate for diversity programs. Johnson knew of Plaintiff's involvement in these protected activities.

VI.    COUNT ONE.

PLAINTIFF WAS DISCRIMINATED AGAINST AND HARASSED ON THE BASIS OF AGE, RACE, AND SEX, AND SUFFERED REPRISALS AND A HOSTILE ENVIRONMENT, TO PREVENT PLAINTIFF FROM ADVANCING TO GS-14 AND TO PUNISH PLAINTIFF FOR EXERCISING HER PROTECTED RIGHTS, WHEN DEFENDANT'S AGENT, MARILYN JOHNSON: (1) OPENLY AND PUBLICLY ACCUSED PLAINTIFF OF THE FEDERAL CRIME OF 'MONEY LAUNDERING', (2) THREATENED AND PROPOSED TO TRANSFER PLAINTIFF'S POSITION TO A FIELD OFFICE, WHICH WOULD REQUIRE PLAINTIFF TO MOVE OR BE TERMINATED; (3) PLACED UNREASONABLE TIME DEMANDS FOR PERFORMANCE ON PLAINTIFF AS PART OF THE CONTINUING HARASSMENT; (4) PLACED UNREASONABLE AND UNJUSTIFIED TIME DEMANDS ON PLAINTIFF'S BUSINESS TRAVEL TO HINDER PLAINTIFF'S ABILITY TO PERFORM.

16.    Johnson made false accusations that Plaintiff had committed the federal crime of "money laundering". Johnson's accusations were made in connection with the Plaintiff's administration of the partnership initiative with Langston University, an HBCU under the BLM's diversity program. Despite protestations by Plaintiff to the contrary, Johnson made

this accusation against Plaintiff on five separate occasions, including management meetings and other meetings in the presence of third parties.

17. The BLM/Langston University partnership initiative was initiated in 1999 by Warren Johnson, former AD/HRM [no relation to Marilyn Johnson] and the former Director, BLM, Thomas Frye. The initiative was entered into to address the severe under-representation of African-Americans in the resource management occupations. The Langston initiative was so successful a model that it has been adopted by two other DOI Bureaus.

18. On September 12, 2002 Johnson, then Acting Associate Director, Human Resource Management for approximately one month, confronted Plaintiff in the hallway outside Johnson's office and accused Plaintiff of laundering money to Langston University. Plaintiff categorically denied the accusation and requested a meeting with Johnson to clarify Plaintiff's role in the BLM's partnership initiative with Langston University.

19. On September 19, 2002, Johnson again accused Plaintiff of money laundering at a meeting in Johnson's office attended by Johnson, Plaintiff, Concetta Stewart, Deputy AD/HRM and Sylvia Felder, Budget Administrator. In that meeting, Plaintiff explained that the partnership initiative with Langston included a grant that had been approved by the prior AD/HRM Warren Johnson and other senior management officials. Plaintiff stated that the partnership with Langston was part of BLM's diversity initiative in accordance with the President's Executive Order

13256 of February 12, 2002, and established EEO and procurement laws and regulations.

20. On July 18, 2003, during a meeting between Johnson and Plaintiff, Johnson again accused Plaintiff of laundering money to Langston University. Plaintiff reiterated her role in administering the grant to Langston University and asked Johnson to refrain from referring to this legitimate initiative as money laundering.

21. During a management meeting on August 12, 2003, Johnson called the partnership initiative with Langston University, "money laundering".

22. On October 2, 2003, at a mediation session Johnson admitted accusing Plaintiff of "money laundering".

23. Johnson never asked her predecessor, Warren Johnson, about the legality of the partnership initiative with Langston University or took any action to investigate the legality of the partnership initiative with Langston University. Johnson knew or should have known that the partnership initiative with Langston was sanctioned by BLM's senior management and met established EEO and procurement regulations. Johnson knew or should have known that Plaintiff, a GS-13 EEO Specialist, did not have the authority to approve the program initiative with Langston University. Johnson knew or should have known that her accusations against Plaintiff were false, but continued to harass Plaintiff and disparage Plaintiff's reputation as an effective program manager.

24.   In a letter dated March 26, 2004, Johnson notified the President, Langston University, that BLM was terminating its partnership initiative with Langston. In the letter, Johnson alleged this decision was based on discrepancies in reports submitted by Langston, however, Johnson did not conduct any audit or program evaluation of the partnership with Langston prior to issuing the letter. Johnson's decision was arbitrary and not based on any objective evidence. Langston was the only university which was a recipient of a BLM grant to be targeted for termination by Johnson.  Johnson's termination of the partnership initiative was motivated by her discriminatory and retaliatory animus toward Plaintiff as an effective program advocate, and toward the Langston partnership as an effective diversity initiative.

25.   In May 2003 Johnson directed a subordinate to send an E-mail to all BLM state offices offering to reassign Plaintiff's program function, the National Student Education Employment Program, to any state office interested in assuming this function. Johnson took this action without any prior consultation with Plaintiff, and without any study of the ramifications of this proposed decision on the program and program personnel. The National Student Education Employment program had always been administered at BLM Headquarters level, and it was incompatible with the program's national focus to transfer the function to a state.

26.   Johnson's decision to transfer Plaintiff's function to a BLM state office would have resulted in a directed reassignment of Plaintiff. Plaintiff was 51 years of age and had more than 30 years of federal service when Johnson proposed the transfer of function. There were two

other program personnel who were affected by this proposal. Each, Steven Shafran and Marciano Briones, were located in BLM's Denver, Colorado office, and each was over 50 years of age, with close to or more than 30 years of federal service.

27.    Plaintiff's program function was not transferred because no BLM state office accepted Johnson's proposal. Johnson's decision to transfer the NSEEP program function was not intended to improve the efficiency of the service. In fact, the transfer of function would have incurred needless expense and disruption to both the BLM and program personnel. Rather, Johnson's intent was to force Plaintiff and two other older workers to resign or retire. Shafran and Briones were forced into retirement and Plaintiff was removed from the NSEEP position and reassigned to a non-existent position. Johnson's action was a further attempt to harass, and retaliate against Plaintiff.

28.    Johnson harassed Plaintiff by placing unreasonable time frames on Plaintiff for statewide databased reports without benefit of an automated system to produce those reports, after Johnson dismantled the Student Employment/HBCU Tracking System (SERTS), the information system designed to produce automated data on the recruitment and hires of students in BLM's diversity programs.

29.    On January 22, 2003, Johnson instructed a subordinate to delete the SERTS system from the AD/HRM information database. Johnson wrongfully blamed Plaintiff by claiming the decision to delete the SERTS was based on Plaintiff's alleged failure to submit a "business case" to the Information Technology Investment Board (ITIB). Plaintiff had submitted a

10

business case to the ITIB, however no action to approve implementation of SERTS was ever taken.

30.    The SERTS system was established pursuant to U.S. Representative Albert Wynn's inquiry into BLM's EEO program in 1995 and the programs under Johnson. The subsequent "Wynn Report" found there was no effective mechanism for monitoring and tracking the recruitment and hiring of students through the Student Employment and HBCU programs. SERTS had cost BLM approximately $100,000 to design and develop and was ready for deployment and implementation.

31.    At approximately 9:30 a.m., on Friday July 18, 2003, Plaintiff was informed by Johnson's secretary that Johnson wanted a statewide program report from Plaintiff for a 10:00 a.m. meeting. Plaintiff contacted Johnson immediately and explained that without SERTS, Plaintiff would have to gather the program data manually by telephoning each individual state office and requesting submission of the program data. Johnson continued to demand the program report and Plaintiff produced the program report by close of business Monday, July 21, 2003.

32.    Johnson deliberately placed undue stress on Plaintiff by demanding a statewide program report within a clearly unachieveable time frame. Johnson knew or should have known that Plaintiff would not be able to comply with her demand in the time frame given, thereby making Plaintiff appear non-responsive. Johnson's action was calculated to frustrate and harass Plaintiff and was another act in a continuing

pattern of discrimination, reprisal and creation of a hostile work environment.

33.    Plaintiff was responsible for the development and coordination of the Student Career Experience Program (SCEP) training program. Since 1998, Plaintiff had traveled to the training site at BLM's Training Center in Phoenix, Arizona, a few days in advance of the training start date to ensure proper coordination of the training with the Training Center staff.

34.    Plaintiff submitted her travel request to Johnson on June 9, 2003 to travel to Phoenix, Arizona on Thursday, June 12, 2003. The SCEP training began on Monday, June 16, 2003. Plaintiff was informed on June 11, 2003 that her training request had been denied. Plaintiff was told that Johnson would only approve Plaintiff's travel for Sunday, June 15, 2003.

35.    The Phoenix Training Center had assigned a new employee, unfamiliar with the orientation training program, and to ensure quality control, it was necessary that Plaintiff have a few days lead-time. Plaintiff was forced to travel on Sunday, June 15 to Phoenix, and then because of the time constraint, Plaintiff had to work through the night to ensure all training materials were in order, and the training coordinator was made aware of the course curriculum.

36.    Johnson claimed that the cost to the BLM for Plaintiff to travel in advance was too high. During the nine months preceding the June 2003, training, Johnson had expended approximately $30,000.00 of BLM's funds for Johnson's travel. The cost for Plaintiff to have traveled to

12

Phoenix on June 12 instead of June 15 would have been $277.00 for the additional three days per-diem and lodging.

37.    Johnson's refusal to permit Plaintiff to travel in advance of her training course, as was the established practice, was not based on a fiscal concern, but part of a continuing pattern of harassment and reprisal. Johnson's action was intended to harass and frustrate Plaintiff in the performance of her program duties. Johnson's action was motivated by a desire to neutralize and punish Plaintiff because Plaintiff was an effective advocate for diversity initiatives.

## VII.  COUNT TWO.

PLAINTIFF WAS DISCRIMINATED AGAINST AND HARASSED ON THE BASIS OF AGE, RACE, AND SEX, AND SUFFERED REPRISALS AND A HOSTILE ENVIRONMENT, TO PREVENT PLAINTIFF FROM ADVANCING TO GS-14 AND TO PUNISH PLAINTIFF FOR EXERCISING HER PROTECTED RIGHTS, WHEN DEFENDANT'S AGENT, MARILYN JOHNSON, IMPOSED A DISCIPLINARY ACTION AGAINST PLAINTIFF.

38.    At the July 30, 2003, meeting when Johnson announced her decision to place Michael Brown, a GS-14 in Plaintiff's position as NSEEP/HBCU Program Manager, Plaintiff spontaneously uttered the words "I'll be damned."

39.    Johnson told Plaintiff to stop cursing. Plaintiff said she had not cursed but had used a commonly used expression.

13

40.    On August 1, 2003, Johnson issued a Letter of Counseling to Plaintiff titled, "Inappropriate Language and Abusive Behavior."

41.    Plaintiff has an unblemished record of federal service and has never been the subject of a disciplinary action, but for Johnson's action against her.

42.    Johnson has a reputation of using foul and vituperative language toward subordinates.

43.    The Letter of Counseling is one further example of Johnson's pattern of hostile and discriminatory behavior toward Plaintiff.

VIII.  <u>COUNT THREE.</u>

PLAINTIFF WAS DISCRIMINATED AGAINST AND HARASSED ON THE BASIS OF AGE, RACE, AND SEX, AND SUFFERED REPRISALS AND A HOSTILE ENVIRONMENT, TO PREVENT PLAINTIFF FROM ADVANCING TO GS-14 AND TO PUNISH PLAINTIFF FOR EXERCISING HER PROTECTED RIGHTS, WHEN DEFENDANT'S AGENT, MARILYN JOHNSON: (1) REMOVED PLAINTIFF FROM HER POSITION, AWARDED THE POSITION TO A YOUNGER MALE AT A HIGHER GRADE, AND PLACED PLAINTIFF IN A NON-EXISTENT POSITION IN A NON-EXISTENT PROGRAM WITH A LOWER CAREER LADDER; (2) REQUIRED PLAINTIFF TO WORK UNDER A FALSE POSITION DESCRIPTION AND PERFORMANCE STANDARDS WHICH WERE NOT QUANTIFIABLE OR ACHIEVABLE AS PART OF THE CONTINUING HARASSMENT; (3) IMPOSED DISPARATE TREATMENT AGAINST PLAINTIFF BY MOVING HER TO A SMALLER OFFICE TO

SHARE, AND BY ORDERING THAT PLAINTIFF NOT BE ALLOWED TO RETAIN THE TELEPHONE NUMBER BY WHICH SHE WAS KNOWN.

44.    On July 30, 2003, Johnson, at an H.R. staff meeting, announced that Plaintiff is removed from her position as Student Employment/HBCU program manager, and that Michael Brown (male, born July 2, 1961) would assume the position, as a GS-14.

45.    Brown, a former government contractor, was hired into the federal service, BLM, on December 3, 2000 at the GS-13 level. When Brown was reassigned into the NSEEP/HBCU Program Manager position, he had fewer than three years of federal government experience and no experience in NSEEP or HBCU programs.

46.    Plaintiff has more than thirty years of federal experience, all of which has been in the areas of equal opportunity and diversity. From 1988 through 1996 Plaintiff worked as a specialist in the Departmental Office for Historically Black Colleges and Universities. From 1998 until her removal, Plaintiff worked as BLM's NSEEP Manager, and from 2001 until her removal, Plaintiff was assigned the duties of the HBCU Program Manager. Plaintiff received numerous performance awards, and letters of recognition for outstanding performance. In 2001, Plaintiff received an outstanding performance evaluation and was recommended for promotion to GS-14.

47.    Brown was removed from the NSEEP/HBCU Program Manager position on November 28, 2004 and simultaneously demoted from GS-14 to GS-13.

48.   Plaintiff's reassignment by Johnson to the GS-13 EEO Specialist position was to deny Plaintiff a promotion to GS-14. The NSEEP Program Manager position has a GS-14 full performance level, while the Title VI EEO specialist position has a GS-13 full performance level. Plaintiff had been recommended for a promotion to the GS-14 level in 2001 as a result of her outstanding performance. Due to budgetary constraints, Plaintiff was given only a temporary promotion to the GS-14 at that time. If Plaintiff had remained in the NSEEP position, she would have advanced to the GS-14 full performance level based on her continued successful performance.

49.   Johnson's reassignment of Plaintiff to the Title VI position contravened a June 13, 2002 directive by Michael Trujillo, DOI, Deputy Assistant Secretary for Human Resources and Workforce Diversity, which cited in pertinent part:

> ...we are in the process of reviewing the organizational structure of the Equal Opportunity/Civil Rights Offices throughout the Department. In anticipation of some restructuring in the near future, please do not make any changes to your current Equal Opportunity organization, structure, location, or personnel until we have completed our review and initiated whatever changes to these offices that are deemed necessary to improve the efficiency of these very important functional areas.

16



50.    Johnson's arbitrary reassignment of Plaintiff to the Title VI program Position prompted Melodee Stith, Departmental Director of the Office for Equal Opportunity, to write to Deputy Assistant Secretary for HR, Michael Trujillo, via E-mail on August 6, 2003, stating in pertinent part:

> It appears Marilyn {Johnson} is moving ahead to reassign Employees into the EEO office. However, it is my perception that she's not acting responsibly...

> I think that we should ask Marilyn to stop all assignments to the EEO Office until she gives us a plan on what she is doing. It appears she is acting arbitrary and capricious on this.

51.    Johnson's reassignment of Plaintiff to Title VI program specialist was arbitrary and spurious because BLM had no Title VI program nor did it have a Title VI program function. Stith, in response to an interrogatory from the U.S. Commission on Civil Rights on whether there were Title VI program in each of DOI's Bureaus that administer federal financial assistance, stated in pertinent part:

> ...to create an active Title VI program in the Bureau of Land Management would be duplicative when pitted against our existing Title VI enforcement program in the National Park Service because both bureaus fund the same types of programs and have the same recipients i.e, State Park and recreation programs. In other program areas receiving Federal financial

17

assistance from the Bureau of Land Management, such as prisons and school districts, these entities are already covered by existing Title VI enforcement programs by Federal agencies other than DOI.

52.    Johnson's arbitrary removal of Plaintiff from the NSEEP/HBCU Program replaced Plaintiff, an effective program manager, with an unqualified, inexperienced, younger one, Michael Brown, who was demoted within 12 months. Johnson ensured that a once successful diversity program and program advocate would now be neutralized, consistent with Johnson's reputation and prior acts. Johnson's action was an abuse of her authority, and was found in her retaliatory and discriminatory animus toward Plaintiff. Johnson's reassignment of Plaintiff to a non-existent Title VI program was intended to deprive Plaintiff of her opportunity to advance to GS-14, and retaliate against Plaintiff for her involvement in protected EEO activity. Johnson's action was also intended to embarrass, demean, and harass Plaintiff, consistent with the hostile environment created by Johnson. Johnson's removal of Plaintiff also sent a chilling message to other BLM employees in the HR office, that if they attempted to engage in similar protected EEO activity, their career opportunities could be abruptly curtailed or over. Johnson's removal of Plaintiff and replacement of Plaintiff with a younger worker, was also consistent with other similar actions against older workers taken by Johnson.

53.    On October 1, 2003, Plaintiff was presented by Johnson with performance standards for the Title VI EEO specialist position. The position description and performance standards were fallacious because

they were both written as though there was an existing Title VI program within the BLM when there was not. The BLM had no Title VI program, no Title VI program guidelines, no records, and no other Title VI program materials.

54.    Plaintiff informed Johnson that she had not worked in a Title VI program for more than twenty years and was not qualified to establish or administer a Title VI program.

55.    Plaintiff attended a Title VI Training Course in September 2003. Plaintiff was stressed and anxious because there was no way to apply the material within BLM since there was no BLM Title VI program function. Stith in responding to a question by the EEO Investigator underscores why Plaintiff's anxiety and concern were well-founded when she stated in reference to the Title VI program: (ROI, Vol 2, D4 pg. 16):

> ...yes, that was a very complicated area. We had given training last year, conducted by Department of Justice as well as the Department of Education and our own Solicitor's Office to give employees a familiarly with the training, but this program area is one of those areas you don't send somebody to a class and say, okay sit down and do it...

56.    The Title VI performance standards issued by Johnson were designed to set Plaintiff up to fail. Johnson knew Plaintiff would be unable to meet the performance standards, and took this action with the intent to find Plaintiff's performance deficient.

57.  Johnson previously took the same action against Marilyn
Daniels, an African-American who filed complaints of racial
discrimination and reprisal. Johnson moved Daniels to a non-existent Title
VI position, and then fired her for failure to perform.

58.  On or about September 3, 2003, Johnson gave Plaintiff two
days to move office space considerably smaller than her previous office,
ordered her to share this smaller space with a junior EEO specialist, and
refused to allow Plaintiff to retain her telephone number.

59.  Plaintiff was the only senior EEO Specialist required to share
office space and not permitted to retain her telephone number, when
moved. The similarly situated employees were afforded more
advantageous treatment.

60.  Plaintiff was made aware months after her relocation of
numerous unsuccessful attempts to contact her by program personnel
within and outside of the federal government. Johnson's disparate
treatment of Plaintiff was motivated by discrimination and reprisal, and
designed to humiliate and embarrass Plaintiff.

IX.    COUNTS ONE THROUGH THREE.

61.  Defendant's agent took actions intended to discredit, defame,
and destroy Plaintiff's professional and personal reputation, damage her
career and potential career, based on her age, race, gender, reprisal,

harassment and hostile work environment, and by so doing, cause Plaintiff to suffer pecuniary and non-pecuniary damages.

62.    The aforestated actions were imposed only on Plaintiff and not on other similarly situated employees who are not of Plaintiff's age, race, sex, or who have not engaged in protected EEO activities or opposed violations of EEO law.

63.    Defendant's agent's actions and statements were clearly intended to interfere with Plaintiff's ability to perform her job and to interfere with and diminish Plaintiff's work performance. Defendant's actions were intended to and did cause Plaintiff to feel intimidated and harassed, and to create for Plaintiff an intimidating, hostile and offensive work environment.

64.    Defendant's agent Johnson has routinely acted in a similar hostile, disparate, and retalitatory manner toward senior African-American employees, including but not limited to the following:

(a)    Taking more severe disciplinary actions against African-American employees than against other similarly situated employees;

(b)    Taking actions to undermine and otherwise neutralize equal employment opportunity and diversity programs and program personnel; and

(c)    Arbitrarily assigning and reassigning older workers in a manner inconsistent with the efficiency of the service, but intended to demoralize and force older workers into resigning or retiring.

65.    Defendant's agent's actions caused Plaintiff to suffer non-pecuniary damages, including anxiety, stress, depression, embarrassment, loss of reputation and other physical and emotional conditions.

66.    As a direct result of the discrimination and reprisal against Plaintiff, Plaintiff suffered emotional pain and suffering, feelings of paranoia, feelings of distrust, nightmares, sexual disfunction, personality disorder, loss of pleasure of life, humiliation, embarrassment, negative changes in her relationships with family and friends, and other non-pecuniary damages.

67.    As a direct result of the discrimination against Plaintiff, Plaintiff has become withdrawn and indifferent toward family members and friends and has experienced a serious diminution in her quality of life. Plaintiff's pain and suffering prevents Plaintiff from continuing to provide her elderly parents with financial and emotional support.

68.    Plaintiff no longer enjoys an active social life, and feels uncomfortable and uneasy at social events. Plaintiff was once involved in a variety of social service and professional organizations, her national alumni association, and other community related activities. Plaintiff now has limited interaction with anyone outside of her co-workers at the BLM.

22

Plaintiff was a happy, extroverted, and socially active person who has been reduced to a fearful, anxious, withdrawn individual.

69.     Plaintiff took immense pride in her thirty years of federal service and in her many awards, commendations, and other acknowledgements for outstanding work performance in equal opportunity and diversity programs. As a result of Defendant's spurious and vicious actions, Plaintiff has suffered a loss of reputation and her outstanding record of federal service has been irrevocably tainted. Plaintiff has had to defend her reputation to co-workers, and to numerous people throughout BLM and DOI who have heard that Plaintiff was removed from her position because she laundered money or otherwise engaged in some illegal activity. The impact of these vicious and fallacious allegations is severe and ongoing.

70.     The discrimination and reprisal against Plaintiff was designed to prevent Plaintiff from advancing to the position of National Student Education Employment Program Manager, GS-14 and/or to other GS-14 positions within the BLM and DOI. As a direct result of the discrimination, and reprisal, Plaintiff has lost financial benefit from lost employment opportunities.

71.     As a direct result of the discrimination and reprisal against Plaintiff, Plaintiff suffered pecuniary damages, including lost income, lost employment opportunities, out-of-pocket expenses for medical care, and attorney's fees.

X.    PRAYER FOR RELIEF.

72.    WHEREFORE, Plaintiff respectfully requests that this Court award Plaintiff the following relief:

(a)    Award Plaintiff compensatory damages to be paid by Defendant in the amount of $300,000 for non-pecuniary damages for emotional pain, suffering, humiliation, anxiety, stress, loss of enjoyment of life, loss of reputation, and other non-pecuniary losses suffered by Plaintiff as a direct result of the unlawful intentional discrimination and reprisal by Defendant.

(b)    Award Plaintiff compensatory damages for lost income, lost employment opportunities, out-of-pocket expenses, and incidental financial losses incurred by Plaintiff as a result of Defendant's unlawful discrimination and reprisal.

(c)    Enter a declaratory judgment finding that Defendant's actions were unlawful discrimination against Plaintiff based on age, race, gender, reprisal, harassment, and hostile work environment in violation of Title VII of the Civil Rights Act, as amended and the Age Discrimination in Employment Act, as amended.

(d)    Issue a mandatory injunction enjoining Defendant and all of Defendant's agents from engaging in such unlawful employment practices.

24

(e)    Rescind the Letter of Counseling issued to Plaintiff on August 1, 2003.

(f)    Order the demotion and/or removal of Defendant's agent, Marilyn Johnson, who discriminated and took reprisals against Plaintiff.

(g)    Order Defendant to post a notice in the Bureau of Land Management in conspicuous places for not less than sixty (60) days, stating that Plaintiff was discriminated against, and corrective action is being taken to remedy the wrongdoing.

(h)    Enter a judgment against Defendant and in favor of Plaintiff for reasonable attorney's fees and costs.

(i)    Award Plaintiff such further and additional relief as the Court may deem just and proper.

(j)    Order Defendant to file a Certificate of Compliance with all orders of the Court no later than sixty (60) days after the entry of judgment.

XII.    JURY TRIAL.

75.    Plaintiff demands a jury trial.

25

Respectfully submitted,

*Romella J. Arnold*

Romella J. Arnold
2107 Wagon Trail Place
Silver Spring, Maryland 20906
Tele. 301-871-7465
Plaintiff, PRO SE