# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROMELLA  J. ARNOLD | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 05-CV-01475 (RWR) |
| | ) | |
| DIRK KEMPTHORNE, DEPARTMENT | ) | |
| OF THE INTERIOR, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT

Defendant respectfully submits this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

Plaintiff, Romella Arnold, is an employee of the U.S. Department of the Interior, Bureau of Land Management. Complaint at ¶ 13.  Plaintiff brings this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and the Age Discrimination and Employment Act, 29 U.S.C. §633a. Complaint at ¶ 6.

Plaintiff made initial contact with an EEO counselor concerning the claims at issue in this case on August 4 or 6, 2003.  Ex.A.  On October 17, 2003, plaintiff filed a formal administrative complaint of discrimination with the Department of the Interior.  In her administrative complaint, plaintiff alleged that she was discriminated against and subjected to a hostile work environment based upon sex (female), reprisal, and age (d.o.b. 5/9/52).

On March 2, 2004, plaintiff amended her complaint to include race as one of the basis of discrimination.  Complaint at ¶ 9.  The defendant assigned the complaint to an investigator, and on or about July 9, 2004, the investigator completed the Report of Investigation. (Complaint at ¶ 10).

1

Plaintiff requested a hearing before an administrative judge of the U.S. Equal Employment Opportunity Commission but filed the instant complaint in federal court on July 27, 2005, before having an administrative hearing. (Complaint at ¶ 11).

Plaintiff alleges that defendant discriminated against her based upon race, gender, age, and reprisal and created a hostile work environment when the following alleged acts occurred:

1. On September 12 and 19, 2002, July 18 and August 12, 2003, the Associate Director, Human Resource Management, Marilyn Johnson, accused her of money laundering in relation to funding given to a university. Plaintiff's Answers to Defendant's Interrogatories (ARog) at pp. 3-4 ;

2. By letter dated March 26, 2004, Ms. Johnson notified the university that BLM was terminating its partnership initiative with the university. ARog at p. 3.

3. In May 2003, Ms. Johnson directed a subordinate to send an e-mail to all BLM state offices offering to reassign (transfer) the National Student Education Employment Program (NSEEP) to a state office. ARog at p. 4.

4. On January 22, 2003, Ms. Johnson instructed a subordinate to delete an automated Student Employment/HBCU Recruitment Tracking System (SERTS) from the AD/HRM information data base. ARog at p. 5.

5. On Friday, July 18, 2003, at approximately 9:30 a.m., Ms. Johnson's secretary informed plaintiff that Ms. Johnson wanted a statewide program report from plaintiff for a 10:00 a.m. meeting. ARog at p. 5.

6. On June 11, 2003, plaintiff was advised that her request to travel to Phoenix on Thursday, June 12 to prepare for SCEP training beginning on Monday, June 16 was denied, and that she was only approved travel for June 15, 2003. ARog at p. 5-6.

7. On August 1, 2003 plaintiff was issued a letter of counseling for inappropriate language and abusive behavior. ARog at p. 6.

8. On August 1, 2003 plaintiff was removed from the position "NSEEP/HBCU program manager" and reassigned to the position EEO Specialist, responsible for Title VI. ARog at p. 7-8.

9. A younger male, Michael Brown, allegedly replaced plaintiff as ""NSEEP/HBCU program manager." ARog at p. 8-9;

2

10.  On October 1, 2003 plaintiff was presented with performance standards for the Title VI EEO Specialist position which Ms. Johnson knew plaintiff would be unable to meet. ARogs at p. 9

11.  That on or about September 3, 2003, Ms. Johnson gave plaintiff two days to move office space.  ARogs at p. 9-10.

12.  That plaintiff was moved into office space smaller than her previous office and she had to share the space with a junior EEO Specialist.  ARogs at p. 9-10.

13.  That she was not allowed to retain her telephone number when she moved. ARogs at p. 9-10.

14.  That from September 12, 2002 through approximately October 1, 2003,  Ms. Johnson created a hostile work environment based on the acts described above.  ARogs at p.12-14.

As is set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff did not timely contact an EEO counselor concerning some of her claims,  plaintiff has not met her burden of establishing all essential elements of her claims,  there are no material facts in genuine dispute, and defendant is entitled to judgment as a matter of law.   Alternatively, pursuant to F.Rule Civ. P. 8 (e), assuming hypothetically, that plaintiff has established a prima facie case as to some of her

claims, defendant has legitimate, non-discriminatory/retaliatory reasons for its actions.  Wherefore,

defendant respectfully requests that plaintiff's complaint be dismissed with prejudice as to all counts.


                              Respectfully Submitted,


                              _____
                              JEFFREY A. TAYLOR, D.C. Bar #498610
                              United States Attorney


                              _____
                              RUDOLPH CONTRERAS, D.C. Bar #434122
                              Assistant United States Attorney


                              _____
                              RHONDA C. FIELDS
                              Assistant United States Attorney
                              Civil Division
                              555 Fourth Street, N.W.
                              Washington, D.C.  20530
                              202/514/6970


                              Counsel for Defendant

OF COUNSEL
PATRICIA ARMSTRONG HARGRAVE
Office of Solicitor
Division of General Law
U.S.Department of the Interior

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ROMELLA  J. ARNOLD                      )
         Plaintiff,                     )
              v.                        )      Civil Action No. 05-CV-01475 (RWR)
                                        )
GALE NORTON, DEPARTMENT                 )
OF THE INTERIOR,                        )
                                        )
         Defendant.                     )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Dirk Kempthorne, Secretary of the U.S. Department of the Interior, hereby

respectfully submits this Memorandum of Points and Authorities in Support of Defendant's Motion for

Summary Judgment.

STATEMENT OF FACTS

**Background**

Plaintiff started her employment with the Department of Interior in 1973 as a co-op student.

Arnold 2007 Depo. at p. 6.  In 1975, she came aboard full time as an EEO Specialist in the Office of

the Secretary.  *Id*.  Plaintiff worked as an investigator, and  Compliance Officer in Title VII and Title

VI enforcement.  *Id*.  Plaintiff worked in the Title VI area for approximately two years.  Arnold 2007

Depo. at p. 6-8.

In 1997, plaintiff moved to an EEO Specialist position at BLM.  *Id*. at p. 14.  In 1998, plaintiff

was asked to take on the duties and responsibilities of the National Student Employment Program

Manager. *Id*. at p. 14-15.    The duties of that position included running the Student Temporary

Employment Program (STEP) and the Student in Career Employment Program (SCEP). *Id*. at p. 15-

1

16.  Due to her additional duties and responsibilities,  plaintiff received a non-competitive promotion from EEO Specialist GS 12 to SCEP Program Manager GS 13.  See Notification of Personnel Action effective date 3/14/99, and Ex. D2c, SCEP Program Manager PD.   The position was neither supervisory nor managerial.  *Id.* at box 11.

 The full performance level for the SCEP Program Manager position is GS 13. Dahlena Johnson Dec.  The position is not and  was never classified as a GS-14.  *Id.*  A GS-13/14 position would be required to be advertised, and Ms. Arnold would have had to compete for the position with other applicants.  *Id*.

Competitive procedures do not apply to

A promotion resulting from an employee's position being classified at a higher grade (**with no further promotion potential**) because of additional duties and responsibilities, **commonly known as accretion of duties**.

 Department of Interior Manual, 370 DM 355 3.B.3. (emphasis, **bold and underlined**, added).

Conversely, competitive procedures do apply to

Promotions due to the addition of substantive, new and higher-graded duties when . . .there are other employees serving in similar or identical positions within the organizational unit to whom the new duties could have been assigned.

*Id*. at 3.A.6.

The SCEP Program Manager position was part of an initiative arising due to an Executive Order requiring the federal government to do business with minority colleges and universities as well as majority institutions. The initiative included recruitment of students for employment in the federal government, faculty exchanges, and giving minority institutions the opportunity to participate in grant and contract opportunities.  Arnold 2007 Depo at page 17.   In addition to plaintiff's program, the initiative included programs run by the following program managers: Marci Briones -- Hispanic Serving Institutions; Steve Shafran –Asian and Pacific Institutions and Students with Disabilities; John

2

Matis -- Native American; Bill Nunn -- Diversity Intern Program and Historically Black Colleges and Universities (HBCU); and plaintiff -- SCEP. *Id.* at p. 19-20. The duties of the other program managers included recruiting students in their particular targeted population. *Id.* at p. 17-20. Those students then would be directed into either a SCEP or Step position. *Id.* at p. 18.

In 2001, Bill Nunn died. Arnold 2007 Depo. at p. 20. His position as HBCU Coordinator was at the GS-14 level. Ex D2p (National Program Manager, HBCU Position Description). The position was neither supervisory nor managerial. *Id.* at box 11. Plaintiff served in the position on a 120-day detail, which was a temporary promotion to GS-14 from July 16, 2001 to November 13, 2001. Arnold 2007 Depo. at Ex. 4. The detail was rotated to Steve Shafran. *Id.* at p. 20-21. After Mr. Shafran's 120-day promotion ended, Connie Stewart asked plaintiff to resume the HBCU duties, but she did not give plaintiff another temporary GS-14 detail. Plaintiff continued doing the HBCU duties, along with her SCEP duties, until August 2003 when she was reassigned to a Title VI position. *Id.* at p. 22.

**Alleged Protected Activity**

Plaintiff states that she has engaged in protected EEO activity since 1994 or 1995, when she became a charter member and Vice President of the National Association for the Advancement of Black Federal Employees (NAABFE). Plaintiff testified before the Congressional Committee on Government Reform and Oversight on September 10, 1997, on the status of African Americans within the Department of the Interior and its various bureaus, including the Bureau of Land Management. Blue Ex. 8, Transcript of Congressional Testimony of Romella Arnold, at 143-44.

In December 1997, plaintiff reported to Warren Johnson, then Assistant Director of Human Resources, an anonymous employee's complaint to her about a racially offensive skit performed at the BLM's National Training Center in Phoenix, Arizona. Arnold 2004 Inv. Interview at p.30-31. The Director of the training Center was suspended and removed from his position as Director. *Id. at* p. 33.

3

At the time of this alleged protected activity,  Marilyn Johnson was the Associate State Director for Eastern States in Springfield, Virginia, and was neither involved in the complaints nor the subject of the allegations. *Id*. at p. 32;  Johnson  2005 Depo. at p. 143-144.

After the removal of the Training Director, Marilyn Johnson was reassigned to the position. Arnold 2004 Inv. Interview at p. 34-35.  Plaintiff met Marilyn Johnson when Johnson was the Training Center Director.  *Id*. at p. 35-36.

**Marilyn Johnson is assigned Assistant Director, Human Resources Management, Washington, D.C.**

Marilyn Johnson, (black female, d.o.b. 8/15/50) began Acting in the position of Assistant Director, Human Resources Management, in September 2002 and permanently obtained the position in June 2003. Johnson 2005 Depo. at p. 7.   In that position, she became plaintiff's second-level supervisor.  Johnson 2004 Investigative Interview at p. 4-5.

Among the tasks which Ms. Johnson undertook after she came on board in September 2002, was to examine the agreement which the BLM had with Langston University.  Johnson  2005 Deposition at 60:20 - 63:10.   The Langston agreement was given special scrutiny because the money going to Langston was taken out of BLM's budget.  *Id.* at 179:12 - 180:15.  Monies going to other, non-minority,  universities did not come directly out of BLM's budget.  *Id.*  Those universities had individual relationships with individual states.  The states spent money based on task orders that they give the universities.  Ms. Johnson had no control over the relationships between the states and the universities.  *Id.*  But, she did have control over the monies going from BLM to Langston.

In going through the assistance agreements with Langston, Ms. Johnson had questions concerning what the funds were being used for.  Johnson 2005 Depo. at p. 67-68.

**Use of the Term Money Laundering**

4

Plaintiff states that on September 12 and 19, 2002, July 18 and August 12, 2003, Marilyn Johnson, accused her of money laundering in relation to funding given to Langston University. Plaintiff's Answers to Defendant's Interrogatories (ARog) at pp. 3-4 . Plaintiff alleges that on September 12, 2002, Ms. Johnson called her into her office and said "I want to talk to you about your program . . . .I want to know why you are laundering all this money to Langston." Arnold 2005 Depo. at p. 14-15.

On September 19, 2002, plaintiff met with Ms. Johnson, Sylvia Felder, (black female, d.o.b. 12/17/54), Administrative Officer and Connie Stewart to discuss the budget and the SCEP program. Arnold 2004 Investigative Interview at p. 13-14 and Exh. 9, Investigative Interview of Sylvia Felder at 5-8. During the meeting, Ms. Johnson asked questions about the BLM assistance agreements with Langston University. Arnold 2004 Investigative Interview at. 14-15 and Johnson 2004 Investigative Interview at p. 6-7. According to plaintiff, Ms. Johnson said, "I want to know why the BLM is laundering all this money to Langston University." Arnold 2004 Investigative Interview at p. 14.. In response to the questions, plaintiff explained that BLM gave money to Langston to give to students. Johnson 2005 Depo at p. 67-69. The money was used for housing and local transportation. Arnold 2005 Depo at p. 16. Johnson asked why they were not giving the money directly to the students, and plaintiff responded that BLM could not legally give the money directly to the students. Johnson 2005 Depo at p. 67-68. Johnson then commented that "When we are giving money to an organization that we can't legally give the money for. . . it looks like money laundering to me." Johnson 2005 Depo at p. 68.

Plaintiff admits that the BLM is not allowed to pay for housing for any employees; but did so through Langston by having Langston give the students a stipend. Arnold 2005 Depo at p. 17. Plaintiff does not believe using Langston University for this purpose posed any problem. *Id.* at p. 17-18.

5

According to plaintiff, the law forbidding such direct payments was a "barrier" to hiring the students.

*Id*.  Plaintiff testified that

> I challenged her [Johnson] on the money going to Langston versus the money going to majority schools during the same time period.  BLM gave $ 2.4 million (sic) to majority universities and Langston at that time had received possibly $270,000.
>         So I challenged that, I said, if this is laundering, what do you call $204 (sic) million?  And she says, well I don't handle those programs.

Arnold LLM-04-02, Ststement dated 3/06/07 at p. 19-20.

Ms. Felder and Ms. Stewart testified that Ms. Johnson did not accuse the plaintiff of laundering money in the meeting.  Ms. Felder  testified that Ms. Johnson used the term "money laundering," but did not accuse plaintiff of money laundering.  Blue Ex 9, Investigative Interview of Sylvia Felder at  p. 6. According to Ms. Felder, Ms. Johnson used the term in response to the briefing she received on the amount of money given to Langston University and how the money was used. *Id*. at p. 7).

Connie Stewart testified that Ms. Johnson used the term "money laundering" in connection with the mechanism of how the government was paying for housing and tuition for students by using Langston University.  According to Stewart, the term was not used "as an accusation against anybody, but it had the appearance of using this university to launder our money." Blue Ex. 5, Investigative Interview of Connie Stewart at p. 7.

Plaintiff alleges that on July 18, 2003, Ms. Johnson stated "I don't understand why we are laundering money to Langston."  Arnold 2005 Depo at p. 18:17-19:2; 20:5-9.  Ms. Johnson also allegedly used the term money laundering in an August 12, 2003 meeting which plaintiff did not attend, because she was no longer in the SCEP position.  *Id*. at p. 20.

Plaintiff admits that in her position,  Ms. Johnson had the right to question or to have Langston be accountable for the money it received.  Arnold 2005 Depo. at p. 22.

 Seven months after plaintiff was reassigned to a new position, by letter dated  March 26, 2004,

Ms. Johnson notified Langston University that BLM was terminating its partnership initiative with the university. Complaint at ¶ 24.

**Proposal of Lead State Concept**

On May 8, 2003, Connie Stewart, Ms. Johnson's assistant, sent an e-mail to the BLM Field Committee concerning "Lead State Concept as discussed at Field Committee meeting." Arnold Doc. Request Response 54. A copy of the e-mail was forwarded to Nancy Taylor, who forwarded a copy to plaintiff stating: "FYI. . .ONLY!!! Thought you might be interested in staying in the know about future plans regarding the recruitment program." *Id.* The document attached in the E-mail discussed a concept proposing to make a "lead state" responsible for student recruitment programs and sending program money and program leads to the lead state. *Id. at p. 2.* The concept included all four of the programs: Hispanic Servicing Institutions, Tribal Colleges and Universities, Historically Black Colleges and Universities, and Student Career Experience Program. *Id.*

The program functions were not transferred to a state office. Complaint at ¶27.

**Student Employment/HBCU Recruitment Tracking System (SERTS)**

According to plaintiff, development of SERTS began in or about 1997-1998. Arnold 2005 Depo. at p. 42. The purpose of the system, *inter alia*, was to track the student employment program. Arnold 2007 Depo at p. 52-53. The BLM had expended about $70,000 on SERTS, but SERTS never became fully operational. Arnold 2005 Depo at p. 47. Other than testing, the SERTS was never used in connection with work; it was never an operational system. Arnold 2005 Depo at p. 43- 44. The SERTS was not attached to a server and was not able to produce reports. Arnold 2005 Depo. at p. 47.

In or about 2001, the BLM created an Information Technology (IT) Investment Management Process for the approval and oversight of all IT projects and investments. Blue Ex 15. The Information Technology Investment Management Board (ITIB) was tasked with overseeing IT projects, including

7

reviewing reports of existing projects, approving proposed projects and providing permission to deploy completed projects.  The SERTS system fell within the jurisdiction of the ITIB because it could be used nationwide. Blue Ex. 16).

By e-mail dated December 12, 2002 plaintiff was advised that: "The SCEP Enhanced Reporting Tracking System is now part of the national IT Portfolio."  Arnold 2007 Depo  Ex. 2 at p. 1.  Plaintiff was advised on December 23, 2002, by the new portfolio manager for the Washington HR Office, Gail Colbert, that "According to the System Coordination Office and the ITIB, there was never a business case or project plan written for this project and, therefore, in the eyes of the ITIB, it isn't on their 'radar screen.'" Arnold 2007 Depo  Ex. 2 at p. 2.

On January 6, 2003 Kurt Ballentyne, the ITIB contact, reminded plaintiff to send in her quarterly reports to the System Coordination Office.  *Id.* at p. 3.   On January 10, 2003, plaintiff was included as an addressee on an e-mail concerning the AD700 portfolio[1].  *Id.* at p. 4.  The e-mail indicated that a decision had to be made concerning whether or nor SERTS would be submited to the ITIB for approval.  *Id.* at p. 4.  On January 23, 2003, Gail Colbert advised plaintiff that at Ms. Johnson's direction ITIB would be requested to remove SERTS from the portfolio:

> Marilyn and I have briefly discussed SERTS' value to the bureau, which is the main criterion for IT systems.  It's my belief, having looked at the system, that the information you're trying to capture can be pulled from the Automated Table of Organizations (SCEPS are tracked based on their "status" in FPPS) or directly from FPPS. . . .

*Id.* at p. 5.  Plaintiff requested a meeting to discuss SERTS.  *Id.* at p. 8.  Ms. Johnson responded

> Romella, I will be glad to meet with you.  However, this system has been on the books forever.  Clark never did a business case for it so we cannot support it being a part of our portfolio anymore.  Denver is very serious about all of the ADs have clean supportable cases for their systems and your system has no documentation so I cannot

---

[1]  The portfolio was a list of all the automated systems that Marilyn Johnson was responsible for.  Johnson 2005 Depo. at p. 79:11-80:4.

support it.

*Id.* Ms. Johnson also advised plaintiff

> The rules have changed Romella. What bothers me about this discussion no one was doing anything with the system until there was a decision to remove it from the portfolio. I never heard of the system before, and neither had the people in Denver. I don't know anyone who has used it to any notable success. Gail will be here tomorrow. I would like to discuss this with her in the room since she seems to have alternative.

*Id.* at p. 7.

In February or March, 2003, in a meeting with Gail Colbert, Marilyn Johnson and others, plaintiff was told to prepare a business case for submission to the ITIB. Arnold 2007 Depo. at Ex 2 p. 21 (E-mail 07/07/2003 3:32 pm). In April 2003, plaintiff submitted the business case for SERTS, called the "300 Lite business case" to Gail Colbert. Arnold 2007 Depo. at Ex. 2 p.15 (see 12:15 pm e-mail).

On May 12, 2003, Kurt Ballantyne, advised plaintiff:

> "If you submit, by close of business Wednesday May 14th, a quarterly report that addresses your project scope, schedule and budget, I will change your project rating from YELLOW to GREEN. . . .

*Id.* at p. 9.

On May 20, 2003, plaintiff sent to Mr. Ballantyne her second quarterly report and the "300 Lite" business case. Arnold 2007 Depo. at Ex. 2 p. 15-19. She wrote

> Would you please provide guidance what happens next and what I should anticipate happening in order to move this project to completion. All we need is a server which is located in the NTC and it will be ready for use by the employees. We have not been able to use the system which we have invested money in because it continues to get bogged down in the bureaucracy and I don't understand why. This project existed before the ITIB was in existence and the design was completed in FY 01 and the system was tested by its users in FY 02. I need help, not opposition which I continue to get from Gail Colbert. . . .

*Id.* at p. 15 .

On July 3, 2003, plaintiff sent another e-mail to Mr. Ballantyne, cc'ed to Ms. Johnson, again

9

questioning why SERTS fell within the jurisdiction of the ITIB and again stating that she thought her project "has gotten bogged down in bureaucracy of BLM ."  Arnold 2007 Depo. at ex 2 p. 21.

Mr. Ballantyne responded in an e-mail dated Jule y, 2003.  *Id.* at p. 20-21.  He explained why SERTS had to comply with BLM's IT policy and the "new way BLM is doing business to plan and track its IT investments and projects."  "Whether you like it or not SERTS is a major IT investment and must comply with the Bureau's policies and procedures regarding the project and investment management processes."  *Id.* at p. 20.  Mr. Ballentyne warned plaintiff that the project was rated yellow because the ITIB received no report in April.  If plaintiff failed to submit a report by July 15, "the project will be rated 'red' for scope, schedule and budget.  A red rating constitutes being 'out of control', and hence would seriously jeopardize the future of the SERTS project."  *Id.* at p. 21.

Plaintiff admits that prior to July 2003, she did not understand that the SERTS program fell within the criteria requiring approval of the ITTB.  Arnold 2007 Depo at p. 67-70.  She did not send anything else to Mr. Ballentyne after July 8, 2003.  Arnold 2007 Depo. at. 70-71.  Thus, she did not meet the July 15th deadline.

Plaintiff claims she sent nothing further after July 8, "because shortly after that I was removed from my job."  *Id*.  However, plaintiff did not know she was being reassigned to another position until August 1, 2003.  Arnold 2007 Depo. at p. 49-51.

The August 1, 2003,  Quarterly Project Rating for April-June, 2003 for SCEP recommended that the ITIB terminate the project and direct that all implementation/deployment efforts be stopped.  Ex.13, 14.  On August 26, 2003, the ITIB, in its third quarterly meeting, decided to terminate the SERTS program. Blue Ex.11-12.  The ITIB made its decision based upon the fact the project was rated red for scope, schedule and budget due to the fact that plaintiff had not complied with quarterly reporting requirements.  On September 8, 2003, the ITIB notified Ms. Johnson that it made the

decision to remove the SERTS from the National IT Portfolio and directed her to terminate the project and all efforts to implement the project. Blue Ex. 11-12..

### Request for report on July 18, 2003

On Friday, July 18, 2003, at approximately 9:30 a.m.,  plaintiff learned that Ms. Johnson wanted a statewide program report from plaintiff for a 10:00 a.m. meeting.  Arnold 2007 Depo. at p. 46.  Plaintiff spoke on the telephone with  Ms. Johnson, and told her she could not get that information to her by 10:00.  Ms. Johnson responded " get it to me when you can."  Plaintiff called 14 field managers to get the information.  Arnold 2007 Depo. at p. 46-47.  On  Monday, July 21, 2003, plaintiff sent an e-mail with the requested information report attached.  The report is a one page list identifying six students.   See Arnold 2007 Depo. at p. 71-74 and at  Ex. 3.

### Denial of Request to Travel in Advance of the Student Career Experience Program (SCEP) Training and Orientation program

On or about June 9-11, 2003, plaintiff submitted a hand written travel request  for approval. Blue Ex. 18 at p. 2; Blue Ex. 17, Arnold e-mail dated 6/10/2003.   Plaintiff requested that she begin travel on June 12, 2003, for the SCEP training and orientation which would begin in Phoenix, Arizona on June 16, 2003. Blue Ex.18 at p. 2.).  On June 11, 2003, Kellye Drakeford, Executive Assistant to Ms.  Johnson, notified plaintiff that Ms. Johnson did not approve her travel beginning Thursday June 12, 2003, since the orientation did not begin until Monday, June 16, 2003.  Johnson approved plaintiff's travel beginning on Sunday, June 15, 2003. Blue Ex. No. 19.   Plaintiff talked with Ms. Johnson about this on the telephone on June 11; Ms. Johnson told plaintiff that she did not approve her travel because of budget considerations.  Arnold 2007 Depo. at p. 44.

### Letter of Counseling

 During a meeting on July 29, 2003, Ms. Johnson announced that she was restructuring the

Special Initiatives Group consisting of plaintiff, Steve Shafran and Marcie Brionnes. Johnson 2004 Investigative Interview at p. 11-12.  As part of the restructuring, Mr. Shafran and Mr. Briones were to be  moved to Washington, D.C., and Dr. Mike Brown would be laterally reassigned to Washington, DC, to supervise the Special Initiatives Group.  Plaintiff did not agree with Ms. Johnson's decisions and notified Ms. Johnson of her disagreement. Arnold 2005 Depo. at p. 24-26.   In response to hearing about Dr. Mike Brown's reassignment, plaintiff stated  "I'll be dammed." *Id*. at p. 26.

On August 1, 2003, Ms. Johnson issued plaintiff a letter of counseling for "Inappropriate Language and Abusive Behavior."  Blue Ex. 23.

### Reassignment of Dr. Mike Brown

The position to which Mr. Brown was being laterally reassigned was a new GS-14 supervisory position which Ms. Johnson created as a part of her restructuring of special initiatives.  Blue Ex. 21 at p. 1 box 11 & 21a, Position Classification Evaluation Statement;  Johnson 2004 Investigative Interview at p. 11-12.   The Major duties in the Position Description required the incumbent to supervise and manage the employment and diversity programs and program managers in the  Bureau of Land Management.  Blue Ex. 21 at p. 2-3, Major Duties and Supervisory Responsibilities.

### Plaintiff's Reassignment; Move to Another Office; Issuance of Performance Standards

On August 1, 2003, Ms. Johnson notified plaintiff that she would be reassigned from her position as Program Manger (SCEP ), GS-13,  to the position of Equal Opportunity Specialist, GS-13, with the organization title of Civil Rights Specialist, in the Office for Equal Employment Opportunity (EEO) effective August 10, 2003. Blue Ex. No. 7;  Arnold 2007 Depo. at p. 49-51.  The reason for the reassignment concerned the report of the U.S. Civil Rights Commission entitled "Ten Year Check Up: Have Federal Agencies Responded to Civil Rights Recommendations" which criticized the Department of the Interior and BLM for not employing a Civil Rights Specialist to handle Title VI issues. Blue Ex.

No. 7.   In an effort to correct this deficiency, Ms. Johnson notified plaintiff that she was reassigning her to Title VI because she had a background in Title VI.  *Id.*  Plaintiff had occupied the position of EEO Specialist Title VI from 1979-1981 in the Office of the Secretary.  Arnold 2007 Depo. at p. 6-8. When Ms. Johnson advised plaintiff of her transfer, plaintiff asked if she could "do both Title VI and keep my student employment position. . . .  So I offered to do both jobs."  Arnold 2007 Depo. at p. 50-51.  Ms. Johnson stated that doing both jobs was not an option.  *Id.* at p. 51.  There was no change in plaintiff's pay, grade or duty station. Blue Ex. 7.

As a result of her reassignment, plaintiff was given another office that was located down the hall from the office she was assigned to as Program Manager.   Arnold 2007 Depo. at p. 79.    She shared the office with a Junior Specialist from September 2003 until February 2004, when plaintiff went on detail.  Arnold 2007 Depo. at p. 78. While she was a Program Manager, plaintiff also had been assigned  shared office space.  Arnold 2007 Depo. at p. 78-79.  Plaintiff had shared an office woth Bill Nunn and later with Tracy Bodner.  Arnold 2005 Depo. at p. 38-39.  Plaintiff's telephone number also was changed..  Her old telephone number  was within the Special Initiatives Office.  *Id.* at p. 39-40.

On or about October 1, 2003, Michelle Stroman, Acting EEO Officer, gave plaintiff her performance standards for the Civil Rights position for the rating period October 1, 2003, to September 30, 2004. Arnold 2004 Inv. Interview at  p. 96-97.

## ARGUMENT

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C.Cir.1994). In determining whether a genuine issue of material fact exists, the trier of fact must

view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-

moving party. *Matsushita*, 475 U.S. at 587. The mere existence of a factual dispute, however, will not

defeat summary judgment. The non-moving party must show that the dispute is genuine and material

to the case. That is, the factual dispute must be capable of affecting the substantive outcome of the

case and be  supported by sufficiently admissible evidence that a reasonable trier of fact could find for

the non-moving party. *Anderson*, 477 U.S. at 247-48; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-

43 (D.C. Cir. 1987). If the evidence favoring the non-moving party is "merely colorable, or is not

significantly probative, summary judgment may be granted." *Id*. *(citing Anderson v. Liberty Lobby,*

*Inc*., 477 U.S. 242, 249-50 (1986)). "[A] complete failure of proof concerning an essential element of

the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is

'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

### Discrimination Claims

The procedure for resolving claims of discrimination such as the instant ones is well-

established. In the absence of direct evidence, a district court may rely on the *McDonald Douglas*

scheme for evaluating the plaintiff's case and determine if trial is necessary. Under the scheme first set

forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a

prima facie case of prohibited discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502,

506 (1993). If the employee succeeds, the employer then must articulate legitimate, nondiscriminatory

reasons for its actions. *See McDonnell Douglas*, 411 U.S. at 802. The  plaintiff then has an

opportunity to discredit the employer's explanation or otherwise demonstrate that  discrimination was a

motivating factor. *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998). The

plaintiff at all times retains the burden of persuasion. *McDonnell Douglas*, 411 U.S. at 802.

14

The Supreme Court has explained that the elements of a prima facie case of discrimination may differ from case to case. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981). The fundamental requirement, however, is that the prima facie case give rise to an inference that the defendant's conduct was discriminatory. *See Simens v. Reno*, 960 F.Supp 6, 8-9 (D.D.C. 1997). As a general matter, therefore, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) she was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *Aka*, 156 F.3d at 1288.

In age discrimination cases, a plaintiff must "demonstrate facts sufficient to create a reasonable inference that age discrimination was "a determining factor" in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C. Cir. 1982). An inference of age discrimination may be proven by showing: (1) she is 40 or over; (2) she was qualified for her position and was meeting her employer's expectations; (3) she suffered an adverse employment action despite her qualifications and performance; and (4) she was disadvantaged in favor of similarly-situated younger employees. *Baloch*, 355 F. Supp. 2d at 255.

A plaintiff must present substantial and credible evidence of discrimination in order to survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson,* 121 F.Supp.2d, 72, 77 (D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); *Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001).

15

Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000), *quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

**Retaliation Claim**

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates: (1) that she engaged in protected behavior, (2) defendant subjected her to a material adverse action, and (3) that a causal connection existed between the protected activity and the materially adverse action. *See E.E.O.C. v. Go Daddy Software,* 2006 WL 1791295, *6 (D.Ariz 2006); *Argo v. Blue Cross and Blue Shield of Kansas, Inc,.* 452 F.3d 1193, 1202 (10th Cir 2006); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 ( 2006); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985).   In defining a materially adverse action, the Supreme Court has ruled that

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

*Burlington,* 126 S.Ct. at 2415 (citations omitted).

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows that for a discrimination claim, i.e. the employer then must articulate legitimate, nondiscriminatory reasons for its actions.  The plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that retaliation was a motivating factor.

**Nature of Agency Action: adverse personnel action or a materially adverse action.**

**Discrimination Claims–Adverse Personnel Action**

In discrimination claims against federal employers a required element is some form of legally cognizable adverse personnel action by the employer.  *Brown v. Brody*, 199 F.3d 446, 453 (D.C.Cir.

1999); *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 17-18 (D.D.C. 2000 ). To establish an "adverse personnel action" there must be a significant change in the plaintiff's employment status-- such as failing to hire, firing, failing to promote, or a decision causing a significant change in benefits. *Id*.

Courts have further defined the concept of an "adverse personnel action" as one involving a **material** change in the aggrieved employee's employment status. A materially adverse change can be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993)*; compare with Flaherty v. Gas Research Institute* (7th Cir. 1994)(a "bruised ego" is not enough), *Koscis v. Multi-Care Mgt., Inc.,* 97 F. 3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties, or prestige insufficient), *Harlston v. McDonnell Douglas Corp.,* 37 F. 3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

To guard against "judicial micromanagement of business practices," courts do not recognize "interlocutory or mediate decisions having no **immediate** effect upon employment" as adverse personnel actions. *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)(the ultimate result of a performance evaluation is often speculative and should not be considered an adverse action if it does not affect an employee's grade or salary)(emphasis added) *citing to Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997). In short, to be considered adverse a personnel action must have a "direct, measurable, and immediate effect," upon the complainant. *Principi, supra* at 819.

**Retaliation Claims-Materially Adverse Action**

The Supreme Court has described the required element of a material adverse action as

follows:

> We conclude that the anti-retaliation provision does not confine the actions and harms
> it forbids to those that are related to employment or occur at the workplace. We also
> conclude that the provision covers those (and only those) employer actions that would
> have been materially adverse to a reasonable employee or job applicant. In the present
> context that means that **the employer's actions must be harmful** to the point that
> they could well dissuade a reasonable worker from making or supporting a charge of
> discrimination.

*Burlington Northern and Santa Fe Ry. Co. v. White*,  126 S.Ct. 2405, 2409 (2006)(emphasis added).

The Court stated that the retaliation must produce an injury or harm.

> The anti-retaliation provision protects an individual not from all retaliation, but from
> retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that
> a reasonable employee would have found the challenged action materially adverse,
> "which in this context means it well might have 'dissuaded a reasonable worker from
> making or supporting a charge of discrimination.' " *Rochon*, 438 F.3d, at 1219
> (quoting *Washington*, 420 F.3d, at 662).

*Id.* 126 S.Ct. at 2414 -2415.  The required harm must be material, i.e. significant to a reasonable

employee, and is to be judged by an objective standard. *Id.*  In *Totten v. Norton*, 421 F.Supp.2d 115,

(D.D.C. 2006), this Court recently noted that

> Although it is not necessary for a Title VII reprisal plaintiff to show that the "alleged
> retaliation affected his pay or benefits-in other words, an adverse action may involve
> something short of what ordinarily would be considered a "personnel action"– a
> plaintiff nonetheless must point to an action that has "*materially* adverse
> consequences" for him.  *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir. 2002); *see
> also Rochon,* at 1219 ("[M]ateriality is implicit in the term 'discriminate' as it is used
> in Title VII.");  *Brown v. Brody,* 199 F.3d 446, 457 (1999) (plaintiff must demonstrate
> "materially adverse consequences ... such that a reasonable trier of fact could conclude
> that the plaintiff has suffered objectively tangible harm"). ... The touchstone of
> materiality in this context, the D.C. Circuit has said, is whether the "employer's
> challenged action ... would have dissuaded a reasonable worker from making or
> supporting a charge of discrimination."  *Id.* at 1219.

*Totten* at 120-21.   In granting that defendant's motion to dismiss the retaliation claim, *Totten* also

stated that the Courts in this Circuit have held that purely psychic injuries -- e.g. embarrassment, public humiliation, loss of reputation, mere inconveniences --  do not qualify as adverse actions for purposes of  federal anti-discrimination statutes, noting that *Rochon*, at 1219 stated "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Totten*,  421 F.Supp.2d at 120 -121. In explaining the retaliation standard of "materially adverse" actions, the Supreme Court has stated  that

> We speak of material adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth "a general civility code for the American workplace.". . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington*, 126 S. Ct. at 2415 (citations omitted).  The Court also stated that the standard is to be objective.

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

*Burlington*, 126 S.Ct at 2415 (Citations omitted).

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Plaintiff claims that she made initial contact with an EEO counselor on August 4, 2003. Response to Interrogatory 3, ARogs at p. 14.

To properly raise a claim under Title VII, a federal employee must contact an EEO counselor within 45 days of the plaintiff's notification of the allegedly discriminatory event.  *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.1995);  42 U.S.C. §  2000e-16(c);  29 C.F.R. §  1614.105(a)(1).

This 45-day time limit is not jurisdictional, but operates as a statute of limitations defense. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). *Armstrong v. Reno*, 172 F Supp. 2d 11, 20 (D.D.C. 2001). *See also Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (filing period begins at time of alleged discrimination, not when its effects are later felt). Therefore, for plaintiff's Title VII and retaliation claims, any alleged discriminatory incidents that occurred prior to May 20, 2003, are barred because plaintiff did not consult with an EEO counselor within 45 days of the incident, as required by 29 C.F.R. § 1614.105(a)(1). *See* 2003 calendar.

To pursue an age discrimination claim a plaintiff must contact a counselor within 180 days of the alleged discriminatory act. 29 U.S.C. 626(d)(1).[2] Therefore, any alleged acts that occurred prior to January 5, 2003, are barred for age discrimination claims.

See the attached EEO Contact Chart which identifies by the word "bar" those claims for which plaintiff did not timely seek counseling.

**EXAMINATION OF PLAINTIFF'S CLAIMS**

**Retaliation Claims in general Causality -- Temporal Proximity**

In order to establish a prima facie case of retaliation, a plaintiff must show a causal connection existed between the materially adverse action and her statutorily protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). "The cases that accept mere temporal proximity between an agency's knowledge of the protected activity and [a materially adverse action] as sufficient evidence of causality to establish a

---

[2]Alternatively the plaintiff may file directly in federal district court in the first instance if 1) the employee gives the EEOC not less than 30 days' notice of intent to file such an action, and 2) such notice is filed within 180 days after the alleged unlawful act occurred. *See Thorne v. Cavazos*, 744 F.Supp. 348, 350 (D.D.C. 1990). Plaintiff has not present any evidence that such a notice was ever filed.

prima facie case, uniformly hold that temporal proximity must be 'very close.'" *Clark County School District  v. Breeden*, 532 U.S. 268 (2001), *citing Richmond v. Oneok, Inc*., 120 F.3d 205, 209 (10th Cir. 1997)(three month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(four month period insufficient); *Mayers v. Laborers' Health & Safety Fund of North America,* 478 F.3d 364, 369 (D.C.Cir.2007)(eight to nine month gap far too long).

In the instant case, plaintiff cannot establish a causal connection by a temporal link between her alleged protected activity and alleged acts of retaliation.  Plaintiff's complaint describes her prior protected activity as testimony before a Congressional Committee in 1997, and reporting a racial incident at the BLM Phoenix Training Center in 1998.  Complaint at p. 15.   In her responses to Interrogatories, plaintiff submitted a list of exhibits which plaintiff claimed related to her protected activity.  See ARogs at p.18-19, Interrogatory 9. Document number 27 is a March 12, 2002  letter and report which plaintiff stated pertained  to a committee plaintiff was on which worked with the EEOC.  Documents 27 and 29, letters dated December 4, 2003 and January 29, 2004,  are after the alleged acts of retaliation in this case.  Ex. 30 contains two affidavits from plaintiff dated: 10-28-97  re Masterson and 1-2-99 re Moore.  Plaintiff has offered no evidence that Ms. Johnson had knowledge of any affidavits plaintiff has provided on behalf of any employees.

The first alleged act of retaliation was the September 12, 2002 conversation concerning money laundering.  This act was 3-4 years after plaintiff's Congressional testimony and reporting on a racial incident in Phoenix.  It is 6 months after the March 12, 2002 letter and report which do not mention plaintiff; plaintiff has offered no evidence that Ms. Johnson was aware of this letter or plaintiff's committee work in relation to it.  Thus, plaintiff has failed to show any causal relationship between protected activity and any alleged acts of retaliation through temporal proximity.

**1. On September 12 and 19, 2002, July 18 and August 12, 2003, the Associate Director, Human Resource Management, Marilyn Johnson,  accused her of money laundering in relation to funding given to Langston University.**

Viewing the evidence in the light most favorable to plaintiff, on September 2 and 19, 2002 and July 18, 2003, Ms. Johnson asked plaintiff why she was laundering money to Langston University, and on August 12, 2003, Ms. Johnson used the term in relation to Langston in a meeting which plaintiff did not attend and which was conducted after plaintiff had been reassigned to the Title VI position.

Plaintiff has failed to establish an essential element of her claims of discrimination and retaliation.

First, Ms. Johnson's alleged accusations had no tangible adverse impact on Plaintiff's employment status nor was it otherwise a material adverse action.  Accusations are not enough to create an actionable employment decision on their own.  *See Mack v. Strauss*,  134 F.Supp.2d 103, 113 fn. 6  (D.D.C.2001):

> [E]ven "false accusations without negative employment consequences are not employment decisions actionable under Title VII." [*Childers v. Slater*, 44 F.Supp. 2d 8] at 20 [(D.D.C. 1999)].   Furthermore, public humiliation or loss of reputation alone does not constitute an adverse employment action. *See Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 885 (7th Cir.1989); *Probst v. Reno*, 2000 WL 1372872 (N.D.Ill. Sept.22, 2000); *Wanamaker v. Columbian Rope Co.*, 907 F.Supp. 522, 535 (N.D.N.Y.1995), aff'd, 108 F.3d 462 (2d Cir.1997).

*Mack v. Strauss*,  134 F.Supp.2d 103, 113 fn. 6  (D.D.C.2001).

Indeed plaintiff has admitted that the alleged verbal accusations caused her no harm:

> I did not go to the IG's Office as I told Marilyn I would **because at the time it was still a verbal accusation**.  **I had not suffered harm**, it just hung in the balance and I didn't know how she was going to use it.  So, I did not go because **I had not suffered an adverse impact**, but once she removed me from my job its all tied back to the agenda that she had when she came in 2002 to destroy the program and conversely (sic) destroy me.

Arnold 2004 Investigative Interview at p. 121 (emphasis added).  Thus, plaintiff admits that the only

arguable adverse action was her removal from her position and not mere verbal accusations.

Secondly, plaintiff has not established that race, sex, age or reprisal was the reason for Ms.

Johnson's actions.  As indicated above, plaintiff has testified that she believed that Ms. Johnson's

"agenda" was to destroy the HBCU program.  *See e.g.*  Arnold 2004 Inv. Interview at p. 18-19, 34-36.

(Plaintiff allegedly learned that Ms. Johnson "was not necessarily supportive of the HBCU Program

because, again, she always felt that she got there on her own merits, so everybody else should be

getting their on their own merit and that there should not be special programs, she looked at them as set

aside programs, to accommodate people of color. And she said that to me on several occasions.")    If

(hypothetically), Ms. Johnson's "agenda" was to dismantle the HBCU program, that agenda is not

evidence of intent to discriminate against plaintiff on the basis of sex, race, age or reprisal.  There may

well be good faith disagreement concerning the appropriateness of different types of set asides or

special accommodations programs.  Even if one disagreed with the alleged agenda of Ms. Johnson and

believed such an agenda to be bad, or contrary to good policy, it is not evidence of discrimination or

retaliation against plaintiff.  *See e.g. Aka v. Washington Hosp. Center*,  156 F.3d 1284, 1291

(D.C.Cir.1998)

> [L]et us consider a case in which the plaintiff . . . demonstrates that the real
> explanation for the employer's behavior is not discrimination, but some other
> motivation. For instance, in *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328 (8th
> Cir.1996), the plaintiff claimed that he had been fired because of his age. When his
> former employer came forward with a number of nondiscriminatory explanations,
> including insubordination, the plaintiff responded with evidence that in fact the real
> reason he had been discharged was that he had discovered that his firm was not in
> compliance with Securities and Exchange Commission rules and his employer wished
> to cover the problem up-a contention that the panel rightly concluded undercut the
> plaintiff's own claim of age discrimination. *See id.* at 1337-38; *cf. Hazen Paper v.
> Biggins*, 507 U.S. 604, 613, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that

"inferring age motivation from the implausibility of the employer's explanation may be problematic in cases where other unsavory motives, such as pension interference, were present."). If a plaintiff shoots himself in the foot, surely there is no point in sending the case to the jury. *See also Visser v. Packer Engineering Assoc.*, 924 F.2d 655, 657 (7th Cir.1991) (in banc) (observing that a plaintiff's evidence that he was fired because he was a whistleblower does not tend to show discrimination, and "tends if anything to show the opposite").

*Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1291 (D.C.Cir.1998).  Plaintiff alleges that the real reason for Ms. Johnson's questioning the Langston relationship and calling it money laundering, is Ms. Johnson's agenda to dismantle the HBCU program.  Arnold 2004 Inv. Interview at p. 18-19.  A motivation other than age, sex, race, or retaliation discrimination against plaintiff is insufficient to establish an essential element of plaintiff's claim.

**2.  By letter dated  March 26, 2004, Ms. Johnson notified the university that BLM was terminating its partnership initiative with the university.**

Although the decision to terminate the BLM agreement with Langston, may have been an adverse business action as to the University, it was not an action versus plaintiff Arnold, much less a material adverse action or material adverse personnel action.  Plaintiff's salary, grade, benefits, and commuting area were not changed by the decision to terminate BLM's relationship with Langston. Indeed the actual termination occurred several months after plaintiff was removed from her SCEP position.  Therefore, plaintiff has failed to establish evidence of an essential element of a discrimination or retaliation claim.

**3.  In May 2003, Ms. Johnson directed a subordinate to send an e-mail to all BLM state offices offering to reassign (transfer) the National Student Education Employment Program (NSEEP) to a state office.**

Plaintiff also has failed to establish how Ms. Stewart's sending a proposal, which was never implemented, materially adversely affected plaintiff, nor how it was designed to harass plaintiff.  The

e-mail affected none of the terms and conditions of plaintiff's employment.  The e-mail and the proposal were not even sent to plaintiff by Ms.Stewart or Ms. Johnson.  Plaintiff admits that the proposal was sent "without prior consultation with plaintiff."  Complaint at ¶25.  The only way plaintiff even learned of the proposal was because an officious individual in the field forwarded a copy of the e-mail to plaintiff.  Arnold Doc Request Response, Document 54.

Plaintiff's speculation of what might or could have happened if the proposal had been accepted by a state, does not establish a material adverse action.  There was simply no tangible negative consequence to plaintiff from the sending of the e-mail.  Therefore, she has failed to present evidence of an essential element of this claim.

**4.  On January 22, 2003, Ms. Johnson instructed a subordinate to delete an automated Student Employment/HBCU Recruitment Tracking System (SERTS) from the AD/HRM information data base.**

Plaintiff similarly has failed to present evidence that Ms. Johnson's  January 22, 2003 direction to delete SERTS materially adversely affected plaintiff in any manner.  It clearly was not an adverse personnel action since it did not affect the terms and conditions of plaintiff's employment.  Nor has plaintiff shown any material adverse action against her outside of work.

**5.  On Friday, July 18, 2003, at approximately 9:30 a.m.,  Ms. Johnson's secretary informed plaintiff that Ms. Johnson wanted a statewide program report from plaintiff for a 10:00 a.m. meeting.**

Plaintiff has failed to present evidence of a material adverse action pertaining to July 18, 2003.  Plaintiff testified that Ms. Johnson's assistant called plaintiff about 9:30 a.m. and told plaintiff that Ms. Johnson wanted a report for a 10:00 a.m. meeting.  Plaintiff called Ms. Johnson and

> A.    I told her I could not get that information to her by 10:00.
> Q.    And what did she say?
> A.    She said when can you get it to me?  I said I don't know.  Today is

Friday.  People have alternative work schedules.  I'll do the best I can.

    Q.     And what did she say?

    A.     **She said get it to me when you can.**

Arnold 2007 Depo. at p. 46-47.  Plaintiff called 14 field managers.  *Id*.  On July 21, 2003, plaintiff sent

an e-mail with the requested information report attached.  The report is a one page list identifying six

students.   See Arnold 2007 Depo at p. 71-74 and at  Ex. 3.

    Plaintiff was told to get the information to Ms. Johnson when she could.  Plaintiff only had to

contact 14 people and produced a simple, uncomplicated report.  Plaintiff has failed to show any

harassment or any adverse action by any objective standard.

    **6.  On June 11, 2003, plaintiff was advised that her request to travel to Phoenix on
Thursday, June 12 to prepare for SCEP training beginning on Monday, June 16 was denied, and
that she was only approved travel for June 15, 2003.**

    Plaintiff has not evidenced a material adverse action in not being allowed to go to Phoenix on

Thursday for a training session scheduled to begin on Monday.  Limiting work related travel does not

constitute a material adverse action.   Although plaintiff may have viewed the travel restrictions as an

inconvenience, they did not create a substantive change in the terms and conditions of her employment

or undermine her ability to perform the job. *See Crenshaw v. Georgetown University*, 23 F.Supp.2d 11,

16-17 (D.D.C. 1998).

    The adverse affect plaintiff has articulated is that "I flew out the day before, I was stressed to no

end.  I had not seen the notebooks, and I had not looked at the rooms that we were being placed in for

training."  Arnold 2004 Investigative Interview at p. 86.  In this age of computers, facsimile machines,

overnight mail and parcel deliveries, plaintiff's stress might well have been alleviated  if she had

obtained a copy or draft of the notebook prior to two days before the training session.  Moreover,

plaintiff admitted that she was working with the training center coordinator assigned to her

telephonically to do the logistics and that the training field trip was at a location where the training had been held before.  Arnold 2005 Depo at p. 48-51.  The only  result of not going out early was that "It wasn't as smooth as I wanted it to be, and this was the fourth year that I had conducted this training. So it should almost go flawless at this point. . . ."  Arnold 2004 Investigative Interview at p. 86.  Thus, plaintiff has not presented evidence of any material adverse action.

**7.  On August 1, 2003 plaintiff was issued a letter of counseling for inappropriate language and abusive behavior.**

Being issued a letter of counseling is not a material adverse employment action, and plaintiff has not presented evidence of how the act was otherwise materially adverse to her.  The letter of counseling does not amount to an adverse action as a matter of law. *See Brody*, 199 F.3d at 458 (stating that a letter of counseling and a lower performance evaluation did not constitute an adverse action because neither affected the appellant's grade or salary) and *see also Ware v. Billington,* 344 F. Supp. 2d 63, 75 (D.D.C. 2004) (counseling memorandum alone is not an adverse action).  Even false accusations without negative employment consequences are not employment decisions actionable under Title VII. *Mack v. Strauss*,  134 F.Supp.2d 103, 113 (D.D.C.2001).

**8.  On August 1, 2003 plaintiff was removed from the position "NSEEP/HBCU program manager" and reassigned to the position EEO Specialist, responsible for Title VI.**

Plaintiff alleges that she was discriminated against and retaliated against because she was removed from the position "NSEEP/HBCU program manager" and reassigned to the position EEO Specialist, GS-13.  Plaintiff has failed to establish essential elements of her claims.

First, plaintiff has failed to present evidence that at the time of her reassignment, she officially occupied a position "NSEEP/HBCU program manager."  The evidence in the record shows that in 1999, plaintiff received a non-competitive accretion of duties promotion from EEO Specialist GS 12 to

27

SCEP Program Manager GS 13.  See Notification of Personnel Action effective date 3/14/99; Ex. D2c,

SCEP Program Manager PD.  The position was neither supervisory nor managerial.  *Id.* at box 11

Declaration of D. Johnson at ¶2-4 .

In 2001, the HBCU program manager, Bill Nunn, died.  Arnold 2007 Depo. at p. 20.   His

position as HBCU Coordinator was at the GS-14 level.  Ex D2p (National Program Manager, HBCU

Position Description).  The position was neither supervisory nor managerial.  *Id.* at box 11.  Plaintiff

served in the position on a 120-day detail, which was a temporary promotion to GS-14 from July 16,

2001 to November 13, 2001.  Arnold 2007 Depo. at Ex. 4. The detail was rotated to Steve Shafran.  *Id.*

at p. 20-21.  After Mr. Shafran's 120-day promotion ended, Connie Stewart asked plaintiff to resume

the HBCU duties, but she did not give plaintiff another temporary GS-14 detail.  Although not

receiving additional pay, plaintiff continued doing the HBCU duties, along with her SCEP duties, until

August 2003 when she was reassigned to a Title VI position.  *Id.* at p. 22.  Thus, the evidence shows at

best, that in 2003 plaintiff was informally  "acting" as the HBCU Coordinator.  Plaintiff's temporary

promotion to HBCU Coordinator GS-14, ended November 13, 2001.  Arnold 2007 Depo. at Ex. 4.

Therefore, in 2003, plaintiff was the SCEP Program Manager, GS-13, and she has failed to present

evidence that at that time she was in the official position of HBCU Program Manager, GS-14.

Second, plaintiff has claimed that the SCEP Program Manager position, which she obtained by

an accretion of duties promotion, was a GS-13/14 position.  Plaintiff has not presented any official

personnel action showing that her position was a GS 13/14 or a GS-14.   The personnel notification

and position description reflect that the position only is classified as GS-13.  D. Johnson Dec. at ¶2,

3(second).  The pertinent department manual provision clearly defines a non-competitive accretion of

duties promotion as "A promotion resulting from an employee's position being classified at a higher

grade (**with no further promotion potential**) . . . ." 370 DM 335 at § 3.B.(3) (emphasis added). See

Johnson Dec. at ¶4 - 6.

Additionally, plaintiff has testified that she **believed** that her former boss, Warren Johnson had

the job reclassified, because plaintiff assumed Bill Nunn's HBCU duties. However, there is no

evidence that he in fact had the position reclassified to the GS-14 level. See Arnold statement in

LLM-04-002 at p. 14:

> And it was Warren Johnson's every intention to promote me into that job, which is why
> he recommended me for the promotion. I mean in writing. . . .That was October of
> 2001. . . That never happened, I never, there was a freeze when he made the
> recommendation. . . on hiring and promotions. So I didn't get the 14.

*Id.* The affidavit which plaintiff submitted from Mr. Johnson states

> I was **in the process** of upgrading Ms. Arnold's position of record to a permanent GS-
> 14, but due to a hiring freeze at the time, we were unable to upgrade the temporary
> promotion to permanent. I believe that Ms. Arnold's **position** had expanded in scope
> and duties and **warranted** the GS-full performance level."

Warren Johnson affidavit at ¶2.(emphasis added). Mr. Johnson's affidavit does not say that the

position had been classified or reclassified to the GS-14 level. Moreover, since there were other

program managers who also could have been assigned the higher level duties (like Mr. Schfran who

also rotated in the temporary GS-14 detail), the department's manual would have required the position

to have been filled competitively. 370 DM 335 at § 3.A.(6). Johnson Dec. at ¶5. Plaintiff has not

presented any personnel classification of her position to a GS-14 level. Therefore, she had failed to

present evidence establishing that her position in 2003 was at the GS-13/14 or 14 level. Since plaintiff

was not moved into a position with a lesser grade than the one she held, or with lesser promotion

potential, she had failed to show a material adverse action.

Third, laterally transferring plaintiff to the EEO Specialist Position was not a material adverse

employment action nor a materially adverse action.  Plaintiff was laterally transferred from a GS-13

SCEP Program Manager Position to a GS-13 EEO Specialist position with the assignment to set up a

Title VI program for the BLM.

A lateral transfer is not an adverse action unless there are some materially adverse

consequences affecting the terms, conditions, or privileges of her employment or her future

employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has

suffered objectively tangible harm. Mere idiosyncrasies are not sufficient to state an injury. *Stewart v.*

*Ashcroft*,  352 F.3d 422, 426 (C.A.D.C.,2003)(citing Brown, 199 F.3d at 457.);  *Taylor v. Small,* 350

F.3d 1286, 1293 (D.C.Cir.2003);  *Rattigan v. Gonzales,*  2007 WL 1577855, *10 (D.D.C.,2007);

*Burlington Industries, Inc. v. Ellerth*,   524 U.S. 742, 761 (1998).

Plaintiff has not offered evidence that her lateral transfer involved a significant change in

responsibilities causing significant tangible harm to plaintiff.  Plaintiff's position was not supervisory;

therefore she suffered no loss of supervisory responsibilities.  Plaintiff has offered no proof that the

position into which she transferred was in any other manner an adverse employment action, or would

have been materially adverse to a reasonable employee.  For example, plaintiff has not offered

evidence that the position required lesser skills (a deskilling of her job) or gave her significantly

diminished responsibilities.

Plaintiff has testified that other than knowing that she was supposed to start a Title VI

program, she had "no idea" what  she was supposed to do in the Title VI position. Arnold 2007 Depo

at p. 22-23:

> Q.    Okay.  And what were you supposed to do in that position, that Title VI
> position?
> A.    According to management, I was supposed to start a program.

Q.      What kind of program?

A.      Title VI program.  I had no idea.

Q.      Well, would it have been like the Title VI program that you worked in when you were an EEO Specialist?

A.      I have no idea.  It was never -- there was never a conversation about what I would do in that position.

Q.      With anyone?

A.      With anyone.

Q.      Who was your direct supervisor?

A.      Marilyn Johnson.

Q.      You never had any conversations with her?

A.      Never had a conversation with Marilyn Johnson about what I would do in that position.

         * * *

BY MS. FIELDS:

Q.      Did you have any conversation with Ms. Stroman about what you would be doing in that position?

A.      I met with Michelle Stroman when she gave me a position description and performance standards for the position.

Q.      And what occurred then?

A.      She asked me to sign it and I refused to.

Q.      Did you have any conversation with her about what you were supposed to be doing in that position?

A.      I asked her for all supporting documents, files, for the program.

Q.      And what happened?

A.      She said there were none.

Q.      And then what happened?

         * * *

WITNESS:  Nothing.


         * * *

BY MS. FIELDS:

Q.      At this time did you receive any training in Title VI in 2003?

A.      I went to a one day workshop, but it was not training.

Q.      What was in the workshop?

A.      They were doing presentations on what Title VI was at the departmental level.  They were still trying to define what their responsibility was at the departmental level and how the bureaus would interface with the Department.

Q.      When you say how the bureaus would interface with the Department, what do you mean?

A.      Well, all bureaus didn't have Title VI responsibility, so they were talking about who would happen (sic) Title VI complaints when they would be filed against the Department and what bureaus had responsibility for implementing or investigating, I

guess, Title VI complaints.

   Q. Was it your understanding that as part of your duties as a Title VI Specialist, under the new duties, that you would be investigating Title VI complaints?

   A. No.  Are you asking me were those part of my new duties?

   Q. Yes.

   A. I don't know what my new duties were.

*Id*. at p. 22:24-25:17.  Plaintiff further testified as follows:

   Q. Now this indicates -- the one, two, three, fourth paragraph.  It says in accordance to your position description and performance standards, one of your responsibilities is to develop policies and procedures to ensure that the BLM can enforce Title VI, is that correct?

   A. Yes.

   Q. And you received this on October the 23rd?

   A. Um-hum.

           * * *

   BY MS. FIELDS:

   Q. And what was your understanding as to what you were supposed to do to develop policies and procedures to ensure that BLM could enforce Title VI?

   A. I had no understanding.

   Q. Then are you indicating that nothing from your previous experience as a Title VI EEO Specialist gave you any inkling of what your duties were supposed to be?

   A. Only if I were to go out and do compliance reviews did I have an understanding of the program.

   Q. So your understanding -- so if you were to do compliance reviews?

   A. Right.

   Q. Did you ask anyone whether or not you were supposed to do compliance reviews?

   A. No, I didn't.

*Id.* at p. 29:13-p. 30:15.

Plaintiff testified that she got no enlightenment concerning what her new functions, duties and responsibilities were  through training.  Plaintiff testified that she went to a training session and did not have any conversation with anyone at the meeting about what should be in a Title VI program.  *Id.* at p. 30-31.  Plaintiff was offered training and a detail opportunity to learn about Title VI, but she did not take those opportunities:

Q. . . .This also indicates BLM is willing -- willingly it says -- is willing to meet with you to discuss training opportunities, details or any other resources that you believe you need to assist in developing the BLM's Title VI program. Did you attempt to find any other training opportunities, details or other resources to learn about Title VI?

A.       I looked into the possibility of a detail with the Office of the Secretary, Melvin Fowler.

Q.       And what would be that detail?

A.       A detail to the Title VI office.

Q.       Okay. And what happened?

A.       I didn't go on it.

Q.       Why not?

A.       Because I took another detail.

Q.       Okay. Did you talk to Mr. Fowler about a detail to his office?

A.       I talked to Mr. Fowler just about program requirements. I would talk to him regularly.

Q.       And did you ask him if you could do a detail to his office for Title VI?

A.       That was always an option.

Q.       So you did talk to him?

A.       Yes, I did.

Q.       Okay. And he said it would be okay?

A.       Yes.

Q.       And did you take him up on trying to get a detail to his office to do Title VI?

A.       No, I did not.

Q.       Okay. Did you attempt to find any other training opportunities in Title VI?

A.       No, I did not.

*Id. at p.* 35:5-36:10.

It is clear that plaintiff had no intention of trying to find out what her duties in the new position were supposed to be and no intention of taking on any duties in the new position. Plaintiff relates that the following occurred on October 1, 2003, when she got her performance standards from Michelle Stroman:

At that meeting I said, Michelle, this further supports that there is no Title VI program. So, what am I expected to do? She said, Romella, we want you to build a program. I said, hell, I built the one I was in. I said, what incentive would I have to build a program, with Marilyn's premise she can just take me out of it because she has the prerogative and then put someone else in it and pay them more money. I don't think so. . . . ."

Ex. D2 at p. 99-100.

Although plaintiff officially was in the Title VI position from August 2003 until February of 2004 when she went on a detail, plaintiff never did any substantive Title VI work. When asked what she did for the six month period, plaintiff replied that she was on leave most of the time. *Arnold* 2007 Depo*. at p. 36. She was on leave September, October, November and parts of December. *Id.* Plaintiff came back to work at the end of the Christmas holidays and "I attended Christmas parties." She did no substantive work. *Id.* at p. 38-39. At the end of December into January "I resumed following up to take care of my work life. . . .I sought to get out of that office." *Id*. at p. 39. She requested and was given a detail. *Id.* at p. 40-41.

To be considered adverse, a personnel action must have a "direct, measurable, and immediate effect upon the complainant. *Principi*, 257 F.3d at 819. The Supreme Court in *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2417 (2006) clearly stated:

> To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' "

The Court emphasized that

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here. *See, e.g., Suders*, 542 U.S., at 141 . . . (constructive discharge doctrine); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 . . . (1993) (hostile work environment doctrine).

*Id*. 126 S.Ct. at 2415.

Plaintiff has not presented any evidence showing a direct and measurable effect on her job

duties and responsibilities.  She has not offered any objective evidence raising a genuine issue by which any reasonable juror could find that she suffered objective harm.  If plaintiff did not know, and as of 2007 does know what her duties and responsibilities were supposed to be, if she did not learn what they might be by taking training, talking with others who occupied similar positions or going on a Title VI detail, if she did not know if she would have been doing work similar to the Title VI work she did years before, and if she never engaged in Title VI duties after she was officially transferred, how can she compare those unknown duties and responsibilities to those of her SCEP position.  On what basis can she say the job was worse and not better?  On what basis could a juror find the new position was materially worse than the SCEP Program manager position?

Plaintiff is unlike the plaintiff in *Burlington* who knew the functions of the position into which she was transferred and thus offered evidence that it was more arduous and dirtier and was objectively a worse job.  *See Burlington*, 126 S.Ct. at 2417.  Since plaintiff says she does not know what her duties and responsibilities were supposed to be, she also is unlike the plaintiff in *Czekalski* who raised a genuine issue as to whether a lateral reassignment left her with "significantly different" - and diminished - supervisory and programmatic responsibilities, by pointing out those differences. *Czekalski*, 475 F.3d at 364.  Thus, since plaintiff claims that as late as January 29, 2007, she does not even know what her functions, duties and responsibilities were to be, she cannot meet her burden of showing any adverse consequences from the transfer.  That plaintiff preferred her SCEP position is not evidence that the transfer was materially adverse.

Additionally, since plaintiff never actually did the Title VI job, she has shown no material adverse effect on her.  She never did the Title VI job and was given a detail to another position as she requested.

**9.  A younger male, Michael Brown, allegedly replaced plaintiff as ""NSEEP/HBCU program manager."**

Plaintiff claims age and sex discrimination because a younger male, allegedly replaced her as NSEEP/HBCU Program Manager.  As is indicated above, plaintiff has failed to prove that she officially was NSEEP/HBCU Program Manager GS-14.  At best, plaintiff was acting informally as HBCU program Manager without benefit of a temporary promotion to the GS-14 level.[3]

The position to which Mr. Brown was being laterally reassigned in 2003 was a new GS-14 supervisory position which Ms. Johnson created as a part of her restructuring of special initiatives. Blue Ex. 21 at p. 1 box 11 & 21a, Position Classification Evaluation Statement; Blue Ex.6 (Johnson Investigative Interview at p. 11-12.   The Major duties in the Position Description required the incumbent to supervise and manage the employment and diversity programs and program managers in the  Bureau of Land Management.  Blue Ex. 21 at p. 2-3, Major Duties and Supervisory Responsibilities.  Plaintiff's position as SCEP Program Manager was not a supervisory position; the HBCU position was not a supervisory position.

Plaintiff's position as SCEP Program manager was a GS-13.  Mr. Brown's grade was a GS-14.

_____

[3]    Assuming hypothetically that plaintiff had been acting in such a position without a promotion to GS-14, the title of Acting does not create any expectancy that failure to be named permanent Chief constitutes a demotion.  *Taylor v. F.D.I.C*,.  132 F.3d 753, 764 (D.C.Cir.1997). ("[W]e do not believe that temporary designation as acting section chief is one of the "terms, conditions, or privileges of employment" compassed by the Act. 12 U.S.C. § 1441a(q)(1). The phrase "terms, conditions, or privileges of employment" is identical to the language of Title VII, 42 U.S.C. § 2000e-2(a). Courts applying Title VII have consistently focused on "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating ... [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions...." )

Plaintiff was not similarly situated to Mr. Brown, because she was not a GS-14.  Therefore, plaintiff

has failed to show that she was disadvantaged in favor of a similarly situated younger employee.

Plaintiff has failed to present any evidence of a material adverse personnel action pertaining to the

lateral transfer of Mr. Brown, nor has she otherwise shown a material adverse action.  She has failed to

establish an essential element of her discrimination/retaliation claim.

**10.  On October 1, 2003 plaintiff was presented with performance standards for the Title VI EEO Specialist position which Ms. Johnson knew plaintiff would be unable to meet.**

Plaintiff has shown no adverse action from merely being given performance standards.

Because plaintiff did not do anything in the position and the went on a detail, whether or not plaintiff

would have failed under the standards is shear speculation.

**11.  That on or about September 3, 2003, Ms. Johnson gave plaintiff two days to move office space.**

Plaintiff testified that on September 3, 2003 Michelle Stroman told plaintiff that she had two

days to move to another office.  Arnold 2004 Investigative interview at p. 90.  Plaintiff called Marilyn

Johnson and:

> Marilyn Johnson called me back and I said I understand you want me to move my
> office, but I'm not going to be able to move within the time frame that has been told me.
> She says, when can you move?  I said, Tuesday after I return to work, because I had
> scheduled to be out on sick leave.  She says, oh, well, that's fine. . . .  She said it was
> no problem, I could move when it was my -- to my convenience

*Id*. at p.  91.

Plaintiff has not presented evidence showing this to be a material adverse action.

**12-13.  That plaintiff was moved into office space smaller than her previous office and she had to share the space with a junior EEO Specialist.  ARogs at p. 9-10; That she was not allowed to retain her telephone number when she moved.**

Plaintiff has failed to present evidence that moving into smaller office space or getting a new telephone was materially adverse.  See, *Carmona v. Snow*, 2007 WL 915220 , *9 (D.D.C. 2007) (Smaller office space not an adverse employment action unless it is a materially adverse change in the terms and conditions of employment which "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."); *Weber v. Hurtgen,* 297 F. Supp.2d 58 D.D.C. 2003) Plaintiff previously has shared space with co-workers, and did so when moved.

**14.  That from September 12, 2002 through approximately October 1, 2003,   Ms. Johnson created a hostile work environment based on the acts described above.**

> To prevail on [a hostile work environment claim], [a plaintiff] must show that the [employer] subjected him to "discriminatory intimidation, ridicule, and insult" of such "sever[ity] or pervasive[ness] [as] to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64. . .(1986)).

*Hussain v. Nicholson*,  435 F.3d 359, 366 (D.C.Cir.2006).  Beyond simply a mechanical test, courts judge the workplace conditions by looking at the totality of the circumstances.  These factors include the frequency of the conduct in question, its severity, its offensiveness, and its impact on work performance.  *See Faragher v. City of Boca Raton*, 524 U.S. 774, 787-88 (1998); *Raymond v. United States Capitol Police Board*, 157 F.Supp. 2d 50, 58 (D.D.C. 2001).

Vital to a claim is the connection between the alleged hostility and a plaintiff's protected status. "Everyone can be characterized by sex, race, ethnicity, and many bosses are harsh, unjust, and rude.  It is therefore important in hostile environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals."  *Bryant v. Brownlee*, 265 F.Supp. 52, 63 (D.D.C. 2003)

(citing *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). The Supreme Court has stated its hope that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

Individually, each act alleged by plaintiff fails to establish a successful discrimination or retaliation claim. Likewise the environment as a whole created by Ms. Johnson cannot be said to be one of severe and pervasive hostility that is full of discriminatory intimidation, ridicule, and insult such that the conditions of employment have been altered. *See Harris*, 510 U.S. at 21.

Plaintiff admits that during the time Ms. Johnson was her supervisor she met or spoke with Ms. Johnson only about eight times. Arnold 2007 Depo at p. 41. Those meetings were:

1.   September 12 and 19, when she alleges Ms. Johnson accused her of moneylaundering. *Id*. at p. 41-42.
2.   A meeting to discuss the SERTs Data tracking system also attended by Gail Colbert, in which plaintiff was told what she needed to submit to the ITIB. *Id*. at p. 42.
3.   A telephone conversation in which Ms. Johnson told her she could not go to the Phoenix training early due to budget considerations. *Id. at p*. 43-44.
4.   A July 18, 2003 telephone conversation about Ms. Johnson's request for data in which Ms. Johnson told plaintiff to "get it to me when you can." *Id*. at p. 46
5.   A face to face meeting during which Ms. Johnson told plaintiff she was "not comfortable with Langston" and asked why they were laundering money to Langston. *Id*. atp. 46-47.
6.   A July 30 tele-conference concerning the pending re-structuring of Special Initiatives. *Id*. at p. 48-49.
7.   August 1, 2003 meeting in which plaintiff was given letter of counseling and told she was being reassigned to develop a Title VI program for BLM. *Id*. at p. 49-50.
8.   Telephone conversation in which Ms. Johnson told plaintiff she could move at her convenience. Arnold 2004 Investigative Interview at p. 91.

Ms. Johnson never made any derogatory comments to plaintiff concerning her age, sex, or race. Arnold 2007 Depo. at p. 51-52. In none of plaintiff's recountings of meetings or conversations with Ms. Johnson does plaintiff describe any derogatory comments concerning her protected activity, or statements of ridicule, intimidation or insult. All plaintiff points to as evidencing discriminatory

animus is Ms. Johnson's use of the term money laundering. ARogs at p. 23-24, Interrogatory 10. This is certainly not a comment on a protected category or evidence of discriminatory animus. The other acts complained about, such as the removal of SERTs, consideration of the lead state concept and the decision to end the relationship with Langston were business decisions having no effect on the terms and conditions of plaintiff's employment.

Taking all inferences in plaintiff's favor, these incidents and the other acts alleged by plaintiff do not demonstrate acts so sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's workplace. *See Alfano v. Costello*, 294 F.3d 365, 379-380 (2nd Cir.2002)(comparing cases where *Harris* hostile work environment standards were met and not met); *Cross v. Small*, 2006 WL 2819758, *11 -12 (D.D.C.2006). *See also Oshiver v. Norton*, 2005 WL 3454336, *17 (D.D.C. 2005) affirmed on motion for summary affirmance by *Oshiver v. Kempthorne*, 2006 WL 3986351, *1 (D.C.Cir. 2006):

> The standard for determining a hostile work environment is intentionally "demanding to ensure that Title VII does not become a 'general civility code." ' *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80, . . . (1998)).

*Oshiver*, 2005 WL 3454336, *17.

Here, plaintiff has not submitted evidence of any acts or statements of discriminatory intimidation, ridicule, and insult. She has submitted no evidence of any act or statements which were abusive or harassing by any objective standard. She has not submitted evidence of acts so sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's workplace. The evidence in the record does not meet the demanding standard required to sustain a prima facie case of hostile work environment. Plaintiff has failed to submit evidence of an essential element of this claim and has failed to establish a prima facie case of hostile work environment.

**Conclusion**

Since plaintiff has failed to establish an essential element of each of the claims discussed above, the defendant is entitled to summary judgment on each claim as a matter of law.   *Celotex Corp.*, 477 U.S. at 32-23.

> **In the Alternative, Even If Plaintiff Can Establish a Prima Facie Case of Race, Reprisal, Age, Sex or Hostile Work Environment Discrimination, the Defendant Has Articulated a Legitimate, Nondiscriminatory Reason for its Actions**.

Under the *McDonnell Douglas* framework, once plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802.   In meeting its burden, the defendant need only produce reasons and "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.   Despite the shifting burdens, the Court has made clear that the ultimate burden of persuading the trier of fact that the defendant committed intentional discrimination rests with the plaintiff. *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert denied*, 540 U.S. 881 (2003).

In the instant case, the defendant has articulated legitimate, nondiscriminatory reasons for its actions.  With respect to the money laundering statement, Ms. Johnson used the term to describe the BLM/Langston arrangement.   Blue Ex. 9, Felder Inv. Interview at p. 6-7; Blue Ex. 5, Stewart Inv. Interview at p. 7.   As plaintiff  admits, regulations did not permit BLM to pay for the housing of employees. Mat. Fact 20.  The agreement with Langston was used as a mechanism to get housing money to student employees and circumvent the "barrier" of the regulation, by giving the money to Langston and having Langston then give the money to students as a stipend.  Mat Fact 21-23.   As the new Director, with responsibility for the funds being issued to Langston out of BLM's budget, it was

entirely proper for Ms. Johnson to question and try to understand whether or not the arrangement was appropriate.  Ms. Johnson did not intend to use the term as  an accusation of criminal wrong doing by plaintiff, but as a characterization of how the use of the funding of the Langston stipends were perceived by her.  Defendant does not dispute that plaintiff may have perceived the statements as accusations against her.  However, both Ms. Felder and Ms. Stewart confirm that the use of the term moneylaundering was not perceived by them as a accusation against plaintiff, but was directed to BLM's use of funds with Langston.

With respect to the dismantling of the SERTS.  BLM had expended $70,000 in the project, but it was still not fully operational.  Mat Fact 32; Johnson Inv. Interview at p. 8-10.  Ms. Johnson directed that SERTs be deleted in January because she was advised that business case had been presented to the ITIB.  Id.  After directing that the program be deleted,  Ms. Johnson and Gail Colbert met with plaintiff and plaintiff was told what she should submit the business case to the ITIB. Mat Facts 42-43.   Despite this meeting, and further correspondence with Kurt Ballentyne, plaintiff failed to submit the required reports on time.  Mat. Facts 47-48.  The ITIB made the decision to remove the SERTS because plaintiff had not complied with quarterly reporting requirements causing the system to receive an unfavorable rating in "scope, schedule and budget."  Id. at 49-51.  It was entirely proper for Ms. Johnson to require compliance with the requirements of the ITIB process.

With respect to the proposed transfer of the National Student Program, it is entirely proper and within the discretion of management to seek input for any proposed actions.  This proposal was not effectuated.  It is entirely proper for management to discuss proposals which individual employees may not like or agree with.  The proposal was not directed to plaintiff by Ms. Johnson and was not discussed with plaintiff by Ms. Johnson.  That plaintiff learned of the proposal through other sources,

is not an act of defendant. See Mat. Facts 27-28.

With respect to the denial of the request to travel in advance to the SCEP training and orientation program, Ms. Johnson  believed that travel on Sunday, June 15, 2003, was appropriate and more cost effective since the conference did not begin until Monday, June 16, 2003.  As the former Director of the Training Center, she did not believe that plaintiff needed to travel on Thursday, June 12, 2003, because the BLM Training Center staff composed the training, the agenda and handled the logistics.  Johnson 2005 Depo. at p. 96-97).  Furthermore, plaintiff did not need to travel days in advance because she had been coordinating the training for four years and was therefore familiar with the program.  Since Ms. Johnson obtained her position, she has only allowed employees the ability to travel to the SCEP orientation training on the day before it is scheduled to begin.  Blue Ex. 26-27).

With respect to the reassignment of plaintiff, the U.S. Civil Rights Commission criticized BLM for not having a Civil Rights Specialist to handle Title VI issues.   The U.S. Commission on Civil Rights Commission evaluated federal agencies' progress in the area of Civil Rights.  On May 20, 2003, in its draft report,  the U.S. Commission on Civil Rights stated that BLM needed a Title VI  program, and disagreed with the Department of the Interior's Office for Equal Employment Opportunity's (OEO) claims that BLM did not need a Title VI program since it relied on the National Park Service's Title VI program.  Blue Ex. 28 at p. 111.  In response to the Department's OEO's claims, the U.S. Commission on Civil Rights Commission stated that

> despite OEO's claims, BLM must have distinct duties from NPS and other federal agencies or there would be no need for its existence.  Accordingly, its federal funding recipient and programs' beneficiaries must be distinct, at least on some level, from those of NPS and other federal agencies.  It only follows that **BLM needs to implement a Title VI compliance and enforcement program** geared toward its recipients, and not depend on NPS and other agencies to ensure compliance on the part of its recipients because they may not possess the ability to do so."

*Id.* (emphasis added).
    .

        In an effort to correct this deficiency noted by the U.S. Commission on Civil Rights in this draft

report, Ms. Johnson decided that a Title VI program should be developed in BLM .  She reassigned

plaintiff effective August 10, 2003.  Plaintiff had experience in Title VI and had occupied the position

of EEO Specialist (Title VI) from 1979 to 1981 in the Office of Compliance, U.S. Department of the

Interior.  Ms. Johnson tasked her Acting Equal Employment Officer, Michelle Stroman, to talk with

Melodee Stith about permission to fill a new position.  Stroman Dec. at ¶ 4.  Ms. Stroman told Ms.

Johnson that the permission had been given.  *Id.*

        Since plaintiff was moving to a different organization within the Bureau of Land Management,

she had to move to another office and was given another telephone number.   Ms. Johnson did not

direct what office plaintiff should be given, nor was she involved in the decision of who kept or did not

keep their telephone numbers.  *Id.* at ¶ 9-10.

         During this same time period, Ms. Johnson also announced the restructuring of the Special

Initiative Programs.  Ms. Johnson created a position to supervise the Program Managers. Johnson Inv.

Interview at p. 11-12.  The supervisory position was classified as a GS-14, and Dr. Brown, who was

already a GS-14, was laterally reassigned.  Johnson 2005 Depo. at p. 28-29

        Ms. Johnson  gave plaintiff a letter of counseling for using inappropriate language in a staff

meeting.  Plaintiff admits that she used the word "damn" in a tele-conference staff meeting in response

to Ms. Johnson's announcement that she was reassigning Dr. Brown to lead the Special Initiatives

Group. Mat. Fact at p. 57.

Conclusion

44

Defendant's motion for summary judgment should be granted and plaintiff's complaint should be dismissed.

Respectfully submitted,

_____

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____

RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970


Counsel for Defendant

OF COUNSEL
PATRICIA ARMSTRONG HARGRAVE
Office of Solicitor
Division of General Law
U.S.Department of the Interior

45