UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROMELLA J. ARNOLD )<br>    Plaintiff, )<br>        v. )<br> )<br>GALE NORTON, DEPARTMENT )<br>OF THE INTERIOR, )<br> )<br>    Defendant. )  | Civil Action No. 05-CV-01475 (RWR) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Defendant, Dirk Kempthorne, Secretary of the U.S. Department of the Interior, hereby respectfully submits this statement of material facts as to which there is no genuine dispute.[1]

1. Plaintiff started her employment with the Department of Interior in about 1973 as a co-op student. Arnold 2007 Depo. at p. 6. In 1975, she came aboard full time as an EEO Specialist in the Office of the Secretary. *Id*. Plaintiff worked as an investigator, and Compliance Officer in Title VII and Title VI enforcement. *Id*.

2. Plaintiff worked in the Title VI area for approximately two years. Plaintiff explained her Title VI work as follows

> Q. And what did you do in the Title VI area?
> A. Title VI, we did Title VI compliance reviews. We would go out to state and local governments to review grantees that were recipients of federal financial assistance, for instance, state and local park recipients under Title VI.
> Q. What is Title VI?. . . .
> A. Title VI is actually the review and compliance of federal and state

---

[1] Defendant's first argument in its motion for summary judgment is that plaintiff has failed to present evidence of essential elements of her claims, and thus, has failed to establish a prima facie case. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

> programs that also involve educational institutions that received grants, state and local governments that receive grants. Like the National Federal -- National Fish and Wildlife Conservation Association is a recipient of the federal dollars, for example.
> Q. And you would review them for compliance with what?
> A. To make sure when they received federal financial assistance they were in compliance with Title VII laws, that their staffing was in compliance with Title VII, that they had affirmative employment programs, that they were promoting women and people of color at the same grade as non-people of color, so they had to be in compliance with Title VII in order to receive Title VI grants. And then a lot of Title VI was about the usage of facilities by the public, so it enforced like accessibility to public land or public facilities.
> Q. Handicap accessibility?
> A. Yes, handicap accessibility, accessibilities as far as crossing race lines. Like I know one time I did a compliance review in Chicago and Chicago's very full of --
>
> * * *
>
> A. Chicago is a very polarized city in that ethnic groups pretty much live and congregate where they live. They, therefore, use facilities in their immediate communities. So I did a compliance review to make sure that persons from other communities have access to use the facilities in other communities such as recreation facilities, community centers, et cetera.

Arnold 2007 Depo. at p. 6-8.

    3. In 1987, plaintiff went on detail as a Program Specialist at the Office of Historically Black College and University Programs. *Id*. at p. 8-9. The detail evolved into a permanent position in which plaintiff remained until 1996. *Id.* at p. 9-11. Her grade level was GS-12. *Id.* at p. 11. In 1996, due to a reduction in force (RIF) plaintiff returned to the Office of the Secretary where she did Title VII work for approximately one year. *Id.* at p. 11-12.

    4. In 1997, plaintiff moved to an EEO Specialist position at BLM. *Id.* at p. 14. In 1998, plaintiff was asked to take on the duties and responsibilities of the National Student Employment Program Manager. *Id.* at p. 14-15. The duties of that position included running the Student Temporary Employment Program (STEP) and the Student in Career Employment Program (SCEP). *Id.* at p. 15-16.

5. By a personnel action effective 3/14/99, plaintiff received a non-competitive accretion of duties promotion from EEO Specialist GS 12 to SCEP Program Manager GS 13. See Notification of Personnel Action effective date 3/14/99, and Ex. D2c, SCEP Program Manager PD. The position was neither supervisory nor managerial. *Id.* at box 11. Declaration of Dahlene Johnson (D. Johnson Dec.) at ¶ 2.

6. Department of the Interior, Departmental Manual Effective Date: 6/9/99 (DMM) provides at 370 DM 335 in pertinent part as follows:

> 3. Application of Competitive Procedures.
>
> A. Competitive procedures apply to the following actions:
> * * *
> (6) Promotions due to the addition of substantive, new and higher-graded duties when the new position is not a clear successor to the old position or there are other employees serving in similar or identical positions within the organizational unit to whom the new duties could have been assigned
>
> B. Competitive procedures do not apply to the following actions:
> * * *
> (3) A promotion resulting from an employee's position being classified at a higher grade (with no further promotion potential) because of additional duties and responsibilities, commonly known as accretion of duties. The noncompetitive upgrade requires the employee to continue to perform the same basic function in the new position that is a clear successor to and absorbs the duties of the old position. In addition, there are no other employees within the organizational unit to whom the additional duties and responsibilities could have been assigned.

D. Johnson Dec. at ¶ 6.

7. The SCEP Program Manager position was part of an initiative arising due to an Executive Order requiring the federal government to do business with minority colleges and universities as well as majority institutions. The initiative included recruitment of students for employment in the federal government, faculty exchanges, and giving minority institutions the opportunity to participate in grant and contract opportunities. Arnold 2007 Depo at page 17. In

1999, the initiative was moved from the supervision of the EEO Office to being directly under the supervision of the Office of the Associate Director, Mr. Warren Johnson. *Id.* at p. 15-16. In addition to plaintiff's program, the initiative included the following programs : Hispanic Serving Institutions, Asian and Pacific Island Colleges and Universities, Native American Colleges and Universities, Students With Disabilities, the Diversity Intern Program, Historically Black Colleges. *Id.* at p. 16-17. Those programs were run by program managers whose duties included recruiting students in their particular targeted population. *Id.* at p. 17-20.

> Those recruiters would go out and recruit the students, and then they would become either a SCEP student or a STEP student, and then I would provide the orientation training for all of the students and then track the students through their progression.
> In the SCEP program we paid students' tuitions, we paid their travel, and we also gave them an initial living stipend to be relocated to their job. If they relocated to a position that was 50 miles outside of their -- radius, they got a stipend.
> So the recruiters would recruit those students and then they would feed into either a SCEP position or a STEP position, and then I managed the students in that program throughout their . . . education.

*Id.* at p. 18.

7. When plaintiff started, the Program managers were Marci Briones -- Hispanic Serving Institutions; Steve Shafran –Asian and Pacific Institutions and Students with Disabilities; John Matis -- Native American; Bill Nunn -- Diversity Intern Program and Historically Black Colleges and Universities (HBCU); and plaintiff -- SCEP. *Id.* at p. 19-20.

8. In 2001, Bill Nunn died. Arnold 2007 Depo. at p. 20. His position as HBCU Coordinator was at the GS-14 level. Ex D2p (National Program Manager, HBCU Position Description). The position was neither supervisory nor managerial. *Id.* at box 11. Plaintiff served in the position on a 120-day detail, which was a temporary promotion to GS-14 from July 16, 2001 to November 13, 2001. Arnold 2007 Depo. at Ex. 4. The detail was rotated to Steve

Shafran. *Id*. at p. 20-21. After Mr. Shafran's 120-day promotion ended, Connie Stewart asked plaintiff to resume the HBCU duties, but she did not give plaintiff another temporary GS-14 detail. Plaintiff continued doing the HBCU duties, along with her SCEP duties, until August 2003, when she was reassigned to a Title VI position. *Id*. at p. 22.

**Alleged Protected Activity**

9. Plaintiff states that she has engaged in protected EEO activity since 1994 or 1995, when she became a charter member and Vice President of the National Association for the Advancement of Black Federal Employees (NAABFE). The organization was formed to address complaints of racial discrimination within the Department of Interior. Arnold 2004 Inv. Interview at p. 23:5 - 21. Plaintiff testified before the Congressional Committee on Government Reform and Oversight on September 10, 1997, on the status of African Americans within the Department of the Interior and its various bureaus, including the Bureau of Land Management. Blue Ex. 8, Transcript of Congressional Testimony of Romella Arnold, p. 143-44.

10. Based on plaintiff's testimony, plaintiff was asked to and did provide a statement to the Office of Inspector General concerning another BLM employee who did not testify before Congress due to alleged witness intimidation. Arnold 2004 Int. Interview at p. 27-28.

11. In December 1997, plaintiff reported to Warren Johnson, then Assistant Director of Human Resources, an anonymous employee's complaint to her about a skit entitled "Redneck Night Before Christmas" performed at the BLM's National Training Center in Phoenix, Arizona. Arnold 2004 Inv. Interview at p. 30-31. The skit received publicity and was reported in the newspapers. *Id.* p. 33. The then Assistant Secretary for Policy Management and Budget ordered that disciplinary action be taken against the Director of the Training Center and the employee who performed the skit; the employee was suspended and the Director was suspended and

removed from his position as Director. *Id*. at p. 33.

12. At the time of this alleged protected activity, Marilyn Johnson was the Associate State Director for Eastern States in Springfield, Virginia, and was neither involved in the complaints nor the subject of the allegations. Arnold 2004 Inv. Interview at p. 32; Johnson 2005 Depo. at p. 143-144.

13. After the removal of the Training Director, Marilyn Johnson was reassigned to the position. Arnold Inv. Interview at p. 34-35.

14. Plaintiff testified that she

> met Marilyn Johnson at the training Center Director in my capacity as the National Student Employment Program Manager. Every June, third week in June, I would hold an orientation for one week for all newly hired students and mentors of those students at the National Training Center. So, I have worked very closely with Miss Johnson and her staff to organize and coordinate the training of the students and mentors.

Arnold Inv. Interview at p. 35. Plaintiff testified that she and Ms. Johnson established a social relationship and that

> I knew she was not necessarily supportive of the HBCU Program because, again, she always felt that she got there on her own merits, so everybody else should be getting their on their own merit and that there should not be special programs, she looked at them as set aside programs, to accommodate people of color. And she said that to me on several occasions.

Ex. 4 at p. 36.

**Marilyn Johnson is assigned Assistant Director, Human Resources Management, Washington, D.C.**

15. Marilyn Johnson, (black female, d.o.b. 8/15/50) began Acting in the position of Assistant Director, Human Resources Management, in September 2002 and permanently obtained the position in June 2003. Johnson 2005 Depo. at p. 7. In that position, she became plaintiff's second-level

supervisor. Johnson 2004 Inv. Interview at p. 4-5..

16. Among the tasks which Ms. Johnson undertook after she came on board in September 2002, was to examine the agreement which the BLM had with Langston University. Johnson 2005 Depo. at 60:20 - 63:10.

17. The money going to Langston was taken out of BLM's budget. *Id.* at 179:12 - 180:15.

**Use of the Term Money Laundering**

18. Plaintiff alleges that on September 12, 2002, Ms. Johnson called her into her office and said "I want to talk to you about your program . . . .I want to know why you are laundering all this money to Langston." Arnold 2005 Depo. at p. 14-15.

 On September 19, 2002, plaintiff met with Ms. Johnson, Sylvia Felder, (black female, d.o.b. 12/17/54), Administrative Officer and Connie Stewart to discuss the budget and the SCEP program. Arnold 2004 Investigative Interview at p. 13-16 and Blue Ex. 9, Investigative Interview of Sylvia Felder at p. 5-8  During the meeting, Ms. Johnson asked questions about the BLM assistance agreements with Langston University. Arnold Investigative Interview at  p. 14-15 and Johnson Investigative Interview at p. 6-7.

19. According to plaintiff, at this second meeting, Ms. Johnson said, "I want to know why the BLM is laundering all this money to Langston University." Arnold 2004 Investigative Interview at p. 14.

20. Plaintiff admits that the BLM is not allowed to pay for housing for any employees; but did so through Langston by having Langston give the students a stipend. Arnold 2005 Depo at p. 17.

21. Plaintiff testified that the regulation not allowing BLM to pay for housing has "been a barrier for our affirmative employment program." *Id.* at p. 18.

22. Plaintiff testified that

[P]rior to me assuming the initiative, the Natural Resource Program Office had already granted a grant to Langston University. So it was just easy to piggyback on that initial grant and to do our own assistance agreement with Langston for what we wanted Langston to provide us in terms of a service.

Arnold 2004 Investigative Interview at p. 20:10-17.


23. Plaintiff testified that monies going to Langston

was to implement our Retention Program and that's what Marilyn had problems with. The fact that we gave a grant to Langston and Langston then was able to issue Oklahoma State checks to all students across the board, African Americans, white students, Asian students, Hispanic students, Native Amerian students, males and females. All students who agreed to accept a position with the BLM who had to relocate 50 miles outside of their residential area got a $1,200 stipend through Langston as well as a round trip ticket, air fare, to go to their job of record.
      Housing has always been an issue for BLM in that a lot of the BLM field offices are located in remote areas. Students don't have a lot of money because they are students and we felt that we needed to do something bold, creative and outside of the box to change the way we were doing business. And we were given the green light by the then Director, Tom Frye.
      So, when we thought of this creative way that students could get some money, students would have money to obtain housing, Langston was the school that we decided to provide this grant to because they said they had a mechanism for doing it, these would be state issued checks . . . .

Arnold 2004 Investigative Interview at p. 70-71.

24. Plaintiff testified that

I challenged her [Johnson] on the money going to Langston versus the money going to majority schools during the same time period. BLM gave $ 2.4 million (sic) to majority universities and Langston at that time had received possibly $270,000.
      So I challenged that, I said, if this is laundering, what do you call $204 (sic) million? **And she says, well I don't handle those programs**.

Arnold Testimony dated 3/06/07 at p. 19-20. (emphasis added).


25. Plaintiff alleges that on July 18, 2003, Ms. Johnson stated "I don't understand why we are laundering money to Langston." Arnold 2005 Depo at p. 18:17-19:2; 20:5-9.

26. Approximately seven months after plaintiff was reassigned to a new position, by letter dated March 26, 2004, Ms. Johnson notified Langston University that BLM was terminating its partnership initiative with the university. Complaint at ¶ 24.

**PROPOSAL OF LEAD STATE CONCEPT**

27. On May 8, 2003, Connie Stewart, Ms. Johnson's assistant, sent an e-mail to the BLM Field Committee concerning "Lead State Concept as discussed at Field Committee meeting." Arnold Doc. Request Response 54.

28. A copy of the e-mail was forwarded to Nancy Taylor, who forwarded a copy to plaintiff stating: "FYI...ONLY!!! Thought you might be interested in staying in the know about future plans regarding the recruitment program." *Id.*

29. The document attached in the E-mail discussed a concept proposing to make a "lead state" responsible for student recruitment programs and sending program money and program leads to the lead state. *Id. at p. 2.* The concept included all four of the programs: Hispanic Servicing Institutions, Tribal Colleges and Universities, Historically Black Colleges and Universities, and Student Career Experience Program. *Id.*

30. The program functions were not transferred to a state office. Complaint at ¶ 27.

**Student Employment/HBCU Recruitment Tracking System (SERTS)**

31. According to plaintiff, development of SERTS began in or about 1997-1998. Arnold 2005 Depo. at p. 42. The purpose of the system, inter alia, was to track the student employment program. Arnold 2007 Depo at p. 52-53.

32. The BLM had expended about $70,000 on SERTS, but SERTS never became fully operational. Arnold 2005 Depo at p. 43- 47.

33. In or about 2001, the BLM created an Information Technology (IT) Investment

Management Process for the approval and oversight of all IT projects and investments. Blue Ex.15. The Information Technology Investment Management Board (ITIB) was tasked with overseeing IT projects, including reviewing reports of existing projects, approving proposed projects and providing permission to deploy completed projects. The SERTS system fell within the jurisdiction of the ITIB because it could be used nationwide. Blue Ex. 16.

36. In December 2002, plaintiff was advised of the official status of SERTS. By e-mail dated December 12, 2002 plaintiff was advised that

> the National ITIB at their June 2002 meeting directed that all national level systems/projects, regardless of size, report their scope, schedule and budget information to the System Coordination Office on a quarterly basis. The SCEP Enhanced Reporting Tracking System is now part of the national IT Portfolio.

Arnold 2007 Depo Ex. 2 at p. 1.

35. Plaintiff was advised on December 23, 2002, by the new portfolio manager for the Washington HR Office, Gail Colbert, that "According to the System Coordination Office and the ITIB, there was never a business case or project plan written for this project and, therefore, in the eyes of the ITIB, it isn't on their 'radar screen.'" Arnold 2007 Depo Ex. 2 at p. 2.

36. On January 6, 2003 Kurt Ballentyne, the ITIB contact, reminded plaintiff to send in her quarterly reports to the System Coordination Office. *Id.* at p. 3.

37. On January 10, 2003, plaintiff was included as an addressee on an e-mail concerning the AD700 portfolio[2]. *Id*. at p. 4. The e-mail summarized the status of various projects in the portfolio. Concerning SCEP, the e-mail stated:

> This system will be analyzed and reviewed.
>
> If it is determined by the project manager that this project will be a sound IT

---

[2] The portfolio was a list of all the automated systems that Marilyn Johnson was responsible for. Johnson 2005 Depo. at p. 79:11-80:4.

      investment, a business case will be submitted to the ITIB for approval at the June meeting. If it is determined by the project manager that this project will not be a sound IT investment, a formal request will be submitted to the ITIB to remove this project from the AD700 portfolio.

*Id*. at p. 4.

    38. On January 23, 2003, Gail Colbert advised plaintiff that at Ms. Johnson's direction ITIB would be requested to remove SERTS from the portfolio:

      Marilyn and I have briefly discussed SERTS' value to the bureau, which is the main criterion for IT systems. It's my belief, having looked at the system, that the information you're trying to capture can be pulled from the Automated Table of Organizations (SCEPS are tracked based on their "status" in FPPS) or directly from FPPS. . . .

*Id.* at p. 5.

    39. Plaintiff responded saying "This is not exactly true. You and I need to meet and I will explain how the system works and why SERTS v. FPPS. Please do not interfere with this decision until you have all the facts." *Id.* at p. 6.

    40. Ms. Colbert responded : "This project was never authorized by the ITIB. It has not been measured against the IT standards . . . ." *Id.*

    41. Plaintiff responded with an e-mail dated January 24, 2003, requesting a meeting to discuss SERTS. *Id.* at p. 8. Ms. Johnson responded

      Romella, I will be glad to meet with you. However, this system has been on the books forever. Clark never did a business case for it so we cannot support it being a part of our portfolio anymore. Denver is very serious about all of the ADs have clean supportable cases for their systems and your system has no documentation so I cannot support it.

*Id.* Ms Johnson also advised plaintiff

      The rules have changed Romella. What bothers me about this discussion no one was doing anything with the system until there was a decision to remove it from the portfolio. I never heard of the system before, and neither had the people in Denver. I don't know anyone who has used it to any notable success. Gail will be here

tomorrow. I would like to discuss this with her in the room since she seems to have alternative.

*Id.* at p. 7.

42. According to plaintiff, in February or March, 2003, in a meeting with Gail Colbert, Marilyn Johnson and others, "it was decided that I should prepare the 300 Lites short version report" for submission to the ITIB. Arnold 2007 Depo. at Ex 2 p. 21 (E-mail 07/07/2003 3:32 pm).

43. In April 2003, plaintiff submitted the business case for SERTS , called the "300 Lite business case" to Gail Colbert. Arnold 2007 Depo. at Ex. 2 p.15 (see 12:15 pm e-mail).

44. On May 12, 2003, Kurt Ballantyne, with cc's to Ms. Johnson, corresponded with plaintiff about the reports required from her for SERTS:

> If you submit, by close of business Wednesday May 14th, a quarterly report that addresses your project scope, schedule and budget, I will change your project rating from YELLOW to GREEN. . . .

*Id.* at p. 9.

45. On May 20, 2003, plaintiff sent to Mr. Ballantyne her second quarterly report and the "300 Lite" business case. Arnold 2007 Depo. at Ex. 2 p. 15-19.  She wrote

> Would you please provide guidance what happens next and what I should anticipate happening in order to move this project to completion. All we need is a server which is located in the NTC and it will be ready for use by the employees. We have not been able to use the system which we have invested money in because it continues to get bogged down in the bureaucracy and I don't understand why. This project existed before the ITIB was in existence and the design was completed in FY 01 and the system was tested by its users in FY 02. I need help, not opposition which I continue to get from Gail Colbert. . . .

*Id.* at p. 15 .

46. On July 3, 2003, plaintiff sent another e-mail to Mr. Ballantyne, cc'ed to Ms. Johnson, again questioning why SERTS fell within the jurisdiction of the ITIB and again stating that she though her project "has gotten bogged down in bureaucracy of BLM ." Arnold 2007 Depo. at Ex

2 p. 21.

47. Mr. Ballantyne responded in an e-mail dated Jule 8, 2003. *Id.* at p. 20-21. He explained why SERTS had to comply with BLM's IT policy and the "new way BLM is doing business to plan and track its IT investments and projects." "Whether you like it or not SERTS is a major IT investment and must comply with the Bureau's policies and procedures regarding the project and investment management processes." *Id.* at p. 20. Mr. Ballentyne warned plaintiff that the project was rated yellow because the ITIB received no report in April. If plaintiff failed to submit a report by July 15, "the project will be rated 'red' for scope, schedule and budget. A red rating constitutes being 'out of control', and hence would seriously jeopardize the future of the SERTS project." *Id.* at p. 21.

48. Plaintiff admits that prior to July 2003, she did not understand that the SERTS program fell within the criteria requiring approval of the ITTB. Arnold 2007 Depo at p. 67-70. Plaintiff did not send anything else to Mr. Ballentyne after July 8, 2003. *Id*. at p. 70-71.

49. The August 1, 2003 Quarterly Project Rating for April-June, 2003 for SCEP recommended that the ITIB terminate the project and direct that all implementation/deployment efforts be stopped. Blue Ex.13, 14.

50. On August 26, 2003, the ITIB, in its third quarterly meeting, decided to terminate the SERTS program. Blue Ex. 11-12. The ITIB made its decision based upon the fact the project was rated red for scope, schedule and budget due to the fact that plaintiff had not complied with quarterly reporting requirements. *Id*

51. On September 8, 2003, the ITIB notified Ms. Johnson that it made the decision to remove the SERTS from the National IT Portfolio and directed her to terminate the project and all efforts to implement the project. *Id.*

**Request for report on July 18, 2003**

52. Plaintiff testified that in July 18, 2003:

    A.    I got to work that morning and Kelly had left a message that Marilyn wanted to see me, so as soon as I got in I called down and Marilyn got on the phone and said she needed some data information by 10:00 and this was at 9:30.
    Q.    And what kind of data info did she need?
    A.    She wanted to know all the students that were in the program that were realty specialists, when they would be graduating and when they would be attending the Lands Academy (phonetic sp.).
    Q.    Okay. And what did you tell her?
    A.    I told her I could not get that information to her by 10:00.
    Q.    And what did she say?
    A.    She said when can you get it to me? I said I don't know. Today is Friday. People have alternative work schedules. I'll do the best I can.
    Q.    And what did she say?
    A.    She said get it to me when you can.
    Q.    Okay. And then you say you talked to her again in the afternoon.
    A.    I went down there that afternoon . . . .
                                * * *
    Q.    And did she have any conversation with you about what she had requested from you in the morning?
    A.    She asked me how I was doing and I gave her what I had at that time.
    Q.    Okay. What did you give her?
    A.    I gave her a list of those names of students I had gotten from the field managers.
    Q.    You had to call the field managers to ask them for the information?
    A.    Every one of them.
    Q.    How many?
    A.    Fourteen states.
    Q.    And how many people did you call?
    A.    I called all of them within the course of the day or left messages.
    Q.    Is that 14 people?
    A.    Yes.

Arnold 2007 Depo. at p. 46-47.

53. On July 21, 2003, plaintiff sent an e-mail with the requested information report attached. The report is a one page list identifying six students. See Arnold 2007 Depo at p. 71-74 and at Ex. 3.

**Denial of Request to Travel in Advance of the Student Career Experience Program**

**(SCEP) Training and Orientation Program**

54. On or about June 9-11, 2003, plaintiff submitted a travel request for approval. Blue Ex. 18 at p. 2; Blue Ex. 17, Arnold e-mail dated 6/10/2003. Plaintiff requested that she begin travel on June 12, 2003, for the SCEP training and orientation which would begin in Phoenix, Arizona on June 16, 2003. Blue Ex. 18 at p. 2.

55. On June 11, 2003, Kellye Drakeford, Executive Assistant to Johnson, notified plaintiff that Johnson did not approve her travel beginning Thursday June 12, 2003, since the orientation did not begin until Monday, June 16, 2003. Johnson approved plaintiff's travel beginning on Sunday, June 15, 2003. Blue Ex.19.

**Letter of Counseling**

56. During a meeting (tele-conference) on July 29, 2003, Ms. Johnson announced that she was restructuring the Special Initiatives Group consisting of plaintiff, Steve Shafran and Marcie Brionnes. Johnson 2004 Investigative Interview at p. 11-12. As part of the restructuring, Mr. Shafran and Mr. Briones were to be moved to Washington, D.C., and Dr. Mike Brown would be laterally reassigned to Washington, DC, to supervise the Special Initiatives Group.

57. Plaintiff did not agree with Ms. Johnson's decisions and notified Ms. Johnson of her disagreement. Arnold 2005 Depo. at p. 24-26. In response to hearing about Dr. Mike Brown's reassignment, plaintiff stated "I'll be dammed" *Id*. at p. 26.

58. On August 1, 2003, Ms. Johnson issued plaintiff a letter of counseling for"Inappropriate Language and Abusive Behavior." Blue Ex. 23.

**Reassignment of Dr. Mike Brown**

59. Mr. Brown was laterally reassigned into a new GS-14 supervisory position which Ms. Johnson created as a part of her restructuring of special initiatives. Blue Ex. 21 at p. 1 box 11 & 21a,

Position Classification Evaluation Statement; (Johnson Investigative Interview at p. 11-12. The Major duties in the Position Description required the incumbent to supervise and manage the employment and diversity programs and program managers in the Bureau of Land Management.

> Primary responsibilities cover the following programs and initiatives:
> - Historically Black Colleges and Universities
> - Hispanic Serving Colleges
> - Tribal Colleges and Universities
> - Asian American/Pacific Islander Initiative
> - Student with Disabilities Initiatives
> - Faculty Exchange Program
> - Executive Orders
> - Educational Partnerships, Diversity Initiatives
> - Diversity Intern Program
> - Student Educational Program
>   - (Student Temporary Employment Program (STEP)
>   - Student Career Experience Program (SCEP).

Blue Ex 21 at p. 2-3, Major Duties and Supervisory Responsibilities.

**Plaintiff's Reassignment; Move to Another Office; Issuance of Performance Standards**

72. On August 1, 2003, Ms. Johnson notified plaintiff that she would be reassigned from her position as Program Manger (SCEP ), GS-13, to the position of Equal Opportunity Specialist, GS-13, with the organization title of Civil Rights Specialist, in the Office for Equal Employment Opportunity (EEO) effective August 10, 2003. (Blue Ex.. 7); Arnold 2007 Depo. at p. 49-51. The letter given to plaintiff explained that the reason for the reassignment concerned the report of the U.S. Civil Rights Commission entitled "Ten Year Check Up: Have Federal Agencies Responded to Civil Rights Recommendations" which criticized the Department of the Interior and BLM for not employing a Civil Rights Specialist to handle Title VI issues. Blue Ex. 7.

73. Plaintiff asked if she could "do both Title VI and keep my student employment position. . . . So I offered to do both jobs." Arnold 2007 Depo. at p. 50-51. Ms. Johnson stated that doing

both jobs was not an option. *Id.* at p. 51. There was no change in plaintiff's pay, grade or duty station. Blue Ex. 7.

74. Following her reassignment, plaintiff was given another office that was located down the hall from the office she was assigned to as Program Manager. Plaintiff also was given a new telephone number. Arnold 2007 Depo. at p. 79.

75. On or about October 1, 2003, Michelle Stroman, Acting EEO Officer, gave plaintiff her performance standards for the New Title VI EEO position for the rating eriod October 1, 2003, to September 30, 2004. Arnold 2004 Investigative Interview at p. 96-97.

Respectfully Submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
202/514/6970

OF COUNSEL
PATRICIA ARMSTRONG HARGRAVE
Office of Solicitor
Division of General Law
U.S.Department of the Interior