FORM DI-1892
REV. 12/98

U.S. DEPARTMENT OF THE INTERIOR
COMPLAINT OF DISCRIMINATION

1. COMPLAINANT'S NAME: **Romella Arnold** PLACE OF EMPLOYMENT: **Dept. of the Interior**

STREET ADDRESS: **1849 C. Street, NW.** ADDRESS: _____

CITY, STATE, ZIP CODE: **Washington DC** CITY, STATE, ZIP CODE: **20240**

SOCIAL SECURITY NUMBER: ~~_____~~ WORK PHONE: **(202) 208 - 2443**

HOME PHONE: ~~_____~~

2. DOI OFFICE WHICH YOU BELIEVE DISCRIMINATED AGAINST YOU?

BUREAU **Bureau of Land Mgt.** DIVISION/OFFICE: **Human Resource Management**

ADDRESS: **1849 C. Street, N.W** REGION: **Washington Headquarters**

CITY/STATE: **Wash. D.C.**

3. BASIS(ES) FOR BELIEVING YOU WERE DISCRIMINATED AGAINST? (CHECK ONE OR MORE, AND PROVIDE THE SPECIFIC INFORMATION)

| | |
|---|---|
| ____ RACE | ✔ AGE(DATE OF BIRTH) **5-9-52** |
| ____ COLOR | ____ PHYSICAL HANDICAP |
| ____ RELIGION | ____ MENTAL HANDICAP |
| ____ NATIONAL ORIGIN | ____ SEXUAL ORIENTATION |
| ✔ SEX | (if filing on this basis please use Addendum B for procedural rights) |
| ✔ REPRISAL | (DATE OF PREVIOUS EEO ACTIVITY **Sept. 1997** |
| ✔ **Hostile work environment/harassment and continuing** | |

4. ALLEGATION(S) OF DISCRIMINATION? (FOR EACH ALLEGATION, STATE THE DATE AND THE SPECIFIC INCIDENT CAUSING YOU TO BELIEVE THAT YOU HAVE BEEN DISCRIMINATED AGAINST. FOR EXAMPLE: I WAS DISCRIMINATED AGAINST ON JANUARY 1, 1992, WHEN I WAS NOT SELECTED FOR THE POSITION OF ANALYST (USE ADDITIONAL PAGES AS NECESSARY)

**See attachment**

5. HAVE YOU DISCUSSED YOUR CLAIMANT WITH AN EEO COUNSELOR? YES ✔ NO ____

IF YES, NAME OF COUNSELOR **Ms. Sharon Salpini**

DATE YOU FIRST CONTACTED THE COUNSELOR **August 6, 2003**

DATE YOU RECEIVED THE NOTICE OF FINAL INTERVIEW AND RIGHT TO FILE A COMPLAINT LETTER FROM THE COUNSELOR **Sept. 7, 2003**

6. ARE YOU AGREEABLE TO USING THE ALTERNATIVE DISPUTE RESOLUTION (ADR) PROCESS?

YES ✔ NO ____

**Docket #: LLM-04-002**
**Complaint Date OCT 17 2003**

October 15, 2003

Equal Employment Opportunity Officer
U.S. Geological Survey
12201 Sunrise Valley Drive MS 602
Reston, Va. 20192

Re: Formal Complaint of Discrimination

Pursuant to the Notice of Final Interview received on October 7, 2003, this formal complaint of discrimination against the Bureau of Land Management is submitted on behalf of our client, Ms. Romella Arnold, hereafter referred to as Complainant. Complainant alleges that she has been the victim of a continuing pattern of discrimination based on age, gender, reprisal, harassment, and a hostile work environment.

These actions by Ms. Marilyn Johnson have caused Complainant severe stress, anxiety, emotional distress and depression. Due to the symptoms of her depression, sleeplessness, difficulty concentrating, isolation from family members and friends, and loss of enjoyment, Complainant has been under the care of a therapist. In addition, these actions exacerbated the stress induced skin condition Complainant has suffered from during these incidents. Complainant has also been under the care of a dermatologist and internist. The issues are:

1. Whether Complainant was discriminated against based on age, gender, reprisal, harassment, and hostile work environment when Ms. Marilyn Johnson, Associate Director, Human Resource Management (AD/HRM) for the Bureau of Land Management (BLM) accused Complainant of engaging in criminal activity, specifically "money laundering", on five separate occasions.

Complainant was employed as the Student Employment Program Manager for the BLM in 1998, and absorbed the duties and responsibilities of the HBCU Team Leader position in 2001. In September 2002 Ms. Marilyn Johnson, then acting AD/HRM for approximately one month, confronted Complainant in a hallway, and accused her of "laundering money to Langston University". Complainant was shocked by this accusation and requested a meeting with Ms. Johnson to clarify her role vis a vis Langston University. This meeting took place about a week later, and Ms. Johnson repeated the allegation that Complainant had laundered money to Langston University in the presence of Complainant's supervisor Ms. Connie Stewart, the then Deputy Associate Director for Human Resource Management and Ms. Sylvia Felder, a budget assistant. Complainant, shocked and humiliated by Ms. Johnson's remark, explained that the grant received by Langston University had been approved by the BLM under the HBCU partnership initiative. Complainant had acted within the scope of her official position description when she had recommended to Mr. Warren Johnson, the prior AD/HRM, that Langston be considered for this partnership grant. (see Attachment A). It was Mr. Johnson in conjunction with BLM managers and procurement and budget personnel that had the authority to approve this recommendation, and did so.

1

On July 18, 2003 during a meeting between Ms. Johnson and Complainant Ms. Johnson again accused Complainant of laundering money to Langston University. Once more, Complainant attempted to clarify her role in the HBCU grant process, and asked Ms. Johnson to stop referring to this legitimate program initiative as money laundering. Ms. Johnson responded with a half-hearted apology at that time. However, Complainant was told by Mr. Steve Shafran that Ms. Johnson again made reference to the partnership with Langston as money laundering during a program managers meeting on August 12, 2003.

At an attempted mediation of Complainant's EEO action on these matters on October 2, 2003, Ms. Johnson stated, "I'm guilty of using the term money laundering." Ms. Johnson added that she was still concerned about the grant issued to Langston University. This was stated in the presence of the mediator, Mr. John Wagner, Ms. Patricia Armstrong, agency attorney, Complainant, and Complainant's representative Ms. Sandra McCrary.

Money laundering is a federal crime, and for Complainant to be accused of this crime by a senior level manager in the presence of Complainant's supervisor and peers is both demeaning and defamatory. Complainant has an unblemished record of over thirty years of federal service. Complainant is the recipient of numerous commendations and awards for her outstanding program leadership. Complainant's program was specifically cited in the February 2003 government wide report by The Performance Institute, which stated, "Another robust recruitment initiative worthy of coverage is the Bureau of Land Management's (BLM) Student Educational Employment Program" (see Attachment B).

Complainant's reputation as an advocate for equal employment opportunity and vocal opponent of discrimination is well known within the BLM and the Department of the Interior. Complainant believes Ms. Johnson made this false accusation against her in reprisal for Complainant's active involvement in BLM EEO initiatives. Complainant avers that Ms. Johnson's repeated accusations of money laundering have damaged Complainant's reputation, self-esteem and career opportunities. Complainant bases this belief, in part, on the fact that subsequent to making these allegations Ms. Johnson reassigned Complainant from her position as Student Employment Program Manager/HBCU Team Leader creating the unjust perception that Complainant was removed from her position because of some wrongdoing on Complainant's part.

2. Whether Complainant was discriminated against based on age, gender, harassment, reprisal and hostile work environment when Ms. Johnson dismantled the Student Employment /HBCU Monitoring and Tracking System, known as the SERTS system, and subsequently imposed unreasonable time frames for data based reports on Complainant.

On January 22, 2003, Ms. Johnson instructed a subordinate to delete the Student Enhancement Recruitment Tracking System (SERTS) from the AD/HRM information system. The SERTS system had been developed because of a finding by a Departmental Task Force (report issued in December 1995 at the behest of Congressman Albert Wynn),

2

that BLM had no effective mechanism in place to monitor and track EEO performance to include the hires and retention of HBCU graduates. The SERTS system cost approximately $100,000 to develop and was the only automated data source available to Complainant for information on her program areas. Absent the SERTS system, Complainant had to manually gather all program data by calling each individual state office, which was both burdensome and time consuming.

On the morning of July 18, 2003, a Friday, when Complainant arrived for work at 9:30 a.m. she had a message from Ms. Johnson's secretary that Ms. Johnson needed a program report for her meeting at 10:00 a.m. that morning. Complainant immediately contacted Ms. Johnson and attempted to explain that without the SERTS system it was not possible to produce a program report in 30 minutes because the information would have to be collected via telephone calls to each of BLM's state offices. Ms. Johnson kept insisting that she needed the report and Complainant responded that she would do her best to provide the information. Complainant submitted a completed report to Ms. Johnson by close of business the following Monday. Ms. Johnson caused Complainant undue stress by placing what Ms. Johnson knew was an unreasonable demand on Complainant. In fact, Ms. Johnson's 11th hour request for the program report was a ruse to obscure her real intent. Ms. Johnson intended to harass Complainant and cause Complainant to suffer emotional distress, because Ms. Johnson knew there was no way Complainant could have produced this report in thirty minutes, and failing so, Complainant was concerned she would appear non-responsive to a direct request by a senior manager. As a result of this incident Complainant suffered a loss of self esteem, a loss of self-confidence, and an inability to sleep.

3. Whether Complainant was discriminated against based on age, gender, harassment, reprisal, and hostile work environment when Ms. Johnson proposed a functional transfer of the National Student Employment Programs (to include the HBCU Team Leader position) from the Washington Headquarters office to the State Level

The first week in June 2003 Ms. Connie Stewart, Complainant's supervisor, at the direction of Ms. Johnson, sent an E-mail to all BLM State offices requesting to know if there was any state office interested in assuming management of the National Student Employment Programs function. This proposal by Ms. Johnson was made without any prior discussion with existing staff or study to determine the efficacy of this decision. Because of the national focus of these programs BLM's Washington headquarters had always administered them. There was not one state office that responded in the affirmative to Ms. Johnson's proposal. However, had a state office agreed to acquire this program function, one result would have been that Complainant would have had to move with the function or risk the loss of her job. Complainant has over thirty years of federal service in the Washington area and has longstanding ties to the Washington community. Had Complainant been directed to move with her program function, as proposed by Ms. Johnson, Complainant's life would have been needlessly disrupted by this forced relocation. Subsequent to this proposal being issued and until it was established that no state office was interested in acquiring this function, Complainant experienced undue

3

stress, anxiety, sleeplessness, and a stress induced skin condition that required medical attention.

4.  Whether Complainant was discriminated against based on age, gender, harassment, reprisal, and hostile work environment when Ms. Marilyn Johnson denied Complainant's travel request to travel to the Student Career Experience Program (SCEP) Training and Orientation program in advance of the program start date.

Complainant has been responsible for administering the SCEP Training and Orientation program for the past five years. Complainant took the lead role in developing the training program, continuing to refine course modules, and working with the staff of the BLM Training Center in Arizona to coordinate the successful presentation of the course. As a result the SCEP training has been recognized by the Department of the Interior as an exemplary program and other bureaus and agencies have modeled their training after this course. To ensure quality control of the training program Ms. Arnold's practice has been to arrive three days prior to the start of the training to work with the Training Center staff, who are not as familiar with the program and its requirements. Accordingly, Ms. Arnold submitted her travel request on June 9, 2003, but was informed on June 11, 2003, by Ms. Marilyn Johnson's staff assistant that her request had been denied. Ms. Johnson informed Complainant that she would only approve travel for the Sunday prior to the Monday when the training was to begin. Despite the denial of her request, Complainant traveled on Sunday and worked through the night to ensure all course materials were prepared and ready for the next day. In addition, Complainant fully briefed the former student intern who had been assigned to assist Complainant in the presentation of the course.

The denial of Complainant's travel request by Ms. Johnson was another attempt by Ms. Johnson to sabotage Complainant's program. Given no advance time to prepare, Complainant was extremely concerned that the course would not be well presented, and Ms. Johnson would use that against Complainant. Because of Complainant's extraordinary effort, the training was well received, however, the incident caused Complainant further stress and anxiety.

5.  Whether Complainant was discriminated against based on age, gender, harassment, reprisal, and hostile work environment when Ms. Johnson removed Complainant from her position as the Student Employment Program Manager/HBCU Team Leader, replaced Complainant with a lesser qualified younger male and female employee, and reassigned Complainant to a dead-end GS-13 position in a non-existent Title VI program.

Ms. Johnson announced on a Wednesday, July 30 2003, her intent to restructure the Student Employment/HBCU Programs by moving two Denver based employees to Washington headquarters and by reassigning Mr. Michael Brown to the HBCU Team Leader position. On August 1, 2003, Ms. Johnson informed Complainant that she was removing Complainant from the Student Employment Program Manager position and reassigning Complainant to a Title VI EEO specialist position.

4

Mr. Brown, a male who is over ten years younger than Complainant, is a former government contractor, has less than three years of federal service, and no prior experience in the federal HBCU program. Ms. Johnson subsequently reassigned Ms. Connie McGriff into the Student Employment Manager position. Ms. McGriff is over fifteen years younger than Complainant, with approximately fifteen years of federal experience. Ms. McGriff had formerly held the Student Employment Program Manager position and had been removed from this position by the former EEO Manager Ms. Gloria Inniss. Both the HBCU Team Leader position and the Student Employment Program position were classified as career ladder positions (GS-12/14) with full performance at the GS-14 grade level. (see Attachment C and D). Mr. Brown was reassigned at the GS-14 level. Ms. McGriff is currently at the GS-12 level The Title VI EEO Specialist position that Complainant was reassigned to is classified at the GS-13 full performance level and Complainant is currently at the GS-13 grade level.

Complainant has over thirty years experience in federal EEO programs and over sixteen years specialized experience in student employment programs. Since assuming the HBCU Team Leader function at the GS-13 grade level, Complainant consistently received outstanding performance evaluations from the former AD/HRM Mr. Warren Johnson. In Complainant's last performance evaluation conducted by Mr. Johnson in December 2001, Mr. Johnson stated that Complainant …"has completed another outstanding year. Her performance has contributed to the Bureau's future work force. She is deserving of promotion to a higher grade." (see Attachment E).

Ms. Johnson's decision to remove Complainant from the Student Employment Program Manager and HBCU Team Leader functions and replace her with a less qualified younger male and female was not only discrimination based on age and gender, but was another retaliatory act in what is an ongoing pattern of reprisal, harassment and hostile work environment. Under Departmental regulations and practice, an employee in a career ladder position is entitled to a promotion to the next higher grade level upon successful performance at the next lower grade level of that position, and a recommendation for a promotion to the next higher level by the employee's supervisor. Complainant has met both of those requirements. Ms. Johnson's action effectively nullified Complainant's opportunity for a promotion to the GS-14 level and Complainant's prior record of outstanding program performance.

Ms. Johnson's action of reassigning Complainant to a Title VI EEO specialist position contravened a directive issued on June 13, 2002 by Mr. J. Michael Trujillo, Deputy Assistant Secretary for Human Resources and Workforce Diversity. This memo stated in pertinent part, "As you may know, we are in the process of reviewing the organizational structure of the Equal Opportunity/Civil Rights Offices throughout the Department. In anticipation if some restructuring in the near future, please do not make any changes to your current Equal Opportunity organization, structure, location, or personnel until we have completed our review and initiated whatever changes to these offices are deemed necessary to improve the efficiency of these very important functional areas." (see Attachment F).

Concern over Ms. Johnson's action was also expressed in an E-mail from Ms. Melodee Stith, Departmental Director of Equal Employment Opportunity to Mr. Trujillo stating in pertinent part; ..."It appears that Marilyn [Ms. Johnson] is moving ahead to reassign employees into the EEO office. However, it is my perception that she's not acting responsibly. . ." "I think that we should ask Marilyn to stop all assignments to the EEO office until she gives us a plan on what she is doing. It appears that she is acting arbitrary and capricious on this. . ." "the employee [Complainant] that's being assigned to Title VI states that she is not qualified for this position, and feels that she is being set up. Now remember, BLM does not have a Title VII position (or program). Therefore, the position does not exist." (see Attachment G).

This action by Ms. Johnson has caused Complainant severe stress, anxiety, emotional distress, and depression. Due to the symptoms of her depression, (sleeplessness, difficulty concentrating, isolation from family members and friends, and loss of enjoyment) Complainant has been under the care of a therapist. In addition, this action exacerbated the stress induced skin condition Complainant has suffered from during these incidents. Complainant has also been under the care of a dermatologist and internist.

6. Whether Complainant was discriminated against based on age, gender, harassment, reprisal and hostile work environment when she was issued a Letter of Counseling by Ms. Johnson.

At the July 30 meeting after Ms. Johnson announced that Complainant was being removed from the HBCU Team Leader position and replaced by Mr. Michael Brown, Complained exclaimed, "I'll be damned." Ms. Johnson responded by telling Complainant to stop cursing, and Complainant answered by stating she had not cursed, but had used a common expression. On August 1, 2003, Ms. Johnson handed Complainant a Letter of Counseling that stated Complainant had used curse words and caused a hostile environment. Complainant refused to sign that she had received this letter.

For Ms. Johnson, who has on numerous occasions knowingly besmirched the reputation of Complainant by accusing her of committing the federal crime of money laundering, to state Complainant caused a hostile environment by using a common expression is hypocritical at best. Ms. Johnson has a reputation among her peers of using foul and vituperative language during meetings. To accuse Complainant of creating a hostile environment because Complainant used a common expression of surprise makes a mockery of the term "hostile work environment." There was no other employee who indicated they were offended by Complainant's exclamation or considered Complainant's statement in any way hostile.

Complainant has an unblemished federal record and has never been the subject of disciplinary action. If what Complainant did could in any way be construed as a first offense it would have warranted no more than an oral counseling. Ms. Johnson's overreaction to Complainant's benign statement is further indication of Ms. Johnson's

real intent. Ms. Johnson's discriminatory and harassing actions against Complainant are calculated and provocative. Ms. Johnson hopes Complainant's frustration will cause her to become insubordinate and thereby justify Ms. Johnson taking disciplinary action against Complainant. However, Complainant has not and will not respond to Ms. Johnson's tactics.

7. Whether Complainant was discriminated against based on age, gender harassment, reprisal and hostile work environment when she was told to move to a smaller shared office space and was not allowed to retain her telephone number, as were other similarly situated employees who had not engaged in protected EEO activities or opposed unlawful discrimination.

On September 3, 2003, a Wednesday, Complainant's co-worker, Ms. Michelle Stroman, acting at the behest of Ms. Johnson, informed Complainant she had two days in which to move to another office. Because of a previously scheduled surgery, Complainant explained she would not be able to move until the following Tuesday. On Tuesday, September 9, 2003, Complainant was informed that she would be sharing a smaller office space with a junior EEO Specialist. Complainant was the only senior EEO specialist required to share an office space. Complainant also requested that she be able to retain her telephone number since she had a large and established network under that number. Ms. Johnson also denied this request. Complainant has been made aware of numerous unsuccessful attempts to reach her by colleagues within and outside of the BLM.

This disparate and harassing treatment by Ms. Johnson is but another action in a well established pattern, and designed to demean and humiliate Complainant. This action has caused Complainant further embarrassment, stress and anxiety.

8. Whether Complainant was discriminated against based on age, gender, harassment, reprisal, and hostile work environment when she was presented with performance standards for the Title VI position that are neither quantifiable nor achievable.

On October 1, 2003, Complainant was presented with performance standards for the Title VI position. Complainant avers that she is not qualified to perform the Title VI position as described in the official position description presented to her by Ms. Johnson. The position description and performance standards are written as though Complainant had been assigned to an existing Title VI position in an existing Title VI program. (see Attachments H and I) Neither is the case. The BLM has never had a Title VI program and there are no existing guidelines, records, or other materials that Complainant can rely upon in attempting to perform in this position.

The reassignment of Complainant to this Title VI heretofore non-existent position is but another example of Ms. Johnson's intent to harass, reprise, and subject Complainant to a hostile work environment by placing Complainant in an impossible situation. This action has further exacerbated Complainant's existing stress related physical and emotional conditions.

7

Remedial Relief

Complainant requests the following relief:

1. Immediate revocation of the reassignment to the Title VI position.

2. Retroactive promotion to a GS-14 EEO Specialist position with back pay effective as of December 6, 2001, to coincide with the performance evaluation and recommendation for promotion by Complainant's former supervisor Mr. Warren Johnson. This action is consistent with Departmental regulations and practice as pertains to career ladder positions. Since Complainant was wrongly reassigned from her career ladder position, and thereby denied a career ladder promotion this action would make Complainant whole.

3. Complainant to receive performance appraisals for years 2002 and 2003 and these appraisals are to be prepared and signed by Complainant's former supervisor Ms. Connie Stewart.

4. Reassignment out of the BLM to an IPA for a period of not less than four years to the National Black Caucus Foundation. All costs associated with the IPA, e.g. travel and training to be borne by the BLM.

5. Restoration of all Complainants' sick and annual leave used in connection with the incidents described in this complaint.

6. Expunction of the Letter of Counseling and Notice of Reassignment to the Title VI position, and any and all other negative materials placed in Complainant's official personnel file, or any other files maintained by Ms. Johnson or her functionaries.  Complainant official personnel file, S.F. 50, to reflect her reassigned from the Student Employment Program Manager/HBCU Team Leader position to the IPA position at the Black Caucus Foundation.

7. Pecuniary compensatory damages to cover actual medical expenses related to the incidents described in this Complaint.

8. Non-pecuniary damages in the amount of $300,000 for the past and future emotional distress, anxiety, depression, and psychic damage the Complainant has and will continue to suffer.

9. All attorneys' fees.

10. A cease and desist order against Ms. Johnson to prevent her from making any further untrue accusations against Complainant.

*Ronella Arnold*

*10-16-03*

8



# United States Department of the Interior

### U.S. GEOLOGICAL SURVEY
Reston, Virginia 20192

### DESIGNATION OF REPRESENTATIVE

This form constitutes my decision regarding representation in all matters pertaining to my complaint of discrimination filed with the Department of the Interior, U.S. Geological Survey on *August 6, 2003, EEO Counselor*

I understand that if I designate a representative that I can terminate the authority and responsibilities granted to that person at any time. Should this occur, I will provide written notification to the Equal Employment Opportunity Officer, U.S. Geological Survey, 602 National Center, 12201 Sunrise Valley Drive, Reston, Virginia 20192.

**Check one:**

[ ]    I am not designating a representative at this time. If, at a later date, I choose to have someone represent me, I will provide written notification to the Equal Employment Opportunity Officer, at above address.

[ ]    I designate _____ to act as my representative. I understand all official correspondence will be sent to me and a copy to my representative unless I state otherwise.

[X]    I designate my attorney *Roy J. Bucholtz and Sandra McCrary* as my representatives I understand all documents and decisions will be sent to him/her, *and* to me. I also understand the timeframes for receipt of materials by me will be computed from the time of receipt by my attorney.

Representative's address: *Roy J. Bucholtz*         *Sandra McCrary*
*Bucholtz & Culbertson, P.C.*    *9907 Chase Hill MCA*
*1801 Reston Parkway (Suite 302)*    *Vienna VA 22182*

Representative's telephone number: *703-471-9660*        *703-438-0936*
*FAX 703-471-5059*

Although the person named above may act for me in all matters pertaining to the discrimination complaint, I understand that I must personally sign all critical EEO related documentation (i.e., Notice of Final Interview, Complaint Withdrawal form, Settlement Agreement).

_____    *10-8-2003*
Signature of Aggrieved Person    Date

_____    *Oct 8, 2003*
Signature of Representative    Date

_____    *10/8/07*

## Page 1

1  UNITED STATES DEPARTMENT OF THE INTERIOR
   BUREAU OF LAND MANAGEMENT
2  WASHINGTON, D. C. 20240
   COMPLAINT OF DISCRIMINATION
3
4
5
   IN RE:   Romella J. Arnold
6         Complaint No. LLM-04-002
7
8
9  ————————————————————
10
11 The Telephone Investigative Interview of CONSTETTA
12 STEWART, taken in the above matter in the Offices of
13 COUNTY COURT REPORTERS, INC., located at 1160 Jordan
14 Springs Road, on the 17th day of March, 2004, beginning
15 at 1:09 p.m.
16
17
18
19
20
21
22
23
24
25

## Page 2

1  APPEARANCES
2
3  ON BEHALF OF THE U.S. DEPARTMENT OF
4  INTERIOR, BUREAU OF LAND MANAGEMENT:
5  Anne E. Anderson, Contracted EEO Investigator
6  DELANY, SIEGAL AND ZORIN
7  201 I Street, S.W., #836
8  Washington, D.C. 20024
9  Telephone: (202) 554-9660
10 Fax: (202) 554-1111
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1  TELEPHONE INVESTIGATIVE INTERVIEW OF
2  CONSTETTA STEWART
3  IN RE: ROMELLA J. ARNOLD
4  Case No. LLM-04-002
5  March 17, 2004
6     COURT REPORTER:  And we're
7  ready to go.
8     MS. ANDERSON: All right.
9  CONSTETTA STEWART was examined, and testified
10 as follows:
11 DIRECT EXAMINATION
12 BY MS. ANDERSON:
13   Q.  Miss Stewart, to begin with would you
14 please state your name in full?
15   A.  Constetta Stewart.
16   Q.  And what is your gender?
17   A.  Female.
18   Q.  And what is your date of birth?
19   A.  7/25/50.
20   Q.  And what is your race?
21   A.  African American.
22   Q.  And do you have any prior EEO
23 activity?
24   A.  No.
25   Q.  All right.  Currently what position

## Page 4

1  do you hold in the Bureau of Land
2  Management?
3    A.  Special Assistant to the Deputy
4  Director Bureau of Land Management.
5    Q.  And what is the series and grade of
6  that position?
7    A.  GS 301-50.
8    Q.  How long have you held your present
9  position?
10   A.  September of 2003.
11   Q.  All right.  During the events
12 complained of in Miss Romella Arnold's
13 Complaint in the year 2003, what was your
14 work relationship to the Complainant?
15   A.  Can I find out what her complaint
16 is?
17   Q.  The Complainant alleges that she's
18 been discriminated against on the basis of
19 her race, her sex, her age and her prior EEO
20 activity.  She states that this
21 discrimination took the form of accusing her
22 of money laundering, removing her from her
23 position, destroying the computer program
24 that she used to track one of the programs
25 that she handled involving minority students,




County Court REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs   1160 Jordan Springs Road   Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 5

1  moving her to a shared office space that was
2  smaller than her former office, as well as
3  transferring her to the Title VI Program
4  which she alleges doesn't exist. She states
5  that she has, through the actions of Marilyn
6  Johnson, been subjected to hostility and
7  discrimination and she alleges that it has
8  ruined her career and it has also left her
9  with a damaged reputation. Okay? So...
10      A. Prior to me moving into the position
11  of Special Assistant I was supervisor and
12  Personnel Management Specialist.
13      Q. All right. Were you Miss Romella
14  Arnold's supervisor?
15      A. Indirectly. If you look at anything
16  on paper it does not say that. I kind of
17  inferred it.
18      Q. So, did you ever do evaluations
19  involving her or were you ever involved in
20  counseling her or in any way directly
21  supervising her activities?
22      A. Whenever there was an absence, yes.
23  Her -- the group that Romella worked in
24  reported directly to the Assistant Director
25  for Human Resources and because I was the

Page 6

1  senior person on staff I acted in the
2  absence of that person. So, whenever
3  directions were given, in their absence, yes,
4  it was me.
5      Q. Now, the first allegation that Miss
6  Arnold makes, she states that on at least
7  five separate instances Ms. Marilyn Johnson
8  accused her of money laundering and I think
9  this was in conjunction with a historically
10  black university. Did you ever or were you
11  ever present when Miss Johnson allegedly made
12  such a statement?
13      A. I was present at meetings and there
14  was a conversation about money, whether it
15  was laundered or not...
16      Q. All right. Well, did you ever hear
17  Miss Johnson directly accuse Ms. Arnold of
18  laundering money?
19      A. I don't know if she accused her. I
20  do know that there was a statement about
21  laundering money.
22      Q. All right. Do you recall, as
23  clearly as you can, what the actual
24  statement was?
25      A. We were having a discussion about

Page 7

1  budget and I think we were talking about a
2  program we were using for giving -- I'm
3  trying to think of the word -- providing a
4  mechanism for our students to be able to pay
5  for housing and tuition or what have you,
6  and at that point we were using a university
7  down in Oklahoma, I think it was Langston
8  University. And I, I don't know whether the
9  statement was laundering money or the
10  appearance of laundering money, but that,
11  that did come up. Not as an accusation
12  against anybody, but that it had the
13  appearance of using this university to
14  launder our money. And I do recall telling
15  her that was not what we were doing and that
16  we should not be using that term.
17      Q. You say you do recall tell, telling
18  her, who are you referring to?
19      A. I'm sorry, telling Marilyn that we
20  were not laundering money, that we were
21  using a vehicle in order to promote the
22  growth of the students for BLM.
23      Q. All right. Along with that the
24  Complainant, Miss Romella Arnold, is alleging
25  that through the actions of Marilyn Johnson,

Page 8

1  that she destroyed the program dealing with
2  minority student recruitment and in, in
3  particular she alleges that Ms. Johnson
4  directed the cessation of a student
5  employment HBCU monitoring and tracking
6  system. Were you aware of or do you have
7  any knowledge concerning that tracking
8  system?
9      A. Yes, I'm aware of the, the tracking
10  system.
11      Q. All right. Was Miss Arnold actually
12  in charge of developing and utilizing that
13  system?
14      A. Yes, she was in charge of it and
15  there was supposed to be a system -- I don't
16  know if I ever saw it, but I knew it
17  existed.
18      Q. Are you aware of or have any
19  knowledge concerning whether or not Miss
20  Johnson actually directed that that program
21  be abandoned?
22      A. That could have happened. I mean, I
23  wasn't privy to everything, but I know that
24  it doesn't exist now, so...
25      Q. All right. Now, Miss Johnson, when


County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

## Page 9

1 she was questioned, states that there is a
2 process within your agency where computer
3 programs have to be justified.
4    A.  Right.
5    Q.  And she states that that program
6 could not be justified.  Well, are you aware
7 of or do you have any knowledge concerning
8 whether anybody ever presented that computer
9 program to the organization that reviews
10 them?
11    A.  You mean to the IPMB?
12    Q.  Yes.
13    A.  I don't know.
14    Q.  Okay.  Now, the other thing that she
15 Mrs. Romella Arnold is stating that she
16 considers discrimination against her because
17 it attacked the programs that she was
18 monitoring, is the National Student Education
19 Employment Program, a special initiative to
20 the states.  She stated that Ms. Johnson
21 sought to destroy the program by transferring
22 the authority for monitoring these programs
23 to individual states.  Well, are you aware
24 of or was this actually ever done?
25    A.  Transferring the programs to the

## Page 10

1 individual states?
2    Q.  That individual states were going to
3 handle the federal program.  This is what
4 Miss Arnold had stated.
5    A.  That could have happened.
6    Q.  Okay.  So, as far as you're aware of
7 you know...
8    A.  And I, I don't have a lot of contact
9 with BLM right now.  So, that could have
10 happened.  My contact diminished long before
11 I went into the other position, so...
12    Q.  All right.  So, you've been
13 transferred out of...
14    A.  I was told I was going into another
15 position prior to when I left to go into
16 this position in September.  I'm trying to
17 think.  There were a number of events that
18 occurred and there were meetings that
19 occurred that I did not sit in on.  So,
20 there may have been things that would, would
21 have changed prior that I might not have
22 been aware of.
23    Q.  Well, the Complainant has also
24 alleged that Ms. Johnson reorganized the
25 Human Resources Program.  Were you aware of

## Page 11

1 any reorganization or were you involved in
2 being reorganized?
3    A.  I was reorganized out.
4    Q.  You are out of BLM or out of Human
5 Resources?
6    A.  Out of Human Resources.
7    Q.  All right.  You were -- were you
8 reassigned or did you apply and were
9 accepted for a different position?
10    A.  I was reassigned.
11    Q.  As far as you are aware, when the
12 reorganization occurred was there any kind of
13 written plan that employees were given or
14 notified of?
15    A.  There was an announcement of, to the
16 group that there was going to be a
17 reorganization, but no copies were given out
18 as far as the reorganization.
19    Q.  Okay.  Well, who made the
20 announcement that there was going to be a
21 reorganization?
22    A.  (No audible response.)
23    Q.  Okay.  Now, the other allegation the
24 Complainant is making is that she was
25 transferred to Title VI, a program that does

## Page 12

1 not exist.  Are you aware of or do you know
2 whether or not before you left Human
3 Resources had a Title VI Program?
4    A.  They were supposed to establish one
5 based on what the Department was telling
6 them that they needed.  So, I guess with her
7 transfer that was the establishment, that was
8 for the Title VI Program.
9    Q.  But when you were working there was
10 there a Title VI Program?
11    A.  Not before, no.
12    Q.  All right.  So, you heard about this
13 program as you were on your way out?
14    A.  Actually it's complicated.  I was
15 still there, but I wasn't there and that's
16 when they -- they established it beforehand
17 with no instruction to go by the Department.
18    Q.  Okay.  Well, when you say you were
19 still there, but you weren't there, do you
20 mean it was before you were transferred out,
21 but...
22    A.  I had no involvement.
23    Q.  Okay, right.  And were you -- well,
24 were you even perform -- were you performing
25 the duties that you normally would have


County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 13

1 performed while you were waiting...
2 A. I, I was, I was asked not to
3 supervise anybody or to talk to anyone and
4 that's exactly what I did.
5 Q. And who gave you that order?
6 A. Marilyn Johnson.
7 Q. Did she give you a reason?
8 A. She just wanted me to move into
9 another position and she asked me not to
10 talk to anyone and not to supervise anyone
11 and I complied.
12 Q. All right. Now, the Complainant is
13 also alleging that she was issued a letter
14 of counseling for saying I'll be damned.
15 Were you present or did — were you around
16 when this statement was allegedly made?
17 A. Wasn't present and had no
18 involvement.
19 Q. Well, based on any of your knowledge,
20 were, were you aware of or do you know
21 whether or not Ms. Romella Arnold used
22 profanity regularly?
23 A. No more than anybody else.
24 Q. All right. So, as far as you're
25 aware of her, her, her use of profanity was

## Page 14

1 no more serious or no more often than any
2 other employee in the office that you had
3 contact with?
4 A. Exactly.
5 Q. All right. Were you aware of
6 whether or not any other employee in the
7 office have ever received a letter of
8 counseling based on using profanity?
9 A. No.
10 Q. Okay. Now, the other thing that the
11 Complainant is alleging is that when she
12 made requests to attend programs that she
13 normally oversaw, for example, the Student
14 Career Experience Program, that she was
15 denied the opportunity to travel to these
16 programs. Now, do you have any knowledge of
17 her having made this request or what
18 happened to it?
19 A. No.
20 Q. Well, in general, can you tell me,
21 during the course of this reorganization were
22 you denied any opportunity to travel or was
23 it in general everybody was stopped from
24 traveling or just specific people?
25 A. I have no clue. I had no place to

## Page 15

1 travel to. So, therefore, I made no request
2 to travel.
3 Q. Okay. So, your position did not
4 involve travel requests?
5 A. Prior to, to the reorganization, yes,
6 it did, but during that time of the
7 transition I did not request to travel.
8 Therefore, I did not travel.
9 Q. Were you given any reason for your
10 treatment as far as being asked not to talk
11 to or supervise anyone during the transition?
12 Was there some particular problem that just
13 came up?
14 A. Yes, and I would prefer not to even
15 discuss it at this point.
16 Q. All right. Now, one of the things
17 that Ms. Arnold had said is that she
18 believes that Miss Marilyn Johnson is fairly
19 negative towards African American employees
20 and that she has a history of this type of
21 negativity as far as once they advance
22 beyond a certain level she does take actions
23 to remove them.
24 Now, she, Miss Arnold has provided me
25 with a list of names and I would like to

## Page 16

1 ask you, as I repeat the name if you know
2 whether or not this person was ever
3 supervised by Ms. Johnson or whether or not
4 this person was actually ever reassigned or
5 moved out of a job due to Miss Johnson.
6 The first person the Complainant
7 names is a Richard Redmond?
8 A. I mean, I know Richard Redmond, but
9 I don't know if he was ever supervised by
10 Marilyn Johnson or not.
11 Q. Okay. Clark Collins?
12 A. He is supervised by Miss Johnson.
13 Q. Do you know whether or not in the
14 reorganization was he removed from his
15 position?
16 A. He went on detail and somebody was
17 detailed into his job. He is back and I'm
18 not sure what he's doing at this point.
19 Q. Okay. Lee Allen?
20 A. Lee Allen is supervised by her.
21 Q. Do you know whether or not he was
22 removed from a position, detailed, demoted
23 or...
24 A. His whole office in his region was
25 abolished. So, she has abolished that.



## Page 17

1    Q. Okay.
2         COURT REPORTER: I'm, I'm
3  sorry. Miss Stewart, could you please
4  speak...
5    A. I'm, I'm sorry. I, I was kind of
6  thinking because I haven't really...
7         COURT REPORTER: Oh, that's
8  okay.
9    A. I just know he works there now, I
10 don't know what position he's in.
11   Q. Okay. Warren Johnson?
12   A. Warren Johnson has retired.
13   Q. Okay. Melvin Fowler?
14   A. I don't know.
15   Q. Edgar R. Weathersby?
16   A. Ed Weathersby, who has retired, did
17 work for Marilyn, but I think he actually
18 went on assignment to the Eastern States
19 Office when she came on board.
20   Q. All right. Denise Stanback?
21   A. I don't know her.
22   Q. Jana Long?
23   A. I don't know her.
24   Q. Ivy J. Garcia?
25   A. Don't know her.

## Page 18

1    Q. Diane Wood-Medly?
2    A. I don't know that person.
3    Q. Okay. The other thing that Ms.
4  Arnold is alleging is that her -- she was
5  transferred out of her office into shared
6  space. Miss Johnson, when asked about it,
7  stated that most employees shared space.
8  Was it unusual or would it have been unusual
9  for an employee at Romella Arnold's level to
10 be sharing an office with another employee?
11   A. Everybody shares space. Space is a
12 problem in this building. It's not unusual
13 to share space.
14   Q. Okay. And Miss Arnold states that
15 she has a reputation for being involved in
16 matters of Civil Rights, that she belongs to
17 a black federal employee organization and has
18 contact with a Congressman. Were you aware
19 of or is it at least well known that Miss
20 Arnold is involved in Civil Rights matters?
21   A. I mean, she could be, I don't know.
22   Q. Okay. So, as far as you know she
23 didn't have an in general reputation of
24 being an activist?
25   A. No.

## Page 19

1    Q. Okay. Is there anything else you
2  would like to add?
3    A. No.
4         MS. ANDERSON: Okay. Well,
5  thank you very much, Miss Stewart. This
6  concludes the interview.
7  (WHEREUPON, the Telephone Investigative
8  Interview of CONSTETTA STEWART was concluded
9  at 1:25 p.m.)
10        COURT REPORTER: Okay, thank
11 you.
12        MS. ANDERSON: Is there
13 anything you need?
14        COURT REPORTER: No, I think
15 that's everything. I have the correct
16 spellings, I thank you very much.
17   A. Okay.
18        MS. ANDERSON: Okay, thank
19 you.
20        COURT REPORTER: All right.
21 Have a good day.
22        MS. ANDERSON: You, too.
23   A. You, too.
24
25

## Page 20

1              CAPTION
2    The Telephone Interview of CONSTETTA
3  STEWART, in the matter, on the date, and at
4  the time and place set out on the title page
5  hereof.
6    It was requested that the Interview
7  be taken by the reporter and that same be
8  reduced to typewritten form.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

**Page 21**

1         SIGNATURE OF WITNESS
2      I have read the foregoing transcript
3 of the Interview taken on the
4 _____ day of _____,
5 2004, and it is a true and correct record of
6 my testimony given at that time and place
7 except as to any corrections I have listed
8 below. I understand that the information I
9 have given is not to be considered
10 confidential and that it may be shown to the
11 interested parties.
12
13
14
15
16        CONSTETTA STEWART
17
18
19
20
21
22
23
24
25

**Page 22**

1      INTERVIEW ERRATA SHEET
2 WITNESS: CONSTETTA STEWART
3 INTERVIEW DATE: March 17, 2004
4 I have read the entire transcript of my
   Interview. I request that the following
5 changes be entered upon the record for the
   reasons indicated. I have signed my name to
6 the Errata Sheet and Signature Page to be
   attached to the original transcript.
7
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 SIGNATURE:_____ DATE:_____
25    CONSTETTA STEWART



1    **CERTIFICATE OF REPORTER**

2

3    **STATE OF VIRGINIA AT LARGE:**

4

5    I, **TONIE M. WALLACE, R.P.R.**,

6    Notary Public for the State of Virginia

7    at Large, do hereby certify that the

8    foregoing constitutes a true and

9    accurate transcript to the best of my

10   ability.

11

12   I further certify that I am not an

13   employee of nor related to any of the

14   parties, and I have no financial

15   interest in the outcome of this matter.

16

17   _____

18                    Notary Public

19

20   My Commission Expires:

21   April 30, 2007

22

23

24

25



**County Court REPORTERS**, inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com



# United States Department of the Interior

**EXHIBIT D22**

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov

August 1, 2003

**Memorandum**

To:         Romella Arnold

From:      Marilyn H. Johnson, *Assistant Director HRM*

Subject:   Reassignment

This memorandum serves to inform you that effective August 10, 2003, you will be assigned to the position of Equal Opportunity Specialist, GS 360-13, with the organization title of Civil Rights Specialist. In preparation of that assignment, you will turn over all information that you have pertaining to the SCEP and STEP Programs to Sylvia Felder, Administrative Officer, HRM by August 6, 2003.

The reason for this reassignment is as follows:

In a report entitled, **Ten-Year Check Up: Have Federal Agencies Responded to Civil Rights Recommendations?** dated June 12, 2003, criticized the Department and the Bureau of Land Management for non-response to the need to enforce Title VI, Enforcement to Ensure that Nondiscrimination in Federally Assisted Programs This report listed the Bureau of Land Management as one of the Bureaus in the Department of the Interior that did not have Civil Rights Specialists employed to do that compliance

As Assistant Director for Human Resources Management for the BLM, I intend to correct that situation by appointing you as the Civil Rights Specialist for BLM Title VI issues. This will necessitate a reassignment from your present position of Student Programs Coordinator for the BLM  Your background in EEO compliance and dealing with a variety of public organizations makes you qualified for this position.

In this position, I expect you to bring the Bureau up to model standards in compliance with its Title VI responsibilities  You will be given your position description and performance standards for this position in thirty days

This position will be located in the EEO Headquarters Office of the Bureau of Land Management  Your pay  grade, and duty station will not be affected

I know that you will do outstanding work in your new position



ONE HUNDRED FIFTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

*9-17-97*
(Date)

For: *Ronella Arnold*

*N A A B F E*

Thank you for participating in the recent hearing. Attached are transcript pages, Nos.*142, 169-170, 182, 186*, showing your remarks given before the subcommittee. Please correct your testimony only, using the following guidelines.

1. <u>Print</u> with <u>red</u> ink or type any corrections, using standard editing symbols. Please initial each completed page.
2. Correct only grammatical and typographical errors. The intent of your remarks should not be changed, nor should the language be so enhanced that it becomes unrecognizable from the original text.
3. Attach documents or other requested information to the appropriate page. Supplemental material supplied for the record should be of photographic quality for reproduction.
4. If you wish to correct any misstatement of fact, please submit a separate letter for the record explaining the misstatement and any correction you wish noted.

Should the subcommittee have questions about your edited transcript, please indicate the name and telephone number of the person to whom inquiries should be made:

_____

_____

To expedite printing, please return this material (even if no corrections are made to the text) by *3 October 1997* to the address below.

Subcommittee on Civil Service
Room B371C Rayburn HOB
Washington, D.C. 20515
<u>Attention:</u> Caroline Fiel Tel. 202/225-6427

UNLESS A PROPERLY CORRECTED TRANSCRIPT IS RECEIVED BY THE SUBCOMMITTEE <u>WITHIN THE SPECIFIED TIME</u>, YOUR REMARKS AS RECORDED WILL APPEAR IN THE PRINTED RECORD.

<u>NOTE:</u> Copies of the transcript are not to be distributed for other than editing purposes and no direct quotations are to be taken from the edited version.

## CERTIFICATION

I certify that the corrections made and initialed by me reflect the changes I wish to make in my oral testimony.

*Ronella J. Arnold*
(signature)

3131 | TESTIMONY OF ROMELLA ARNOLD

3132      Ms. ARNOLD.  Thank you, Mr. Chair.  Good afternoon,
3133 | members of the committee.  I would like, first, to say that I
3134 | was not the first choice to give testimony today, but I am
3135 | from that agency that sent out a message to our senior-level
3136 | employee who was asked and invited to participate in this
3137 | testimony that, if she showed up, that her career would be
3138 | over.  So I am sorry Mr. Cummings is not here because I could
3139 | shed some light to that incident as it happened, and I am her
3140 | replacement.

3141      I also feel that I, too, will be reprised against, once
3142 | it gets back to the Department that I am the witness giving
3143 | testimony here today.  So I would like to go on record as
3144 | saying that reprisal is very much the monster at the
3145 | Department of the Interior, and that, yes, the message is
3146 | managers can and will reprise and retaliate against us when
3147 | we speak out about the injustices at the Department of the
3148 | Interior.

3149      I am here today as a representative for the National
3150 | Association for the Advancement of Black Federal Employees.
3151 | NAABFE was formed by African American employees at the
3152 | Department of the Interior in 1997--1994.  Our mission is to
3153 | address the status of African American employment within the
3154 | Department.  The employees we represent are deeply concerned

3155 by the lack of equal opportunity within the Department of the
3156 Interior.  The Department's longstanding resistance to adhere
3157 to the spirit and the intent of equal opportunity laws and
3158 regulations has caused severe underrepresentation and in some
3159 instances a conspicuous absence of African Americans within
3160 the employment categories and levels.

3161 Throughout the years, the Department's EEO program has
3162 been the focus of numerous congressional inquiries, audits,
3163 and investigations by regulatory agencies and the media.  All
3164 appear to have reached the same incontrovertible conclusion:
3165 The Department, through its employment practices, has
3166 systemically excluded African American employees as a class,
3167 and those practices continue to perpetuate and affects the
3168 past discrimination.  The legacy is a workforce that in no
3169 way reflects the diversity of our Nation, and a Department
3170 that will be ill-prepared to enter the next century and to
3171 deal with the challenges and the opportunities that a more
3172 diverse society will present.

3173 We believe the following statistics reflect what many
3174 years of institutional racism has created.  These percentages
3175 should be compared to the national civilian labor force
3176 percentage of 10.4 percent, and this percentage has been used
3177 by the Office of Personnel Management as the representational
3178 standard.

3179 All but two major Federal agencies, the Department of

3180 Agriculture and the Department of the Interior, have met and

3181 exceed this standard. As of June 1997, out of a total

3182 employment population of 74,827, African Americans represent

3183 only 6.1 percent or 3,357 of the 53,400 permanent employees

3184 and 2.4 percent or 514 of the 21,427 temporary employees

3185 within the Department.

3186     A recent article in The Washington Post identified the

3187 Department of the Interior as the whitest of all Federal

3188 agencies when it comes to employment at the GS-13 and above

3189 levels. At the GS-13 through -15, out of a total of 9,100

3190 employees, African Americans represent 3.8 percent or 346.

3191 This condition has persisted, despite a net growth in the

3192 Department over the last 10 years.

3193     According to an annual report published by the EEOC

3194 Commission, the representation of African Americans from 1986

3195 to 1995 flat-lined between 5.9 and 6.0 percent, despite a net

3196 increase of over 5,000. I submit to you, Mr. Chair, if we

3197 were hooked up to an EEOC respirator, they would have pulled

3198 the plug on us by now. We contend this is due to an

3199 unwritten quota policy of replacement-only where African

3200 American employment is concerned. The same EEOC report has

3201 ranked Interior last out of 42 agencies and departments in

3202 its employment of African Americans.

3203     As the statistics demonstrate, the institutional

3204 discrimination that has produced and perpetuated this

3205 underrepresentation of African Americans is evident in the
3206 representational statistics within every department, and some
3207 far more worse than others.

3208     For instance, the Bureau of Land Management, African
3209 American males represent 1.2 percent or 101 of a total of
3210 8,418.   In the Bureau of Reclamation, African American men
3211 are 1.3 percent or 73, and African American women are 1.5
3212 percent or 88 out of a total of 5,612.  Within the Office of
3213 the Solicitor, African American males represent 4 or 1.1
3214 percent of a total 365 attorneys.   In this Nation's capital,
3215 where attorneys are like taxi drivers, it's appalling to
3216 wonder why Interior only has four Black male attorneys
3217 nationwide within the Department.

3218     African Americans are also severely underrepresented and
3219 mostly conspicuously absent in many of the Department's
3220 mission-critical occupations.   Mission-critical occupations
3221 are those occupations that are typically highly populated and
3222 they are directly related to the agency's missions, and they
3223 offer the greatest career opportunities.

3224     Examples of these agencies are as follows:

3225     Park management positions within the National Park
3226 Service, where African American men represent 3.7 percent or
3227 119, and African American women represent 1.7 percent or 55
3228 out of a total of 3,220 park management positions.

3229     General biologist positions within the U.S. Fish and

3230  Wildlife Service, where African American males represent .5
3231  or 5 and African American women represent 1.2 or 12 out of a
3232  total population of 973 biologists.

3233      In the Bureau of Land Management, range management
3234  specialists, African American males and women are
3235  non-existent.  We represent zero percent out of a total of
3236  392 range managers.

3237      Equally disturbing has been the loss of African Americans
3238  at the SES level, and within the departmental personnel and
3239  EEO offices.  In 1993, there were 17 African American SESes
3240  at the Department out of a population of 256.  While modest,
3241  this representation had taken years to achieve.  In 1997,
3242  this number has declined to 13 out of 196.  Because of the
3243  severe underrepresentation of African Americans at the GS-15
3244  and -14 levels, and the absence of any effective recruitment
3245  program at this level, we feel this number will continue to
3246  decrease.

3247      In 1976, the political leadership at the Department began
3248  a concerted effort to recruit African Americans into the
3249  departmental Office of Personnel.  This office is key because
3250  it is where personnel policies are formulated and interpreted
3251  for the Department.  At that time, there were no African
3252  American personnel specialists within this office.  By 1993,
3253  there were nine.  By 1997, we're down to one.  This loss
3254  occurred at the same time new employees were being hired in

3255    the Department's Office of Personnel.  In 1996, there were

3256    seven new hires in this office, all at the GS-13 and above

3257    level, and all of the selectees were White.

3258        A similar decrease has occurred within the Office of

3259    Equal Opportunity and the agency's EEO offices.  These

3260    offices, traditionally understaffed, were among the first

3261    targeted for downsizing.  Because the EEO offices have been

3262    one of the few offices to hire a significant number of

3263    minorities and women, the loss of EEO staff only served to

3264    exacerbate the Department's poor EEO profile.

3265        In 1993, there were 267 EEO specialists departmentwide

3266    and 30 within the departmental Office for Equal Opportunity.

3267    By 1997, there are approximately 140 EEO specialists

3268    departmentwide, a decrease of 40 percent, and 10 in the

3269    departmental office, a decrease of 66 percent.

3270        Most distressing of all, however, is the comparison

3271    between new hires and separations.  Between 1992 and 1997,

3272    there were approximately 7,110 new hires into the Department.

3273    Of that number, African Americans represented 6 percent or

3274    426.  During the same time period, approximately 18,188

3275    people left the Department.  Of that number, African

3276    Americans represented 6.6 percent or 1,198.

3277        We believe an explanation for the work environment facing

3278    African American employees very early in their

3279    employment--many realize there is no future at the

3280 | Department. This message is driven home in a variety of

3281 | ways, some more overt than others. Among the more glaring

3282 | examples are the incidents of racial intolerance and

3283 | harassment that have increased in recent years.

3284 | There is a story in the Department about an incident that

3285 | occurred back in the 1930's during the construction of the

3286 | Hoover Dam. As the story goes, White employees of the Bureau

3287 | of Reclamation who were involved in this construction project

3288 | accepted an old black dog as their mascot. They named this

3289 | dog ''Old Nigger,'' and thought so highly of him that, upon

3290 | his death, they placed a plaque at the site of the Hoover Dam

3291 | with the inscription, ''To Old Nig.'' This plaque remained

3292 | there for quite some time, until it was finally removed in

3293 | the 1960's.

3294 | Unfortunately, the following case studies reveal not much

3295 | has changed since then. A newly Black hired male employee of

3296 | the regional office of the U.S. Fish and Wildlife Service was

3297 | continually subjected to various forms of harassment by his

3298 | first-level supervisor through most of his first year of

3299 | employment. Just prior to terminating him in December of

3300 | 1996, days before Christmas, his first-and second-level

3301 | supervisors presented him with a certificate. This

3302 | certificate was prepared on Government time and on Government

3303 | equipment, containing shocking racial language, clearly

3304 | intended to demean this young Black male. An EEO counselor

HGO253-030

3305  later found a copy of this certificate, which I hold in my
3306  hand, and after presenting it to the managers at the agency,
3307  the gentleman was promptly rehired.  To date, we know of no
3308  disciplinary action that was taken against either of the
3309  supervisors.
3310  In 1992, an African American female employee of the
3311  Minerals Management Service was confronted by a White male
3312  manager after she was informed that he had referred to her as
3313  a ''Mississippi nigger.''  When she confronted him to ask him
3314  if he made this statement, his comment to her was, ''Would it
3315  make you feel better if I called you a 'good Mississippi
3316  nigger'?''  Initially, the officials within the Minerals
3317  Management Service resisted to taking any action, stating
3318  that it was her word against his word.  It wasn't until 1997
3319  that the officials finally decided to suspend the manager for
3320  only three days.
3321  In 1995, an EEOC administrative judge found the National
3322  Park Service had racially harassed an African American woman
3323  in the Service's regional office.  A White male co-worker of
3324  the woman had referred to her as ''a lazy black bee'' and ''a
3325  F-ing nigger'' on a number of occasions.  These statements
3326  were made in the presence of his supervisor and other
3327  co-workers who chose to do nothing.
3328  After over a year-and-a-half of adamantly refusing to
3329  take any disciplinary action against the co-worker or the

HG0253.090

3330  supervisor, the Park Service reluctantly issued both of them

3331  a letter of reprimand, which is the lowest form of

3332  disciplinary action that one can take.

3333       Most recently, at the Department of the Interior, as of

3334  August 1997, there was a Ku Klux Klan poster posted in the

3335  mechanics room, known as the ''weld room.''  The Ku Klux Klan

3336  poster was prominently displayed, and it was announcing a

3337  Klan rally to be held in Bowie, Maryland.  The managers who

3338  got a hold of the poster tried to keep it quiet, but the

3339  employees who worked down there felt intimidated, and they

3340  came to our organization and reported this incident.  We

3341  reported it to the Office of the Secretary ethics counselor.

3342  To date, we know of no disciplinary action that has been

3343  taken against the employee who posted the poster in the ~~break~~

3344  room.

3345       In 1996, there were over 700 discrimination complaints at

3346  the Department.  On an average, it takes complaints 565 days

3347  to be processed, three times longer than the statutory

3348  requirements of 180 days.  Too often, complaints of

3349  discrimination are accompanied by complaints of reprisal and

3350  retaliation by complainants alleging they experienced an

3351  adverse employment action as a result of an EEOC complaint.

3352       Fear of reprisal is very real at the Department.

3353  Recently, an African American senior executive employee had

3354  agreed to serve as an agent on a class action complaint

K96

3355    against the Department, withdrew his name, citing incidents

3356    of reprisal he felt were directly related to his involvement

3357    in the class.  Rights have little meaning if one is in fear

3358    of exercising them.  If someone at the SES level can be

3359    intimidated, only one can wonder about the chilling effects

3360    that it has on lower-graded employees such as myself.

3361        We recognize these problems have evolved over many years

3362    and will take time to correct.  However, the time to begin is

3363    long overdue.  We, along with other employee groups, have

3364    provided the Secretary of the Interior and his designee with

3365    specific recommendations to correct these inequities on a

3366    number of occasions since his arrival in 1993.  We believe

3367    that the problem is not that the Department does not know how

3368    to effectuate the change needed, but that the Department is

3369    disinclined to make these changes.

3370        The recommendations that we have provided are summarized

3371    in four points:

3372        Establish EEO goals and time tables designed to eliminate

3373    the severe underrepresentation of African Americans.

3374        The development and implementation of an accountability

3375    system that rewards EEO progress and punishes noncompliance.

3376        The development of centralized recruitment and training

3377    programs at the entry, mid, and senior levels, that create

3378    applicant pools.

3379        And the implementation of a policy that ensures incidents

3380 of racial discrimination and harassment are dealt with

3381 expeditiously, in a manner designed to send a message to

3382 others who might be inclined to engage in similar behavior.

3383     We know these problems we have described are not unique

3384 to the Department, but are symbolic of a larger issue

3385 involving the structure of the Federal equal opportunity

3386 programs.  Bureaucracies do not suffer change well; they are

3387 best for maintaining status quo.

3388     We believe for the equal opportunity program to function

3389 effectively it must be able to carry out its responsibilities

3390 independent of influences by the department or agencies it

3391 represents.  Similar to the inspector general's role, the

3392 role of the EEO office should be to monitor and to ensure

3393 compliance and establish laws and regulations.  The existing

3394 structure does not permit this.  In fact, it impedes change.

3395     Therefore, we respectfully recommend that Congress

3396 initiate legislation that will enable Federal EEO officials

3397 to be more effective.  We suggest that you play a key role

3398 through your agency appropriations committees in ensuring

3399 that intent becomes a reality.  We only have to look to NASA

3400 in the mid-seventies; it was not until a congressional

3401 appropriations committee for NASA made it clear that NASA's

3402 future funding would be contingent on demonstrable EEO

3403 progress that we finally saw our first minority astronaut and

3404 ~~woman -- minority~~ and woman astronaut.  We need your

3405  interdiction, and I thank you for allowing me to participate

3406  in these hearings.   Thank you.

3407      [Applause.]

3408      [The statement of Mr. Arnold follows:]


3409  ********** INSERT **********

3743  Mr. MICA.  I thank each of our panelists for their

3744  testimony, and I'm going to yield first to the gentlelady

3745  from Maryland, who has joined us, Ms. Morella, for questions.

3746  Ms. MORELLA.  Thank you, Mr. Chairman, and I want to

3747  thank Mr. Cummings for requesting this hearing and Mr. Mica,

3748  for you in having them.

3749  I read all the testimony, certainly have the benefit of

3750  this last panel.  You've all very clearly expressed your

3751  concern with the current EEO process, and also sharing

3752  concerns about strengthening and simplifying the system and

3753  eliminating the backlog.

3754  I do want to pledge here to work with Mr. Mica and Mr.

3755  Cummings, Mr. Martinez, Ms. Norton, and Mr. Wynn to craft the

3756  legislation that would help to clear up that backlog of cases

3757  and discrimination that we've seen here, and try to remedy it

3758  in other ways also, and make it far more fair.

3759  But let me just ask you one question.  What else do you

3760  think that we can do?  What is the role, in your regard, of

3761  the alternative dispute resolution?  And do you think that

3762  diversity training within the Federal workplace would also

3763  help?  So I guess I would just ask that question to each of

3764  you--perhaps whoever wants to start.

3765  Ms. ARNOLD.  I'd like to be the first to respond.  As far

3766  as the role that Congress could help to correct this problem,

3767  I feel that once again I will state it for the record:   If

3768    you tie the appropriations of the agencies to their

3769    non-compliance, they would think twice about discriminating

3770    against individuals and classes of protected groups.

3771        Also, at the Department of the Interior, ADR is just a

3772    litmus test.  There is no active, formal ADR program that

3773    employees can turn to, and, also, ADR is voluntary.  If an

3774    employee wants an ADR session and a manager does not, that

3775    session will not occur at the Department of the Interior.  So

3776    unless, once again, ADR is legislated to be part of the

3777    process, it won't happen at our agency.

3778        Ms. MORELLA.  But even if the employee wants it and the

3779    manager does not, it doesn't happen?

3780        Ms. ARNOLD.  Right, because the manager has to be a part

3781    of it.

3782        Ms. COX.  Hi.  I'd like to respond first to the question

3783    regarding the diversity training.  As one of the things that

3784    the agency did after the court found them guilty of

3785    discrimination, it was to engage in diversity training for

3786    all management, all management and all staff.  And we believe

3787    that this training has had an effect on employees, but we

3788    believe that it needs to go further in terms of dealing with

3789    the managers, because we believe that they are in the unique

3790    position to set the standards and affect the attitudes of

3791    their workforce.  So we believe that there has to be

3792    something in their evaluation that holds them accountable for

4068   was in the room, and the chairman, to his credit, said,

4069   ''Look, we've got a deadline and you've got to have us an

4070   answer within 45 days.''  Actually, it was less than 45 days

4071   that they came and we met with them yesterday, and they had

4072   answers to the problem.  And I mean, this was as very, very,

4073   very, very complicated problem, but they had answered, and

4074   they have worked on this for years.

4075     So I'm just trying to figure out, do you have any

4076   suggestions as to how we can do that, because we want to be

4077   effective?

4078     Ms. ARNOLD.  Thank you, Mr. Cummings.  Our recommendation

4079   was the recommendation to tie the appropriations to the

4080   agencies that are in non-compliance.  One way to keep track

4081   of that is through the reports that come out from EEOC,

4082   because all of the agencies have to report to EEOC.  And when

4083   you get those reports and you see an agency such as the

4084   Department of the Interior ranking last out of 42 agencies

4085   with the underrepresentation of African Americans, you have

4086   to wonder, is this by design or how did this happen?  And

4087   then when you look at the complaint process system within the

4088   agency and you don't see that the process is working, when it

4089   comes appropriation time, you go to the Chairs that sit on

4090   the Appropriations Committee for that agency and you do an

4091   inquiry, and you say, ''Well, why do you all continue to have

4092   700 complaints on the books that have not been processed?''

4093    And EEOC already has charted out how long it has taken us

4094    to process our complaints.   The average complaint within the

4095    Department takes 565 days to process.   That's years of a

4096    person's life--years.

4097    So when you see that kind of report card that's coming

4098    out from the Commission, you can use that as leverage when

4099    you go to these agencies and it's appropriation time.   They

4100    come to you all and they say, ''We need 'X' amount of dollars

4101    for the grazing of land.''   And you say, ''Well, what does

4102    your human resources profile look like?  We know you've got a

4103    grazing problem, but what about your people problem?''

4104    [Applause.]

4105    Mr. CUMMINGS.  Let me just interject something in there,

4106    and then I want to hear from you, Ms. Cox.

4107    One of the things that I think we have to stay reminded

4108    of--and, again, I think we've just got to embed this in the

4109    DNA of every cell of our brains--we all pay into the Federal

4110    Government system, all of us.  If you don't believe it, ask

4111    IRS.  And so we all deserve, as Americans, fair

4112    opportunities.  And sometimes we seem to forget that, that we

4113    all pay into this system.  Nobody gives you a tax exemption

4114    because you can't be promoted.  Nobody gives you a tax

4115    exemption because you can't get a job, although you're

4116    qualified.  Nobody gives you a tax exemption when your child

4117    has done everything in his power or her power, stayed on the

4168 Government can move fast.  It can move fast when there are
4169 people up here who want it to move fast, and not only want it
4170 to, but do what is necessary to make it move fast.  And I'm
4171 very glad that we're having this hearing.  You all have said
4172 a lot of information that is very important.

4173    There are a lot of people in pain, and we understand that
4174 pain.  We feel that pain, and we're going to try to make sure
4175 your pain does not go on forever and ever and ever, and that
4176 10 years from now you're still talking about the same pain.

4177    Yes, Ma'am?

4178    Ms. ARNOLD.  You weren't in the room when I addressed the
4179 committee, but I am the replacement of the Black female
4180 senior executive that was forewarned that her appearance here
4181 today may result in her career demise.  So I just wanted to
4182 mention that.

4183    Mr. CUMMINGS.  I promise you--I promise you--that that is
4184 going to be something--I hope Mr. Mica will join me in that,
4185 but no matter what--no matter what--if God spares my life
4186 long enough, I will get a letter to whoever is the head of
4187 that Department, a copy to the President, trying to figure
4188 out what is going on there, because to me that is criminal,
4189 and it will be even more criminal for me as a Member of the
4190 Congress of the United States not to do something about it.

4191    [Applause.]

4192    Yes, Ma'am?

ORIGINAL

**EXHIBIT D5**

## UNITED STATES DEPARTMENT OF THE INTERIOR
### BUREAU OF LAND MANAGEMENT
#### WASHINGTON, D. C. 20240
#### COMPLAINT OF DISCRIMINATION


IN RE:     Romella J. Arnold
           Complaint No. LLM-04-002


~~~~~~~~~~~~~~~~~~~~~~~~~


The Sworn Telephone Investigative Interview of **SYLVIA**

**FELDER**, taken in the above matter in the Offices of

**COUNTY COURT REPORTERS, INC.**, located at 1160 Jordan

Springs Road, on the 9th day of March, 2004, beginning at

10:35 a.m.



**County Court REPORTERS,**INC.
The Nations Leader in Digital Litigation Support Technology
www.CountyCourtReporters.com

**800.262.8777**
**540.667.6562** FAX

CORPORATE OFFICES
**Historic Jordan Springs**
**1160 Jordan Springs Road**
**Stephenson, VA 22656**

2

1       A P P E A R A N C E S

2

3       ON BEHALF OF THE U.S. DEPARTMENT OF

4       INTERIOR, BUREAU OF LAND MANAGEMENT:

5       Jesse Hicks, EEO Investigator

6            U.S. Department of Interior, BLM

7            WO-720-EEO

8            1620 L Street, N.W., Suite 700

9            Washington, D.C.  20036

10           Telephone: (202) 452-5102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ⟋ 1160 Jordan Springs Road ⟋ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

3

1    <u>SWORN TELEPHONE INVESTIGATIVE INTERVIEW OF</u>

2    <u>SYLVIA FELDER</u>

3    <u>IN RE: ROMELLA J. ARNOLD</u>

4    <u>Case No. LLM-04-002</u>

5    <u>March 9, 2004</u>

6         MS. ANDERSON:  Do you swear

7    or affirm the information you are about to

8    give is true to the best of your knowledge

9    or belief?

10         MS. FELDER:  Yes.

11    SYLVIA FELDER, having been duly sworn by Ms.

12    Anderson was examined and testified as

13    follows:

14    DIRECT EXAMINATION

15    BY MS. ANDERSON:

16         Q.  Please state your full name for the

17    record.

18         A.  Sylvia Felder.

19         Q.  And please state what agency you're

20    employed by?

21         A.  Department of Interior.

22         Q.  And what is your position title?

23         A.  Administrative Officer.

24         Q.  And the series and grade of that

25    position?



4

```
1        A.   I believe the series is 341, since I
2    just became a couple months ago...
3        Q.   Oh.
4        A.   ...and the -- my grade is a 13.
5        Q.   Okay.  And if you've only held this
6    position for a few months, during the the
7    year 2003, which covers this complaint, what
8    position did you hold?
9        A.   I was a Program Analyst.
10       Q.   And the series and grade of that
11   position?
12       A.   The grade was a 12 and I don't know
13   what the series of it was.
14       Q.   Okay.  During that period of time
15   who was your first level supervisor?
16       A.   For the year of 2000 and...
17       Q.   2003, before you get the current
18   position.
19       A.   From -- Marilyn Johnson.
20       Q.   Okay.  And what is her position
21   title?
22       A.   She's Assistant Director for Human
23   Resources.
24       Q.   And who was your second level
25   supervisor; that would be whoever is over
```

**County Court**
**REPORTERS** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ℓ 1160 Jordan Springs Road ℓ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

5

1   Ms. Johnson?

2        A.   I guess that would be the Deputy

3   Director of the Bureau.

4        Q.   Okay.   Now, you state that you're

5   currently in a different position than you

6   were in 2003.   Explain how did you -- did

7   you get promoted or did you transfer, how

8   did you move from this...

9        A.   I got promoted.

10       Q.   Okay.   Now, Ms. Romella Arnold is

11  alleging that she was discriminated against

12  based on her race, her sex, her age and the

13  fact that she had prior EEO activity.   She

14  states that this discrimination took the form

15  of discrimination in the terms and conditions

16  of her employment.   She names as the

17  responsible management official Ms. Marilyn

18  Johnson.

19       Now, to begin with, in her

20  allegations she states that Ms. Johnson

21  accused her of money laundering.   Were you

22  present at any time when Ms. Johnson

23  allegedly made these statements?

24       A.   Yes.

25       Q.   Did you hear her accuse the

**County Court REPORTERS** INC.

The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com

6

1   Complainant of money laundering?

2       A.   No

3       Q.   All right.  So, as far as you are

4   aware Miss Johnson, at least in your

5   presence, never made an accusation of money

6   laundering?

7       A.   She made an -- she did not make an

8   accusation of money laundering to Miss

9   Arnold.  She stated it in a general term in

10  a meeting that we attended, that we were in

11  and she was saying, what it sounds like is

12  money laundering to me.  But it was not

13  addressed to anybody in particular because

14  there was like several of us in the meeting.

15      Q.   Now, what was she responding to

16  saying it was money laundering?

17      A.   She was responding to the fact that

18  we had had, Miss Johnson was new to the

19  program and we were briefing her on the,

20  some of the, at, at that time we were

21  briefing her on the Langston University

22  partnership that we had and how that worked

23  and how the funds were -- how much money was

24  given to them and how they were -- and what

25  the monies were used for and all that.



**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ⌡ 1150 Jordan Springs Road ⌡ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

7

1    And so, in that sense she, you know,

2    in briefing her and we were giving her the,

3    you know, how everything worked before she

4    got there when the previous -- when the

5    previous Assistant Director, the way he

6    handled things and she said, well, you know,

7    I, I'm just paraphrasing this because I

8    can't remember, I think it was like two

9    years ago we had this conversation, this

10   meeting, and she said something like, well,

11   oh, that sounds like that's money laundering

12   to me.  Something like -- to that effect.

13   I don't, she never actually said that any

14   particular, anybody was laundering money,

15   so...

16       Q.    All right.  Was she making the

17   comment about the program?

18       A.    Yes, the program.

19       Q.    And, and that's the Student

20   Employment Program?

21       A.    Well, not the whole student program.

22   It's just that part of it, the, the

23   relationship with Langston University.

24       Q.    All right.  So...

25       A.    It was just the one contract under



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

8

1    that program.  We have several.

2        Q.  All right.  So, her comment was

3    directed at one particular program with

4    Langston University?

5        A.  Right.

6        Q.  And was that the program that at the

7    time the Complainant was over, that she was

8    in charge of?

9        A.  At that time I don't know if she was

10   in charge of it.  She was in, she was in

11   charge of the SCEP Program, which is Student

12   Career Experience Program.  There had been

13   some discrepancies in the directorate at the

14   time, so a lot of people were taking turns

15   on doing some of the work.  So, I can't

16   speak to say at that time that she was in

17   charge of it, but she had knowledge of it.

18   We all did.

19       Q.  All right.  So, the Complainant was

20   employed as the Student Employment Program

21   Manager.  Now, was that for one particular

22   program or she just worked in general with

23   student employment programs?

24       A.  She -- the, the Student Employment

25   Program encompasses the Historically Black



**County Court REPORTERS**, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777    Historic Jordan Springs ⎩ 1160 Jordan Springs Road ⎩ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

9

1  Colleges and Universities Program, the Tribal

2  Colleges Program, the Hispanic initiatives, I

3  mean, Servicing Institutions Program and the

4  Student Career Experience Program.  And at

5  that time, at that, at that meeting actually

6  she -- Romella was just the Student Career

7  Experience Program Manager because the other

8  Program Managers handled other aspects of the

9  Student Educational Programs.  I recall there

10 was two programs, but she, she was just

11 managing one part of it which is the SCEP

12 Program.

13     Q.  Well, the position you held, how did

14 you interact with the program?

15     A.  I interacted because I was the, I'm

16 the budget lead for the, for the

17 directorate.  So, any time they needed to,

18 any monies that they needed transferred or

19 to be used I, I pretty much monitored their

20 budgets and that's how, you know, I was

21 involved in knowing what, how the funding

22 was set apart.

23     Q.  Now, are you aware of or did you

24 know, was there a general memorandum put out

25 that the Equal Employment -- the Equal



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ✆ 1160 Jordan Springs Road ✆ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

1    Opportunity groups were going to be

2    reorganized under Miss Johnson?

3        A.   No.

4        Q.   Okay.   So, there was no notification

5    of any reorganization?

6        A.   I'm proceeding -- clarification...

7        Q.   Right.   I was asking whether or not

8    once Miss Johnson became really the second

9    level supervisor, was there any sort of

10   reorganization under her, did she make any

11   announcements, put out any memos, in any way

12   say that the, the people would be

13   reorganized in the program now that she was

14   over it?

15       A.   Yeah, and I think that, I don't know

16   particularly with the EEO Programs, but I

17   know that she -- and I, I'm not famil -- I

18   don't know, there may have been a memo, but

19   I'm not sure.   So, I, I can't speak to

20   that, but I know it was announced in the

21   staff meeting of all the staff or that, that

22   there, there would be some reorganization and

23   some movement of staff.   We all were aware

24   of that.

25       Q.   All right.   Did she give any



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777    Historic Jordan Springs ⟨ 1150 Jordan Springs Road ⟨ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

11

1    specific names of just say that in general

2    there's going to be a reorganization?

3        A.   She may at some time have given

4    specific names and according to whatever was

5    going on.   We have had several

6    reorganizations, not to just EEO Programs,

7    but the whole Human Resources Programs.

8        Q.   All right.   Well, the Complainant is

9    alleging that Ms. Johnson specifically sought

10   to dismantle the Student Employment Program

11   as it related to historically black colleges.

12       A.   No.   No, I don't have that

13   understanding.

14       Q.   Okay.   Well, were -- are these

15   programs still in effect?   For example, do

16   you still have a contract with Langston

17   University?

18       A.   No, we no longer have a contract

19   with Langston University, but we have with,

20   with other HBCU's.   You know, we still have

21   an HBCU program.

22       Q.   Is there any particular reason you

23   don't, you no longer have a contract with

24   Langston?

25       A.   Yes, because of the fact that there



**County Court REPORTERS, INC.**
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
**www.CountyCourtReporters.com**

12

1    were some inaccuracies and mismanagement of

2    the funds.

3        Q.  Were -- was Ms. Arnold involved in

4    that in any way?

5        A.  I don't -- no, I don't think so.

6        Q.  Well, another thing is, do you or

7    were you aware of at any time Miss Arnold

8    using profanity in any of your staff

9    meetings, I mean, was she known for using

10   profanity?  She received a letter of

11   counseling, she alleges, based on being

12   accused of using profanity.

13       A.  Well, she was in one meeting which I

14   think was a conference call.  But she wasn't

15   in that meeting, she was on the phone and

16   she did use profanity at that time.  That

17   was the only, that was the only meeting I

18   was a part of.

19       Q.  All right.  So, as far as just in

20   general, did you ever hear her use

21   profanity?  I mean, some people in their

22   ordinary speech pepper it with a few words.

23       A.  Not in my presence.  I, I can't say

24   that I have.  I, I mean, maybe in general

25   talking maybe, but I mean, it's just not



**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

13

1   like she interacted that much that, you

2   know, I would say that I heard her use

3   profanity on a number of occasions, but I do

4   know she was in a meeting, on a conference

5   call that she has used profanity.

6       Q.   All right.  Do you know whether or

7   not was, was any other management people

8   present at the time?

9       A.   Well, Miss Johnson was on the call

10  and the other Program Managers for the

11  different programs, the Hispanic Program

12  and...

13      Q.   Do you recall what she said?

14      A.   I don't recall exactly what was said.

15  I, I just know that it was something that,

16  you know, raised eyebrows, you know, but I

17  can't remember.  It, you know, it was, she

18  was, I think she was reacting to an

19  announcement because Miss Johnson had made

20  the announcement that she was going to bring

21  in someone else to manage the whole, overall

22  Student Program which is, Miss Arnold's

23  program was just one part of that, and that

24  she was going to bring in a Dr. Michael

25  Brown to be over the program management and

**County Court**
**REPORTERS**, inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ℓ 1160 Jordan Springs Road ℓ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

14

1    she made a comment -- that's when she made

2    a, a pro -- a, a cuss word to, I guess, in

3    reaction to the fact that somebody...

4        Q.  Complainant is saying that said, I'll

5    be damned.

6        A.  I mean, I don't remember exact words

7    but, you know, she did, she used a word of

8    profanity, you know, in that conversation, if

9    you want to say that is.

10        Q.  All right.  Now, the Complainant says

11    that, that several people were transferred

12    and reassigned and they were reassigned to a

13    Title 6 position which had no funding and

14    wasn't operative.  Now, when you dealt with

15    budgets, did you deal with the Title 6

16    Program at all?

17        A.  Okay, wait a minute.  You asked if

18    several people were, were reassigned to Title

19    6?

20        Q.  My understanding that the Complainant

21    and the Complainant's supervisor, a Miss

22    Stewart, were reassigned and they were

23    reassigned to work with the Title 6 Program.

24        A.  No, Miss Stewart was not reassigned

25    to work in the, the Title 6 Program.



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777    Historic Jordan Springs  1160 Jordan Springs Road  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

1    Q.  Okay.  So, just the Complainant was

2  reassigned then?

3    A.  Right.

4    Q.  Okay.  Are you aware of, since you

5  dealt with budgets are you aware of whether

6  or not there was a budget for Title 6?

7    A.  Well, there is a budget for the EEO

8  Programs and part of the EEO Program the

9  bureau was cited as -- by the EEO Commission

10  and they did an audit, I mean a, what you

11  call it, audit of the Bureau.  And one of

12  the things that we were cited on was the

13  fact that we didn't have a Title 6 Program.

14  And so that, as part of that, this is my

15  understanding, as part of that report and,

16  and, and trying to remedy that situation a

17  Title 6 position had to be established and,

18  yeah, we would have had the funding for

19  that.

20    Q.  Now, while there were, as, as you

21  stated before, as far as you know there was

22  information put out that there would be a

23  reorganization, but I take it there was no

24  formal plan that everybody was given later

25  on?

**County Court**
**REPORTERS,** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∟ 1160 Jordan Springs Road ∟ Stephenson, VA 22656    540.667.6562 FAX
**www.CountyCourtReporters.com**

16

1    A.   Well, right now we're still working

2  on it because it's still in process.   That

3  would be hard to say.   As a matter of fact

4  we are right now in the, in the process of

5  establishing two new groups.   We have a Work

6  Force Planning Group where people are going

7  to be reassigned to that.   We have a new

8  Service and Personnel Office that people are

9  going to be reassigned to.   They're already

10 there, but we just need to do their -- she

11 needs to reassign them and, but they're

12 working on that now.   So, it's still in

13 process, so -- and a new organizational

14 chart will be sent out.   So...

15    Q.   Now Complainant is -- Miss Arnold is

16 also alleging that as part of what she sees

17 as discrimination against her, that the --

18 was it, there was a computer program that

19 was eliminated, the Student Enhancement

20 Recruitment Tracking System.   Do you know

21 whether or not there was such a program and

22 was it eliminated from the system?

23    A.   There was one -- it wasn't

24 eliminated, it was never really established.

25 When I came on board here in Human Resources

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ⟋ 1160 Jordan Springs Road ⟋ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

17

1    under the old administration in 1999 and it

2    existed at that time.  And in looking at the

3    funding for it, they had sunk a lot of money

4    into it, but we had no product.  So, all --

5    so, they began questioning, you know, what

6    is this?  And so, in trying to give them

7    an opportunity to -- Miss Arnold and whoever

8    she had working with her -- to bring this

9    project to fruition, to a, to a closure

10    where it needed to be a functioning system

11    that you can just go in and pull the

12    information out and she assured us that it

13    would be that way and every year we would,

14    you know, give them more money.

15            So, this year when Miss Johnson came

16    aboard and, you know, and we could not

17    really justify why we had been spending

18    money.  We still had no -- there was still

19    nothing that we could show anybody to say,

20    okay, this is it.  So, our -- we have, now

21    we have an ITIB Board which is our --

22    basically where all the systems, coordination

23    or whatever for the Bureau, and you have to

24    go before them with any new systems.  And

25    they required a report, they wanted to know

**County Court**
**REPORTERS, INC.**
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ⟨ 1160 Jordan Springs Road ⟨ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

1    what this system was about and no one could

2    come up with what they call a 300B, which is

3    a business case for this system.  And we had

4    already sunk all this money into it, but the

5    decision was made that we would scrap it,

6    so...

7        Q.  Was it made after a presentation

8    before this Board?

9        A.  No, it never got to the Board.

10       Q.  Okay, it never got to the Board.

11       A.  Yeah, because no one -- you, you

12   have to do preparation or particulars to go

13   to the Board before it could -- and that was

14   never done, no.

15       Q.  So, was Miss Johnson the one who

16   decided to eliminate the system...

17       A.  Yes.

18       Q.  ...would be justified?

19           Okay.  Now, the Complainant actually

20   in her allegations said it, it's stating

21   that she felt that she actions that took

22   place were harassment, particularly

23   harassment directed at her because of her

24   race, her sex, her age and the fact that she

25   was known for her EEO activity.  Among other



**County Court**
**REPORTERS** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  ∠ 1160 Jordan Springs Road  ∠ Stephenson, VA 22656    540.667.6562 FAX
**www.CountyCourtReporters.com**