1 (Pages 1 to 4)



**Page 1**

1 UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
2 WASHINGTON, D. C. 20240
COMPLAINT OF DISCRIMINATION
3
4
5
IN RE: Romella J. Arnold
6 Complaint No. LLM-04-002
7
8
9 _____
10
11 The Sworn Telephone Investigative Interview of SYLVIA
12 FELDER, taken in the above matter in the Offices of
13 COUNTY COURT REPORTERS, INC., located at 1160 Jordan
14 Springs Road, on the 9th day of March, 2004, beginning at
15 10:35 a.m.
16
17
18
19
20
21
22
23
24
25

**Page 2**

APPEARANCES

1
2
3 ON BEHALF OF THE U.S. DEPARTMENT OF
4 INTERIOR, BUREAU OF LAND MANAGEMENT:
5 Jesse Hicks, EEO Investigator
6 U.S. Department of Interior, BLM
7 WO-720-EEO
8 1620 L Street, N.W., Suite 700
9 Washington, D.C. 20036
10 Telephone: (202) 452-5102
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1 SWORN TELEPHONE INVESTIGATIVE INTERVIEW OF
2 SYLVIA FELDER
3 IN RE: ROMELLA J. ARNOLD
4 Case No. LLM-04-002
5 March 9, 2004
6 MS. ANDERSON: Do you swear
7 or affirm the information you are about to
8 give is true to the best of your knowledge
9 or belief?
10 MS. FELDER: Yes.
11 SYLVIA FELDER, having been duly sworn by Ms.
12 Anderson was examined and testified as
13 follows:
14 DIRECT EXAMINATION
15 BY MS. ANDERSON:
16 Q. Please state your full name for the
17 record.
18 A. Sylvia Felder.
19 Q. And please state what agency you're
20 employed by?
21 A. Department of Interior.
22 Q. And what is your position title?
23 A. Administrative Officer.
24 Q. And the series and grade of that
25 position?

**Page 4**

1 A. I believe the series is 341, since I
2 just became a couple months ago...
3 Q. Oh.
4 A. ...and the -- my grade is a 13.
5 Q. Okay. And if you've only held this
6 position for a few months, during the the
7 year 2003, which covers this complaint, what
8 position did you hold?
9 A. I was a Program Analyst.
10 Q. And the series and grade of that
11 position?
12 A. The grade was a 12 and I don't know
13 what the series of it was.
14 Q. Okay. During that period of time
15 who was your first level supervisor?
16 A. For the year of 2000 and...
17 Q. 2003, before you get the current
18 position.
19 A. From -- Marilyn Johnson.
20 Q. Okay. And what is her position
21 title?
22 A. She's Assistant Director for Human
23 Resources.
24 Q. And who was your second level
25 supervisor; that would be whoever is over





## Page 5

1  Ms. Johnson?
2  A.  I guess that would be the Deputy
3  Director of the Bureau.
4  Q.  Okay.  Now, you state that you're
5  currently in a different position than you
6  were in 2003.  Explain how did you -- did
7  you get promoted or did you transfer, how
8  did you move from this...
9  A.  I got promoted.
10  Q.  Okay.  Now, Ms. Romella Arnold is
11  alleging that she was discriminated against
12  based on her race, her sex, her age and the
13  fact that she had prior EEO activity.  She
14  states that this discrimination took the form
15  of discrimination in the terms and conditions
16  of her employment.  She names as the
17  responsible management official Ms. Marilyn
18  Johnson.
19       Now, to begin with, in her
20  allegations she states that Ms. Johnson
21  accused her of money laundering.  Were you
22  present at any time when Ms. Johnson
23  allegedly made these statements?
24  A.  Yes.
25  Q.  Did you hear her accuse the

## Page 6

1  Complainant of money laundering?
2  A.  No
3  Q.  All right.  So, as far as you are
4  aware Miss Johnson, at least in your
5  presence, never made an accusation of money
6  laundering?
7  A.  She made an -- she did not make an
8  accusation of money laundering to Miss
9  Arnold.  She stated it in a general term in
10  a meeting that we attended, that we were in
11  and she was saying, what it sounds like is
12  money laundering to me.  But it was not
13  addressed to anybody in particular because
14  there was like several of us in the meeting.
15  Q.  Now, what was she responding to
16  saying it was money laundering?
17  A.  She was responding to the fact that
18  we had had, Miss Johnson was new to the
19  program and we were briefing her on the,
20  some of the, at, at that time we were
21  briefing her on the Langston University
22  partnership that we had and how that worked
23  and how the funds were -- how much money was
24  given to them and how they were -- and what
25  the monies were used for and all that.

## Page 7

1       And so, in that sense she, you know,
2  in briefing her and we were giving her the,
3  you know, how everything worked before she
4  got there when the previous -- when the
5  previous Assistant Director, the way he
6  handled things and she said, well, you know,
7  I, I'm just paraphrasing this because I
8  can't remember, I think it was like two
9  years ago we had this conversation, this
10  meeting, and she said something like, well,
11  oh, that sounds like that's money laundering
12  to me.  Something like -- to that effect.
13  I don't, she never actually said that any
14  particular, anybody was laundering money,
15  so...
16  Q.  All right.  Was she making the
17  comment about the program?
18  A.  Yes, the program.
19  Q.  And, and that's the Student
20  Employment Program?
21  A.  Well, not the whole student program.
22  It's just that part of it, the, the
23  relationship with Langston University.
24  Q.  All right.  So...
25  A.  It was just the one contract under

## Page 8

1  that program.  We have several.
2  Q.  All right.  So, her comment was
3  directed at one particular program with
4  Langston University?
5  A.  Right.
6  Q.  And was that the program that at the
7  time the Complainant was over, that she was
8  in charge of?
9  A.  At that time I don't know if she was
10  in charge of it.  She was in, she was in
11  charge of the SCEP Program, which is Student
12  Career Experience Program.  There had been
13  some discrepancies in the directorate at the
14  time, so a lot of people were taking turns
15  on doing some of the work.  So, I can't
16  speak to say at that time that she was in
17  charge of it, but she had knowledge of it.
18  We all did.
19  Q.  All right.  So, the Complainant was
20  employed as the Student Employment Program
21  Manager.  Now, was that for one particular
22  program or she just worked in general with
23  student employment programs?
24  A.  She -- the, the Student Employment
25  Program encompasses the Historically Black



**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777     Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX
**www.CountyCourtReporters.com**

## Page 9

1 Colleges and Universities Program, the Tribal
2 Colleges Program, the Hispanic initiatives, I
3 mean, Servicing Institutions Program and the
4 Student Career Experience Program. And at
5 that time, at that, at that meeting actually
6 she -- Romella was just the Student Career
7 Experience Program Manager because the other
8 Program Managers handled other aspects of the
9 Student Educational Programs. I recall there
10 was two programs, but she, she was just
11 managing one part of it which is the SCEP
12 Program.
13    Q. Well, the position you held, how did
14 you interact with the program?
15    A. I interacted because I was the, I'm
16 the budget lead for the, for the
17 directorate. So, any time they needed to,
18 any monies that they needed transferred or
19 to be used I, I pretty much monitored their
20 budgets and that's how, you know, I was
21 involved in knowing what, how the funding
22 was set apart.
23    Q. Now, are you aware of or did you
24 know, was there a general memorandum put out
25 that the Equal Employment -- the Equal

## Page 10

1 Opportunity groups were going to be
2 reorganized under Miss Johnson?
3    A. No.
4    Q. Okay. So, there was no notification
5 of any reorganization?
6    A. I'm proceeding -- clarification...
7    Q. Right. I was asking whether or not
8 once Miss Johnson became really the second
9 level supervisor, was there any sort of
10 reorganization under her, did she make any
11 announcements, put out any memos, in any way
12 say that the, the people would be
13 reorganized in the program now that she was
14 over it?
15    A. Yeah, and I think that, I don't know
16 particularly with the EEO Programs, but I
17 know that she -- and I, I'm not famil -- I
18 don't know, there may have been a memo, but
19 I'm not sure. So, I, I can't speak to
20 that, but I know it was announced in the
21 staff meeting of all the staff or that, that
22 there, there would be some reorganization and
23 some movement of staff. We all were aware
24 of that.
25    Q. All right. Did she give any

## Page 11

1 specific names of just say that in general
2 there's going to be a reorganization?
3    A. She may at some time have given
4 specific names and according to whatever is
5 going on. We have had several
6 reorganizations, not just EEO Programs,
7 but the whole Human Resources Programs.
8    Q. All right. Well, the Complainant is
9 alleging that Ms. Johnson specifically sought
10 to dismantle the Student Employment Program
11 as it related to historically black colleges.
12    A. No. No, I don't have that
13 understanding.
14    Q. Okay. Well, were -- are these
15 programs still in effect? For example, do
16 you still have a contract with Langston
17 University?
18    A. No, we no longer have a contract
19 with Langston University, but we have with,
20 with other HBCU's. You know, we still have
21 an HBCU program.
22    Q. Is there any particular reason you
23 don't, you no longer have a contract with
24 Langston?
25    A. Yes, because of the fact that there

## Page 12

1 were some inaccuracies and mismanagement of
2 the funds.
3    Q. Were -- was Ms. Arnold involved in
4 that in any way?
5    A. I don't -- no, I don't think so.
6    Q. Well, another thing is, do you or
7 were you aware of at any time Miss Arnold
8 using profanity in any of your staff
9 meetings, I mean, was she known for using
10 profanity? She received a letter of
11 counseling, she alleges, based on being
12 accused of using profanity.
13    A. Well, she was in one meeting which I
14 think was a conference call. But she wasn't
15 in that meeting, she was on the phone and
16 she did use profanity at that time. That
17 was the only, that was the only meeting I
18 was a part of.
19    Q. All right. So, as far as just in
20 general, did you ever hear her use
21 profanity? I mean, some people in their
22 ordinary speech pepper it with a few words.
23    A. Not in my presence. I, I can't say
24 that I have. I, I mean, maybe in general
25 talking maybe, but I mean, it's just not


County Court REPORTERS, INC.

800.262.8777   Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

## Page 13

1  like she interacted that much that, you
2  know, I would say that I heard her use
3  profanity on a number of occasions, but I do
4  know she was in a meeting, on a conference
5  call that she has used profanity.
6  Q. All right. Do you know whether or
7  not was, was any other management people
8  present at the time?
9  A. Well, Miss Johnson was on the call
10  and the other Program Managers for the
11  different programs, the Hispanic Program
12  and...
13  Q. Do you recall what she said?
14  A. I don't recall exactly what was said.
15  I, I just know that it was something that,
16  you know, raised eyebrows, you know, but I
17  can't remember. It, you know, it was, she
18  was, I think she was reacting to an
19  announcement because Miss Johnson had made
20  the announcement that she was going to bring
21  in someone else to manage the whole, overall
22  Student Program which is, Miss Arnold's
23  program was just one part of that, and that
24  she was going to bring in a Dr. Michael
25  Brown to be over the program management and

## Page 14

1  she made a comment -- that's when she made
2  a, a pro -- a, a cuss word to, I guess, in
3  reaction to the fact that somebody...
4  Q. Complainant is saying that said, I'll
5  be damned.
6  A. I mean, I don't remember exact words
7  but, you know, she did, she used a word of
8  profanity, you know, in that conversation, if
9  you want to say that is.
10  Q. All right. Now, the Complainant says
11  that, that several people were transferred
12  and reassigned and they were reassigned to a
13  Title 6 position which had no funding and
14  wasn't operative. Now, when you dealt with
15  budgets, did you deal with the Title 6
16  Program at all?
17  A. Okay, wait a minute. You asked if
18  several people were, were reassigned to Title
19  6?
20  Q. My understanding that the Complainant
21  and the Complainant's supervisor, a Miss
22  Stewart, were reassigned and they were
23  reassigned to work with the Title 6 Program.
24  A. No, Miss Stewart was not reassigned
25  to work in the, the Title 6 Program.

## Page 15

1  Q. Okay. So, just the Complainant was
2  reassigned then?
3  A. Right.
4  Q. Okay. Are you aware of, since you
5  dealt with budgets are you aware of whether
6  or not there was a budget for Title 6?
7  A. Well, there is a budget for the EEO
8  Programs and part of the EEO Program the
9  bureau was cited as -- by the EEO Commission
10  and they did an audit, I mean a, what you
11  call it, audit of the Bureau. And one of
12  the things that we were cited on was the
13  fact that we didn't have a Title 6 Program.
14  And so that, as part of that, this is my
15  understanding, as part of that report and,
16  and, and trying to remedy that situation a
17  Title 6 position had to be established and,
18  yeah, we would have had the funding for
19  that.
20  Q. Now, while there were, as, as you
21  stated before, as far as you know there was
22  information put out that there would be a
23  reorganization, but I take it there was no
24  formal plan that everybody was given later
25  on?

## Page 16

1  A. Well, right now we're still working
2  on it because it's still in process. That
3  would be hard to say. As a matter of fact
4  we are right now in the, in the process of
5  establishing two new groups. We have a Work
6  Force Planning Group where people are going
7  to be reassigned to that. We have a new
8  Service and Personnel Office that people are
9  going to be reassigned to. They're already
10  there, but we just need to do their -- she
11  needs to reassign them and, but they're
12  working on that now. So, it's still in
13  process, so -- and a new organizational
14  chart will be sent out. So...
15  Q. Now Complainant is -- Miss Arnold is
16  also alleging that as part of what she sees
17  as discrimination against her, that the --
18  was it, there was a computer program that
19  was eliminated, the Student Enhancement
20  Recruitment Tracking System. Do you know
21  whether or not there was such a program and
22  was it eliminated from the system?
23  A. There was one -- it wasn't
24  eliminated, it was never really established.
25  When I came on board here in Human Resources



**County Court REPORTERS**, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 17

1  under the old administration in 1999 and it
2  existed at that time. And in looking at the
3  funding for it, they had sunk a lot of money
4  into it, but we had no product. So, all --
5  so, they began questioning, you know, what
6  is this? And so, in trying to give them
7  an opportunity to -- Miss Arnold and whoever
8  she had working with her -- to bring this
9  project to fruition, to a, to a closure
10  where it needed to be a functioning system
11  that you can just go in and pull the
12  information out and she assured us that it
13  would be that way and every year we would,
14  you know, give them more money.
15      So, this year when Miss Johnson came
16  aboard and, you know, and we could not
17  really justify why we had been spending
18  money. We still had no -- there was still
19  nothing that we could show anybody to say,
20  okay, this is it. So, our -- we have, now
21  we have an ITIB Board which is our --
22  basically where all the systems, coordination
23  or whatever for the Bureau, and you have to
24  go before them with any new systems. And
25  they required a report, they wanted to know

Page 18

1  what this system was about and no one could
2  come up with what they call a 300B, which is
3  a business case for this system. And we had
4  already sunk all this money into it, but the
5  decision was made that we would scrap it,
6  so...
7      Q. Was it made after a presentation
8  before this Board?
9      A. No, it never got to the Board.
10      Q. Okay, it never got to the Board.
11      A. Yeah, because no one -- you, you
12  have to do preparation or particulars to go
13  to the Board before it could -- and that was
14  never done, no.
15      Q. So, was Miss Johnson the one who
16  decided to eliminate the system...
17      A. Yes.
18      Q. ...would be justified?
19      Okay. Now, the Complainant actually
20  in her allegations said it, it's stating
21  that she felt that she actions that took
22  place were harassment, particularly
23  harassment directed at her because of her
24  race, her sex, her age and the fact that she
25  was known for her EEO activity. Among other

Page 19

1  things is, she said she was denied a travel
2  request to attend Student Career Experience
3  Program Orientation Training. Do you know
4  whether or not that is true and was it part
5  of the reorganization?
6      A. I don't know anything about any
7  denying travel.
8      Q. Okay. She also says that she was
9  the only person in her grade level who was
10  moved into shared office space, that she
11  actually had to share office space with
12  another lower graded employee as part of
13  this reorganization?
14      A. Well, we have a -- almost everybody
15  in this directory has shared space.
16      Q. So, you all have it?
17      A. We all have shared space, yeah,
18  except for a few people who have individual
19  offices. Now, I can't tell you right now
20  the grades. They're all either 14's or
21  15's, one of them.
22      Q. Okay. Now, the other thing that
23  Miss Arnold is stating is that she was known
24  for her Civil Rights work, particularly with
25  a black organization of federal employees and

Page 20

1  that because she was outspoken about
2  discrimination in BLM that she believes that
3  she was harassed, the program -- excuse me,
4  removed from the program that she worked in
5  and the computer system was removed. Do you
6  know whether just in general she was known
7  for, for outside activities on behalf of
8  minority federal employees?
9      A. Well, I didn't know about it. I'm
10  not, I, I'm not privy to any stuff where she
11  was involved. I mean, I would say no, I
12  mean, it wasn't known to me, well known to
13  me. So, I don't know, I can't speak for
14  anybody else.
15      Q. But as far as you know she wasn't
16  working with a Congressman about problems
17  they had perceived in the Bureau of Land
18  Management?
19      A. No. I don't know anything about
20  that.
21      Q. Okay. Now, the other thing that
22  Miss Johnson -- I mean, Miss Arnold has
23  complained about is she states that it is
24  well known that Miss Marilyn Johnson is
25  fairly hostile towards other African



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX

www.CountyCourtReporters.com

## Page 21

1  Americans and she gives a list of people
2  that she believes have been run out of the
3  agency particularly by Miss Johnson.  And
4  she gives the name of Richard Redmond, have
5  you ever heard of him?
6      A.  He was our -- I've heard of him,
7  yes.  He left the bureau years ago.
8      Q.  Okay.  Did he leave before Miss
9  Johnson headed the Human Resources or was
10  the Associate Director?
11     A.  Yes.
12     Q.  Okay.  Clark Collins?
13     A.  Clark is still working with us.
14     Q.  Okay.  Do you know whether he's been
15  transferred out of his position, has he been
16  demoted, has he...
17     A.  No.
18     Q.  Okay, Lee Allen?
19     A.  Miss Johnson did not -- Lee Allen --
20  Miss Johnson has had no involvement with Lee
21  Allen.  Right now he's on a, an assignment
22  outside the Bureau, but that, whatever was
23  arranged, that was done in the past
24  administration under Mr. Warren Johnson.
25     Q.  Okay.  And Warren Johnson?

## Page 22

1      A.  What, was Miss...
2      Q.  Was he ever supervised by Miss
3  Marilyn Johnson, did she ever...
4      A.  No, he supervised Miss Marilyn
5  Johnson.
6      Q.  Oh, okay.  So, he was her
7  supervisor?
8      A.  Right.
9      Q.  Do you know whether he retired or
10  was he removed from his position?
11     A.  Retired.
12     Q.  Okay.  Melvin Fowler?
13     A.  No.
14     Q.  Okay.  Edgar R. Weathersby?
15     A.  I don't know him.
16     Q.  Okay.  Denise Stanback?
17     A.  No, I don't know her.
18     Q.  Jana Long?
19     A.  I don't know her.
20     Q.  Okay.  Ivy Garcia?
21     A.  I don't know her.
22     Q.  And Diane Wood-Medly?
23     A.  No.
24     Q.  Well, Ms. Arnold has stated that she
25  believes that Miss Johnson is, is more

## Page 23

1  likely to take negative action against an
2  African American than she is against a non-
3  minority employee.  She feels that Miss
4  Johnson has created an environment of
5  hostility and she also feels that her
6  transfer to Title 6, her removal from the
7  student, as Student Employment Program
8  Manager and the statements about money
9  laundering have led to her feeling that
10  she's being harassed and driven out of BLM.
11     Now, as far as you're aware, have
12  you observed what you would consider Miss
13  Arnold being in a negative position or of
14  being thought of in a negative manner?  You
15  know, like for example, does she have a
16  reputation that she doesn't do her work or
17  she was removed for shall we say a negative
18  reason?
19     A.  No.  I do know that the, that since
20  Miss Johnson has been here, that there have
21  been some changes and that some people don't
22  like them because we are now trying to get a
23  functioning, workable direct -- you know, she
24  -- directorate going.  You know, a Human, a
25  Human Resources Office that we can be proud

## Page 24

1  of and I know in all the reassignments and
2  everything that most of them have been
3  African Americans and a few of us have
4  gotten promotions from it.
5      So, you know, I don't know if that
6  would be hostile.  We wouldn't look at it as
7  being hostile.  I think it's maybe, you
8  know, when you're trying to run a more
9  efficient office, you know, changes had to
10  be made and we all were, you know, subject
11  to doing it.  So, we are trying some job
12  changes and whatever, so...
13     Q.  Well, are there now more promotional
14  or better promotional opportunities?
15     A.  Right, yes.
16     Q.  About how many people got promoted?
17     A.  I think about four people.
18     Q.  And were they -- what's the sort of
19  racial breakout?
20     A.  All African Americans.
21     Q.  How, how about age, are they mostly
22  people over 40, in their 40's?
23     A.  Over 40.
24     Q.  Okay.  Males or females?
25     A.  Females, all females, yeah.



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs ℓ 1150 Jordan Springs Road ℓ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 25

1  Q. Okay. Well, is there anything else
2  you want to add and in that instance is
3  there anything else you've observed in the
4  work environment of the Complainant, Romella
5  Arnold?
6  A. No.
7  Q. Okay. Well, I want to thank you
8  very much.
9     Now, before we leave, though, because
10 of the fact that she filed on certain
11 factors I have to ask you. So, I need to
12 ask what is your race?
13 A. African American.
14 Q. And what is your gender?
15 A. Female.
16 Q. And your date of birth?
17 A. 12/17/54.
18 Q. And do you have prior EEO activity,
19 have you ever filed an EEO complaint?
20 A. No.
21 Q. Okay.
22    MS. ANDERSON: Well, thank
23 you very much and that completes it.
24 (WHEREUPON, the Sworn Telephone Investigative
25 Interview of SYLVIA FELDER was concluded at

## Page 26

1  10:59 a.m.)
2     MS. ANDERSON: Is there any
3  spelling or anything you need, Mr. Spacek?
4     COURT REPORTER: Yes, ma'am.
5  One early, Michael Brown I'm assuming is M-
6  I-C-H-A-E-L B-R-O-W-N.
7     MS. ANDERSON: Mm-hmm.
8  (Indicating affirmatively.)
9     COURT REPORTER: And Langston
10 University?
11    MS. ANDERSON: You need to
12 know how to spell Langston?
13 A. L-A-N-G-S-T-O-N.
14    COURT REPORTER: I was right
15 on that one, okay. Yes, ma'am, that takes
16 care of it, thank you.
17    MS. ANDERSON: All right,
18 thank you.
19
20
21
22
23
24
25

## Page 27

1        CAPTION
2  The Sworn Telephone Interview of
3  SYLVIA FELDER, in the matter, on the date,
4  and at the time and place set out on the
5  title page hereof.
6     It was requested that the Interview
7  be taken by the reporter and that same be
8  reduced to typewritten form.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 28

1     SIGNATURE OF WITNESS
2  I have read the foregoing transcript
3  of the Interview taken on the
4  _____ day of_____,
5  2004, and it is a true and correct record of
6  my testimony given at that time and place
7  except as to any corrections I have listed
8  below. I understand that the information I
9  have given is not to be considered
10 confidential and that it may be shown to the
11 interested parties.
12
13
14
15
16      _____
16          SYLVIA FELDER
17
18
19
20
21
22
23
24
25

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 29

1     INTERVIEW ERRATA SHEET
2     WITNESS:  SYLVIA FELDER
3     INTERVIEW DATE: March 9, 2004
4     I have read the entire transcript of my
      interview.  I request that the following
5     changes be entered upon the record for the
      reasons indicated.  I have signed my name to
6     the Errata Sheet and Signature Page to be
      attached to the original transcript.
7
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
      SIGNATURE:_____DATE:_____
25       SYLVIA FELDER



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com

# CERTIFICATE OF REPORTER

STATE OF VIRGINIA AT LARGE:

I, **FRANK J. SPACEK, III,** Notary Public for the State of Virginia at Large, do hereby certify that the foregoing constitutes a true and accurate transcript to the best of my ability.

I further certify that I am not an employee of nor related to any of the parties, and I have no financial interest in the outcome of this matter.

_____

Notary Public

My Commission Expires:
May 31, 2005



County Court REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs  ∠ 1160 Jordan Springs Road  ∠  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com



**Record of Decision**
**for the**
**Information Technology Investment Board**



## Quarterly Project Rating: SCEP Enhanced Reporting Tracking System (SERTS)

The SCO quarterly project rating for the SERTS project was presented to the ITIB at its August 2003 meeting. The project was rated RED for scope, schedule and budget. The project manager has not complied with quarterly reporting requirements. This is the second quarter without a quarterly report submitted by the project manager. The SCO has developed the following corrective actions for this project:

1. The ITIB should direct the AD-790 to assign a trained or experienced project manager.

2. The Project Sponsor should provide evidence at the November 2003 ITIB meeting that a trained or experienced project manager has been assigned to the project.

3. The project manager must develop an implementation plan and submit it to the SCO for review and approval prior to the November meeting.

Accepted: _____

~~Accepted~~ with Modifications:  ✓

Modifications:

1.  _Remove from Portfolio. The project ~~is terminated~~_ is terminated.

2.  _____

Approved by:  _Michael J. Howell_          8/26/03
                    **Chair, ITIB**              **Date**



| Code | Name | Date |
|------|------|------|
| WO-570D | *signature* | 09/05/3 |
| WO-570D | *signature* | 9-5-03 |
| WO-570D | *signature* | 9-5-03 |
| WO-570D | | |
| | | |
| | | |

## UNITED STATES DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## SYSTEM COORDINATION OFFICE
## WASHINGTON, DC 20240

In Reply Refer To:
1400-300 (WO-570D)

SEP   8  2003

Memorandum

To:       AD, WO-700, MIB, Rm. 5628

From:    System Coordination Office (SCO) Manager

Subject:  SCEP Enhanced Reporting Tracking System (SERTS) Decision

The Third Quarter FY 2003 Quarterly Project Rating for the SCEP Enhanced Reporting
Tracking System (SERTS) was presented to the Information Technology Investment Board
(ITIB) on August 26, 2003.

The recommendation in the rating was not accepted. Based on the "red" rating for scope,
schedule and budget, and because the project manager has not complied with quarterly reporting
requirements, the ITIB made the decision to remove it from the National IT Portfolio and has
directed the AD-700 to terminate the project.

The AD-700 should terminate all efforts to implement the project. The AD-700 will inform the
Board at the November 2003 ITIB meeting of all costs associated with the termination of the
project, including the required Post Deployment Review. The project will need to continue to
provide quarterly reports until the Post Deployment Review Report has been accepted by the
Project Sponsor.

If you have any questions, please contact Kurt Ballantyne, the SCO point of contact assigned to
work with you and the project manager, at (303) 236-5270.

*signature*

1 Attachment
     1 - ITIB Record of Decision, SCEP Enhanced Reporting and Tracking System (1 p)

cc:  Chair, ITIB
      Vice Chair, ITIB
      WO-550, LS, Rm. 700 (M. Allen)
      HR-210 (G. Colbert)
      WO-720, LS, Rm. 302  (R. Arnold)



 **Melissa McNichols**

08/05/2003 04:47 PM

To: Romella Arnold/WO/BLM/DOI
cc: Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H
   Johnson/WO/BLM/DOI@BLM, Kurt Ballantyne/DWO/BLM/DOI@BLM
Subject: Quarterly Report Rating for SERTS - 3rd Quarter 2003

Romella,

In order to provide improved IT oversight and coordination, the SCO is advising you of the analysis results
of your quarterly report, before submitting this
information to the ITIB at their June 2003 meeting.

The SCO has evaluated your FY03 Second Quarter quarterly report and rated the project for scope,
schedule and budget. Please see the attached file.



serts_q3_03.doc

Kurt Ballantyne is out of the office until August 11. Let me know if you have any questions on the assigned
ratings, comments, and/or recommendations. Thank you, for continuing to provide these quarterly reports;
we appreciate your cooperation and compliance with the investment management policies.

Melissa McNichols
Bureau of Land Management
System Coordination Office (WO570D)
303-236-1782 (voice)
303-236-1981 (fax)



## Quarterly Project Rating
### FY 2003 – Third Quarter, April - June 2003

**Project: SCEP Enhanced Reporting Tracking System (SERTS)**
**Project Number or Special Interest Project Code(s):  (024S)**

**Current Quarter Rating:**

| | Rating | Comments |
|---|---|---|
| Scope | | No Quarterly Report Received for 3rd Q FY03 (second time) |
| Schedule | | No Quarterly Report Received for 3rd Q FY03 (second time) |
| Budget | | No Quarterly Report Received for 3rd Q FY03 (second time) |

**Previous Quarter Rating:**

| | Rating | Comments |
|---|---|---|
| Scope | 1 | No Quarterly Report Received for 2nd Q FY03 |
| Schedule | 1 | No Quarterly Report Received for 2nd Q FY03 |
| Budget | 1 | No Quarterly Report Received for 2nd Q FY03 |

**General Comments:** This project is being managed by a Project Manager without training and/or experience. Previous quarterly reports reported the system in Operations and Maintenance, current communication with the Project Manager has revealed that the project/system has not been implemented/deployed. The Project Manager has communicated that she has no implementation/deployment or project plan/schedule.  This project is not included in the FY03 or FY04 IT Spending Cap. FY05 Ex300-1s submitted request $ 14,500 year for FY03-05.

**Recommendations:**  The ITIB should terminate this project and direct the SCO to inform the Project Sponsor/Project Manager to stop all implementation/deployment efforts. The ITIB should also direct the SCO and IMG to remove it form the National IT Portfolio / IT Spending Cap.

**SCO Program Analyst Name:** Kurt Ballantyne



Case 1:05-cv-01475-RWR      Document 17-9      Filed 07/11/2007      Page 14 of 89

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
September 21, 2001

In Reply Refer To:
1260 (WO-570D) P

EMS TRANSMISSION 09/24/2001
Instruction Memorandum No. 2001-222
Expires: 09/30/2002

To: All WO and FO Officials
    Attention: Project Managers

From: Assistant Director, Information Resources Management

Subject: Information Technology Investment Management Process, Version 1.0

**Program Area:** Information Technology Investment Management

**Purpose**: The purpose of this directive is to establish the BLM's policy and procedures for managing Information Technology (IT) investments.

**Policy/Action:** The BLM's Information Technology Investment Management Process (IT IMP) document institutes the Bureau's information technology investment management improvement processes. IT project managers, project sponsors, and system managers will be guided now by one all-encompassing process with well defined sub-processes.

**Timeframe**: This policy is effective immediately.

**Background:** In recent years, a number of statutes were passed requiring federal agencies to revise their operational and management practices to achieve greater mission efficiency and effectiveness. These include: The Government Performance and Results Act of 1993, The Paperwork Reduction Act of 1995, and The Clinger-Cohen Act of 1996.

Development of the Bureau's IT IMP has rapidly evolved over the last 12 to 18 months. Several other federal agencies have recently developed similar policies and procedures. Many of which were reviewed and incorporated into the development of Version 1.0 of the Bureau's IT IMP. In addition, the U.S. General Accounting Office has developed several IT Investment Management Guidance documents that significantly influenced the structure and format of our new all encompassing processes.

The IT IMP implements information technology requirements of those laws. The IT IMP ensures that all IT investments (or projects) align with the Bureau's mission and architecture,

and supports the business needs, while minimizing risks and maximizing returns through the investment's life-cycle.

**Budget Impact:** The investment management process will ensure investments are made that provide the greatest value to the Bureau and reduce the risk of project failure. This action will have a positive affect on the budget. This policy will enable the National ITIB and the Budget Strategy Team to better forecast funding needs and take steps to obtain and allocate the required funds.

**Manual/Handbook Sections Affected**: None.

**Coordination:** This guidance has been coordinated with National ITIB, WO-550 IRM Investment Management Group, WO-560 IRM Policy and Records Group, Bureau Architecture Team, CIO Council, and Assistant Director's IRM Advisors.

**Contact:** If you have any questions or need additional information, please contact John Foster, (303) 236-8915, or Kurt Ballantyne, (303) 236-5270, System Coordination Office.

Signed by:                                                    Authenticated by:

W. Hord Tipton                                         Barbara J. Brown

Assistant Director                                      Policy & Records Group, W

Information Resources Management

1 Attachment
 1 - Information Technology Investment Management Process, Volume 1.0 (56 pp)



**Kurt Ballantyne**
07/08/2003 02:03 PM

To: Romella Arnold/WO/BLM/DOI@BLM
cc: Connie Stewart/WO/BLM/DOI@BLM, Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H Johnson/WO/BLM/DOI@BLM
Subject: Re: Quarterly Reports are due July 15th for FY03 3rd Quarter

Romella, lets see if I can address your latest concerns/problems.

The ITIB "grandfathered" the SERTS into the Information Technology Investment Management Process (IT- IMP) because SERTS **does** met the definition of a major IT system or national level investment. In fact, the previous AD-700 confirmed SERTS was part of the WO-700 IT portfolio.

Whether you like it or not SERTS is a major IT investment and must comply with the Bureau's IT policies and procedures regarding the project and investment management processes.

In my earlier e-mail message I stated that the criteria for determining if an investment/project is a national level investment was :

1) $500,000 (total life cycle), **or**
2) systems/applications used in more than one state/center, **or**
3) system/applications used by more than one business/program area

I left out the first "or" between item 1) and item 2), which might of cause your confusion. My apology.

Since SERTS will be used Bureauwide the dollar threshold really doesn't matter. It meets the criteria of being a national system under criteria #2.

To answer your concern about  " I think my project has gotten bogged down in the bureaucracy of the BLM and it does not fit from what I'm reading".

This is the new way BLM is doing business to plan and track it's IT investments and projects. We are not alone, throughout the government  increased oversight and planning is being mandated by law (Clinger-Cohen Act and OMB guidance (Circular A-11)). Over 80% of all IT projects fail or cost substantially more money than originally planned, hence the need for increased planning, management oversight and improved project management.

Completing the necessary paperwork (ie Ex300-1) doesn't  mean that you can just deploy.  The Ex300-1 is a "Capital Planning Investment Control - CPIC" or  budget document and nothing more.

The BLM, has developed policies and procedures on how projects must be "managed".  It seems that you are unaware of these policies as the project manager.  That is one reason why the ITIB has established policy that only trained or experienced project managers should lead these complicated IT projects. SERTS needs to enter the IT Investment Management Process and that is why I have suggested that you might consider a trip to Denver to become aware of the IT IMP / ITIB requirements to get your project deployed.

Depending on the current project life cycle status, there are numerous review points and project management reviews and documentation (ie a Project / ImplementationPlan) that must be conducted/completed before you can proceed with deployment, including being  "tested" within the National Test Lab.

The location of the server and it's operations and maintenance (the server and the software) need to be address and planned for. Currently all the "national level system" other than the training application at NTC are on servers at the National IRM Center here in Denver ( that however is a WO-700 decision but from a cost standpoint still needs ITIB approval).

After all the appropriate documentation and reviews have been completed the Sponsor of the SERTS must come before the ITB and ask permission to deploy (after the Transition/Deployment Readiness Review).

This is not meant to be a threat but a "heads up". The ITIB has been looking at non-performing and/or projects out of control (through the quarterly reporting process) and has seriously considered terminating on-going projects in order to stay within the IT Spending Cap placed on the ITIB by the Budget Strategy Team.

At the June ITIB meeting SERTS was rated as "yellow" for project scope, "yellow" for project schedule and "yellow" for project budget. The reason for this rating was that no report was received in April.

Your Quarterly report is due on July 15th. If no report is received on July 15th, the project will be rated "red" for scope, schedule and budget. A red rating constitutes being "out of control", and hence would seriously jeopardize the future of the SERTS project.

I will be on leave from July 10 to the 21st. I suggest that if you have any more concerns that we get on a conference call with Gail before I go on leave.

Kurt Ballantyne
Project Management Specialist
System Coordination Office (WO-570)
Voice : (303) 236-5270
Fax :    (303) 236-1981
E-Mail : Kurt_Ballantyne@blm.gov
Romella Arnold

---

**Romella Arnold**
07/03/2003 03:32 PM

To: Kurt Ballantyne/DWO/BLM/DOI@BLM
cc: Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H Johnson/WO/BLM/DOI@BLM, Connie Stewart/WO/BLM/DOI@BLM
Subject: Re: Quarterly Reports are due July 15th for FY03 3rd Quarter

Kurt,

Thanks for the update. I'm still having problems based on the information provided, understanding why SERTs was "grandfathered" into this process by the ITIB since it falls below what is considered major IT investments. The only criteria that is falls within is it's a contract system/application that was developed, tested by its users, analyzed by the users, but it has not be implement for its use. This is where I'm stuck. The system does not fall within the $500,000 amount and therefore, why would it need to be led by a full-time, trained or experienced IT project manager and if such is the case who would that be for the SERTs system? I think my project has gotten bogged down in the bureaucracy of the BLM and it does not fit from what I'm reading. When I met with Gail, Marilyn, Ron Tucker and Connie Stewart sometime back in Feb. or March, it was decided that I should prepare the 300 Lites short version report which I did and it would be presented to the ITIB. Once this was done, SERTS could be placed on a server located at the NTC. This has not happened and I'm having a hard time understanding how to make it happen. Doing these quarterly reports is not getting the results I need to implement this system and this is where I need guidance. I will arrange a conference call with you and Gail once I return to the office the week of July 14, and maybe I can get some guidance on how to get SERTS on a server so that the users can begin using it. Once this happens, the quarterly reports will be meaningful. Thanks for the information you've shared and I will contact both you and Gail when I return. Have a great weekend.



 **Dahlena Johnson**      To:
03/03/2004 12:23 PM      cc:
                         Subject:

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM
—— Forwarded by Kellye Drakeford/WO/BLM/DOI on 03/01/2004 09:21 AM ——

> **Kellye Drakeford**        To: Romella Arnold/WO/BLM/DOI@BLM
> 06/10/2003 04:00 PM         cc:
>                             Subject: Your Travel Plans

Romella,

I have been unable to locate your travel authorization for your upcoming trip to Phoenix. This office requires a signed authorization prior to leaving for travel. If you have any questions or comments you may speak to Marilyn.

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM

PGT-03-7 065

UNITED STATES
DEPARTMENT OF THE INTERIOR
FORM NO. DI-1020
FORM APPROVED BY COMP. GEN. U.S.
NOVEMBER 8, 1949

**TRAVEL AUTHORIZATION**

1. No. _____
2. June 13, 2003
   (DATE)

3. Bureau of Land Management
   (BUREAU OR OFFICE)

4. NAME  Romela Arnold          5. OFFICIAL STATION  Washington, DC

6. TITLE  Program Lead          7. ACCOUNTING OFFICE  Denver, Colorado

You are authorized to travel as indicated below and to incur necessary expenses in accordance with applicable laws and regulations.

## PLACES OF TRAVEL

8. FROM:  Washington, DC
9. TO:  Phoenix, AZ  and return

10. PURPOSE AND REMARKS:

Facilitate training orientation for SCEB and mentors

11. PER DIEM ALLOWANCE:

Lodging: $59    M&IE  $46    Total: $105

12. PERIOD OF TRAVEL: Beginning on or about  June 15, 2003  Ending on or about  June 20, 2003

## MODE OF TRAVEL

13. [X] Common carrier    14. [ ] Extra fare    15. [ ] Government-owned conveyance
16. [ ] Privately owned        at a mileage rate of        cents, subject to:
   (a)  Administratively determined to be the advantage of the Government
   (b)  A showing of advantage to the Government
   (c)  Not to exceed cost by common carrier, including consideration of Per Diem allowance

## MISCELLANEOUS

17. [ ] Transportation immediate family    19. [ ] Shipment household goods and personal effects
18. [✓] Other (specify) rental car

**ESTIMATED COST**

20. Transportation _____ $ 342
21. Per Diem _____ 525
22. Other ___ Rental Car ___ 134
23.    TOTAL _____ $ 1,001
24. CHARGED TO:

WO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-XL-SCEP-211D

25. _____
   (FISCAL OFFICER'S SIGNATURE)

26. _____
   (REQUESTER'S SIGNATURE)

27. Romella Arnold, Program Lead
   (TITLE)

28. Conceita B Stewart
   (AUTHORIZING OFFICER'S SIGNATURE)

29. Marilyn H. Johnson, Assistant Director, HRM
   (TITLE)

This form was electronically produced by Elite Federal Forms, Inc.



Travel Authorization
Request

Romella Arnold

June 12: CU: BWI ~~Residence/~~ going to NTC
to ~~enter~~ facilitate training orientation for    Phoenix, Arizona
SCEPs and mentors

June 20: Return to BWI

Per diem / Lodging — current rate

Airfare: $342.00
Rental Car: $134.00 weekly rate
Misc: Tips, Taxes, etc.

Kellye
CALL Lorraine Farley — when does Student Orientation
Start at NTC.

Thanks
Connie



**Dahlena Johnson**    To:
                                  cc:
03/03/2004 12:21 PM        Subject:

---

**Kellye Drakeford**    To: Romella Arnold/WO/BLM/DOI@BLM
                                cc: Marilyn H Johnson/NTC/BLM/DOI@BLM
06/11/2003 02:42 PM     Subject: Re: Your Travel Plans

Romella,

Your request for travel tomorrow is declined. Given that the orientation doesn't start until Monday, June 16th, Marilyn will approve your travel starting on Sunday, June 15th.

If you would like to discuss this further with Marilyn, let me know and I'll see if I can get you on her calendar.

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM
Romella Arnold

---



**Romella Arnold**    To: Kellye Drakeford/WO/BLM/DOI@BLM
                               cc:
06/10/2003 05:09 PM    Subject: Re: Your Travel Plans

Thanks. I will bring down the information requesting a TA first thing in the morning.

Romella Arnold
Program Manager, SCEP
Bureau of Land Management
(202) 208-1549





 **Michelle Stroman**          To: Romella Arnold/WO/BLM/DOI@BLM
10/23/2003 08:18 AM          cc: Marilyn H Johnson/WO/BLM/DOI@BLM
                            Subject: Re: Title VI Information

Romella,

I would like to meet with you on Friday, October 24, 2003, at 10:00 in my office to discuss this matter.

Michelle Stroman

Romella Arnold

 **Romella Arnold**          To: Michelle Stroman/WO/BLM/DOI@BLM
10/16/2003 10:30 AM          cc: Marilyn H Johnson/WO/BLM/DOI@BLM
                            Subject: Title VI Information

In order to work within the performance standards provided to me on Wednesday October 1, 2003, please provide me with all files that exist pertinent to the BLM's Title VI program. Files should include, IM's, IB's, directives, guidelines, policies and copies of compliance review reports, etc. In order for me to begin to manage a program, I need to review documents to see what has happened in the BLM's Title VI program. Just as I was required to turn over files relevant to the SEEP, I need the same advantage as those managing the SEEP, in order to grasp the BLM's Title VI program. Thanks.

Romella Arnold
Program Manager, SCEP
Bureau of Land Management
(202) 208-1549

Meeting with Romella Arnold, Friday October 23, 2003

Title VI Program

This is in response to your E-Mail message of October 16, 2003, Subject: Title VI Information. In your message, you requested that I provide you with all the files that exist pertinent to the Bureau of Land Management's (BLM) Title VI program.

As cited in the U.S. Commission on Civil Rights Report entitled, "Ten-Year Check Up: Have Federal Agencies Responded to Civil Rights Recommendations?" dated June 12, 2003, the Department of the Interior and the BLM were criticized for non-response to the need to enforce Title VI. The report listed the BLM as one the Bureaus in the Department that did not have a Civil Rights Specialist employed to do Civil Rights compliance.

Therefore, we do not have any IM's, IB's, directives, guidelines, policies or copies of compliance review reports.

In accordance to your position description and performance standards, one of your responsibilities is to develop policies and procedures to ensure that the BLM can enforce Title VI. To assist you in complying information to be used to develop these policies, the BLM has approved and you have attended two training courses in which pertinent information regarding this topic was distributed and discussed (Civil Rights Offsite Meeting, September 23-24, 2003 and the Disability Rights Compliance and Enforcement Training (October 21-23, 2003). We are exploring other training courses and possible details which may assist you in accomplishing this task.

The BLM is willingly to meet with you to discuss training opportunities, details or any other resources that you believe you need to assist in developing the BLM's Title VI program.

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | | | Agency Position No. *10147* |
|---|---|---|---|

| 2. Reason for Submission | 3. Service | 4. Employing Office Location Washington, DC | 5. Duty Station Washington, DC | 6. OPM Certification No. |
|---|---|---|---|---|

☑ Redescription  ☐ New  ☑ Hours ☐ Field

☐ Reestablishment  ☐ Other

Explanation *(Show any positions replaced)*

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| ☑ Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interest | ☐ Yes  ☑ No |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☐ Competitive | ☑ Supervisory | ☑ 1--Non-Sensitive  ☐ 3--Critical | |
| ☑ Excepted *(Specify in Remarks)* | ☐ Managerial | | 14. Agency Use |
| ☐ SES (Gen.)  ☐ SES (CR) | ☐ Neither | ☐ 2--Noncritical Sensitive  ☐ 4--Special Sensitive | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Program Manager | GS | 0340 | 14 | RMC | 8/4/03 |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|

| 18. Department, Agency, or Establishment Department of the Interior | c. Third Subdivision |
|---|---|
| a. First Subdivision Bureau of Land Management | d. Fourth Subdivision |
| b. Second Subdivision AD, Human Resources Management | e. Fifth Subdivision |

19. Employee Review-This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*
Marilyn H. Johnson
AD, Human Resources Management

| Signature | Date | Signature *[signed]* | Date 7/28/03 |
|---|---|---|---|

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

22. Position Classification Standards Used in Classifying/Grading Position
OPM Job Family PCS for Admin. Work in Human Resources Mgmt Group, GS-200, dtd. 12/00; GSSG, dtd. 4/98

Typed Name and Title of Official Taking Action
Linda Y. Behlin
Human Resources Specialist

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| Signature *[signed]* | Date 8/4/03 |
|---|---|

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

25. Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265    Previous Edition Usable    5008-106    OPF8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter

Program Manager, GS-340-14

Introduction

The incumbent serves as a Program Manager in the Human Resources Management Directorate of the Bureau of Land Management (BLM), overseeing the administration of important employment and diversity programs that are bureau-wide. Incumbent provides support, input, advice, training and direction to subordinate staff members who develop and implement bureau-wide initiatives, in partnership with educational institutions and others, to ensure the continuing flow into BLM's workforce of students with appropriate scientific and professional academic preparation and other highly qualified candidates with diverse racial and ethnic backgrounds.

Major Duties

The incumbent oversees, directs, coordinates, supervises and manages a subordinate staff involved in planning, administering and managing a variety of employment and diversity programs in the Bureau of Land Management. Primary responsibilities cover the following programs and initiatives:

- Historically Black Colleges and Universities
- Hispanic Serving Colleges
- Tribal Colleges and Universities
- Asian American/Pacific Islander Initiative
- Students with Disabilities Initiatives
- Faculty Exchange Program
- Executive Orders
- Educational Partnerships
- Diversity Initiatives
- Diversity Intern Program
- Student Educational Employment Program
  - Student Temporary Employment Program (STEP)
  - Student Career Experience Program (SCEP)

Oversees the management and operations of employment and diversity programs, advising, counseling and assisting human resources specialists in delivering the highest quality and efficiency of human resources services possible.

Designs, plans and participates in management assessments to determine the effectiveness of numerous BLM employment and diversity programs and services. Develops and recommends evaluation strategies to determine the effectiveness of operational practices and procedures and to address and solve systemic problems. Develops measures of quality, effectiveness, efficiency and readiness for all assigned programs.

Supervisory Responsibilities: Supervises the staff and manages employment and diversity programs of the Bureau. Exercises the full range of supervisory duties in overseeing the work

of subordinates and performs broad personnel management duties throughout the programs for which responsible. Ensures that equal opportunity goals and objectives are achieved with respect to training, promotions, awards, appointments, recognition and career development opportunities.

Factor 1, Knowledge Require by the Position

Knowledge of management theories, principles, practices, laws and regulations in order to provide technical authority over a variety of employment and diversity programs.

Ability to plan and manage broad Department programs of national scope with multiple demanding policies, processes and procedures to integrate and coordinate.

Skill in managing, coordinating, directing and supervising complex programs.

Knowledge of organizational and process improvement techniques, management analysis and management theory and how to apply these techniques and theories to the improvement of programs.

Ability to design, plan and participate in management assessment studies to determine the effectiveness of employment and diversity programs and to develop recommendations to address systemic problems and improve program operations.

Advanced communication skills in order to present, defend, explain and negotiate broad HR initiatives, program revisions and policies.

Ability to collaborate with management in employing change process concepts and techniques.

Knowledge of BLM's missions, programs, organizational structure, relationships, business processes and lines of authority.

Factor 2, Supervisory Controls

Works under the supervision of the Deputy Assistant Director (DAD) for HR Operations, Human Resources Management. As a Program Manager, the incumbent has authority and responsibility to manage the BLM operations that he/she is assigned. The DAD consults with the incumbent to establish strategic plans and initiatives. The Deputy Assistant Director defines major program goals and objectives, and the incumbent directs and manages operations independently, exercising judgment in interpreting and applying broad program mandates. The incumbent's recommendations and decisions are considered to be authoritative. Work is reviewed for achievement of the goals and objectives of the various programs managed.

Factor 3, Guidelines

Guidelines include basic legislation, regulations, Department directives and instructions, court decisions, OPM rules and regulations, guidance and regulations from agencies such as GAO,

OMB, MSPB, EEOC, etc. The incumbent uses judgment and exercises latitude to determine the intent and manner of application of these guidelines. Senior Bureau staff recognize the incumbent as a technical expert.

Factor 4, Complexity

Incumbent has broad and varied program responsibility over various functions and has management and supervisory responsibility. He/She manages important Bureau programs that are broad in scope, complex and critically important. The issues that the incumbent must confront are varied, often problematic and usually sensitive in nature. Exercising responsibility for a large number of separate programs and initiatives requires special care in the establishment, coordination and oversight of management and supervisory structure and procedures.

Factor 5, Scope and Effect

Work involves analyzing, evaluating, and developing major aspects of bureau-wide employment and diversity programs. Issues and problems confronted are often sensitive and potentially controversial. Work may establish precedents for other Department programs and offices and may influence or persuade top Department officials to change major HR policies or procedures.

Factor 6, Personal Contacts

Contacts include persons outside the agency, including representatives of colleges and universities, members of associations and organizations, human resources professionals in other government agencies and in the private sector, contractors, or business executives, in moderately unstructured settings, such as conferences, meetings, training sessions, etc. There are regular contacts also with senior Bureau officials.

Factor 7, Purpose of Contacts

The purpose of personal contacts is to represent the Bureau and the Department in recruitment and liaison activities, to present information about Bureau employment and diversity programs, to negotiate or settle matters involving significant or controversial issues; e.g., recommendations affecting major programs, dealing with substantial expenditures, or handling sensitive employee and workplace issues.

Factor 8, Physical Demands

There no unusual physical demands. Occasional travel is required.

Factor 9, Work Environment

The work is performed in an office setting.

**Position Classification**
**Evaluation Statement**

| | |
|---|---|
| **Proposed Position:** | **Program Manager**<br>**GS-340-14** |
| **Organizational Location:** | **Department of the Interior**<br>**Bureau of Land Management**<br>**Human Resources Management** |
| **References:** | **1. OPM Job Family PCS for Administrative**<br>**Work in the Human Resources Management**<br>**Group, GS-0200, 12/00**<br>**2. OPM General Schedule Supervisory Guide,**<br>**HRCD-5, 4/98** |

**Background:** This position is a new position as a Program Manager, responsible for a variety of BLM employment and diversity programs.

**Series/Title Determination:**

According to Reference 1, although some positions may include work requiring some knowledge and skills in the human resources management area, classification to the Human Resources Management Group, GS-201, may not be appropriate. If the work involves performing management duties or assisting in a line capacity in managing or directing one or more programs when the paramount qualification requirements are management and executive knowledge and when the positions do not require competence in a specialized subject matter or functional area, the position may be classified in the GS-340, Program Management series.

This position does not require technical competence in a specialized function area of Human Resources Management, but rather has a paramount qualification requirement for management knowledge and skills. Consequently the position is titled Program Manager and the series of the position is GS-0340.

**Grade Level Determination:** Since this position has supervisory and management responsibilities, the General Schedule Supervisory Guide is used to determine the grade. The criteria in the Guide are used to evaluate the grade-controlling duties of the position, which are those of a Program Manager of employment and diversity programs. This guide measures six factors in supervisory positions.

Factor 1. Program Scope and Effect                    FL 1-4, 775 Points

*Directs segments of a professional, highly technical and complex administrative program, which involves the development of major aspects of key administrative programs. Work impacts the Department's headquarters operations, bureau-wide programs and field establishments.*



Factor 2, Organizational Settings                                    FL 2-2, 250 Points

The position is accountable to a position that is one reporting level below an SES position.

Factor 3, Supervisory and Managerial Authority Exercised      FL 3-2, 450 Points

Carries out the full authority and responsibility of a first level technical and administrative supervisor.

Factor 4, Personal Contacts
      Factor 4A, Nature of Contacts                      FL4A-3, 75 Points

Frequent contacts are with high-level Bureau officials and with senior managers of other agencies, as well as with representatives of colleges and universities, professional associations and organizations, legal and union representatives and contractors.  Contacts include those in conferences and meetings, may require the preparation of briefings and presentations and may involve controversial or sensitive subject matter.

      Factor 4B, Purpose of Contacts                      FL 4B-2, 75 Points

The purpose of contacts is to represent the Bureau and the Department in recruitment and liaison activities, to present information about Bureau employment and diversity programs, and to negotiate or settle matters involving significant or controversial issues.

Factor 5, Difficulty of Typical Work Directed                 FL 5-7, 930 Points

The highest grade which best characterizes the nature of the professional work performed within the incumbent's organization and which constitutes more than 25% of the non-supervisory, non-leader total workload or duty time is GS-12.

Factor 6, Other Conditions                                    FL 6-4, 1120 Points

Supervision and oversight requires significant coordination and integration of a number of important programs.

**Summary and Final Determination:**

| Factor 1 | Level 4 | 775 Points |
|----------|---------|------------|
| Factor 2 | Level 2 | 250 Points |
| Factor 3 | Level 2 | 450 Points |
| Factor 4A | Level 3 | 75 Points |
| Factor 4B | Level 2 | 75 Points |
| Factor 5 | Level 7 | 930 Points |
| Factor 6 | Level 5 | 1120 Points |

| Total | | 3675 Points |

A total of 3675 points is in the range of 3605-4050 for conversion to the grade of GS-14. It is recommended that this position be classified as **Program Manager, GS-340-14.**

Richard M. Cooley
HR Specialist
August 4, 2003

# SCEP PROGRAM MANAGER

## GS-301-13

### I.    INTRODUCTION

The incumbent serves as the Program Manager for the Bureau of Land Management's (BLM), Student Career Experience Program (SCEP), with national-level responsibility for developing, implementing, and coordinating the SCEP. The position is located organizationally in the Equal Employment Opportunity Office, BLM.

Incumbent provides support, input, advice, training and direction to ensure development of plans to implement policies, guidelines, and regulations relating to the SCEP. Contributes to the general achievement of the human resource goals, and objectives of the organization through outreach and recruiting activities.

### II.    MAJOR DUTIES

The incumbent performs the following duties:

Serves as principal liaison for the Bureau's Student Career Experience Program. Has lead responsibility for formulating and implementing program policies and procedures. Advises, coordinates, and provides leadership for the SCEP activities with respect to the Bureau of Land Management's and the Office of Personnel Management's (OPM), policies, guidelines, and regulations, and overall program goals.

Evaluates effectiveness of program through a variety of means, including planning and reviewing recruitment activities; tracking data on participants in SCEP; conducting yearly assessment evaluations; and conducting regular meetings with managers, SCEP coordinators, and the recruitment and orientation design teams for input.

Analyzes policies, workforce profile and statistical data on SCEP participants to formulate plans to meet the organization's needs. Collects necessary information from BLM State and Center offices and compiles data for the BLM's quarterly plan and reports as required by the Department of the Interior.

Plans, organizes, and manages orientations, workshops and seminars and other educational training events to promote the SCEP. Develops brochures, bulletins, news releases and other written materials to facilitate the recruitment of students in the SCEP, and the establishment of partnerships between BLM and higher educational institutions.

Performs a variety of technical and administrative tasks required for managing the SCEP such as budget development, execution, and tracking as it relates to program management, and provides guidance, direction and support to managers and field offices in their implementation and achievement of the SCEP initiatives.

III.    EVALUATION FACTORS

1.    Knowledge Required

Knowledge and skills in oral and written communication methods, techniques and procedures to effectively communicate BLM/ DOI programs, objectives and goals to presidents, chancellors, staff and students of higher education institutions, professional organizations, as well as the private and public sector.

Ability to establish, improve and maintain interpersonal relationships with management and other program officials within BLM and DOI, other Federal agencies, special interest groups and organizations in the private sector and serve as liaison to further the SCEP objectives and issues to advance the program.

Knowledge of a wide range of concepts, principles, and personnel staffing guidelines, employment qualifications, special hiring authorities, recruitment programs, and employment trends in order to recommend and/or develop methods, approaches, or procedures for recruiting students of all races and national origins for the SCEP.

Sufficient knowledge of the BLM, its mission, and types of work performed to develop relevant outreach objectives and strategies for the SCEP.

Knowledge of the scope and intent of Public Laws, Federal Regulations, BLM guidelines, and Executive Orders which pertain to increasing opportunities for all students through the SCEP.

Knowledge of practical data collection, sampling methods and techniques for monitoring the SCEP.

Ability to plan, prepare and deliver presentations before public and private sector officials, national and international organizations, and to participate in meetings, conferences, seminars, and workshops with groups of all sizes.

2.    Supervisory Controls

The incumbents receives general direction from the EEO Officer, BLM/HRM who reviews work for the soundness of recommendations, conformance to policy, program objectives, and quality. Employee works independently to perform planning and oversight functions of the job. Utilizes established general priorities but sets own specific priorities and performs on own initiative, consulting supervisor on unusual or sensitive issues or precedent-setting situations. Completed work is relied on as technically authoritative, accurate, and in detail. Incumbent exercises extensive latitude and discretion in day-to-day program operation and operates independently in relationships with others.

Provides leadership in the formulation of policies, and new concepts to promote the SCEP as it relates to recruitment and retention of students. Initiates, plans, conducts, and participates in national and regional meetings, workshops, seminars, and conferences for the purpose of gaining support and advancing BLM's mission and objectives for the SCEP.

Develops and monitors budget, allocations and expenses in support of all activities implemented for the SCEP. Recommends approval or disapproval of, and level of funding for specific SCEP projects. Monitors the implementation of SCEP guidelines to ensure that the states and centers are managing the program in accordance with guidelines.

Provides guidance and technical assistance in the development of orientation training for SCEP students, mentors, SCEP coordinators and managers to help stimulate an awareness and understanding of BLM's mission and the objectives of the SCEP.

Develops system for monitoring and maintaining accurate data collection of SCEP participants BLM nationwide. Works with Information Resources Management to provide computer electronic system to develop required SCEP reports and data for use in presentations and training workshops.

Participates in activities to promote multi-cultural diversity in the SCEP within BLM. Such activities include recruitment career fairs, workshops and seminar for students and Career Counselors, conferences, and internal and external meetings with officials. Develops relationships with professional organizations associated with employment of students and career development.

3. Guidelines

Personnel Regulations and BLM guidelines provide general requirements and parameters within which the incumbent operates.

Considerable judgement and originality are required by incumbent for situations for which explicit guidance is unavailable or insufficient. The incumbent uses resourcefulness and sound judgement in deviating from traditional methods, developing new and innovative methods and devising new approaches to accomplishing work.

Utilizes creativity to foster interaction between on-going BLM SCEP and BLM managers and designs approaches to utilizing relationships with management to further the accomplishment of the SCEP and other student employment programs.

4. Complexity

Assignments involve the formulation of National SCEP policy, guideline revisions, technical assistance, and coordination of SCEP coordinators Bureau-wide, oversight of formal mentoring program, and outreach coordination with national cooperative education

associations such the National Co-op Consortium, Cooperative Education departments at colleges and universities throughout the U.S. and professional Educational Organizations such as NAFEO, HACU, AISES, and MANNRs. Factors that must be integrated include: traditional patterns of employment, recruitment and retention; historic and current barriers to cultural diversity in the SCEP and in the workforce; BLM's mission, direction and goals; environmental education requirements; and related personnel requirements, job availability for SCEP positions and human resources systems.

The incumbent is required to research, plan and implement the SCEP using a variety of conventional and analytical techniques. Management and supervisors have special emphases they need addressed and must be integrated into an overall strategic plan. Extensive contacts with management BLM-wide, various academic institutions and organizations are integral to the assignment. Incumbent will be required to provide advice and guidance to top management on a wide variety of problems and ways to overcome barriers.

5.    Scope and Effect

The purpose of the work is to provide Bureau-wide leadership of SCEP initiative and statewide implementation of SCEP. Incumbent will be recognized as the Bureau's foremost expert and program leader for SCEP matters nation-wide. The formulation of SCEP guidelines and strategies must complement existing plans in traditional Bureau offices. Constant contact with all bureau programs and continuous liaison with the colleges and universities is required. Results affect the accomplishment of Department and Bureau-wide targets for employment needs as well as State and field office SCEP.

6.    Personal Contacts

The incumbent is required to deal with a wide variety of intra and inter Bureau management and personnel contacts. This includes direct contacts with top management and program managers within BLM nationwide.

Personal contacts also include college and university administrators, students, career counselors, and other ranking officials from educational organizations nationwide. Contacts for environmental educational may include representatives from colleges and universities, and educational associations.

7.    Purpose of Contacts

Personal contacts are a continuing and important part of the work of the incumbent. Specifically, bureau and office contacts are required to develop and maintain liaison with program managers to ensure utilization of the SCEP for meeting BLM employment needs.

8.    Physical Demands

The work is primarily sedentary with some physical moderate activity required when conducting exhibit/recruitment trips.

9.    Work Environment

Work is performed both in an office setting. Some travel, particularly to career fairs, and conferences and campus environments is required.





# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov

August 1, 2003

Memorandum of Conversation

To:        Romella Arnold

From:      Assistant Director, HRM

Subject:   Inappropriate Language and Abusive Behavior

This memorandum is to serve notice that your abusive behavior and inappropriate use of cursing in the work place will no longer be tolerated. On July 29, 2003, during a conversation with the Recruitment Team, Sylvia Felder, Administrative Officer and myself, you reacted to action items in our conversation with curse words and abusive tones. This is not the first time that I have experienced this unprofessional and abusive behavior by you. In addition, you have been overheard cursing and showing abusive behavior in your work surroundings. This creates and promotes a hostile work environment.

You are on notice that this behavior will no longer be tolerated by me or your co-workers. If you display further outbursts of hostile and abusive behavior or language, it may result in disciplinary action against you.

Furthermore, the hostile language you have used in your email messages to this office and/or concerning policy of this office to colleagues in the field, has been noted as inappropriate and unprofessional. These email messages serve to undermine the authority and integrity of the Office of the Assistant Director, Human Resources Management and must therefore not continue.

It is the prerogative of management to assign work as it deems necessary. While you have the right to disagree with decisions made by management, your disagreement must be made in a professional, courteous, non-threatening manner.

You are expected to relate to me and your co-workers with respect and dignity. No further abuse or disrespect will be tolerated. You are on notice to improve your customer service demeanor.

You acknowledge this notice by signing below.

_____
Romella Arnold

_____
Date



**Kurt Ballantyne**
07/02/2003 10:39 AM

To: Ron Tucker/NTC/BLM/DOI@BLM, Gail Colbert/NCS/BLM/DOI@BLM,
Connie Stewart/WO/BLM/DOI@BLM, Tom
Navarro/NCS/BLM/DOI@BLM, Chip Calamaio/NTC/BLM/DOI@BLM,
Romella Arnold/WO/BLM/DOI@BLM, Gary Dreier/WO/BLM/DOI@BLM
cc: Gail Colbert/NCS/BLM/DOI@BLM
Subject: Quarterly Reports are due July 15th for FY03 3rd Quarter

WO-700 Project Managers;

| | |
|---|---|
| Ron Tucker | = Distance Learning Tool [P331] |
| | = Automated IDP [025S] |
| | = Leadership Needs Assessment Tool [030S] |
| | = Needs Assessment Training and Validation [026S] |
| Gail Colbert | = Automated Table of Organization |
| | = PayCheck [P207] |
| Connie Stewart | = Exit Interview [028S] |
| Tom Navarro | = QuickHire [P208] |
| Chip Calamaio | = Satellite Broadcast Two Way Communication [P330] |
| Romella Arnold | = SCEP Enhanced Reporting Tracking System (SERTS) [024S] |
| Gary Dreier | = Workforce Planning Manager's Framework |

This is a reminder that quarterly project reports are due to the System Coordination Office.

Please submit your report for FY 3rd Quarter (April 1 thru June 30) by July 15, 2003.

**Scope:** Please submit a statement regarding the status of the project's scope (see IM 2001-137, Change 1, Information Technology (IT) Project Status Reporting for ITIB Approved Projects - http://www.blm.gov/nhp/efoia/wo/fy01/im2001-137ch1.html).

**Schedule:** Please update the project schedule using *Project Reporter* (see IM 2002-228, Mandatory IT Project Scheduling Reporting Format and Software - http://www.blm.gov/nhp/efoia/wo/fy02/im2002-228.html). Explain any variances to the baseline.

**Budget:** Please ensure that all planned and actual spending for the project are reflected correctly in MIS. Explain any variances related to planned spending within the project schedule.

Previous quarterly report ratings for all ITIB approved projects are located at:
http://web.blm.gov/itib/itib_index.htm

If you have any questions or need assistance, please contact me anytime.

Kurt Ballantyne
Project Management Specialist
System Coordination Office (WO-570)
Voice : (303) 236-5270
Fax :   (303) 236-1981
E-Mail : Kurt_Ballantyne@blm.gov



(SEP) SERTS



**Kurt Ballantyne**

05/09/03 08:16 AM

To: Romella Arnold/WO/BLM/DOI@BLM
cc: Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H
    Johnson/NTC/BLM/DOI@BLM
Subject: Quarterly Report Rating for (Second Quarter FY03)
    for SCEP Enhanced Reporting Tracking System (SERTS) (024S)

Romella,

In order to provide improved IT oversight and coordination, the SCO is advising you of the analysis results of your quarterly report, before submitting this information to the ITIB at their June 10, 2003 meeting.

The SCO has evaluated your FY03 Second Quarter, quarterly report.

The SCO has rated your project for Scope, Schedule and Budget. Please see the attached file.



serts_q2_03.doc

These findings will be reported to the ITIB at their June 10, 2003, meeting.

Please let me know if you have any questions on the assigned ratings, comments, and/or recommendations.

Kurt Ballantyne
Project Management Specialist
System Coordination Office (WO-570)
Voice : (303) 236-5270
Fax :    (303) 236-1981
E-Mail : Kurt_Ballantyne@blm.gov





**Romella Arnold**

04/28/03 04:16 PM

To: Melissa McNichols/DWO/BLM/DOI@BLM
cc: Kurt Ballantyne/DWO/BLM/DOI@BLM
Subject: Re: Guidance for Exhibit 300-1 

Melissa,

Thanks so much for your assistance and for the extension of time granted to me in completing this report. Attached is the 300-1 Project Profile for the SERTs data application system. I responded to as much information as I could based on my knowledge as it relates to workforce planning which is certainly in the Department's Strategic Plan and the President's Management agenda. If there are sections I need to respond to, do not hesitate to let me know and I will research the information as needed. Again, much thanks for your time and patience.



exhibit_300-1_temp.doc

Romella Arnold
Program Manager, SCEP
Bureau of Land Management
(202) 208-1549



## Exhibit 300-1 Project Profile

**Agency:** Department of the Interior
**Bureau/Office:** Bureau of Land Management
**Location in Budget:** Indicates where the project would be addressed in the Agency's Budget Justification
**Account Title:** Title of the account used in the Exhibit 53 – include account, activity, subactivity
**Account Identification Code** not identified in Exhibit 53
**Program Activity: Student Educational Employment Program, SEEP**
**Name of Project: Student Enhancement Recruitment Tracking System also known as SERTS**
**Unique Project Identifier:** Same as the 23-digit identifier that is used in the Exhibit 53
**Project Composition:** (This project is) **(DOI Requirement)**

       \_\_\_\_\_% Financial
       \_\_\_\_\_% Security
       \_N\_\_\_\_Homeland Security (Y/N)
       \_\_\_\_\_Current E-Gov (Y/N/Potential) Yes this project has E/Gov potential

### Summary of Spending for Project Stages
(In Thousands)
Estimates for 2006 and beyond are for planning and do not represent funding decisions

| | PY-1& Earlier | PY 2003 | CY 2004 | BY 2005 | BY+1 2006 | BY+2 2007 | BY+3 2008 | BY+4& Beyond | Total |
|---|---|---|---|---|---|---|---|---|---|
| Planning | | | | | | | | | |
| Budgetary Resources | N/A | | | | | | | | |
| Outlays | | | | | | | | | |
| Acquisition | | | | | | | | | |
| Budgetary Resources | | | | | | | | | |
| Outlays | | | | | | | | | |
| Total, Sum of Stages | | | | | | | | | |
| Budgetary Resources | | | | | | | | | |
| Outlays | | | | | | | | | |
| Maintenance | | | | | | | | | |
| Budgetary Resources | | | $14,500 | $14,500 | $14,500 | and | beyond | | |
| Outlays | | | | | | | | | |
| Total, All Stages | | | | | | | | | |
| Budgetary Resources | | | | | | | | | |
| Outlays | | | | | | | | | |
| FLA Labor (FTE): | | | | | | | | | |
| Non-FLA Labor (FTE): | | | | | | | | | |
| Total FTE Costs: | | | | | | | | | |

### I.A. Project Description
Provide a brief description of the project and its status through the bureau/office and Departmental CPIC process.
The purpose of the SERTs application/project is to provide a system that meets the requirements of the

department, the SEEP Program Manager, the SEEP Coordinators and all of the BLM states and centers. These requirements include at a minimum:

Provide the SEEP Coordinators, states and centers with an automated system that enables them to track both sensitive and non-sensitive information specific to the BLM student employees within their geographic area of responsibility. The capability does not currently exist in any other automated system including FPPS.

Provide the SEEP Program Manager with an automated system that enables he/she to gather and analyze statistical information pertaining to all BLM student employees. Additionally, the system must provide the Program Manager with the ability to quickly and accurately provide detailed statistical report to the department and upper management within the BLM.

The assumptions made about this project are:

The SERTs system has been designed to track data that is not collected in the system known as FPPS used by the department and the BLM, as well as small subsets of data which exists in FPPS. The FPPS does not contain accurate employee information when tracking their on-board status, such as duty station location, race and national origin and gender, etc. Also, the FPPS system does not capture data required for students employed by the department such anticipated graduation dates, a student's enrollment status, and grade point averages. This data collection is required according to the CFR regulations, Administrative Personnel, 5 Parts 213.3202. This investment will improve efficiencies through reduced costs because the cost to run and maintain this system is low by comparison to the use of the FPPS system, costing the BLM $2.3 million annually to run data reports that are inaccurate. There is no annual cost for using SERTs because the BLM is not leasing the system. The estimated costs for SERTs is based on hours to maintain the system/server @ $14, 500 for FY 2004 and beyond.

Two milestones for this project over the last year are:

The design of the system has been **completed** and its application has been **tested** by all of the users.

Two planned milestones for this project in this budget year FY 2005 are:

The SERTs system is ready for deployment and training will be provide to all of its users, namely the SEEP Coordinators and the Program Manager. The system is ready for the collection of data once the server has been identified. A tentative decision has been made to have the NTC provide the server. The SERTs system has been reviewed by and demonstrated to the department's Office of Educational Partnerships and Community Outreach. Pending funding, the department has indicated their desire to purchase use of the system from the BLM which would bring revenue to the BLM and therefore SERTs could become a fee for service system.

Attachment I-I
Project Profile, Exhibit 300-1

## I.C.  Performance Goals and Measures

Relate this project to the criteria at the Department's draft Strategic Plan and to the President's management agenda.

This investment supports the strategic management of human capital outlined in the President's Management Agenda, in that the information technology system will capture data on all student participants that is relevant to the BLM's strategic workforce planning which includes recruitment placement and retention of employees and other reporting requirements.



| Fiscal Year | Strategic Goal(s) Supported | Existing Baseline | Planned Performance Improvement Goal | Actual Performance Improvement Results | Planned Performance Metric(s) | Actual Performance Metric Results |
|---|---|---|---|---|---|---|
| 2003 | Work force Planning goal | | | | | |
| 2003 | Workforce Planning goal | | | | | |
| 2004 | | | | | | |
| 2004 | | | | | | |
| 2005 | | | | | | |
| 2005 | | | | | | |

## I.H.2. Original Baseline

What are the costs and schedule goals for this phase or segment of the project (e.g. what are the major project milestones or events, when will each occur, what is the estimated cost to accomplish each one. Also indicate if this is a multi-agency project, or how it relates to the E-Gov initiatives.

| Cost and Schedule Goals:  Original Baseline for a Phase/Segment/Module of Project | | | | | |
|---|---|---|---|---|---|
| | Schedule | | | | |
| Description of Milestones | Start Date | End Date | Duration - In Days | Planned Cost | Funding Agency |
| 1. Deployment of the SERTs | July 1, 2003 | August 1, 2003 | | To place on existing server no cost | DOI/ BLM |
| 2. Training for users | October 2003 | | One week | $15,000 | DOI/ BLM |
| 3. Upgrades (on an as needed basis). | FY 2005 | | One month | $8,560 | DOI/ BLM |
| Note:  Maintenance of the system is ongoing. | FY 2004 and beyond | | 260 hours | Maintenance $14, 500 | DOI/ BLM |
| Completion Date: | | | | Total Completion Cost:  $38,060 | |

## II.A. Enterprise Architecture (DOI Requirement)

Provide a description of how the project ties to the Interior Enterprise Architecture and the

bureau/office architecture.

The SERTs application has been developed using an existing approved application infrastructure. By using Lotus Domino as the software architecture, the SERTs application takes advantage of the existing directory structure and e-mail infrastructure, already deployed throughout the department the BLM.

## II.B. Security (DOI Requirement)
This section should address the security at the project level, referring to security plans is not acceptable. Indicate the dollar level funded within the project – this amount as compared to total project funding should match the percentage for security you indicated on Exhibit 53.

The data within the SERTs application is sensitive and therefore it is crucial that the data be secure. The SERTs application has been developed with security as a high priority. Access to the system is strictly controlled using the Lotus Notes directory structure. To secure the application from unauthorized access on the "back end", the application stores all of the data within an encrypted database. Beyond the basic user access, the application uses a specific "access control list" to ensure that among the individual users accessing the system, only the appropriate access is granted for each individual.

## II.C. GPEA (DOI Requirement)
Indicate if this project supports electronic transactions or record-keeping that is covered by GPEA. Relate this project to your bureau/office GPEA inventory most recently completed.

**Melissa McNichols**

04/28/03 10:03 AM

To: Romella Arnold/WO/BLM/DOI@BLM
cc: Kurt Ballantyne/DWO/BLM/DOI@BLM
Subject: Guidance for Exhibit 300-1

Romella,

Please go to this web site:

http://web.blm.gov/sco/help/index.htm

Ensure you are using the Exhibit 300-1 template that is on this page.

If you need any specific help with your project information, please call Kurt Ballantyne at 303-236-5270.

Thank you.
Melissa McNichols
Bureau of Land Management
System Coordination Office (WO570D)
303-236-1782 (voice)
303-236-1981 (fax)





**Romella Arnold**

04/25/03 03:33 PM

To: Gail Colbert/NCS/BLM/DOI@BLM
cc: Connie Stewart/WO/BLM/DOI@BLM, Kurt
Ballantyne/DWO/BLM/DOI@BLM, Linda
Sedbrook/NCS/BLM/DOI@BLM
Subject: Re: SCO Reports and Exhibit 300-1s

Gail I've been on travel ever since the requests came in for the SCO report.  I'm certain you recieved the e-mail notifier which indicated I was out of the office and today April 25, is my first day back.  I have not had time to prepare the report nor review the lengthy documents that were sent re: the SERTs data system that I must respond to.  I'm only one person doing many thinks.  Once I request an extention, I will provide the information as soon as I can.  Who do I need to request an extention from and if that's you, please let this message serve as the notice requesting an extention.  I will work on the report and review the exhibit 300-1s next week.  Thanks for the reminder

Romella Arnold
Program Manager, SCEP
Bureau of Land Management
(202) 208-1549
Gail Colbert




**Gail Colbert**

04/25/2003 09:18 AM

To: Connie Stewart/WO/BLM/DOI@BLM, Romella
Arnold/WO/BLM/DOI@BLM
cc: Linda Sedbrook/NCS/BLM/DOI@BLM, Kurt
Ballantyne/DWO/BLM/DOI@BLM
Subject: SCO Reports and Exhibit 300-1s

Connie and Romella -

I sent a message to you last week noting that you hadn't turned in quarterly reports to the SCO for the Exit Interview and the SCEP application. Now I have to inform you that OMB Exhibit 300-1s, that were due today, have not been completed either.

The ITIB will downgrade these projects at their meeting in June and they will most likely be discarded from the 700 portfolio. You will receive a decision document from the ITIB telling you to, basically, "cease and desist" on these projects and that further spending on these projects will not be allowed.

If these documents have, in fact, been completed, please forward them to me immediately.

Please call me when you can so that we can discuss this.


Gail Colbert
Portfolio Manager - AD700
Project Manager - NHRMC





**Kurt Ballantyne**

04/01/03 09:12 AM

To: Ron Tucker/NTC/BLM/DOI@BLM, Gail Colbert/NCS/BLM/DOI@BLM,
Tom Navarro/NCS/BLM/DOI@BLM, Chip
Calamaio/NTC/BLM/DOI@BLM, Gary Dreier/NTC/BLM/DOI@BLM,
Connie Stewart/WO/BLM/DOI@BLM

cc: Gail Colbert/NCS/BLM/DOI@BLM, Connie
Stewart/WO/BLM/DOI@BLM, Marilyn H Johnson/NTC/BLM/DOI@BLM

Subject: Quarterly Reports to the SCO

WO-700 Project Managers.

| | |
|---|---|
| Automated Individual Development Plan | Ron Tucker |
| Automated Table of Organization | Gail Colbert |
| Distance Learning Tool | Ron Tucker |
| Exit Interview | Connie Stewart |
| Leadership Needs Assessment | Ron Tucker |
| Needs Assessment Training & Validation | Ron Tucker |
| PayCheck | Gail Colbert |
| Quickhire | Tom Navarro |
| Satellite Broadcast Two-Way Comm. System | Chip Calamaio |
| SCEP Enhanced Reporting Tracking System | Romella Arnold |
| Workforce Planning Manager's Framework | Gary Dreier |

This is a reminder that quarterly project reports are due to the System Coordination Office.

Please submit your FY03 2nd Quarter (January 1 thru March 31) by April 15.

**Scope:** Please submit a statement regarding the status of the project's scope (see IM 2001-137, Change 1, Information Technology (IT) Project Status Reporting for ITIB Approved Projects - http://www.blm.gov/nhp/efoia/wo/fy01/im2001-137ch1.html).

**Schedule:** Please update the project schedule using *Project Reporter* (see IM 2002-228, Mandatory IT Project Scheduling Reporting Format and Software - http://www.blm.gov/nhp/efoia/wo/fy02/im2002-228.html). Explain any variances to the baseline.

**Budget:** Please ensure that all planned and actual spending for the project are reflected correctly in MIS. Explain any variances related to planned spending within the project schedule.

Previous quarterly report ratings for all ITIB approved projects are located at: http://web.blm.gov/itib/itib_index.htm

If you have any questions or need assistance, please contact me anytime.

Kurt Ballantyne
Project Management Specialist
System Coordination Office (WO-570)
Voice : (303) 236-5270
Fax :   (303) 236-1981
E-Mail : Kurt_Ballantyne@blm.gov







**Gail Colbert**

04/18/03 01:40 PM

To: Connie Stewart/WO/BLM/DOI@BLM, Romella
    Arnold/WO/BLM/DOI@BLM
cc: Linda Sedbrook/NCS/BLM/DOI@BLM, Kurt
    Ballantyne/DWO/BLM/DOI@BLM
Subject: Quarterly Reports

Connie and Romella -

You have not turned in the Quarterly Reports on the Exit Interview and the SCEP system that were due to the SCO on April 15th.

These two systems have been on shaky ground, as you know - this was the opportunity to get them fully "accounted for" in the 700 portfolio. Since this is the last reporting period before the June ITIB meeting, these systems are now at risk.

Kurt Ballantyne will be calling you on Monday and he and I will be meeting to discuss next steps.

Gail



**TRAVEL VOUCHER**

*(Read Privacy Act Statement on the back)*

| 1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE | 2. TYPE OF TRAVEL | 3. VOUCHER NO. |
|---|---|---|
| WO-720 | ☒ TEMPORARY DUTY<br>☐ PERMANENT CHANGE OF STATION | PG T04 073 |
| | | 4. SCHEDULE NO. |

**5.**

| a. NAME *(Last, first, middle initial)*<br><br>Brown, Michael | b. SOCIAL SECURITY NO. | 6. PERIOD OF TRAVEL |
|---|---|---|
| | | a. FROM<br>06/13/2004 | b. TO<br>06/19/2004 |

| c. MAILING ADDRESS *(Include ZIP Code)* | d. OFFICE TELEPHONE NO. | 7. TRAVEL AUTHORIZATION |
|---|---|---|
| | | a. NUMBER(S)<br>PG T04 073 | b. DATE(S)<br><br>06/28/2004 |

| e. PRESENT DUTY STATION<br><br>Washington Office | f. RESIDENCE *(City and State)* | 10. CHECK NO. |
|---|---|---|

| 8. TRAVEL ADVANCE | | 9. CASH PAYMENT RECEIPT | | 11. PAID BY |
|---|---|---|---|---|
| a. Outstanding | 0 | a. DATE RECEIVED | b. AMOUNT RECEIVED<br>$ | |
| b. Amount to be applied | 0.00 | | | |
| c. Amount due Government<br>*(Attached* ☐ Check ☐ Cash*)* | | c. PAYEE'S SIGNATURE | | |
| D. Balance outstanding | | | | |

| 12. GOVERNMENT TRANSPORTATION REQUESTS, OR TRANSPORTATION TICKETS, IF PURCHASED WITH CASH *(List by number below and attach passenger coupon; if cash is used show claim on reverse side)* | I hereby assign the United States any right I may have against any parties in connection with reimbursable transportation charges described below, purchased under cash payment procedures (FPMR 101-7) | | | | ▶ *Traveler's initials* | |
|---|---|---|---|---|---|---|
| | AGENT'S VALUATION OF TICKET<br>(a) | ISSUING CAR-RIER<br>(Initials)<br>(b) | MODE CLASS OF SERVICE AND ACCOM-MODATIONS<br>(c) | DATE ISSUED<br>(d) | POINTS OF TRAVEL | |
| | | | | | FROM<br>(e) | TO<br>(f) |
| See Attached Ticket 1 | 370.20 | | | | | |

COMMENTS:
Trip Number 1   PERSONAL FUNDS USED WERE CASH IS INDICATED.

**13.** I certify that this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me. When applicable, per diem claimed is based on the average cost of lodging incurred during the period covered by this voucher.

| TRAVELER SIGN HERE ▶ *(signature)* | DATE 7-1-04 | AMOUNT CLAIMED ▶ | 773.21 |
|---|---|---|---|

NOTE: *Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 287; i.d. 1001).*

**14.** This voucher is approved. Long distance phone calls, if any, are certified as necessary in the interest of the Government.  *(NOTE: If long distance telephone calls are included, the approving official must have been authorized in writing by the head of the department or agency to so certify (31 U.S.C. 680e).)*

| APPROVING OFFICIAL SIGN HERE ▶ Marilyn H. Johnson  *(signature)* Robert Fenton | DATE 7/1/04 |
|---|---|

**17. FOR FINANCE OFFICE USE ONLY COMPUTATION**

| | | $ |
|---|---|---|
| a. DIFFER-ENCES, IF ANY *(Explain and show amount)* | | |

**15.** LAST PRECEDING VOUCHER PAID UNDER SAME TRAVEL AUTHORIZATION

| a. VOUCHER NO. | b. D.O. SYMBOL | c. MONTH & YEAR |
|---|---|---|

b. TOTAL VERIFIED CORRECT FOR CHARGE TO APPROPRIATION

*Certifier's initials:*

**16.** THIS VOUCHER IS CERTIFIED CORRECT AND PROPER FOR PAYMENT

| AUTHORIZED CERTIFYING OFFICIAL SIGN HERE ▶ | DATE |
|---|---|

c. APPLIED TO TRAVEL ADVANCE *(Appropriation symbol):*     $   0.00

d.     NET TO TRAVELER ▶   $   773.21

**18.** ACCOUNTING CLASSIFICATION
WO-WO-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XL-HBCU-211D---- -          773.21   NR-          670.81

NSN 7540-00-634-4180        STANDARD FO...<br>Prescribed by GSA, F...


completed

**SCHEDULE OF EXPENSES AND AMOUNTS CLAIMED**

**INSTRUCTIONS TO TRAVELER**  (Unlisted items are self explanatory)

Col. (c)  If the voucher includes per diem allowances for members of employee's immediate family, show members' names, ages, and relationships to employee and marital status of children (unless information is shown on the travel authorization.)

Complete only for actual expense travel  —  Col. (d) thru (h)

(d) thru (g)  Show amount incurred for each meal, including tax and tips, and daily total meal cost.

(h)  Show expenses, such as: laundry, cleaning and pressing of clothes, tips to bellboys, porters, etc. (other than meals and lodging.)

(i)  Explain expenses incurred for actual expense travel.

(m)  Show total subsistence expense incurred for actual expense travel. Show per diem amount, limited to maximum rate, or travel on actual expense, show the lesser of the amount from col. (j) or maximum rate.

(n)  Show expenses, such as: taxi/limousine fares, air fare (if purchased with cash), local or long distance telephone calls for Government business, car rental, relocation other than subsistence, etc.

Complete this information if this is a continuation sheet.  **PAGE 2 OF  PAGES**

TRAVEL AUTHORIZATION NO.  **PG T04 073**

TRIP# 1

TRAVELER'S LAST NAME  **Brown**

MILEAGE RATE: **0.375**

| DATE 20 04 (a) | TIME (Hour and am/pm) (b) | DESCRIPTION (Departure/arrival city, per diem computation, or other explanation of expenses) (c) | BREAK-FAST (d) | LUNCH (e) | DINNER (f) | TOTAL (g) | MISCEL-LANEOUS SUBSIS-TENCE (h) | LODGING (i) | TOTAL SUBSISTENCE EXPENSE (j) | NO. OF MILES (k) | MILEAGE (l) | SUBSISTENCE (m) | OTHER (n) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/13 | | D-:RES: | | | | | | | | | | | |
| 06/13 | | Airline Flight | | | | | | | | | | | |
| 06/13 | | A-:PHOENIX,AZ | | | | | | | | | | | |
| 06/13 | | Rental Car | | | | | | | | | | | |
| 06/13 | | Private Vhcle | | | | | | | | 25 | 9.38 | | |
| 06/14 | | Subsistence | | | | 35.25 | | 59.00 | 94.25 | | | 94.25 | |
| 06/15 | | Parking (cash) | | | | | | | | | | | 1.50 |
| 06/15 | | Parking (cash) | | | | | | | | | | | 2.75 |
| 06/15 | | Subsistence | | | | 47.00 | | 59.00 | 106.00 | | | 106.00 | |
| 06/15 | | Gas-Rental/Govt Car | | | | | | | | | | | 33.48 |
| 06/16 | | Subsistence | | | | 47.00 | | 59.00 | 106.00 | | | 106.00 | |
| 06/17 | | Subsistence | | | | 47.00 | | 59.00 | 106.00 | | | 106.00 | |
| 06/18 | | Private Vhcle | | | | | | | | 25 | 9.38 | | |
| 06/18 | | Parking Fees | | | | | | | | | | | 48.00 |
| 06/18 | | Subsistence | | | | 47.00 | | | 47.00 | | | 47.00 | |
| 06/18 | | Lodging Tax | | | | | | | | | | | 42.72 |
| 06/19 | | D-:PHOENIX,AZ | | | | | | | | | | | |
| 06/19 | | Gas-Rental/Govt Car | | | | | | | | | | | 25.50 |
| 06/19 | | A:Washington Offic | | | | | | | | | | | |
| 06/19 | | Subsistence | | | | 35.25 | | | 35.25 | | | 35.25 | |
| | | **SUBTOTALS** | | | | | | | | | 18.76 | 600.50 | 153.95 |
| | | **TOTALS** | | | | | | | | | 18.76 | 600.50 | 153.95 |

If additional space is required, continue on another 1012-A BACK, leaving the front blank.

Enter grand total of columns (l), (m) and (n), below and in Item 13 on the front of this form.

**TOTAL AMOUNT CLAIMED ▶   773.21**

STANDARD FORM 1012 BACK (10-77)

In compliance with the Privacy Act of 1974, the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chap. 57 as implemented by Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, and E.O. 11012 of March 27, 1962. The primary purpose of the requested information is to determine payment or reimbursement to eligible individuals for allowable travel and/or relocation expenses incurred under appropriate administrative authorization and to record and maintain costs of such reimbursements to the Government. The information will be used by officers and employees who have need for the information in the performance of their official duties. The information may be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, the issuance of a security clearance, or investigations of the performance of official duty while in Government service. Your Social Security Account Number (SSN) is solicited under the authority of the Internal Revenue Code (26 U.S.C. 6011(b) and 6109) and E.O. 9397, November 22, 1943, for use as a tax payer and/or employee identification number; disclosure is MANDATORY on vouchers claiming payment or reimbursement which is, or may be, taxable income. Disclosure of your SSN and other requested information is voluntary in all other instances; however, failure to provide the information (other than SSN) required to support the claim may result in delay or loss of reimbursement.

000189

```
06/28/04      ACCOUNTING DETAIL        |Doc No:          PG 104 073
Copyright 2003 Gelco Information Network, Inc. |Brown, Michael ~~~~~~~~~~
===============================================================================
```

```
                                                           TRIP 1
ACCOUNTING CLASS CODE
-----------------------  -----------------  -----------------  -----------------
  COM. CARRIER-408                                              370.20
  LODGING-409                                                   337.72
  M&IE-409                                                      305.50
  MILEAGE-408                                                    18.76
  OTHER-409                                                       4.25
  RENTAL CAR-409                                                300.61
  TRANSPORT-409                                                 106.98
                         -----------------  -----------------  -----------------
WO                              0.00               0.00          1,444.02
```

Organization:
WO-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XL-HBCU-211D----


SPLIT PAY DISBURSEMENTS:

```
   TOTAL EXPENSES ------------------------------        1,444.02
   NON-REIMBURSABLE EXPENSES -------------------          670.81
                                                     ==================
   TOTAL AMOUNT CLAIMED ----------------------           773.21

     GOV'T ADVANCE OUTSTANDING --          0.00
     GOV'T ADVANCE APPLIED ------          0.00
                                         ----            0.00
                                                     ==================
   NET TO TRAVELER (GOVT) ---------------------         773.21

     GOV'T CHARGE CARD EXPENSES -          0.00
     GOV'T CHARGE CARD ATM ADV --          0.00
     ADD'L GOV'T CHARGE CARD PYMT
                                          0.00
                                     ==================
     TOTAL GOV'T CHARGE CARD AMT          0.00

   PAY TO GOV'T CHARGE CARD -------------------           0.00
   PAY TO TRAVELER ----------------------------         773.21
```

000190

UNITED STATES
DEPARTMENT OF THE INTERIOR
FORM NO. DI-1020
FORM APPROVED BY COMP. GEN. U.S.
NOVEMBER 8, 1949

## TRAVEL AUTHORIZATION

1. No. __PGT-04-073__

2. __June 10, 2004__
(DATE)

3. __Bureau of Land of Management__
(BUREAU OR OFFICE)

4. NAME __Michael Brown__    5. OFFICIAL STATION __Washington, DC__

6. TITLE __Special Initiatives Coordinator__    7. ACCOUNTING OFFICE __Denver, CO__

You are authorized to travel as indicated below and to incur necessary expenses in accordance with applicable laws and regulations.

### PLACES OF TRAVEL

8. FROM: Washington, DC
9. TO: Phoenix, AZ and return

10. PURPOSE AND REMARKS:

To attend SCEP Orientation

11. PER DIEM ALLOWANCE:

Lodging $59.00       M&IE $47.00       TOTAL $106.00

12. PERIOD OF TRAVEL: Beginning on or about __6/12/04__       Ending on or about __6/19/04__

### MODE OF TRAVEL

13. ✔ Common carrier      14. Extra fare      15. Government-owned conveyance
16. Privately owned            at a mileage rate of        cents, subject to:
   (a) ✔ Administratively determined to be the advantage of the Government
   (b) A showing of advantage to the Government
   (c) Not to exceed cost by common carrier, including consideration of Per Diem allowance

### MISCELLANEOUS

17. Transportation immediate family       19. Shipment household goods and personal effects
18. ✔ Other (specify)

Rental Car

ESTIMATED COST

| | | |
|---|---|---|
| 20. Transportation | $ | 620.20 |
| 21. Per Diem | | 305.50 |
| 22. Other | | 210.00 |
| 23. TOTAL | $ | 1135.70 |

24. CHARGED TO:

WO-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-XL-HBCU-211D

26. _____
(REQUESTER'S SIGNATURE)

27. Michael Brown, Special Initiatives Coordinator
(TITLE)

28. _____
(AUTHORIZING OFFICER'S SIGNATURE)

29. Marilyn H. Johnson, Assistant Director, HRM
(TITLE)

25. _____
(FISCAL OFFICER'S SIGNATURE)

This form was electronically produced by Elite Federal Forms, Inc

000191

Michael Brown

SPG#

Room Number          463
No of Person(s)        1
Checked out by
Page                        1
Rate              $    59.00

Arrival      06/13/04
Departure   06/19/04
Confirmation No.    366685
INVOICE NO.    318508/1    Four Points Barcelo Phoenix Metro, 06/18/04 03:28
10220 N Metro Pkwy E
Phoenix, AZ 85051 USA
602-997-5900

| Date | Text | Debits | Credits |
|------|------|--------|---------|
| 06/13 | Room Charge | 59.00 | |
| 06/13 | Occ Tax | 7.12 | |
| 06/14 | Room Charge | 59.00 | |
| 06/14 | Occ Tax | 7.12 | |
| 06/15 | Room Charge | 59.00 | |
| 06/15 | Occ Tax | 7.12 | |
| 06/16 | Room Charge | 59.00 | |
| 06/16 | Occ Tax | 7.12 | |
| 06/17 | Room Charge | 59.00 | |
| 06/17 | Occ Tax | 7.12 | |
| 06/18 | Room Charge | 59.00 | |
| 06/18 | Occ Tax | 7.12 | |

Total        396.72

Balance      396.72 USD

I agree that my liability for this bill is not waived and agree to be held personally
liable in the event that the indicated person, company or association fails to pay
for any part of the full amount of these charges.


Signature: _____


Thank you for choosing the Four Points Barcelo Hotel.  In effort to improve
our overall guest satisfaction we utilize surveys from NFO WorldGroup.
We appreciate all feedback and look at this opportunity
as a way to meet and exceed guest expectations.  All guests who complete
the evaluation will be entered into a quarterly drawing to win weekend
room accommodations at our Four Points Hotel.

000192

```
EXXON EXPRESS PAY

DENMART EXXON
HOME OF THE
TOUCHLESS CARWASH

DLR# 4599763
DENMAR EXXON
PHOENIX            AZ
06/16/04      21:29
               ACCT#
XXXXXXXXXXXXX   24
INV# EJS2781
AUTH# 066678
PUMP# 7
   READ        16.91

         GAL   $2.0
         TOTAL $33.40

TOTAL          $33.40

DENMART EXXON
HOME OF THE
TOUCHLESS CARWASH
```



```
FastPay

AIRPORT CHEVRON
402 E WASHINGTON
PHOENIX, AZ

06/19/04      12:23
TN #      00206657

ICFLEET

AUTH#      099328
NV #      5750603
CREDIT
     #09   REGUN
     ONS   12.03
   $2.119/GAL
          $25.5

L/NOTAX   $25.5
TOTAL     $25.50

THANK YOU, HAVE
A NICE DAY!!!
```

```
PO BOX 310757, BOCA RATON, FL
RESERVATIONS: 800-327-9633
CUSTOMER RELATIONS: 800-445-5664


PHOENIX - RETURN RECEIPT

RA#/CAR#: 3391-609798-1/41297862 (CC)
RENTED:   13JUN04  13:11
RETURNED: 19JUN04  12:36
LENGTH:   5 DAYS 23 HOURS
MLG OUT/IN: 9,911/10,446   GAS: F
CUSTOMER:  MICHAEL BROWN


$
TIME      110.00 T
UPGRADE   114.00 T
VLFRS      12.70
CNTYSCH     8.26
GARS       30.00 T
TAXES      25.65 *
TOT CHR   300.61
CR. CARD  300.61-
BALANCE      .00
%
CR. CARD: TOTAL BILLED TO MASTER CARD


     THANK YOU FOR USING ALAMO.

SERVED BY: 62300
%
```

000193

# OMEGA WORLD TRAVEL

| | | |
|---|---|---|
| BROWN/MICHAEL | **Attention: MICHAEL** | 10-Jun-2004   4:09 pm |
| | | Page 1 of 2 |

The booking locator is OIUGCH.             The fare is $370.20.

| | |
|---|---|
| **MISC** | |
| 13-Jun-2004 Sunday | ASSOCIATE NAME SOUTHWEST AIRLINES AMOUNT DUE USD B325.58X44.62T370.20 ITEM COST USD 370.20 CONFIRMATION NUMBER HQ2PVD TICKET NUMBER 2704895816 NON REFUNDABLE TRANSACTION FEE OF $24.06 |

| | | | | |
|---|---|---|---|---|
| ✈ 13-Jun-2004  11:15am Sunday | **Air** From: Meal: Equip Arrival: | Southwest Airlines Baltimore Wash MD, USA None Boeing 737-700 Jet 13-Jun-2004  Sunday       12:50pm | Flight# To: Status: | 2006       Class: Y Phoenix AZ, USA Confirmed |

| | | |
|---|---|---|
| 🚗 13-Jun-2004 Sunday | **Car**       Alamo Rent A Car Pick Up: Phoenix AZ, USA Confirmation:   50274940 Return:  19-Jun-2004 Rate Info:  USD 110.00WK Ulmtd /RC-MG/LT01/ARR-WN2006-1250/DT-1240/NM-BROWN MICHAEL/RI-APPROX TOTAL 216.05 USD INCLUDES TAXES-FEES-SURCHARGES/SI-Z43653/CF-50274940 Z43653/CF-50274940 Arrival Time: 1250 Dropoff Time: 12:40pm | Type:       Compact Car Auto Ac Rate:       110.00USD |

| | | |
|---|---|---|
| 🛏 ...un-2004 Sunday | **Hotel**      Sheraton Corporation Four Points Phoenix Metrocent 10220 NORTH METRO PARKWAY E PHOENIX AZ US 8505 Phone:  602 997 5900 Number of Rooms: 1 Confirmation:   C031175526 #SI# Check Out: 19-Jun-2004  Saturday Cancellation note: CXL AFTR12JUN04TM18:00 AMT:59.00 USD NON SMOKING | Fax:    602 943 6156 Rate:       59.00USD Room Guaranteed |

| | | | | |
|---|---|---|---|---|
| ✈ 19-Jun-2004  01:40pm Saturday | **Air** From: Meal: Equip Arrival: | Southwest Airlines Phoenix AZ, USA None Boeing 737-700 Jet 19-Jun-2004  Saturday       09:05pm | Flight# To: Status: | 1808       Class: Y Baltimore Wash MD, USA Confirmed |

| | |
|---|---|
| **MISC** | |
| 19-Dec-2004 Sunday | ASSOCIATE NAME RETENTION |

000194

# OMEGA WORLD TRAVEL

BROWN/MICHAEL                    **Attention: MICHAEL**                    10-Jun-2004   4:09 pm
                                                                          Page 2 of 2

The booking locator is OIUGCH.              The fare is $370.20.

*****AIR PRICE SHOWN ON PNR IS BASED PER PERSON.*****

```
***************************************************
PLEASE CHECK-IN FOR DOMESTIC FLIGHTS 1 HOUR PRIOR
TO SCHEDULED DEPARTURE
CHECK-IN FOR INTERNATIONAL FLIGHTS IS 2 HOURS
PRIOR TO SCHEDULED DEPARTURE
***************************************************
LET US KNOW HOW WE ARE DOING...AT YOUR CONVENIENCE
PLEASE TAKE A MOMENT TO COMPLETE OUR USER SURVEY
AT WWW.DOITRAVEL.COM/ONLINE UNDERSCORE SURVEY.HTML
***************************************************
DID YOU KNOW YOU CAN BOOK RESERVATIONS ONLINE
FOR MORE INFORMATION OR ASSISTANCE..PLEASE CONTACT
YOUR BUREAU ADMINISTRATOR. THANK YOU
***************************************************
S*1/800
REMEMBER TICKETS ARE WORTH MONEY...PLEASE NOTIFY YOUR T  MC
OR AGENCY TRAVEL COORDINATOR OF UNUSED TICKETS OR CANCELLED TRIPS.
PLEASE DO NOT WRITE ON UNUSED TICKETS.
BA4031
SOUTHWEST CONFIRMATION NUMBER IS * H Q 2 P V D *
TOTAL SOUTHWEST TICKET COST IS 370.20
TRAVEL ARRANGMENTS MADE BY STACEY-4031
A 24.06 SERVICE FEE WILL BE APPLIED TO YOUR CREDIT CARD
```

000195

# TRAVEL VOUCHER

*(Read Privacy Act Statement on the back)*

| | |
|---|---|
| **1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE** | |
| WO-720 | |

**2. TYPE OF TRAVEL**
☒ TEMPORARY DUTY
☐ PERMANENT CHANGE OF STATION

**3. VOUCHER NO.** PG T04 3015

**4. SCHEDULE NO.**

**b. SOCIAL SECURITY NO.**

**6. PERIOD OF TRAVEL**
a. FROM 06/13/2004   b. TO 06/18/2004

**5.**
a. NAME  *(Last, first, middle initial)*
Frazier-Yates, Norma

c. MAILING ADDRESS  *(Include ZIP Code)*

**d. OFFICE TELEPHONE NO.**

**7. TRAVEL AUTHORIZATION**
a. NUMBER(S) PG T04 3015   b. DATE(S) 05/25/2004

e. PRESENT DUTY STATION
Washington Office

f. RESIDENCE  *(City and State)*

**10. CHECK NO.**

**11. PAID BY**

| 8. TRAVEL ADVANCE | | 9. CASH PAYMENT RECEIPT |
|---|---|---|
| a. Outstanding | 0 | b. DATE RECEIVED |
| b. Amount to be applied | 0.00 | AMOUNT RECEIVED $ |
| c. Amount due Government *(Attached* ☐ Check ☐ Cash*)* | | c. PAYEE'S SIGNATURE |
| D. Balance outstanding | | |

▶ Traveler's Initials

**12. GOVERNMENT TRANSPORTATION REQUESTS, OR TRANSPORTATION TICKETS, IF PURCHASED WITH CASH** *(List by number below and attach passenger coupon; if cash is used show claim on reverse side)*

I hereby assign the United States any right I may have against any parties in connection with reimbursable transportation charges described above, purchased under cash payment procedures (FPMR 101-7)

| | AGENT'S VALUATION OF TICKET (a) | ISSUING CARRIER (Initials) (b) | MODE CLASS OF SERVICE AND ACCOMMODATIONS (c) | DATE ISSUED (d) | POINTS OF TRAVEL FROM (e) | TO (f) |
|---|---|---|---|---|---|---|
| See Attached Ticket 1 | 520.00 | | | | | |

**COPY**

COMMENTS :
Trip Number 1
Personal funds used for shuttle (22.00)

**13.** I certify that this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me. When applicable, per diem claimed is based on the average cost of lodging incurred during the period covered by this voucher.

TRAVELER SIGN HERE ▶ *Norma Frazier Yates*   DATE 6/29/04   **AMOUNT CLAIMED** ▶ 676.10

NOTE: Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 287; I.d. 1001).

**14.** This voucher is approved. Long distance phone calls, if any, are certified as necessary in the interest of the Government.   *(NOTE: If long distance telephone calls are included, the approving official must have been authorized in writing by the head of the department or agency to so certify (31 U.S.C. 680a).)*

APPROVING OFFICIAL SIGN HERE ▶ *Michael Burn*   Group Manager   DATE 6-28-04

**15. LAST PRECEDING VOUCHER PAID UNDER SAME TRAVEL AUTHORIZATION**

| a. VOUCHER NO. | b. D.O. SYMBOL | c. MONTH & YEAR |
|---|---|---|

**16. THIS VOUCHER IS CERTIFIED CORRECT AND PROPER FOR PAYMENT**

AUTHORIZED CERTIFYING OFFICIAL SIGN HERE ▶   DATE

**17. FOR FINANCE OFFICE USE ONLY COMPUTATION**

| | $ |
|---|---|
| a. DIFFERENCES, IF ANY *(Explain and show amount)* | |
| b. TOTAL VERIFIED CORRECT FOR CHARGE TO APPROPRIATION  *Certifier's initials:* | $ |
| c. APPLIED TO TRAVEL ADVANCE *(Appropriation symbol:)* | $ 0.00 |
| d. NET TO TRAVELER ▶ | $ 676.10 |

**18. ACCOUNTING CLASSIFICATION**
WO-WO-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XL-HBCU-211D---- -    676.10  NR-    520.00

Complete this information
PAGE 2
If this is a continuation sheet OF ___ PAGES

TRAVEL AUTHORIZATION NO.
PG TO4 3015

TRAVELER'S LAST NAME
Frazier-Yates

TRIP# 1

**SCHEDULE OF EXPENSES AND AMOUNTS CLAIMED**

**INSTRUCTIONS TO TRAVELER** (Unlisted items are self explanatory)

Col. (c) If the voucher includes per diem allowances for members of employee's immediate family, show members' names, ages, and relationship to employee and marital status of children (unless information is shown on the travel authorization).

Com-plete only for actual expense travel

Col. (d) thru (n)

(d) Show amount incurred for each meal, including tax and tips, and dally total meal cost.
(h) Show expenses, such as; laundry cleaning and pressing of clothes, tips to bellboys, porters, etc. (other than for meals).
(f) Complete for per diem and actual expense travel.
(l) Show total subsistence expense incurred for actual expense travel.
(m) Show per diem amount, limited to maximum rate, or travel on actual expenses, show the lesser of the amount from col. (l) or maximum rate.
(n) Show expenses, such as: taxi/limousine fares, car fare (if purchased with cash), local or long distance telephone calls for Government business, car rental, relocation other than subsistence, etc.

MILEAGE RATE: 0.375

| DATE 20__ (a) | TIME (Hour and am/pm) (b) | DESCRIPTION (Departure/arrival city, per diem computation, or other explanation of expenses) (c) | BREAK-FAST (d) | LUNCH (e) | DINNER (f) | TOTAL (g) | MISCEL-LANEOUS SUBSIS-TENCE (h) | LODGING (i) | TOTAL SUBSISTENCE EXPENSE (l) | NO. OF MILES (k) | MILEAGE (l) | SUBSISTENCE (m) | OTHER (n) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/13 | | D.:RES: | | | | | | | | | | | |
| 06/13 | | Airline Flight | | | | | | | | | | | 14 00 |
| 06/13 | | A.:PHOENIX,AZ | | | | | | | | | | | |
| 06/13 | | Shuttle (charge card) | | | | | | | | | | | 22 00 |
| 06/13 | | Shuttle (cash) | | | | 35 25 | | 59 00 | 94.25 | | | 94 25 | |
| 06/14 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/15 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/16 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/17 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/18 | | D.:PHOENIX,AZ | | | | | | | | | | | |
| 06/18 | | Private Vhcle | | | | | | | | 40 | 15 00 | | |
| 06/18 | | A:RES: | | | | | | | | | | | |
| 06/18 | | Subsistence | | | | 35 25 | | | 35.25 | | | 35 25 | |
| 06/18 | | Authorized Call Home | | | | | | | | | | | 30 00 |
| 06/18 | | Lodging Tax | | | | | | | | | | | 35 60 |
| 06/18 | | GOVCC ATM ADVANCE FEE | | | | | | | | | | | 6 00 |
| | | SUBTOTALS | | | | | | | | | 15 00 | 553 50 | 107 60 |
| | | TOTALS | | | | | | | | | 15 00 | 553 50 | 107 60 |

Enter grand total of columns (l), (m) and (n), below and in item 13 on the front of this form.

**TOTAL AMOUNT CLAIMED ▶**   676.10

STANDARD FORM 1012 BACK (10-77)

If additional space is required, continue on another 1012-A BACK, leaving the front blank.

In compliance with the Privacy Act of 1974, the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chap. 57 as implemented by the Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, E.O. 11012, E.O. 9397, November 22, 1943, E.O. 11609 of July 22, 1971 (E.O. 6011(b) and 6109. The primary purpose of the information is to determine payment or reimbursement to eligible individuals for allowable expenses incurred in official travel and/or relocation and to record and maintain costs of such reimbursement. The information will be used by officers and employees who have a need for the information in the performance of their official duties. The information may be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil,

requirement, by this agency in connection with the hiring or firing of an employee, the issuance of a security clearance, or investigations of the performance of official duties while in Government service. Your Social Security Account Number (SSN) is solicited under the authority of the Internal Revenue Code (26 U.S.C. 6011(b)) and/or employee identification number, disclosure of which is mandatory for vouchers claiming travel and/or relocation expenses reimbursement which is, or may be, taxable income. In all other instances, you SSN and other requested information (other than SSN) required to support the claim may result in delay or loss of reimbursement.

000197

ACCOUNTING DETAIL

Copyright 2003 Gelco Information Network, Inc.

06/22/04

Doc No:
Frazier-Yates,

PG T04 3015

TRIP 1

ACCOUNTING CLASS CODE

| | |
|---|---|
| COM. CARRIER-408 | 520.00 |
| LODGING-409 | 330.60 |
| M&IE-409 | 258.50 |
| MILEAGE-408 | 15.00 |
| OTHER-409 | 42.00 |
| PHONE CALLS-409 | 30.00 |
| | 0.00 | 0.00 | 1,196.10 |

WO

Organization:
WO-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XL-HBCU-211D----

SPLIT PAY DISBURSEMENTS:                                1,196.10

TOTAL EXPENSES ---------------------------              520.00
NON-REIMBURSABLE EXPENSES ------------------            ==================

TOTAL AMOUNT CLAIMED --------------------               676.10

    GOV'T ADVANCE OUTSTANDING --            0.00
    GOV'T ADVANCE APPLIED ------            0.00        0.00
                                                        ==================
NET TO TRAVELER (GOVT) ---------------                  676.10

    GOV'T CHARGE CARD EXPENSES -            0.00
    GOV'T CHARGE CARD ATM ADV --            0.00
    ADD'L  GOV'T  CHARGE CARD PYMT          0.00
                                           ==================
    TOTAL  GOV'T CHARGE CARD AMT            0.00

PAY TO  GOV'T CHARGE CARD ----------------              0.00
PAY TO TRAVELER --------------------------              676.10

000198

**OFFICIAL TDY TRAVELER AUTHORIZATION**

(Note: See Privacy Act Statement on reverse)

| 1. AUTHORIZATION NO. | |
|---|---|
| PG T04 3015 | |

**2. TRAVELER** (first name, middle initial, last name)

Norma Frazier-Yates

**3. TITLE**

**4. SOCIAL SECURITY NO.** ▓▓▓▓▓

**5. ADDRESS TO WHICH REIMBURSEMENT CHECK WILL BE MAILED:**

**6A. OFFICE/SERVICE AND DIVISION**

WO-720

**6B. CORR. SYMBOL**

**7. OFFICIAL DUTY STATION**

Washington Office

**8. OFFICE PHONE NO.**

| 9. TYPE | | 10. CATEGORY | | | |
|---|---|---|---|---|---|
| [X] ORIGINAL   [ ] AMENDMENT | | [ ] SINGLE TRIP   [ ] LOA   ( [ ] COST   [ ] NO COST ) | | | |

**11. TRAVEL PURPOSE** (check one)

[ ] SITE VISIT   [ ] INFORMATION MEETING   [ ] TRAINING ATTENDANCE   [X] SPEECH OR PRESENTATION   [ ] CONFERENCE ATTENDANCE   [ ] ENTITLEMENT   [ ] SPECIAL MISSION   [ ] OTHER (SPECIFY)

**12. SPECIFIC TRAVEL PURPOSE**

### 13. AUTHORIZED OFFICIAL ITINERARY

NOTE: DO NOT include any personal sidetrips or modes of transportation that are for personal convenience and/or preference.

| DATE (a) | WEEK-DAY (b) | ITINERARY POINT (c) CITY | STATE | MILE RATE (d) | MAXIMUM LODGING (e) | TOTAL MAXIMUM (f) | ACTUAL EXPENSE RATE (g) | MODE OF TRANS. BETWEEN ITINERARY POINTS (h) | MODE OF LOCAL TRANSPORTATION (i) |
|---|---|---|---|---|---|---|---|---|---|
| | | FROM: | | | | | | | |
| 06/13/2004 | SUN | TO: PHOENIX | AZ | 47 | 59 | 106 | | AIR | RENT |
| 06/19/2004 | SAT | PHOENIX | AZ | 47 | 59 | 106 | | ---- | ---- |
| -------- | --- | TO: -------------- | -- | --- | --- | --- | | ---- | ---- |
| 06/19/2004 | SAT | TO: -------------- | -- | --- | --- | --- | | | |

| YES | NO | | |
|---|---|---|---|
| | X | **14.** IS THE EMPLOYEE MAKING ANY DEVIATIONS FROM THE AUTHORIZED ITINERARY FOR PERSONAL CONVENIENCE, TAKING ANY ANNUAL LEAVE OR USING A DIFFERENT MODE OF TRANSPORTATION FOR PERSONAL CONVENIENCE? (If YES, explain in item 22, REMARKS) (Note: any deviations from the authorized itinerary requires a comparative cost statement on the SF 1012, Travel Voucher.) | |
| X | | **15.** IF AIR TRANSPORTATION IS THE AUTHORIZED MODE OF TRAVEL BETWEEN ITINERARY POINTS, IS THE LOWEST PRICED CONTRACT CARRIER BEING USED BETWEEN ALL ITINERARY POINTS? (If NO, justify in item 22) | |
| | X | **16.** IS EXTRA AIR FARE (first class, business class, etc.) OR RAIL (Metroclub, pullman, etc.) AUTHORIZED? (If YES, justify in item 22) | 17B. MILEAGE RATE AUTHORIZED PER MILE. |
| | X | **17A.** WILL POV BE USED FOR ANY TRAVEL BETWEEN ITINERARY POINTS? (If YES, check one box below and complete item 17B)   [ ] USE OF POV IS ADVANTAGEOUS TO THE GOVERNMENT.   [ ] USE OF POV IS NOT ADVANTAGEOUS TO THE GOVERNMENT, USE OF POV HAS BEEN DETERMINED TO BE FOR PERSONAL CONVENIENCE AND REIMBURSEMENT LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER. (If YES, justify in item 22) | |
| | X | **18.** IS ACTUAL EXPENSE UNUSUAL CIRCUMSTANCES AUTHORIZED? IF ACTUAL EXPENSE IS AUTHORIZED, THE FOLLOWING APPLY: (1) EXPENSES MUST BE ITEMIZED EACH DAY AND EACH MEAL OVER $25.00. (2) RECEIPTS ARE REQUIRED FOR LODGING AND MISCELLANEOUS SUBSISTENCE EXPENSE MAY NOT EXCEED 150% OF THE AMOUNT IN ITEM 13(d) (3) REIMBURSEMENT FOR MEALS AND MISCELLANEOUS SUBSISTENCE. (Check one) (Note: if item 19a was checked and you check 20b or c, explain in item 22) | 21. FUNDS OBLIGATED   A. INITIALS / B. DATE |

**19. TRAVELER IS** (check one)

[X] a. GOVT CHARGE CARD HOLDER   [ ] b. GOVT CHARGE CARD DECLINEE   [ ] c. INFREQUENT TRAVELER

**20. METHOD OF OBTAINING COMMON CARRIER TICKETS** (check one)

[ ] a. INDIVIDUAL GOVERNMENT CHARGE CARD   [ ] b. BLANKET GOVERNMENT CHARGE CARD   [ ] c. GOVERNMENT TRANSPORTA-TION REQUEST   [X] OTHER (explain in item 22)

**22. REMARKS**

| 23. EST. COST TO GOVERNMENT | | |
|---|---|---|
| A. TOTAL COMMON CARRIER COST | $ | 500.00 |
| B. TOTAL PER DIEM AND OTHER | $ | 909.50 |
| C. TOTAL ESTIMATED COST | $ | 1409.50 |

**24. TRAVEL ADVANCE WILL BE OBTAINED BY** (check one)

[X] a. GOVERNMENT ISSUED CHARGE CARD   [ ] b. SF 1038, ADVANCE OF FUNDS APPLICATION AND ACCOUNT

| 25. ADVANCE AUTHORIZED | $ | 0.00 |
|---|---|---|

**IMPORTANT: SAFETY BELT USE IS MANDATORY. DRIVE SAFELY**

A SF 1012, TRAVEL VOUCHER MUST BE SUBMITTED TO THE VOUCHER APPROVING OFFICIAL WITHIN 5 WORKING DAYS OF COMPLETION OF TRIP.

| 26. NEAR ACCOUNT CLASS. | FUND | BUDGET ACTIVITY | OBJECT CLASS | FUNCTION | PROJECT / PROSPECTUS | COST ELEMENT | COST CENTER A | WORK ITEM | COST CENTER B |
|---|---|---|---|---|---|---|---|---|---|
| | WO | 700 | 04 | 1220XL | HBCU | 211D | | | |

**27A. NAME AND TITLE OF AUTHORIZING OFFICIAL**

Jesse Hicks - Group Manager

**27B. SIGNATURE** (PRESS FIRMLY USE BALL POINT PEN)

**27C. DATE**

GENERAL SERVICES ADMINISTRATION

GSA FORM 87 (REV. 8/86)

000199

```
06/22/04          ACCOUNTING DETAIL          | Doc No:        PG T04 3015
Copyright 2003 Gelco Information Network, Inc. | Frazier-Yates, 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
==============================================================================
```
                                                                    TRIP 1
                                                                ---------------
  ACCOUNTING CLASS CODE        ---------------   ---------------    500.00
  -----------------------                                           354.00
  COM. CARRIER-408                                                  305.50
  LODGING-409                                                       250.00
  M&IE-409                                                      ---------------
  RENTAL CAR-409            ---------------   ---------------      1,409.50
                                       0.00              0.00

  WO

  Organization:
  WO-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XL-HBCU-211D----

000200



Residence Inn Phoenix
8242 N. Black Canyon Highway
Phoenix, AZ 85051
(602) 864-1900

Guest Folio Summary

| Guest Name | N FRAZIER-YALES | | | Page 1 |
|---|---|---|---|---|
| | | | Folio Number | P1-91242 |
| | | | Suite Number | 1411 |
| | | | Suite Type | STDO |
| | BLM SCEP | | No. of Guest | 1 |
| | | | Rate | 59.00 |
| | | | Account Number | KLP |

| Arrive | 13Jun04 | Time | 10:13 AM | Depart | | Time | |
|---|---|---|---|---|---|---|---|

| Date | | Description | Charges | Credits |
|---|---|---|---|---|
| 13Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 13Jun04 | T11411 | Room Tax | 7.12 | |
| 14Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 14Jun04 | T11411 | Room Tax | 7.12 | |
| 15Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 15Jun04 | T11411 | Room Tax | 7.12 | |
| 16Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 16Jun04 | T11411 | Room Tax | 7.12 | |
| 17Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 17Jun04 | T11411 | Room Tax | 7.12 | |

```
+--------------------------------------------------+
|              Paid-Mastercard                     |
|         AMOUNT:     330.60                        |
|         --> SIGNATURE ON FILE <--                 |
+--------------------------------------------------+
```

HAVE A GREAT DAY AND COME HOME SOON

02/02 - 02/05 K
NORMAN FRAZIER YATES

SUPER SHUTTLE

DATE 02-13-04    STORE/CASHIER
AUTHORIZATION NO.  REFERENCE NO.
X16207  8982
UNV 3749
5544289

HASER SIGN HERE

older acknowledges receipt of goods and/or services in the amount
otal shown hereon and agrees to perform the obligations set forth
ardholder's agreement with the issuer.

| QTY. | DESCRIPTION | AMOUNT |
|------|-------------|--------|
|      |             | 12     |
|      |             |        |
|      | TAX         |        |
| SALES SLIP | TIP MISC | 2.00 |
| TOTAL |          | 14.00  |

CUSTOMER COPY

**IMPORTANT: RETAIN THIS COPY FOR YOUR RECORDS**

---

**AMERICA WEST AIRLINES**

**GROUP 5**

Name of Passenger
FRAZIERYATES / NORI
Conf:  UHBAPA/HP
FFD:
PHOENIX
WASHINGTON

Flight 46

Date 18JUN

Gate A22    Boarding Time 215P    Seat 17F Window

---

# SuperShuttle®

**TRIP RECORD**

Pass. Name NORMAN YATS
Company DOT / BLKH
Address/Bldg.
City_____ Zip_____
Badge/P.O.
From 818 N 13 AC  TO: Airport

#Pass._____

| Fare $ | 22.00 |
|--------|-------|
| Tip $  |       |
| Total $ | 22.00 |

Method of Payment
CREDIT CARD  ✓
DIRECT BILL
CASH RECEIPT
PREPAID

Driver No. 9/18 /  Date 06/13/04

---

**AMERICA WEST AIRLINES**

**GROUP 2**

Name of Passenger
FRAZIERYATES / NOR
Conf:  UHBAPA/HP
FFD:
WASHINGTON
PHOENIX

Flight 482

Date 13JUN

Gate 16    Boarding Time 648A    Seat 7A Window

000202

PG T04 30
Doc No:
Frazier-Yates, 579-74-210

COUNTING DETAIL                                             TRIP
co Information Network, Inc.
=====================================                       0
                                                           60
                                                           50
                                                           .00
 CODE          -------------                               2.00
 ------------                                              0.00
                                                           ---
 3                                                         196 — 10

                                          0.00

)9                      0.00

:
:20XL-HBCU-211D----

                                                           1,196
                                                            520
DISBURSEMENTS: -----------              ==============      670

EXPENSES -----------                    0.00
IMBURSABLE EXPENSES                     0.00               .00
                                                           ===
 AMOUNT CLAIMED ------                  ==============      .10

'T ADVANCE OUTSTANDING --
'T ADVANCE APPLIED ------
                                        0.00
                                        0.00
 TO TRAVELER (GOVT)

GOV'T CHARGE CARD EXPENSES -            0.00
GOV'T CHARGE CARD ATM ADV --
ADD'L  GOV'T  CHARGE CARD PYMT  ==============
                                        0.00
                                                           0 . 00
 TOTAL  GOV'T CHARGE CARD -----                            676 . 10

PAY TO  GOV'T CHARGE CARD -----
PAY TO TRAVELER --------------

**UNITED STATES COMMISSION ON CIVIL RIGHTS**

WASHINGTON, D.C. 20425

OFFICE OF STAFF DIRECTOR

May 20, 2003

E. Melodee Stith
Director
Office for Equal Opportunity
Department of the Interior
1849 C St., NW  Rm. 5214
Washington, DC 20240

Dear Ms. Stith:

In 2001, the U.S. Commission on Civil Rights (Commission) initiated an assessment of 11 federal agencies' responsiveness to recommendations the Commission made in the 1990s. Our research and analyses are being presented in a series of reports, the first two of which were released in 2002. We have now completed a draft of the third report, *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume III -- An Evaluation of the Departments of Agriculture and Interior, the Environmental Protection Agency, and the Small Business Administration*. The Department of Interior is discussed in chapter 3.

It is the Commission's policy to provide agencies discussed in our reports a copy of the draft so that agency staff can review and comment on the information presented. I have enclosed one copy of the relevant section of Volume III. To allow Commission staff to respond to your comments, we must have your agency's written comments, should you decide to provide any, by June 3, 2003.

You are not required to provide comments. However, to the extent that you do, the comments must be in writing and received before the due date.  Since there is a statutorily-imposed deadline for the completion of this study, any request for an extension cannot be guaranteed.

If you have any questions concerning the report or our request, please contact Terri A. Dickerson, Assistant Staff Director, Office of Civil Rights Evaluation, at 202-376-8542.  I appreciate your cooperation and assistance in the preparation and completion of this report.

Sincerely,

Les Jin
Staff Director

Enclosures



# CHAPTER 3

# DEPARTMENT OF THE INTERIOR

As the nation's principal conservation agency, the Department of the Interior (DOI) has responsibility for most of America's public lands and natural resources. This responsibility entails fostering sound use of the nation's land and water resources; protecting its fish, wildlife, and biological diversity; preserving the environmental and cultural values of its national parks and historical places; and providing for the enjoyment of life through outdoor recreation. DOI assesses the country's energy and mineral resources and works to ensure that their development is in the best interests of all American people by encouraging stewardship and citizen participation in their care. DOI also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. administration.[1]

## Overview

The Commission last reviewed the Department of the Interior's (DOI's) civil rights enforcement program in 1996. At that time, the only bureaus with active Title VI programs were the National Park Service (NPS), the Fish and Wildlife Service (FWS), and the Bureau of Reclamation (WBR). In 1991, the Office for Equal Opportunity (OEO) had assumed new responsibility for coordinating and developing civil rights policy at DOI.[2] OEO's duties entailed the "overall direction, policy development, and oversight of bureaus' Title VI enforcement efforts...."[3] Its new role not only increased bureau accountability, but also allowed OEO to assign more personnel to civil rights enforcement work.[4]

A year before the Commission's review, as OEO reorganized its federal financial assistance programs and federal employment staffs, DOI was participating in the National Performance Review Reinvention Laboratory. Both DOI and OEO sought to streamline and improve civil rights performance. OEO hoped to accomplish this by assembling the external civil rights Federal Financial Assistance Programs (FFAP) staff and internal equal employment opportunity Federal Employment Programs (FEP) staff into a team structure.[5] Staff supervisors, possessing no civil rights enforcement training, would also be replaced with process managers,

---

[1] U.S. Department of the Interior, Minerals Management Service, "20 years of Service to America, MMS, Minerals Management Service, 1982–2002, *n.d.*

[2] U.S. Commission on Civil Rights, *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs*, June 1996, p. 388 (hereafter cited as USCCR, *Federal Title VI Enforcement*). When the Commission reviewed OEO in 1996, it established that OEO had decentralized its civil rights program in 1991. Prior to 1991, the civil rights program had been centralized. In 1996, OEO stated that decentralization had improved its civil rights performance efforts. Presently, OEO is planning to centralize its civil rights program. If centralization is approved, the scheduled effective date for full implementation is October 1, 2003. The director believes that centralization will dramatically improve OEO's civil rights compliance and enforcement efforts. *See* E. Melodee Stith, interview in Washington, DC, Jan. 15, 2003 (hereafter cited as Stith Interview).

[3] USCCR, *Federal Title VI Enforcement*, p. 388.

[4] USCCR, *Federal Title VI Enforcement*, p. 388.

[5] USCCR, *Federal Title VI Enforcement*, p. 388.

10-Year Review—Volume III

Case 1:05-cv-01475-RWR    Document 17-9    Filed 07/11/2007    Page 66 of 89    Confidential Draft
Not for Public Release: 5/20/2003

who would receive civil rights enforcement training.[6] Before the reorganization, personnel did not work as closely and were less familiar with the programs they administered and program recipients. Because of these factors, they were not held accountable for the administration of these programs. After reorganization, process managers and staff would be held directly accountable for the programs they administered.[7] DOI focused on ensuring that existing regulations and operational procedures allowed efficient and effective enforcement of civil rights laws.[8]

**Priority of Civil Rights**

In 1996, the OEO director reported to the deputy assistant secretary for human resources, not the Secretary of the Interior, from whom the director was several levels removed.[9] The lack of immediate access to the Secretary likely hindered OEO's efforts to enforce Title VI in all of DOI's federally assisted programs and activities. This arrangement may have also hindered the enforcement of other civil rights laws at DOI and the department's equal employment opportunity program, which OEO administered.[10] The director stated that she had "ready access to both the Assistant Secretary for Policy, Budget, and Administration and the Deputy Assistant Secretary for Human Resources," participated in weekly meetings with these officials, and met with all office directors bimonthly.[11] The Commission noted that OEO's enforcement efforts would benefit if the director reported to the Secretary, thus giving civil rights the same priority as other DOI responsibilities.[12]

The Commission's 2003 review finds that the director is still several levels removed from the Secretary. According to OEO, the reporting hierarchy has not changed during the past 10 years: the director still reports to the Deputy Assistant Secretary for Human Resources and Workforce Diversity (DASHRWD), who reports to the Assistant Secretary for Policy,

---

[6] USCCR, *Federal Title VI Enforcement*, pp. 388–89.

[7] USCCR, *Federal Title VI Enforcement*, p. 388. In 1996, the Commission was unable to evaluate the likelihood that OEO would meet its goal because OEO did not provide the Commission with much information on its reorganization.

[8] USCCR, *Federal Title VI Enforcement*, pp. 388–89.

[9] Ms. E. Melodee Stith has been director of the Office for Equal Opportunity during the Commission's 1996 review and the present one. *See* Stith Interview.

[10] In addition to Title VI of the Civil Rights Act of 1964, OEO is responsible for enforcing the following civil rights laws, executive orders and DOI regulations: Title VII of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972, as amended; Title II of the Americans with Disabilities Act; Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 357 (codified as amended at 29 U.S.C. § 701 (1994)); Age Discrimination Act of 1975, Pub. L. No. 94-175, 89 Stat. 728 (codified as amended at 42 U.S.C. § 6101 (1994)); Exec. Order 12,898, 59 Fed. Reg. 7,629 (1994); Exec. Order 13,160 66 Fed. Reg. 5,398 (2001); Exec. Order 13,166, 3 C.F.R. § 289 (2001), *reprinted in* 42 U.S.C.S. § 2000d-1 (Law. Co-op. 2003); Nondiscrimination in Activities Conducted Under Permits, Rights-of-Way, Public Land Orders and other Federal Authorizations Granted or Issued Under Title II of Public Law 93-153, 43 C.F.R. § 27 (2002); Requirements for Equal Opportunity During Construction and Operation of the Alaska Natural Gas Transportation System, 43 C.F.R. § 34 (2002). OEO provided this information. *See* Department of Interior's Response to the U.S. Commission on Civil Rights' Interrogatory for Volume III of the Ten-Year Review of Civil Rights Enforcement, Office for Equal Opportunity, Jan. 29, 2003, pp. 2–4 (hereafter cited as DOI Interrogatory).

[11] USCCR, *Federal Title VI Enforcement*, p. 387.

[12] USCCR, *Federal Title VI Enforcement*, p. 405.

Management and Budget (ASPMB).[13] Despite having direct access to the DASHRWD and ASPMB, the director's comments reach the Secretary through one or two supervisors. OEO still maintains that this does not negatively impact the civil rights program because the Office of Policy, Management and Budget (PMB) makes administrative decisions for OEO. Furthermore, the director continues to "participate in all important executive meetings concerning budget, staffing, and policy issues affecting those programs for which she is responsible. . . ."[14] Reporting to the DASHRWD in no way ensures that OEO's concerns reach the Secretary because other concerns can overshadow these civil rights matters in PMB. The director is satisfied, however, that she has direct access to the Secretary when needed. Nevertheless, the director's weekly report to the Secretary merely includes an account of Title VI activities, instead of detailed information on what OEO requires to prioritize Title VI enforcement at DOI (see figure 3.1).[15]

**Figure 3.1**
**Department of Interior Organization Chart**



Source: Department of Interior, Organization Chart, Mar. 24, 2003.

In 1996, the FFAP staff handled Title VI enforcement at OEO and reported directly to the director. The FEP staff addressed Title VII or equal employment opportunity (internal civil rights) and also reported to the director.[16] The separation of external and internal civil rights

---

[13] DOI Interrogatory, pp. 1, 4.

[14] DOI Interrogatory, p. 1; U.S. Department of the Interior, "Organization Chart," n.d., <http://www.doi.gov/org.htm> (hereafter cited as DOI Organization Chart). Examples of executive meetings provided by OEO on the interrogatory are: Management Initiatives Team, Human Capital Management Team and Workforce Planning Work Group.

[15] Stith Interview.

[16] In 2003, OEO maintains three staffs: Complaints Processing and Adjudication, Diversity and Program Evaluation, and Civil Rights Program. *See* DOI Interrogatory, p. 5.

enforcement prevented Title VI resources from being redirected to internal civil rights obligations. Despite this, OEO was not sufficiently prioritizing Title VI enforcement because it did not have a legal structure to do so. The office relied instead on DOI's Office of the Solicitor (Solicitor) to maintain Title VI regulations current and draft Title VI procedures and guidelines.[17]

As of 2003, Title VI civil rights compliance and enforcement at OEO are managed by the Civil Rights Program Staff (CRPS), with the Diversity and Program Evaluation Staff (DPES) and Complaints Processing and Adjudication Staff (CPA) addressing internal civil rights functions.[18] Since OEO has maintained separate external and internal units, Title VI resources continue to be used solely for external efforts.[19] OEO has no dedicated legal staff and continues to rely on DOI's Office of the Solicitor to provide legal instruction on Title VI matters.[20] OEO's reliance on the Solicitor for these services emphasizes DOI's failure to prioritize external enforcement (see figures 3.2 and 3.3).

In 1996, the failure of DOI's Title VI enforcement program prompted the Commission to recommend the separation of OEO from offices responsible for developing projects required to meet external or internal civil rights laws. To accomplish this, the Commission envisioned OEO serving as a watchdog for the other offices to ensure that every initiative, plan, program, and activity originating at DOI met agency civil rights enforcement goals.[21] This is a critical issue because OEO is responsible for enforcing and ensuring compliance with all federal civil rights laws and executive orders for which the department has responsibility.[22] OEO has authority to conduct these duties under Title VI of the Civil Rights Act of 1964 and to ensure that they are fully enforced.[23]

---

[17] USCCR, *Federal Title VI Enforcement*, pp. 387–88.

[18] U.S. Department of the Interior, "Departmental Manual," Oct. 6, 1998, <http://elips.doi.gov/elips/release/3225.htm>; *DOI Organization Chart*. These units were previously called the Federal Financial Assistance Programs Staff and Federal Employment Programs Staff, respectively. (*See* USCCR, *Federal Title VI Enforcement*, pp. 387–88; U.S. Department of the Interior, FY 1994 Civil Rights Implementation Plans and Supporting Workload and Performance Data, p. 3). Specifically, DPES develops policy and designs, manages, and directs enhancement programs to promote full diversity within the Department, which include affirmative action planning and implementation. CPA, is responsible for issuing final agency decisions on all complaint of discrimination filed against the Department on the basis of race, color, sex, national origin, religion, age, disability or sexual orientation.

[19] DOI Interrogatory, p. 11.

[20] U.S. Department of the Interior, *FY 2002 Information and Reporting Requirements for Agencies Covered by Executive Order 12,250, (October 1, 2001–September 30, 2002)*, p. 3 (hereafter cited as *DOI FY 2002, Information and Reporting Requirements*); Stith Interview.

[21] USCCR, *Federal Title VI Enforcement*, p. 405.

[22] DOI Interrogatory, p. 4.

[23] Department of the Interior, "Departmental Manual," Feb. 3, 1996, <http://elips.doi.gov/elips/release/3051.html> (hereafter cited as *Departmental Manual, Feb. 3, 1996*).

**Figure 3.2**
**Department of Interior, Office for Equal Opportunity Organization Chart**
**Effective 1991 to October 5, 1998**



Source: USCCR, *Federal Title VI Enforcement*, pp. 387–92.

**Figure 3.3**
**Department of Interior, Office for Equal Opportunity Organization Chart Effective October 6, 1998**



Source: Department of Interior, Office for Equal Opportunity Organization chart, Jan. 31, 2003.

In 2003, OEO's Title VI compliance and enforcement efforts continue to be hindered by its placement within PMB.[24] Specifically, OEO is included in PMB and, within that, subsumed under the DASHRWD. OEO's subordinate position within PMB may negate its ability to ensure

---

[24] U.S. Department of the Interior, Office of Policy, Management and Budget, "PMB Offices," *n.d.*, <http://www.doi.gov/policy-management-budget.html> (hereafter cited as *PMB Offices*); *See* USCCR, *Federal Title VI Enforcement*, pp. 387, 405.

that PMB projects required to adhere to laws enforced by OEO do so.[25] Included among the many duties of ASPMB, for example, are special-emphasis programs such as equal opportunity, small and minority business utilization and minority educational institutions, programs subject to civil rights compliance.[26] This deficiency is especially stark because among OEO's objectives is providing "department-wide oversight . . . for the various Interior . . . civil rights compliance programs."[27]

## Resources—Funding and Staffing

The Commission's 1996 evaluation found that DOI annually distributed approximately $900 million in federal financial assistance. Between 1964 and 1994, DOI provided 12,414 recipients more than $22 billion in financial assistance through 62 programs. Although DOI's bureaus operated all of its federally assisted programs, only NPS, FWS, and WBR had responsibility for implementing and enforcing Title VI in the federal financial assistance programs they administered.[28] At that time, DOI's other bureaus did not have active Title VI programs but operated federally assisted programs.[29] Despite the responsibilities assigned to NPS, FWS and WBR, OEO was ultimately responsible for enforcing Title VI in all DOI's federally assisted programs and activities.[30] Specifically, OEO oversees and offers policy direction, guidance, training and support to bureaus in Title VI activities. Moreover, OEO is charged with reporting noncompliance and enforcement actions against recipients to other federal agencies, including termination of funding.[31] In FY 1993, DOI's total civil rights budget was $5.2 million.[32] Of this amount, OEO was allocated $1.6 million, which also sustained its oversight of the equal employment opportunity program within the Department.[33]

In 2003, the Commission finds that OEO received a steady increase in funding between FYs 1998 and 2002. Specifically, OEO's average annual funding was $1.3 million from FY 1996

---

[25] *DOI FY 2002 Information and Reporting Requirements*, p. 1; *PMB Offices*.

[26] U.S. Department of the Interior, "Office of Policy, Management and Budget," n.d., <http://www.doi.gov/policy-management-budget.htm>.

[27] U.S. Department of the Interior, Office for Equal Opportunity, *FY 2002 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-95 (hereafter cited as *OEO FY 2002 Budget Submission and Appropriation*).

[28] USCCR, *Federal Title VI Enforcement*, pp. 385, 389.

[29] USCCR, *Federal Title VI Enforcement*, pp. 388, 390. In addition to the National Park Service, the Fish and Wildlife Service, and the Bureau of Reclamation, in 1996 the bureaus were the Bureau of Indian Affairs, Bureau of Land Management, Office of Surface Mining Reclamation and Enforcement, Minerals Management Service, U.S. Geological Survey, and U.S. Bureau of Mines.

[30] USCCR, *Federal Title VI Enforcement*, p. 387.

[31] *Departmental Manual, Feb. 3, 1996*.

[32] USCCR, *Federal Title VI Enforcement*, pp. 385, 391. This amount also included expenditures; U.S. Department of the Interior, *FY 1994 Civil Rights Implementation Plans and Supporting Workload and Performance Data*, p. 4 (hereafter cited as *DOI FY 1994 Information*).

[33] U.S. Department of the Interior, Office for Equal Opportunity, *FY 1994 Budget Submission and Appropriation, Justification of Program and Performance*, p. SEC-26; USCCR, *Federal Title VI Enforcement*, p. 387.

through the FY 2002 budget request.[34] The only decrease during this period occurred in FY 1997 when funding was $150,000 below the previous year (see figure 3.4)[35]

In 1996, OEO had neglected to develop a mechanism for managing, allocating or tracking Title VI funds and expenditures. In fact, no formal tracking system existed for any of its external civil rights activities. Because OEO did not know how its Title VI expenditures compared with its other program areas, its ability to systematically plan its Title VI activities was impeded.[36] Moreover, failing to monitor external civil rights expenditures may have caused the reductions in OEO's budget, staffing and resources that occurred at that time.[37] The Commission recommended that OEO develop an information management system that would permit it to isolate Title VI outlays from those for all other civil rights activities. The Commission said both OEO's and the bureaus' expenditures should be tracked in order to accurately account for costs.[38] In 1996 the Commission also found that DOI's budget did not designate funds for OEO.[39]

---

[34] U.S. Department of the Interior, Office for Equal Opportunity, *FY 1997 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-61 (hereafter cited as *OEO FY 1997 Budget Submission and Appropriation*); U.S. Department of the Interior, Office for Equal Opportunity, *FY 1998 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-54 (hereafter cited as *OEO FY 1998 Budget Submission and Appropriation*); U.S. Department of the Interior, Office for Equal Opportunity, *FY 1999 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-58; U.S. Department of the Interior, Office for Equal Opportunity, *FY 2000 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-99; U.S. Department of the Interior, Office for Equal Opportunity, *FY 2001 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-98; *OEO FY 2002 Budget Submission and Appropriation*, p. DM-95. The FY 2002 figure is based on OEO's budget request for that fiscal year.

[35] *OEO FY 1997 Budget Submission and Appropriation*, p. DM-61; *OEO FY 1998 Budget Submission and Appropriation*, p. DM-54.

[36] USCCR, *Federal Title VI Enforcement*, p. 408.

[37] USCCR, *Federal Title VI Enforcement*, p. 391.

[38] USCCR, *Federal Title VI Enforcement*, p. 408.

[39] USCCR, *Federal Title VI Enforcement*, p. 391.

10-Year Review—Volume III

Case 1:05-cv-01475-RWR    Document 17-9    Filed 07/11/2007    Page 72 of 89
97
Confidential Draft
Not for Public Release: 5/20/2003

**Figure 3.4**
**Office for Equal Opportunity Budget History, FYs 1996–2002**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996–2002 Budget Submissions and Appropriations.

     The forgoing has not changed in 2003. Funding for OEO is contained in the Departmental Management portion of DOI's budget, thus, funds are still not being designated for OEO. Consequently, the director is responsible for obtaining funds from the Department and distributing them to each civil rights functional area.[40] Matters are further clouded by OEO's continued failure to institute an information management system for tracking civil rights expenditures.[41] The situation is especially troublesome since more than five years ago, DOI spent in excess of $1.5 million and staff to further develop the Accessibility Data Management System.[42] The system would have allowed the review, reporting, monitoring, and tracking of DOI's civil rights compliance and enforcement.[43] Failing to implement such a system has likely prevented OEO from assessing the impact of funding on Title VI enforcement. Lack of funding also has negatively affected DOI's systematic planning for Title VI activities.

     In 1996, the Commission found that OEO's work was further compromised by the lack of a dedicated unit for policy development and programmatic guidance.[44] At that time OEO devoted only five staff members to external civil rights activities. However, only one employee

---

[40] DOI Interrogatory, p. 11.

[41] DOI Interrogatory, p. 11.

[42] U.S. Department of the Interior, *FY 1997 Civil Rights Information and Reporting Requirements*, p. 8 (hereafter cited as *DOI FY 1997 Civil Rights Information*).

[43] *DOI FY 1997 Civil Rights Information*, p. 8.

[44] USCCR, *Federal Title VI Enforcement*, p. 406.

performed work for OEO because FWS used three staff while NPS used one.[45] Still, increasing the number of staff was only half the battle, as OEO had to adequately train, monitor, and guide them.[46]

The 2003 study reveals that OEO staff is responsible for policy development and programmatic guidance, dissemination of guidance to bureaus, and monitoring and overseeing bureaus' civil rights enforcement.[47] Consequently, OEO is still lacking a unit dedicated to policy development and programmatic guidance. Furthermore, since OEO only dedicates five civil rights program staff to external activities, including the four assigned to individual bureaus, staff are still greatly overburdened despite being periodically supplemented by personnel temporarily detailed to Title VI activities from other OEO sections (see figure 3.5).[48]

**Figure 3.5**
**Office for Equal Opportunity and Bureau Title VI Staffing History, FY 1996–FY 2002**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1994–2002 Civil Rights Implementation Plans and Supporting Workload and Performance Data.

Bureau civil rights staff work in dedicated internal and external enforcement units with the director overseeing staffing levels. But, the director does not have authority to influence the

---

[45] USCCR, *Federal Title VI Enforcement*, p. 408.

[46] USCCR, *Federal Title VI Enforcement*, p. 409.

[47] DOI Interrogatory, p. 5.

[48] DOI Interrogatory, pp. 12, 16; Stith Interview, p. 5. The four CRPS not working directly for OEO are assigned to the National Park Service, Fish and Wildlife service, Office of Surface Mining, and U.S. Geological Survey, respectively.

number of staff dedicated to external duties. Although all bureaus have an equal opportunity office, civil rights enforcement specialists are only in NPS, FWS, Office of Surface Mining (OSM), and the U.S. Geological Survey (USGS). Bureaus without civil rights enforcement specialists are the Bureau of Land Management (BLM); Bureau of Indian Affairs (BIA); WBR; and the Minerals Management Service (MMS).[49] Finally, bureaus with civil rights program management staff may or may not assign civil rights specialists to Title VI duties, and the director has no authority to instruct them to do so.[50]

## Planning

According to the Commission's 1996 report, OEO's civil rights implementation plans (CRIP) failed to meet the Department of Justice's (DOJ) requirements. OEO was not providing enough information to permit DOJ to assess the program's quality. OEO's CRIP also failed to provide the public with an understanding of DOI's federally funded programs. Moreover, since the goals and objectives of the plans were not specific and lacked timetables and standards for accomplishment, as prescribed by DOJ, the Commission found that they did not serve as a management tool.[51] Because the plans were not meeting DOJ's standards, the Commission recommended that OEO develop plans that fulfilled DOJ's specified objectives. It also recommended that the plans clearly explain DOI's Title VI enforcement program and be readily available to the public. Because these plans needed to be used as a management tool, OEO had to present its "methods for selecting recipients for compliance reviews."[52] Furthermore, complaint handling procedures and the provisions for providing outreach and education, training, and technical assistance also had to be included in the plans. OEO's civil rights implementation plans also had to include a description of DOI's Title VI quality assurance programs and specific long-range and short-term goals and objectives, with timeframes for accomplishing them.[53] To ensure that goals and objectives were met, OEO had to develop them by accounting for available staff and resources as well as directing enough of both to that end.[54]

During the Commission's 2003 study, OEO indicated that the CRIP has always been developed with the Department of Justice's guidance.[55] According to OEO, it has been developing these plans since 1972. OEO further states that DOJ has never provided any feedback on the sufficiency of the implementation plans and the DOI interpreted DOJ's silence as approval.[56]

[49] Department of the Interior, "Workforce Diversity," *DOI EO Offices*, May 30, 2002, <http://www.doi.gov/diversity/8doi_eeo.html>.
[50] DOI Interrogatory, pp. 9–10, 16.
[51] USCCR, *Federal Title VI Enforcement*, p. 414. In 1996, the Department of Justice included specific objective for 12,250, 'Leadership and Coordination of Nondiscrimination Laws."
[52] USCCR, *Federal Title VI Enforcement*, p. 414. civil rights implementation plans in its "Guidelines for Agency Implementation Plans Required by Executive Order
[53] USCCR, *Federal Title VI Enforcement*, p. 414.
[54] USCCR, *Federal Title VI Enforcement*, p. 414.
[55] DOI Interrogatory, p. 6.
[56] DOI Interrogatory, p. 6.

In 2003, the Commission finds that DOI last modified its Title VI regulations in FY 2002.[63] Although the regulations were updated to include the Civil Rights Restoration Act's definition of a covered "program" and "program or activity," it neglected to incorporate the act's clarifications to Title VI's coverage and funding termination provisions.[64] Furthermore, DOI failed to provide appropriate model regulations or examples, instead choosing to maintain those developed by DOEd.[65] Finally, DOI has not published an annual list of its federally assisted programs in the *Federal Register*.[66]

In 1996, the Commission also found that DOI's Title VI guidelines were outdated. Once more, the Commission asked DOI to immediately remedy the situation since existing regulations did not accurately reflect the agency's current Title VI enforcement structure and process. Perhaps more disturbing was DOI's failure to issue guidelines for its other federally assisted programs.[67]

The Commission recommended that DOI clearly outline the "relative responsibilities of OEO, the bureaus, civil rights offices, the bureaus' program offices, and recipients [in] ensuring Title VI compliance in the areas of pre-award and post-award compliance reviews; complaints processing; data collection, reporting, and analysis; technical assistance; and outreach and education" in the guidelines.[68] Guidelines also needed to clearly describe the specific types of data that recipients were required to collect and provide to OEO and supply clear and relevant examples of the actions that violated Title VI.[69]

The Commission also recommended that guidelines provide state recipients receiving funding under continuing programs with an explicit understanding of Title VI compliance responsibilities. It was also recommended that guidelines require states to seek DOI approval for their methods of administration and to submit regularly self-assessments and compliance plans to DOI.[70]

The 2003 study finds that OEO develops guidelines "on an as need basis" and when DOJ provides new Title VI standards.[71] Although OEO proposed revising DOI civil rights guidelines in FY 1998, this was for Title IX (education) not Title VI (grants).[72] The Title VI guidelines used by OEO in 2003 continue to be badly outdated as they do not even incorporate the Civil Rights

---

[63] DOI Interrogatory, p. 6.

[64] *DOI FY 2002 Information and Reporting Requirements*, p. 7; U.S. Department of Justice, "Joint NPRM Incorporating the CRRA," Dec. 6, 2000, <http://www.usdoj.gov:80/crt/cor/byagency/crranprm.htm> (hereafter cited as *DOJ NPRM*).

[65] *DOI FY 2002 Information and Reporting Requirements*, p. 7; *DOJ NPRM*.

[66] An exhaustive search of the *Federal Register* at http://www. s...ress.gpo.gov/su_doc...ces/aces140.html on February 11, 2003, provided no such listing.

[67] USCCR, *Federal Title VI Enforcement*, p. 409.

[68] USCCR, *Federal Title VI Enforcement*, p. 409.

[69] USCCR, *Federal Title VI Enforcement*, p. 409.

[70] USCCR, *Federal Title VI Enforcement*, p. 409.

[71] DOI Interrogatory, p. 7.

[72] *DOI FY 1998 Information and Reporting Requirements*, p. 4.

Restoration Act. One set of guidelines is included as part of the *Land and Water Conservation Fund Grants Manual* and is very general. Although it incorporates some of the areas mentioned by the Commission, it neglects just as many. Moreover, it is only directed at the NPS and its recipients, and thus is of little if any use to other DOI bureaus.[73] The other set of guidelines is developed by the FWS and is equally vague and covers the same general areas as the manual.[74]

The Commission found in its 1996 review that DOI's Title VI enforcement procedures were also in need of immediate updating and revision. The Commission noted that the existing Title VI enforcement manual made no mention of OEO's current Title VI enforcement procedures. Instead, the manual described an outdated Title VI enforcement structure.[75] To correct the situation, the Commission recommended that the manual be updated and revised to explain (1) every civil rights implementation and enforcement procedure; (2) how to conduct pre-award and post-award compliance reviews; (3) how to process and investigate complaints correctly; (4) how to perform community outreach, public education, and technical assistance; and (5) how to negotiate and monitor compliance agreements.[76]

To strengthen OEO's reviews and investigations, the Commission also recommended that OEO provide staff with detailed instructions and elaborate on the types of information to be considered during reviews and investigations. In addition, the manual should provide examples of whom staff should contact for information throughout compliance reviews and complaint investigations.[77] A final recommendation was the inclusion of a Title VI compliance analysis outline for the staff's erudition.[78]

The Commission finds that in 2003, OEO has no Title VI enforcement manual. According to OEO, it issues equal opportunity memoranda to distribute enforcement procedures.[79] However, the Commission received no documentation supporting the assertion that DOI was fulfilling this requirement.[80]

**Technical Assistance**

DOI's bureaus depended on technical assistance from OEO for effective Title VI enforcement. OEO's mandate to coordinate and oversee the bureaus' Title VI efforts also required it to provide bureaus with this assistance. OEO's ability to provide technical assistance, however, was a function of staff.[81] When the Commission reviewed OEO in 1996, external

---

[73] U.S. Department of the Interior, Office for Equal Opportunity, *Land & Water Conservation Fund Grants Manual*, n.d., pp. 1–11; *DOI FY 1997 Civil Rights Information*, p. 12.

[74] U.S. Fish and Wildlife Service, *Federal Aid Toolkit* (2002) (hereafter cited as *Toolkit*).

[75] USCCR, *Federal Title VI Enforcement*, p. 410.

[76] USCCR, *Federal Title VI Enforcement*, p. 410.

[77] USCCR, *Federal Title VI Enforcement*, p. 410.

[78] USCCR, *Federal Title VI Enforcement*, p. 410.

[79] DOI Interrogatory, pp. 6, 23.

[80] Because OEO did not provide any memorandums to the Commission, as many as could be found on the Internet were obtained.

[81] USCCR, *Federal Title VI Enforcement*, pp. 412–13.

103                            Confidential Draft
Not for Public Release: 5/20/2003

enforcement staff consisted of only six full-time-equivalent positions (FTEs).[82] The Commission
concluded that the number was insufficient to handle the workload.

   Because of insufficient staffing, the Commission recommended that OEO maximize its
resources by providing technical assistance during its regular on-site monitoring reviews of
bureaus' programs. Delivery of technical assistance could also be improved by developing a
regular and systematic program for those bureau staff performing Title VI enforcement
procedures. In addition to assisting bureau staff, OEO needed to begin providing periodic
assistance to all its recipients via the bureaus. To avoid taxing resources, bureaus could
accomplish this over the telephone, through written communications and civil rights conferences,
and other appropriate forums. Prior to delegating this responsibility, however, OEO had to
provide comprehensive training to bureau staff on external civil rights enforcement. The quality
of this and other civil rights work had to be supervised by OEO to avoid the shortfalls of the
previous effort.[83]

   In 2003, the Commission finds that OEO and the bureaus provide recipients with
technical assistance on request and during compliance reviews and complaint investigations.[84]
Recipients, as well as public entities, routinely receive expert technical assistance from DOI
bureaus and offices aimed at resolving noncompliance.[85] However, FY 2000 was the last time
OEO provided recipients with technical assistance.[86] OEO, NPS, FWS, OSM, and USGS each
have one full-time staff member to perform all Title VI enforcement duties, including technical
assistance. The BIA provides technical assistance to Native American and Alaska Native
communities concerning limited-English-proficiency (LEP) and race discrimination issues
despite not having an established Title VI compliance review program.[87]

   The Commission also finds that OEO annually reviews bureaus to assess their plans and
accomplishments in enforcing the provisions of Title VI, including the effectiveness of the
technical assistance they provide.[88] However, OEO has not provided technical assistance to
bureaus having compliance and enforcement responsibilities since FY 1999.[89] Training for
DOI's equal opportunity personnel at the NPS, FWS, WBR, and OSM on providing effective
technical assistance was last provided in FY 2000.[90]

   OEO further states that when subrecipients receive federal funds, primary recipients are
responsible for providing them with technical assistance. Although DOI requires primary
recipients to have continuing technical assistance programs, the quality of these programs is not

---

[82] USCCR, *Federal Title VI Enforcement*, p. 385.

[83] USCCR, *Federal Title VI Enforcement*, p. 413.

[84] DOI Interrogatory, p. 19.

[85] *DOI FY 2000 Information and Reporting Requirements*, p. 5.

[86] *DOI FY 2000 Information and Reporting Requirements*, p. 5.

[87] DOI Interrogatory, pp. 16, 19–20.

[88] DOI Interrogatory, p. 19.

[89] *DOI FY 1999 Civil Rights Information*, p. 5.

[90] *DOI FY 2000 Information and Reporting Requirements*, p. 2.

monitored nor are recipients required to submit self-evaluation reports on their program.[91] However, the last time OEO acknowledges training primary recipients was in FY 1997. Even then, only primary recipients receiving funds through the NPS, FWS, and WBR received technical assistance.[92]

OEO needs to provide recipients more frequent technical assistance, minimally once a year, and not wait for them to request it or receive it during compliance reviews and complaint investigations. Bureaus must also be provided technical assistance at least once a year because their Title VI enforcement performance depends on this. Lastly, OEO must ensure that primary recipients meet their obligation to provide technical assistance to subrecipients. Again, a minimal baseline for this assistance should be once every year.

**Education and Outreach**

The Commission's 1996 evaluation revealed that education and outreach efforts were essentially limited to the development and distribution of a multilingual civil rights poster and several brochures. Apart from these publications, neither OEO nor the bureaus provided meaningful outreach and education. In fact, although three bureaus had active Title VI enforcement programs, only the FWS did more than display the poster.[93] The Commission recommended that DOI immediately develop a comprehensive Title VI community outreach and public education program under the direction of OEO.[94]

In 2003, the Commission finds that OEO continues to rely on civil rights posters as the primary means of informing the public of DOI's Title VI civil rights obligations. Recipients are required to place a reasonable number of these posters in prominent locations throughout all areas of their operations. The posters explain the procedures for filing complaints with DOI, and are supplemented with pamphlets that describe DOI's civil rights policies and procedures. These pamphlets are made available to all public entities.[95] Recipients are further obligated to notify the public of their nondiscrimination policies in publications describing program availability.[96] Additionally, bureau civil rights staff regularly participate in natural-resources-related conferences at both the state and local levels and hold training and discussion workshops that cover Title VI policies. DOI has five FTEs overseeing outreach and education, the same ones charged with all other civil rights duties.[97]

Education and outreach efforts must greatly improve if OEO is to meet its Title VI obligations. Posters and pamphlets should be complimentary to concerted education and outreach efforts, not the primary means of providing these services. OEO should enhance its education and outreach efforts to include participation in civic events and presentations for community

---

[91] DOI Interrogatory, p. 19.

[92] *DOI FY 1994 Information*, p. 17.

[93] USCCR, *Federal Title VI Enforcement*, p. 412.

[94] USCCR, *Federal Title VI Enforcement*, p. 412.

[95] DOI Interrogatory, p. 17. OEO did not provide pamphlets for the Commission to review.

[96] DOI Interrogatory, p. 17.

[97] DOI Interrogatory, pp. 16–18.

groups, areas where existing and future beneficiaries are present. Finally, OEO must be proactive in its efforts, initiating contact with targeted groups and not rely on chance to alert these groups to DOI's Title VI programs and obligations.

**Complaints Processing**

In 1996, the failings of DOI's Title VI enforcement program were also evident in OEO's methods for conducting complaint investigations. Generally, OEO's Title VI complaint investigations did not detect discrimination, leading the Commission to conclude that perhaps they were not sufficiently comprehensive. There was no question they were rudimentary because neither OEO or the bureaus had developed or implemented procedures for conducting them. Moreover, investigations were not reviewed to verify their thoroughness.[98]

To remedy this lack of investigative vigor, in 1996 the Commission recommended that OEO and the bureaus develop and implement clear and comprehensive complaint investigation procedures. The Commission also recommended that a quality assurance review process be established to certify the thoroughness of investigations before providing complainants and recipients with decisions.[99]

OEO's internal Title VI complaint investigation procedures are currently found in DOI's *Equal Opportunity Directive No. 1998-13, Internal Civil Rights Complaints Processing Procedures, September 30, 1998.*[100] The procedures detailed in this directive are generally clear and detailed in explaining OEO's and the bureaus' responsibilities in investigating and processing Title VI complaints. Unfortunately, these procedures do not provide steps for verifying the thoroughness of a complaint investigation.[101] Furthermore, external procedures are nonexistent except for requiring recipients to report any complaints or lawsuits against them alleging they discriminated because of race, color, or national origin.[102] OEO, and specifically the director, is charged with overseeing and monitoring the entire complaints process, including resolution.[103] Complaint investigations are still conducted by the five aforementioned civil rights FTEs.[104]

The Commission's 2003 study further finds that DOI's complaints process may also continue to be hindered by its relatively weak education and outreach efforts since, on average, it annually received a mere eight Title VI violation complaints from FY 1996 through FY 2001. Although OEO does not specify the annual number of Title VI complaints left unresolved, over this same period it had approximately 175 unresolved civil rights complaints (see figures 3.6 and

---

[98] USCCR, *Federal Title VI Enforcement*, p. 412.

[99] USCCR, *Federal Title VI Enforcement*, p. 412.

[100] DOI Interrogatory, p. 15.

[101] U.S. Department of the Interior, Office for Equal Opportunity, "Equal Opportunity Directive No. 1998-13, Internal Civil Rights Complaints Processing Procedures," Sept. 30 1998, <http://www.doi.gov/diversity/doc/eod98_13.htm>.

[102] DOI Interrogatory, p. 15.

[103] DOI Interrogatory, p. 14; *Directive No. 1998-13*.

[104] DOI Interrogatory, p. 16; Stith Interview.

3.7).[105] DOI's complaint investigation procedures are vague on bureau time limits for processing complaints. Specifically, the procedures state that the "most egregious complaints should be reported to the Departmental Office for Equal Opportunity within five (5) days [of] receipt."[106] Complaints other than the most egregious are to be reported to OEO at the established monthly intervals with the resolution of "all complaints of alleged discrimination [to be resolved] promptly and appropriately whenever possible."[107]

**Figure 3.6**
**Department of Interior Title VI Complaints, FY 1996 through FY 2001**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996 through 2001 Civil Rights Workload and Performance Data.

Unfortunately, the procedures rely on individual interpretations of what "most egregious" means. While a complaint may strike one equal opportunity officer as not egregious enough to warrant immediate action, another staff member may view it as egregious and worthy of immediate processing. Moreover, procedures for resolving complaints promptly and appropriately whenever possible are imprecise and do not specify how and on what timeframe duties must be accomplished.

---

[105] U.S. Department of the Interior, *FY 1996 Civil Rights Workload and Performance Data*, p. 15; U.S. Department of Interior, *FY 1997 Civil Rights Workload and Performance Data*, p. 13; U.S. Department of Interior, *FY 1998 Civil Rights Workload and Performance Data*, p. 15 (hereafter cited as *DOI 1998 Civil Rights Data*); U.S. Department of Interior, *FY 1999 Civil Rights Workload and Performance Data*, p. 12; U.S. Department of Interior, *FY 2000 Civil Rights Workload and Performance Data*, p. 19; U.S. Department of Interior, *FY 2001 Civil Rights Workload and Performance Data*, p. 15 (hereafter cited as *DOI 2001 Civil Rights Data*).

[106] *Directive No. 1998-13.*

[107] *Directive No. 1998-13.*

**Figure 3.7**
**Department of Interior Unresolved Civil Rights Complaints, FYs 1996–2001**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996 through 2001 Civil Rights Workload and Performance Data.

## Compliance Reviews

During the Commission's 1996 review of OEO, it was discovered that no uniform policy existed requiring pre-award reviews of all applicants before deciding whether to approve federal funding. In fact, at that time only the NPS and FWS were conducting pre-award reviews. Even this, however, was questionable as these bureaus were merely administering a Title VI checklist, not conducting "comprehensive assessments" of Title VI compliance.[108]

OEO's failings prompted the Commission to recommend that it implement pre-award reviews in "each of its major federally assisted programs" that carefully evaluate "program data and other information supplied by applicants" before authorizing federal funding.[109] Only if applicants were in compliance with Title VI and DOI's Title VI regulations, would federal funding be furnished.[110]

The Commission's 2003 study finds that OEO still only conducts cursory pre-award reviews of an applicant's program and takes a passive posture, assuming compliance will prevail upon a recipient's signature on a civil rights assurance form.[111] Pre-award reviews are not guided by uniform policies and thus differ between bureaus with the result that some conduct less

---

[108] USCCR, *Federal Title VI Enforcement*, p. 411.

[109] USCCR, *Federal Title VI Enforcement*, p. 411.

[110] USCCR, *Federal Title VI Enforcement*, p. 411.

[111] DOI Interrogatory, p. 13.

comprehensive ones. Responsibility for conducting reviews belongs to bureau program specialists and not civil rights personnel. DOI believes that limited pre-award reviews focusing on the applicant's operations and requiring them to sign a civil rights assurance form are more efficient because grants are awarded more quickly and do not overburden the grant-making process with protracted and unnecessary delays. Consequently, DOI collects no additional program data during pre-award reviews and some bureaus may conduct more lenient reviews. DOI identifies and resolves civil rights problems through a fall back process. If noncompliance is found during an applicant's pre-award review, the director is notified and an investigation is initiated.[112] DOI should be proactive and conduct expanded pre-award reviews, as resources permit, and thus address a problem before it becomes a violation.

Despite the shortcomings of OEO's pre-award reviews, both NPS and FWS had implemented them by 1996. Conversely, OEO had never implemented a system of post-award desk-audit reviews. Such a failure indicated a waste of resources, both staff and monetary, since desk audits permit agencies to evaluate more recipients with fewer staff and resources than on-site reviews.[113] To address this problem, in 1996 the Commission recommended that OEO develop and implement procedures that would allow it to make post-award desk-audit reviews an integral part of its enforcement process. The process was to include the regular collection of enough relevant information to perform adequate reviews of recipients. Relevant information included data on individuals participating in the program and those eligible to participate by race, color, national origin, and ethnic group membership.[114]

DOI now relies extensively on post-award desk-audit reviews because costs are low compared with on-site reviews. Furthermore, OEO has established procedures for conducting reviews at numerous DOI programs, including park and recreation programs and historic preservation activities.[115] These procedures were established in FY 1998 according to documents.[116] In FY 2001, OEO conducted 1,503 post-award reviews of a total 13,256 estimated covered recipients, slightly more than 11 percent of recipients. Of the 1,503, only three recipients were found to be in noncompliance, slightly less than 0.2 percent, and only two were reviewed with more than desk audits. All three cases of noncompliance were resolved through corrective action commitments by the recipients.[117]

Although DOI's bureaus conducted on-site compliance reviews during the Commission's 1996 review, they fell far short of the comprehensive reviews required by the DOJ. Their lack of investigative depth was rooted in OEO's failure to assign civil rights staff to conduct them. Regrettably, program management staff, lacking understanding of Tile VI requirements and the experience to uncover discrimination, was conducting on-site reviews. Reviews were further hindered by being limited to readily identifiable forms of discrimination, examples of which

---

[112] DOI Interrogatory, pp. 12–13. OEO states that pre-award reviews are part of the federal financial assistance process.

[113] USCCR, *Federal Title VI Enforcement*, p. 411.

[114] USCCR, *Federal Title VI Enforcement*, p. 411.

[115] DOI Interrogatory, p. 14.

[116] *DOI 1998 Civil Rights Data*, p. 1.

[117] *DOI 2001 Civil Rights Data*, p. 19.

could be easily marked off on a civil rights checklist.[118] OEO's on-site reviews also focused on specific projects and not the entire system thus not adhering to a Title VI requirement under the Civil Rights Restoration Act of 1987.[119]

In its 1996 report, the Commission concluded that OEO needed to develop and implement specific procedures for reviewing the civil rights compliance status of DOI's federal funding recipients. These external reviews needed to be comprehensive and geared toward both Title VI and other civil rights statutes. Furthermore, these reviews had to complement the monitoring performed during civil rights project reviews, not replace it.[120]

As a result, the Commission recommended that such reviews include a liberal examination of a recipient's programs and practices and not be limited to those funded directly by DOI. Information was to be gathered from a "recipient's staff, program participants, affected parties, and interested community groups" via extensive interviews.[121] Data collected by the recipient and obtained by OEO were to be thoroughly analyzed. Reviews were to be performed by trained civil rights personnel from DOI's bureaus or OEO, and not by program management staff lacking the training or knowledge for such work.[122]

In 2003, while on-site compliance reviews are comprehensive in nature, the majority still focus on isolated problems and practices due to limited civil rights staff. Both OEO and the bureaus now assign civil rights staff to conduct on-site compliance reviews.[123] Documents and interviews, however, do not reveal an expanded review process. One document, a *Federal Aid Toolkit*, is limited to the FWS and simply lists a number of documents to be examined during an FWS on-site compliance review. No interviews of recipients or beneficiaries is mandated and recipients may not even be required to submit all the documents.[124] The effectiveness of an on-site review is not present in the process incorporating this document.

The second document, *Civil Rights Post-Award Review Checklist*, continues to be limited to readily identifiable forms of discrimination and is predominantly aimed at recipients, thus addressing very few of the Commission's 1996 recommendations. Although community representatives and program beneficiaries are to be interviewed, the instructions designate people with hearing impairments as the target group. Consequently, the document is limited to programs geared toward or in which hearing-impaired individuals participate. Yet, if it is a limited scope review, community representatives and program beneficiaries may not be interviewed.[125] In sum, program participants, affected parties, and interested community groups may be excluded from participating in the review process even if involved in the program under review.

---

[118] USCCR, *Federal Title VI Enforcement*, pp. 411–12.

[119] USCCR, *Federal Title VI Enforcement*, pp. 411–12.

[120] USCCR, *Federal Title VI Enforcement*, p. 412.

[121] USCCR, *Federal Title VI Enforcement*, p. 412.

[122] USCCR, *Federal Title VI Enforcement*, p. 412.

[123] DOI Interrogatory, p. 14.

[124] *Toolkit*.

[125] U.S. Department of the Interior, *Civil Rights Post-award Review Checklist*, n.d.

## Staff Training

The Commission's 1996 evaluation found a lack of staff training. Perhaps the most prominent example was the bureaus' administration staff, which was frequently assigned Title VI enforcement responsibilities despite having little if any training in this area. The intrinsic nature of this moribund condition, led the Commission to declare "OEO's Title VI enforcement activities [as] generally performed by poorly trained staff at the expense of the quality of its Title VI enforcement program."[126]

In 2003, the Commission finds that funding for staff training has not increased and remains inadequate.[127] Despite the funding freeze, OEO states that all equal opportunity staff are provided adequate training and that no staff have been "denied the opportunity for work-related training …."[128] Moreover, training is regularly provided across all program areas with Title VI training periodically conducted during each fiscal year. OEO was in the process of planning Title VI training for mid-2003. Training is accomplished both at OEO and the bureaus with bureau-level training directed at regional civil rights staff, federal grants personnel and recipient officials.[129]

Despite OEO's assertion that Title VI training is periodically conducted during each fiscal year, the Commission finds that the last time Title VI training was provided was in FY 2000. No documentation for subsequent fiscal years reports Title VI training under activities accomplished for that year.[130] Title VI training is an ongoing process, initial and follow-up training is crucial for external civil rights staff to grasp and effectively conduct their assigned duties. Training, in fact, should be conducted twice a year, resources permitting, or, at the very least, annually.

## Delegation

In 1996, the Commission found that OEO had failed to implement active Title VI programs at each of the bureaus providing federal financial assistance. Since bureau civil rights staff dealt directly with concerned parties, enforcement would have been improved if they were entrusted with primary responsibility for complaint investigations, compliance reviews, technical assistance, and public outreach and education. The Commission noted that by judiciously delegating Title VI responsibilities to bureaus, OEO could enhance DOI's civil rights enforcement work. The foundation for this was already laid as OEO had existing arrangements with the NPS, FWS and WBR.[131]

[126] USCCR, *Federal Title VI Enforcement*, p. 413.

[127] DOI Interrogatory, p. 6.

[128] DOI Interrogatory, p. 20.

[129] DOI Interrogatory, pp. 20–21.

[130] *DOI FY 2000 Information and Reporting Requirements*, p. 2; *DOI FY 2002 Information and Reporting Requirements*.

[131] USCCR, *Federal Title VI Enforcement*, pp. 407–08.

The Commission's 2003 study reveals that DOI currently has one equal opportunity office in each bureau in addition to the main OEO. According to OEO, bureau offices serve as focal point for effectuating Title VI compliance among each bureau's respective recipients.[132] OEO further states that bureaus were authorized to perform Title VI functions starting in February 1996. Currently, however, only the NPS and FWS have active Title VI programs with OSM, USGS and WBR having marginal programs, according to OEO.[133]

OEO justifies DOI's bureau enforcement system by stating that: (1) creating an active program at BLM would waste resources because it has the same types of programs and funds the same recipients as NPS; (2) those BLM programs not shared with NPS are covered by Title VI enforcement programs at other federal agencies; (3) the DOI views the BIA as dealing with sovereign entities, namely Native American nations and Native Alaska villages, who when federally recognized are not generally bound by the provisions of Title VI; and (4) the "abstract nature" of the programs and activities administered by MMS "do not sufficiently lend themselves to Title VI coverage."[134]

Despite OEO's claims, BLM must have distinct duties from NPS and other federal agencies or there would be no need for its existence. Accordingly, its federal funding recipients and programs' beneficiaries must be distinct, at least on some level, from those of NPS and other federal agencies. It only follows that BLM needs to implement a Title VI compliance and enforcement program geared toward its recipients, and not depend on NPS and other agencies to ensure compliance on the part of its recipients because they may not posses the ability to do so. It is also important that MMS implement a Title VI compliance and enforcement program because a review of its FY 2000 through FY 2005 strategic plan clearly shows that its programs and activities require it.[135]

**Oversight and Quality Assurance**

In 1996, the Commission found that despite being ultimately responsible for ensuring DOI's external civil rights enforcement, OEO had not implemented a "systematic oversight and monitoring program of [the] Title VI enforcement work" the bureaus performed.[136] The lack of such activity, the Commission noted, further eroded OEO's ability to ensure DOI met its civil rights enforcement obligations. The Commission recommended the creation of a unit that would be responsible for the "operational planning and overall development of fiscal year goals and objectives for DOI's civil rights enforcement efforts."[137] This unit would regularly and thoroughly evaluate bureau civil rights staff performance. The close monitoring of staff would reveal defects in Title VI implementation and enforcement procedures at the bureaus and provide

---

[132] DOI Interrogatory, p. 8.

[133] DOI Interrogatory, p. 9.

[134] DOI Interrogatory, p. 9.

[135] Department of Interior, Minerals Management Service, *Strategic Plan, FY 2000–FY 2005*.

[136] USCCR, *Federal Title VI Enforcement*, p. 406.

[137] USCCR, *Federal Title VI Enforcement*, p. 406.

the opportunity to assess how efficiently and effectively the bureaus were meeting the fiscal year goals and objectives.[138]

## Bureaus

Because of a decentralized civil rights enforcement structure, in 1996 the Commission recommended that OEO develop a system to oversee and monitor the bureaus' Title VI enforcement activities.[139] The Commission concluded that the effectiveness of OEO's oversight and monitoring would be greatly enhanced if periodic on-site reviews of the bureaus' efforts were undertaken. During these assessments it was suggested that OEO evaluate a bureau's complaint and compliance review files along with appraising a bureau's data collection efforts. It was also suggested that OEO take this opportunity to interview program staff and recipients concerning pertinent issues and "issue a report with findings and recommendations for improvement."[140]

In addition to these periodic reviews, the Commission further recommended that OEO "conduct annual reviews of Title VI self-assessments provided by the bureaus."[141] To remedy any deficiencies, it was requested that OEO provide bureaus with regular Title VI staff training and technical assistance.[142]

The Commission now finds that DOI's program is decentralized, thus bureau EEO officers supervise Title VI work. OEO provides: policy guidance to bureaus on Title VI enforcement; oversight and evaluation of bureaus' programs; staff training; and programmatic direction to ensure uniform enforcement.[143] However, OEO lacks any authority to determine the number of bureau personnel who perform Title VI duties.[144]

Clearly, this is not an effective way to ensure Title VI compliance among recipients. Simply stated, bureaus may not assign enough personnel to Title VI duties thus not permitting pro-active monitoring of recipient's programs nor adequate pre-award review of an applicant's program. Regardless of whether it is pre- or post-award review, the director must be given the resources and authority to ascertain and ensure that bureaus assign sufficient personnel to Title VI duties.

## Continuing State Programs

In 1996, DOI conducted very limited oversight of continuing state programs. Its efforts consisted of Title VI regulations requiring state recipients to submit their methods of administration for maintaining compliance with Title VI and DOI's Title VI regulations.

---

[138] USCCR, *Federal Title VI Enforcement*, p. 406.

[139] DOI decentralized OEO in 1991 and redirected its focus towards coordination and policy development.

[140] USCCR, *Federal Title VI Enforcement*, p. 411.

[141] USCCR, *Federal Title VI Enforcement*, p. 411.

[142] USCCR, *Federal Title VI Enforcement*, p. 411.

[143] DOI Interrogatory, pp. 8–10.

[144] DOI Interrogatory, p. 9.

Guidelines for the land and water conservation fund provided somewhat more detailed state requirements.[145] However, apart form this program, the guidelines included no Title VI responsibilities for state recipients. Furthermore, OEO had no active monitoring program of states' Title VI compliance and thus did not know whether or not states were complying. This was a major lapse at DOI because most of its funds were distributed via continuing state programs.[146]

The Commission's 1996 evaluation revealed that OEO and the bureaus could remedy this situation by reviewing and approving, or not, a state's methods of administration. To accomplish this, states operating continuing state programs would be required to submit such data along with "annual Title VI self-assessments reporting on their compliance with Title VI."[147] The Commission also recommended that trained bureau staff review data, thus limiting the possibility that noncompliance would be overlooked.

To further reduce noncompliance, the Commission asked OEO to monitor and evaluate the work of bureau staff. Conditions also warranted periodic on-site compliance reviews of continuing state programs by bureau civil rights staff. Noncompliance could be further reduced and resources maximized if technical assistance were provided during on-site reviews along with a report appraising Title VI compliance status and suggestions for eliminating any deficiencies.[148]

During the 2003 review, the Commission finds that OEO continues to falter in its oversight of continuing state programs due to DOI's organizational structure. Specifically, OEO states that DOI is not structured to hold states accountable for their Title VI enforcement programs. As such, there are no adequate resources to require states to perform annual self-assessment reports.[149]

**Conclusion**

Despite minor improvements to Title VI enforcement in DOI's federal financial assistance programs, these efforts are negligible in the face of a Title VI program that has not met its obligations since the early 1980s, if ever.[150] The Department and OEO must make a determined effort to drastically improve their Title VI enforcement program by increasing funding, assigning more staff, and dedicating themselves to, generally, raising its stature within DOI. Simply put, Title VI must be prioritized at DOI if recipients and beneficiaries are ever to receive the commitment they deserve and, more importantly, is their right.

---

[ ] The National Park Service administers the Land and Water Conservation Fund. *See* .nttp://www.nps.gov/programs/lwcf>.

[146] USCCR, *Federal Title VI Enforcement*, p. 413.

[147] USCCR, *Federal Title VI Enforcement*, p. 413.

[148] USCCR, *Federal Title VI Enforcement*, p. 413.

[149] DOI Interrogatory, p. 20.

[150] Stith Interview.

114

The department and OEO can take a first step on this road by committing themselves to ensuring that the nine key elements and six strategies presented in the Commission's *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations? Volume I: A Blueprint for Civil Rights Enforcement* report (September 2002); are promptly incorporated into DOI's civil rights enforcement program. Specifically, the nine key elements are:

- a high priority for civil rights enforcement, established through sufficient resources consisting of funding and staffing;
- an organizational structure that expresses the priority of civil rights, for example, by having the top civil rights official reporting directly to the agency head;
- planned civil rights goals and activities, such as a strategic plan for which and how many enforcement activities are needed to fulfill the agency's civil rights obligations and what resources will be allocated to accomplish them;
- clear and pertinent policy guidance, including internal procedures, external policy, and current regulations;
- technical assistance, such as helping employers and service providers establish policies and procedures that comply with antidiscrimination laws;
- education and outreach, such as helping victims of discrimination and the public understand their civil rights and how to obtain assistance if discrimination occurs;
- effective complaint processing systems to ensure that those who believe they have been discriminated against have a means of resolution;
- systems to review all federal funding recipients' compliance with antidiscrimination laws both before and after awards are made and to correct deficiencies; and
- regular staff training on civil rights statutes and enforcement policies and procedures.[151]

The six strategies are:

- integrating civil rights enforcement throughout every part of the agency, including all its agency components, programs, and field offices, and in every program that receives federal funding;
- delegating enforcement activities, such as responsibility for reviewing civil rights compliance, from agency headquarters to agency components, field offices, contracting organizations, and recipients with subrecipients;
- implementing oversight and quality assurance procedures to ensure that delegated responsibilities are carried out properly and consistently;
- coordinating civil rights enforcement activities with other federal agencies;
- streamlining enforcement procedures to ensure that they are conducted effectively and efficiently with the fewest resources; and
- involving advocacy groups and community organizations in designing civil rights enforcement activities.[152]

---

[151] U.S. Commission on Civil Rights, *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume I: A Blueprint for Civil Rights Enforcement* (September 2002), pp. x–xii (hereafter cited as USCCR, *Ten-Year Check-Up, Vol. I*).

[152] USCCR, *Ten-year Check-Up, Vol. I*, pp. xii–xiii.

115

If DOI and OEO incorporate these elements and strategies into their Title VI enforcement program, they will have taken a critical step toward making civil rights an integral part of the department and meeting their Title VI enforcement obligations.