### Page 1

1  UNITED STATES DEPARTMENT OF THE INTERIOR
   BUREAU OF LAND MANAGEMENT
2  WASHINGTON, D. C. 20240
   COMPLAINT OF DISCRIMINATION
3
4
5  IN RE:  Romella J. Arnold
6          Complaint No. LLM-04-002
7
8
9  ------------------------------
10
11 The Sworn Telephone Investigative Interview of MARILYN H.
12 JOHNSON, taken in the above matter in the Offices of
13 COUNTY COURT REPORTERS, INC., located at 1160 Jordan
14 Springs Road, on the 9th day of March, 2004, beginning at
15 12:38 p.m.
16
17
18
19
20
21
22
23
24
25

### Page 2

1              APPEARANCES
2
3  ON BEHALF OF THE U.S. DEPARTMENT OF
4  INTERIOR, BUREAU OF LAND MANAGEMENT:
5  Jesse Hicks, EEO Investigator
6    U.S. Department of Interior, BLM
7    WO-720-EEO
8    1620 L Street, N.W., Suite 700
9    Washington, D.C. 20036
10   Telephone: (202) 452-5102

### Page 3

1   SWORN TELEPHONE INVESTIGATIVE INTERVIEW OF
2   MARILYN H. JOHNSON
3   IN RE: ROMELLA J. ARNOLD
4       Case No. LLM-04-002
5       March 9, 2004
6       MS. ANDERSON:  Miss Johnson,
7   I'm going to swear to you in.
8       COURT REPORTER:  You're on
9   the record.
10      MS. ANDERSON:  Do you swear
11  or affirm the information you are about to
12  give is true to the best of your knowledge
13  or belief?
14      MS. JOHNSON:  Yes.
15  MARILYN H. JOHNSON, having been duly sworn
16  by Ms. Anderson was examined and testified
17  as follows:
18  DIRECT EXAMINATION
19  BY MS. ANDERSON:
20      Q.  Please state your full name for the
21  record.
22      A.  Marilyn H. Johnson
23      Q.  And what is your gender?
24      A.  I'm female.
25      Q.  And what is your date of birth?

### Page 4

1       A.  8/15/50.
2       Q.  And do you have prior EEO activity,
3   have you ever filed an EEO complaint?
4       A.  No.
5       Q.  Okay.  Have you ever joined an
6   outside act -- organization and protested
7   discriminatory or alleged discriminatory
8   activities on the part of the Bureau of Land
9   Management?
10      A.  No.
11      Q.  And what is your race?
12      A.  I'm black.
13      Q.  Okay.  Who is your first level
14  supervisor?
15      A.  Francis Cherry.
16      Q.  And who is your second level
17  supervisor?
18      A.  I don't have one.
19      Q.  Okay.  And what position do you
20  hold?
21      A.  I'm the Assistant Director for Human
22  Resources for the Bureau of Land Management.
23      Q.  And what is the series and grade of
24  that position?
25      A.  It's ES340, it's an SES position.



County Court REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.8502
www.CountyCourtReporters.com

Page 5

1  Q. Okay. And how long have you held
2  your present position?
3  A. Since June of 2003.
4  Q. Okay. And what is your work
5  relationship to the Complainant, Romella
6  Arnold?
7  A. I'm her supervisor or -- and direct
8  -- her second level supervisor.
9  Q. Okay. And how long have you been
10 her second level supervisor?
11 A. Since June, officially.
12 Q. All right. The Complainant is
13 alleging in, in part of her reprisal is that
14 you had knowledge of her prior public
15 support for non-discrimination in employment.
16 She belongs to a black organization for
17 federal employees and she also states that
18 she has worked with Congressmen. Are you
19 aware of these actions?
20 A. Yes.
21 Q. Okay. Were they in any way part of
22 any decisions that you made concerning Ms.
23 Arnold?
24 A. No.
25 Q. All right. Now, the first allegation

Page 6

1  that she is making is that she alleges that
2  you accused her at least on five separate
3  occasions of money laundering.
4  A. That's not true.
5  Q. Okay. Well...
6  A. I've never accused of money
7  laundering. We were in a meeting and I was
8  asking her about the relationship we had
9  with Langston University and I was reviewing
10 the agreement we had and the assistance
11 agreement we had and I wasn't comfortable
12 with the language in the contract and I
13 asked her what this was all about. And so
14 her response was that we, we give Langston
15 money for our SCEP students which we can't
16 directly give to them.
17 Q. Mm-hmm. (Indicating affirmatively.)
18 A. So, I said, why can't we directly
19 give it to them and she said we had no
20 legal authority to do that. And I was just,
21 I wasn't talking to her, I was looking at
22 the agreement and I said, if we can't
23 legally give them the money directly and
24 we're funneling it through Langston, I said
25 it looks like we're laundering money. Not

Page 7

1  to her, it was just an off the cuff
2  statement.
3  In fact, she came back to me and she
4  said, you hurt my feelings. And I asked her
5  how did I hurt her feelings and she said,
6  you accused me of laundering money. And I
7  said, no, I didn't accuse you of laundering
8  money. I was just speaking in general
9  because we have an agreement here where
10 we're handing another organization money for
11 something we can't pay for directly
12 ourselves, but if you believe I was hurting
13 your feelings -- I even apologized.
14 So, I thought it was over. So, it
15 was nothing against her, I wouldn't -- if I
16 thought she was laundering money it would be
17 a whole different thing. But it wasn't -- I
18 wasn't even talking to Romella, it was just
19 off the cuff.
20 Q. Well, did you have other times when
21 you had to question her concerning this
22 particular program?
23 A. No.
24 Q. Okay. All right. And another
25 thing that she is alleging is, she is

Page 8

1  alleging that you destroyed programs dealing
2  with minority recruitment in -- of minority
3  students through -- for employment with BLM.
4  And she gives as an example of this, she
5  says that you directed the cessation of the
6  student employment HBCU monitoring and
7  tracking system. She states that was, SERTS
8  I believe it's called, was a system that
9  allowed her to keep track of how the program
10 was doing in her position.
11 A. When I got on board there were a
12 number of information technology items in my
13 portfolio and I went down and assessed the
14 viability of each and every one of them. I
15 found out we had spent something like
16 $70,000 on this SERTS Program and it still
17 wasn't up and running.
18 And so, the only way at that point
19 to get it up and running, it had to go
20 before what we call the Information
21 Technology Investment Board, the ITIB. And
22 I couldn't get it in front of the Board
23 because no one had done a business case for
24 it. So, I told her it will never go
25 anywhere unless, I don't care how much money



### Page 9

1  we spent on it before, it won't go anywhere
2  until it passes the ITIB and without a
3  business case it's not going anywhere.
4  　　So, Romella was supposed to be
5  working with Kurt Balantine in Denver about
6  getting a business case, but the business
7  case never got up so it never got before the
8  ITIB. And there's nothing I can do about
9  that because that is a Bureau policy. So,
10 there's no way we could have -- even if I
11 wanted to spend more money on it to make it
12 run, I couldn't make it run because the
13 Board would say no. It's a national IT
14 system and we are not allowed to deploy
15 national IT systems now unless you have the
16 concurrence and approval of the IT Investment
17 Board.
18 　　Q. Well, were you instructed to
19 eliminate it or did it just have to die
20 because it wasn't viable?
21 　　A. It just had to die because it wasn't
22 viable and there was no business case for
23 it. I mean, you can't get any system, not
24 just her system. I can't get a Work Force
25 Planning system, I can't get another system

### Page 10

1  up called the Exit Interview, I have to have
2  business cases for each one of the items in
3  the portfolio. And Human Resources isn't
4  the only one held to that standard, I mean,
5  Minerals is held to that standard, Resources
6  is held to that standard. The ITIB has to
7  approve every one of their systems.
8  　　Q. Okay. The Complainant also alleges
9  that she was issued a letter of counseling
10 for using the phrase I'll be damned. Did
11 she actually receive a letter of counseling?
12 　　A. Yes, she did.
13 　　Q. And did she receive it for using
14 this phrase or was it something else?
15 　　A. It was I'll be goddamned. And I did
16 it for two reasons. For that particular
17 instance and I also had been getting
18 feedback from people in her work area that
19 when she was upset that that was just her
20 practice, but they were afraid to confront
21 her about her language. So, when she used
22 it in front of me that was an opportune time
23 to put her on notice that that was not
24 appropriate behavior. And I do that for
25 anybody, all of my employees. I expect

### Page 11

1  professional behavior from them and it wasn't
2  professional behavior. So that was...
3  　　Q. How many complaints did you get
4  concerning her use of profanity?
5  　　A. I got about three.
6  　　Q. Could you give me the names of the
7  employees that...
8  　　A. They don't want their names. That's
9  why I didn't give them to her, they don't
10 want their names put out because they were
11 concerned that she would come back and get
12 them.
13 　　Q. Well, the reason I ask is because
14 the other witnesses that I've questioned
15 state that she does not have a reputation
16 for using profanity and that in that
17 instance allegedly she was told that someone
18 else was going to be placed in her position
19 and that led to the expletive deleted that
20 she used.
21 　　A. No. No one was going to be placed
22 in her position. I -- what -- the
23 conversation that was going on at the time
24 was, I told her I was restructuring the
25 special initiative programs and I was

### Page 12

1  bringing Dr. Mike Brown into the team lead
2  position. Brand new position. She was not
3  in the position, it never was her position.
4  Her position was the SCEP Student Program
5  Manager, only. She had two other Program
6  Managers she worked with, but she didn't
7  supervise them. So, at the time she was not
8  the lead person and it is not her position,
9  it's a brand new position.
10 　　Q. Okay. She responded to your bringing
11 this Dr. Mike Brown on by making the...
12 　　A. Right.
13 　　Q. ...profane statement?
14 　　A. That's correct.
15 　　Q. All right. Now, did she, during
16 the, that period of time, I guess it was in
17 the year 2003, did you have occasion to
18 issue any other letters of counseling to
19 her?
20 　　A. No.
21 　　Q. Okay. One of the other things that
22 she states that she says shows that there
23 was an effort to harass her and get rid of
24 her is that she has no performance
25 evaluations. She says she hasn't had any



Page 13

1  in the last two years. Her last one was in
2  2001. Are you aware of allegedly her lack
3  of performance evaluations and is there
4  any...
5      A. No.
6      Q. ...reason that you know of?
7      A. No. I didn't take on this position
8  until, officially until June. Her supervisor
9  before then was Connie Stewart. So, Connie
10 was responsible for giving her her
11 performance appraisals before then and I was
12 interested in Romella taking on a brand new
13 assignment for which I gave her a position
14 description and a performance appraisal. So,
15 when I asked her to do her new assignment
16 she received a brand new performance
17 appraisal and her position description.
18     Q. Now, she is alleging that prior to
19 her being transferred out of this position
20 working with the SCEP Program that she made
21 a request to attend the Student Career
22 Experience Program orientation training and
23 she stated that the request was denied.
24 Now, she alleges that it was denied because
25 you, well, arbitrarily wanted to harass her

Page 14

1  and to force her to leave, get her out of
2  that position. Now, did she make a request
3  to attend this training and if it was
4  denied, why?
5      A. She made a request to do the
6  orientation and she wasn't denied attendance.
7  What was denied was going out six days early
8  to do the orientation. And the reason for
9  it being was we were under a travel ceiling
10 and our travel funds were limited. So, I
11 told Connie to tell Romella, because that's
12 who signed her travel authorization, that I
13 wasn't authorizing her to go out six days
14 early.
15     She had done this program for four
16 years, we give the Training Center money to
17 set up the program before she even gets
18 there and she knows the program by rote and
19 there was no reason to go out a whole week
20 early to set up orientation. But she went,
21 I didn't deny her going, I just said you
22 can't go six days early.
23     Q. Okay. Now, the other thing she's
24 alleging is that she was removed from the
25 SCEP Program and sent to Title 6 and Title 6

Page 15

1  was literally a program that didn't exist.
2      A. Well, she's correct about it not
3  being in existence at the time, but I was
4  being criticized for not having a Title 6
5  Program. And it's in a written report and I
6  gave her the title of the report and my name
7  and the Bureau of Land Management is right
8  there. I can give you a copy of the report
9  if you'd like to see it. It says we were
10 devoid of a Title 6 Program.
11     Romella has previous experience in
12 Title 6 work. She was an excellent
13 candidate to go and get that program up and
14 running. So, this is nothing against
15 Romella because she had experience in doing
16 it and I didn't have a program and I needed
17 to get the program up and running.
18     Q. Okay.
19     A. Would you like to see a copy of the
20 report or do you have a copy of the report?
21     Q. No, I don't have a copy of the
22 report and, yes, I would like to actually
23 have a copy of it for the investigative
24 record.
25     A. Okay.

Page 16

1      Q. Now, among her other allegations
2  she's also alleging that she was moved to a
3  smaller office and forced to share space
4  with another employee.
5      A. She was sharing space with other
6  employees before then. She was in an office
7  with three other people. And so, when they
8  moved her across the hallway it was no
9  different than the arrangement she was
10 already in.
11     Q. Now, one of the things that Ms.
12 Arnold is stating is that she believes in
13 general that there is a hostile attitude
14 towards African American employees and a
15 desire to force them out. She has given the
16 names of ten employees that she believes in
17 some way were forced out or treated less
18 fairly because they're African American and
19 she believes that you may have been involved
20 in this.
21     In fact, what she is stating,
22 claiming, is that she believes that you are
23 hostile towards African American employees
24 and that if there's any negative action to
25 be taken against them that that is what you

County Court REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs ⌒ 1160 Jordan Springs Road ⌒ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com