```
                                                              1

         U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                    WASHINGTON FIELD OFFICE
                  1801 L Street, NW, Suite 100
                        Washington, D. C.

         - - - - - - - - - - - - - -x

         ROMELLA J. ARNOLD,            :

                 Complainant,          : EEOC
                                         No. 100-2004
              -vs-                     :     -00843X
                                         Agency No.
         GALE A. NORTON, Secretary:     LLM 04-002
         Department of the               Judge
         Interior,                     : Richard Schneider

                 Agency.               :

         - - - - - - - - - - - - - -x

                                Reston, Virginia

                                Wednesday, March 10, 2005

              Deposition of:

                        MARILYN H. JOHNSON

         called for examination on behalf of counsel

         for the Complainant, at the offices of Roy J.

         Bucholtz, Esquire, of:  Bucholtz &
```

ORIGINAL

ANN FIELDER - Court Reporters
P.O. BOX 11404
ALEXANDRIA, VIRGINIA 22312
PHONE: (703) 750-3455



2

Culbertson, P. C., 1801 Reston Parkway, Suite 302, Reston, Virginia 20190, beginning at 10:05 o'clock, a. m., before Doris Ann Fielder, a Certified Verbatim Reporter and Notary Public for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

    For the Complainant:

    ROY J. BUCHOLTZ, ESQUIRE
    Of:  Bucholtz & Culbertson, PC
    1801 Reston Parkway, Suite 302
    Reston, Virginia 20190
    (703) 471-9660

    SANDRA McCRARY, ESQUIRE
    9907 Chase Hill Court
    Vienna, Virginia 22182
    (703) 220-0364

```
                                                    67
 1   from them of what they were doing with the
 2   money.
 3          So in the correspondence that I wrote
 4   them, I terminated the agreement because I
 5   could not get a clear picture.
 6      Q.  Did you ever accuse Langston
 7   University of receiving funds improperly?
 8      A.  I never accused them, no.
 9      Q.  Did you ever accuse Ms. Arnold of
10   somehow being involved in transferring funds
11   or providing funds to Langston University
12   improperly?
13      A.  No.
14      Q.  Did you ever tell Ms. Arnold that
15   Langston University's receipt of funds was
16   money laundering?
17      A.  What I said was I could not see what
18   the funds were being used for.
19          I was flipping through the assistance
20   agreements.  My question was, "I don't see
21   what the funds are for."
22          Ms. Arnold said, "They are being used
23   to pay for baby sitting services, apartments,
```

1   bus tickets for the STEP students."
2   I said, "Well, why aren't we giving
3   them the money directly?" She said, "We
4   can't legally do that."
5   So I said, "When we are giving money
6   to an organization that we can't legally give
7   the money for," I said, "it looks like money
8   laundering to me." It was an off-the-cuff
9   comment. It was not directed at her.
10   Q. When you said "STEP students", is
11   that an abbreviation S-T-E-P?
12   A. Yes.
13   Q. What does it stand for?
14   A. Student Temporary Employment Program.
15   Q. What did Ms. Arnold then say to you?
16   A. She said, "I didn't launder money."
17   I said, "I wasn't talking to you."
18   Q. Who were you talking to? Was anyone
19   else there?
20   A. It was an off-the-cuff; yes, there
21   was other people there, and it was an off-
22   the-cuff comment not directed at Ms. Arnold
23   or anybody else in the room.

69

1    Q.  Who else was there?
2    A.  Sylvia Felder and Connie Stewart.
3    Q.  Do you know the date?
4    A.  No, I don't know the date.
5    Q.  Would September 19, 2002, sound
6  familiar to you?
7    A.  I don't know the date specifically.
8    Q.  Do you recall that this was September
9  2002?
10   A.  It may have been then.
11   Q.  And, in fact, hadn't you a week
12 before; literally one week before, September
13 12, 2002; had the same type of conversation
14 directly with Ms. Arnold with no one else
15 present?
16   A.  No.
17   Q.  On September 12, 2002, did you or did
18 you not say anything to Ms. Arnold about this
19 subject?
20   A.  The only other conversation I had
21 about that subject was Romella came back to
22 me later and said, "You hurt my feelings."  I
23 said, "How did I hurt your feelings?"  She

```
 1   said, "You accused me of laundering money."
 2            I said, "Romella, I did not accuse
 3   you of laundering money.  But if you feel
 4   that way, I apologize."
 5       Q.  Was that before or after what you
 6   said on September 19, 2002?
 7       A.  That was after the meeting, whatever
 8   date that was.
 9       Q.  The let's go back to September 12,
10   2002.
11            Did you or did you not have a
12   discussion of the same topic about money and
13   using the word "laundering" to Langston
14   University on September 12, 2002, with Ms.
15   Arnold?
16       A.  I only had the meeting where I
17   mentioned that, and the meeting where I
18   apologized.
19       Q.  When you say "where I apologized",
20   was anyone else present?
21       A.  No.  She came to me and just said,
22   "You hurt my feelings."
23       Q.  So when you say "a meeting", it was
```

1    A.   It wasn't working at the time I got
2 there.
3    Q.   How do you know that?
4    A.   Because I had a conversation with
5 Kirk Ballantyne, and it was in my portfolio,
6 and it had a low score, and he said because
7 it was not working.
8    Q.   Who is Kirk Ballantyne?
9    A.   Kirk Ballantyne is a member of the
10 systems coordination office out in Denver.
11    Q.   What do you mean by "your portfolio"?
12    A.   My portfolio is a list of all the
13 automated systems that I am responsible for.
14    Q.   What did Kirk Ballantyne give you
15 that showed that SERTS was not working?
16    A.   He gave me a score card that said we
17 were in the red.
18    Q.   What do you mean by "score card"?
19    A.   They rate and score; the system
20 coordination office rates and scores each
21 computer system in each AD's folder.  So the
22 portfolio was a basic listing of all the
23 computer systems that you own.

80

1      So he had rated all of my systems,
2 and that particular system got a red, because
3 it was not working, it didn't have a business
4 case, and it was over budget.
5      Q.  What was the budget?
6      A.  I don't know what the budget was.
7 But it was my understanding that we had spent
8 close to $60,000 on the system before I got
9 there.
10      Q.  Did Ms. Arnold write and submit a
11 business case for the SERTS system?
12      A.  No.
13      Q.  So you have never seen such a thing?
14      A.  No.
15      Q.  And to your knowledge, did Ms. Arnold
16 ever submit a business case to Kirk
17 Ballantyne?
18      A.  Not to my knowledge.
19      Q.  And there is no other person
20 involved.  Do you have an assistant named
21 Gail Tolbert?
22      A.  Colbert.
23      Q.  Colbert, I'm sorry.  With a "C"?

1    A.  Yes.
2    Q.  Gail Colbert.  To your knowledge, did
3 Ms. Arnold ever submit the business case to
4 Ms. Colbert?
5    A.  Not to my knowledge.
6    Q.  Did either Mr. Ballantyne or Ms.
7 Colbert ever submit such a business case or a
8 copy of it to you?
9    A.  No, sir.
10   Q.  So as far as you know, there just has
11 never been such as thing done by Ms. Arnold?
12   A.  She was working on the business case,
13 because I instructed her to go talk to Kirk
14 about developing the business case.  Now,
15 whether the business case was ever completed,
16 I don't recall.
17   Q.  Did you ever ask Mr. Ballantyne if he
18 had received a copy of the business case?
19   A.  Kirk told me he had not received a
20 copy of the business case.  So he said
21 whatever he had was not enough to present in
22 front of the ITIB.  And the ITIB is our
23 Information Technology Investment Board.