## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROMELLA ARNOLD,        )
         )
     Plaintiff,      )
         )     CA No. 05-1475 (RWR)
    v.         )
         )
GALE A. NORTON,        )
         )
     Defendant.    )

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

### Interrogatories

**Interrogatory 1.** Fully identify and describe in detail the factual basis for each and every instance where you believe you were subjected to retaliation or discrimination based on sex, age, or race, by Department of Interior (DOI) employees or management officials, noting for each instance the alleged type of discrimination or retaliation, the date and location of the alleged act, all witnesses or parties to the incident, and what evidence you have to support your belief that discrimination or retaliation occurred.

Answer: Plaintiff is a career federal employee employed by the U.S. Department of the Interior (DOI), since November 1975. In approximately April 1997, Plaintiff was hired by the Bureau of Land Management (BLM), DOI, Office of Equal Opportunity( OEO) as an EEO Specialist. In March 1998, Plaintiff was reassigned to the position of BLM's National Student Education Employment Program (NSEEP) Manager in the Office of Human Resource Management. In October 2001, Plaintiff was assigned the additional duties and responsibilities of the BLM's Historically Black Colleges and Universities (HBCU) Program Manager. In her capacity as the NSEEP/HBCU Program Manager,

1

Plaintiff reported to the BLM's Associate Director, Human Resource Management (AD/HRM).

Marilyn Johnson is an African-American female, born August 15, 1950, with no prior participation in protected EEO activity or opposition to violations of EEO law. Since June 2003, Johnson has served as the Associate Director, Human Resource Management (AD/HRM). In the Summer of 2002, Johnson was reassigned from her position as the BLM's Director, Phoenix Training Center located in Phoenix, Arizona, to the position of BLM's Acting AD/HRM located at the BLM's headquarters in Washington, D.C. From 1994 through 1996 Johnson had served as the BLM's AD/HRM and was responsible for the overall management of the NSEEP/HBCU programs. Johnson had a pattern of actions and reprisals against EEO program advocates and GS-13 and above African-American employees.

Plaintiff was well known within the BLM and DOI as an advocate for EEO and diversity programs, and as an opponent of violations of EEO laws and regulations. In 1995, Plaintiff served as Vice President of the National Association for the Advancement of Black Federal Employees (NAABFE), an organization dedicated to the elimination of systemic discrimination within DOI. In Fall 1995, BLM's equal employment opportunity program was the subject of a Congressional Inquiry by U. S. Representative Albert Wynn. A Departmental report, ( referred to as the Wynn Report), issues in response to the Inquiry found there was a negligible number of African- American college graduates hired by the BLM and no viable affirmative action program to recruit students from the HBCU's into permanent positions. On September 10, 1997, Plaintiff, in her capacity as an officer of NAABFE, was called to testify before a Congressional Committee on Government Reform and Over-site, on issues involving EEO and diversity within the DOI in general and specifically within the BLM. Plaintiff's testimony focused on BLM's EEO Program which was under Johnson's management as BLM's AD/HRM during the time period preceding the Inquiry. In October 1997, Plaintiff was quoted extensively in a Federal Times article titled "Interior Officials admit Need For Attention To Racial Discrimination". In 1998, Plaintiff brought to the attention of the Secretary, DOI, and BLM officials a racial incident at the BLM Phoenix Training Center that resulted in disciplinary action against the offending managers, which appeared in the Phoenix press. As a result of Plaintiff's reassignment, in 1998, Plaintiff was assigned to the position of the NSEEP Manager. The program realized demonstrative improvement and progress. Similarly, after Plaintiff was assigned the duties of HBCU Program Manager, the number of student hires within the BLM significantly increased. Both programs managed by Plaintiff were highlighted as model programs by both DOI and the Performance Management Institute. Plaintiff has continued her involvement in NAABFE and continued to bring incidents of racial harassment and violations of EEO laws to the attention of senior management within the DOI as well as outside support organizations. Plaintiff has continued to advocate for diversity programs and currently serves as the Vice President of Blacks In Government, DOI. Johnson knew of Plaintiff's involvement in these protected activities.

**COUNT ONE**

Plaintiff was discriminated against and harassed on the basis of age, race, and sex and suffered reprisals and a hostile environment, to prevent Plaintiff from advancing to GS-14 and to punish Plaintiff for exercising her protected rights, when defendant's agent Marilyn Johnson (1) openly and publicly accused Plaintiff of the federal crime of "Money Laundering"; (2) threatened and proposed to transfer Plaintiff's position to a field office, which would require Plaintiff to move or be terminated; (3) placed unreasonable time demands for performance on Plaintiff as part of the continuing harassment; (4) placed unreasonable and unjustified time demands on Plaintiff's business travel to hinder Plaintiff's ability to perform.

Johnson made false accusations that Plaintiff had committed the federal crime of "money laundering". Johnson's accusations were made in connection with the Plaintiff's administration of the partnership initiative with Langston University, an HBCU under the BLM's diversity program. Despite protestations by Plaintiff to the contrary, Johnson made this accusation against Plaintiff on five separate occasions, including management meetings and other meetings in the presence of third parties.

The BLM/Langston University partnership initiative was initiated in 1999 by Warren Johnson, former AD/HRM (no relation to Marilyn Johnson) and the former Director, BLM, Thomas Frye. The initiative was entered into to address the severe under-representation of African-Americans in the resource management occupations. The Langston initiative was so successful a model that it has been adopted by two other DOI Bureaus.

On September 12, 2002, Marilyn Johnson, the Acting Associate Director, Human Resource Management for approximately one month, confronted Plaintiff in the hallway outside Johnson's office and accused Plaintiff of laundering money to Langston University. Plaintiff categorically denied the accusation and requested a meeting with Johnson to clarify Plaintiff's role in the BLM's partnership initiative with Langston University.

On September 19, 2002, Johnson again accused Plaintiff of money laundering at a meeting in Johnson's office attended by Johnson, Plaintiff, Concetta Stewart, Deputy AD/HRM and Sylvia Felder, Budget Administrator. In that meeting, Plaintiff explained that the partnership initiative with Langston included a grant that had been approved by the prior AD/HRM Warren Johnson and other senior management officials. Plaintiff stated that the partnership with Langston was part of the BLM's diversity initiative in accordance with the President's Executive Order 13256 of February 12, 2002, and established EEO and procurement laws and regulations. During this meeting Plaintiff asked Johnson to refrain from referring to this legitimate initiative as money laundering.

On July 18, 2003, during a meeting between Johnson and Plaintiff, Johnson again accused Plaintiff of laundering money to Langston University. Plaintiff reiterated her role in administering the grant to Langston University and again asked Johnson to refrain from referring to this initiative as money laundering.

During a management meeting on August 12, 2003, Johnson called the partnership initiative with Langston University, "money laundering".

On October 2, 2003, at a mediation session Johnson admitted accusing Plaintiff of "money laundering".

Johnson never asked her predecessor, Warren Johnson, about the legality of the partnership initiative with Langston University or took any action to investigate the legality of the partnership initiative with Langston University. Johnson knew or should have known that the partnership initiative was sanctioned by BLM's senior management and met established EEO and procurement regulations. Johnson knew or should have known that Plaintiff, a GS-13 Program Manager did not have the authority to approve the program initiative with Langston University. Johnson knew or should have known that her accusations against Plaintiff were false, but continued to harass Plaintiff and disparage Plaintiff's reputation as an effective program manager.

In a letter dated March 26, 2004, Johnson notified the President, Langston University, that the BLM was terminating its partnership initiative with Langston. In the letter, Johnson alleged this decision was based on discrepancies in reports submitted by Langston, however, Johnson did not conduct any audit or program evaluation of the partnership with Langston prior to issuing the letter. Johnson's decision was arbitrary and not based on any objective evidence. Langston was the only university which was a recipient of a BLM grant to be targeted for termination by Johnson. Johnson's termination of the partnership initiative was motivated by her discriminatory and retaliatory animus toward Plaintiff as an effective program advocate, and toward the Langston partnership as an effective diversity initiative.

In May 2003, Johnson directed a subordinated to send an E-mail to all BLM state offices offering to reassign Plaintiff's program function, the National Student Education Employment Program, to any state office interested in assuming this function. Johnson took this action without any prior consultation with Plaintiff, and without any study of the ramifications of this proposed decision on the program and program personnel. The National Student Education Employment Program had always been administered at BLM Headquarters level, and it was incompatible with the program's national focus to transfer the function to a state.

Johnson's decision to transfer Plaintiff's function to a BLM state office would have resulted in a directed reassignment of Plaintiff. Plaintiff was 51 years of age and had more than 30 years of federal service when Johnson proposed the transfer of function. There were two other program personnel who were affected by this proposal. Each Steven Shafran and Marciano Briones, were located in BLM's Denver, Colorado office, and each was over 50 years of age, with close to or more than 30 years of federal service.

Plaintiff's program function was not transferred because no BLM state office accepted Johnson's proposal. Johnson's decision to transfer the NSEEP program function was not intended to improve the efficiency of the service. In fact, the transfer of function would

4

have incurred needless expense and disruption to both the BLM and program personnel. Rather, Johnson's intent was to force Plaintiff and two other older workers to resign or retire. Shafran and Briones were forced into retirement and Plaintiff was removed from the NSEEP position and reassigned to a non-existent position. Johnson's action was a further attempt to harass, and retaliate against Plaintiff.

Johnson harassed Plaintiff by placing unreasonable time frames on Plaintiff for statewide data-based reports without benefit of an automated system to produce those reports, after Johnson dismantled the Student Employment/HBCU Recruitment Tracking System (SERTS), the information system designed to produce automated data on the recruitment, hires, and placement of students in BLM's diversity programs.

On January 22, 2003, Johnson instructed a subordinate too delete the SERTS system from the AD/HRM information database. Johnson wrongfully blamed Plaintiff by claiming the decision to delete the SERTS was based on Plaintiff's alleged failure to submit a "business case" to the Information Technology Investment Board (ITIB). Plaintiff had submitted a business case to the ITIB, however no action by Johnson to approve implementation of SERTS was ever taken.

The SERTS system was established pursuant to U.S. Representative Albert Wynn's inquiry into the BLM's EEO program in 1995 and all other programs under Johnson. The subsequent "Wynn Report" found there was no effective mechanism for monitoring and tracking the recruitment and hiring of students through the Student Employment and HBCU program. SERTS had cost BLM approximately $100,000 to design and develop and was ready for deployment and implementation.

At approximately 9:30 a.m., on Friday July 18, 2003, Plaintiff was informed by Johnson's secretary that Johnson wanted a statewide program report from Plaintiff for a 10:00 a.m. meeting. Plaintiff contacted Johnson immediately and explained that without SERTS, Plaintiff would have to gather the program data manually by telephoning each individual state office and requesting submission of the program data. Johnson continued to demand the program report and Plaintiff produced the program report by close of business Monday, July 21, 2003.

Johnson deliberately placed undue stress on Plaintiff by demanding a statewide program report within a clearly unachievable time frame. Johnson knew or should have known that Plaintiff would not be able to comply with her demand in the time frame given, thereby making Plaintiff appear non-responsive. Johnson's action was calculated to frustrate and harass Plaintiff and was another act in a continuing pattern of discrimination, reprisal and creation of a hostile work environment.

Plaintiff was responsible for the development and coordination of the Student Career Experience Program (SCEP) training orientation. Since 1998, Plaintiff had traveled to the training site at BLM's Training Center in Phoenix, Arizona, a few days in advance of the training start date to ensure proper coordination of the training with the Training Center staff.

Plaintiff submitted her travel request to Johnson on June 9, 2003, to travel to Phoenix Arizona on Thursday June 12, 2003. The SCEP training began on Monday, June 16, 2003. Plaintiff was informed on June 11, 2003, that her training request had been denied. Plaintiff was told that Johnson would only approve Plaintiff's travel for Sunday, June 15, 2003.

The Phoenix Training Center had assigned a new employee, unfamiliar with the orientation training program, and to ensure quality control, it was necessary that Plaintiff have a few days lead-time. Plaintiff was forced to travel on Sunday, June 15 to Phoenix, and then because of the time constraint, Plaintiff had to work through the night to ensure all training materials were in order, and the training coordinator was made aware of the course curriculum.

Johnson claimed that the cost to the BLM for Plaintiff to travel in advance was too high. During the nine months proceeding the June 2003, training orientation, Johnson had expended approximately $30,000 of BLM's funds for Johnson's travel. The cost for Plaintiff to have traveled to Phoenix on June 12 instead of June 15 would have been $277.00 for the additional three days per-diem and lodging.

Johnson's refusal to permit Plaintiff to travel in advance of her training orientation, as was the established practice, was not based on a fiscal concern, but part of a continuing pattern of harassment and reprisal. Johnson's action was intended to harass and frustrate Plaintiff in the performance of her program duties. Johnson's action was motivated by a desire to neutralize and punish Plaintiff because Plaintiff was an effective advocate for diversity initiatives.

**COUNT TWO**

Plaintiff was discriminated against and harassed on the basis of age, race, and sex and suffered reprisals and hostile environment, to prevent Plaintiff from advancing to GS-14 and to punish Plaintiff for exercising her protected rights, when defendant's agent, Marilyn Johnson, imposed a disciplinary action against Plaintiff.

At the July 30, 2003, meeting when Johnson announced her decision to place Michael Brown, a GS-14 in Plaintiff's position as NSEEP/HBCU Program Manager, Plaintiff spontaneously uttered the words "I'll be damned."

Johnson told Plaintiff to stop cursing. Plaintiff said she had not cursed but had used a commonly used expression.

On August 1, 2003, Johnson issues a Letter of Counseling to Plaintiff titled, "Inappropriate Language and Abusive Behavior. On this same day Johnson issued Plaintiff the memo which removed Plaintiff from her position as the NSEEP/HBCU program manager and reassigned Plaintiff to a non-existent position.

Plaintiff has an unblemished record of federal service and has never been the subject of a

disciplinary action, but for Johnson's action against her.

Johnson has a reputation of using foul and vituperative language toward subordinates.

The Letter of Counseling is one further example of Johnson's pattern of hostile discriminatory behavior toward Plaintiff.

## COUNT THREE

Plaintiff was discriminated against and harassed on the basis of age, race, and sex and suffered reprisals and a hostile environment, to prevent Plaintiff from advancing to the GS-14 and to punish Plaintiff for exercising her protected rights, when Defendant's agent, Marilyn Johnson: (1) removed Plaintiff from her position, awarded the position to a younger male at a higher grade, and placed Plaintiff in a non-existent position in a non-existent program with a lower career ladder; (2) Required Plaintiff to work under false position description and performance standards which were not quantifiable or achievable as part of the continuing harassment; (3) Imposed disparate treatment against Plaintiff by moving her to a smaller office to share and by ordering that Plaintiff not be allowed to retain the telephone number by which she was known.

On July 30, 2003, Johnson, at an H.R. staff meeting, announced that Plaintiff is removed from her position as the Student Employment/HBCU Program Manager, and that Michael Brown (male, born July 2, 1961) would assume the position, as a GS-14.

Brown, a former government contractor, was hired into the federal service, BLM, on December 3, 2000, at the GS-13 level. When Brown was reassigned into the NSEEP/HBCU Program Manager position, he had fewer than three years of federal government experience and no experience in the NSEEP or HBCU programs.

Plaintiff has more than thirty years of federal experience, all of which has been in the areas of equal opportunity and diversity. From 1988 through 1996, Plaintiff worked as a specialist in the Departmental Office of Historically Black Colleges and Universities. From 1998 until her removal, Plaintiff worked as BLM's NSEEP Manager, and from 2001 until her removal, Plaintiff was assigned the duties of the HBCU Program Manager. Plaintiff received numerous performance awards, and letters of recognition for outstanding performance. In 2001, Plaintiff received an outstanding performance evaluation and was recommended for a permanent promotion to GS-14.

Brown was removed from the NSEEP/HBCU Program Manager position on November 28, 2004 and simultaneously demoted from GS-14 to GS-13.

Plaintiff's reassignment by Johnson to the GS-13, EEO Specialist position was to deny Plaintiff a promotion to GS-14. The NSEEP Program Manager position has a GS-14 full performance level, while the Title VI EEO Specialist position has a GS-13 full performance level. Plaintiff had been recommended for a promotion to the GS-14 level in 2001 as a result of her outstanding performance. Due to budgetary constraints, Plaintiff

7

was given only a temporary promotion to the GS-14 at that time. If Plaintiff had remained in the NSEEP position, she would have advanced to the GS-14 full performance level based on her continued successful performance.

Johnson's reassignment of Plaintiff to the Title VI position contravened a June 13, 2002 directive by Michael Trujillo, DOI, Deputy Assistant Secretary for Human Resources and Workforce Diversity, which cited in pertinent part:

> ...we are in the process of reviewing the organizational structure of the Equal Opportunity/Civil Rights Offices throughout the Department. In anticipation of some restructuring in the near future, please do not make any changes to your current Equal Opportunity organization, structure, location, or personnel until we have completed our review and initiated whatever changes to these offices that are deemed necessary to improve the efficiency of these very important functional areas.

Johnson's arbitrary reassignment of Plaintiff to the Title VI program position prompted Melodee Stith, Departmental Director of the Office for Equal Opportunity, to write to Deputy Assistant Secretary for H.R., Michael Trujillo, via E-mail on August 6, 2003, stating in pertinent part:

> It appears Marilyn (Johnson) is moving ahead to reassign employees into the EEO office. However, it is my perception that she's not acting responsibly...
>
> I think that we should ask Marilyn to stop all assignments to the EEO office until she gives us a plan on what she is doing. It appears she acting arbitrary and capricious on this.

Johnson's reassignment of Plaintiff to Title VI program specialist was arbitrary and spurious because BLM had no Title VI program nor did it have a Title VI program function. Stith, in response to an interrogatory from the U.S. Commission on Civil Rights on whether there were Title VI program in each of the DOI's Bureaus that administer federal financial assistance, stated in pertinent part:

> ...to create an active Title VI program in the Bureau of Land Management would be duplicative when pitted against our existing Title VI enforcement program in the National Park Service because both bureaus fund the same types of programs and have the same recipients i.e., State park and recreation programs. In other program areas receiving Federal financial assistance from the Bureau of Land Management, such as prison and school districts, these entities are already covered by existing Title VI enforcement programs by Federal agencies other that DOI.

Johnson's arbitrary removal of Plaintiff from the NSEEP/HBCU Program replaced Plaintiff, an effective program manager, with an unqualified, inexperienced, younger one,

8

Michael Brown, who was demoted within 12 months. Johnson ensured that a once successful diversity program and program advocate would now be neutralized, consistent with Johnson's reputation and prior acts. Johnson's action was an abuse of her authority, and was found in her retaliatory and discriminatory animus toward Plaintiff. Johnson's reassignment of Plaintiff to a non-existent Title VI program was intended to deprive Plaintiff of her opportunity to advance to GS-14, and retaliate against Plaintiff for her involvement in protected EEO activity. Johnson's action was also intended to embarrass. Demean, and harass Plaintiff, consistent with the hostile environment created by Johnson. Johnson's removal of Plaintiff also sent a chilling message to other BLM employees in the H.R. office, that if they attempted to engage in similar protected EEO activity, their career opportunities could be abruptly curtailed or over. Johnson's removal of Plaintiff and replacement of Plaintiff with a younger worker was also consistent with other similar actions against older workers taken by Johnson.

On October 1, 2003, Plaintiff was presented by Johnson with performance standards for the Title VI EEO specialist position. The position description and performance standards were fallacious because they were both written as though there was an existing Title VI program within the BLM when there was not. The BLM had no Title VI program, no Title VI guidelines, no records, and no other Title VI program materials.

Plaintiff informed Johnson that she had not worked in a Title V I program for more than twenty years and was not qualified to establish or administer a Title VI program.

Plaintiff attended a Title VI Training session in September 2003. Plaintiff was stressed and anxious because there was no way to apply the material within BLM since there was no BLM Title VI program function. Stith in responding to a question by the EEO Investigator underscores why Plaintiff's anxiety and concern were well-founded when she stated in reference to the Title program: (ROI, Vol. 2, D4 pg.16):

> ...yes, that was a very complicated area. We had given training last year, conducted by Department of Justice as well as the Department of Education and our own Solicitor's office to give employees a familiarly with the training, but this program area is one of those areas you don't send somebody to a class and say okay sit down and do it...

The Title VI performance standards issued by Johnson were designed to set Plaintiff up to fail. Johnson knew Plaintiff would be unable to meet the performance standards, and took this action with the intent to find Plaintiff's performance deficient.

Johnson previously took the same action against Marilyn Daniels, an African-American who filed complaints of racial discrimination and reprisal. Daniels was placed in a non-existent Title VI position, and then fired by Johnson for failure to perform.

On or about September 3, 2003, Johnson gave Plaintiff two days to move office space considerably smaller than her previous office, ordered her to share this smaller space

9

with a junior EEO Specialist, and refused to allow Plaintiff to retain her telephone number.

Plaintiff was the only senior EEO Specialist required to share office space and not permitted to retain her telephone number, when moved.  The similarly situated employees were afforded more advantageous treatment.

Plaintiff was made aware months after her relocation of numerous unsuccessful attempts to contact her by program personnel within and outside of the federal government. Johnson's disparate treatment of Plaintiff was motivated by discrimination and reprisal, and designed to humiliate and embarrass Plaintiff.

COUNTS ONE THROUGH THREE

Defendant's agent took actions intended to discredit, defame, and destroy Plaintiff's professional and personal reputation, damage her career and potential career, based on her age, race, gender, reprisal, harassment and hostile work environment, and by so doing, cause Plaintiff to suffer pecuniary and non-pecuniary damages.

The aforestated actions were imposed only on Plaintiff and not on other similarly situated employees who are not of Plaintiff's age, race, sex, or who have not engaged in protected EEO activities or opposed violations of EEO law.

Defendant's agent's actions and statements were clearly intended to interfere with Plaintiff's ability to perform her job and to interfere with and diminish Plaintiffs work performance.  Defendant's actions were intended to and did cause Plaintiff to feel intimidated and harassed, and to create for Plaintiff and intimidating, hostile and offensive work environment.

Defendant's agent Johnson has routinely acted in a similar hostile, disparate, and retaliatory manner toward senior African-American employees, including but not limited to the following:

(a) Taking more severe disciplinary actions against African-American employees than against other similarly situated employee;

(b) Taking actions to undermine and otherwise neutralize equal employment opportunity and diversity programs and program personnel; and

© Arbitrarily assigning and reassigning older workers in a manner inconsistent with the efficiency of the service, but intended to demoralize and force older workers into resigning or retiring.

Defendant's agent's actions caused Plaintiff to suffer non-pecuniary damages, including anxiety, stress, depression, embarrassment, loss of reputation and other physical and emotional conditions.

As a direct result of the discrimination and reprisal against Plaintiff, Plaintiff suffered emotional pain and suffering, feeling of paranoia, feelings of distrust, nightmares, and sexual dysfunction, personality disorder, loss of pleasure of life, humiliation, embarrassment, negative changes in her relationships with family and friends, and other non-pecuniary damages.

As a direct result of the discrimination against Plaintiff, Plaintiff has become withdrawn and indifferent toward family members and has experienced a serious diminution in her quality of life.   Plaintiff's pain and suffering prevents Plaintiff from continuing to provide her elderly parents with financial and emotional support.

Plaintiff no longer enjoys an active social life, and feels uncomfortable and uneasy at social events.  Plaintiff was once involved in a variety of social service and professional organizations, her national alumni association, and other community related activities. Plaintiff now has limited interaction with anyone outside of her co-workers at the BLM.

Plaintiff was a happy, extroverted, and socially active person who has been reduced to a fearful, anxious, withdrawn individual.

Plaintiff took immense pride in her thirty years of federal service and in her many awards, commendation, and other acknowledgements for outstanding work performance in equal opportunity and diversity programs.  As a result of Defendant's spurious and vicious actions, Plaintiff has suffered a loss of reputation and her outstanding record of federal service has been irrevocably tainted.  Plaintiff has had to defend her reputation to co-workers, and to numerous people throughout the BLM and DOI who have heard that Plaintiff was removed from her position because she laundered money or otherwise engaged in some illegal activity.  The impact of these vicious and fallacious allegations is severe and ongoing.

The discrimination and reprisal against Plaintiff was designed to prevent Plaintiff from advancing to the position of National Student Education Employment Program Manager, GS-14, and/or to other GS-14 positions within the BLM and DOI.  As a direct result of the discrimination, and reprisal, Plaintiff has lost financial benefit from lost employment opportunities.

As a direct result of the discrimination and reprisal against Plaintiff, Plaintiff suffered pecuniary damages, including lost income, lost employment opportunities, out of pocket expenses for medical care and attorney's fees.

**Interrogatory 2.**  Fully identify and describe in detail in chronological order the factual

basis for each and every action which you contend formed a hostile working

environment.  With respect to each action, individually specify which of your causes of

action (i.e. sex, age, race, or reprisal) you believe caused the action; why you believe that

connection exists; and what, if any, evidence you have supporting your belief.

Answer: Plaintiff believes the following actions taken by Johnson were taken to create a hostile environment based on reprisal. Johnson served as the BLM's AD/HRM from 1994-1996, at which time this program was the subject of a Congressional Inquiry in 1995, led by Representative Albert Wynn. Following a series of events, Johnson was reassigned from the AD/HRM position.

Johnson has a reputation and long-standing history of not supporting affirmative employment programs and diversity within the BLM. Plaintiff disagreed with Johnson and challenged Johnson in her accusation of "money laundering", and the funds granted to Langston and other HBCU's versus funds granted to majority universities by the BLM.

Plaintiff has a history of being an outspoken advocate for EEO and diversity within the DOI and specifically the BLM to include:

- Served as a Government Witness and testified before Congress during a Congressional Hearing, September 10, 1997
- Plaintiff provided testimony on September 26, 1997 to a Special Agent, Office of Inspector General regarding witness intimidation against a BLM management official, Denise Meredith. Investigation resulted in the removal of the former BLM Director, Pat Shay.
- In October 1997, Plaintiff was quoted extensively in the Federal times article titled "Interior Officials Admit Need for Attention to Racial Discrimination".
- In 1997, and 1998, Plaintiff brought to the attention of the Secretary, DOI, and BLM officials, a racial incident at the BLM Training Center the resulted in disciplinary action against the offending managers and news of the racial incident appeared in the press.
- In October 1997, Plaintiff planned and organized a protest march at the main Interior building. October 21, 1997, protest march included Congressional leaders, local Clergy, members representing the NAACP, the Black Farmers Association, NAABFE, and employees throughout the federal government. March was publicized and generated articles in the national press.
- Plaintiff quoted extensively in Federal Times article title "Interior Pushes for Diversity".
- Plaintiff continues to provide witness testimony for employees who filed complaints of discrimination,1997 though present.
- Plaintiff serves as Vice President for Blacks In Government and continues to remain involved with issues that impact Black employees in DOI and the BLM specifically.

**Acts of Reprisal creating a hostile environment by Johnson against Plaintiff:**

On September 12, 2002 Johnson, then Acting Associate Director, Human Resource Management for approximately one month confronted Plaintiff and accused Plaintiff of laundering money to Langston University.

On September 19, 2002, Johnson again accused Plaintiff of money laundering at a meeting in the presence of Concetta Stewart and Sylvia Felder. Plaintiff was present during the discussion.

On July 18, 2003, during a meeting between Johnson and Plaintiff, Johnson again accused Plaintiff of laundering money to Langston University.

During a management meeting on August 12, 2003, Johnson called the partnership initiative with Langston University, "money laundering".

On October 2, 2003, at a mediation session Johnson admitted accusing Plaintiff of "money laundering".

November 21, 2003, in a staff meeting Johnson highlighted Michael Brown. Brown stated he was here to fix the problem which occurred with Langston University. Clark Collins was present in this meeting and witnessed the statements made by Brown regarding Langston University.

January 22, 2003, Johnson sent an e-mail to a subordinate, Gail Colbert to delete the Student Employment Recruitment Tracking System (SERTs).

May 7, 2003, Concetta Stewart a subordinate sent an e-mail on behalf of Johnson to BLM Field Committee proposing to transfer Plaintiff position and program to any state office willing to accept the student programs.

June 11, 2003, Johnson denied Plaintiff's request to travel to the Phoenix training center ahead of participants, causing Plaintiff undue stress. Johnson claimed that the cost to the BLM for Plaintiff to travel in advance was too high. The extra cost for 2 days per-diem and lodging to the agency would have been $277 total. During the nine months preceding the June orientation training, Johnson had expended approximately $30,000 of BLM's funds for Johnson's travel.

July 18, 2003, Johnson requested a data report from Plaintiff which Johnson claims she needed in 30 minutes, placing undue stress on Plaintiff by demanding a statewide report within a clearly unachievable time frame.

July 30, 2003, in program staff meeting Johnson announced her decision to place Michael Brown in Plaintiff's position as the team leader NSEEP/HBCU Manager.

August 1, 2003, Johnson issued Plaintiff letter of counseling claiming Plaintiff used inappropriate behavior when Plaintiff commented "I'll be damned", upon hearing that Michael Brown would take over as the NSEEP/HBCU Program Manager's position

which Plaintiff held.

August 1, 2003, Johnson issued Plaintiff a direct reassignment memo, assigning Plaintiff to a non-existent Title VI function and position. Johnson's reassignment of Plaintiff to the Title VI position contravened a June 13, 2002, directive by Michael Trujillo, DOI, Deputy Assistant Secretary for Human Resources and Workforce Diversity.

September 2003, Johnson gave Plaintiff two days to move office space considerably smaller than her previous office, ordered Plaintiff to share this smaller space with a junior EEO Specialist, and refused to allow Plaintiff to retain her telephone number.

On October 1, 2003, one day before mediation session, Plaintiff was presented with performance standards for the non-existent Title VI, EEO Specialist position. The performance standards and position description were fallacious because they were both written as though there was an existing Title VI program within the BLM when there was not.

**Interrogatory 3**. As to every act of discrimination or retaliation you allege occurred

fully describe in detail and identify your initial contact with an EEO counselor or with

the EEOC including the date of the alleged act of discrimination, the date and location of

initial contact, how the contact was made, with whom the contact was made, and any

evidence substantiating when the initial contact was made.

Answer:

| | |
|---|---|
| August 4, 2003 | Initial contact with EEO Counselor/ Sharon Salpini, USGS, following removal and letter of counseling August 1, 2003 |
| August 5, 2003 | Contacted DOI, Director EEO, Melodee Stith |
| August 12, 2003 | Date entered process |
| August 13, 2003 | Election to participate in ADR mediation |
| August 14, 2003 | Date of initial interview |
| September 10, 2003 | Designation of Representative |
| October 2, 2003, | Mediation session |
| October 2, 2003 | Requested to file formal complaint |
| October 3, 2003 | Notice of final interview |
| October 16, 2003 | Report of Counseling issued |
| November 1, 2003 | Deadline date for counseling extension |
| | |
| September 2002 and Continuing | Alleged violations of discrimination by Johnson |

| | |
|---|---|
| July 18, 2005 | Filed second complaint of discrimination and reprisal |
| November 29, 2005 | Agency dismissed complaint filed July 18, 2005 |
| January 17, 2005 | Filed notice of appeal with EEOC re: agency dismissal |
| March 8, 2006 | EEOC acknowledges receipt of appeal |
| August 25, 2006 | EEOC Decision on appeal. Agency's dismissal of November 29, |

2005 was improper and should be rescinded and remanded to the agency for further

processing.

**Interrogatory 4**. Fully describe in detail the factual basis for all damages including

compensatory damages, that you attribute to the alleged sex, age, race discrimination,

and retaliation and hostile work environment. This includes setting forth the specific

sums attributable to each of the following:

    a.  medical expenses;

    b.  hospital expenses;

    c.  medication expenses;

    d.  permanent disability;

    e.  pain and suffering;

    f.  anxiety;

    g.  psychological distress;

    h.  emotional distress;
    i.  mental anguish;

    j.  humiliation;

    k.  destruction of and lost earning capacity;

    l.  loss of love;

    m.  loss of companionship;

    n.  loss of society;

    o.  future medical expenses;

p. future expenses for extra care;

q. future expenses for extra attendance;

r. limitations on the ability to find employment; and

s. loss of enjoyment of life.

Answer: Please refer to Counts One through Three as written above which details factual basis for all damages including compensatory damages.

**Interrogatory 5.**   In relation to paragraph 15 of your complaint, fully describe in detail

all evidence which you contend shows that Marilyn Johnson and/or any actions of

Marilyn Johnson were the subject of any Congressional inquiry by U.S. Representative

Albert Wynn or the Congressional Committee on Government Reform and Oversite.

Answer: Please see response to request for documents.  Refer to series of letters written by Representative Albert Wynn, a letter written by the former National President of Blacks In Government, a petition signed by Black employees at the DOI and newspaper articles all referring to the report, prepared by the DOI Departmental Inquiry Team, regarding employment practices in the BLM, December 1995.  This report became the "Wynn Report", which Plaintiff, former Vice President of NAABFE presented in its initial meeting with the former Secretary of the Interior, Bruce Babbitt. Following a series of meetings with the Secretary, the Congressional Hearing was scheduled in September 1997 (documents provided).

Johnson was the manager for the BLM, HR program 1994-1996. Following the conduct of the Congressional inquiry into the employment practices in the BLM, in December 1995, Johnson was reassigned after the findings and recommendations were made in the report.

**Interrogatory 6.** In relation to paragraph 15 of your complaint, identify and fully

describe in detail each of plaintiff's acts of involvement in protected activity which you

claim Marilyn Johnson knew of and how she knew of such acts of involvement in

protected activity.

Answer: On March 9, 2004, in a sworn statement, Johnson responded "Yes" that she had knowledge of Plaintiff's prior public support for non-discrimination in employment.

Plaintiff belongs to a Black organization for federal employees and Plaintiff worked with Congressmen (ROI, Page 5, lines 12-20).

In addition to Johnson's admission of Plaintiff's advocacy role and involvement at the highest level in the DOI with the Secretary, negative press was generated because of Plaintiff's direct involvement and some high level officials were removed from their positions. Plaintiff's role and involvement was common knowledge within the DOI as well as within other federal external agencies and organizations.

**Interrogatory 7.** If it is your contention that you ever were officially promoted to a

position at a GS-14 level or with promotion potential to a GS-14 level, fully describe in

detail the position(s), when such an official promotion was received, and, if the

promotion was a temporary reassignment, the termination date.

Answer:  Plaintiff was promoted to the GS-14, HBCU Coordinator position on July 16, 2001. Plaintiff's promotion was not to exceed November 13, 2001. Plaintiff continued to manage the HBCU program along with managing the NSEEP and produced all of the work assignments given to her by Concetta Stewart, Deputy, AD/HRM. Plaintiff continued to attend meetings and conferences regarding the HBCU's that partnered with the BLM.

On December 6, 2001, Plaintiff received an outstanding performance rating from the former AD/HRM, Warren Johnson. This recommendation was made because the position held by Plaintiff as the NSEEP Manager had a full performance level to the GS-14 level.

**Interrogatory 8.** In regard to paragraph 70 of your complaint fully identify and describe

in detail the factual basis for the allegation that the alleged acts of discrimination or

retaliation prevented you from advancing to other GS-14 positions within BLM and DOI.

Answer:  Plaintiff has applied to 3 vacancies following exercising her rights in EEO matters.  All of the vacancies were for GS-14 positions in the following:
                        Senior Program Analyst/ WO-830
                        Senior Program Analyst/ WO-830
                        Program Manager/WO-720
Plaintiff was qualified for all three positions, but was unsuccessful in the selection process.  Plaintiff believes that the discriminatory actions taken against her by Johnson have led to her career derailment and demise. The accusation of "money laundering" made by Johnson against Plaintiff was spread throughout the BLM nation-wide.

**Interrogatory 9.** Fully identify and list each and every exhibit that is relevant to

plaintiff's proof and theory of the case. (If previously Bates stamped, Bates stamp

numbers are sufficient).

Answer: List of exhibits provided in support of interrogatories.

1. April 8, 1996, letter to the former BLM's EEO Officer, Gloria Inniss concerning the "Review and Analysis of the Employment Status of African Americans in the BLM from 1990 to present, dated December, 1995, also known as the "Wynn Report".
2. March 13, 1996, letter to former Representative Dellums written by Representative Wynn concerning the "Wynn Report".
3. March 14, 1996, letter to former President William Clinton, written by Representative Wynn concerning the targeted study of the BLM.
4. Copy of signed petition by DOI employees.
5. September 23, 1996, letter to former BLM Director, Mike Dombeck, written by former National BIG President, concerning the Wynn report and the Federal Times article
6. November 6, 1996, Press Release issued by Representative Wynn concerning meeting with Plaintiff, representatives of NAABFE, Congressman Wynn and the Secretary of the Interior, former Bruce Babbitt.
7. May 19, 1997, Federal Times article titled "Rally Against Racism", citing the BLM as one of the agencies.
8. July 21, 1997, Washington Post article titled "The White Look", citing Interior's dubious distinction of being the "whitest of all" in a survey of several departments hiring practices.
9. September 11, 1997 letter to Plaintiff from Representative Wynn for Plaintiff's participation in Congressional Hearing.
10. Plaintiff's Congressional Hearing Transcript from September 10, 1997 hearing.
11. Copy of Plaintiff's statement to be used in hearing submitted to Congress prior to hearing.
12. September 2, 1997, letter to Denise Meredith, original witness to provide hearing testimony.
13. Copy of travel itinerary for Denise Meredith and airline ticket purchased by NAABFE for Meredith to use to fly in to D.C. for hearing as witness.
14. September 11, 1997, letter written to former Secretary Bruce Babbitt requesting a thorough investigation into an allegation of witness intimidation by Interior official against Denise Meredith.
15. October 9, 1997, letter to Plaintiff from Representative John Mica, Chairman, Civil Service Subcommittee, concerning witness intimidation.
16. Plaintiff's affidavit for Denise Meredith concerning witness intimidation investigation
17. October 16, 1997, Washington Times article titled, "Interior Color".
18. October 20, 1997, Federal Times article titled, "Interior Officials Admit Need for Attention to Racial Discrimination", Plaintiff is quoted extensively in the article.
19. October 27, 1997, Federal Times article titled, "For Minorities, Top Still Hard to

Reach".

20. October 30, 1997, The Prince George's Post article titled, "Babbitt Asked To Step Down".

21. December 15, 1997, Federal Times article titled, "Interior Pushes For Diversity", Plaintiff is quoted extensively in the article.

22. October 1-10, 1997, letters written to various external organizations by Plaintiff regarding the organized protest rally at the DOI which took place October 21, 1997.

23. January 9, 1998, letter written to former Secretary Babbitt from NAABFE informing him of the racial skit performed at the BLM Training Center in Phoenix. Plaintiff was the one notified of the skit and reported it to the Interior officials. News article included in exhibit. Ron Tucker is the white male who performed the offending racist skit. He became a subordinate of Johnson's when she became the center Director.

24. September 23, 1998, letter to Plaintiff from the former DOI, Deputy Assistant Secretary for Workforce Diversity, David Montoya.

25. October 6, 1999, letter from former DOI, Assistant Secretary, Policy, Management and Budget, to NAACP Task Force, addressing the placement of African Americans in the SES Candidate's program and placing NAABFE members on the Diversity Council and the Executive Resources Board.

26. February 27, 2001, Black History Month program. Plaintiff is listed in the program.

27. March 12, 2002, letter and report to DOI's Assistant Secretary for Policy, Management and Budget, Lynn Scarlett from R. Edison Elkins, Director of Federal Sector Programs, EEOC, addressing problems identified in the BLM's EEO related practices. Plaintiff served on the committee that worked with EEOC in identifying these continuing problems.

28. December 4, 2003, letter written to the Secretary of the Interior from Representative Wynn addressing the accusation of "money laundering", against Plaintiff and her removal from a critical occupation where she was most valued and successful.

29. June 29, 2004, letter written to the Secretary of the Interior from the President of BIG addressing the continued pattern and practice of racial discrimination in the DOI.

30. Copies of affidavits Plaintiff provided on behalf of employees involved in protected EEO matters. The most recent affidavits were provided in 2003 for Marilyn Daniels and in 2006 for Steven Shafran.

Exhibits 1-30 all relate to Plaintiff's direct involvement as a leader, advocate, and an opponent of violations of EEO laws and regulations, before and dating back to 1995 when the Wynn Report was published, and up to the present on matters concerning discriminatory practices in the DOI and specially, in the BLM. Johnson was the BLM's AD/HRM from 1994-1996, when the Congressional leadership and external organizations focus was on these practices in the BLM and on the programs under Johnson's management, i.e. the employment of students. There is a direct connection to Johnson's management or the lack thereof, on matters dealing with EEO practices and diversity during her tenure as the AD/HRM and the matters which led to the Congressional Hearings in September 1997. Johnson was reassigned in 1996 following the findings and recommendations on the Wynn Report.

Exhibits 31-47: Witness Statements, letters, and a sampling of awards in support of

Plaintiff

31. Witness Statement: Steven Shafran
32. Witness Statement: Warren Johnson
33. Witness Statement and letter issued by Johnson of performance deficiencies: Clark Collins
34. Witness Statement: Diane Wood-Medley
35. Witness Statement: Denise Stanback
36. Witness Statement: Richard Redmond
37. Witness Statement: Lee Allen
38. Witness Statement: Ivy Garcia
39. Witness Statement: Edgar Weathersby
40. Witness Statement: Dr. Delores Carpenter
41. Witness Statement: Mary Arnold
41. (a) Witness Statement: Melvin Fowler

42. Sworn Statement by Johnson provided to the Investigator and contained in the Report of Investigation

43. May 27, 2003, letter of commendation and award to Plaintiff from the BLM's State Director, Mike Poole, California. Issued month prior to Johnson's permanent arrival.
44. August 20, 2003, letter in support of Plaintiff written to the Deputy Director, Fran Cherry by Warren Johnson, Plaintiff's former supervisor who preceded M. Johnson (no relationship)
45. September 2, 2003, letter in support of Plaintiff from Langston's liaison, Sherman Lewis.
46. September 21, 1998, letter of commendation and award to Plaintiff from the former Assistant Secretary, Land and Minerals Management.  Award based on Plaintiff's participation on the Recruitment Team.
47. March 2002, Plaintiff received the National Association for Equal Opportunity in Higher Education (NAFEO's) Distinguished Alumni Award. This award is the highest given by the organization and exemplifies the outstanding work of the Plaintiff in the HBCU community and elsewhere.

Exhibits: 48-53 Letters concerning the termination of Langston's grant an its partnership with the BLM by Johnson

48. November 11, 2000, e-mail for the former Arizona State Director, Denise Meredith commending the first recruitment effort at Langston University and explaining Plaintiff's role.
49. March 26, 2004, Johnson's letter to President Holloway of Langston University. Letter is full of lies and innuendos.
50. April 12, 2004, letter to Congressman Albert Wynn for Sherman Lewis of Langston challenging the termination by Johnson of Langston's grant and it's partnership with the BLM.
51. April 19, 2004, letter to Dr. Holloway from Sherman Lewis refuting the letter written

by Johnson. Submitted supporting documents on funding and how the grant was spent. This information supports what Johnson said did not exist, records on how the funds were used.

52. April 26, 2004, letter to the BLM's Director Clarke from President Holloway of Langston.

53. June 28, 2004, letter to Dr. Holloway in response to his letter to Director Clarke. A typically weak written response at best signed by the former Deputy Director.

54. May 8, 2003, e-mail for Plaintiff's co-worker in the field providing the e-mail and attachment sent by Concetta Stewart on behalf of Johnson proposing transferring the student programs to the field which would have a negative impact on Plaintiff and the other employment managers who were all over 50 during this time, with 30 or more years of service.

Exhibits: 55-70 E-mails regarding the SERTS system and how Johnson's level of understanding of IT systems is at the "eight" grade as quoted by Johnson in an e-mail dated 1-7-2004. This may explain why she chose to have the SERTS deleted.

55. August 21, 2001, Project Plan for the development of the Student Employment Recruitment Tracking System (SERTS).

56. Comments provided by the Student Employment Managers in the BLM field offices after testing the system.

57. December 12, 2002, e-mail from Kurt Ballantyne to Plaintiff regarding SERTS.

58. December 23, 2002, e-mail from Gail Colbert to Plaintiff regarding SERTS.

59. January 6, 2003, e-mail from Kurt Ballantyne to Plaintiff regarding SERTS.

60. January 10, 2003, e-mail from Gail Colbert to Kurt Ballantyne, AD/700 portfolio.

61. January 22, 23, 2003, e-mails from Colbert and Johnson deleting SERTS.

62. January 23, 2003, Plaintiff's response to Colbert's e-mail.

63. January 24, 2003, Plaintiff's e-mail to Johnson and Colbert requesting a meeting re: SERTS.

64. January 27, 2003, Johnson's response to Plaintiff's request for a meeting.

65. May 12, 2003, e-mail from Kurt Ballantyne to Plaintiff regarding SERTS

66. Plaintiff's submission of the Exhibit 300 Project Profile for SERTS.

67. May 20, 2003, e-mails between Plaintiff, Colbert and Johnson. Attachments include the Business Case for the BLM Non-Major National IT Project "300 Lite" and the quarterly report as required. In Johnson's March 10, 2005, Deposition she claims Plaintiff did not submit and Business Case as required to keep the SERTs system. It's apparent Johnson doesn't read her e-mail or she didn't care that Plaintiff provided the information required to keep the SERTS. Johnson needed an excuse to continue to harass Plaintiff and to make Plaintiff appear ineffective in the performance of her duties as the NSEEP/HBCU Program Manager.

68. July 3, 2003, e-mail from Plaintiff to Kurt Ballantyne requesting clarification.

69. July 8, 2003, e-mail from Ballantyne to Plaintiff with explanation.

70. January 7, 2004, e-mail from Johnson requesting a conversation on IT issues in 8th Grade English.

Exhibit:

80. February 2003 Report/ Strategic Recruitment for Government citing the robust recruitment initiative worthy of highlighting, the BLM's SEEP and the SERTs System. Report was issued by the Performance Institute.

Exhibits:

81. July 21, 2003, e-mail from Plaintiff to Ray Brady with attachment. This is the data Johnson requested from Plaintiff on Friday July 18, 2003, and gave Plaintiff a 30 minute deadline to produce the information. Request was submitted on July 21, 2003.

82. Plaintiff's hand written notice requesting travel to the NTC for the SCEP orientation training. Plaintiff requested to go out to the NTC on Thursday June 12, 2003, contrary to what Johnson alleged in the ROI and Deposition.

83. List of Johnson's travel for a nine month period which totaled approximately $30,000 in funds spent by Johnson.

84. August 1, 2003, letter of counseling issued by Johnson to Plaintiff

85. August 1, 2003, letter of removal and reassignment issue by Johnson to Plaintiff. Attachments include the PD and performance standards for the non-existent Title VI function and position. Also read e-mails between Plaintiff and Stroman concerning the PD and the lack of any Title VI documentation made available to Plaintiff.

86. Photographs of Plaintiff's suite of offices prior to the move to a shared smaller space with a junior employee, Jesse Hick's office space which he had to himself and the smaller office Plaintiff was forced into. Photos also exhibit a host of empty offices for HR staff at the time. Also, Stroman had two offices, one located at 1620 L Street, N.W., and the other in the main Interior building. Stroman did not share any of her office space with another employee. Plaintiff was more senior in experience and employment than both her co-workers who are similarly situated.

87. Plaintiff's performance standards and appraisals from 1998-2001, the Plaintiff's promotion recommendation by Warren Johnson and Plaintiff's SF-50 showing the Plaintiff's promotion to the GS-14 HBCU Team Leader position, along with the position description.

88. Copy of the BLM's Table or Organization Chart, outlining all BLM Washington office employees by position title, occupational series, grade and full performance grade level. On page 29, Plaintiff is listed and the full performance grade level for the position she occupied is a GS-14. This document was current because it lists the Director, Clarke on the first page.

89. Michael Brown's sanitized performance appraisal for period 10-30-04 to 9/05. Plaintiff was told by Brown that he received a satisfactory performance rating.

90. Michael Brown's SF-50 demoting him from a GS-14 to the GS-13 along with PD. Johnson claims Brown requested to be demoted.

Exhibits: 91-95 E-mails, Directive and EEOC reports on the DOI Civil Rights program and E. Melodee Stith's sworn statement

91. June 13, 2002, Directive from Michael Trujillo, DOI's Deputy Assistant Secretary for

Human Resources and Workforce Diversity, re: Organization of Equal Opportunity
Offices. Johnson contravened the directive when she arbitrarily and capriciously removed
Plaintiff from the NSEEP/HBCU Program Manager's position and reassigned her to the
non-existent Title VI function and position.
92. August 6, 2003, e-mail from Melodee Stith to Trujillo concerning two disturbing
telephone calls, one from Plaintiff and Concetta Stewart.
93. March 9, 2004, Stith's sworn statement provided to the investigator.
94. May 20, 2003, the EEOC's assessment of 11 federal agencies.
95. June 3, 2003, Stith's response to the Commission's report and recommendations.

Exhibits: 96-101 Supporting documents showing attempts by Plaintiff to get a GS-14
position and e-mails which verify that Johnson circumvented Plaintiff when selecting
staff to serve in Acting supervisory positions in her absence and other managers.

96. Copy of vacant position application which Plaintiff applied for in February 2004, but
was unsuccessful in getting. This is one of three that Plaintiff has competed for since
being removed from the NSEEP/HBCU Program Managers position.
97. Copy of vacancy announcement # WO-Merit-2005-0135, Program Manager position
Plaintiff applied to and now has a complaint based on reprisal against the agency's agent
Johnson for failure to consider.
98. July 1, 2005, e-mail from personnel assistant to Plaintiff stating that Plaintiff is
qualified, but did not rank high enough for referral.
99. July 7, 2005, e-mail shared with Plaintiff reflecting the thoughts of one of the
candidates who interviewed for vacancy # WO-Merit-2005-0135, Program Manager but
was not selected.
100. July 7, 2005, e-mail shared with Plaintiff from co-worker Steven Shafran which
announces the selection for the Program Manager's position.
101. Series of e-mail sent to staff by Johnson or her subordinate, announcing those
Acting in her absence. E-mails date back to September 2002, when Johnson was Acting,
AD/HRM.

Exhibits: 102-103

102. Plaintiff's e-mails to former student (now full-time) working in the field regarding
the rumor of money laundering and what the employee heard.
103. Witness statement provided by Concetta Stewart to the investigator.
104. Sample list of African American and white employees who have worked under

Johnson and the actions taken against them by Johnson. The actions taken against the

African Americans are more severe and adverse, than those taken against the whites.

**Interrogatory 10.** Fully describe in detail any statements by DOI supervisors or

managers which you believe evidence discriminatory animus towards you based on sex,

age, race, reprisal, or to create a hostile work environment; this should include but not be

limited to the date, actor, statement made, and witnesses thereto.

Answer: Marilyn Johnson repeatedly accused Plaintiff of "money laundering, on five different occasions and continued to repeat the accusation even after Plaintiff and others asked Johnson to stop. Johnson accused Plaintiff of "money laundering' and or used the term in front of Plaintiff co-workers on:

| Dates | Witnesses |
|---|---|
| September 12, 2002 | Plaintiff |
| September 19, 2002 | Concetta Stewart |
| July 18, 2003 | Plaintiff |
| August 12, 2003 | Steven Shafran |
| October 2, 2003 | Solicitor, Armstrong, Plaintiff's Attorney, Sandra McCrary, John Wagner Mediator, and Plaintiff |

In Johnson's March 9, 2004, statement provided for the Report of Investigation (ROI, pg. 6) and by deposition of Johnson, March 10, 2005, Johnson admits to saying the use of funds going to Langston looks like money laundering to her (pg. 68).

**Interrogatory 11.** Fully describe in detail any consultation, treatment, or any program

plaintiff has had or has attended for or relating to anxiety, stress, depression, personality

disorder, paranoia or any other mental or emotional condition prior to January 2003.

Answer: None

**Interrogatory 12.** Fully describe in detail all incidents where you contend individuals

were similarly situated to you and were afforded more advantageous treatment, fully

identifying the similarly situated individual(s).