# BLUE EXHIBITS

CONDENSED

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D. C. 20240
COMPLAINT OF DISCRIMINATION

IN RE:   Romella J. Arnold
Complaint No. LLM-04-002

~~~~~~~~~~~~~~~~~~~~~~~~

The Sworn Investigative Interview of **ROMELLA J. ARNOLD**,
taken in the above matter in the Law Offices of **BUCHOLTZ
& CULBERTSON, P.C.** located at 1801 Reston Parkway, Suite
302, Reston, Virginia, on the 4th day of March, 2004,
beginning at 10:40 a.m.



EXHIBIT tabbies
Blue
4



EXHIBIT tabbies
Arnold
2004
Inv. Interview





**County Court**
**REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
www.CountyCourtReporters.com

**800.262.8777**
**540.667.6562** FAX

CORPORATE OFFICES
Historic Jordan Springs
1160 Jordan Springs Road
Stephenson, VA 22656

2

1         **A P P E A R A N C E S**

2

3 ON BEHALF OF THE U.S. DEPARTMENT

4 OF INTERIOR, BUREAU OF LAND MANAGEMENT:

5 Anne E. Anderson, Contracted EEO Investigator

6 **DELANY, SIEGAL AND ZORIN**

7     201 I Street, S.W., #836

8     Washington, D.C.  20024

9     Telephone: (202) 554-9660

10     Fax: (202) 554-1111

11

12

13 ON BEHALF OF THE COMPLAINANT:

14 Roy J. Bucholtz, Esquire

15 **BUCHOLTZ & CULBERTSON, P.C.**

16     1801 Reston Parkway, Suite 302

17     Reston, Virginia 20190

18     Telephone: (703) 471-9660

19     Fax: (703) 471-5059

20

21

22

23

24

25

**County Court REPORTERS,** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777   Historic Jordan Springs / 1160 Jordan Springs Road / Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

3

1    A P P E A R A N C E S

2    C O N T I N U E D

3

4    ON BEHALF OF THE COMPLAINANT:

5    Sandra McCrary, Attorney At Law

6    LAW OFFICES OF SANDRA McCRARY

7        9907 Chase Hill Court

8        Vienna, Virginia 22182

9        Telephone: (703) 438-0936

10       Fax: (703) 757-5853

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


**County Court REPORTERS, INC.**
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 1

```
1        UNITED STATES DEPARTMENT OF THE INTERIOR
            BUREAU OF LAND MANAGEMENT
2            WASHINGTON, D. C. 20240
             COMPLAINT OF DISCRIMINATION
3
4
5
     IN RE:   Romella J. Arnold
6             Complaint No. LLM-04-002
7
8
9    _____
10
11   The Sworn Investigative Interview of ROMELLA J. ARNOLD,
12   taken in the above matter in the Law Offices of BUCHOLTZ
13   & CULBERTSON, P.C. located at 1801 Reston Parkway, Suite
14   302, Reston, Virginia, on the 4th day of March, 2004,
15   beginning at 10:40 a.m.
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
1                    A P P E A R A N C E S
2
3    ON BEHALF OF THE U.S. DEPARTMENT
4    OF INTERIOR, BUREAU OF LAND MANAGEMENT:
5    Anne E. Anderson, Contracted EEO Investigator
6    DELANY, SIEGAL AND ZORIN
7      2011 Street, S.W., #836
8      Washington, D.C.  20024
9      Telephone: (202) 554-9660
10     Fax: (202) 554-1111
11
12
13   ON BEHALF OF THE COMPLAINANT:
14   Roy J. Bucholtz, Esquire
15   BUCHOLTZ & CULBERTSON, P.C.
16     1801 Reston Parkway, Suite 302
17     Reston, Virginia 20190
18     Telephone: (703) 471-9660
19     Fax: (703) 471-5059
20
21
22
23
24
25
```

## Page 3

```
1                    A P P E A R A N C E S
2                      C O N T I N U E D
3
4    ON BEHALF OF THE COMPLAINANT:
5    Sandra McCrary, Attorney At Law
6    LAW OFFICES OF SANDRA McCRARY
7      9907 Chase Hill Court
8      Vienna, Virginia 22182
9      Telephone: (703) 438-0936
10     Fax: (703) 757-5853
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1           SWORN INVESTIGATIVE INTERVIEW OF
2                  ROMELLA J. ARNOLD
3            IN RE: ROMELLA J. ARNOLD
4               CASE NO. LLM-04-002
5                   March 4, 2004
6          COURT REPORTER:  Good
7    morning, my name is James Hall, Court
8    Reporter and Notary Public with the firm of
9    County Country Reporters located at 1160
10   Jordan Springs Road, Stephenson, Virginia.
11   We are here today, March 4th, 2004, at 10:40
12   a.m. to take the investigative interview of
13   Romella Arnold in the matter of U.S.
14   Department of Interior, In Re: Arnold,
15   Romella.
16        Counsel, will you please state your
17   name, the firm you are with and whom you
18   represent for the record?
19        MS. ANDERSON:  My name is
20   Anne Anderson. I'm a contract EEO
21   Investigator currently under contract through
22   a company known as Delaney, Siegal, Zorin
23   with the United States Geological Survey and
24   ordered to conduct this investigation.
25        MR. BUCHOLTZ:  I am Roy J.
```



## Page 5

1  Bucholtz, Attorney, 1801 Reston Parkway,
2  Suite 302, Reston, Virginia, 20190. I
3  represent the Complainant Romella J. Arnold.
4        MS. McCRARY: I am Sandra
5  McCrary, 9907 Chase Hill Court, Vienna,
6  Virginia, 22182. I am an attorney and I,
7  too, represent Miss Romella J. Arnold.
8        COURT REPORTER: Thank you.
9  Miss Arnold, will you please raise your
10 right hand and be sworn for the record?  Do
11 you solemnly swear to tell the testi  that
12 the testimony you are about to give will the
13 truth, the whole truth and nothing but the
14 truth, so help you God?
15        THE WITNESS: Yes.
16        COURT REPORTER: Thank you.
17 Counsel, you may proceed.
18        MR. BUCHOLTZ: Well, if I
19 may, can I ask you a question?
20        MS. ANDERSON: Yes.
21        MR. BUCHOLTZ: Yesterday I
22 faxed you a letter, I wanted to confirm that
23 you received it. Actually it was, it was
24 faxed on Tuesday, March 2, 2004 by which I
25 stated Miss Arnold amends her Complaint to

## Page 6

1  add race based on African American and I
2  want to confirm that you have that.
3        MS. ANDERSON: Yes, I have
4  received it.
5        MR. BUCHOLTZ: Thank you very
6  much.
7        MS. ANDERSON: All right, are
8  you ready to go ahead?
9  ROMELLA J. ARNOLD, having been duly sworn by
10 the Notary, was examined, and testified as
11 follows:
12 DIRECT EXAMINATION
13 BY MS. ANDERSON:
14    Q.  Would you please state your full name
15 for the record?
16    A.  Romella J. Arnold.
17    Q.  And what agency are you employed by?
18    A.  Department of the Interior, Bureau of
19 Land Management.
20    Q.  Currently what position do you hold?
21    A.  Currently I'm on a detail working
22 with the Office of Recreation Program –
23 Recreation Resource Programs and this detail
24 became effective as of February the 9th,
25 2004.

## Page 7

1     Q.  And what position, title, series and
2  grade do you have in this detailed position?
3     A.  In this detailed position I'm a
4  Program Specialist. My grade is GS-13,
5  Series 301.
6     Q.  And who is your first level
7  supervisor while you are on this detail?
8     A.  My first level supervisor is Bob
9  Ratcliff, R-A-T-C-L-I-F-F.
10    Q.  Okay. And who is your second level
11 supervisor?
12    A.  That would be – I have it in the
13 reverse. Bob is the second level supervisor
14 and the person I report to on a daily basis
15 is Mark Goldbach, G-O-L-D-B-A-C-H.
16    Q.  All right. What position did you
17 hold previously to the current detail?
18    A.  I was an EEO Specialist working in
19 the Office for Equal Opportunity managing the
20 Title VI Program.
21    Q.  And how long did you hold this
22 position?
23    A.  Since August the 1st, 2003.
24    Q.  All right. And who was your first
25 level supervisor in this position?

## Page 8

1     A.  That would have been the Acting EEO
2  Manager, Michelle Stroman.
3     Q.  All right. And who was the second
4  level supervisor?
5     A.  Marilyn Johnson.
6     Q.  Okay. Explain why you were removed
7  from this position and put into a detail?
8     A.  I believe I was removed from this
9  position because of reprisal, having...
10        MS. McCRARY: No, no, no,
11 excuse me.
12        MS. ANDERSON: Don't take
13 this down.
14        MS. McCRARY: You weren't
15 removed from the Title VI position because
16 of reprisal, you were removed from the one
17 prior to the Title VI position, right?
18    A.  Right.
19        MS. McCRARY: Okay.
20    A.  That's the one I thought she was
21 speaking to.
22        MS. McCRARY: No, because you
23 never identified that position.
24        COURT REPORTER: Excuse me,
25 did you want to go off the record for this?



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 9

1  MS. ANDERSON: Yes, yes,
2  while she's talking because her — it's not
3  to be recorded.
4  COURT REPORTER: Okay.
5  MS. ANDERSON: She's
6  counseling the...
7  OFF THE RECORD
8  CONTINUATION OF DIRECT
9  EXAMINATION BY MS. ANDERSON:
10  Q. Prior to the detail that you are now
11  on what position were you in?
12  A. I was EEO Specialist, Program Manager
13  for the Title VI Program.
14  Q. All right. Now, did you hold a
15  position prior to being an EEO Specialist?
16  A. Yes, I did.
17  Q. And what was that position?
18  A. I was the National Student Employment
19  Program Manager for the BLM.
20  Q. Now, is that the position that is at
21  issue in your Complaint?
22  A. Absolutely, yes.
23  Q. Okay. Now, the position that was at
24  issue, who was your first level supervisor
25  when you were in that position?

Page 10

1  A. I've had several supervisors. The
2  one that was my first level supervisor when
3  I was removed from that position would have
4  been Connie Stewart.
5  Q. All right. And is that the
6  supervisor that is involved in your
7  allegations of discrimination?
8  A. No, it is not.
9  Q. All right.
10  A. She's involved, but she's not the one
11  who removed me. The second level
12  supervisor, Marilyn Johnson, removed me from
13  that position.
14  Q. All right. So, Marilyn Johnson is
15  the supervisor involved in your complaint?
16  A. Absolutely.
17  Q. All right. Now, please explain how
18  you got from your -- the position that's at
19  issue to the second position, to the current
20  position that we're dealing with...
21  A. Okay.
22  Q. ...in order?
23  A. On August the 1st I was notified
24  by...
25  MR. BUCHOLTZ: What year?

Page 11

1  A. August the 1st, 2003 I was notified
2  by memoranda from Marilyn Johnson that she
3  was removing me from my position as the
4  National Student Employment Program Manager
5  to be the Program Specialist over the Title
6  VI Program in the EEO Office.
7  Q. Did she give you a reason for
8  removing you from this position?
9  A. Yes. She said she could remove me
10  from this position because it was her
11  prerogative to use her FTE's the way she
12  wanted to.
13  Q. Had there been any prior incidents
14  involving her that led up to this statement
15  that she made?
16  A. Yes.
17  Q. Okay. Could you please explain what
18  it was that took place, that led to her
19  deciding to remove you and saying it was her
20  prerogative?
21  A. Okay. As far back as September,
22  2002 Marilyn was the Acting Assistant
23  Director for Human Resource, BLM. In that
24  Acting capacity she approached me in
25  September, 2002, it was around mid-September,

Page 12

1  she approached me in the reception area of
2  her office and she said, Romella, I need to
3  speak with you about your program.
4  So, I proceeded and walked in her
5  office and I said, what's up, what do you
6  need to know? I want to know why are you
7  laundering all this money to Langston
8  University and I was shocked. I'm like,
9  laundering, what are you talking about? She
10  said, I want to know why you're laundering
11  all this money to Langston University. I
12  said, excuse me, but laundering is a federal
13  crime and I don't participate in anything
14  that would jeopardize my job, employment
15  status. I said, I don't understand what
16  you're talking about. Why are we giving all
17  this money to Langston University? I said,
18  Marilyn, I really think this is a subject
19  that we need to have a formal meeting on.
20  If you don't mind, I'm going to get on your
21  calendar so that we can meet to discuss this
22  issue. So, she said, fine.
23  So, I went out into the reception
24  area, and at that time Shelva  Shelva Noble
25  was the Staff Assistant and I got on the



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 13

1 calendar and arranged a meeting. The
2 meeting took place about a week following.
3 It was like, that meeting was like at the
4 end of the week and the meeting took place
5 about a week later. And present at that
6 meeting was Connie Stewart, who would have
7 been my first line supervisor, and Sylvia
8 Felder who was the Budget Administrator and
9 myself.
10 Prior to the meeting that morning
11 Sylvia came upstairs and she stopped in my
12 office. I said, do you know why you are
13 going to a meeting this morning? She said,
14 yeah, the meeting is to discuss the Langston
15 budget. I said, no, the meeting is to
16 discuss why I'm laundering money to Langston.
17 She said, well, I don't know anything about
18 that.
19 So, as we proceeded out of my office
20 to go to the -- Marilyn's office for the
21 meeting, we met Connie in the reception
22 area. I said, Connie, do you know why
23 you're coming in this meeting this morning?
24 She said, yeah, to discuss the budget. I
25 said, no, to discuss why I'm laundering

## Page 14

1 money to Langston. So, Connie looked at me
2 with this funny eye like I don't know what
3 you're talking about. I said, trust me,
4 it's going to come out in the meeting.
5 So, we all went in, sat down at the
6 conference table and Marilyn opened up the
7 meeting with the exact question, I want to
8 know why the BLM is laundering all this
9 money to Langston University and you,
10 Romella, I want to know what this is all
11 about.
12 So, I proceeded to explain to her
13 the Executive Order that governed HBCU
14 programs and the responsibility that agencies
15 had to participate with HBCU's as far as
16 contracting and grants opportunities. I
17 further cited the sections in the Executive
18 Order and give her a copy of the Executive
19 Order.
20 Then she says, why are we giving all
21 this money to Langston, why not some other
22 school? I explained to her that Langston
23 was located in the west, it was the only
24 HBCU in the west, and that they had a very
25 good natural resource program in terms of

## Page 15

1 its curriculum. They also had an agreement
2 with the University of Utah which is the
3 premier natural resource school in the west.
4 Because of its location, located in-between
5 BLM states, it was viable that students
6 could possibly be recruited and would go and
7 accept positions within the BLM states
8 surrounding the State of Oklahoma. Langston
9 is located in Oklahoma.
10 So, then I further explained to her
11 that the relationship we had at Langston all
12 came about because of the constant problem
13 of not being able to recruit students of
14 color and particularly African Americans to
15 the BLM. So, Langston was an ideal school
16 as far as location, curriculum and the fact
17 that it's an HBCU predominantly African
18 American university.
19 So, she says, why not Howard
20 University, why not another university? I
21 said, it could have been any university, but
22 when you look at the location of HBCU's, all
23 of them are on the East Coast and all of
24 them, with the exception of two, are in the
25 south. Many HBCU's do not have a natural

## Page 16

1 resource curriculum in terms of the kind of
2 curriculum BLM looks to when recruiting its
3 employees.
4 Then, she didn't seem to be satisfied
5 and I went on further to explain to her that
6 no one has ever challenged or even
7 questioned the amount of money that goes to
8 majority universities. I had with me for
9 this meeting prepared a report where I got
10 the data from the Office of Prop -- Property
11 Acquisition Management, and that's a
12 departmental office, it's not a BLM office.
13 And that report showed within that same time
14 period that she was questioning the dollar
15 amount that went to Langston, $22,814,616 had
16 gone to majority universities in that same
17 time period. Only 443,000 or 2 percent was
18 granted to HBCU's during that same time
19 period.
20 Q. Well, are you, in actual fact, were
21 you actually in charge of how much money
22 they would get in the first place?
23 A. I was not in charge of how much
24 money they would get, but I was actually
25 part of the budget formulation in terms of

**County Court REPORTERS**, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ✓ 1160 Jordan Springs Road ✓ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 17

1    how much money they would get because there
2    were line items that spelled out what they
3    were supposed to do so we estimated what it
4    would cost for them to do that.
5    Q. But I'm also assuming that your, your
6    work, your suggestions, whatever went on in
7    the budget was overseen by someone else? In
8    other words, what I'm trying to get at is,
9    you did not have the final authority on how
10    much money Langston...
11    A. No.
12    Q. ...was to get?
13    A. No. I was just part of the budget
14    formulation to determine how much money
15    should go to Langston in terms of them doing
16    whatever they had to do with the budget
17    for...
18    MS. McCRARY:  Point...
19    A. ...to assist us.
20    MS. McCRARY:  Excuse me.
21    Point of clarification.
22    MS. ANDERSON:  This is off
23    the record, her point of clarification.
24    COURT REPORTER:  Excuse me.
25    OFF THE RECORD

## Page 18

1    MS. McCRARY: This agreement
2    predated your hire with the...
3    THE WITNESS:  ...prior to
4    my assuming the Langston HBCU initiative
5    under my program.
6    CONTINUATION OF DIRECT
7    EXAMINATION BY MS. ANDERSON:
8    Q. Well, why do you believe that Ms.
9    Johnson questioned you and directly went to
10    you instead of dealing, say, with the, the
11    Budget Committee that you were part of?
12    A. I believe that Marilyn Johnson
13    directed that question at me prior -- before
14    even directing it to my first line
15    supervisor and before directing it to Budget
16    because it was in her -- it was her attempt
17    and it was her agenda to destroy the HBCU
18    function within my program.
19    Q. And why do you believe that she
20    wanted to destroy the HBCU function?
21    A. Because she has never believed in
22    support of HBCU's. This function has been
23    in her office in her prior career when she
24    served as the AD for HR back in the mid
25    '90s which would have been '94, '95 and she

## Page 19

1    did the exact same thing. She does not
2    believe in affirmative employment. She
3    believes that if anybody comes to work for
4    BLM it should be on your own bootstraps.
5    She has never supported the HBCU initiative
6    and she has done everything within her power
7    and beyond her authority to destroy the
8    initiative.
9    Q. Now, besides what she said to you
10    are you aware of any other public statements
11    that she has made expressing this disbelief?
12    A. Yes. She made the statement, she
13    referred to the accusation of me laundering
14    money on five different occasions. She
15    referred to the mon, money laundering
16    accusation with myself in several meetings
17    following our initial meeting. She referred
18    to money laundering on July the...
19    MS. McCRARY:  18th.
20    A. ...18th when we had a one on one
21    meeting.
22    MR. BUCHOLTZ:  What year?
23    A. July 18th, 2003. She -- we were, we
24    were meeting to discuss another issue and I
25    called the meeting and when we -- as we were

## Page 20

1    talking through what I called the meeting to
2    discuss, she went right back into the litany
3    of I want to know why you're laundering all
4    of this money to Langston. And I said, I
5    don't understand what you don't understand.
6    I've explained it to you. Then I began to
7    reiterate again, we have the responsibility
8    based on the Executive Order requirement and
9    because of the relationship Langston already
10    had with the Bureau of Land Management prior
11    to me assuming the initiative, the Natural
12    Resource Program Office had already granted a
13    grant to Langston University. So, it was
14    just easy to piggyback on that initial grant
15    and to do our own assistance agreement with
16    Langston for what we wanted Langston to
17    provide us in terms of a service.
18    Q. All right. Aside from her making
19    accusations of money laundering, what other
20    negative actions did she take towards you?
21    A. She went from the accusation of
22    money, money laundering to immediate removal
23    of my position. She made the accusation --
24    when she came back in June of 2003 as the
25    official appointed AD for HR, that's when



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  1150 Jordan Springs Road  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Case 1:05-cv-01475-WMR Sworn Investigative Interview of Romella Jeanbaptiste 3/4/04 Document 26-7 Filed 01/24/2007 Page 10 of 133

6 (Pages 21 to 24)

## Page 21

1    she got the job, it was a promotion for her,
2    a three year temporary term promotion to the
3    SES position, she immediately moved in on me
4    about the money laundering situation and on
5    August 1st, 2003 I was removed from the job.
6        Q. Now, how was the removal
7    accomplished? Was it considered — were you
8    detailed, was the job abolished, were you
9    transferred, how were you removed from your
10   position?
11      A. The — I was removed by reassignment.
12   That's the term that's used. I was
13   reassigned to work and become the program
14   lead for the Title VI Program. She did not
15   abolish my position. In fact, she replaced,
16   she hired an African American male younger
17   to replace me in my position and she gave
18   the job to him at a higher grade level.
19      Q. What about his experience?
20      A. And he had only been in government
21   at the time less than two years. He had a,
22   like a year and some months of experience in
23   the federal government.
24      Q. And what was his name?
25      A. Mike Brown, Brown.

## Page 22

1      Q. Are you aware of or did you hear any
2   rumors or whatever, did she know him prior
3   to hiring him?
4      A. Yes, she knew him. He was working
5   in Arizona for the Arizona State Office and
6   Marilyn came from Arizona as the Director of
7   the National Training Center in Arizona.
8   So, yes, she knew him very well prior to
9   putting him in my position.
10      Q. Now, when reassigning you from the
11   position, was your position advertised?
12      A. No. The -- a position was
13   advertised, but I don't know today if it was
14   still my position. I have copy of a vacancy
15   that was advertised, but the position was
16   advertised the same week he showed up. So,
17   it couldn't have been a position that he
18   applied for, but a position was advertised
19   and the title of that advertised position
20   was HR Specialist and then in parens it had
21   recruitment and retention, GS-14. It was
22   advertised at a 13/14 level. I actually
23   have the position with me.
24      Q. Now, when you state in your
25   allegations that Miss Johnson took these

## Page 23

1    actions because of your age, your sex, your
2   prior EEO activity and your race, I need to
3   go specifically over each basis. First and
4   foremost, when you say that it was taken in,
5   as reprisal against you, what was your prior
6   EEO activity?
7      A. I was very involved in an
8   organization which I was also a charter
9   member of known as NAABFE, the National
10   Association for the Advancement of Black
11   Federal Employees, which is an organization
12   that we formed within the Department of the
13   Interior back in 1995, '94 or '95. In that
14   organization I served as Vice-President.
15   There were numerous complaints filed and
16   being made by African Americans about the
17   egregious employment practices at the
18   Department of the Interior. As an outgrowth
19   of these complaints and employees in general
20   being treated unfairly we started this
21   organization.
22      In my capacity as Vice-President of
23   the organization I worked very closely with
24   the black employees, as well as with outside
25   organizations such as the NAACP, Title VII

## Page 24

1    Task Force, Blacks in Government and also we
2   had established a relationship with
3   Congressman Wynn, Congressional leader from
4   the State of Maryland, because 70 percent of
5   the federal employees, African Americans in
6   the federal government, live in his district.
7   Congressman Wynn had been very
8   involved in the complaints and problems going
9   on within the BLM and took it upon himself
10   to commission a work group to look into the
11   area of discrimination within BLM. As a
12   result of this commissioned team, a report
13   was issued that went on to become the Wynn
14   Report. And in that report it talked about
15   the inequality of the BLM across the board
16   in terms of hiring practices for African
17   Americans, promotion practices for African
18   Americans, African Americans were treated
19   harsher when disciplined, African Americans
20   had a higher rate of termination when there
21   were problems of performance and/or conduct
22   and it was Marilyn Johnson who made certain
23   that she was the one that carried out these
24   actions against Marilyn Johnson (sic) at the
25   behest of white managers. She has a



**County Court REPORTERS, INC.**
The Nation's Leader in Digital Litigation Support Technology

CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com

Page 25

1  reputation for terminating more African
2  Americans than even white managers.
3       Q.  And was she aware of your
4  participation in this organization?
5       A.  Yes, she was.  Everybody was.  I
6  made the news, I had several articles...
7            MS. McCRARY:  You testified.
8       A.  I had several articles that were
9  printed in the Federal Digest Newspaper.
10           MR. BUCHOLTZ:  Federal Times.
11      A.  Federal Times Newspaper.  I was
12  called by Congressman Wynn to testify before
13  the Subcommittee -- I'll give you the name -
14  - to testify before Congress and the
15  Committee on Government Reform and Oversight
16  on September 10th, 1999 on the status of
17  African American...
18           MS. McCRARY:  '97.
19      A.  1997, I'm sorry.  On the status of
20  African -- African American employment at the
21  Department of the Interior and particularly
22  the Bureau of Land Management.  During that
23  testimony I opened up my test -- testimony
24  saying that I was called as a substitute
25  witness because the initial witness, who was

Page 26

1  at the time the highest ranking black female
2  official within the Bureau of Land Management
3  had been called, but before she got to
4  preside to do her hearing...
5            MR. BUCHOLTZ:  Her name?
6       A.  Denise Meredith.  Before Denise
7  Meredith presided to do her hearing she had
8  to back off from giving testimony because
9  she was threatened by the then Director Mr.
10  Pat Shea.  He was the Director of BLM.  He
11  approached Denise at a management team
12  meeting when they were on travel, the week
13  prior to her giving her testimony, and told
14  her he had heard that she had been called as
15  a government witness and if she showed up at
16  that testimony her career would be over
17  within the BLM.
18      Q.  Now, how do -- were you present when
19  this happened or how did you find out about
20  it?
21      A.  Denise called me on the phone long
22  distance from Arizona to let me know that
23  she would not be able to give testimony.
24  She was greatly upset.  She was very, very
25  distraught that someone would threaten her.

Page 27

1       So, when I began my testimony I
2  opened up saying that I was a substitute
3  witness and I explained how I got there
4  versus Denise Meredith.  This caused great
5  concern to the Congressional leaders who were
6  present at this hearing.  Following my
7  testimony I was called into the chambers or
8  Congressman Mika and in chambers was
9  Congressman Eliza Cummings, Albert Wynn,
10  Congresswoman Eleanor Holmes Norton and
11  Congressman Mika and they again questioned me
12  in detail in terms of why I was a substitute
13  witness.  And they said that they will not,
14  under no uncertain terms, have government
15  witnesses being threatened by managers.
16      Following the hearing, a few weeks
17  later I was called by the IG's office to
18  give a statement on why I was giving -- I
19  was the substitute witness for the
20  Congressional hearing.  And, again, I
21  reiterated my role and I said, well, why are
22  you all doing this?  They said that Congress
23  had asked them to look into witness
24  intimidation by the then Pat Shea at the
25  Department of the Interior.

Page 28

1       So, I provided my statement.  I also
2  know that Denise provided her statement and
3  as an outgrowth of a finding that was made
4  by the Justice Department, Justice passed it
5  back on to Interior and said, yes, that the
6  witness had been intimidated and recommended
7  that disciplinary action be taken against the
8  official and shortly after that Pat Shea,
9  who was a political appointee, was removed
10  as the Director of the BLM and sat in a
11  job, a non-job until he left at the end of
12  that year.  He did not serve out his
13  appointment term.
14      Q.  Now, would Marilyn Johnson have
15  knowledge of these events and your
16  participation in them?
17      A.  Yes, she would have because also at
18  the same time that was going on there was a
19  -- this was the month of December.  I
20  testified in September of 1997.  So, in
21  December of 1997 there was a skit held at
22  the National Training Center in Phoenix.
23  There was an employee who felt the need to
24  do a skit called A Red -- Redneck Night
25  Before Christmas.



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com

**Page 29**

1    MR. BUCHOLTZ: Was the
2  employee African American or what was it?
3    A. No, it was a white male employee.
4  His name is Ron Fox.
5    MR. BUCHOLTZ: Title,
6  position?
7    A. I have no idea.
8    MR. BUCHOLTZ: Go on.
9    A. He came to work dressed in green
10  Army fatigues, he had an American -- a
11  Confederate flag, I'm sorry, a Confederate
12  flag and he had a slide presentation. I
13  guess at that time it was the outgrowth of
14  the Powerpoint presentation and he did this
15  skit called a Redneck Night Before Christmas.
16  In the video it showed hunters hunting, and
17  as he dialoged about what rednecks do the
18  night before Christmas, he talked about they
19  hunt for coons, he displayed the flag on
20  video, on this skit, production, whatever he
21  was doing and, long story short, it was very
22  offensive to the few African American
23  employees that came to the party. They
24  actually left. One woman threw her food on
25  the floor and walked out.

**Page 30**

1    That same day of the party I got a
2  call that afternoon. I was in Washington at
3  my desk and I got an anonymous phone call
4  from a female who -- no, I got a call from
5  a woman who worked in the office for the
6  Assistant Secretary for Lands and Minerals.
7  She was also a member of the organization
8  NAABFE. She said, Romella, I got a
9  disturbing phone call from an African
10  American female at the Phoenix Training
11  Center. She was very upset, she was crying
12  and then she began to explain to me about
13  this Redneck Night Before Christmas skit. I
14  said, who is it? She said, she wants to
15  remain anonymous. I said, well, I don't
16  know what to do with this without a name,
17  but it bothered me.
18    So, all afternoon I toiled and toiled
19  with what am I going to do with this
20  information. So, I assured Belva that I
21  would discreetly tell someone at a higher
22  level. That afternoon, that evening when I
23  was leaving to go home I went down to main
24  Interior and I ran into Warren Johnson who
25  was the then newly selected Assistant

**Page 31**

1  Director for Human Resource. I went into
2  his office, I said, Warren, I got a very
3  disturbing phone call this afternoon about a
4  redneck Christmas party held at the Phoenix
5  Training Center.
6    So, I told him about the party in
7  detail as it was told to me. And he said,
8  well, what do you think we should do? I
9  said, some heads need to roll. He said, I'm
10  going to order sensitivity training for
11  everybody at the Training Center. Well, he
12  did. He also assembled a team to go out to
13  look into the matter. The team was the EEO
14  Manager, who was Gloria Inniss, and Jessie
15  Hicks who was an EEO Specialist, and I
16  believe one other person. I think three of
17  them went out there. Warren, Warren was the
18  third person.
19    So, they got on the plane and flew
20  to Phoenix to interview the employees. All
21  the blacks said they were offended, and it
22  was few blacks working there. So, it was
23  like maybe five -- five...
24    Q. Who was head of the Training Center?
25    A. At the time the Training Center

**Page 32**

1  Director was Gary Dryer. They...
2    MR. BUCHOLTZ: Is he African
3  American?
4    A. No, he's a white male.
5    Q. Where was Miss Johnson in relation...
6    A. Miss Johnson was then the Associate
7  State Director for Eastern States in
8  Virginia, Springfield, Virginia.
9    They flew out and did an inquiry
10  into the matter and they found -- what they
11  found was, it was offensive to the African
12  Americans, and then other employees thought it was
13  funny. When Gloria came back I asked her
14  about the situation because at the time she
15  didn't know who had made the phone call to
16  the Department. So, she said that an Asian
17  woman found it funny. I'm like, well, what
18  are you telling me about an Asian woman's
19  perception of what happened, she probably
20  doesn't even know what the Confederate flag
21  means let alone find it offensive if she's
22  from Asia. So, Gloria said, oh, Romella,
23  blacks are too sensitive. I said, yeah,
24  right. So...
25    Q. So, I'm assuming that no further



**County Court REPORTERS** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Case 1:05-cv-01475-RMU Document 8-4 Filed 04/26/2007 Page 13 of 133
Sworn Investigation Interview of Romella J. Edmond 3/4/04

9 (Pages 33 to 36)

Page 33

1   action was taken regarding the incident?
2       A.  Yes, it was.  The incident was so
3   egregious it made the media.  The Arizona
4   Sun picked up on the story after I was
5   contacted by the Federal Times.  The Federal
6   Times called me, I did an interview.  Then
7   they also interviewed the President of
8   NAABFE.  Once the Federal Times picked up on
9   the story, then the Arizona Sun picked up on
10  the story.
11      The Department of the Interior,
12  Assistant Secretary for Policy Management and
13  Budget who at the time was John Barry, he
14  was very annoyed that this story had leaked
15  to the media and he ordered that
16  disciplinary action be taken both against the
17  Director of the Training Center and the
18  employee who participated in the skit.  The
19  employee was suspended for one week, Ron
20  Fox, the actual person who performed this
21  skit.  Gary Dryer was suspended, but then he
22  was also removed from his job as the
23  Training Center Director for being present
24  during the skit, but for not stopping the
25  skit.

Page 34

1       Q.  Okay.  And this was in 1997?
2       A.  Yes.  Mm-hmm.  (Indicating
3   affirmatively.)
4       Q.  Okay.  Now, what I need to know, I,
5   I think we've got a, a history of, of why
6   you believe it's reprisal, I also need to
7   know why you believe you were discriminated
8   against based on your sex.
9       MR. BUCHOLTZ:  Excuse me a
10  second, if I may?
11      MS. ANDERSON:  You can stop,
12  this is off the record.
13      MR. BUCHOLTZ:  Fine, off the
14  record.
15      COURT REPORTER:  I am now
16  going off the record, the time is 11:17 a.m.
17          OFF THE RECORD
18      COURT REPORTER:  We are now
19  going back on, going back on the record, the
20  time is now 11:19 a.m.
21      THE WITNESS:  Following the
22  removal of Gary Dryer from his position,
23  Marilyn Johnson became the Training Center
24  Director as an outgrowth of Gary Dryer's
25  demise and removal and now she becomes Gary

Page 35

1   Dryer's supervisor and also the supervisor of
2   Ron Fox.
3       I met Marilyn Johnson as the Training
4   Center Director in my capacity as the
5   National Student Employment Program Manager.
6   Every June, third week in June, I would hold
7   an orientation for one week for all newly
8   hired students and mentors of those students
9   at the National Training Center.  So, I have
10  worked very closely with Miss Johnson and
11  her staff to organize and coordinate the
12  training of the students and mentors.
13      Marilyn and I established a social
14  relationship.  Marilyn and I from time to
15  time would have conversations about the BLM
16  and the status of African Americans.  We
17  didn't always agree to things that were
18  happening, but I didn't have a sense that
19  she was someone who was part and partisan to
20  participating in the demise of African
21  Americans.  I had heard about that from
22  other employees, but I didn't know for
23  myself that she was one who was responsible
24  for ending the careers of African Americans
25  in the BLM.

Page 36

1       So, I knew that she was not
2   necessarily supportive of the HBCU Program
3   because, again, she always felt that she got
4   there on her own merits, so everybody else
5   should be getting there on their own merit
6   and that there should not be special
7   programs, she looked at them as set aside
8   programs, to accommodate people of color.
9   And she had said that to me on several
10  occasions.
11      She was also aware -- the woman who
12  actually reported the Redneck Night Before
13  Christmas skit was Ivy Garcia who worked at
14  the Training Center under Marilyn's
15  supervision.  Once Marilyn knew that Ivy was
16  the one who reported the skit, the first
17  thing Marilyn did when she got to the
18  Training Center, she removed Ivy Garcia from
19  her position.  Ivy was a training
20  coordinator for the Minerals and Mining Law
21  Program.  She was the training coordinator.
22  She removed Ivy as if Ivy had done something
23  wrong for reporting the skit.
24      The Interior had a lot of visibility
25  at the time because of Albert Wynn's support

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs ⟋ 1160 Jordan Springs Road ⟋ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

**Page 37**

1 to NAABFE. We engaged in a protest march
2 around the building which got media coverage.
3 CONTINUATION OF DIRECT
4 EXAMINATION BY MS. ANDERSON:
5    Q.  When did that happen?
6    A.  The protest march happened in October
7 of...
8          MS. McCRARY:  '98?
9    A.  ...1998. No, 1997, 1997. It was
10 October, 1997.
11    Q.  All right. Now, do you have any
12 other incidents that you believe led to them
13 being able to identify you as someone who
14 protested discrimination?
15    A.  Well, I was an outspoken advocate for
16 the program with Marilyn. In our meetings
17 it was very well known that because of my
18 prior work experience in the late '80s, from
19 1987 to 1995, I was a Program Specialist for
20 the then Office of Historically Black College
21 Programs and in that capacity my
22 responsibility was to work with all of the
23 bureaus to forge relationships and
24 partnerships where we could do collaborative
25 work together.

**Page 38**

1          And that's when I first came to know
2 of Marilyn Johnson, having several meetings
3 with the BLM officials which she was part
4 of. And I noticed in those meetings that
5 she would never speak to anything that
6 supported whatever we were trying to garner
7 with BLM. BLM was a very hard agency and
8 very difficult to get cooperation from. We
9 had cooperation from most of the bureaus but
10 -- and, particularly, BLM is the second
11 largest bureau within the department. So,
12 it has the resources, financial and the
13 people resources but at the time, like I
14 said, she was the AD and she did not want
15 to do anything in support of the HBCU's and
16 she knew that I was an advocate and very
17 outspoken in that regard.
18    Q.  Okay. Now, you also have alleged
19 that negative actions took place against you
20 concerning your race. I need to know why
21 you believe your race is a factor in how
22 you've been treated?
23    A.  My race is a factor because Marilyn
24 Johnson has made it her life career to
25 destroy African Americans within the BLM.

**Page 39**

1 When African Americans reach the mid level,
2 the mid level journeyman grades 12 through
3 the upper grades, 15, her reputation has
4 been to remove individuals out of those
5 positions for no founded reason.
6    Q.  Could you give me some names and
7 some examples, please?
8    A.  Absolutely.
9          MR. BUCHOLTZ:  Off the record
10 just a second.
11          OFF THE RECORD
12          THE WITNESS:  Marilyn Johnson
13 was responsible for the removal of Ed
14 Weathersby as a Personnel Specialist. He is
15 an African American male. When she removed
16 him from his position he was a GS-13.
17 Subsequent to removal he filed a complaint
18 and his complaint was settled.
19          She was also involved in the removal
20 of Richard Redmond who was the EEO Manager
21 when Marilyn Johnson was the Personnel
22 Specialist and then she moved on to be the
23 AD for HR. She was in cahoots with the
24 white officials to remove Richard Redmond out
25 of his position as EEO Manager. He filed

**Page 40**

1 several complaints and his complaints have
2 been settled. Also, Richard Redmond has
3 provided a statement.
4          Marilyn Johnson, when she was the AD
5 for HR, she was the official who attempted
6 to terminate Mr. Lee Allen, African American
7 male. Lee Allen was brought up on trumped
8 up charges of sexual harassment and there
9 were a lot of things done that were improper
10 in the handling of that complaint. For
11 instance, before there was even a report of
12 investigation for the record there was a
13 settlement to a female who Lee Allen
14 allegedly sexually harassed. And I
15 understand that female got an enormous amount
16 of money.
17          MR. BUCHOLTZ:  Was the female
18 white?
19          THE WITNESS:  She is from
20 the Middle East.
21          MR. BUCHOLTZ:  All right.
22          THE WITNESS:  White. And
23 before there was an investigation there was
24 a settlement. So, it's almost like there
25 was a finding of discrimination without a



Case 1:05-cv-01473-RMU Document 18-4 Filed 04/26/2007 Page 15 of 133
Sworn Investigative Interview of Romella J. Lennox 3/14/04

11 (Pages 41 to 44)

Page 41

1 report of record.
2     Lee Allen -- Lee Allen was
3 disciplined by Richard Redmond, who was the
4 EEO Manager. He was written up and given a,
5 a written reprimand. Well, after the
6 written reprimand was issued, the Deputy
7 Director for the BLM, who was Denise
8 Meredith, a black female, felt that that
9 wasn't harsh enough. According to Marilyn
10 Johnson, she told me directly herself that
11 Denise lied to her and told her that Richard
12 -- that Lee Allen had not been disciplined
13 and that she wanted Lee Allen to be
14 disciplined. So, it was Denise Meredith and
15 Marilyn Johnson who decided that Lee Allen
16 should be terminated. Marilyn Johnson got
17 on a plane at taxpayer's expense, flew to
18 Denver to hand carry a proposed letter of
19 termination. That's the extreme of what any
20 manager does to terminate an employee. You
21 usually mail them a letter, return receipt,
22 in the mail.
23 CONTINUATION OF DIRECT
24 EXAMINATION BY MS. ANDERSON:
25     Q. Wasn't that subsequent to his

Page 42

1 supervisor refusing to take that action...
2     A. Right.
3     Q. ...because of lack of facts?
4     A. Right. Denise...
5         MR. BUCHOLTZ: You have to
6 speak louder.
7     A. Denise Meredith ordered Richard
8 Redmond as the EEO Manager and...
9         MS. McCRARY: Bembry.
10     A. ...Larry Bembry who was Lee Allen's
11 first line supervisor, to remove him and
12 they refused to participate because there
13 weren't enough factual basis for removal.
14     So, Marilyn was much -- more than
15 accommodating and her position was, well,
16 I'll do it if nobody else has the balls to
17 do it. So, she took it upon herself to be
18 the one to hand deliver this 30 day proposed
19 termination letter. Lee retained counsel and
20 turned it over to his attorney. His
21 attorney wrote a scathing letter to the
22 Director, Michael Donback, citing several
23 infractions and improprieties at the way they
24 went about disciplining Lee and to get rid
25 of Lee.

Page 43

1     In that letter his attorney asked
2 that both Marilyn and Denise recuse
3 themselves from the case because there was
4 no way they could be biased and impartial
5 because they participated in his removal.
6 Mike Donback followed the suggestion of Lee's
7 attorney. Lee was brought back into the
8 work force because of being terminated
9 improperly with the -- through the
10 overzealous Marilyn Johnson and Denise
11 Meredith, but Marilyn Johnson was the one.
12 All she needed was the green light and she
13 took it upon herself to do what she needed
14 to do.
15     Now, she called Denise Meredith a
16 lying B. When she explained it to me she
17 said -- I asked her about it directly, why
18 did you do that? And she said, because
19 that lying B, and she used the word, and she
20 swore on a stack of books that she would
21 never do anything else without getting the
22 facts first. But that's more -- far, that's
23 the farthest thing from the truth because
24 she does everything without any factual
25 basis, it's whatever day she wakes up, on

Page 44

1 what side of the bed, that she decides she's
2 going to attack African American employees.
3     Q. Okay. Now, you've provided the
4 information on why you believe that there is
5 bias based on race.
6     A. Oh, let me tell you some more.
7     Q. Okay.
8     A. She also, when she was -- I stated
9 that she removed Ivy Garcia. When she came
10 to Washington as the Acting AD in August of
11 2002, I, I believe it was July or August,
12 2002, that's when she showed up, she carried
13 out a recommendation that was an outgrowth
14 of a study. It was an HR study done and
15 the study was done in the fall of 2001.
16 The report had come out of this study, which
17 she was part of, she was the -- on the
18 team.
19     Now, this was very odd because she's
20 a subordinate of the AD for HR who at the
21 time was Warren Johnson, African American
22 male. She worked...
23     Q. Who she worked for?
24     A. ...she worked for Warren Johnson,
25 just as I worked for Warren Johnson because



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

---

**Page 45**

1    the Training Center came under Warren
2    Johnson. The Deputy Director, Nina Hatfield,
3    ordered a study of HR. Marilyn somehow is
4    asked or puts herself on that team to be
5    part of the study team. Usually studies
6    that are performed of this nature are done
7    by an outside consulting company and at
8    minimal it will have peer level persons on
9    the team. That would mean peer level
10   persons to Warren Johnson who was the AD for
11   HR. Well, Marilyn ends up being on the
12   study and she's a subordinate of Warren
13   Johnson.
14       One of the recommendations that came
15   out of that study was to remove the AD from
16   -- of HR from the position, put a much
17   stronger person in the position who could
18   carry out the other recommendation which was
19   to do a restructuring of the whole personnel
20   side of HR. She got the job that she
21   helped remove Warren from.
22       So, that was kind of suspicious like,
23   why would you work so hard to get rid of
24   someone in the position that you now want
25   and you have? She was given the position at

**Page 46**

1    a higher grade level. Warren had been
2    through the SES Program, completed the
3    program, never got the SES appointment. He
4    was removed as the HR -- AD for HR and put
5    into the job as the EEO Manager. Warren
6    chose to retire versus to take the
7    reassignment as the EEO Manager. So,
8    Marilyn played a part in his career demise.
9       When she was acting as AD she
10   removed Jesse Hicks from his position,
11   African American male. Jesse was Acting EEO
12   Manager. After Warren left and didn't take
13   the job Jesse was serving as Acting because
14   he was the most senior EEO Specialist.
15       She trumped up some erroneous charges
16   against Jesse about his management of the
17   EEO Program and removed him. I don't even
18   think he got a removal in writing, it was a
19   verbal removal. Jesse was very embarrassed
20   and hurt, but he didn't do anything about
21   it.
22       During her Acting capacity as AD for
23   HR she removed Clark Collins who is a
24   African American male, GS-14. She actually
25   removed Clark Collins on some bogus

**Page 47**

1    performance measure. She said that he was
2    having performance problems. Clark was
3    issued a letter of removal from his position
4    which I have a copy of.
5       Also, she removed Connie Stewart --
6    oh, okay. So, these are the persons she
7    removed when she was acting, Clark, Jesse
8    and Warren Johnson. Then when she comes
9    back as the AD for HR in June of 2003 she
10   removed Connie Stewart, who she had named
11   during her Acting tenure her Deputy for HR.
12   Q. Is Connie an African American female?
13   A. Connie is African American female,
14   GS-15. She was removed from her position as
15   the Deputy for HR the same time I was
16   removed from my position as the National
17   Student Employment Program Manager. We were
18   removed that same week. She reassigned
19   Connie to become now the EEO Manager.
20   Connie has over 30 years of federal service
21   and has never worked in EEO in her entire
22   career. So, it was a setup for her to
23   fail.
24       She removed Marilyn Daniels -- she
25   did not remove Marilyn Daniels, she

**Page 48**

1    terminated Marilyn Daniels, GS-15, African
2    American male --
3       MS. McCRARY: Female.
4    A. ...female, I'm sorry, was terminated
5    May of 2003, May/June, 2003 when Marilyn
6    came back in the position as a permanent
7    term employee. Marilyn Daniels had filed
8    several complaints. One I know was based on
9    disability. So, Marilyn had over 30 years
10   of service, she was close to retirement age
11   and she was terminated last summer. She,
12   and now, of course, she removed me in August
13   1 of 2003.
14   Q. How many years of federal service do
15   you have?
16   A. I have 30 years of federal service
17   and the way she has treated me has destroyed
18   my career, my reputation and all that I have
19   built over the last 30 years of my career.
20   Q. Now, Marilyn Johnson, during this
21   period of time when she was terminating
22   African Americans, did she terminate any
23   other employees of different races?
24   A. She has never terminated a white
25   employee in her entire career in the BLM.

**County Court REPORTERS**, inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com

Page 49

1    Marilyn Johnson not only ingratiates herself
2    with the white employees, she promoted Ron
3    Fox, the same gentleman who per -- who
4    performed the Redneck Night Before Christmas,
5    he got a promotion to a GS-4 (sic) following
6    her coming to the Training Center. Ivy
7    Garcia gets removed for reporting the skit,
8    Ron Fox gets a promotion after a one week
9    suspension.
10        MR. BUCHOLTZ: Did you, did
11   you say GS-4?
12       A. 14.
13        MR. BUCHOLTZ: Oh, that's
14   better.
15       A. GS-14. So, no, she ingratiates
16   herself to do all that she can for white
17   employees despite their performance, despite
18   their conduct, she makes sure that their
19   careers are furthered versus ended.
20       Q. All right. Now, you allege that you
21   were discriminated against based on your sex.
22   Can you give me some idea of why you believe
23   that your sex is a reason for the treatment
24   you've received?
25        MR. BUCHOLTZ: Excuse me.

Page 50

1    Off the record.
2        COURT REPORTER: I am now
3    going off the record. The time is 11:39.
4        OFF THE RECORD
5        THE WITNESS: The examples
6    that I've given you of other African
7    Americans that she has been instrumental and
8    responsible for in terms of ending their
9    careers or bringing their careers down, those
10   are just examples. You will find that there
11   are more in the declarations that have been
12   provided from statements of employees that
13   have worked with her and have worked in the
14   BLM during her tenure in the BLM. Those
15   names that I gave you are just a few of the
16   many that she has been responsible for.
17       Statistics will show that Marilyn
18   Johnson, we have -- right now we have, there
19   are a total of 20 African Americans and of
20   the 20, 19 are female that are GS-13's in
21   the BLM. There are a total of 324 -- let
22   me digress, I'm sorry.
23       There are a total of 1,900 -- 1,900
24   -- 916 GS-13's in the BLM. Of that total
25   20 are African American males and 19 are

Page 51

1    African American females. There are a total
2    of 320 GS-14's in the BLM. Of this total 7
3    are African American males and 7 are African
4    American females. There are a total of 102
5    GS-15's in the BLM and of this total one is
6    an African American male and four are
7    African American females.
8        Marilyn Johnson continues to take out
9    that pipeline of African Americans who have
10   reached the GS-13, 14 and 15 positions
11   making these statistics almost bleak in terms
12   of there being any African Americans in the
13   pipeline to move up to where she has aspired
14   and achieved, to the SES level. Currently
15   in the BLM we have one African American
16   male, his name is Mike Ned, who is an SES
17   and we have one African American female,
18   Marilyn Johnson, who is an SES. So, that's
19   two out of 102. And the way she's taking
20   out the 14's and the 15's there won't be any
21   for a long time, not under her watch. She
22   will make sure that no one gets to enjoy the
23   status of an SES that she now enjoys.
24
25

Page 52

1    CONTINUATION OF DIRECT
2    EXAMINATION BY MS. ANDERSON:
3        Q. Okay. And now you have alleged that
4    you were discriminated against based on your
5    sex. So, would you tell me why you believe
6    your sex is a factor in how you've been
7    treated?
8        A. I believe I was discriminated based
9    on sex because Mike Brown, the gentleman who
10   replaced me in the duties that I held is a
11   male. He's less qualified than I am for the
12   job and he does not have any work experience
13   working in the federal government nor the
14   BLM.
15       Marilyn Johnson picks her victims.
16   First it was her rampage with African
17   American males. Now her rampage is with
18   African American females. Citing the most
19   recent were the removal of myself and Connie
20   Stewart and the recent termination of Marilyn
21   Johnson.
22       Q. Marilyn Johnson?
23       A. Marilyn Daniels. I'm sorry, Marilyn
24   Daniels.
25       Q. Okay. And also you allege you were


County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ✎ 1160 Jordan Springs Road ✎ Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com

Case 1:05-cv-01475-RWR Investigative Interview of Romella J. Arnold #64266 3/4/04 Document 11 Filed 07/26/2007 Page 18 of 133

14 (Pages 53 to 56)

## Page 53

1   discriminated against based on age. Why do
2   you believe your age was the reason for how
3   you were treated?
4     A. I believe age was part of her
5   agenda. Back in June of 2000 -- back in
6   June of 2003 Connie Stewart, my first line
7   supervisor, sent an e-mail on behalf of
8   Marilyn Johnson to all of the State
9   Directors requesting that if any state, BLM
10  state, would take the student program she
11  would provide with them the budget for the
12  student program as well as the staff for the
13  student program.
14     We got a copy of the e-mail from the
15  coordinators in the field in the State
16  Offices that we work with. When I say we
17  I'm speaking of myself who is over 50, Mr.
18  Steve Shafran was the Employment Program
19  Manager over the Hispanic -- I mean, of the
20  Native American Colleges and Universities
21  programs and the students with disabilities,
22  he is over 50. And Marcie Brionis was the
23  Employment Manager over the Hispanic serving
24  institutions, he is over 60. So, when
25  Connie sent out the e-mail for Marilyn

## Page 54

1   asking any state to take over the program...
2     Q. Which is national in scope, correct?
3     A. Which is a national program in its
4   scope, that would have meant that Steve
5   Shafran, Marcie Brionis and Romella Arnold,
6   myself, would have been given directed
7   reassignments to whatever state decided they
8   wanted to take the student program. So, she
9   was targeting age. She felt that we would
10  probably not take the directed reassignments
11  thereby retiring early and then she could
12  follow-up on her premise that she could use
13  her FTE's the way she wanted to.
14     Connie sent out the e-mail, no states
15  agreed to take the program because of its
16  national scope, having the Executive Order
17  programs under the program which were the
18  HBCU initiative, Hispan -- Hispanic serving
19  institutions initiative and the tribal
20  college initiatives. So, the program
21  remained at the national level in Washington,
22  D.C.
23     When that didn't happen, the next
24  meeting we had to discuss the program was
25  when we met on July 28th and that's when...

## Page 55

1     MR. BUCHOLTZ: What year?
2     A. July 28th, 2003, and that's when
3   Marilyn opened up the meeting with she
4   wanted to restructure the Student Employment
5   Program.
6     MS. McCRARY: Was that not
7   the July 30th that you referred to in your
8   formal Complaint? Yeah.
9     A. Yes, I'm sorry. Wednesday, July
10  30th, 2003 she announced that she was going
11  to restructure the Student Employment
12  Program. In that announcement she said that
13  she was requesting that Marcie Brionis and
14  Steve Shafran relocate to Washington,
15  D. C. because she found it difficult to
16  supervise them in the field and she could
17  not micromanage them being out in Denver.
18     Steve was very outspoken about her
19  decision to order a directed reassignment to
20  Washington. He stated the hardship that it
21  would cause him and his family. I spoke out
22  and said that I did not think she had given
23  a fair assessment to the program. She had
24  never met with any of us to discuss the
25  program other than me to accuse me of

## Page 56

1   laundering money in the HBCU Program and the
2   first time she ever spoke with us as a group
3   was at the meeting on July 30th when she
4   announced the restructuring. I said, I
5   don't think the team has been given a fair
6   chance to demonstrate what they can do and
7   at minimum that's what you need to consider
8   when requesting someone to uproot themselves
9   to come to Washington.
10     She also announced in that meeting
11  that she was going to bring someone in over
12  us. And so, I said, who might that be?
13  And she said, Mike Brown. And I commented,
14  I'll be damned. She said, why are you
15  cursing? I said, I'm not cursing, I used a
16  phrase. I said, I have a problem with you
17  bringing someone in over us, not giving us
18  the chance to compete for the position.
19  Between the three of us we've got 90 years
20  of federal service, Mike Brown has one. How
21  does he qualify to be more suited for the
22  position than any of us?
23     MR. BUCHOLTZ: What is his
24  age?
25     A. Mike Brown was 39 at the time, I

**County Court REPORTERS** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Page 57

1  think he's 40 now. She was not pleased with
2  my comment and she says, well, I'll give
3  this team a few months. I'll see when Mike
4  Brown comes how I'm going to handle this.
5  She said, I'll give you a few months to
6  prove that you can perform your duties from
7  Denver before I make my final decision. So,
8  at that time she was targeting age.
9  Following Mike Brown coming on board, he
10 came on board I believe it was like August
11 the 11th, they had a meeting on...
12         MR. BUCHOLTZ: August 11,
13 2003?
14 A. Yes.
15         , MR. BUCHOLTZ: Please always
16 state the year.
17 A. August 11, 2003 Mike Brown came to
18 Washington and they had a meeting. At that
19 meeting...
20         MS. McCRARY: Was that --
21 the -- at an August 1 meeting you were given
22 a letter of counseling.
23         MS. ANDERSON: Don't put her
24 statements on the record, please. Excuse
25 me.

Page 58

1         MS. McCRARY: Could we go
2  off the record for a minute, please?
3         COURT REPORTER: Yes. We
4  are now going off the record, the time is
5  now 11:51 a.m.
6         OFF THE RECORD
7         THE WITNESS: On August 12th,
8  2003 Marilyn Johnson held a meeting in
9  Washington which Mike Brown was in
10 attendance. During that meeting she --
11 which I was not invited to -- she again
12 alluded to the money laundering accusation as
13 if to give the team the impression that I
14 had done something wrong and to further
15 justify my removal from the position. When
16 I was removed from the position I point
17 blank asked her, why are you removing me
18 from my position, does this have anything to
19 do with performance? She said, no, and
20 that's when she told me it was her
21 prerogative to use her FTE the way she
22 wanted to.
23         Following the August 12th meeting,
24 Steve Shafran came to my office and he said,
25 she used that word again. I said, what

Page 59

1  word? He said, the word she accused you of.
2  I said, laundering? She even had him
3  petrified to use the word. So, he said,
4  yeah.
5         So, it has been her intent to send
6  the message that Romella has done something
7  wrong and because people don't know all that
8  happened in-between the assumption is I
9  laundered money and, therefore, I have been
10 removed from my job. If Marilyn Johnson in
11 fact felt that I had really participated in,
12 in an illegal activity, she had the
13 responsibility and the duty as the Manager,
14 to follow up on like getting the facts and
15 if the facts supported her accusation, she
16 had the responsibility to do something.
17         She has -- she did no inquiry, she
18 did not even contact the procurement office
19 that procured the grant to Langston. She
20 has never held any discussions to inquire
21 about the Langston grant with any officials
22 in BLM to question its use of the grant or
23 what the purpose and intent of the grant was
24 for.
25

Page 60

1  CONTINUATION OF DIRECT
2  EXAMINATION BY MS. ANDERSON:
3  Q. All right. You make some other
4  statements I'd like to go back to. In your
5  formal Complaint you noted that Ms. Johnson
6  took actions to dismantle programs that you
7  oversaw. What I'd like to know is what
8  programs was it that she tried to dismantle
9  and was this done while you were still in
10 the position or did she move you out of the
11 position and then dismantle them?
12 A. It was done while I was in the
13 position as the Student Employment Program
14 Manager and the first thing she did when --
15 while she was there in the Acting capacity
16 she directed our IRM advisor, our person who
17 is in charge of our technology, who replaced
18 Clark Collins, white female, Gail Colbert,
19 she sent Gail Colbert an e-mail and told
20 Gail Colbert to delete the tracking system
21 that I was responsible for the design and
22 structure of through a contractor known as
23 SERTS, the Student Enhancement Recruitment
24 Tracking System. I even named it and we
25 called it SERTS. The acronym is S-E-R-T-S.



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ✄ 1150 Jordan Springs Road ✄ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Page 61

1    I spent at least two and a half
2  years working with an outside contractor as
3  well as Clark Collins, who was at the time
4  my IRM advisor, securing a contractor who
5  could build a data tracking system to track
6  all of the students nationwide in the
7  student program. The system was ready for
8  deployment when Marilyn came in her Acting
9  capacity. That November of 2002 the system
10  had been sent to all of its potential users
11  and they had to critique the ease of its
12  software program and to make comment in
13  terms of how we could tweak the software for
14  their use. Everybody responded, provided
15  comment. The con -- contractor went further
16  to make those changes and we were ready to
17  deploy the system.
18    Marilyn never agreed to look at the
19  system. I offered on numerous times to have
20  the contractor come in to demonstrate the
21  system. It went on deaf ears. The next
22  thing I knew she sent an e-mail to Gail
23  Colbert, the white female, and in her e-mail
24  she instructed Gail Colbert to delete the
25  search tracking system. Her e-mail was sent

Page 62

1  on 1/22/03 at 3:33 p.m. and the e-mail says,
2  Gail, that SKEP tracking system should be
3  deleted.
4    So, she comes in right in to destroy
5  the tracking system that was built to enable
6  me to be able to track the students which
7  was very vital to me performing my job
8  because I had to oftentimes provide query
9  reports, number of students, conversion of
10  students, where the students were working,
11  how many were on board, when they went back
12  to school. I had to track everything,
13  potential graduation dates, their grade point
14  averages. Every semester I had to always
15  ensure that students were still in good
16  standing when they return -- would return
17  for work. I had a heavy responsibility and
18  to be able to track the students, the only
19  way you can do it is through an electronic
20  system. There's no way you can continue to
21  manage that manually because we had over 430
22  something students in the program at the
23  time.
24    Q. You believe that she had the --
25  attempted to have the system eliminated in

Page 63

1  order to take a negative action towards you?
2    A. Absolutely.
3    Q. And why do you believe that she
4  wanted to take this action towards you?
5    A. On Friday, July 18th, 2003, on Friday
6  morning I got to work, I had a message from
7  Marilyn's staff assistant, Kelly Drayford.
8  The message was, good morning, Romella, this
9  is Kelly. Marilyn wants some information
10  from you for her 10:00 o'clock meeting. I
11  got to work at 9:15.
12    So, I'm like, Marilyn wants some
13  information for her 10:00 o'clock meeting,
14  what could that be? I called Kelly
15  immediately. I said, Kelly, I got your
16  message, what kind of information does
17  Marilyn want? She says, well, I'm not sure.
18  I said, well, let me speak to Marilyn. Then
19  she said, Marilyn's in a meeting. I said,
20  well, you tell Marilyn whatever it is she
21  needs for her 10:00 o'clock meeting she
22  won't have because I don't know what she
23  needs.
24    And Marilyn immediately gets on the
25  phone. Good morning, Romella. I said, yes,

Page 64

1  Marilyn, how can I help you? She said, I
2  want to know how many students are in the
3  program, working in the Realty Program, where
4  they're located and when they're going to
5  graduate. My immediate response was, when
6  do you need this information? I need it for
7  my 10:00 o'clock meeting. I said, Marilyn,
8  it's 9:30, I just got to work. I don't
9  have that information and I don't have a
10  button I can push to get you that
11  information because I don't have a tracking
12  system. The same tracking system she
13  deleted which would have provided that
14  information in a quick turnaround she deleted
15  and now she's asking me to provide the data
16  which I now have to call 14 states to get
17  the information from the states on the
18  students who were hired as Realty Specialists
19  and find out when they are graduating and
20  when they'll be eligible for conversion.
21    I feel that this was a deliberate
22  attempt by Marilyn to again discredit my
23  credibility. If she, in fact, needed such
24  information for a 10:00 o'clock meeting she
25  should have given me far more advance



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777     Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX

www.CountyCourtReporters.com

<table>
<tr><td>

**Page 65**

1  notice. You don't tell someone you need
2  something 30 minutes before a meeting and
3  act like I can't have my meeting without
4  this information. And I think it was a
5  bogus request and I don't believe there ever
6  was a meeting. She was doing it to harass
7  me.
8      This is the kind of tactic that
9  Marilyn employs when she's trying to bring
10  down and discredit an employee, further to
11  intimidate me. I told her I would get the
12  information to her as soon as possible. It
13  was going to take some time. It was on a
14  Friday. People don't work on Fridays. They
15  have all kinds of work schedules. AWF incl
16  -- AS included and a lot of people just were
17  not at work.
18      I did provide the information to her
19  on Monday, the following Monday at the close
20  of business. That following Monday I
21  provided her the information she allegedly
22  needed on Friday. So, that's the example of
23  what you asked me.
24     Q.  Okay. Now, the other thing I wanted
25  to ask...

</td></tr>
</table>

**Page 66**

1      MS. McCRARY: Can we go off
2  the record one second?
3      COURT REPORTER: Yes. We
4  are now going off the record, the time is
5  now 12:02 p.m.
6      OFF THE RECORD
7      THE WITNESS: To further
8  prove that Marilyn Johnson did everything she
9  could to dismantle the HBCU Program
10  initiative, when she gets her team in place,
11  the team that she wants, the team consisted
12  of Mike Brown, age 40, Connie MacGriff who
13  assumed the duties that I performed as the
14  Student Employment Program Manager, Connie is
15  38 years old. And still part of that team
16  is Steve Shafran and Marcie Brionis who
17  remained in Denver for, for the period of
18  time I'm speaking of.
19      There was a meeting, staff meeting
20  held on November 21st, 2003. At that
21  meeting Mike Brown -- she introduced everyone
22  to the staff. Mike Brown was introduced as
23  the new person taking over the Student
24  Employment Program team lead. And I want
25  to make it very specific for the record. I

**Page 67**

1  was the team leader for the whole Student
2  Employment Program, Student Employment
3  Educational Program and by being team leader
4  I assumed the responsibility for the HBCU
5  initiative program which was a separate
6  program.
7      That program was -- had such high
8  visibility and was heavily funded under the
9  prior AD HR Warren Johnson. It also had its
10  own Program Manager who was the former Bill
11  Nunn. Bill Nunn and I shared an office
12  together. So, we worked very closely
13  together in what we did. Bill Nunn became
14  deathly ill and that's when I assumed the
15  responsibility of his full time job. Bill
16  Nunn was a GS-14.
17      So, I'm now wearing two hats. I'm
18  performing my job full time and the HBCU
19  Program Manager's responsibilities full time
20  and that's how I became the team leader.
21  Mike Brown became that person. Connie
22  MacGriff still functioned to do what I did
23  as the Program Manager just for the student
24  employment side of it.
25      They had a meeting and Mike Brown

**Page 68**

1  started talking about the HBCU initiative and
2  then he mentioned Langston University and he
3  stopped in the mid-sentence and Marilyn said,
4  tell them, tell them, go ahead and tell
5  them, tell them about Langston. Now, this
6  is a staff meeting with all of the HR
7  employees. Mike Brown said, well, it has
8  been the decision that we're no longer going
9  to continue working with Langston University.
10  Langston could not account for the grant
11  money that we gave them. Langston has not
12  been able to account for how they spent the
13  money. And there was silence in the room
14  because now, through Mike Brown, Marilyn
15  Johnson has told the entire HR staff that I
16  have been removed from my job for something
17  illegal. Everybody knew I was handling the
18  Langston initiative. I assumed that when
19  Bill Nunn passed in October of 2001.
20      So, she has tainted Mike Brown to
21  carry out, to continue carrying out this
22  erroneous belief that something was done
23  illegally by Langston and through me aiding
24  Langston by money laundering, laundering
25  money to Langston. So, I didn't attend the

**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ✒ 1160 Jordan Springs Road ✒ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 69

1  staff meeting. Members of the staff came
2  back and told me.
3      MR. BUCHOLTZ: Names.
4      THE WITNESS: Tracy Bodner,
5  who at the time was assisting me. She was
6  an assistant they hired. She was a
7  contractor and they hired her to do the
8  financial tracking the summer of 2002 of the
9  students. Jesse Hicks also attended that
10 meeting and he said, yeah, it did give a
11 hint of that there was something wrong with
12 the program and that the...
13     MS. McCRARY: They pulled the
14 funds, didn't they?
15     THE WITNESS: Right. And
16 they made the decision not to continue the
17 relationship with Langston University. That
18 assumption that Langston did something wrong
19 is as bogus as it gets. The same time that
20 that meeting took place, which was in
21 November, I had already provided Marilyn
22 Johnson with a detailed report which she
23 used in September of 2003 at the budget
24 strategy meeting. She used the report that
25 I provided to defend her budget and to

## Page 70

1  justify the Langston initiative and to show
2  how that money was spent. So, if Langston
3  didn't provide adequate documentation and
4  record of how they spent the money, she
5  couldn't have had that report because the
6  report was generated from the information
7  that I got from Langston.
8      I also have a copy of the Langston
9  agreement and it details the money that was
10 provided as well as the reports that were
11 provided and I have provided a copy of the
12 report that she used at the budget strategy
13 meeting. So, I will give you this whole
14 package.
15     And Langston has accounted for every
16 penny, right down to the penny which
17 includes the names of every student that got
18 a dime, how much they got and what the money
19 was for. And it was to implement our
20 Retention Assistance Program and that's what
21 Marilyn had problems with. The fact that we
22 gave a grant to Langston and Langston then
23 was able to issue Oklahoma State checks to
24 all students across the board, African
25 Americans, white students, Asian students,

## Page 71

1  Hispanic students, Native American students,
2  males and females. All students who agreed
3  to accept a position with the BLM who had to
4  relocate 50 miles outside of their
5  residential area got a $1,200 stipend through
6  Langston as well as a round trip ticket, air
7  fare, to go to their job of record.
8      Housing has always been an issue for
9  BLM in that a lot of the BLM field offices
10 are located in remote areas. Students don't
11 have a lot of money because they are
12 students and we felt that we needed to do
13 something bold, creative and outside of the
14 box to change the way we were doing
15 business. And we were given that green
16 light by the then Director, Tom Fry.
17     So, when we thought of this creative
18 way that students could get some money,
19 students would have money to obtain housing,
20 Langston was the school that we decided to
21 provide this grant to because they said they
22 had a mechanism for doing it, these would be
23 state issued checks, students had to report
24 it as earned income. So, everything that
25 was done, every I was dotted and every T was

## Page 72

1  crossed. There was nothing ever questioned
2  by any manager, white or black, other than
3  Marilyn Johnson about the use of the grant
4  that we provided Langston to carry out our
5  retention initiative. No one has ever
6  questioned it other than Marilyn Johnson.
7      MR. BUCHOLTZ: Did Johnson
8  ever question the money that went to white
9  colleges?
10     THE WITNESS: Johnson never
11 questioned the money that went to white
12 universities. And I say that because at the
13 same time she questioned the money that went
14 to Langston, $10 million was procured to
15 Northern Arizona University, right in her
16 state, because she was at the time State
17 Director -- I mean the Center Director for
18 the Training Center. I mentioned it to her
19 at our September, 2002 meeting, that $10,000
20 went to...
21     MS. McCRARY: 10 million.
22     THE WITNESS: ...$10 million
23 went to Northern Arizona University and she
24 wasn't questioning that and she says, that
25 money's for research. I said, we're not a

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
800.262.8777   Historic Jordan Springs ℒ 1160 Jordan Springs Road ℒ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 73

1 research agency. That's an awful lot of
2 money going to one school. I said, a lot
3 of hands are going to be greased with a $10
4 million grant. The grant was for the
5 restoration of forest fire -- the restoration
6 of forest in the event of forest fire. We
7 didn't even have -- had -- we hadn't even
8 had fires at that time and they procured a
9 $10 million grant to Northern Arizona
10 University to study what they could do in
11 the threat of forest fires.
12     I told her that if she continued --
13 at that September, 2002 meeting I told her
14 if she continued to use the word laundering
15 money and accuse me of laundering money I
16 was going to report her to the IG as well
17 as report all of the money that BLM gives
18 away to majority schools with no questions
19 asked by anybody.
20     This seems to be secret information
21 although it's very public if you know where
22 to go and get it. And I say that because
23 on my behalf, once I got into this process,
24 because of the discrimination that has
25 occurred against me Albert Wynn wrote a

Page 74

1 letter to the Secretary, Gail Norton,
2 inquiring into the accusation of money
3 laundering launched against me by Marilyn
4 Johnson.
5     Also in that letter he requested
6 statistical data of how much money has been
7 procured to all universities, HBCU's
8 included. He asked for the dollar amounts
9 that have been procured by BLM as well as
10 who made the decision to provide these
11 grants to all universities and colleges.
12 This letter was written and sent to the
13 Department on December the 4th.
14     MR. BUCHOLTZ: What year?
15     THE WITNESS: 19 -- I mean,
16 December 4th, 2003. As of January 8th,
17 2004, the Department has responded to Albert
18 Wynn's letter citing that where Romella is
19 involved in the EEO matter and it'll take
20 care of itself and with regard to the
21 request for the information Albert Wynn
22 requested on the colleges and universities,
23 they're still working on it.
24     Well, it doesn't take four months to
25 get that kind of data. I got the data

Page 75

1 recently and the records show that the
2 Department -- I mean, the BLM, in fiscal
3 year 2003 the BLM has procured $18 million
4 to majority schools and only 50,000 to
5 HBCU's and that money went to Langston
6 University, an amended agreement.
7 They responded to the letter written by
8 Albert Wynn to Secretary Norton on January
9 12th, 2004 and in that letter it says, you
10 have also requested certain information
11 related to the BLM's Historically Black
12 College and University Program. The BLM is
13 in the process of gathering data on the
14 amount of federal dollars it has given to
15 majority colleges and universities as well as
16 historically black colleges and universities.
17 We will forward that information to you as
18 soon as it's available. Why is it not
19 available? It's, it's available all the
20 time because it's produced by another office.
21     So, this is a way to stall, it is
22 part of Marilyn's way to again keep the --
23 cast the aspersion that I've done something
24 wrong. Ironically, when these Congressionals
25 come in they are sent down from the

Page 76

1 Secretary's Office to the appropriate office
2 for a response. Well, the appropriate
3 office that they deemed should respond to
4 this is the EEO Office who was, at the time,
5 under Michelle Stroman, the Acting EEO
6 Manager.
7     Well, Michelle Stroman is in bed
8 with Marilyn Johnson. She is a poor
9 manager, she lacks knowledge, she is
10 incompetent. She doesn't know where to find
11 information. She's been removed several
12 times from assignments by previous EEO
13 Managers because of her lack of competence.
14 And the report ended up in her hand, the
15 letter to respond to ended up in her hand
16 and that's why they don't have a response
17 because she doesn't know what she's doing
18 and she doesn't know how to find the
19 information, but I have obtained the
20 information and I have passed it forward.
21     MR. BUCHOLTZ: Passed it
22 forward to whom?
23     THE WITNESS: Albert Wynn's
24 office. I have provided them with the data
25 that he has requested on the recent grants



**Page 77**

1 that went to all of the colleges and
2 universities and that's how I know what they
3 did in FY '03.
4 MS. McCRARY: August 1,
5 letter of counseling.
6 THE WITNESS: Okay. August
7 1, when we had our meeting I was issued two
8 letters. I was issued a letter of
9 counseling -- August 1, 2003 we had our
10 meeting and I was issued two letters, a
11 letter of counseling which was a bogus,
12 trumped up letter that Marilyn issued me
13 alleging that I was cursing and I caused a
14 hostile work environment.
15 So, I asked her, cursing, when I was
16 cursing and when did I cause a hostile work
17 environment? She said they said, I said,
18 who is they. Well, I'm not going to tell
19 you who they are because I don't want you to
20 confront them. I said, oh, so, I don't have
21 a right to face my accuser and you're giving
22 me a letter and this is the first I'm
23 hearing about it. She didn't bring it to me
24 when it allegedly happened because it never
25 happened. Marilyn is vicious, she's devious,

**Page 78**

1 she's mean spirited and she will do anything
2 she can, once she has it in her craw to go
3 after you.
4 CONTINUATION OF DIRECT
5 EXAMINATION BY MS. ANDERSON:
6 Q. Now, you said you received two
7 letters of counseling. You said the first
8 one...
9 A. No. One letter of counseling...
10 Q. Mm-hmm. (Indicating affirmatively.)
11 A. ...and the other letter was the memo
12 of reassignment.
13 Q. Okay. So, the letter of counseling
14 you received it because she alleged you were
15 cursing?
16 A. Right.
17 Q. But she did not name, she didn't say
18 that she actually heard you curse or...
19 A. No.
20 Q. Okay.
21 A. And then she said -- then she, then
22 she gave me the letter of reassignment. So,
23 it's like I'm being disciplined with these
24 letters before she even gives me a verbal.
25 Q. Okay. And it was reassignment to

**Page 79**

1 what position?
2 A. The Title VI position which is a
3 nonexistent position within the BLM at the
4 time, that she reassigned me to do that job.
5 Q. Now, is this Title VI where you
6 review everyone receiving federal financial
7 assistance?
8 A. Absolutely.
9 MS. McCRARY: Nonexistent
10 program.
11 A. The program is nonexistent in the BLM
12 and I say that because it was a program that
13 BLM didn't see as a program. They never
14 funded it as a program, they never staffed
15 it as a program. The only activity that BLM
16 has engaged in in Title VI was when a Title
17 VI complaint was filed against the BLM.
18 That has not often -- has not happened often
19 and when those complaints came in Jesse
20 Hicks, the Complaints Manager, handled them
21 as a complaint. That's what he does. So,
22 that's the only activity BLM has ever
23 engaged in in the Title VI Program. There
24 is no program and there has not been a
25 program.

**Page 80**

1 Marilyn Daniels, the African American
2 female who was terminated, was given the
3 same duties to perform in the Title VI
4 Program. She was supposed to build a
5 program. She was unsuccessful and that's
6 why she's fighting the loss of her job today
7 because that's virtually impossible, to build
8 a program if you have no resources for
9 building a program. And I know that for a
10 fact because when I came to the BLM and I
11 was offered the job as the Student
12 Employment Program Manager by the previous
13 Gloria Inniss, who was the EEO Manager
14 because at the time student employment was
15 under EEO, the first thing Gloria said was,
16 if you take this program I will give you the
17 resources, the budget to manage the program.
18 I said, let me think about it and I'll get
19 back to you. It was on a Friday. I
20 thought about it over the weekend and I came
21 to her that Monday and I said, Gloria, let
22 me try this for six months. If I'm
23 successful I wish to be considered for a
24 promotion. If I'm unsuccessful I'd like to
25 go back to resuming the duties that I was



Case 1:05-cv-01475-PWR   Document 18   Filed 07/26/07   Page 25 of 133
Sworn Investigative Interview of Romella Holmes 7/3/4/04

21 (Pages 81 to 84)

**Page 81**

1  doing as an EEO Investigator. She said you
2  have a deal.
3      I assumed the Student Employment
4  Program which at the time was being managed
5  by Connie MacGriff, the young woman I spoke
6  of before. Connie could not handle the
7  program. She didn't have the personality,
8  she didn't have the tenacity, she didn't
9  have the wherewithal and she was not a go-
10  getter. And Gloria was not pleased with her
11  performance and they had had a confrontation
12  about the management of the program. So,
13  she went AWOL, she walked off the job one
14  day upset with Gloria and she was never to
15  be seen again because she went to the AD for
16  HR, Carolyn Burrell, and Carolyn let her sit
17  for over a year in her office doing nothing.
18      So, I assumed the responsibilities of
19  the Student Employment Program and built the
20  program to what it had become under my
21  management and leadership. It was the most
22  visible program in HR that BLM had going for
23  it. It was the best program that BLM had
24  and it was the most visible because all
25  managers had now bought into using the

**Page 82**

1  student program to bring in, fill entry
2  level positions and to bring in new talent.
3  I have for the record a stack of letters and
4  commendations that I have received over time
5  since managing the program and I would like
6  to give you those.
7      MS. McCRARY: How about the
8  article that highlights it as...
9      A. I also have included with that stack
10  of commendation letters and thank you's, a
11  report was issued February 2003 by the
12  Performance Institute, which is a think tank
13  organization that has been established to
14  look at recruitment for the federal
15  government and in that report on Page 3 it
16  highlights the Interior's aggressive Student
17  Employment Program managed under my watch as
18  well as it talks about our student tracking
19  system, the SERTS system. It talks about
20  how we have improved our numbers, it gives
21  the statistical data for how we have
22  increased the hiring of all students of
23  color and this report was published and
24  issued February, 2003. So, that's included
25  in this packet, as well.

**Page 83**

1      Q. Okay. Now, while you were — you
2  were talking about the fact that you had
3  received a letter of counseling accusing you
4  of cursing and along with that...
5      A. Causing a hostile work environment.
6      Q. Right, a reassignment. One of the
7  things you also talked about were being
8  denied a travel request and along with some
9  other actions I guess that took place
10  preventing you from performing your job.
11  And what I'd like to get some information
12  from on, is that when you were attempting to
13  perform your job before you were reassigned,
14  the obstacles that were put in your way
15  dealing with the travel request, dealing with
16  being moved, I guess, out of your office.
17      A. Typically, when I schedule my trip to
18  Phoenix in June to conduct the orientation
19  for the students and the mentors, I would
20  always go out a few days ahead of the
21  participants. This is a routine that
22  was developed when I worked for Gloria
23  Inniss. And Gloria's premise was, you never
24  put on anything to this magnitude without
25  going out, making sure the facilities that

**Page 84**

1  have been chosen are okay, your notebooks
2  are in order.
3      So, when I became -- when I started
4  working in the program Gloria insisted that
5  I go ahead of the participants and — to
6  prepare, to make sure all of the final
7  logistics were in place. Even when Warren
8  became the AD for HR and moved the program
9  under him, it was the same routine, that I
10  go out ahead of the participants.
11      June, 2003 Marilyn shows up. I
12  submitted a travel request, travel
13  authorization request. It's the Thursday
14  before I'm scheduled to fly and that was on
15  June the 11th. I submitted the request on
16  June the 9th, 2003. On June the 11th, 2003
17  I contacted Marilyn's office and I said,
18  Kelly, I'm going on travel, I need my travel
19  voucher. She said -- travel authorization.
20  She said, Marilyn didn't sign it. I said,
21  why? She said, I don't know.
22      So, I asked to -- I didn't speak
23  with Marilyn about it at that time. So, I
24  called the Training Center and I spoke with
25  my training coordinator. So, I said, Leon,



County Court
REPORTERS, inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 85

1  did Marilyn...
2       MR. BUCHOLTZ: Leon who?
3       A. Leon Thomas, African American male,
4  did Marilyn contact you about me coming to
5  the Training Center. And he said, no, but
6  she spoke with Loraine Farley, white female,
7  who is the training team leader at the
8  Training Center. Keep in mind, all these
9  people used to work for Marilyn Johnson.
10      I spoke with Loraine Farley and I
11 said, what was your conversation that you
12 had with Marilyn about me coming to the
13 Training Center? She said, Marilyn wanted
14 to know what you would be doing and if we
15 had a need for you to be here and I said, I
16 don't know. Well, that's typical of what
17 Loraine's response would be because she
18 wasn't involved in what I needed to do at
19 the Training Center.
20      And it was more important that I
21 went ahead this particular year before the
22 participants because Leon Thomas had just
23 come on board March of 2003. He was a
24 converted student from my program. They had
25 converted him to a full time training

## Page 86

1  coordinator. This was the first time he had
2  ever done any training and it was imperative
3  that I be there to work with him.
4       So, as a result of me not being able
5  to go ahead of the participants, Marilyn
6  said, well, you can go on Sunday. Well,
7  that's the day before the participants show
8  up. The training kicked off Monday morning
9  at 8:30. So, I flew out the day before, I
10 was stressed to no end. I had not seen the
11 notebooks, I had not looked at the rooms
12 that we were being placed in for the
13 training. So for the entire trip to Phoenix
14 I was agonized over how this training was
15 going to turn out.
16      It wasn't as smooth as I wanted it
17 to be, and this was the fourth year that I
18 had conducted this training. So, it should,
19 it should almost go flawless at this point,
20 but because of Marilyn and her further
21 attempts to make me look bad, she denied me
22 the opportunity to go ahead of the
23 participants and to harass me through further
24 anxiety and stress. So, I didn't know what
25 to anticipate that Monday morning.

## Page 87

1       Q. Are there any other events in which
2  you felt that she was preventing you from
3  doing your job and attempting to make it
4  look as though you were incompetent?
5       A. When we — when she asked me for the
6  statistics about how many students were in
7  the Realty Program, that all came about
8  because I informed her that -- oh, she told
9  me that she ran into Mr. Ray Brady, white
10 male. He's probably a GS-15. I, I don't
11 think he's an SES. He's over the Realty
12 Program for the BLM. She told me that she
13 ran into Ray Brady in the hallway and Ray
14 Brady told her I owe her some statistics.
15      So, I said, I owe Ray Brady some
16 statistics? She said, yes, he wants to know
17 how many Realty students are in the program
18 and you're not able to provide this
19 information to him. I said, that is not
20 true. I saw Ray Brady on the shuttle, the
21 BLM shuttle which runs between main Interior
22 and our office on L Street. It was I who
23 initiated a conversation with Ray Brady and
24 I said, Ray, when are we having the next
25 Lands Academy training? All employees who

## Page 88

1  are hired as Realty Specialists, they have
2  to attend the Lands Academy training. It's
3  a six month training. He said, I'm not
4  sure. I said, well, I think we're going to
5  have quite a few students graduating this
6  year who will probably be participants in
7  that Academy, but I'll just call the
8  Training Center and find out. He said,
9  could you provide me with that information?
10 I said, you want all students who will be
11 graduating this year or you want all Realty
12 students? He said, I want all Realty
13 students. I said, no problem, I'll get it
14 to you. I never gave him a date or a time.
15      This is where she concocted this
16 meeting that she allegedly was having and
17 she needed that data. She alleges that Ray
18 Brady told her that I owed him some data.
19 When I proceeded to explain to her the
20 conversation that I had with Ray Brady, she
21 shut me down and said, I don't know -- I
22 don't want to know what happened on the
23 shuttle. All I know is we need that data.
24      And she talks very disrespectful, she
25 raises her voice, she hollers at you like

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ⟋ 1160 Jordan Springs Road ⟋ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Case 1:05-cv-01475-RWR  Document 16-4  Filed 07/26/2007  Page 27 of 133
Sworn Investigative Interview of Romella Holloman 3/4/04

23 (Pages 89 to 92)

Page 89

1  you're less than human. And so, once I got
2  the data I sent it via e-mail attachment. I
3  sent it to Ray Brady and in the e-mail, it
4  was sent to Ray Brady on July the 21st,
5  2003, 4:47 p.m. It says, Ray, as a courtesy
6  to you and based on our informal
7  conversation on the BLM shuttle July 16th,
8  2003 about the SKEP Realty students which I
9  initiated, I'm providing the attached
10  document which lists all the students
11  currently in the SKEP program who were hired
12  as Realty Specialists. I've also indicated
13  their anticipated -- anticipated graduation
14  dates. Please note that the only converted
15  SKEP who will participate in the Lands or
16  Realty Academy this year is Francisca Rod --
17  Rodriguez. She is located in the Yuma Field
18  Office, Arizona. Thanks for your support
19  and have a nice day.
20       Well, I cc'd Marilyn Johnson and
21  Connie Stewart on this e-mail and Marilyn
22  Johnson was livid and told me that my e-mail
23  was not necessary, it was inappropriate and
24  it was unprofessional. I don't see anything
25  unprofessional about this e-mail. What this

Page 90

1  e-mail does is it exposes her because she
2  lied.
3       Q.  All right. Were there any other
4  incidents in which you believe that she was
5  attempting to undermine your authority or
6  make it appear as though you were
7  incompetent or prevent you from doing your
8  job?
9       A.  Yes. She -- once I was reassigned
10  to take over the Title VI Program, Marilyn
11  Johnson felt the need to have me move my
12  office. On September 3rd -- September the
13  3rd, 2003 a coworker at the time, Michelle
14  Stroman, the Acting EEO Manager, informed me
15  that I had two days in which to move to
16  another office. I said, two days, that
17  doesn't give me enough time because tomorrow
18  I'm going on leave and I'm going in the
19  hospital.
20       So, I said, I will explain this to
21  Marilyn Johnson, I will not be moving in two
22  days because I won't be here. So, I told
23  Michelle Stroman that I would contact Marilyn
24  Johnson, which I did. I called, Kelly said
25  she was in a meeting. I left a message,

Page 91

1  urgent to have her call me back. Marilyn
2  called me back and I said, I understand you
3  want me to move my office, but I'm not going
4  to be able to move within the time frame
5  that has been told to me. She says, when
6  can you move? I said, Tuesday after I
7  return to work, because I had scheduled to
8  be out on sick leave. She says, oh, well,
9  that's fine. They said you weren't going to
10  move. I said, they, who is they? So, she
11  has this real thwarted mind to always throw
12  they in, they, but they is a pretext. There
13  is no they. She is the they.
14       So, I said -- she said it was no
15  problem, I could move when it was my -- to
16  my convenience. Before I could get back
17  upstairs Connie -- I mean, Michelle Stroman
18  called Marilyn and Michelle Stroman was the
19  one who told her I said I wasn't going to
20  move, but she didn't tell her the truth. I
21  said I wasn't going to move in two days.
22       So, that's how Marilyn would take
23  that statement, that I wasn't going to move.
24  And if I hadn't taken the initiative to call
25  her myself to explain why I wasn't going to

Page 92

1  move, she would have disciplined me just
2  based on what the messenger brought her and
3  that's how she conducts her business as a
4  manager.
5       MS. McCRARY:  Where did you
6  move to?
7       A.  I moved to an office with a former
8  student. That was a slap in my face. One
9  of my former students, I had to move into
10  the office. Our offices are cubed inside of
11  a larger space. I had to move to the
12  smallest space within that office. I was
13  the only Senior EEO Specialist that had to
14  share an office. The staff is small.
15  Although small, I was the only one required
16  to share an office even though they had
17  empty offices. Right next to the office I
18  moved into, the office was completely empty.
19  No one was in three of the offices at the
20  time. So, that's disparate treatment.
21  Jesse had his own office, Stroman had two
22  offices. She had an office at main Interior
23  and an office on L Street, big, palatial
24  offices with conference tables.
25       Also, the same time that the moving


County Court
REPORTERS, inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Page 93

1  was taking place it was Marilyn's decision
2  that I had to have my phone number changed.
3  I requested to keep the same phone number
4  for a lot of different reasons. One,
5  because I've established credibility as
6  myself with that phone number. A lot of
7  people have that phone number and a lot of
8  people had a reason to contact me through
9  that phone number.
10      The same day I moved, Jesse Hicks
11  moved his office to a bigger office, Shelva
12  Noble moved her office to the office to be
13  with the person that she reported to, Gary
14  Dryer, and I moved. They were both allowed
15  to keep the same telephone number. When I
16  asked Michelle Stroman, the messenger, why
17  couldn't I keep the same phone number, she
18  said Marilyn Johnson doesn't want you to
19  keep the same phone number.
20      So, this again was another attempt by
21  Marilyn to put me in isolation, shut me out
22  of total communication with those persons
23  that I have garnered and developed a, a
24  working rapport with and a relationship with
25  a lot of them, and to cast me away as if I

Page 94

1  had done something wrong. So, that's
2  another example of disparate treatment.
3      Also, I noticed that once the
4  reorganization took place her, what she
5  perceived as a reorganization -- and I want
6  to go on record in saying at that meeting
7  that took place on July 30th with Mike
8  Brown, Steve Shafran, Marcie, myself and
9  Connie, when she talked about the
10  reorganization and named Mike Brown as the
11  team leader, at that meeting, I was not part
12  of that reorganization. I was still very
13  much employed on the team. It was August
14  the 1st that I was notified that I would no
15  longer be working in the program. So, you
16  know, she's reacting. She's not doing any
17  program planning whatsoever, she's merely
18  reacting.
19      So, I couldn't keep the same phone
20  number, but I also was never given the
21  opportunity to serve as the Acting EEO
22  Manager. I would reach as far down as
23  the GS-12's to have someone Acting, but
24  never gave me the opportunity. Michelle
25  Stroman and Jesse Hicks both served as

Page 95

1  Acting EEO Managers with pay, with the
2  promotion to the 14. I have more years of
3  service than both of them, I'm the senior
4  employee to all of them. I was never given
5  the opportunity to act as the EEO Manager
6  and consequently I was never given the
7  opportunity to act in Marilyn's job when she
8  was not available.
9      For example, I have e-mails that she
10  sent to -- that Kelly, her staff assistant,
11  sent out to all employees, Delegation of
12  Authority. While Marilyn Johnson is out of
13  office on travel, Linda Balin will be Acting
14  Assistant Director for Washington Office
15  January 26th through the 27th. Michelle
16  Stroman will be Acting Assistant Director
17  from January 28th to January 30th. This is
18  all 2004. And then she goes on to list --
19  oh, Sherry Ann Loan, is a woman she brought
20  in on detail from California, will be Acting
21  Assistant Director from February 2nd to
22  February 3rd. And this e-mail went out, I,
23  as I stated, 1/22/04.
24      So, that's -- all three persons,
25  we're all the same grade level, she goes out

Page 96

1  to California to bring somebody in Acting
2  and I'm sitting right there, never being
3  given the opportunity. Jesse was never
4  given the opportunity to act on her behalf,
5  either, because she had removed him from his
6  job already. So, she already had it out to
7  get him.
8      I even have an e-mail 9/9/2003.
9  Sylvia Felder will be the Acting Director
10  today while Marilyn Johnson is attending a
11  Field Committee meeting. Sylvia Felder is a
12  GS-12. So, she goes to any and everybody to
13  put them in the Acting capacity and never
14  once was I allowed that opportunity because
15  of her insistence to single me out and to
16  treat me differently. So, that just further
17  exemplifies that her intent was to be an
18  adverse action.
19      MS. McCRARY: Performance
20  standards.
21      A. Also, when I got the reassignment to
22  the Title VI Program I was issued
23  performance standards. I'm the only person
24  on the EEO staff who has been issued
25  performance standards for FY 2004. I was

County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ⎰ 1160 Jordan Springs Road ⎰ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 101

1    A.  Title VI?
2    Q.  ...in Title VI?
3    A.  Right.  Also, once I decided that
4  this was discrimination, and it is, I have
5  26 years of experience in EEO.
6        MS. McCRARY:  Full
7  performance levels.  Title VI is 13.
8    A.  Oh, right.  Another reason why this
9  was a discriminatory act that adds adverse
10  impact to my career is that the full
11  performance level of the job that I occupied
12  as the Student Employment Program Manager is
13  a GS-14.  I have documentation, the Bureau
14  of Land Management's Table of Organization
15  and on Page 29 you will see my name.  It
16  has my current position, GS-13, and then the
17  full performance grade level GS-14.  So, she
18  has taken me out of a job that had full --
19  another promotion potential to the GS-14 and
20  put me in a dead end job, Title VI, that
21  only reaches a GS-13.
22       Also to support the documentation
23  that I have, I'm providing a copy of the job
24  description held by the former HBCU Program
25  Manager, Bill Nunn.  I'm also including a

## Page 102

1  copy of my most recent and only performance
2  evaluation that I currently have dated
3  October 1, 2000 to September 30th, 2001
4  given to me by my then supervisor, Warren
5  Johnson, where I was given outstanding
6  performance ratings.  And in this performance
7  evaluation it states that I fully achieved
8  all of my elements.  Miss Arnold has
9  completed another outstanding year.  Her
10  performance has contributed to the BLM's
11  future work force.  She is deserving of a
12  promotion to the higher grade.  Miss Arnold
13  is a valuable asset to the youth of this
14  bureau and, therefore, the future of the
15  BLM.  And this was signed and dated by
16  myself and Warren 12/6/2001.  And so, I'm
17  providing that.
18       And, again, to further support that
19  the position of what I was doing as a Human
20  Resource Specialist and the level of what I
21  was doing, I stated earlier that Marilyn put
22  out a vacancy announcement on 7/16/03 and
23  the closing date of that vacancy announcement
24  was 8/08/03 and that vacancy was announced
25  for the position as a Human Resource

## Page 103

1  Specialist, Recruitment and Placement,
2  GS201/13-14.  So, she herself agrees that
3  the work I was doing is at the GS-14 level.
4  So, I'm providing these as exhibits to the -
5  - for the record.
6       MS. McCRARY:  Announcement.
7    A.  On August 5th, 2004 I contacted the
8  Director for OEO, Melody Stiff.  I was so
9  distraught by what had happened on August
10  1st, I stayed home.
11       MR. BUCHOLTZ:  You mean 2003.
12  August, 2004 has not occurred yet.
13    A.  August, 2003.
14       MR. BUCHOLTZ:  Right.
15    A.  Right.  I contacted Melody Stiff, the
16  Director for OEO on August 5th, 2003 and I
17  explained to her what had happened.  And
18  from that conversation Melody Stiff, African
19  American female, Director for the
20  Departmental Office of Equal Opportunity
21  contacted her supervisor, Mr. Mike Trujillo,
22  Hispanic male, and Mike Trujillo was the
23  Assistant Secretary for Diversity Work Force
24  Planning.
25       And in that e-mail she sent to Mike

## Page 104

1  she, the subject matter is Concerns in BLM.
2  And in that e-mail she says, Mike, I
3  received two disturbing phone calls from BLM
4  employees yesterday.  One employee is being
5  reassigned to do Title VI, that's me,
6  Romella Arnold.  She was so upset that I
7  could hardly understand her.  She was at
8  home and she was crying hysterically.  I
9  encouraged her to go to her doctor.
10       Two other employees in Denver have
11  been given directed reassignments to
12  Washington where it is contemplated that they
13  will not accept the reassignments and thus
14  be out of a job.  That would be Marcie
15  Brionis and Steve Shafran.  That was the --
16  and that, and that was based on the
17  conversation that I had with Melody when I
18  told her about the proposed restructuring to
19  make them come to Washington.
20       It appears that Marilyn is moving
21  ahead to reassign employees into the EEO
22  Office.  However, it is my perception that
23  she's not acting responsibly.  Like our
24  discussions with Connie, Marilyn is not
25  giving them a reason for reassigning them.



Case 1:05-cv-01475-RWR   Document 18-4  Sworn Investigative Interview of Romella Jackson 07/19/2007 3/4/P Filed 07/29/2008   Page 30 of 133

27 (Pages 105 to 108)

## Page 105

1   The employee said that when they asked why
2   they were being reassigned Marilyn responded
3   because I can. Both employees are entering
4   into the EEO process which probably could
5   have been avoided if it had been explained
6   to them why they were being reassigned.
7       Well, Connie has not entered into the
8   EEO process because she, Connie Stewart, she
9   was -- went to Mike and Melody...
10      MS. McCRARY: Trujillo?
11  A.  ...Mike Trujillo, and Mike with the
12  assistance of Fran Cherry, the Deputy
13  Director for BLM, immediately gave Connie a
14  detail assignment out of the office so that
15  she could not be subjected to the harassment
16  of Marilyn Johnson. So, she landed -- she
17  never even went to the EEO Office. She just
18  continued to go -- she was detailed to work
19  directly with Mike Trujillo.
20      I think that we should ask Marilyn
21  to stop all assignments to the EEO Office
22  until she gives us a plan on what she is
23  doing. It appears that she is acting
24  arbitrarily and capricious on this. I
25  thought our agreement was that the bureaus

## Page 106

1   would send in a request to fill EEO jobs and
2   that we would re -- would review it and then
3   approve or disapprove. The employee that's
4   being assigned to Title VI states that she,
5   too, is not qualified for this position and
6   feels that she is being set up. Now,
7   remember, the BLM does not have a Title VI
8   position or program. Therefore, this
9   position does not exist. As I mentioned to
10  you yesterday someone from the BLM EEO
11  Office came down to me yesterday to ask me
12  to explain what was required of them in
13  Title VI. That someone was Michelle
14  Stroman. This furthers my belief that
15  Marilyn is acting irresponsibly. Why
16  reassign an employee to a nonexisting
17  position and particularly when no one,
18  including Marilyn, has any idea of what it
19  entails? To me this is poor management. I
20  hope this, this isn't her response to what's
21  wrong, I'll fix it suggestion at the MIT.
22      Marilyn Johnson, Melody Stiff and
23  Mike Trujillo all were participants on the
24  Management Interagency Team or whatever that
25  stands for. It's a team of all managers

## Page 107

1   making plans for, at this time, the
2   restructuring of EEO. There was a proposal
3   to restructure the entire EEO staff, bureau-
4   wide, and that restructuring was to bring
5   all of these offices under one office. The
6   office would become the Office of Civil
7   Rights and it would be a centralized office.
8       Mike Trujillo sent out a memoranda on
9   June 13th, 2002 and it was sent to all
10  bureau and office directors and in that
11  memoranda he writes, as you know, we are in
12  the process of reviewing the organizational
13  structure of the Equal Opportunity Civil
14  Rights Office throughout the Department. In
15  anticipation of some restructuring in the
16  near future, please do not make any changes
17  to your current Equal Opportunity
18  organization, structure, location or
19  personnel until we have completed our review
20  and initiated whatever changes to these
21  offices that are deemed necessary to improve
22  the efficiency of these very important
23  functional areas. Of course, I will keep
24  you advised of any anticipated changes.
25      This memo came out a year and

## Page 108

1   Marilyn still defied the memo and acted like
2   the memo didn't even exist, never consulted
3   with the EEO staff at the departmental level
4   to let them know that she had some critical
5   positions she needed to fill and to request
6   an exemption of this memo. She just acted
7   on her own accord and placed people in jobs
8   so that we would fail.
9       On July 28, 2003 she sends a memo
10  out to all of the BLM Field Offices, State
11  Offices, Personnel Offices and EEO Managers.
12  My friends and associates, the Department has
13  decided to place the EEO restructuring
14  proposal on hold indefinite. In light of
15  that decision the Bureau of Land Management
16  is lifting the freeze on hiring our critical
17  EEO positions. Effective today your offices
18  may proceed with the recruitment, hiring and
19  filling of EEO positions.
20      Well, she did not get this cleared
21  through the directive that came from the
22  top, which was Mike Trujillo. So, this
23  further shows that her acts are more of
24  reactionary. I believe she issued that e-
25  mail to justify why she was about to make

Page 109

1   the decisions to reassign myself and Connie
2   Stewart into EEO jobs. So, this e-mail was
3   sent on the 28th. I was removed on August
4   1st, 2003. So, two days. That's why she
5   sent this e-mail.
6       So, I'm submitting the e-mail from
7   Melody, the memoranda from Mike Trujillo and
8   Marilyn's e-mail to all of the BLM officials
9   as an exhibit.
10  Q.   Is there anything else you want to
11  add?
12  A.   Yes. I would like to add that as
13  far as being compensated for this...
14      MR. BUCHOLTZ: Just a second.
15  Do you have other documents you want to hand
16  in?
17  A.   Just the medical which I'm getting
18  ready to speak to.
19      MR. BUCHOLTZ: Okay. I
20  wanted you to speak to the medical bills and
21  reactions from yourself.
22  A.   Right.
23      MR. BUCHOLTZ: Go ahead.
24  A.   As a result of what has happened to
25  me in this period of time it has caused

Page 110

1   great stress for me. I feel like someone
2   who has been banished from total existence
3   and after 30 years of what is a very, very
4   good career performance-wise, and I worked
5   myself to become an exemplary performer, and
6   to be treated like this in such a short span
7   of time has really caused a lot of distress.
8   I wasn't handling it too well.
9       So, upon the advice of friends and
10  family I went to counseling. So, I'm now in
11  therapy and I'm seeing my internist on a
12  regular basis because even after therapy I
13  was having the emotional highs and lows,
14  having difficulty sleeping, eating and
15  remaining my social contacts. I even have
16  difficulty coming to work and...
17      MS. McCRARY: Did you not
18  have a physical reaction, skin?
19  A.   I broke out in a rash right after it
20  happened and I was seeing a dermatologist
21  because I kept breaking out and I couldn't
22  control the rash. So, the dermatologist put
23  me on some kind of steroid cream. I also,
24  because I couldn't control the emotional
25  crying, my therapist suggested that I see a

Page 111

1   medical doctor because he's a licensed social
2   worker therapist. So, my doctor now has me
3   on a low dose of antidepressants. I have
4   tried various antidepressants. One made me
5   completely numb and lethargic and she didn't
6   want me in that state. So, she's changed my
7   medication which I'm on now.
8       So, I see my internist like every
9   three to six weeks, whenever I can get in
10  for an appointment and I have -- excuse me -
11  - I have documentation from my therapist and
12  my dermatologist and one of the prescriptions
13  that I was pre, prescribed when I first went
14  on the antidepressant medication. And I
15  used these documents and scheduled a meeting
16  with Mr. Mike Trujillo. And Mike agreed to
17  intervene on my behalf as my employee
18  relations representative. This happened the
19  day after -- the Friday after Thanksgiving.
20      And as a result of my meeting with
21  Mr. Mike Trujillo he agreed to help me get a
22  meeting with Mr. Fran Cherry, Deputy Director
23  for BLM, also Marilyn Johnson's boss, to
24  intervene so that I could get a detail out
25  of that office because I was losing my mind.

Page 112

1   And I was able to get that meeting with Fran
2   Cherry and Mike Trujillo on December 5th,
3   2003.
4       Fran Cherry called in by conference
5   call and I explained to him, to him
6   everything that I had gone through and I
7   gave them four options to consider for a
8   detail, all of which were denied. My
9   initial request was to request a detail, an
10  IPA assignment, inter-personnel government
11  assignment which would take me completely out
12  of the agency and allow me to work for
13  another agency at the expense of BLM, but it
14  would also put me in a situation where I
15  would no longer have to be subjected to
16  further humiliation and embarrassment. It
17  was embarrassing just to show up because
18  people were like, there she is, what's going
19  on? They would ask everybody on staff what
20  happened to me, but none of them would ever
21  ask me what happened to me.
22      So, that's the feeling of isolation.
23  When people don't even feel comfortable
24  enough to come to you to ask you what's
25  going on, that's because the perception is

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777    Historic Jordan Springs  ✓  1160 Jordan Springs Road  ✓  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

### Page 113

1   already out there that I've done something
2   wrong.
3            None of the IPA options were allowed
4   me. So, Fran Cherry contacted his Personnel
5   Officer in Montana, Diane Freeze, and asked
6   her would she assist me in finding a detail.
7   So, the next person that I got a phone call
8   from requesting the detail, after I had
9   requested the detail was Diane Freeze,
10  Personnel Officer for the Montana State
11  Office. And she told me that Fran Cherry
12  had shared with her that I was seeking a
13  detail. She had contacted some managers
14  within the BLM and it looked like she might
15  have had a detail assignment kind of pretty
16  much earmarked for me, but she would get
17  back to me and let me know. And she did
18  and when she did she told me that the detail
19  assignment would be to work with the
20  Recreation Resource Management Group.
21           A few weeks later I got an e-mail
22  from the gentleman, Mark Goldback -- bach
23  and welcoming me aboard and telling me my
24  detail would be effective at the beginning
25  of the pay period, which was February 9th,

### Page 114

1   2004. So, that's how I was able to obtain
2   the six month detail, it's for 120 days.
3            MS. McCRARY: Is it six
4   months or 120 days?
5        A.  120 days, yeah, detail. So, that's
6   how I was able to get the detail based on
7   my medical records that I shared with them
8   and asked them under no uncertain terms are
9   they to give this medical information to
10  Marilyn Johnson because there's no telling
11  what she would do in terms of how she would
12  use it if she could. She would probably try
13  to have me declared incompetent.
14       Q.  So, your detail is based on their
15  giving accommodation to your disability?
16       A.  Yes.
17       Q.  And have they made any -- taken any
18  steps or whatever to get you a permanent
19  position?
20       A.  No, but I have. I'm, I'm applying
21  for positions.
22       Q.  Are you having any problems as far
23  as references or...
24       A.  Yes, I am because the only
25  performance appraisal that I have is dated

### Page 115

1   back to 2001. This is 2004. So, I don't
2   have a performance appraisal and I'm sure
3   anyone reviewing my packet is going to,
4   going to want to know about the gap, why am
5   I only submitting a 2001 performance
6   appraisal? Absolutely, that raises a red
7   flag.
8            As far as applying for positions
9   within BLM, that's almost like a fait
10  accompli, incomplete. Everybody knows that
11  I've been removed from my position. So, no
12  manager is going to touch me in terms of
13  allowing me the opportunity to work for
14  them. Once employees engage in EEO
15  activities they're automatically labeled as a
16  troublemaker and I'm sure Marilyn Johnson has
17  let that be known that there is an EEO
18  activity that has been filed against her.
19           So, this has impeded my ability to
20  seek further employment, it has stifled my
21  ability to move up within the organization.
22  And I had already proved that I was capable
23  and qualified to move to the next level. I
24  have approximately four years left before I'm
25  eligible to retire and this greatly impacts

### Page 116

1   my economic status.
2            And that's what Marilyn is most noted
3   for, making sure that African Americans will
4   never make the kind of money that they're
5   capable and qualified of making and to make
6   sure that no other opportunities are afforded
7   them once she has done her damage to them.
8   It has happened over the last 10 year span
9   of her career and the record will support
10  that.
11           I have applied for several positions.
12  One I was best qualified, got the interview,
13  did not get the job. Now currently in -- I
14  have applied recently to, for two other GS-
15  14 positions within BLM. I haven't heard
16  back from them. One just closed January
17  20th, 2004 and the other one, I don't
18  remember the closing date, but I don't...
19           MS. McCRARY: You have a
20  shadow over you, you have that money
21  laundering.
22       A.  Right. I have a shadow over me, the
23  money laundering. It's no secret that that
24  was an accusation because she said it on
25  five different occasions in front of staff.



Page 117

1 And if nothing else, that's something that
2 everybody's gossiping about. I even have
3 colleagues calling me from the field offices,
4 Romella, what's going on, are you okay? I
5 heard what happened. I said, what did you
6 hear? You mon -- you laundered money to
7 Langston. So, it's well known throughout 14
8 states what I've been accused of and nobody
9 is going to touch me, nobody.
10 Q. All right. Does that conclude your
11 testimony at this time?
12 MR. BUCHOLTZ: No. Do you
13 have any more documents that you want to
14 hand in?
15 A. I have the copy of the my hearing
16 transcript from the hearing that I
17 participated on, participated in on September
18 17th, 1997. And I also have a copy of the
19 Final Draft Report of the HR Study. And
20 this report was issued November 30th, 2001
21 and this is the report that removes Warren
22 Johnson out of his position as the AD for HR
23 and it also shows Marilyn Johnson as a team
24 member on the Human Resource Study Team
25 which she should not have been part of.

Page 118

1 MR. BUCHOLTZ: Can we go off
2 the record, please?
3 COURT REPORTER: Okay. We
4 are now going off the record, the time is
5 now 1:11 p.m.
6 OFF THE RECORD
7 COURT REPORTER: We are now
8 back on the record, the time is now 1:13
9 p.m.
10 THE WITNESS: Yes, I would
11 like to reiterate that once again the money
12 laundering accusation, it's probably the
13 caveat to this whole complaint...
14 MR. BUCHOLTZ: Catalyst.
15 THE WITNESS: Catalyst to
16 this whole complaint that I have filed. The
17 money laundering accusation is very defaming.
18 It leads one to believe that there was some
19 illeg illegal activity going on and
20 Marilyn has refused to even change her
21 choice of words when describing what she
22 perceives as something illegal.
23 She -- never has she, to my
24 knowledge, inquired into the matter through
25 the IG's Office or the Office of Special

Page 119

1 Counsel and, as I stated before, she has not
2 even gone to upper level management, her
3 peers, to address the money laundering
4 allegation. She has only taken an adverse
5 action against me and I believe she knows
6 the severity of what she has done.
7 CONTINUATION OF DIRECT
8 EXAMINATION BY MS. ANDERSON:
9 Q. Well, tell me something, has the
10 agency in its granting of money to the
11 university, have they ever done any kind of
12 financial review?
13 A. No. There's never been an audit by
14 the agency or at Marilyn's request. Nothing
15 has ever gone beyond her lips to
16 substantiate, support any of it.
17 Q. Well, has that university been denied
18 further funding by BLM?
19 A. Yes, they have; yes, they have.
20 MS. McCRARY: At Marilyn's...
21 A. And, and that was at Marilyn's
22 request that they discontinue doing business
23 with Langston University. Absolutely, it has
24 harmed the school, as well.
25 MS. McCRARY: Other agencies

Page 120

1 have continued to do business.
2 A. I must, on the record, what we did
3 was so innovative in terms of being able to
4 get students money to accept BLM positions,
5 this was shared throughout the entire
6 Department of the Interior because I was
7 invited on many occasions to speak to other
8 agencies about our recruitment efforts
9 because everybody knew what we were doing.
10 The Office of Surface Mining
11 Educational Employment Program and the
12 Minerals -- Minerals Management Service
13 Education Programs Office have both joined
14 the BLM and they now have entered into grant
15 agreements with Langston to do the exact
16 same thing Langston did for the BLM. Most
17 recently they entered into an agreement
18 April, 2004 (sic) with the Minerals
19 Management Service.
20 Now, with this cloud over their heads
21 this might impede them from getting further
22 grant opportunities within the Department
23 because BLM is not the only agency they're
24 trying to do business with. They've
25 approached Park Service, they've approached



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∕ 1160 Jordan Springs Road ∕ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Case 1:05-cv-01475-RWR    Document 18-4    Filed 07/26/2007    Page 34 of 133
Sworn Investigative Interview of Romella Langston 3/4/04

31 (Pages 121 to 124)

Page 121

1   Fish and Wildlife Service and, like I said,
2   the other two agencies that have done the
3   same thing and procured the same money to do
4   the same thing are the Office of Surface
5   Mining and the Minerals Management Service as
6   recent as April, 2004.
7       I did not go to the IG's Office as
8   I told Marilyn I would because at the time
9   it was still a verbal accusation. I had not
10  suffered harm, it just hung in the balance
11  and I didn't know how she was going to use
12  it. So, I did not go because I had not
13  suffered an adverse impact, but once she
14  removed me from my job it's all tied back to
15  the agenda that she had when she came in
16  2002 to destroy the program and conversely
17  destroy me, because she could not do away
18  with the program.
19      She, in fact, said the only reason
20  why she was even going to keep the program
21  was because of the Executive Order. So, she
22  herself feels compelled to keep a program
23  intact because the Executive Order says
24  that's what all federal agencies are supposed
25  to do.

Page 122

1       MS. McCRARY: Off the record
2   for one second.
3       COURT REPORTER: Okay.
4   Going off the record, the time is now 1:18
5   p.m.
6       OFF THE RECORD
7       COURT REPORTER: We are now
8   back on the record, the time is now 1:20
9   p.m.
10      THE WITNESS: I want to
11  reiterate that I, in no way, had the
12  authority nor the wherewithal to handle any
13  money that was procured to Langston. I
14  wrote the assistance agreement, I'm listed on
15  the assistance agreement as the Assistant
16  Representative. That agreement is also
17  signed by the Procurement Officer, Modestina
18  Bush, who signs off on all grant agreements
19  for our office and Mr. Sherman Lewis, who is
20  the Director of Outreach Programs from
21  Langston University is also a signee to the
22  assistance agreement.
23      In the federal government it's just
24  not possible to launder money if you're not
25  the person who handles the money. I never

Page 123

1   handled money. I only formulate budgets and
2   hand them in to those who do do the budget
3   appropriation. And as far as signing the
4   assistance agreement, I assisted Langston
5   with what the proposal would be based on,
6   what we wanted. Langston submitted the
7   proposal and the proposal was funded under
8   the Director Tom Fry and Warren Johnson in
9   terms of the retention assistance part that
10  our assistance agreement covered.
11      I want to go on record to amend my
12  Complaint today under oath.
13      MS. McCRARY: To affirm.
14  A. To affirm...
15      MS. McCRARY: That everything
16  in there.
17  A. ...that everything in this Complaint
18  should be investigated...
19      MS. McCRARY: And it's true.
20  A. ...and it is true, factual and based
21  on the facts as they have happened.
22      MR. BUCHOLTZ: Did you give
23  confidential classified information to Wynn?
24  A. No. The information that I have
25  provided to Marilyn Johnson...

Page 124

1       MR. BUCHOLTZ: To Johnson or
2   to Wynn?
3   A. To Marilyn Johnson and to Albert Wynn
4   is public information. All it takes is a
5   phone call to the Procurement Acquisition
6   Management Office under the Department of the
7   Interior to make the request for the kind of
8   data that you're looking for. And the kind
9   of data that they maintain are the yearly
10  reports that account for all monies that are
11  procured through contracts and grants to
12  HBCU's. That's just one area. They take
13  care of all money that goes out to
14  contractors, private sector, everything.
15      And I called the office and said,
16  I'd like to have the year end report for
17  funding that went to the HBCU's and majority
18  colleges by bureaus and they provided that
19  documentation to me. It is not classified
20  information and if you know where to get it,
21  you can get it within a matter of 24 hours.
22  And this is the information that they
23  continue to hold back from Congressman Wynn
24  because they really do not want the Congress
25  to know what kind of money they're giving to

**County Court**
**REPORTERS** INC

The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Case 1:05-cv-01475-RWR    Document 18-11    Filed 07/26/2007 3/4/0    Page 35 of 133
Sworn Investigative Interview of Romella J. Arnold #4/26/07

32 (Pages 125 to 128)

## Page 125

1  majority schools and the HBCU's are not even
2  getting a drop in the bucket.
3      That's why this information is not
4  being released in a timely manner because it
5  will open Pandora's Box. It has always been
6  a sore spot for the agency. They never want
7  the Congressional leaders to know how much
8  money they're procuring to the white colleges
9  because it will become an issue for them
10  when the black college presidents find out.
11  And that's why we have an Executive Order,
12  because of that kind of federal support that
13  keeps the doors open and will continue to go
14  to white universities.
15  CONTINUATION OF DIRECT
16  EXAMINATION BY MS. ANDERSON:
17      Q. All right, just to go back a bit.
18  You stated that you received a letter of
19  counseling and at the same time you received
20  a, a let -- notice reassigning you. How
21  many letters of counseling did Ms. Johnson
22  actually give you?
23      A. Just one.
24      Q. Okay. You just received one?
25      A. So, before – the personnel

## Page 126

1  regulations require before you even write
2  someone up you give them a verbal warning.
3  She skipped right over verbally telling me
4  what I did, because I don't even still to
5  today know what I did. I didn't do it.
6  Whatever she said I did, I didn't do it and
7  she goes straight to writing me up for
8  something I didn't do. And then she says,
9  they said I – no date, no time, she didn't
10  even tell me what I allegedly said.
11      Q. Okay. Now, for the instance in
12  which you said I'll be damned, was that an
13  exclamation that came because you were
14  startled?
15      A. Yes.
16      Q. Was this the first time you heard
17  about the announcement?
18      A. About Mike Brown taking over the
19  program, absolutely, because I was certainly
20  ready to go into her to see what I could do
21  to compete for that job. I was ready, yes.
22      MS. McCRARY: Her reputation
23  pertaining to vulgar language.
24      A. And I know that when I said I'll be
25  damned, she knew exactly how it was

## Page 127

1  intended. Miss Johnson, herself, is not
2  removed from cursing. You will see in those
3  affidavits where witnesses have provided
4  sworn testimony to witnessing her having
5  outbursts, cursing in management meetings.
6  Even the Director of OEO, Melody Stiff, said
7  the way Marilyn Johnson behaves at the MIT
8  meetings is embarrassing. She is the only
9  loudmouthed, African American cursing,
10  hollering in the meetings. The other few
11  African Americans that attend those meetings
12  are almost ready to crawl under the table
13  she is such an embarrassment in terms of her
14  use of language and her loud voice.
15      So, she is not, herself, immune to
16  cursing nor hearing cursing in the workplace.
17  And it's all how you do it whether it's
18  termed hostile work environment or you're
19  just business as usual. And the white
20  managers in BLM are certainly no saints when
21  it comes to the use of foul language because
22  when you get out in the west, the ranchers
23  don't even know that there is such a law
24  that prohibits creating a hostile work
25  environment. It's what they do and it's

## Page 128

1  what they do well. They're very informal in
2  the BLM and part of that informality
3  includes their choice of language in the
4  workplace.
5      Q. All right. Is there anything else
6  that you want to add, any other documents
7  that you want to take note of in your
8  testimony?
9      MR. BUCHOLTZ: These are the
10  documents that Miss Arnold referred to
11  through her testimony. So, these are the, I
12  think in the order...
13      MS. ANDERSON: Oh, don't put
14  down what he's saying.
15      MR. BUCHOLTZ: ...in the
16  order I think that we were trying -- do you
17  have copies of those?
18      MS. ANDERSON: Yeah, yeah.
19  She's the only one giving testimony.
20      COURT REPORTER: We are going
21  off the record.
22      OFF THE RECORD
23      COURT REPORTER: We're back
24  on the record.
25      THE WITNESS: I would like



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777    Historic Jordan Springs  •  1160 Jordan Springs Road  •  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 129

1  to also add in my testimony that on December
2  26th, 2003, Marilyn did move forward with
3  her proposal to reassign Steve Shafran and
4  Marcie Brionis to the Washington Office. On
5  December 26th, 2003 they received in the
6  mail letters directed reassigning them to
7  come to Washington. They had 15 days to
8  make a decision or they would be out of a
9  job.
10        Steve Shafran was distraught. He
11 contacted Lee Allen, because they both live
12 in Denver, and was complaining about how
13 this was going to create a hardship, it
14 would probably break up his marriage because
15 his wife made a decision she wasn't coming.
16 And so, in Steve's effort to see if he could
17 get Marilyn to reconsider, he came to
18 Washington the first week in January. He
19 came by my office first thing in the
20 morning. He told me while he -- why he was
21 in Washington. He said he had a meeting
22 scheduled with Marilyn.
23        Following that meeting he came back
24 to my office. I asked him how did the
25 meeting go? He said, it went well because

## Page 130

1  in less than 40 minutes she was -- he was
2  able to convince her that he could not take
3  a reassignment and she rescinded the decision
4  to bring both Steve Shafran and Marcie
5  Brionis to Washington.
6  CONTINUATION OF DIRECT
7  EXAMINATION BY MS. ANDERSON:
8       Q.  What are the races of Mr. Shafran...
9       A.  Shafran is white male, Jewish, and
10 Brionis is Hispanic male.
11      Q.  Do either of them have prior EEO
12 activity?
13      A.  Marcie Brionis does, yes. Steve
14 Shafran, no.
15      Also, I would like it to be known
16 for the record that since my complaint has
17 been moving along in the process, Marilyn
18 recently has again reacted the closer this
19 complaint has gotten to being investigated.
20 And on February 12th, Thursday, February
21 12th, 2004 Marilyn sent an e-mail announcing
22 Jesse Hicks as the Acting EEO Manager. And
23 this is the same person she removed as the
24 Acting EEO Manager in 2002. She now puts
25 him back in that job. She put out a

## Page 131

1  vacancy announcement for a one year temporary
2  position. Jesse applied for it knowing he
3  wasn't going to get it. He even told me, I
4  know I'm not going to get it, but I'm going
5  to throw my ringer in the hat anyway, but I
6  think Marilyn's having second thoughts about
7  what she has done to people in light of my
8  complaint and she has now selected Jesse for
9  that Acting position. So, if you decide to
10 talk with him you're probably not going to
11 get much out of him now that he's in the
12 job because he feels beholden to Marilyn.
13        And on February 13th, Clark Collins -
14 - February 13th, 2004, Clark Collins informed
15 me that she has now put him back in his
16 position, the same one she removed him from
17 for performance reasons.
18        So, she is now trying to redo what
19 she has done to, I guess, justify that she
20 does not discriminate, but it's too little,
21 too late because these actions were
22 documented on paper. The directed
23 reassignment letter as well as the
24 performance letter that she issued Clark when
25 she issued all those formal letters. So,

## Page 132

1  again, Marilyn Johnson is not very clever,
2  not very smart.
3       Q.  Okay. Does that conclude your
4  statement.
5       A.  That concludes my statement.
6          MS. ANDERSON: Okay, thank
7  you.
8          MR. BUCHOLTZ: Do we have a
9  chance to rebut Marilyn Johnson's testimony?
10         MS. ANDERSON: Yes.
11         MR. BUCHOLTZ: Will we be
12 receiving a copy of the transcript of her
13 testimony?
14         MS. ANDERSON: Yes.
15         MR. BUCHOLTZ: Thank you very
16 much.
17      A.  Also...
18         MS. ANDERSON: You'll receive
19 copies of the transcripts of all the
20 responsible management officials in order to
21 do the rebut.
22         MR. BUCHOLTZ: Okay, thank
23 you.
24      A.  Also, Marilyn won't receive copies of
25 other employees' transcripts?



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  ✔ 1160 Jordan Springs Road  ✔ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 133

1     MS. ANDERSON: No, no.
2   A. Okay.
3     MS. ANDERSON: Now, the one
4 thing I have to be honest with people about,
5 the way this is supposed to work, only those
6 people who have a legal right to know are
7 supposed to be able to look into an
8 investigation.
9     COURT REPORTER: I'm still on
10 record, so...
11     MS. ANDERSON: Oh, are you
12 still on record?
13     COURT REPORTER: Yes. The
14 only thing I had left to say was, Miss
15 Arnold, you have the right to review the
16 deposition transcript for its accuracy or you
17 waive that right, which do you prefer?
18   A. I would like to review the
19 transcript.
20     COURT REPORTER: Okay. This
21 concludes the deposition of Romella J. Arnold
22 and the time is approximately 1:40 p.m.
23 (WHEREUPON, the Sworn Investigative Interview
24 of ROMELLA J. ARNOLD was concluded at 1:40
25 p.m.)

## Page 134

1     CAPTION
2    The Sworn Investigative Interview of
3 ROMELLA J. ARNOLD, in the matter, on the
4 date, and at the time and place set out on
5 the title page hereof.
6    It was requested that the Interview
7 be taken by the reporter and that same be
8 reduced to typewritten form.

## Page 135

1     SIGNATURE OF WITNESS
2    I have read the foregoing transcript
3 of the Interview taken on the
4 _____ day of _____,
5 2004, and it is a true and correct record of
6 my testimony given at that time and place
7 except as to any corrections I have listed
8 below. I understand that the information I
9 have given is not to be considered
10 confidential and that it may be shown to the
11 interested parties.

16     ROMELLA J. ARNOLD

## Page 136

INTERVIEW ERRATA SHEET
WITNESS: ROMELLA J. ARNOLD
INTERVIEW DATE: March 4, 2004
I have read the entire transcript of my Interview. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and Signature Page to be attached to the original transcript.

SIGNATURE: _____ DATE: _____
ROMELLA J. ARNOLD


County Court REPORTERS, Inc.
The Nation's Leader in Digital litigation Support Technology
800.262.8777   Historic Jordan Springs 1160 Jordan Springs Road Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

# CERTIFICATE OF REPORTER

STATE OF VIRGINIA AT LARGE:

I, **JAMES C. HALL, III,** Notary Public for the State of Virginia at Large, do hereby certify that the foregoing constitutes a true and accurate transcript to the best of my ability.

I further certify that I am not an employee of nor related to any of the parties, and I have no financial interest in the outcome of this matter.

_____

                    Notary Public

My Commission Expires:
December 31, 2004

**County Court REPORTERS, INC.**
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

Interview Errata Sheet

Witness: Romella J. Arnold
Interview date: March 4, 2004

I have read the entire transcript of my Interview. I request that the following changes be
entered upon the record for the reasons indicated. I have signed my name to the Errata
Sheet and Signature Page to be attached to the original transcript.

Page 9, line # 18, National Student Educational Employment Program Manager

Page 11, line #22, Acting Associate Director for Human Resources

Page 13, lines #2&3, the week following. That meeting was at the end of the week.....

Page 16, line # 19, insert the following:

At the September 2002, meeting, I informed Marilyn Johnson if she continued to accuse
me of "money laundering", I was going to go to the Inspector General's (IG), office with
the dollar amounts that had been procured to the majority universities and let them tell us
who's laundering money. Marilyn stated, you do what you got to do and the meeting
ended. Following the meeting I was livid and I went to Connie Stewart's office and
asked, what is this about? Nobody seems to care when we give all the money to the
majority schools, but as soon as we find ways to do business with the HBCU's it's
considered "money laundering". Connie stated that this has been going on for years. I
told Connie, if Marilyn thinks she's going to run a wrecking ball and chain through the
program to destroy it, I wasn't going to allow her to do it on my watch. I will take this
matter straight to the IG's office. It should be noted that Marilyn Johnson and I only met
on three different occasions prior to my removal to discuss management of the student
program/HBCU initiative and all of these meetings were contentious because she
repeatedly accused me of "money laundering", to the point of badgering me. We never
discussed the program and its implementation because she would disrupt the discussion
and go back to the accusation of "money laundering" under pretext that she didn't
understand the grant procured to Langston University after I explained it numerous times.

Page 19, line #25, I called the meeting and as we were......

Page 21, line #15, delete the words, she replaced......

Page 22, line # 23, replace the word position with vacancy

Page 24, line # 24, delete against Marilyn Johnson

Page 25, line #16, September 10, 1997

Page 26, line # 4, preside to do the hearing

R.J.Arnold

Interview Errata Sheet (page 2)

Page 26, line # 7, the hearing
Page 26, lines # 15&16, and provided testimony her career......

Page 27, line # 18, delete I was giving..........

Page 28, line # 18, same time this was going on......

Page 29, line # 4, His name is Ron Tucker......
Page 29, line # 10, he had displayed a Confederate flag
Page 29, line #18, he talked about how they hunt coons as a sport......

Page 30, line # 16, know what to do with this information......
Page 30, line # 22, Late afternoon.....

Page 32, line # 1, Director was Gary Drier
Page 32, line # 7, Associate Director with Eastern States.....
Page 32, line 17, well, why.....

Page 33, lines # 20& 21, Ron Tucker. Gary Drier.....
Page 33, line # 24, and for not stopping......

Page 34, lines # 22 & 24, Gary Drier, Gary Drier

Page 35, lines# 1&2, Drier's supervisor, Ron Tucker.....

Page 38, line #17, outspoken in this regard.

Page 40, line # 5, for HR in the mid 90's.....

Page 41, line # 11, delete the name Richard

Page 42, line # 22, Director Michael Dombeck.....
Page 42, line # 23, improprieties in the way.....

Page 43, line #6, Mike Dombeck
Page 43, line #9, delete the - - through
Page 43, line #22, delete that's more---far,

Page 44, line #14, There was an HR study....

Page 45, line # 12, study team and....

Page 45, line #22, kind of suspicious meaning.....

Interview Errata Sheet (page 3)

Page 46, line # 14, he was the most senior EEO Specialist in grade, GS-14....

Page 47, line # 11, as the Deputy for HR

Page 48, lines # 1&2, terminated Marilyn Daniels, GS-13, African American Female.
Page 48, lines # 12 &13, She removed me on August 1, 2003.

Page 49, line # 3, Ron Tucker
Page 49, line #5, he received a promotion to a GS-14.....
Page 49, line # 8, Ron Tucker.....

Page 51, line # 16, his name is Mike Nedd
Page 51, line #19, 2 out of the total number of SES in the BLM.

Page 52, lines # 20&21, Marilyn Daniels.

Page 53, line # 18, Steve Shafran is......
Page 53, line # 22, Marci Briones is......

Page 61, line # 25, SERTs Tracking System.

Page 62, line #2, SCEP tracking system should be deleted.
Page 62, line # 7 vital to me in performing.......
Page 62, line # 9 conversion dates.....
Page 62, line # 21, manage the information manually.....

Page 63, line # 12, So, Marilyn wants some.......

Page 65, line # 15, Alternative Work Schedule, AWS.....

Page 66, line # 12, Connie McGriff
Page 66, line # 16, Steve Shafran and Marci Briones who both.....
Page 67, line # 22, Connie McGriff

Page, 68, line # 18 & 19, I assumed the duties prior to Bill Nunn passing in October 2001.
Page 68, line #25, I didn't attend the.......

Page 69, line # 12, the program.  Add: Clark Collin's was present at this meeting as well.
Page 69, line # 24, strategy team meeting.

Page 70, line # 12, strategy team .......

Page 74, line # 18, citing that Romella......

*K.J. Arrold*

Interview Errata Sheet (page 4)

Page 75, line # 22, Marilyn's way to again, cast the aspersion that.....

Page 76, line # 13, Managers because she lacks competence. Insert, Gloria Inniss, the former EEO Manager removed Michelle Stroman from her duties as the Complaints Manager because she was incompetent. Michelle had problems tracking the number of complaints bureau-wide, so Gloria reassigned the function to Jesse Hicks and made him the bureau's Complaints Manager.

Page 77, line # 23, She didn't bring it to my attention.....

Page 78, line # 21, Then ..........
Page 78, line # 24, verbal warning.

Page 79, line #18, This is has not happened often
Page 79, line # 24, is no program and there has never been a Title VI Program in the BLM.

Page 80, line # 9, And, I know this for a ......
Page 80, line # 14, At the time the student program was under......

Page 81, line # 5, Connie McGriff, the young woman.....
Page 81, line #10, Gloria was not pleased with her......

Page 84, line # 3, When I started......

Page 86, line # 2, ever coordinated any training.........

Page 88, line # 7, the Academy.....
Page 88, line # 17, she needed some data.....

Page 89, lines # 8, 11, &15, change to read SCEP

Page 91, line # 14, She said it was no......

Pages 92& 93 are out of order. Please rearrange.

Page 93, line # 6, established credibility and a reputation and people knew how to contact me at the phone number .....
Page 93, line # 8 people had reasons for contacting me, by using the phone number
Page 93, line # 14, Drier and I moved.

Page 95, line # 14, Linda Behlin
Page 95, line # 19, Sherian Long

*R.J. Arnold*

Interview Errata Sheet (page 5)

Page 96, line # 11, Sylvia Felder was a GS-12. Insert, I understand she is now a GS-13.
Page 96, line # 17, Insert: exemplifies that her motive and intent was to discriminate and
to cause an adverse impact. This act of discrimination is disparate treatment.

Page 103, lines # 8, 15, & 18, Melodee Stith

Page 104, lines # 15&16, Briones. That was based on......

Page 105, line # 9, Melodee.....
Page 105, lines # 15, 16, 17, &18, she would not be subjected to harassment by Marilyn
Johnson. She never went in the EEO process. She was detailed to work directly with
Mike Trujillo.

Page 106, line # 22, Melodee Stith

Page 113, line # 3, None of the IPA options were afforded me.
Page 113, line # 22, Mark Goldbach

Page 118, line #12, is probably.......

Page 126, line # 4, &5, what I did, because I don't even today know what I did.

Page 127, line # 18, termed hostile work environment or you're conducting......

Page 192, line # 4 Marci Briones

Page 130, line # 4, 5, &13, Marci Briones

Signature _Cornelia Arnold_ Date _March 29, 2004_

135

## SIGNATURE OF WITNESS

I have read the foregoing transcript of the Interview taken on the _____4_____ day of _March_, 2004, and it is a true and correct record of my testimony given at that time and place except as to any corrections I have listed below. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_Romella J. Arnold_

ROMELLA J. ARNOLD

**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  1160 Jordan Springs Road   Stephenson...

## Page 1

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D. C. 20240
COMPLAINT OF DISCRIMINATION

IN RE:  Romella J. Arnold
        Complaint No. LLM-04-002

_____

The Telephone Investigative Interview of CONSTETTA
STEWART, taken in the above matter in the Offices of
COUNTY COURT REPORTERS, INC., located at 1160 Jordan
Springs Road, on the 17th day of March, 2004, beginning
at 1:09 p.m.

## Page 2

### A P P E A R A N C E S

ON BEHALF OF THE U.S. DEPARTMENT OF
INTERIOR, BUREAU OF LAND MANAGEMENT:
Anne E. Anderson, Contracted EEO Investigator
DELANY, SIEGAL AND ZORIN
  201 I Street, S.W., #836
  Washington, D.C.  20024
  Telephone: (202) 554-9660
  Fax: (202) 554-1111

## Page 3

TELEPHONE INVESTIGATIVE INTERVIEW OF
CONSTETTA STEWART
IN RE: ROMELLA J. ARNOLD
Case No. LLM-04-002
March 17, 2004
        COURT REPORTER:  And we're
ready to go.
        MS. ANDERSON: All right.
CONSTETTA STEWART was examined, and testified
as follows:
DIRECT EXAMINATION
BY MS. ANDERSON:
    Q.  Miss Stewart, to begin with would you
please state your name in full?
    A.  Constetta Stewart.
    Q.  And what is your gender?
    A.  Female.
    Q.  And what is your date of birth?
    A.  7/25/50.
    Q.  And what is your race?
    A.  African American.
    Q.  And do you have any prior EEO
activity?
    A.  No.
    Q.  All right.  Currently what position

## Page 4

do you hold in the Bureau of Land
Management?
    A.  Special Assistant to the Deputy
Director Bureau of Land Management.
    Q.  And what is the series and grade of
that position?
    A.  GS 301-50.
    Q.  How long have you held your present
position?
    A.  September of 2003.
    Q.  All right.  During the events
complained of in Miss Romella Arnold's
Complaint in the year 2003, what was your
work relationship to the Complainant?
    A.  Can I find out what her complaint
is?
    Q.  The Complainant alleges that she's
been discriminated against on the basis of
her race, her sex, her age and her prior EEO
activity.  She states that this
discrimination took the form of accusing her
of money laundering, removing her from her
position, destroying the computer program
that she used to track one of the programs
that she handled involving minority students,



EXHIBIT
Stewart
Inv. Interview



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

EXHIBIT
Blue
5

800.262.8777    Historic Jordan Springs ℓ 1160 Jordan Springs Road ℓ Stephenson, VA 22656

Page 5

1   moving her to a shared office space that was
2   smaller than her former office, as well as
3   transferring her to the Title VI Program
4   which she alleges doesn't exist. She states
5   that she has, through the actions of Marilyn
6   Johnson, been subjected to hostility and
7   discrimination and she alleges that it has
8   ruined her career and it has also left her
9   with a damaged reputation. Okay? So...
10      A.  Prior to me moving into the position
11  of Special Assistant I was supervisor and
12  Personnel Management Specialist.
13      Q.  All right. Were you Miss Romella
14  Arnold's supervisor?
15      A.  Indirectly. If you look at anything
16  on paper it does not say that. I kind of
17  inferred it.
18      Q.  So, did you ever do evaluations
19  involving her or were you ever involved in
20  counseling her or in any way directly
21  supervising her activities?
22      A.  Whenever there was an absence, yes.
23  Her -- the group that Romella worked in
24  reported directly to the Assistant Director
25  for Human Resources and because I was the

Page 6

1   senior person on staff I acted in the
2   absence of that person. So, whenever
3   directions were given, in their absence, yes,
4   it was me.
5       Q.  Now, the first allegation that Miss
6   Arnold makes, she states that on at least
7   five separate instances Ms. Marilyn Johnson
8   accused her of money laundering and I think
9   this was in conjunction with a historically
10  black university. Did you ever or were you
11  ever present when Miss Johnson allegedly made
12  such a statement?
13      A.  I was present at meetings and there
14  was a conversation about money, whether it
15  was laundered or not...
16      Q.  All right. Well, did you ever hear
17  Miss Johnson directly accuse Ms. Arnold of
18  laundering money?
19      A.  I don't know if she accused her. I
20  do know that there was a statement about
21  laundering money.
22      Q.  All right. Do you recall, as
23  clearly as you can, what the actual
24  statement was?
25      A.  We were having a discussion about

Page 7

1   budget and I think we were talking about a
2   program we were using for giving -- I'm
3   trying to think of the word -- providing a
4   mechanism for our students to be able to pay
5   for housing and tuition or what have you,
6   and at that point we were using a university
7   down in Oklahoma, I think it was Langston
8   University. And I, I don't know whether the
9   statement was laundering money or the
10  appearance of laundering money, but that,
11  that did come up. Not as an accusation
12  against anybody, but that it had the
13  appearance of using this university to
14  launder our money. And I do recall telling
15  her that was not what we were doing and that
16  we should not be using that term.
17      Q.  You say you do recall tell, telling
18  her, who are you referring to?
19      A.  I'm sorry, telling Marilyn that we
20  were not laundering money, that we were
21  using a vehicle in order to promote the
22  growth of the students for BLM.
23      Q.  All right. Along with that the
24  Complainant, Miss Romella Arnold, is alleging
25  that through the actions of Marilyn Johnson,

Page 8

1   that she destroyed the program dealing with
2   minority student recruitment and in, in
3   particular she alleges that Ms. Johnson
4   directed the cessation of a student
5   employment HBCU monitoring and tracking
6   system. Were you aware of or do you have
7   any knowledge concerning that tracking
8   system?
9       A.  Yes, I'm aware of the, the tracking
10  system.
11      Q.  All right. Was Miss Arnold actually
12  in charge of developing and utilizing that
13  system?
14      A.  Yes, she was in charge of it and
15  there was supposed to be a system -- I don't
16  know if I ever saw it, but I knew it
17  existed.
18      Q.  Are you aware of or have any
19  knowledge concerning whether or not Miss
20  Johnson actually directed that that program
21  be abandoned?
22      A.  That could have happened. I mean, I
23  wasn't privy to everything, but I know that
24  it doesn't exist now, so...
25      Q.  All right. Now, Miss Johnson, when



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777   Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 9

1    she was questioned, states that there is a
2    process within your agency where computer
3    programs have to be justified.
4        A.  Right.
5        Q.  And she states that that program
6    could not be justified. Well, are you aware
7    of or do you have any knowledge concerning
8    whether anybody ever presented that computer
9    program to the organization that reviews
10   them?
11       A.  You mean to the IPMB?
12       Q.  Yes.
13       A.  I don't know.
14       Q.  Okay. Now, the other thing that
15   Mrs. Romella Arnold is stating that she
16   considers discrimination against her because
17   it attacked the programs that she was
18   monitoring, is the National Student Education
19   Employment Program, a special initiative to
20   the states. She stated that Ms. Johnson
21   sought to destroy the program by transferring
22   the authority for monitoring these programs
23   to individual states. Well, are you aware
24   of or was this actually ever done?
25       A.  Transferring the programs to the

Page 10

1    individual states?
2        Q.  That individual states were going to
3    handle the federal program. This is what
4    Miss Arnold had stated.
5        A.  That could have happened.
6        Q.  Okay. So, as far as you're aware of
7    you know...
8        A.  And I, I don't have a lot of contact
9    with BLM right now. So, that could have
10   happened. My contact diminished long before
11   I went into the other position, so...
12       Q.  All right. So, you've been
13   transferred out of...
14       A.  I was told I was going into another
15   position prior to when I left to go into
16   this position in September. I'm trying to
17   think. There were a number of events that
18   occurred and there were meetings that
19   occurred that I did not sit in on. So,
20   there may have been things that would, would
21   have changed prior that I might not have
22   been aware of.
23       Q.  Well, the Complainant has also
24   alleged that Ms. Johnson reorganized the
25   Human Resources Program. Were you aware of

Page 11

1    any reorganization or were you involved in
2    being reorganized?
3        A.  I was reorganized out.
4        Q.  You are out of BLM or out of Human
5    Resources?
6        A.  Out of Human Resources.
7        Q.  All right. You were -- were you
8    reassigned or did you apply and were
9    accepted for a different position?
10       A.  I was reassigned.
11       Q.  As far as you are aware, when the
12   reorganization occurred was there any kind of
13   written plan that employees were given or
14   notified of?
15       A.  There was an announcement of, to the
16   group that there was going to be a
17   reorganization, but no copies were given out
18   as far as the reorganization.
19       Q.  Okay. Well, who made the
20   announcement that there was going to be a
21   reorganization?
22       A.  (No audible response.)
23       Q.  Okay. Now, the other allegation the
24   Complainant is making is that she was
25   transferred to Title VI, a program that does

Page 12

1    not exist. Are you aware of or do you know
2    whether or not before you left Human
3    Resources had a Title VI Program?
4        A.  They were supposed to establish one
5    based on what the Department was telling
6    them that they needed. So, I guess with her
7    transfer that was the establishment, that was
8    for the Title VI Program.
9        Q.  But when you were working there was
10   there a Title VI Program?
11       A.  Not before, no.
12       Q.  All right. So, you heard about this
13   program as you were on your way out?
14       A.  Actually it's complicated. I was
15   still there, but I wasn't there and that's
16   when they -- they established it beforehand
17   with no instruction to go by the Department.
18       Q.  Okay. Well, when you say you were
19   still there, but you weren't there, do you
20   mean it was before you were transferred out,
21   but...
22       A.  I had no involvement.
23       Q.  Okay, right. And were you -- well,
24   were you even perform -- were you performing
25   the duties that you normally would have



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com

## Page 13

1 performed while you were waiting...
2 A. I, I was, I was asked not to
3 supervise anybody or to talk to anyone and
4 that's exactly what I did.
5 Q. And who gave you that order?
6 A. Marilyn Johnson.
7 Q. Did she give you a reason?
8 A. She just wanted me to move into
9 another position and she asked me not to
10 talk to anyone and not to supervise anyone
11 and I complied.
12 Q. All right. Now, the Complainant is
13 also alleging that she was issued a letter
14 of counseling for saying I'll be damned.
15 Were you present or did -- were you around
16 when this statement was allegedly made?
17 A. Wasn't present and had no
18 involvement.
19 Q. Well, based on any of your knowledge,
20 were, were you aware of or do you know
21 whether or not Ms. Romella Arnold used
22 profanity regularly?
23 A. No more than anybody else.
24 Q. All right. So, as far as you're
25 aware of her, her, her use of profanity was

## Page 14

1 no more serious or no more often than any
2 other employee in the office that you had
3 contact with?
4 A. Exactly.
5 Q. All right. Were you aware of
6 whether or not any other employee in the
7 office has ever received a letter of
8 counseling based on using profanity?
9 A. No.
10 Q. Okay. Now, the other thing that the
11 Complainant is alleging is that when she
12 made requests to attend programs that she
13 normally oversaw, for example, the Student
14 Career Experience Program, that she was
15 denied the opportunity to travel to these
16 programs. Now, do you have any knowledge of
17 her having made this request or what
18 happened to it?
19 A. No.
20 Q. Well, in general, can you tell me,
21 during the course of this reorganization were
22 you denied any opportunity to travel or was
23 it in general everybody was stopped from
24 traveling or just specific people?
25 A. I have no clue. I had no place to

## Page 15

1 travel to. So, therefore, I made no request
2 to travel.
3 Q. Okay. So, your position did not
4 involve travel requests?
5 A. Prior to, to the reorganization, yes,
6 it did, but during that time of the
7 transition I did not request to travel.
8 Therefore, I did not travel.
9 Q. Were you given any reason for your
10 treatment as far as being asked not to talk
11 to or supervise anyone during the transition?
12 Was there some particular problem that just
13 came up?
14 A. Yes, and I would prefer not to even
15 discuss it at this point.
16 Q. All right. Now, one of the things
17 that Ms. Arnold had said is that she
18 believes that Miss Marilyn Johnson is fairly
19 negative towards African American employees
20 and that she has a history of this type of
21 negativity as far as once they advance
22 beyond a certain level she does take actions
23 to remove them.
24 Now, she, Miss Arnold has provided me
25 with a list of names and I would like to

## Page 16

1 ask you, as I repeat the name if you know
2 whether or not this person was ever
3 supervised by Ms. Johnson or whether or not
4 this person was actually ever reassigned or
5 moved out of a job due to Miss Johnson.
6 The first person the Complainant
7 names is a Richard Redmond?
8 A. I mean, I know Richard Redmond, but
9 I don't know if he was ever supervised by
10 Marilyn Johnson or not.
11 Q. Okay. Clark Collins?
12 A. He is supervised by Miss Johnson.
13 Q. Do you know whether or not in the
14 reorganization was he removed from his
15 position?
16 A. He went on detail and somebody was
17 detailed into his job. He is back and I'm
18 not sure what he's doing at this point.
19 Q. Okay. Lee Allen?
20 A. Lee Allen is supervised by her.
21 Q. Do you know whether or not he was
22 removed from a position, detailed, demoted
23 or...
24 A. His whole office in his region was
25 abolished. So, she has abolished that.



**Page 17**

1    Q.  Okay.
2           COURT REPORTER:  I'm, I'm
3    sorry.  Miss Stewart, could you please
4    speak...
5    A.  I'm, I'm sorry.  I, I was kind of
6    thinking because I haven't really...
7           COURT REPORTER:  Oh, that's
8    okay.
9    A.  I just know he works there now, I
10   don't know what position he's in.
11   Q.  Okay.  Warren Johnson?
12   A.  Warren Johnson has retired.
13   Q.  Okay.  Melvin Fowler?
14   A.  I don't know.
15   Q.  Edgar R. Weathersby?
16   A.  Ed Weathersby, who has retired, did
17   work for Marilyn, but I think he actually
18   went on assignment to the Eastern States
19   Office when she came on board.
20   Q.  All right.  Denise Stanback?
21   A.  I don't know her.
22   Q.  Jana Long?
23   A.  I don't know her.
24   Q.  Ivy J. Garcia?
25   A.  Don't know her.

**Page 18**

1    Q.  Diane Wood-Medly?
2    A.  I don't know that person.
3    Q.  Okay.  The other thing that Ms.
4    Arnold is alleging is that her -- she was
5    transferred out of her office into shared
6    space.  Miss Johnson, when asked about it,
7    stated that most employees shared space.
8    Was it unusual or would it have been unusual
9    for an employee at Romella Arnold's level to
10   be sharing an office with another employee?
11   A.  Everybody shares space.  Space is a
12   problem in this building.  It's not unusual
13   to share space.
14   Q.  Okay.  And Miss Arnold states that
15   she has a reputation for being involved in
16   matters of Civil Rights, that she belongs to
17   a black federal employee organization and has
18   contact with a Congressman.  Were you aware
19   of or is it at least well known that Miss
20   Arnold is involved in Civil Rights matters?
21   A.  I mean, she could be, I don't know.
22   Q.  Okay.  So, as far as you know she
23   didn't have an in general reputation of
24   being an activist?
25   A.  No.

**Page 19**

1    Q.  Okay.  Is there anything else you
2    would like to add?
3    A.  No.
4           MS. ANDERSON:  Okay.  Well,
5    thank you very much, Miss Stewart.  This
6    concludes the interview.
7    (WHEREUPON, the Telephone Investigative
8    Interview of CONSTETTA STEWART was concluded
9    at 1:25 p.m.)
10          COURT REPORTER:  Okay, thank
11   you.
12          MS. ANDERSON:  Is there
13   anything you need?
14          COURT REPORTER:  No, I think
15   that's everything.  I have the correct
16   spellings, I thank you very much.
17   A.  Okay.
18          MS. ANDERSON:  Okay, thank
19   you.
20          COURT REPORTER:  All right.
21   Have a good day.
22          MS. ANDERSON:  You, too.
23   A.  You, too.
24
25

**Page 20**

1           CAPTION
2    The Telephone Interview of CONSTETTA
3    STEWART, in the matter, on the date, and at
4    the time and place set out on the title page
5    hereof.
6    It was requested that the Interview
7    be taken by the reporter and that same be
8    reduced to typewritten form.



Page 21

1         SIGNATURE OF WITNESS
2        I have read the foregoing transcript
3  of the Interview taken on the
4  _____ day of _____,
5  2004, and it is a true and correct record of
6  my testimony given at that time and place
7  except as to any corrections I have listed
8  below. I understand that the information I
9  have given is not to be considered
10 confidential and that it may be shown to the
11 interested parties.
12
13
14
15     _____
16       CONSTETTA STEWART
17
18
19
20
21
22
23
24
25

Page 22

1       INTERVIEW ERRATA SHEET
2  WITNESS: CONSTETTA STEWART
3  INTERVIEW DATE: March 17, 2004
4  I have read the entire transcript of my
   Interview. I request that the following
5  changes be entered upon the record for the
   reasons indicated. I have signed my name to
6  the Errata Sheet and Signature Page to be
   attached to the original transcript.
7
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 SIGNATURE:_____DATE:____
25   CONSTETTA STEWART



# CERTIFICATE OF REPORTER

STATE OF VIRGINIA AT LARGE:

I, TONIE M. WALLACE, R.P.R.,
Notary Public for the State of Virginia
at Large, do hereby certify that the
foregoing constitutes a true and
accurate transcript to the best of my
ability.

I further certify that I am not an
employee of nor related to any of the
parties, and I have no financial
interest in the outcome of this matter.

_____

Notary Public


My Commission Expires:
April 30, 2007

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com



## Page 1

1  UNITED STATES DEPARTMENT OF THE INTERIOR
   BUREAU OF LAND MANAGEMENT
2  WASHINGTON, D. C. 20240
   COMPLAINT OF DISCRIMINATION
3
4
5  IN RE:   Romella J. Arnold
6      Complaint No. LLM-04-002
7
8
9  _____
10
11  The Sworn Telephone Investigative Interview of MARILYN H.
12  JOHNSON, taken in the above matter in the Offices of
13  COUNTY COURT REPORTERS, INC., located at 1160 Jordan
14  Springs Road, on the 9th day of March, 2004, beginning at
15  12:38 p.m.
16
17
18
19
20
21
22
23
24
25

## Page 2

1  A P P E A R A N C E S
2
3  ON BEHALF OF THE U.S. DEPARTMENT OF
4  INTERIOR, BUREAU OF LAND MANAGEMENT:
5  Jesse Hicks, EEO Investigator
6      U.S. Department of Interior, BLM
7      WO-720-EEO
8      1620 L Street, N.W., Suite 700
9      Washington, D.C. 20036
10     Telephone: (202) 452-5102
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1  SWORN TELEPHONE INVESTIGATIVE INTERVIEW OF
2      MARILYN H. JOHNSON
3      IN RE: ROMELLA J. ARNOLD
4      Case No. LLM-04-002
5      March 9, 2004
6      MS. ANDERSON:  Miss Johnson,
7  I'm going to swear to you in.
8      COURT REPORTER:  You're on
9  the record.
10     MS. ANDERSON:  Do you swear
11  or affirm the information you are about to
12  give is true to the best of your knowledge
13  or belief?
14     MS. JOHNSON:  Yes.
15  MARILYN H. JOHNSON, having been duly sworn
16  by Ms. Anderson was examined and testified
17  as follows:
18  DIRECT EXAMINATION
19  BY MS. ANDERSON:
20     Q.  Please state your full name for the
21  record.
22     A.  Marilyn H. Johnson.
23     Q.  And what is your gender?
24     A.  I'm female.
25     Q.  And what is your date of birth?

## Page 4

1      A.  8/15/50.
2      Q.  And do you have prior EEO activity,
3  have you ever filed an EEO complaint?
4      A.  No.
5      Q.  Okay.  Have you ever joined an
6  outside act – organization and protested
7  discriminatory or alleged discriminatory
8  activities on the part of the Bureau of Land
9  Management ?
10     A.  No.
11     Q.  And what is your race?
12     A.  I'm black.
13     Q.  Okay.  Who is your first level
14  supervisor?
15     A.  Francis Cherry.
16     Q.  And who is your second level
17  supervisor?
18     A.  I don't have one.
19     Q.  Okay.  And what position do you
20  hold?
21     A.  I'm the Assistant Director for Human
22  Resources for the Bureau of Land Management.
23     Q.  And what is the series and grade of
24  that position?
25     A.  It's ES340, it's an SES position.

EXHIBIT
Johnson
2004
Inv. Interview

County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

EXHIBIT
Blue
6

800.2        ngs  ∟ 1160 Jordan Springs Road  ∟ Stephenson, VA 22656        540.667.0502

www.CountyCourtReporters.com

## Page 5

1  Q. Okay. And how long have you held
2  your present position?
3  A. Since June of 2003.
4  Q. Okay. And what is your work
5  relationship to the Complainant, Romella
6  Arnold?
7  A. I'm her supervisor or -- and direct
8  -- her second level supervisor.
9  Q. Okay. And how long have you been
10  her second level supervisor?
11  A. Since June, officially.
12  Q. All right. The Complainant is
13  alleging in, in part of her reprisal is that
14  you had knowledge of her prior public
15  support for non-discrimination in employment.
16  She belongs to a black organization for
17  federal employees and she also states that
18  she has worked with Congressmen. Are you
19  aware of these actions?
20  A. Yes.
21  Q. Okay. Were they in any way part of
22  any decisions that you made concerning Ms.
23  Arnold?
24  A. No.
25  Q. All right. Now, the first allegation

## Page 6

1  that she is making is that she alleges that
2  you accused her at least on five separate
3  occasions of money laundering.
4  A. That's not true.
5  Q. Okay. Well...
6  A. I've never accused of money
7  laundering. We were in a meeting and I was
8  asking her about the relationship we had
9  with Langston University and I was reviewing
10  the agreement we had and the assistance
11  agreement we had and I wasn't comfortable
12  with the language in the contract and I
13  asked her what this was all about. And so
14  her response was that we, we give Langston
15  money for our SCEP students which we can't
16  directly give to them.
17  Q. Mm-hmm. (Indicating affirmatively.)
18  A. So, I said, why can't we directly
19  give it to them and she said we had no
20  legal authority to do that. And I was just,
21  I wasn't talking to her, I was looking at
22  the agreement and I said, if we can't
23  legally give them the money directly and
24  we're funneling it through Langston, I said
25  it looks like we're laundering money. Not

## Page 7

1  to her, it was just an off the cuff
2  statement.
3  In fact, she came back to me and she
4  said, you hurt my feelings. And I asked her
5  how did I hurt her feelings and she said,
6  you accused me of laundering money. And I
7  said, no, I didn't accuse you of laundering
8  money. I was just speaking in general
9  because we have an agreement here where
10  we're handing another organization money for
11  something we can't pay for directly
12  ourselves, but if you believe I was hurting
13  your feelings -- I even apologized.
14  So, I thought it was over. So, it
15  was nothing against her, I wouldn't -- if I
16  thought she was laundering money it would be
17  a whole different thing. But it wasn't -- I
18  wasn't even talking to Romella, it was just
19  off the cuff.
20  Q. Well, did you have other times when
21  you had to question her concerning this
22  particular program?
23  A. No.
24  Q. Okay. All right. And another
25  thing that she is alleging is, she is

## Page 8

1  alleging that you destroyed programs dealing
2  with minority recruitment in -- of minority
3  students through -- for employment with BLM.
4  And she gives as an example of this, she
5  says that you directed the cessation of the
6  student employment HBCU monitoring and
7  tracking system. She states that was, SERTS
8  I believe it's called, was a system that
9  allowed her to keep track of how the program
10  was doing in her position.
11  A. When I got on board there were a
12  number of information technology items in my
13  portfolio and I went down and assessed the
14  viability of each and every one of them. I
15  found out we had spent something like
16  $70,000 on this SERTS Program and it still
17  wasn't up and running.
18  And so, the only way at that point
19  to get it up and running, it had to go
20  before what we call the Information
21  Technology Investment Board, the ITIB. And
22  I couldn't get it in front of the Board
23  because no one had done a business case for
24  it. So, I told her it will never go
25  anywhere unless, I don't care how much money



**County Court REPORTERS,** INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  1160 Jordan Springs Road  Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com

## Page 9

1    we spent on it before, it won't go anywhere
2    until it passes the ITIB and without a
3    business case it's not going anywhere.
4         So, Romella was supposed to be
5    working with Kurt Balantine in Denver about
6    getting a business case, but the business
7    case never got up so it never got before the
8    ITIB. And there's nothing I can do about
9    that because that is a Bureau policy. So,
10   there's no way we could have -- even if I
11   wanted to spend more money on it to make it
12   run, I couldn't make it run because the
13   Board would say no. It's a national IT
14   system and we are not allowed to deploy
15   national IT systems now unless you have the
16   concurrence and approval of the IT Investment
17   Board.
18        Q.  Well, were you instructed to
19   eliminate it or did it just have to die
20   because it wasn't viable?
21        A.  It just had to die because it wasn't
22   viable and there was no business case for
23   it. I mean, you can't get any system, not
24   just her system. I can't get a Work Force
25   Planning system, I can't get another system

## Page 10

1    up called the Exit Interview, I have to have
2    business cases for each one of the items in
3    the portfolio. And Human Resources isn't
4    the only one held to that standard, I mean,
5    Minerals is held to that standard, Resources
6    is held to that standard. The ITIB has to
7    approve every one of their systems.
8         Q.  Okay. The Complainant also alleges
9    that she was issued a letter of counseling
10   for using the phrase I'll be damned. Did
11   she actually receive a letter of counseling?
12        A.  Yes, she did.
13        Q.  And did she receive it for using
14   this phrase or was it something else?
15        A.  It was I'll be goddamned. And I did
16   it for two reasons. For that particular
17   instance and I also had been getting
18   feedback from people in her work area that
19   when she was upset that that was just her
20   practice, but they were afraid to confront
21   her about her language. So, when she used
22   it in front of me that was an opportune time
23   to put her on notice that that was not
24   appropriate behavior. And I do that for
25   anybody, all of my employees. I expect

## Page 11

1    professional behavior from them and it wasn't
2    professional behavior. So that was...
3         Q.  How many complaints did you get
4    concerning her use of profanity?
5         A.  I got about three.
6         Q.  Could you give me the names of the
7    employees that...
8         A.  They don't want their names. That's
9    why I didn't give them to her, they don't
10   want their names put out because they were
11   concerned that she would come back and get
12   them.
13        Q.  Well, the reason I ask is because
14   the other witnesses that I've questioned
15   state that she does not have a reputation
16   for using profanity and that in that
17   instance allegedly she was told that someone
18   else was going to be placed in her position
19   and that led to the expletive deleted that
20   she used.
21        A.  No. No one was going to be placed
22   in her position. I -- what -- the
23   conversation that was going on at the time
24   was, I told her I was restructuring the
25   special initiative programs and I was

## Page 12

1    bringing Dr. Mike Brown into the team lead
2    position. Brand new position. She was not
3    in the position, it never was her position.
4    Her position was the SCEP Student Program
5    Manager, only. She had two other Program
6    Managers she worked with, but she didn't
7    supervise them. So, at the time she was not
8    the lead person and it is not her position,
9    it's a brand new position.
10        Q.  Okay. She responded to your bringing
11   this Dr. Mike Brown on by making the...
12        A.  Right.
13        Q.  ...profane statement?
14        A.  That's correct.
15        Q.  All right. Now, did she, during
16   the, that period of time, I guess it was in
17   the year 2003, did you have occasion to
18   issue any other letters of counseling to
19   her?
20        A.  No.
21        Q.  Okay. One of the other things that
22   she states that she says shows that there
23   was an effort to harass her and get rid of
24   her is that she has no performance
25   evaluations. She says she hasn't had any



County Court
REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs  1160 Jordan Springs Road  Stephenson, VA 22656    540.667.6562 FAX

www.CountyCourtReporters.com



# United States Department of the Interior

**EXHIBIT D22**

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov

August 1, 2003

## Memorandum

To:        Romella Arnold

From:      Marilyn H. Johnson, *Assistant Director, HRM*

Subject:   Reassignment

This memorandum serves to inform you that effective August 10, 2003, you will be assigned to the position of Equal Opportunity Specialist, GS 360-13, with the organization title of Civil Rights Specialist. In preparation of that assignment, you will turn over all information that you have pertaining to the SCEP and STEP Programs to Sylvia Felder, Administrative Officer, HRM by August 6, 2003.

The reason for this reassignment is as follows:

In a report entitled, **Ten-Year Check Up: Have Federal Agencies Responded to Civil Rights Recommendations?** dated June 12, 2003, criticized the Department and the Bureau of Land Management for non-response to the need to enforce Title VI, Enforcement to Ensure that Nondiscrimination in Federally Assisted Programs. This report listed the Bureau of Land Management as one of the Bureaus in the Department of the Interior that did not have Civil Rights Specialists employed to do that compliance

As Assistant Director for Human Resources Management for the BLM, I intend to correct that situation by appointing you as the Civil Rights Specialist for BLM Title VI issues. This will necessitate a reassignment from your present position of Student Programs Coordinator for the BLM. Your background in EEO compliance and dealing with a variety of public organizations makes you qualified for this position.

In this position, I expect you to bring the Bureau up to model standards in compliance with its Title VI responsibilities. You will be given your position description and performance standards for this position in thirty days

This position will be located in the EEO Headquarters Office of the Bureau of Land Management. Your pay, grade, and duty station will not be affected

I know that you will do outstanding work in your new position

**EXHIBIT**
Blue
7

EXHIBIT
Blue
8

ONE HUNDRED FIFTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

*9-17-97*
(Date)

For: *Ronella Arnold*

*N A A B F E*

Thank you for participating in the recent hearing. Attached are transcript pages, Nos. *142, 169-170, 182, 186*, showing your remarks given before the subcommittee. <u>Please correct your testimony only</u>, using the following guidelines.

1. <u>Print</u> with <u>red</u> ink or type any corrections, using standard editing symbols. Please initial each completed page.
2. Correct only grammatical and typographical errors. The intent of your remarks should not be changed, nor should the language be so enhanced that it becomes unrecognizable from the original text.
3. Attach documents or other requested information to the appropriate page. Supplemental material supplied for the record should be of photographic quality for reproduction.
4. If you wish to correct any misstatement of fact, please submit a separate letter for the record explaining the misstatement and any correction you wish noted.

Should the subcommittee have questions about your edited transcript, please indicate the name and telephone number of the person to whom inquiries should be made:

_____

_____

To expedite printing, please return this material (even if no corrections are made to the text) by *3 October 1997* to the address below.

Subcommittee on Civil Service
Room B371C Rayburn HOB
Washington, D.C. 20515
<u>Attention</u>: Caroline Fiel Tel. 202/225-6427

UNLESS A PROPERLY CORRECTED TRANSCRIPT IS RECEIVED BY THE SUBCOMMITTEE <u>WITHIN THE SPECIFIED TIME</u>, YOUR REMARKS AS RECORDED WILL APPEAR IN THE PRINTED RECORD.

<u>NOTE</u>: Copies of the transcript are not to be distributed for other than editing purposes and no direct quotations are to be taken from the edited version.

## CERTIFICATION

I certify that the corrections made and initialed by me reflect the changes I wish to make in my oral testimony.

*Ronella J. Arnold*
(signature)

3180 Agriculture and the Department of the Interior, have met and
3181 exceed this standard. As of June 1997, out of a total
3182 employment population of 74,827, African Americans represent
3183 only 6.1 percent or 3,357 of the 53,400 permanent employees
3184 and 2.4 percent or 514 of the 21,427 temporary employees
3185 within the Department.

3186     A recent article in The Washington Post identified the
3187 Department of the Interior as the whitest of all Federal
3188 agencies when it comes to employment at the GS-13 and above
3189 levels. At the GS-13 through -15, out of a total of 9,100
3190 employees, African Americans represent 3.8 percent or 346.
3191 This condition has persisted, despite a net growth in the
3192 Department over the last 10 years.

3193     According to an annual report published by the EEOC
3194 Commission, the representation of African Americans from 1986
3195 to 1995 flat-lined between 5.9 and 6.0 percent, despite a net
3196 increase of over 5,000. I submit to you, Mr. Chair, if we
3197 were hooked up to an EEOC respirator, they would have pulled
3198 the plug on us by now. We contend this is due to an
3199 unwritten quota policy of replacement-only where African
3200 American employment is concerned. The same EEOC report has
3201 ranked Interior last out of 42 agencies and departments in
3202 its employment of African Americans.

3203     As the statistics demonstrate, the institutional
3204 discrimination that has produced and perpetuated this

3155 by the lack of equal opportunity within the Department of the

3156 Interior. The Department's longstanding resistance to adhere

3157 to the spirit and the intent of equal opportunity laws and

3158 regulations has caused severe underrepresentation and in some

3159 instances a conspicuous absence of African Americans within

3160 the employment categories and levels.

3161 Throughout the years, the Department's EEO program has

3162 been the focus of numerous congressional inquiries, audits,

3163 and investigations by regulatory agencies and the media. All

3164 appear to have reached the same incontrovertible conclusion:

3165 The Department, through its employment practices, has

3166 systemically excluded African American employees as a class,

3167 and those practices continue to perpetuate the effects the of

3168 past discrimination. The legacy is a workforce that in no

3169 way reflects the diversity of our Nation, and a Department

3170 that will be ill-prepared to enter the next century and to

3171 deal with the challenges and the opportunities that a more

3172 diverse society will present.

3173 We believe the following statistics reflect what many

3174 years of institutional racism has created. These percentages

3175 should be compared to the national civilian labor force

3176 percentage of 10.4 percent, and this percentage has been used

3177 by the Office of Personnel Management as the representational

3178 standard.

3179 All but two major Federal agencies, the Department of

U.S. Department of Interior Investigative Interview of Sylvia Felder

1 (Pages 1 to 4)



**Page 1**

1  UNITED STATES DEPARTMENT OF THE INTERIOR
   BUREAU OF LAND MANAGEMENT
2  WASHINGTON, D. C. 20240
   COMPLAINT OF DISCRIMINATION
3
4
5
   IN RE:   Romella J. Arnold
6          Complaint No. LLM-04-002
7
8
9  ---------------------------------
10
11 The Sworn Telephone Investigative Interview of SYLVIA
12 FELDER, taken in the above matter in the Offices of
13 COUNTY COURT REPORTERS, INC., located at 1160 Jordan
14 Springs Road, on the 9th day of March, 2004, beginning at
15 10:35 a.m.
16
17
18
19
20
21
22
23
24
25

**Page 2**

1        A P P E A R A N C E S
2
3  ON BEHALF OF THE U.S. DEPARTMENT OF
4  INTERIOR, BUREAU OF LAND MANAGEMENT:
5  Jesse Hicks, EEO Investigator
6     U.S. Department of Interior, BLM
7     WO-720-EEO
8     1620 L Street, N.W., Suite 700
9     Washington, D.C.  20036
10    Telephone: (202) 452-5102
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  SWORN TELEPHONE INVESTIGATIVE INTERVIEW OF
2              SYLVIA FELDER
3  IN RE: ROMELLA J. ARNOLD
4        Case No. LLM-04-002
5           March 9, 2004
6        MS. ANDERSON:  Do you swear
7  or affirm the information you are about to
8  give is true to the best of your knowledge
9  or belief?
10       MS. FELDER:  Yes.
11 SYLVIA FELDER, having been duly sworn by Ms.
12 Anderson was examined and testified as
13 follows:
14 DIRECT EXAMINATION
15 BY MS. ANDERSON:
16    Q.  Please state your full name for the
17 record.
18    A.  Sylvia Felder.
19    Q.  And please state what agency you're
20 employed by?
21    A.  Department of Interior.
22    Q.  And what is your position title?
23    A.  Administrative Officer.
24    Q.  And the series and grade of that
25 position?

**Page 4**

1     A.  I believe the series is 341, since I
2  just became a couple months ago...
3     Q.  Oh.
4     A.  ...and the — my grade is a 13.
5     Q.  Okay.  And if you've only held this
6  position for a few months, during the the
7  year 2003, which covers this complaint, what
8  position did you hold?
9     A.  I was a Program Analyst.
10    Q.  And the series and grade of that
11 position?
12    A.  The grade was a 12 and I don't know
13 what the series of it was.
14    Q.  Okay.  During that period of time
15 who was your first level supervisor?
16    A.  For the year of 2000 and...
17    Q.  2003, before you get the current
18 position.
19    A.  From -- Marilyn Johnson.
20    Q.  Okay.  And what is her position
21 title?
22    A.  She's Assistant Director for Human
23 Resources.
24    Q.  And who was your second level
25 supervisor; that would be whoever is over

**EXHIBIT**

Felder Inv
Interview

**EXHIBIT**
Blad
9


The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES
Historic Jordan Springs  ∠  1160 Jordan Springs Road  ∠  Stephenson, VA 2265
www.CountyCourtReporters.com

## Page 5

1  Ms. Johnson?
2  A.  I guess that would be the Deputy
3  Director of the Bureau.
4  Q.  Okay.  Now, you state that you're
5  currently in a different position than you
6  were in 2003.  Explain how did you -- did
7  you get promoted or did you transfer, how
8  did you move from this...
9  A.  I got promoted.
10  Q.  Okay.  Now, Ms. Romella Arnold is
11  alleging that she was discriminated against
12  based on her race, her sex, her age and the
13  fact that she had prior EEO activity.  She
14  states that this discrimination took the form
15  of discrimination in the terms and conditions
16  of her employment.  She names as the
17  responsible management official Ms. Marilyn
18  Johnson.
19      Now, to begin with, in her
20  allegations she states that Ms. Johnson
21  accused her of money laundering.  Were you
22  present at any time when Ms. Johnson
23  allegedly made these statements?
24  A.  Yes.
25  Q.  Did you hear her accuse the

## Page 6

1  Complainant of money laundering?
2  A.  No
3  Q.  All right.  So, as far as you are
4  aware Miss Johnson, at least in your
5  presence, never made an accusation of money
6  laundering?
7  A.  She made an -- she did not make an
8  accusation of money laundering to Miss
9  Arnold.  She stated it in a general term in
10  a meeting that we attended, that we were in
11  and she was saying, what it sounds like is
12  money laundering to me.  But it was not
13  addressed to anybody in particular because
14  there was like several of us in the meeting.
15  Q.  Now, what was she responding to
16  saying it was money laundering?
17  A.  She was responding to the fact that
18  we had had, Miss Johnson was new to the
19  program and we were briefing her on the,
20  some of the, at, at that time we were
21  briefing her on the Langston University
22  partnership that we had and how that worked
23  and how the funds were -- how much money was
24  given to them and how they were -- and what
25  the monies were used for and all that.

## Page 7

1      And so, in that sense she, you know,
2  in briefing her and we were giving her the,
3  you know, how everything worked before she
4  got there when the previous -- when the
5  previous Assistant Director, the way he
6  handled things and she said, well, you know,
7  I, I'm just paraphrasing this because I
8  can't remember, I think it was like two
9  years ago we had this conversation, this
10  meeting, and she said something like, well,
11  oh, that sounds like that's money laundering
12  to me.  Something like -- to that effect.
13  I don't, she never actually said that any
14  particular, anybody was laundering money,
15  so...
16  Q.  All right.  Was she making the
17  comment about the program?
18  A.  Yes, the program.
19  Q.  And, and that's the Student
20  Employment Program?
21  A.  Well, not the whole student program.
22  It's just that part of it, the, the
23  relationship with Langston University.
24  Q.  All right.  So...
25  A.  It was just the one contract under

## Page 8

1  that program.  We have several.
2  Q.  All right.  So, her comment was
3  directed at one particular program with
4  Langston University?
5  A.  Right.
6  Q.  And was that the program that at the
7  time the Complainant was over, that she was
8  in charge of?
9  A.  At that time I don't know if she was
10  in charge of it.  She was in, she was in
11  charge of the SCEP Program, which is Student
12  Career Experience Program.  There had been
13  some discrepancies in the directorate at the
14  time, so a lot of people were taking turns
15  on doing some of the work.  So, I can't
16  speak to say at that time that she was in
17  charge of it, but she had knowledge of it.
18  We all did.
19  Q.  All right.  So, the Complainant was
20  employed as the Student Employment Program
21  Manager.  Now, was that for one particular
22  program or she just worked in general with
23  student employment programs?
24  A.  She -- the, the Student Employment
25  Program encompasses the Historically Black



**County Court**
**REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICE

800.262.8777      Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656      540.667.6562 FAX

www.CountyCourtReporters.com

Page 9

1  Colleges and Universities Program, the Tribal
2  Colleges Program, the Hispanic initiatives, I
3  mean, Servicing Institutions Program and the
4  Student Career Experience Program. And at
5  that time, at that, at that meeting actually
6  she -- Romella was just the Student Career
7  Experience Program Manager because the other
8  Program Managers handled other aspects of the
9  Student Educational Programs. I recall there
10 was two programs, but she, she was just
11 managing one part of it which is the SCEP
12 Program.
13    Q.  Well, the position you held, how did
14 you interact with the program?
15    A.  I interacted because I was the, I'm
16 the budget lead for the, for the
17 directorate. So, any time they needed to,
18 any monies that they needed transferred or
19 to be used I, I pretty much monitored their
20 budgets and that's how, you know, I was
21 involved in knowing what, how the funding
22 was set apart.
23    Q.  Now, are you aware of or did you
24 know, was there a general memorandum put out
25 that the Equal Employment -- the Equal

Page 10

1  Opportunity groups were going to be
2  reorganized under Miss Johnson?
3    A.  No.
4    Q.  Okay. So, there was no notification
5  of any reorganization?
6    A.  I'm proceeding -- clarification...
7    Q.  Right. I was asking whether or not
8  once Miss Johnson became really the second
9  level supervisor, was there any sort of
10 reorganization under her, did she make any
11 announcements, put out any memos, in any way
12 say that the, the people would be
13 reorganized in the program now that she was
14 over it?
15    A.  Yeah, and I think that, I don't know
16 particularly with the EEO Programs, but I
17 know that she -- and I, I'm famil -- I
18 don't know, there may have been a memo, but
19 I'm not sure. So, I, I can't speak to
20 that, but I know it was announced in the
21 staff meeting of all the staff or that, that
22 there, there would be some reorganization and
23 some movement of staff. We all were aware
24 of that.
25    Q.  All right. Did she give any

Page 11

1  specific names of just say that in general
2  there's going to be a reorganization?
3    A.  She may at some time have given
4  specific names and according to whatever was
5  going on. We have had several
6  reorganizations, not to just EEO Programs,
7  but the whole Human Resources Programs.
8    Q.  All right. Well, the Complainant is
9  alleging that Ms. Johnson specifically sought
10 to dismantle the Student Employment Program
11 as it related to historically black colleges.
12    A.  No. No, I don't have that
13 understanding.
14    Q.  Okay. Well, were -- are these
15 programs still in effect? For example, do
16 you still have a contract with Langston
17 University?
18    A.  No, we no longer have a contract
19 with Langston University, but we have with,
20 with other HBCU's. You know, we still have
21 an HBCU program.
22    Q.  Is there any particular reason you
23 don't, you no longer have a contract with
24 Langston?
25    A.  Yes, because of the fact that there

Page 12

1  were some inaccuracies and mismanagement of
2  the funds.
3    Q.  Were -- was Ms. Arnold involved in
4  that in any way?
5    A.  I don't -- no, I don't think so.
6    Q.  Well, another thing is, do you or
7  were you aware of at any time Miss Arnold
8  using profanity in any of your staff
9  meetings, I mean, was she known for using
10 profanity? She received a letter of
11 counseling, she alleges, based on being
12 accused of using profanity.
13    A.  Well, she was in one meeting which I
14 think was a conference call. But she wasn't
15 in that meeting, she was on the phone and
16 she did use profanity at that time. That
17 was the only, that was the only meeting I
18 was a part of.
19    Q.  All right. So, as far as just in
20 general, did you ever hear her use
21 profanity? I mean, some people in their
22 ordinary speech pepper it with a few words.
23    A.  Not in my presence. I, I can't say
24 that I have. I, I mean, maybe in general
25 talking maybe, but I mean, it's just not



County Court
REPORTERS INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ⌐ 1160 Jordan Springs Road ⌐ Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com

<table>
<tr><td>

**Page 13**

1 like she interacted that much that, you
2 know, I would say that I heard her use
3 profanity on a number of occasions, but I do
4 know she was in a meeting, on a conference
5 call that she has used profanity.
6    Q. All right. Do you know whether or
7 not was, was any other management people
8 present at the time?
9    A. Well, Miss Johnson was on the call
10 and the other Program Managers for the
11 different programs, the Hispanic Program
12 and...
13    Q. Do you recall what she said?
14    A. I don't recall exactly what was said.
15 I, I just know that it was something that,
16 you know, raised eyebrows, you know, but I
17 can't remember. It, you know, it was, she
18 was, I think she was reacting to an
19 announcement because Miss Johnson had made
20 the announcement that she was going to bring
21 in someone else to manage the whole, overall
22 Student Program which is, Miss Arnold's
23 program was just one part of that, and that
24 she was going to bring in a Dr. Michael
25 Brown to be over the program management and

</td><td>

**Page 15**

1    Q. Okay. So, just the Complainant was
2 reassigned then?
3    A. Right.
4    Q. Okay. Are you aware of, since you
5 dealt with budgets are you aware of whether
6 or not there was a budget for Title 6?
7    A. Well, there is a budget for the EEO
8 Programs and part of the EEO Program the
9 bureau was cited as -- by the EEO Commission
10 and they did an audit, I mean a, what you
11 call it, audit of the Bureau. And one of
12 the things that we were cited on was the
13 fact that we didn't have a Title 6 Program.
14 And so that, as part of that, this is my
15 understanding, as part of that report and,
16 and, and trying to remedy that situation a
17 Title 6 position had to be established and,
18 yeah, we would have had the funding for
19 that.
20    Q. Now, while there were, as, as you
21 stated before, as far as you know there was
22 information put out that there would be a
23 reorganization, but I take it there was no
24 formal plan that everybody was given later
25 on?

</td></tr>
<tr><td>

**Page 14**

1 she made a comment -- that's when she made
2 a, a pro -- a, a cuss word to, I guess, in
3 reaction to the fact that somebody...
4    Q. Complainant is saying that said, I'll
5 be damned.
6    A. I mean, I don't remember exact words
7 but, you know, she did, she used a word of
8 profanity, you know, in that conversation, if
9 you want to say that is.
10    Q. All right. Now, the Complainant says
11 that, that several people were transferred
12 and reassigned and they were reassigned to a
13 Title 6 position which had no funding and
14 wasn't operative. Now, when you dealt with
15 budgets, did you deal with the Title 6
16 Program at all?
17    A. Okay, wait a minute. You asked if
18 several people were, were reassigned to Title
19 6?
20    Q. My understanding that the Complainant
21 and the Complainant's supervisor, a Miss
22 Stewart, were reassigned and they were
23 reassigned to work with the Title 6 Program.
24    A. No, Miss Stewart was not reassigned
25 to work in the, the Title 6 Program.

</td><td>

**Page 16**

1    A. Well, right now we're still working
2 on it because it's still in process. That
3 would be hard to say. As a matter of fact
4 we are right now in the, in the process of
5 establishing two new groups. We have a Work
6 Force Planning Group where people are going
7 to be reassigned to that. We have a new
8 Service and Personnel Office that people are
9 going to be reassigned to. They're already
10 there, but we just need to do their -- she
11 needs to reassign them and, but they're
12 working on that now. So, it's still in
13 process, so -- and a new organizational
14 chart will be sent out. So...
15    Q. Now Complainant is -- Miss Arnold is
16 also alleging that as part of what she sees
17 as discrimination against her, that the --
18 was it, there was a computer program that
19 was eliminated, the Student Enhancement
20 Recruitment Tracking System. Do you know
21 whether or not there was such a program and
22 was it eliminated from the system?
23    A. There was one -- it wasn't
24 eliminated, it was never really established.
25 When I came on board here in Human Resources

</td></tr>
</table>



**County Court REPORTERS**, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777   Historic Jordan Springs ⎰ 1160 Jordan Springs Road ⎰ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 17

1 under the old administration in 1999 and it
2 existed at that time. And in looking at the
3 funding for it, they had sunk a lot of money
4 into it, but we had no product. So, all --
5 so, they began questioning, you know, what
6 is this? And so, in trying to give them
7 an opportunity to -- Miss Arnold and whoever
8 she had working with her -- to bring this
9 project to fruition, to a, to a closure
10 where it needed to be a functioning system
11 that you can just go in and pull the
12 information out and she assured us that it
13 would be that way and every year we would,
14 you know, give them more money.
15     So, this year when Miss Johnson came
16 aboard and, you know, and we could not
17 really justify why we had been spending
18 money. We still had no -- there was still
19 nothing that we could show anybody to say,
20 okay, this is it. So, our -- we have, now
21 we have an ITIB Board which is our --
22 basically where all the systems, coordination
23 or whatever for the Bureau, and you have to
24 go before them with any new systems. And
25 they required a report, they wanted to know

Page 18

1 what this system was about and no one could
2 come up with what they call a 300B, which is
3 a business case for this system. And we had
4 already sunk all this money into it, but the
5 decision was made that we would scrap it,
6 so...
7     Q. Was it made after a presentation
8 before this Board?
9     A. No, it never got to the Board.
10     Q. Okay, it never got to the Board.
11     A. Yeah, because no one -- you, you
12 have to do preparation or particulars to go
13 to the Board before it could -- and that was
14 never done, no.
15     Q. So, was Miss Johnson the one who
16 decided to eliminate the system...
17     A. Yes.
18     Q. ...would be justified?
19     Okay. Now, the Complainant actually
20 in her allegations said it, it's stating
21 that she felt that she actions that took
22 place were harassment, particularly
23 harassment directed at her because of her
24 race, her sex, her age and the fact that she
25 was known for her EEO activity. Among other

Page 19

1 things is, she said she was denied a travel
2 request to attend Student Career Experience
3 Program Orientation Training. Do you know
4 whether or not that is true and was it part
5 of the reorganization?
6     A. I don't know anything about any
7 denying travel.
8     Q. Okay. She also says that she was
9 the only person in her grade level who was
10 moved into shared office space, that she
11 actually had to share office space with
12 another lower graded employee as part of
13 this reorganization?
14     A. Well, we have a -- almost everybody
15 in this directory has shared space.
16     Q. So, you all have it?
17     A. We all have shared space, yeah,
18 except for a few people who have individual
19 offices. Now, I can't tell you right now
20 the grades. They're all either 14's or
21 15's, one of them.
22     Q. Okay. Now, the other thing that
23 Miss Arnold is stating is that she was known
24 for her Civil Rights work, particularly with
25 a black organization of federal employees and

Page 20

1 that because she was outspoken about
2 discrimination in BLM that she believes that
3 she was harassed, the program -- excuse me,
4 removed from the program that she worked in
5 and the computer system was removed. Do you
6 know whether just in general she was known
7 for, for outside activities on behalf of
8 minority federal employees?
9     A. Well, I didn't know about it. I'm
10 not, I, I'm not privy to any stuff where she
11 was involved. I mean, I would say no, I
12 mean, it wasn't known to me, well known to
13 me. So, I don't know, I can't speak for
14 anybody else.
15     Q. But as far as you know she wasn't
16 working with a Congressman about problems
17 they had perceived in the Bureau of Land
18 Management?
19     A. No. I don't know anything about
20 that.
21     Q. Okay. Now, the other thing that
22 Miss Johnson -- I mean, Miss Arnold has
23 complained about is she states that it is
24 well known that Miss Marilyn Johnson is
25 fairly hostile towards other African



County Court
REPORTERS INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ∠ 1160 Jordan Springs Road ∠ Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com

## Page 21

1 Americans and she gives a list of people
2 that she believes have been run out of the
3 agency particularly by Miss Johnson. And
4 she gives the name of Richard Redmond, have
5 you ever heard of him?
6     A. He was our -- I've heard of him,
7 yes. He left the bureau years ago.
8     Q. Okay. Did he leave before Miss
9 Johnson headed the Human Resources or was
10 the Associate Director?
11     A. Yes.
12     Q. Okay. Clark Collins?
13     A. Clark is still working with us.
14     Q. Okay. Do you know whether he's been
15 transferred out of his position, has he been
16 demoted, has he...
17     A. No.
18     Q. Okay, Lee Allen?
19     A. Miss Johnson did not -- Lee Allen --
20 Miss Johnson has had no involvement with Lee
21 Allen. Right now he's on a, an assignment
22 outside the Bureau, but that, whatever was
23 arranged, that was done in the past
24 administration under Mr. Warren Johnson.
25     Q. Okay. And Warren Johnson?

## Page 22

1     A. What, was Miss...
2     Q. Was he ever supervised by Miss
3 Marilyn Johnson, did she ever...
4     A. No, he supervised Miss Marilyn
5 Johnson.
6     Q. Oh, okay. So, he was her
7 supervisor?
8     A. Right.
9     Q. Do you know whether he retired or
10 was he removed from his position?
11     A. Retired.
12     Q. Okay. Melvin Fowler?
13     A. No.
14     Q. Okay. Edgar R. Weathersby?
15     A. I don't know him.
16     Q. Okay. Denise Stanback?
17     A. No, I don't know her.
18     Q. Jana Long?
19     A. I don't know her.
20     Q. Okay. Ivy Garcia?
21     A. I don't know her.
22     Q. And Diane Wood-Medly?
23     A. No.
24     Q. Well, Ms. Arnold has stated that she
25 believes that Miss Johnson is, is more

## Page 23

1 likely to take negative action against an
2 African American than she is against a non-
3 minority employee. She feels that Miss
4 Johnson has created an environment of
5 hostility and she also feels that her
6 transfer to Title 6, her removal from the
7 student, as Student Employment Program
8 Manager and the statements about money
9 laundering have led to her feeling that
10 she's being harassed and driven out of BLM.
11     Now, as far as you're aware, have
12 you observed what you would consider Miss
13 Arnold being in a negative position or of
14 being thought of in a negative manner? You
15 know, like for example, does she have a
16 reputation that she doesn't do her work or
17 she was removed for shall we say a negative
18 reason?
19     A. No. I do know that the, that since
20 Miss Johnson has been here, that there have
21 been some changes and that some people don't
22 like them because we are now trying to get a
23 functioning, workable direct -- you know, she
24 -- directorate going. You know, a Human, a
25 Human Resources Office that we can be proud

## Page 24

1 of and I know in all the reassignments and
2 everything that most of them have been
3 African Americans and a few of us have
4 gotten promotions from it.
5     So, you know, I don't know if that
6 would be hostile. We wouldn't look at it as
7 being hostile. I think it's maybe, you
8 know, when you're trying to run a more
9 efficient office, you know, changes had to
10 be made and we all were, you know, subject
11 to doing it. So, we are trying some job
12 changes and whatever, so...
13     Q. Well, are there now more promotional
14 or better promotional opportunities?
15     A. Right, yes.
16     Q. About how many people got promoted?
17     A. I think about four people.
18     Q. And were they -- what's the sort of
19 racial breakout?
20     A. All African Americans.
21     Q. How, how about age, are they mostly
22 people over 40, in their 40's?
23     A. Over 40.
24     Q. Okay. Males or females?
25     A. Females, all females, yeah.



County Court
REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777     Historic Jordan Springs   1160 Jordan Springs Road   Stephenson, VA 22656     540.667.6562 FAX
www.CountyCourtReporters.com

**Page 25**

1 Q. Okay. Well, is there anything else
2 you want to add and in that instance is
3 there anything else you've observed in the
4 work environment of the Complainant, Romella
5 Arnold?
6 A. No.
7 Q. Okay. Well, I want to thank you
8 very much.
9 Now, before we leave, though, because
10 of the fact that she filed on certain
11 factors I have to ask you. So, I need to
12 ask what is your race?
13 A. African American.
14 Q. And what is your gender?
15 A. Female.
16 Q. And your date of birth?
17 A. 12/17/54.
18 Q. And do you have prior EEO activity,
19 have you ever filed an EEO complaint?
20 A. No.
21 Q. Okay.
22 MS. ANDERSON: Well, thank
23 you very much and that completes it.
24 (WHEREUPON, the Sworn Telephone Investigative
25 Interview of SYLVIA FELDER was concluded at

**Page 26**

1 10:59 a.m.)
2 MS. ANDERSON: Is there any
3 spelling or anything you need, Mr. Spacek?
4 COURT REPORTER: Yes, ma'am.
5 One early, Michael Brown I'm assuming is M-
6 I-C-H-A-E-L B-R-O-W-N.
7 MS. ANDERSON: Mm-hmm.
8 (Indicating affirmatively.)
9 COURT REPORTER: And Langston
10 University?
11 MS. ANDERSON: You need to
12 know how to spell Langston?
13 A. L-A-N-G-S-T-O-N.
14 COURT REPORTER: I was right
15 on that one, okay. Yes, ma'am, that takes
16 care of it, thank you.
17 MS. ANDERSON: All right,
18 thank you.
19
20
21
22
23
24
25

**Page 27**

1 CAPTION
2 The Sworn Telephone Interview of
3 SYLVIA FELDER, in the matter, on the date,
4 and at the time and place set out on the
5 title page hereof.
6 It was requested that the Interview
7 be taken by the reporter and that same be
8 reduced to typewritten form.

**Page 28**

1 SIGNATURE OF WITNESS
2 I have read the foregoing transcript
3 of the Interview taken on the
4 _____ day of _____,
5 2004, and it is a true and correct record of
6 my testimony given at that time and place
7 except as to any corrections I have listed
8 below. I understand that the information I
9 have given is not to be considered
10 confidential and that it may be shown to the
11 interested parties.
12
13
14
15
16 _____
       SYLVIA FELDER



County Court REPORTERS, Inc.
The Nation's Leader in Digital Litigation Support Technology

800.262.8777   Historic Jordan Springs ✓ 1160 Jordan Springs Road ✓ Stephenson, VA 22656   540.667.6562 FAX
www.CountyCourtReporters.com

Page 29

```
 1          INTERVIEW ERRATA SHEET
 2    WITNESS:  SYLVIA FELDER
 3    INTERVIEW DATE: March 9, 2004
 4    I have read the entire transcript of my
      Interview.  I request that the following
 5    changes be entered upon the record for the
      reasons indicated.  I have signed my name to
 6    the Errata Sheet and Signature Page to be
      attached to the original transcript.
 7
       _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24
      SIGNATURE:_____DATE:_____
25        SYLVIA FELDER
```



**County Court REPORTERS**, INC.

The Nation's Leader in Digital Litigation Support Technology

CORPORATE OFFICES

800.262.8777     Historic Jordan Springs ∤ 1150 Jordan Springs Road ∤ Stephenson, VA 22656     540.667.6562 FAX

www.CountyCourtReporters.com

# CERTIFICATE OF REPORTER

STATE OF VIRGINIA AT LARGE:

I, FRANK J. SPACEK, III, Notary Public for the State of Virginia at Large, do hereby certify that the foregoing constitutes a true and accurate transcript to the best of my ability.

I further certify that I am not an employee of nor related to any of the parties, and I have no financial interest in the outcome of this matter.

_____

Notary Public

My Commission Expires:
May 31, 2005



County Court REPORTERS, INC.
The Nation's Leader in Digital Litigation Support Technology
CORPORATE OFFICES

800.262.8777    Historic Jordan Springs ∠ 1150 Jordan Springs Road ∠ Stephenson, VA 22656    540.667.6562 FAX
www.CountyCourtReporters.com



Record of Decision
for the
Information Technology Investment Board



## Quarterly Project Rating:  SCEP Enhanced Reporting Tracking System (SERTS)

The SCO quarterly project rating for the SERTS project was presented to the ITIB at its August 2003 meeting.  The project was rated RED for scope, schedule and budget.  The project manager has not complied with quarterly reporting requirements.  This is the second quarter without a quarterly report submitted by the project manager.  The SCO has developed the following corrective actions for this project:

1. The ITIB should direct the AD-790 to assign a trained or experienced project manager.

2. The Project Sponsor should provide evidence at the November 2003 ITIB meeting that a trained or experienced project manager has been assigned to the project.

3. The project manager must develop an implementation plan and submit it to the SCO for review and approval prior to the November meeting.

Accepted: _____

Accepted with Modifications: __/__

**Modifications:**

1. _Remove from Portfolio. The project is terminated._

2. _____

Approved by: _Michael J. Howell_    Chair, ITIB        8/26/03    Date

**EXHIBIT**
Blue
11

| Code | Name | Date |
|------|------|------|
| WO-570D | K.Balla M | 09/05/3 |
| WO-570D | ClCooney | 9-5-03 |
| WO-570D | AR bunchan | 9-5-03 |
| WO-570D | | |

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**SYSTEM COORDINATION OFFICE**
**WASHINGTON, DC 20240**

In Reply Refer To:
1400-300 (WO-570D)

SEP   8 2003

Memorandum

To:      AD, WO-700, MIB, Rm. 5628

From:    System Coordination Office (SCO) Manager

Subject: SCEP Enhanced Reporting Tracking System (SERTS) Decision

The Third Quarter FY 2003 Quarterly Project Rating for the SCEP Enhanced Reporting
Tracking System (SERTS) was presented to the Information Technology Investment Board
(ITIB) on August 26, 2003.

The recommendation in the rating was not accepted. Based on the "red" rating for scope,
schedule and budget, and because the project manager has not complied with quarterly reporting
requirements, the ITIB made the decision to remove it from the National IT Portfolio and has
directed the AD-700 to terminate the project.

The AD-700 should terminate all efforts to implement the project. The AD-700 will inform the
Board at the November 2003 ITIB meeting of all costs associated with the termination of the
project, including the required Post Deployment Review. The project will need to continue to
provide quarterly reports until the Post Deployment Review Report has been accepted by the
Project Sponsor.

If you have any questions, please contact Kurt Ballantyne, the SCO point of contact assigned to
work with you and the project manager, at (303) 236-5270.

John Foster

1 Attachment
    1 - ITIB Record of Decision, SCEP Enhanced Reporting and Tracking System (1 p)

cc: Chair, ITIB
    Vice Chair, ITIB
    WO-550, LS, Rm. 700 (M. Allen)
    HR-210 (G. Colbert)
    WO-720, LS, Rm. 302  (R. Arnold)


EXHIBIT
Blue
12

 **Melissa McNichols**

08/05/2003 04:47 PM

To: Romella Arnold/WO/BLM/DOI
cc: Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H
Johnson/WO/BLM/DOI@BLM, Kurt Ballantyne/DWO/BLM/DOI@BLM
Subject: Quarterly Report Rating for SERTS - 3rd Quarter 2003

Romella,

In order to provide improved IT oversight and coordination, the SCO is advising you of the analysis results of your quarterly report, before submitting this
information to the ITIB at their June 2003 meeting.

The SCO has evaluated your FY03 Second Quarter quarterly report and rated the project for scope, schedule and budget. Please see the attached file.



serts_q3_03.doc

Kurt Ballantyne is out of the office until August 11. Let me know if you have any questions on the assigned ratings, comments, and/or recommendations. Thank you, for continuing to provide these quarterly reports; we appreciate your cooperation and compliance with the investment management policies.

Melissa McNichols
Bureau of Land Management
System Coordination Office (WO570D)
303-236-1782 (voice)
303-236-1981 (fax)

**EXHIBIT**
Blue
13

1400-300
SCEP Enhanced Reporting Tracking System

## Quarterly Project Rating
FY 2003 – Third Quarter, April - June 2003

**Project: SCEP Enhanced Reporting Tracking System (SERTS)**
**Project Number or Special Interest Project Code(s):  (024S)**

**Current Quarter Rating:**

|  | Rating | Comments |
|---|---|---|
| Scope |  | No Quarterly Report Received for 3rd Q FY03 (second time) |
| Schedule |  | No Quarterly Report Received for 3rd Q FY03 (second time) |
| Budget |  | No Quarterly Report Received for 3rd Q FY03 (second time) |

**Previous Quarter Rating:**

|  | Rating | Comments |
|---|---|---|
| Scope | 1 | No Quarterly Report Received for 2nd Q FY03 |
| Schedule | 1 | No Quarterly Report Received for 2nd Q FY03 |
| Budget | 1 | No Quarterly Report Received for 2nd Q FY03 |

**General Comments:** This project is being managed by a Project Manager without training and/or experience. Previous quarterly reports reported the system in Operations and Maintenance, current communication with the Project Manager has revealed that the project/system has not been implemented/deployed. The Project Manager has communicated that she has no implementation/deployment or project plan/schedule. This project is not included in the FY03 or FY04 IT Spending Cap. FY05 Ex300-1s submitted request $ 14,500 year for FY03-05.

**Recommendations:**  The ITIB should terminate this project and direct the SCO to inform the Project Sponsor/Project Manager to stop all implementation/deployment efforts. The ITIB should also direct the SCO and IMG to remove it form the National IT Portfolio / IT Spending Cap.

**SCO Program Analyst Name:** Kurt Ballantyne



EXHIBIT
Blue
14

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
September 21, 2001



In Reply Refer To:
1260 (WO-570D) P

EMS TRANSMISSION 09/24/2001
Instruction Memorandum No. 2001-222
Expires: 09/30/2002

To: All WO and FO Officials
    Attention: Project Managers

From: Assistant Director, Information Resources Management

Subject: Information Technology Investment Management Process, Version 1.0

**Program Area:** Information Technology Investment Management

**Purpose:** The purpose of this directive is to establish the BLM's policy and procedures for managing Information Technology (IT) investments.

**Policy/Action:** The BLM's Information Technology Investment Management Process (IT IMP) document institutes the Bureau's information technology investment management improvement processes. IT project managers, project sponsors, and system managers will be guided now by one all-encompassing process with well defined sub-processes.

**Timeframe:** This policy is effective immediately.

**Background:** In recent years, a number of statutes were passed requiring federal agencies to revise their operational and management practices to achieve greater mission efficiency and effectiveness. These include: The Government Performance and Results Act of 1993, The Paperwork Reduction Act of 1995, and The Clinger-Cohen Act of 1996.

Development of the Bureau's IT IMP has rapidly evolved over the last 12 to 18 months. Several other federal agencies have recently developed similar policies and procedures. Many of which were reviewed and incorporated into the development of Version 1.0 of the Bureau's IT IMP. In addition, the U.S. General Accounting Office has developed several IT Investment Management Guidance documents that significantly influenced the structure and format of our new all encompassing processes.

The IT IMP implements information technology requirements of those laws. The IT IMP ensures that all IT investments (or projects) align with the Bureau's mission and architecture,

and supports the business needs, while minimizing risks and maximizing returns through the investment's life-cycle.

**Budget Impact:** The investment management process will ensure investments are made that provide the greatest value to the Bureau and reduce the risk of project failure. This action will have a positive affect on the budget. This policy will enable the National ITIB and the Budget Strategy Team to better forecast funding needs and take steps to obtain and allocate the required funds.

**Manual/Handbook Sections Affected**: None.

**Coordination:** This guidance has been coordinated with National ITIB, WO-550 IRM Investment Management Group, WO-560 IRM Policy and Records Group, Bureau Architecture Team, CIO Council, and Assistant Director's IRM Advisors.

**Contact:** If you have any questions or need additional information, please contact John Foster, (303) 236-8915, or Kurt Ballantyne, (303) 236-5270, System Coordination Office.

Signed by:                                         Authenticated by:

W. Hord Tipton                                     Barbara J. Brown

Assistant Director                                 Policy & Records Group, W

Information Resources Management

1 Attachment
 1 - Information Technology Investment Management Process, Volume 1.0 (56 pp)



**Kurt Ballantyne**
07/08/2003 02:03 PM

To: Romella Arnold/WO/BLM/DOI@BLM
cc: Connie Stewart/WO/BLM/DOI@BLM, Gail
    Colbert/NCS/BLM/DOI@BLM, Marilyn H Johnson/WO/BLM/DOI@BLM
Subject: Re: Quarterly Reports are due July 15th for FY03 3rd Quarter

Romella, lets see if I can address your latest concerns/problems.

The ITIB "grandfathered" the SERTS into the Information Technology Investment Management Process (IT- IMP) because SERTS **does** met the definition of a major IT system or national level investment. In fact, the previous AD-700 confirmed SERTS was part of the WO-700 IT portfolio.

Whether you like it or not SERTS is a major IT investment and must comply with the Bureau's IT policies and procedures regarding the project and investment management processes.

In my earlier e-mail message I stated that the criteria for determining if an investment/project is a national level investment was :

    1) $500,000 (total life cycle)**, or**
    2) systems/applications used in more than one state/center, **or**
    3) system/applications used by more than one business/program area

I left out the first "or" between item 1) and item 2), which might of cause your confusion. My apology.

Since SERTS will be used Bureauwide the dollar threshold really doesn't matter. It meets the criteria of being a national system under criteria #2.

To answer your concern about " I think my project has gotten bogged down in the bureaucracy of the BLM and it does not fit from what I'm reading".

This is the new way BLM is doing business to plan and track it's IT investments and projects. We are not alone, throughout the government increased oversight and planning is being mandated by law (Clinger-Cohen Act and OMB guidance (Circular A-11)). Over 80% of all IT projects fail or cost substantially more money than originally planned, hence the need for increased planning, management oversight and improved project management.

Completing the necessary paperwork (ie Ex300-1) doesn't mean that you can just deploy. The Ex300-1 is a "Capital Planning Investment Control - CPIC" or budget document and nothing more.

The BLM, has developed policies and procedures on how projects must be "managed". It seems that you are unaware of these policies as the project manager. That is one reason why the ITIB has established policy that only trained or experienced project managers should lead these complicated IT projects. SERTS needs to enter the IT Investment Management Process and that is why I have suggested that you might consider a trip to Denver to become aware of the IT IMP / ITIB requirements to get your project deployed.

Depending on the current project life cycle status, there are numerous review points and project management reviews and documentation (ie a Project / ImplementationPlan) that must be conducted/completed before you can proceed with deployment, including being "tested" within the National Test Lab.

The location of the server and it's operations and maintenance (the server and the software) need to be address and planned for. Currently all the "national level system" other than the training application at NTC are on servers at the National IRM Center here in Denver ( that however is a WO-700 decision but from a cost standpoint still needs ITIB approval).

**EXHIBIT**
Blue
16

After all the appropriate documentation and reviews have been completed the Sponsor of the SERTS must come before the ITB and ask permission to deploy (after the Transition/Deployment Readiness Review).

This is not meant to be a threat but a "heads up". The ITIB has been looking at non-performing and/or projects out of control (through the quarterly reporting process) and has seriously considered terminating on-going projects in order to stay within the IT Spending Cap placed on the ITIB by the Budget Strategy Team.

At the June ITIB meeting SERTS was rated as "yellow" for project scope, "yellow" for project schedule and "yellow" for project budget. The reason for this rating was that no report was received in April.

Your Quarterly report is due on July 15th. If no report is received on July 15th, the project will be rated "red" for scope, schedule and budget. A red rating constitutes being "out of control", and hence would seriously jeopardize the future of the SERTS project.

I will be on leave from July 10 to the 21st. I suggest that if you have any more concerns that we get on a conference call with Gail before I go on leave.

Kurt Ballantyne
Project Management Specialist
System Coordination Office (WO-570)
Voice : (303) 236-5270
Fax :    (303) 236-1981
E-Mail : Kurt_Ballantyne@blm.gov
Romella Arnold

| | |
|---|---|
| **Romella Arnold** | To: Kurt Ballantyne/DWO/BLM/DOI@BLM |
| 07/03/2003 03:32 PM | cc: Gail Colbert/NCS/BLM/DOI@BLM, Marilyn H Johnson/WO/BLM/DOI@BLM, Connie Stewart/WO/BLM/DOI@BLM |
| | Subject: Re: Quarterly Reports are due July 15th for FY03 3rd Quarter |

Kurt,

Thanks for the update. I'm still having problems based on the information provided, understanding why SERTs was "grandfathered" into this process by the ITIB since it falls below what is considered major IT investments. The only criteria that is falls within is it's a contract system/application that was developed, tested by its users, analyzed by the users, but it has not be implement for its use. This is where I'm stuck. The system does not fall within the $500,000 amount and therefore, why would it need to be led by a full-time, trained or experienced IT project manager and if such is the case who would that be for the SERTs system? I think my project has gotten bogged down in the bureaucracy of the BLM and it does not fit from what I'm reading. When I met with Gail, Marilyn, Ron Tucker and Connie Stewart sometime back in Feb. or March, it was decided that I should prepare the 300 Lites short version report which I did and it would be presented to the ITIB. Once this was done, SERTS could be placed on a server located at the NTC. This has not happened and I'm having a hard time understanding how to make it happen. Doing these quarterly reports is not getting the results I need to implement this system and this is where I need guidance. I will arrange a conference call with you and Gail once I return to the office the week of July 14, and maybe I can get some guidance on how to get SERTS on a server so that the users can begin using it. Once this happens, the quarterly reports will be meaningful. Thanks for the information you've shared and I will contact both you and Gail when I return. Have a great weekend.

EXHIBIT
BLue
17


**Dahlena Johnson**       To:
03/03/2004 12:23 PM      cc:
                          Subject:

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM
—— Forwarded by Kellye Drakeford/WO/BLM/DOI on 03/01/2004 09:21 AM ——

       **Kellye Drakeford**       To: Romella Arnold/WO/BLM/DOI@BLM
       06/10/2003 04:00 PM       cc:
                                  Subject: Your Travel Plans

Romella,

I have been unable to locate your travel authorization for your upcoming trip to Phoenix.  This office
requires a signed authorization prior to leaving for travel.  If you have any questions or comments you may
speak to Marilyn.

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM

PGT–03–7 065

UNITED STATES
DEPARTMENT OF THE INTERIOR
FORM NO. DI-1020
FORM APPROVED BY COMP. GEN. U.S.
NOVEMBER 6, 1949

**TRAVEL AUTHORIZATION**

**1.** No. _____

**2.** June 13, 2003
     *(DATE)*

**3.** Bureau of Land Management
     [BUREAU OR OFFICE]

**4. NAME** Romela Arnold          **5. OFFICIAL STATION** Washington, DC

**6. TITLE** Program Lead          **7. ACCOUNTING OFFICE** Denver, Colorado

You are authorized to travel as indicated below and to incur necessary expenses in accordance with applicable laws and regulations.

## PLACES OF TRAVEL

**8. FROM:** Washington, DC
**9. TO:** Phoenix, AZ  *and return*

**10. PURPOSE AND REMARKS:**

Facilitate training orientation for SCEB and mentors

**11. PER DIEM ALLOWANCE:**

Lodging: $59     M&IE    $46        Total: $105

**12. PERIOD OF TRAVEL: Beginning on or about** June 15, 2003 **Ending on or about** June 20, 2003

## MODE OF TRAVEL

**13.** [X] Common carrier          **14.** [ ] Extra fare          **15.** [ ] Government-owned conveyance
**16.** [ ] Privately owned                    at a mileage rate of          cents, subject to:
     *(a)* [ ] Administratively determined to be the advantage of the Government
     *(b)* [ ] A showing of advantage to the Government
     *(c)* [ ] Not to exceed cost by common carrier, including consideration of Per Diem allowance

## MISCELLANEOUS

**17.** [ ] Transportation immediate family          **19.** [ ] Shipment household goods and personal effects
**18.** [✓] Other *(specify)* rental car

| ESTIMATED COST | | |
|---|---|---|
| **20.** Transportation | $ 342 | **26.** _____ |
| **21.** Per Diem | 525 | *(REQUESTER'S SIGNATURE)* |
| **22.** Other  Rental Car | 134 | **27.** Romella Arnold, Program Lead |
| **23.** TOTAL | $ 1,001 | *(TITLE)* |
| **24.** CHARGED TO: | | **28.** *Concetta B Stewart* |
| WO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-XL-SCEP-211D | | *(AUTHORIZING OFFICER'S SIGNATURE)* |
| **25.** _____ | | **29.** Marilyn H. Johnson, Assistant Director, HRM |
| *(FISCAL OFFICER'S SIGNATURE)* | | *(TITLE)* |

This form was electronically produced by Elite Federal Forms, Inc.

EXHIBIT
Blue
18

Travel Authorization
Request

Romella Arnold

June 12 : LU: BWI Residence/ going to NTC
to ~~conduct~~ facilitate training orientation for       Phoenix, Arizona
SCEPs and mentors

June 20 : Return to BWI

Perdiem / Lodging — current rate

Airfare : $342.00
Rental Car : $134.00 weekly rate
Misc : Tips, Taxes, etc.

Kellye
CALL Lorraine Farley — when does Student Orientation
Start at NTC.

Thanks
Connie


**Dahlena Johnson**

03/03/2004 12:21 PM

To:
cc:
Subject:

**Kellye Drakeford**

06/11/2003 02:42 PM

To: Romella Arnold/WO/BLM/DOI@BLM
cc: Marilyn H Johnson/NTC/BLM/DOI@BLM
Subject: Re: Your Travel Plans

Romella,

Your request for travel tomorrow is declined. Given that the orientation doesn't start until Monday, June 16th, Marilyn will approve your travel starting on Sunday, June 15th.

If you would like to discuss this further with Marilyn, let me know and I'll see if I can get you on her calendar.

Kellye A. Drakeford
Executive Assistant
Office of the Assistant Director, HRM
Romella Arnold


**Romella Arnold**

06/10/2003 05:09 PM

To: Kellye Drakeford/WO/BLM/DOI@BLM
cc:
Subject: Re: Your Travel Plans

Thanks. I will bring down the information requesting a TA first thing in the morning.

Romella Arnold
Program Manager, SCEP
Bureau of Land Management
(202) 208-1549

EXHIBIT
Blue
19



**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | |
|---|---|
| 1. Agency Position No. 10147 | |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☒ Redescription ☐ Reestablishment ☐ New | ☒ Hdqtrs ☐ Field ☐ Other | Washington, DC | Washington, DC | |

Explanation *(Show any positions replaced)*

| 7. Fair Labor Standards Act | 8. Financial Statements Required | | Subject to IA Action |
|---|---|---|---|
| ☒ Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interest | | ☐ Yes  ☒ No |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☒ Competitive | ☒ Supervisory | ☒ 1—Non-Sensitive   ☐ 3—Critical | |
| ☐ Excepted *(Specify in Remarks)* | ☐ Managerial | | 14. Agency Use |
| ☐ SES (Gen.)  ☐ SES (CR) | ☐ Neither | ☐ 2—Noncritical Sensitive   ☐ 4—Special Sensitive | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Program Manager | GS | 0340 | 14 | RMC | 8/4/03 |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

16. Organizational Title of Position *(if different from official title)*

17. Name of Employee *(if vacant, specify)*

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| Department of the Interior | |
| a. First Subdivision | d. Fourth Subdivision |
| Bureau of Land Management | |
| b. Second Subdivision | e. Fifth Subdivision |
| AD, Human Resources Management | |
| | Signature of Employee *(optional)* |

19. Employee Review–This is an accurate description of the major duties and responsibilities of my position.

20. Supervisory Certification.  *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible.  This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*

Marilyn H. Johnson

AD, Human Resources Management

Signature                    Date

Signature                    Date 7/28/03

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action

Linda Y. Behlin

Human Resources Specialist

Signature                    Date 8/4/03

22. Position Classification Standards Used in Classifying/Grading Position

OPM Job Family PCS for Admin. Work in Human Resources Mgmt Group, GS-200, dtd. 12/00; GSSG, dtd. 4/98

Information for Employees.  The standards, and information on their application, are available in the personnel office.  The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management.  Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

25. Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265    Previous Edition Usable    5008-106

OF 8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

EXHIBIT
Blue
21

Program Manager, GS-340-14

Introduction

The incumbent serves as a Program Manager in the Human Resources Management Directorate of the Bureau of Land Management (BLM), overseeing the administration of important employment and diversity programs that are bureau-wide. Incumbent provides support, input, advice, training and direction to subordinate staff members who develop and implement bureau-wide initiatives, in partnership with educational institutions and others, to ensure the continuing flow into BLM's workforce of students with appropriate scientific and professional academic preparation and other highly qualified candidates with diverse racial and ethnic backgrounds.

Major Duties

The incumbent oversees, directs, coordinates, supervises and manages a subordinate staff involved in planning, administering and managing a variety of employment and diversity programs in the Bureau of Land Management. Primary responsibilities cover the following programs and initiatives:

- Historically Black Colleges and Universities
- Hispanic Serving Colleges
- Tribal Colleges and Universities
- Asian American/Pacific Islander Initiative
- Students with Disabilities Initiatives
- Faculty Exchange Program
- Executive Orders
- Educational Partnerships
- Diversity Initiatives
- Diversity Intern Program
- Student Educational Employment Program
    - Student Temporary Employment Program (STEP)
    - Student Career Experience Program (SCEP)

Oversees the management and operations of employment and diversity programs, advising, counseling and assisting human resources specialists in delivering the highest quality and efficiency of human resources services possible.

Designs, plans and participates in management assessments to determine the effectiveness of numerous BLM employment and diversity programs and services. Develops and recommends evaluation strategies to determine the effectiveness of operational practices and procedures and to address and solve systemic problems. Develops measures of quality, effectiveness, efficiency and readiness for all assigned programs.

Supervisory Responsibilities: Supervises the staff and manages employment and diversity programs of the Bureau. Exercises the full range of supervisory duties in overseeing the work

of subordinates and performs broad personnel management duties throughout the programs for which responsible. Ensures that equal opportunity goals and objectives are achieved with respect to training, promotions, awards, appointments, recognition and career development opportunities.

Factor 1, Knowledge Require by the Position

Knowledge of management theories, principles, practices, laws and regulations in order to provide technical authority over a variety of employment and diversity programs.

Ability to plan and manage broad Department programs of national scope with multiple demanding policies, processes and procedures to integrate and coordinate.

Skill in managing, coordinating, directing and supervising complex programs.

Knowledge of organizational and process improvement techniques, management analysis and management theory and how to apply these techniques and theories to the improvement of programs.

Ability to design, plan and participate in management assessment studies to determine the effectiveness of employment and diversity programs and to develop recommendations to address systemic problems and improve program operations.

Advanced communication skills in order to present, defend, explain and negotiate broad HR initiatives, program revisions and policies.

Ability to collaborate with management in employing change process concepts and techniques.

Knowledge of BLM's missions, programs, organizational structure, relationships, business processes and lines of authority.

Factor 2, Supervisory Controls

Works under the supervision of the Deputy Assistant Director (DAD) for HR Operations, Human Resources Management. As a Program Manager, the incumbent has authority and responsibility to manage the BLM operations that he/she is assigned. The DAD consults with the incumbent to establish strategic plans and initiatives. The Deputy Assistant Director defines major program goals and objectives, and the incumbent directs and manages operations independently, exercising judgment in interpreting and applying broad program mandates. The incumbent's recommendations and decisions are considered to be authoritative. Work is reviewed for achievement of the goals and objectives of the various programs managed.

Factor 3, Guidelines

Guidelines include basic legislation, regulations, Department directives and instructions, court decisions. OPM rules and regulations, guidance and regulations from agencies such as GAO,

OMB, MSPB, EEOC, etc. The incumbent uses judgment and exercises latitude to determine the intent and manner of application of these guidelines. Senior Bureau staff recognize the incumbent as a technical expert.

Factor 4, Complexity

Incumbent has broad and varied program responsibility over various functions and has management and supervisory responsibility. He/She manages important Bureau programs that are broad in scope, complex and critically important. The issues that the incumbent must confront are varied, often problematic and usually sensitive in nature. Exercising responsibility for a large number of separate programs and initiatives requires special care in the establishment, coordination and oversight of management and supervisory structure and procedures.

Factor 5, Scope and Effect

Work involves analyzing, evaluating, and developing major aspects of bureau-wide employment and diversity programs. Issues and problems confronted are often sensitive and potentially controversial. Work may establish precedents for other Department programs and offices and may influence or persuade top Department officials to change major HR policies or procedures.

Factor 6, Personal Contacts

Contacts include persons outside the agency, including representatives of colleges and universities, members of associations and organizations, human resources professionals in other government agencies and in the private sector, contractors, or business executives. in moderately unstructured settings, such as conferences, meetings, training sessions, etc. There are regular contacts also with senior Bureau officials.

Factor 7, Purpose of Contacts

The purpose of personal contacts is to represent the Bureau and the Department in recruitment and liaison activities, to present information about Bureau employment and diversity programs, to negotiate or settle matters involving significant or controversial issues; e.g.. recommendations affecting major programs, dealing with substantial expenditures, or handling sensitive employee and workplace issues.

Factor 8, Physical Demands

There no unusual physical demands. Occasional travel is required.

Factor 9, Work Environment

The work is performed in an office setting.

<div align="center">

**Position Classification**
**Evaluation Statement**

</div>

| | |
|---|---|
| **Proposed Position:** | **Program Manager**<br>**GS-340-14** |
| **Organizational Location:** | **Department of the Interior**<br>**Bureau of Land Management**<br>**Human Resources Management** |
| **References:** | **1. OPM Job Family PCS for Administrative**<br>**Work in the Human Resources Management**<br>**Group, GS-0200, 12/00**<br>**2. OPM General Schedule Supervisory Guide,**<br>**HRCD-5, 4/98** |

**Background:** This position is a new position as a Program Manager, responsible for a variety of BLM employment and diversity programs.

**Series/Title Determination:**

According to Reference 1, although some positions may include work requiring some knowledge and skills in the human resources management area, classification to the Human Resources Management Group, GS-201, may not be appropriate. If the work involves performing management duties or assisting in a line capacity in managing or directing one or more programs when the paramount qualification requirements are management and executive knowledge and when the positions do not require competence in a specialized subject matter or functional area, the position may be classified in the GS-340, Program Management series.

This position does not require technical competence in a specialized function area of Human Resources Management, but rather has a paramount qualification requirement for management knowledge and skills. Consequently the position is titled Program Manager and the series of the position is GS-0340.

**Grade Level Determination:** Since this position has supervisory and management responsibilities, the General Schedule Supervisory Guide is used to determine the grade. The criteria in the Guide are used to evaluate the grade-controlling duties of the position, which are those of a Program Manager of employment and diversity programs. This guide measures six factors in supervisory positions.

Factor 1, Program Scope and Effect                                FL 1-4, 775 Points

Directs segments of a professional, highly technical and complex administrative program, which involves the development of major aspects of key administrative programs. Work impacts the Department's headquarters operations, bureau-wide programs and field establishments.

Factor 2, Organizational Settings           FL 2-2, 250 Points

The position is accountable to a position that is one reporting level below an SES position.

Factor 3, Supervisory and Managerial Authority Exercised     FL 3-2, 450 Points

Carries out the full authority and responsibility of a first level technical and administrative supervisor.

Factor 4, Personal Contacts
       Factor 4A, Nature of Contacts          FL4A-3, 75 Points

Frequent contacts are with high-level Bureau officials and with senior managers of other agencies, as well as with representatives of colleges and universities, professional associations and organizations, legal and union representatives and contractors. Contacts include those in conferences and meetings, may require the preparation of briefings and presentations and may involve controversial or sensitive subject matter.

       Factor 4B, Purpose of Contacts         FL 4B-2, 75 Points

The purpose of contacts is to represent the Bureau and the Department in recruitment and liaison activities, to present information about Bureau employment and diversity programs, and to negotiate or settle matters involving significant or controversial issues.

Factor 5, Difficulty of Typical Work Directed       FL 5-7, 930 Points

The highest grade which best characterizes the nature of the professional work performed within the incumbent's organization and which constitutes more than 25% of the non-supervisory, non-leader total workload or duty time is GS-12.

Factor 6, Other Conditions            FL 6-4, 1120 Points

Supervision and oversight requires significant coordination and integration of a number of important programs.

Summary and Final Determination:

| Factor | Level | Points |
|--------|---------|-------------|
| Factor 1 | Level 4 | 775 Points |
| Factor 2 | Level 2 | 250 Points |
| Factor 3 | Level 2 | 450 Points |
| Factor 4A | Level 3 | 75 Points |
| Factor 4B | Level 2 | 75 Points |
| Factor 5 | Level 7 | 930 Points |
| Factor 6 | Level 5 | 1120 Points |
| Total | | 3675 Points |

A total of 3675 points is in the range of 3605-4050 for conversion to the grade of GS-14.
It is recommended that this position be classified as **Program Manager, GS-340-14.**

Richard M. Cooley
HR Specialist
August 4, 2003



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov

August 1, 2003

Memorandum of Conversation

To:         Romella Arnold

From:       Assistant Director, HRM

Subject:    Inappropriate Language and Abusive Behavior

This memorandum is to serve notice that your abusive behavior and inappropriate use of cursing in the work place will no longer be tolerated. On July 29, 2003, during a conversation with the Recruitment Team, Sylvia Felder, Administrative Officer and myself, you reacted to action items in our conversation with curse words and abusive tones. This is not the first time that I have experienced this unprofessional and abusive behavior by you. In addition, you have been overheard cursing and showing abusive behavior in your work surroundings  This creates and promotes a hostile work environment.

You are on notice that this behavior will no longer be tolerated by me or your co-workers. If you display further outbursts of hostile and abusive behavior or language, it may result in disciplinary action against you.

Furthermore, the hostile language you have used in your email messages to this office and/or concerning policy of this office to colleagues in the field, has been noted as inappropriate and unprofessional. These email messages serve to undermine the authority and integrity of the Office of the Assistant Director, Human Resources Management and must therefore not continue.

It is the prerogative of management to assign work as it deems necessary. While you have the right to disagree with decisions made by management, your disagreement must be made in a professional, courteous, non-threatening manner.

You are expected to relate to me and your co-workers with respect and dignity. No further abuse or disrespect will be tolerated  You are on notice to improve your customer service demeanor

You acknowledge this notice by signing below.

_____
Romella Arnold

_____
Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROMELLA ARNOLD, )
)
Plaintiff, )
) CA No. 05-1475 (RWR)
v. )
)
GALE A. NORTON, )
)
Defendant. )

DECLARATION OF DAHLENA JOHNSON

I, Dahlena Johnson, hereby declare and say:

1. I am the Human Resources Officer for the Bureau of Land Management. I am the supervisor of Philesa Spencer, who is the Human Resources Specialist who was responsible for the classification of Romella Arnold's position to a GS-13 as a result of an accretion of duties in 1999.

2. The personnel file of Romella Arnold reflects that by a personnel action effective 3/14/99, Ms. Arnold received a non-competitive accretion of duties promotion from EEO Specialist GS 12 to SCEP Program Manager GS 13. Notification of Personnel Action effective date 3/14/99. The position was neither supervisory nor managerial.

3. Her file reflects that Ms. Arnold received a 120-day detail, which was a temporary promotion to GS-14, from July 16, 2001 to November 13, 2001.

3. There is no documentation in Ms. Arnold's personnel file reflecting that her position was ever reclassified to the GS 14 grade level, or that she was ever in a position with promotion potential to the GS-14 level.

4. An accretion of duties promotion is a non-competitive promotion based on the

addition of new and higher level duties. An accretion of duties promotion must be justified by a

classification of the current duties, sometimes called a desk audit. Ms. Arnold's accretion of

duties promotion was only to the GS-13 level. The promotion could not have been to a GS-

13/14 position because department regulations provide that an accretion of duties promotion be

made "with no further promotion potential." See 370 DM 335 at §3.B.(3) below.

5. In order to obtain a GS-14 position, Ms. Arnold would have to compete. There were

other program managers in her organizational unit to whom GS 14 duties could be assigned, such

as Mr. Shafran, who also was a GS-13 program manager. See 370 DM 335 at § 3.A.(6)

6. Department of the Interior, Departmental Manual Effective Date: 6/9/99 (DMM)

provides at 370 DM 335 in pertinent part as follows:
3. Application of Competitive Procedures.
A. Competitive procedures apply to the following actions:
        * * *
(6) Promotions due to the addition of substantive, new and higher-graded duties when the
new position is not a clear successor to the old position or there are other employees
serving in similar or identical positions within the organizational unit to whom the new
duties could have been assigned

B. Competitive procedures do not apply to the following actions:
* * *
(3) A promotion resulting from an employee's position being classified at a higher grade (
**with no further promotion potential**) because of additional duties and responsibilities;
commonly known as accretion of duties. The noncompetitive upgrade requires the
employee to continue to perform the same basic function in the new position that is a
clear successor to and absorbs the duties of the old position. In addition, there are no
other employees within the organizational unit to whom the additional duties and
responsibilities could have been assigned.

7.  A lateral reassignment is not a promotion, and no competition is required for a lateral

reassignment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11$^{th}$ day of July, 2007.

Dahlena Johnson

# DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
### WASHINGTON HUMAN RESOURCES SERVICING OFFICE
### 1620 L. ST. N.W., SUITE 700
### WASHINGTON, DC 20036

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|-----|-------|
| Rhonda Fields | Dahlena Johnson |

Cc:

| COMPANY: | DATE: |
|----------|-------|
| Bureau of Land Management | 07/11/07 |

| PHONE NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---------------|-------------------------------------|
| 202-514-6970 | 4 |

| FAX NUMBER: | TELEPHONE NUMBER: |
|-------------|-------------------|
| 202-514-8780 | (202) 452-5072 |

| | FAX NUMBER: |
|--|-------------|
| | (202) 452-5144 |

☐ URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ REPLY ASAP  ☒ CONFIDENTIAL

Notes/Comments:

If you have any questions, please call on (202) 452-5072.

Thank you

| TRAVEL VOUCHER | 1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE | 2. TYPE OF TRAVEL | 3. VOUCHER NO. |
|---|---|---|---|

**TRAVEL VOUCHER**

*(Read Privacy Act Statement on the back)*

**1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE**
WO-720

**2. TYPE OF TRAVEL**
☒ TEMPORARY DUTY
☐ PERMANENT CHANGE OF STATION

**3. VOUCHER NO.**
PG T04 073

**4. SCHEDULE NO.**

**5. a. NAME** *(Last, first, middle initial)*
Brown, Michael

**b. SOCIAL SECURITY NO.**

**6. PERIOD OF TRAVEL**
a. FROM 06/13/2004    b. TO 06/19/2004

**c. MAILING ADDRESS** *(Include ZIP Code)*

**d. OFFICE TELEPHONE NO.**

**7. TRAVEL AUTHORIZATION**
a. NUMBER(S) PG T04 073    b. DATE(S) 06/28/2004

**e. PRESENT DUTY STATION**
Washington Office

**f. RESIDENCE** *(City and State)*

**10. CHECK NO.**

**8. TRAVEL ADVANCE**

| a. Outstanding | 0 00 |
| b. Amount to be applied | 0 00 |
| c. Amount due Government (Attached ☐ Check ☐ Cash) | |
| D. Balance outstanding | |

**9. CASH PAYMENT RECEIPT**
a. DATE RECEIVED    b. AMOUNT RECEIVED $

c. PAYEE'S SIGNATURE

**11. PAID BY**

| 12. GOVERNMENT TRANSPORTATION REQUESTS, OR TRANSPORTATION TICKETS, IF PURCHASED WITH CASH *(List by number below and attach passenger coupon; if cash is used show claim on reverse side)* | AGENT'S VALUATION OF TICKET (a) | ISSUING CARRIER (Initials) (b) | MODE CLASS OF SERVICE AND ACCOMMODATIONS (c) | DATE ISSUED (d) | POINTS OF TRAVEL FROM (e) | TO (f) |
|---|---|---|---|---|---|---|
| See Attached Ticket 1 | 370.20 | | | | | |

Traveler's Initials ▶

COMMENTS:
Trip Number 1   PERSONAL FUNDS USED WERE CASH IS INDICATED.

**13.** I certify that this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me. When applicable, per diem claimed is based on the average cost of lodging incurred during the period covered by this voucher.

TRAVELER SIGN HERE ▶ *[signature]*    DATE 7-1-04    AMOUNT CLAIMED ▶ 773 21

NOTE: Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 287; id. 1001).

**14.** This voucher is approved. Long distance phone calls, if any, are certified as necessary in the interest of the Government.    *[NOTE: If long distance telephone calls are included, the approving official must have been authorized in writing by the head of the department or agency to so certify (31 U.S.C. 680a).]*

APPROVING OFFICIAL SIGN HERE ▶ Marilyn H. Johnson  *[signature]* Robert Kenton    DATE 7/1/04

**17. FOR FINANCE OFFICE USE ONLY COMPUTATION**

a. DIFFERENCES, IF ANY (Explain and show amount)    $

b. TOTAL VERIFIED CORRECT FOR CHARGE TO APPROPRIATION

Certifier's Initials    $

**15. LAST PRECEDING VOUCHER PAID UNDER SAME TRAVEL AUTHORIZATION**
a. VOUCHER NO.    b. D.O. SYMBOL    c. MONTH & YEAR

c. APPLIED TO TRAVEL ADVANCE (Appropriation symbol):    $ 0 00

**16. THIS VOUCHER IS CERTIFIED CORRECT AND PROPER FOR PAYMENT**

AUTHORIZED CERTIFYING OFFICIAL SIGN HERE ▶    DATE

d. NET TO TRAVELER ▶ $ 773 21

**18. ACCOUNTING CLASSIFICATION**
WO-WO-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XL-HBCU-211D---- -    773.21  NR-    670.81

1012-16    NSN 7540-00-634-4180    STANDARD FO... Prescribed by GSA, F...





EXHIBIT
Blue
26

**SCHEDULE OF EXPENSES AND AMOUNTS CLAIMED**

**INSTRUCTIONS TO TRAVELER** *(Unlisted items are self explanatory)*

Col. (c) If the voucher includes per diem allowances for members of employee's immediate family, show members' names, ages, and relationship to employee and marital status of children (unless information is shown on the travel authorization).

Col. (c) thru (g) — Complete only for actual expense travel.

(c) Show amount incurred for each meal, including tax and tips, and daily total meal cost.

(h) Show expenses, such as: laundry, cleaning and pressing of clothes, tips to bellboys, porters, etc. (other than for meals).

(i) Complete for per diem and actual expense travel.

(j) Show total subsistence expense incurred for actual expense travel.

(m) Show per diem amount, limited to maximum rate, or travel on actual expenses, show the lesser of the amount from col. (j) or maximum rate.

(n) Show expenses, such as: taxi/limousine fares, air fare (if purchased with cash), local or long distance telephone calls for Government business, car rental, relocation other than subsistence, etc.

*Complete this information sheet if this is a continuation.*  PAGE **2** OF **1** PAGES

TRAVEL AUTHORIZATION NO.  PG T04 073

TRIP# 1

TRAVELER'S LAST NAME: **Brown**

MILEAGE RATE: 0.375

| DATE 20-04 (a) | TIME (Hour and am/pm) (b) | DESCRIPTION *(Departure/arrival city, per diem computation, or other explanation of expenses)* (c) | BREAK-FAST (d) | LUNCH (e) | DINNER (f) | TOTAL (g) | MISCEL-LANEOUS SUBSIS-TENCE (h) | LODGING (i) | TOTAL SUBSISTENCE EXPENSE (j) | NO. OF MILES (k) | MILEAGE (l) | SUBSISTENCE (m) | OTHER (n) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/13 | | D-:RES: | | | | | | | | | | | |
| 06/13 | | Airline Flight | | | | | | | | | | | 1 |
| 06/13 | | A-:PHOENIX,AZ | | | | | | | | | | | |
| 06/13 | | Rental Car | | | | | | | | | | | |
| 06/13 | | Private Vhcle | | | | 35\|25 | | 59\|00 | 94.25 | 25 | 9\|38 | 94\|25 | |
| 06/14 | | Subsistence | | | | 47\|00 | | 59\|00 | 106.00 | | | 106.00 | |
| 06/15 | | Parking (cash) | | | | | | | | | | | 1\|50 |
| 06/15 | | Parking (cash) | | | | | | | | | | | 2\|75 |
| 06/15 | | Subsistence | | | | 47\|00 | | 59\|00 | 106.00 | | | 106,00 | |
| 06/15 | | Gas-Rental/Govt Car | | | | | | | | | | | 33\|48 |
| 06/16 | | Subsistence | | | | 47\|00 | | 59\|00 | 106.00 | | | 106.00 | |
| 06/16 | | Subsistence | | | | 47\|00 | | 59\|00 | 106.00 | | | 106,00 | |
| 06/18 | | Private Vhcle | | | | | | | | 25 | 9\|38 | | 48\|00 |
| 06/18 | | Parking Fees | | | | | | | | | | | 42\|72 |
| 06/18 | | Subsistence | | | | 47\|00 | | | 47.00 | | | 47\|00 | |
| 06/19 | | Lodging Tax | | | | | | | | | | | |
| 06/19 | | D-:PHOENIX,AZ | | | | | | | | | | | |
| 06/19 | | Gas-Rental/Govt Car | | | | | | | | | | | 25\|50 |
| 06/19 | | A:Washington Offic | | | | | | | | | | | |
| 06/19 | | Subsistence | | | | 35\|25 | | | 35\|25 | | | 35\|25 | |
| | | **SUBTOTALS** | | | | | | | | | | | |
| | | **TOTALS** | | | | | | | | | 18\|76 | 600\|50 | 153\|95 |
| | | | | | | | | | | | 18\|76 | 600\|50 | 153\|95 |

*If additional space is required, continue on another 1012-A BACK, leaving the front blank.*

Enter grand total of columns (l), (m) and (n), below and in item 13 on the front of this form.

**TOTAL AMOUNT CLAIMED** ▶  773.21

STANDARD FORM 1012 BACK (10-77)

In compliance with the Privacy Act of 1974, the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chap. 57 as implemented by the Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, E.O. 11012 of March 27, 1962, E.O. 9397 of November 22, 1943, and 26 U.S.C. 6011(b) and 6109. The primary purpose of the requested information is to determine payment or reimbursement to eligible individuals for allowable travel and/or relocation expenses incurred under appropriate administrative authorization and to record and maintain costs of such reimbursements to the Government. The information will be used by officers and employees who have a need for the information in the performance of their official duties. The information may be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, the issuance of a security clearance, or investigations of the performance of official duty while in Government service. Your Social Security Account Number (SSN) is solicited under the authority of the Internal Revenue Code (26 U.S.C. 6011(b), 6051(f) and 6109) and E.O. 9397, November 22, 1943, for use as a tax payer and/or employee identification number; disclosure is MANDATORY on vouchers claiming travel and/or relocation allowance expenses reimbursement which may constitute taxable income. Disclosure of your SSN and other requested information is voluntary in all other instances; however, failure to provide the information (other than SSN) required to support the claim may result in delay or loss of reimbursement.

000189

```
06/28/04        ACCOUNTING DETAIL        | Doc No:              PG 104 073
Copyright 2003 Gelco Information Network, Inc.  | Brown, Michael @████████████
===============================================================================
```

```
 ACCOUNTING CLASS CODE                                              TRIP 1
-------------------------  ---------------  ---------------  ----------------
 COM. CARRIER-408                                                    370.20
 LODGING-409                                                         337.72
 M&IE-409                                                            305.50
 MILEAGE-408                                                          18.76
 OTHER-409                                                             4.25
 RENTAL CAR-409                                                      300.61
 TRANSPORT-409                                                       106.98
                           ---------------  ---------------  ----------------
 WO                               0.00            0.00             1,444.02
```

Organization:
WO-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XL-HBCU-211D----


SPLIT PAY DISBURSEMENTS:

```
   TOTAL EXPENSES -------------------------------     1,444.02
   NON-REIMBURSABLE EXPENSES ------------------         670.81
                                                    ==================
   TOTAL AMOUNT CLAIMED -----------------------         773.21

     GOV'T ADVANCE OUTSTANDING --        0.00
     GOV'T ADVANCE APPLIED ------        0.00
                                        ----                0.00
                                                    ==================
   NET TO TRAVELER (GOVT) --------------------         773.21

     GOV'T CHARGE CARD EXPENSES -        0.00
     GOV'T CHARGE CARD ATM ADV --        0.00
     ADD'L  GOV'T  CHARGE CARD PYMT
                                         0.00
                                        ==================
     TOTAL  GOV'T CHARGE CARD AMT        0.00

   PAY TO  GOV'T CHARGE CARD --------------------         0.00
   PAY TO TRAVELER ---------------------------           773.21
```

000190

| | | | 1. No. | PGT-04-073 |
|---|---|---|---|---|

UNITED STATES
DEPARTMENT OF THE INTERIOR
FORM NO. DI-1020
FORM APPROVED BY COMP. GEN. U.S.
NOVEMBER 8, 1949

# TRAVEL AUTHORIZATION

1. No. __PGT-04-073__
2. __June 10, 2004__
   (DATE)

3. __Bureau of Land of Management__
   (BUREAU OR OFFICE)

4. NAME __Michael Brown__  5. OFFICIAL STATION __Washington, DC__

6. TITLE __Special Initiatives Coordinator__  7. ACCOUNTING OFFICE __Denver, CO__

   You are authorized to travel as indicated below and to incur necessary expenses in accordance with applicable laws and regulations.

## PLACES OF TRAVEL

8. FROM: Washington, DC

9. TO: Phoenix, AZ and return

10. PURPOSE AND REMARKS:

To attend SCEP Orientation

11. PER DIEM ALLOWANCE:

Lodging $59.00      M&IE $47.00      TOTAL $106.00

12. PERIOD OF TRAVEL: Beginning on or about __6/12/04__      Ending on or about __6/19/04__

## MODE OF TRAVEL

13. ✔ Common carrier
14.   Extra fare
       at a mileage rate of
15.   Government-owned conveyance
       cents, subject to:
16.   Privately owned
      (a) ✔ Administratively determined to be the advantage of the Government
      (b)   A showing of advantage to the Government
      (c)   Not to exceed cost by common carrier, including consideration of Per Diem allowance

## MISCELLANEOUS

17.   Transportation immediate family
18. ✔ Other *(specify)*
    Rental Car
19.   Shipment household goods and personal effects

ESTIMATED COST

20. Transportation _____ $  620.20
21. Per Diem _____    305.50
22. Other _____    210.00
23.     TOTAL _____ $ 1135.70
24. CHARGED TO:

    WO-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-XL-HBCU-211D

25. _____
    (FISCAL OFFICER'S SIGNATURE)

26. _____
    (REQUESTER'S SIGNATURE)
27. Michael Brown, Special Initiatives Coordinator
    (TITLE)

28. _____
    (AUTHORIZING OFFICER'S SIGNATURE)
29. Marilyn H. Johnson, Assistant Director, HRM
    (TITLE)

This form was electronically produced by Elite Federal Forms, Inc.

000191

Michael Brown                           SPG#

                                            Room Number        463
                                            No of Person(s)      1
                                            Checked out by
                                            Page               1
Arrival      06/13/04                       Rate          $    59.00
Departure    06/19/04
Confirmation No.    366685
INVOICE NO.    318508/1    Four Points Barcelo Phoenix Metro, 06/18/04 03:28
                              10220 N Metro Pkwy E
                              Phoenix, AZ 85051 USA
                                602-997-5900

| Date  | Text          | Debits | Credits |
|-------|---------------|--------|---------|
| 06/13 | Room Charge   | 59.00  |         |
| 06/13 | Occ Tax       | 7.12   |         |
| 06/14 | Room Charge   | 59.00  |         |
| 06/14 | Occ Tax       | 7.12   |         |
| 06/15 | Room Charge   | 59.00  |         |
| 06/15 | Occ Tax       | 7.12   |         |
| 06/16 | Room Charge   | 59.00  |         |
| 06/16 | Occ Tax       | 7.12   |         |
| 06/17 | Room Charge   | 59.00  |         |
| 06/17 | Occ Tax       | 7.12   |         |
| 06/18 | Room Charge   | 59.00  |         |
| 06/18 | Occ Tax       | 7.12   |         |

                    Total          396.72

                    Balance        396.72 USD


I agree that my liability for this bill is not waived and agree to be held personally
liable in the event that the indicated person, company or association fails to pay
for any part of the full amount of these charges.


          Signature: _____


Thank you for choosing the Four Points Barcelo Hotel.  In effort to improve
our overall guest satisfaction we utilize surveys from NFO WorldGroup.
We appreciate all feedback and look at this opportunity
 s a way to meet and exceed guest expectations.  All guests who complete
 he evaluation will be entered into a quarterly drawing to win weekend
room accommodations at our Four Points Hotel.

000192

EXXON EXPRESS PAY

DENMART EXXON
HOME OF THE
TOUCHLESS CARWASH

DLR# 4539763
DENMAR EXXON
PHOENIX            AZ
06/15/04      21:29
                ACCT:
XXXXXXXXXXXX       24
INV# EJS2781
AUTH# 066678
PUMP# 7
  LEAD        15.91

     GAL     $2.0
     TOTAL   $33.4

TOTAL         $33.40

DENMART EXXON
HOME OF THE
TOUCHLESS CARWASH

**FastPay**

IRPORT CHEVRON
402 E WASHINGTON
HOENIX, AZ

06/19/04      12:23
TN #       00206657

CFLEET

UTH#       099328
NV #       5750603
REDIT
     09    REGUNI
       ONS  12.03
    $2.119/GAL
         $25.5

L/NOTAX   $25.5
OTAL      $25.50

HANK YOU, HAVE
 NICE DAY!!!



PO BOX 310757, BOCA RATON,
RESERVATIONS: 800-327-9633
CUSTOMER RELATIONS: 800-445-5664

PHOENIX - RETURN RECEIPT

RA#/CAR#: 3391-609798-1/41297862 (CC)
RENTED:  13JUN04  13:11
RETURNED: 19JUN04  12:36
LENGTH:  5 DAYS 23 HOURS
MLG OUT/IN: 9,911/10,446   GAS: F
CUSTOMER:  MICHAEL BROWN

$
TIME       110.00 T
UPGRADE    114.00 T
VLFRS       12.70
CNTYSCH      8.26
GARS        30.00 T
TAXES       25.65 *
TOT CHR    300.61
CR. CARD   300.61-
BALANCE       .00
%
CR. CARD: TOTAL BILLED TO MASTER CARD

      THANK YOU FOR USING ALAMO.

SERVED BY: 62300
%

000193

# OMEGA WORLD TRAVEL

| | | |
|---|---|---|
| BROWN/MICHAEL | **Attention: MICHAEL** | 10-Jun-2004  4:09 pm |
| | | Page 1 of 2 |

The booking locator is OIUGCH.                    The fare is $370.20.

| | | |
|---|---|---|
| | **MISC** | |
| 13-Jun-2004<br>Sunday | ASSOCIATE NAME SOUTHWEST AIRLINES<br>AMOUNT DUE USD B325.58X44.62T370.20<br>ITEM COST USD 370.20<br>CONFIRMATION NUMBER HQ2PVD<br>TICKET NUMBER 2704895816<br>NON REFUNDABLE TRANSACTION FEE OF $24.06 | |

| | | |
|---|---|---|
| ✈<br>13-Jun-2004  11:15am<br>Sunday | **Air**  Southwest Airlines<br>From:  Baltimore Wash MD, USA<br>Meal:  None<br>Equip  Boeing 737-700 Jet<br>Arrival:  13-Jun-2004 Sunday        12:50pm | Flight#  2006        Class: Y<br>To:      Phoenix AZ, USA<br><br>Status: Confirmed |

| | | |
|---|---|---|
| 🚗<br>13-Jun-2004<br>Sunday | **Car**  Alamo Rent A Car<br>Pick Up: Phoenix AZ, USA<br>Confirmation:  50274940<br>Return:  19-Jun-2004<br>Rate Info: USD 110.00WK Ulmtd<br>/RC-MG/LT01/ARR-WN2006-1250/DT-1240/NM-BROWN MICHAEL/RI-APPROX TOTAL<br>216.05 USD INCLUDES TAXES-FEES-SURCHARGES/SI-Z43653/CF-50274940<br>243653/CF-50274940<br>Arrival Time: 1250<br>Dropoff Time: 12:40pm | Type:  Compact Car Auto Ac<br>Rate:  110.00USD |

| | | |
|---|---|---|
| 🛏<br>...Jun-2004<br>Sunday | **Hotel**  Sheraton Corporation Four Points Phoenix Metrocent<br>10220 NORTH METRO PARKWAY E PHOENIX AZ US 8505<br>Phone:  602 997 5900<br>Number of Rooms: 1<br>Confirmation:  C031175526 #SI#<br>Check Out: 19-Jun-2004 Saturday<br>Cancellation note: CXL AFTR12JUN04TM18:00 AMT:59.00 USD<br>NON SMOKING | Fax:  602 943 6156<br>Rate:  59.00USD<br>Room Guaranteed |

| | | |
|---|---|---|
| ✈<br>19-Jun-2004  01:40pm<br>Saturday | **Air**  Southwest Airlines<br>From:  Phoenix AZ, USA<br>Meal:  None<br>Equip  Boeing 737-700 Jet<br>Arrival:  19-Jun-2004 Saturday        09:05pm | Flight#  1808        Class: Y<br>To:      Baltimore Wash MD, USA<br><br>Status: Confirmed |

| | | |
|---|---|---|
| | **MISC** | |
| 19-Dec-2004<br>Sunday | ASSOCIATE NAME RETENTION | |

000194

# OMEGA WORLD TRAVEL

BROWN/MICHAEL                    **Attention: MICHAEL**                    10-Jun-2004   4:09 pm
                                                                          Page 2 of 2

The booking locator is OIUGCH.              The fare is $370.20.

                    *****AIR PRICE SHOWN ON PNR IS BASED PER PERSON.*****


                    ***********************************************
                    PLEASE CHECK-IN FOR DOMESTIC FLIGHTS 1 HOUR PRIOR
                    TO SCHEDULED DEPARTURE
                    CHECK-IN FOR INTERNATIONAL FLIGHTS IS 2 HOURS
                    PRIOR TO SCHEDULED DEPARTURE
                    ***********************************************
                    LET US KNOW HOW WE ARE DOING...AT YOUR CONVENIENCE
                    PLEASE TAKE A MOMENT TO COMPLETE OUR USER SURVEY
                    AT WWW.DOITRAVEL.COM/ONLINE UNDERSCORE SURVEY.HTML
                    ***********************************************
                    DID YOU KNOW YOU CAN BOOK RESERVATIONS ONLINE
                    FOR MORE INFORMATION OR ASSISTANCE..PLEASE CONTACT
                    YOUR BUREAU ADMINISTRATOR. THANK YOU
                    ***********************************************
                    S*1/800
                    REMEMBER TICKETS ARE WORTH MONEY...PLEASE NOTIFY YOUR T  MC
                    OR AGENCY TRAVEL COORDINATOR OF UNUSED TICKETS OR CANCELLED TRIPS.
                    PLEASE DO NOT WRITE ON UNUSED TICKETS.
                    BA4031
                    SOUTHWEST CONFIRMATION NUMBER IS * H Q 2 P V D *
                    TOTAL SOUTHWEST TICKET COST IS 370.20
                    TRAVEL ARRANGMENTS MADE BY STACEY-4031
                    A 24.06 SERVICE FEE WILL BE APPLIED TO YOUR CREDIT CARD

000195

| TRAVEL VOUCHER | 1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE | 2. TYPE OF TRAVEL | 3. VOUCHER NO. |
|---|---|---|---|

**TRAVEL VOUCHER**

*(Read Privacy Act Statement on the back)*

1. DEPARTMENT OR ESTABLISHMENT BUREAU DIVISION OR OFFICE

WO-720

2. TYPE OF TRAVEL

[X] TEMPORARY DUTY

[ ] PERMANENT CHANGE OF STATION

3. VOUCHER NO.
PG T04 3015

4. SCHEDULE NO.

b. SOCIAL SECURITY NO.

6. PERIOD OF TRAVEL

a. FROM 06/13/2004    b. TO 06/18/2004

5. a. NAME *(Last, first, middle initial)*

Frazier-Yates, Norma

c. MAILING ADDRESS *(Include ZIP Code)*

d. OFFICE TELEPHONE NO.

7. TRAVEL AUTHORIZATION

a. NUMBER(S)   PG T04 3015    b. DATE(S)

05/25/2004

e. PRESENT DUTY STATION

Washington Office

f. RESIDENCE *(City and State)*

10. CHECK NO.

8. TRAVEL ADVANCE

a. Outstanding

b. Amount to be applied

c. Amount due Government *(Attached [ ] Check [ ] Cash)*

D. Balance outstanding

0.00

0.00

9. CASH PAYMENT RECEIPT

a. DATE RECEIVED

b. AMOUNT RECEIVED $

c. PAYEE'S SIGNATURE

11. PAID BY

▶ Traveler's Initials

12. GOVERNMENT TRANSPORTATION REQUESTS, OR TRANSPORTATION TICKETS, IF PURCHASED WITH CASH *(List by number below and attach passenger coupon; if cash is used show claim on reverse side)*

I hereby assign the United States any right I may have against any parties in connection with reimbursable transportation charges described below, purchased under cash payment procedures (FPMR 101-7)

| | AGENT'S VALUATION OF TICKET (a) | ISSUING CARRIER (Initials) (b) | MODE CLASS OF SERVICE AND ACCOMMODATIONS (c) | DATE ISSUED (d) | POINTS OF TRAVEL | |
|---|---|---|---|---|---|---|
| | | | | | FROM (e) | TO (f) |
| See Attached Ticket 1 | 520.00 | | | | | |

**COPY**

COMMENTS:
Trip Number 1
Personal funds used for shuttle (22.00)

13. I certify that this voucher is true and correct to the best of my knowledge and belief, and that payment or credit has not been received by me. When applicable, per diem claimed is based on the average cost of lodging incurred during the period covered by this voucher.

TRAVELER SIGN HERE ▶ *Norma Frazie Yates*    DATE 6/29/04    AMOUNT CLAIMED ▶    676.10

NOTE: Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years or both (18 U.S.C. 287; Id. 1001).

14. This voucher is approved. Long distance phone calls, if any, are certified as necessary in the interest of the Government.   (NOTE: If long distance telephone calls are included, the approving official must have been authorized in writing by the head of the department or agency to so certify (31 U.S.C. 680e).)

APPROVING OFFICIAL SIGN HERE ▶ *Michael Burns*    Group Manager    6-28-04

17. FOR FINANCE OFFICE USE ONLY COMPUTATION

a. DIFFERENCES, IF ANY *(Explain and show amount)*    $

15. LAST PRECEDING VOUCHER PAID UNDER SAME TRAVEL AUTHORIZATION

a. VOUCHER NO.    b. D.O. SYMBOL    c. MONTH & YEAR

b. TOTAL VERIFIED CORRECT FOR CHARGE TO APPROPRIATION

Certifier's initials:    $

16. THIS VOUCHER IS CERTIFIED CORRECT AND PROPER FOR PAYMENT

AUTHORIZED CERTIFYING OFFICIAL SIGN HERE ▶    DATE

c. APPLIED TO TRAVEL ADVANCE *(Appropriation symbol):*    $    0.00

d. NET TO TRAVELER ▶ $    676.10

18. ACCOUNTING CLASSIFICATION
WO-WO-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XL-HBCU-211D---- -    676.10  NR-    520.00

1012-16    NSN 7540-00-634-4180    STANDARD FORM 10
Prescribed by GSA, FPMR


EXHIBIT
Blue
27

**Complete this information if this is a continuation sheet.**  PAGE 2 OF ___ PAGES

**TRAVEL AUTHORIZATION NO.**  TRIP # 1   PG T04 3015

**TRAVELER'S LAST NAME**  Frazier-Yates

## INSTRUCTIONS TO TRAVELER

Col. (o)  If the voucher includes per diem allowances for members of employee's immediate family, show members' names, ages, and relationship to employee and marital status of children (unless information is shown on the travel authorization).

Col. (d) thru (g)  (Unlisted items are self explanatory)  Show amount incurred for each meal, including tax and tips, and daily total meal cost.

Col. (h)  Show expenses, such as: laundry, cleaning and pressing of clothes, tips to bellhops, porters, etc. (other than for subsistence).

Col. (j)  Complete for per diem and actual expense travel.

Col. (l)  Show total subsistence expense incurred for actual expense travel.

Col. (m)  Show per diem amount, limited to maximum rate, or travel on actual expenses, show the lesser of the amount from col. (l) or maximum rate.

Col. (n)  Show expenses, such as: taxi/limousine fares, air fare (if purchased with cash), local or long distance telephone calls for Government business, car rental, relocation other than subsistence, etc.

**MILEAGE RATE: 0.375**

| DATE 20-04 (b) | TIME (Hour and am/pm) (b) | DESCRIPTION (Departure/arrived city, per diem computation, or other explanation of expenses) (c) | BREAK-FAST (d) | LUNCH (e) | DINNER (f) | TOTAL (g) | MISCELLANEOUS SUBSISTENCE (h) | LODGING (j) | TOTAL SUBSISTENCE EXPENSE (l) | NO. OF MILES (k) | MILEAGE (m) | SUBSISTENCE (m) | OTHER (n) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/13 | | D-:RBS: | | | | | | | | | | | |
| 06/13 | | Airline Flight | | | | | | | | | | | |
| 06/13 | | A-:PHOENIX,AZ | | | | | | | | | | | |
| 06/13 | | Shuttle (charge card) | | | | | | | | | | | 14 00 |
| 06/13 | | Shuttle (cash) | | | | 35 25 | | | 94.25 | | | 94 25 | 22 00 |
| 06/14 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106,00 | |
| 06/15 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106,00 | |
| 06/16 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/17 | | Subsistence | | | | 47 00 | | 59 00 | 106.00 | | | 106 00 | |
| 06/17 | | D-:PHOENIX,AZ | | | | | | | | | | | |
| 06/17 | | Private Vhcle | | | | | | | | 40 | 15 00 | | |
| 06/18 | | A:RES: | | | | | | | | | | | |
| 06/18 | | Subsistence | | | | 35 25 | | | 35.25 | | | 35 25 | 30 00 |
| 06/18 | | Authorized Call Home | | | | | | | | | | | 35 50 |
| 06/18 | | Lodging Tax | | | | | | | | | | | 6 00 |
| 06/18 | | GOVCC ATM ADVANCE FEE | | | | | | | | | | | |
| | | **SUBTOTALS** | | | | | | | | | 15 00 | 553 50 | 107 50 |
| | | **TOTALS** | | | | | | | | | 15 00 | 553 50 | 107 50 |

Enter grand total of columns (l), (m) and (n), below and in item 13 on the front of this form.

**TOTAL AMOUNT CLAIMED** ▶ 676.10

STANDARD FORM 1012 BACK (10-77)

*If additional space is required, continue on another 1012-A BACK, leaving the front blank.*

In compliance with the Privacy Act of 1974, the following information is provided: Solicitation of the information on this form is authorized by 5 U.S.C. Chapter 57, subchapter I, as implemented in part by Executive Orders (E.O.) 11609 of July 22, 1971, E.O. 11012 of March 27, 1962, E.O. 9397 of November 22, 1943, and 28 U.S.C. Section 8109. The primary purpose of the requested information is to determine payment or reimbursement to eligible individuals for allowable travel and/or relocation expenses incurred under appropriate administrative authorization. The information will be used to document and record individual travel and/or relocation costs of such reimbursements made to the Government's officers and employees who have a need for the information in the performance of their official duties. The information may be disclosed to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, the issuance of a security clearance, or investigations of the performance of official duty while in Government service. Your Social Security Account Number (SSN) is solicited under the authority of the Internal Revenue Code (26 U.S.C. 6011(b) and 6109) and E.O. 9397, November 22, 1943, for use as a tax payer and/or employee identification number; disclosure is MANDATORY on vouchers claiming payment or reimbursement which is, or may be, taxable income. Disclosure of other requested information is voluntary; however, failure to provide information other than your SSN required to support the claim may result in delay or loss of reimbursement.

000197

```
                                                          |Doc No:           PG T04 3015
                      ACCOUNTING DETAIL                    |Frazier-Yates, ▬▬▬▬▬
06/22/04        Copyright 2003 Gelco Information Network, Inc.
===============================================================================
                                                                      TRIP 1
                                                                  ---------------
ACCOUNTING CLASS CODE          ---------------  ---------------    520.00
-------------------                                                330.60
                                                                   258.50
COM. CARRIER-408                                                     15.00
LODGING-409                                                          42.00
M&IE-409                                                             30.00
MILEAGE-408                                                       ---------------
OTHER-409                                                         1,196.10
PHONE CALLS-409             ---------------  ---------------  0.00
                                             0.00

WO

Organization:
WO-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XL-HBCU-211D----


SPLIT PAY DISBURSEMENTS:                                    1,196.10
                                                              520.00
   TOTAL EXPENSES --------------------------------       ==================
   NON-REIMBURSABLE EXPENSES -----------------               676.10

TOTAL AMOUNT CLAIMED --------------------   0.00
                                            0.00
   GOV'T ADVANCE OUTSTANDING --             0.00                 0.00
   GOV'T ADVANCE APPLIED ------             ----         ==================
                                                            676.10

NET TO TRAVELER (GOVT) --------------------   0.00
                                              0.00
   GOV'T CHARGE CARD EXPENSES -
   GOV'T CHARGE CARD ATM ADV --
   ADD'L  GOV'T  CHARGE CARD PYMT             0.00
                                           ==================
                                              0.00

   TOTAL  GOV'T CHARGE CARD AMT                                  0.00
                                                               676.10
PAY TO  GOV'T CHARGE CARD --------------------
PAY TO TRAVELER --------------------------
```

000198

# OFFICIAL TDY TRAVELER AUTHORIZATION

(Note: See Privacy Act Statement on reverse)

| 1. AUTHORIZATION NO. |
|---|
| PG T04 3015 |

**2. TRAVELER** (first name, middle initial, last name)

Norma Frazier-Yates

**3. TITLE**

**4. SOCIAL SECURITY NO.**

**6B. CORR. SYMBOL**

**5. ADDRESS TO WHICH REIMBURSEMENT CHECK WILL BE MAILED:**

**6A. OFFICE/SERVICE AND DIVISION**

WO-720

**7. OFFICIAL DUTY STATION**

Washington Office

**8. OFFICE PHONE NO.**

**9. TYPE** [X] ORIGINAL [ ] AMENDMENT

**10. CATEGORY** [ ] SINGLE TRIP [ ] LOA [ ] COST [ ] NO COST

**11. TRAVEL PURPOSE** (check one)

[ ] SITE VISIT [ ] INFORMATION MEETING [ ] TRAINING ATTENDANCE [X] SPEECH OR PRESENTATION [ ] CONFERENCE ATTENDANCE [ ] ENTITLEMENT [ ] SPECIAL MISSION [ ] OTHER (SPECIFY)

**12. SPECIFIC TRAVEL PURPOSE**

## 13. AUTHORIZED OFFICIAL ITINERARY

NOTE: DO NOT include any personal sidetrips or modes of transportation that are for personal convenience and/or preference.

| DATE (a) | WEEK-DAY (b) | ITINERARY POINT (c) CITY | STATE | PER DIEM RATE M&IE RATE (d) | MAXIMUM LODGING (e) | TOTAL MAXIMUM (f) | ACTUAL EXPENSE RATE (g) | MODE OF TRANS. BETWEEN ITINERARY POINTS (h) | MODE OF LOCAL TRANSPORTATION (i) |
|---|---|---|---|---|---|---|---|---|---|
| | | FROM: | | | | | | | |
| 06/13/2004 | SUN | TO: PHOENIX | AZ | 47 | 59 | 106 | | AIR | RENT |
| 06/19/2004 | SAT | PHOENIX | AZ | 47 | 59 | 106 | | --- | --- |
| ------- | --- | TO: | | -- | -- | -- | | --- | --- |
| 06/19/2004 | SAT | TO: | | | | | | | |

| | YES | NO | |
|---|---|---|---|
| 14. IS THE EMPLOYEE MAKING ANY DEVIATIONS FROM THE AUTHORIZED ITINERARY FOR PERSONAL CONVENIENCE, TAKING ANY ANNUAL LEAVE OR USING A DIFFERENT MODE OF TRANSPORTATION FOR PERSONAL CONVENIENCE? (If YES, explain in item 22, REMARKS) (Note: any deviations from the authorized itinerary requires a comparative cost statement on the SF 1012, Travel Voucher.) | | X | |
| 15. IF AIR TRANSPORTATION IS THE AUTHORIZED MODE OF TRAVEL BETWEEN ITINERARY POINTS, IS THE LOWEST PRICED CONTRACT CARRIER BEING USED BETWEEN ALL ITINERARY POINTS? (If NO, justify in item 22) | X | | |
| 16. IS EXTRA AIR FARE (first class, business class, etc.) OR RAIL (Metroclub, pullman, etc.) AUTHORIZED? (If YES, justify in item 22) | | X | |
| 17A. WILL POV BE USED FOR ANY TRAVEL BETWEEN ITINERARY POINTS? (If YES, check one box below | | X | 17B. MILEAGE RATE AUTHORIZED PER MILE. |

[ ] USE OF POV IS ADVANTAGEOUS TO THE GOVERNMENT. [ ] USE OF POV IS NOT ADVANTAGEOUS TO THE GOVERNMENT. USE OF POV HAS BEEN DETERMINED TO BE FOR PERSONAL CONVENIENCE AND REIMBURSEMENT LIMITED TO CONSTRUCTIVE COST OF COMMON CARRIER (If YES, justify in item 22)

| 18. IS ACTUAL EXPENSE UNUSUAL CIRCUMSTANCES AUTHORIZED? | | X | |
|---|---|---|---|

IF ACTUAL EXPENSE IS AUTHORIZED, THE FOLLOWING APPLY:
(1) EXPENSES MUST BE ITEMIZED EACH DAY. EACH MEAL OVER $25.00.
(2) RECEIPTS ARE REQUIRED FOR LODGING AND EACH MEAL OVER $25.00.
(3) REIMBURSEMENT FOR MEALS AND MISCELLANEOUS SUBSISTENCE EXPENSE MAY NOT EXCEED 150% OF THE AMOUNT IN ITEM 13(d)

**19. TRAVELER IS** (check one)

[X] a. GOVT CHARGE CARD HOLDER [ ] b. GOVT CHARGE CARD DECLINEE [ ] c. INFREQUENT TRAVELER

**20. METHOD OF OBTAINING COMMON CARRIER TICKETS** (check one)
(Note: if item 19a was checked and you check 20b or c, explain in item 22)

[ ] a. INDIVIDUAL GOVERNMENT CHARGE CARD [ ] b. BLANKET GOVERNMENT CHARGE CARD [ ] c. GOVERNMENT TRANSPORTA-TION REQUEST [ ] OTHER (explain in item 22)

**21. FUNDS OBLIGATED** A. INITIALS     B. DATE

**22. REMARKS**

**23. EST. COST TO GOVERNMENT**

| | $ |
|---|---|
| A. TOTAL COMMON CARRIER COST | 500.00 |
| B. TOTAL PER DIEM AND OTHER | 909.50 |
| C. TOTAL ESTIMATED COST | 1409.50 |
| **25. ADVANCE AUTHORIZED** | 0.00 |

**24. TRAVEL ADVANCE WILL BE OBTAINED BY** (check one)

[X] a. GOVERNMENT ISSUED CHARGE CARD [ ] b. SF 1038, ADVANCE OF FUNDS APPLICATION AND ACCOUNT

**IMPORTANT: SAFETY BELT USE IS MANDATORY. DRIVE SAFELY**

A SF 1012, TRAVEL VOUCHER MUST BE SUBMITTED TO THE VOUCHER APPROVING OFFICIAL WITHIN 5 WORKING DAYS OF COMPLETION OF TRIP.

| 26. NEAR ACCOUNT CLASS. | FUND | BUDGET ACTIVITY | OBJECT CLASS | FUNCTION | COST ELEMENT | PROJECT / PROSPECTUS | COST CENTER A | WORK ITEM | COST CENTER B |
|---|---|---|---|---|---|---|---|---|---|
| | WO | 700 | 04 | 1220XL | HBCU | 211D | | | |

**27A. NAME AND TITLE OF AUTHORIZING OFFICIAL**

Jesse Hicks - Group Manager

**27B. SIGNATURE** (PRESS FIRMLY USE BALL POINT PEN)

**27C. DATE**

GENERAL SERVICES ADMINISTRATION

GSA FORM 87 (REV. 8/86)

000199

```
06/22/04           ACCOUNTING DETAIL        | Doc No:      PG T04 3015
Copyright 2003 Gelco Information Network, Inc. | Frazier-Yates, 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
====================================================================================
                                                              TRIP 1
                                              --------------   --------------
  ACCOUNTING CLASS CODE          --------------                     500.00
  --------------------------                                        354.00
  COM. CARRIER-408                                                  305.50
  LODGING-409                                                       250.00
  M&IE-409                                                     --------------
  RENTAL CAR-409            --------------   --------------       1,409.50
                                     0.00             0.00

  WO

  Organization:
  WO-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XL-HBCU-211D----
```



Residence Inn Phoenix
8242 N. Black Canyon Highway
Phoenix, AZ 85051
(602) 864-1900

Guest Folio Summary

| Guest Name | N FRAZIER-YALES | | | | Page 1 |
|---|---|---|---|---|---|
| | | | | Folio Number | P1-91242 |
| | | | | Suite Number | 1411 |
| | BLM SCEP | | | Suite Type | STDO |
| | | | | No. of Guest | 1 |
| | | | | Rate | 59.00 |
| | | | | Account Number | KLP |

| Arrive | 13Jun04 | Time | 10:13 AM | Depart | | Time | |
|---|---|---|---|---|---|---|---|

| Date | | Description | Charges | Credits |
|---|---|---|---|---|
| 13Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 13Jun04 | T11411 | Room Tax | 7.12 | |
| 14Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 14Jun04 | T11411 | Room Tax | 7.12 | |
| 15Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 15Jun04 | T11411 | Room Tax | 7.12 | |
| 16Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 16Jun04 | T11411 | Room Tax | 7.12 | |
| 17Jun04 | R21411 | Room Charge-Studio 5-11 | 59.00 | |
| 17Jun04 | T11411 | Room Tax | 7.12 | |

```
+----------------------------------------------------+
|                  Paid-Mastercard                   |
|             AMOUNT:      330.60                    |
|            --> SIGNATURE ON FILE <--               |
+----------------------------------------------------+
```

HAVE A GREAT DAY AND COME HOME SOON

000201

02/02 - 02/05 K
NORMA H FRAZIER YATES

Super Shuttle

DATE 6-15-04
AUTHORIZATION NO. REFERENCE NO.
CX16207
VR4379

5544289

HABER SIGN HERE

IMPORTANT: RETAIN THIS COPY FOR YOUR RECORDS

| QTY. | DESCRIPTION | AMOUNT |
|------|-------------|--------|
|      |             | 12     |
| TAX  |             |        |
| SALES SLIP | TIP MISC | 2 00 |
| TOTAL |           | 14 00 |

CUSTOMER COPY

---

## AMERICA WEST AIRLINES

### GROUP 5

Name of Passenger
FRAZIERYATES / NORI
Conf: UHBAPA/HP
FFD:
PHOENIX
WASHINGTON

Flight     Date
46         18 JUN

| Gate | Boarding Time | Seat |
|------|---------------|------|
| A22  | 215P          | 7F Window |

---

# SuperShuttle®

### TRIP RECORD

Pass. Name _Norma Yates_

Company _DOT Jacki_

Address/Bldg. _____

City _____  Zip _____

Badge/P.O. _____

From _Standard_  To: _Airport_

#Pass. _____

| | Method of Payment | |
|---|---|---|
| | CREDIT CARD | ✓ |
| Fare $ 22.00 | DIRECT BILL | |
| Tip $ — | CASH RECEIPT | |
| Total $ 22.00 | PREPAID | ✓ |

Driver No. _9118_  Date _061304_

---

## AMERICA WEST AIRLINES

### GROUP 2

Name of Passenger
FRAZIERYATES / NORI
Conf: UHBAPA/HP
FFD:
WASHINGTON
PHOENIX

Flight     Date
482        13 JUN

| Gate | Boarding Time | Seat |
|------|---------------|------|
| 16   | 648A          | 7A Window |

000303

PG T04 301
Doc No:
Frazier-Yates, 579-74-210

CCOUNTING DETAIL                                              TRIP
co Information Network, Inc.                                      70
                                                                 60
                                                                 50
                                                                .00
CODE                                                          2.00
                                                             0.00
                                                          196 - 20

                                        0.00
                              0.00

)9

:
20XL-HBCU-211D

                                                    1,196
                                                      520
                                        ===========     670

DISBURSEMENTS:

EXPENSES                                                         .00
IMBURSABLE EXPENSES                     0.00                  ====
                                        0.00                  6.10
 AMOUNT CLAIMED                              ===========

'T ADVANCE OUTSTANDING
J'T ADVANCE APPLIED

                                        0.00
                                        0.00
TO TRAVELER (GOVT)

 GOV'T CHARGE CARD EXPENSES              0.00
GOV'T CHARGE CARD ATM ADV              ============
ADD'L GOV'T CHARGE CARD PYMT            0.00                       0 . 00
                                                               676 - 10
   TOTAL GOV'T CHARGE CARD AMT

PAY TO GOV'T CHARGE CARD
PAY TO TRAVELER

UNITED STATES COMMISSION ON CIVIL RIGHTS

WASHINGTON, D.C. 20425

OFFICE OF STAFF DIRECTOR

May 20, 2003

E. Melodee Stith
Director
Office for Equal Opportunity
Department of the Interior
1849 C St., NW Rm. 5214
Washington, DC 20240

Dear Ms. Stith:

In 2001, the U.S. Commission on Civil Rights (Commission) initiated an assessment of 11 federal agencies' responsiveness to recommendations the Commission made in the 1990s. Our research and analyses are being presented in a series of reports, the first two of which were released in 2002. We have now completed a draft of the third report, *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume III – An Evaluation of the Departments of Agriculture and Interior, the Environmental Protection Agency, and the Small Business Administration*. The Department of Interior is discussed in chapter 3.

It is the Commission's policy to provide agencies discussed in our reports a copy of the draft so that agency staff can review and comment on the information presented. I have enclosed one copy of the relevant section of Volume III. To allow Commission staff to respond to your comments, we must have your agency's written comments, should you decide to provide any, by June 3, 2003.

You are not required to provide comments. However, to the extent that you do, the comments must be in writing and received before the due date. Since there is a statutorily-imposed deadline for the completion of this study, any request for an extension cannot be guaranteed.

If you have any questions concerning the report or our request, please contact Terri A. Dickerson, Assistant Staff Director, Office of Civil Rights Evaluation, at 202-376-8542. I appreciate your cooperation and assistance in the preparation and completion of this report.

Sincerely,

Les Jin
Staff Director

Enclosures



EXHIBIT
Blue
28

## CHAPTER 3

## DEPARTMENT OF THE INTERIOR

As the nation's principal conservation agency, the Department of the Interior (DOI) has responsibility for most of America's public lands and natural resources. This responsibility entails fostering sound use of the nation's land and water resources; protecting its fish, wildlife, and biological diversity; preserving the environmental and cultural values of its national parks and historical places; and providing for the enjoyment of life through outdoor recreation. DOI assesses the country's energy and mineral resources and works to ensure that their development is in the best interests of all American people by encouraging stewardship and citizen participation in their care. DOI also has a major responsibility for American Indian reservation communities and for people who live in island territories under U.S. administration.[1]

### Overview

The Commission last reviewed the Department of the Interior's (DOI's) civil rights enforcement program in 1996. At that time, the only bureaus with active Title VI programs were the National Park Service (NPS), the Fish and Wildlife Service (FWS), and the Bureau of Reclamation (WBR). In 1991, the Office for Equal Opportunity (OEO) had assumed new responsibility for coordinating and developing civil rights policy at DOI.[2] OEO's duties entailed the "overall direction, policy development, and oversight of bureaus' Title VI enforcement efforts...."[3] Its new role not only increased bureau accountability, but also allowed OEO to assign more personnel to civil rights enforcement work.[4]

A year before the Commission's review, as OEO reorganized its federal financial assistance programs and federal employment staffs, DOI was participating in the National Performance Review Reinvention Laboratory. Both DOI and OEO sought to streamline and improve civil rights performance. OEO hoped to accomplish this by assembling the external civil rights Federal Financial Assistance Programs (FFAP) staff and internal equal employment opportunity Federal Employment Programs (FEP) staff into a team structure.[5] Staff supervisors, possessing no civil rights enforcement training, would also be replaced with process managers,

---

[1] U.S. Department of the Interior, Minerals Management Service, "20 years of Service to America, MMS, Minerals Management Service, 1982–2002, n.d.

[2] U.S. Commission on Civil Rights, *Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs*, June 1996, p. 388 (hereafter cited as USCCR, *Federal Title VI Enforcement*). When the Commission reviewed OEO in 1996, it established that OEO had decentralized its civil rights program in 1991. Prior to 1991, the civil rights program had been centralized. In 1996, OEO stated that decentralization had improved its civil rights performance efforts. Presently, OEO is planning to centralize its civil rights program. If centralization is approved, the scheduled effective date for full implementation is October 1, 2003. The director believes that centralization will dramatically improve OEO's civil rights compliance and enforcement efforts. *See* E. Melodee Stith, interview in Washington, DC, Jan. 15, 2003 (hereafter cited as Stith Interview).

[3] USCCR, *Federal Title VI Enforcement*, p. 388.

[4] USCCR, *Federal Title VI Enforcement*, p. 388.

[5] USCCR, *Federal Title VI Enforcement*, p. 388.

who would receive civil rights enforcement training.[6] Before the reorganization, personnel did
not work as closely and were less familiar with the programs they administered and program
recipients. Because of these factors, they were not held accountable for the administration of
these programs. After reorganization, process managers and staff would be held directly
accountable for the programs they administered.[7] DOI focused on ensuring that existing
regulations and operational procedures allowed efficient and effective enforcement of civil rights
laws.[8]

**Priority of Civil Rights**

In 1996, the OEO director reported to the deputy assistant secretary for human resources,
not the Secretary of the Interior, from whom the director was several levels removed.[9] The lack
of immediate access to the Secretary likely hindered OEO's efforts to enforce Title VI in all of
DOI's federally assisted programs and activities. This arrangement may have also hindered the
enforcement of other civil rights laws at DOI and the department's equal employment
opportunity program, which OEO administered.[10] The director stated that she had "ready access
to both the Assistant Secretary for Policy, Budget, and Administration and the Deputy Assistant
Secretary for Human Resources," participated in weekly meetings with these officials, and met
with all office directors bimonthly.[11] The Commission noted that OEO's enforcement efforts
would benefit if the director reported to the Secretary, thus giving civil rights the same priority as
other DOI responsibilities.[12]

The Commission's 2003 review finds that the director is still several levels removed from
the Secretary. According to OEO, the reporting hierarchy has not changed during the past 10
years: the director still reports to the Deputy Assistant Secretary for Human Resources and
Workforce Diversity (DASHRWD), who reports to the Assistant Secretary for Policy,

---

[6] USCCR, *Federal Title VI Enforcement*, pp. 388–89.

[7] USCCR, *Federal Title VI Enforcement*, p. 388. In 1996, the Commission was unable to evaluate the likelihood that
OEO would meet its goal because OEO did not provide the Commission with much information on its
reorganization.

[8] USCCR, *Federal Title VI Enforcement*, pp. 388–89.

[9] Ms. E. Melodee Stith has been director of the Office for Equal Opportunity during the Commission's 1996 review
and the present one. *See* Stith Interview.

[10] In addition to Title VI of the Civil Rights Act of 1964, OEO is responsible for enforcing the following civil rights
laws, executive orders and DOI regulations: Title VII of the Civil Rights Act of 1964; Title IX of the Education
Amendments of 1972, as amended; Title II of the Americans with Disabilities Act; Section 504 of the Rehabilitation
Act of 1973, Pub. L. No. 93-112, 87 Stat. 357 (codified as amended at 29 U.S.C. § 701 (1994)); Age Discrimination
Act of 1975, Pub. L. No. 94-175, 89 Stat. 728 (codified as amended at 42 U.S.C. § 6101 (1994)); Exec. Order
12,898, 59 Fed. Reg. 7,629 (1994); Exec. Order 13,160 66 Fed. Reg. 5,398 (2001); Exec. Order 13,166, 3 C.F.R. §
289 (2001), *reprinted in* 42 U.S.C.S. § 2000d-1 (Law. Co op. 2003); Nondiscrimination in Activities Conducted
Under Permits, Rights-of-Way, Public Land Orders and other Federal Authorizations Granted or Issued Under Title
II of Public Law 93-153, 43 C.F.R. § 27 (2002); Requirements for Equal Opportunity During Construction and
Operation of the Alaska Natural Gas Transportation System, 43 C.F.R. § 34 (2002). OEO provided this information.
*See* Department of Interior's Response to the U.S. Commission on Civil Rights' Interrogatory for Volume III of the
Ten-Year Review of Civil Rights Enforcement, Office for Equal Opportunity, Jan. 29, 2003, pp. 2–4 (hereafter cited
as DOI Interrogatory).

[11] USCCR, *Federal Title VI Enforcement*, p. 387.

[12] USCCR, *Federal Title VI Enforcement*, p. 405.

Management and Budget (ASPMB).[13] Despite having direct access to the DASHRWD and ASPMB, the director's comments reach the Secretary through one or two supervisors. OEO still maintains that this does not negatively impact the civil rights program because the Office of Policy, Management and Budget (PMB) makes administrative decisions for OEO. Furthermore, the director continues to "participate in all important executive meetings concerning budget, staffing, and policy issues affecting those programs for which she is responsible. . . ."[14] Reporting to the DASHRWD in no way ensures that OEO's concerns reach the Secretary because other concerns can overshadow these civil rights matters in PMB. The director is satisfied, however, that she has direct access to the Secretary when needed. Nevertheless, the director's weekly report to the Secretary merely includes an account of Title VI activities, instead of detailed information on what OEO requires to prioritize Title VI enforcement at DOI (see figure 3.1).[15]

**Figure 3.1**
**Department of Interior Organization Chart**



Source: Department of Interior, Organization Chart, Mar. 24, 2003.

In 1996, the FFAP staff handled Title VI enforcement at OEO and reported directly to the director. The FEP staff addressed Title VII or equal employment opportunity (internal civil rights) and also reported to the director.[16] The separation of external and internal civil rights

---

[13] DOI Interrogatory, pp. 1, 4.

[14] DOI Interrogatory, p. 1; U.S. Department of the Interior, "Organization Chart," n.d., <http://www.doi.gov/org.htm> (hereafter cited as DOI Organization Chart). Examples of executive meetings provided by OEO on the interrogatory are: Management Initiatives Team, Human Capital Management Team and Workforce Planning Work Group.

[15] Stith Interview.

[16] In 2003, OEO maintains three staffs: Complaints Processing and Adjudication, Diversity and Program Evaluation, and Civil Rights Program. *See* DOI Interrogatory, p. 5.

Confidential Draft
Not for Public Release: 5/20/2003

enforcement prevented Title VI resources from being redirected to internal civil rights obligations. Despite this, OEO was not sufficiently prioritizing Title VI enforcement because it did not have a legal structure to do so. The office relied instead on DOI's Office of the Solicitor (Solicitor) to maintain Title VI regulations current and draft Title VI procedures and guidelines.[17]

As of 2003, Title VI civil rights compliance and enforcement at OEO are managed by the Civil Rights Program Staff (CRPS), with the Diversity and Program Evaluation Staff (DPES) and Complaints Processing and Adjudication Staff (CPA) addressing internal civil rights functions.[18] Since OEO has maintained separate external and internal units, Title VI resources continue to be used solely for external efforts.[19] OEO has no dedicated legal staff and continues to rely on DOI's Office of the Solicitor to provide legal instruction on Title VI matters.[20] OEO's reliance on the Solicitor for these services emphasizes DOI's failure to prioritize external enforcement (see figures 3.2 and 3.3).

In 1996, the failure of DOI's Title VI enforcement program prompted the Commission to recommend the separation of OEO from offices responsible for developing projects required to meet external or internal civil rights laws. To accomplish this, the Commission envisioned OEO serving as a watchdog for the other offices to ensure that every initiative, plan, program, and activity originating at DOI met agency civil rights enforcement goals.[21] This is a critical issue because OEO is responsible for enforcing and ensuring compliance with all federal civil rights laws and executive orders for which the department has responsibility.[22] OEO has authority to conduct these duties under Title VI of the Civil Rights Act of 1964 and to ensure that they are fully enforced.[23]

---

[17] USCCR, *Federal Title VI Enforcement*, pp. 387–88.

[18] U.S. Department of the Interior, "Departmental Manual," Oct. 6, 1998, <http://elips.doi.gov/elips/release/3225.htm>; *DOI Organization Chart*. These units were previously called the Federal Financial Assistance Programs Staff and Federal Employment Programs Staff, respectively. (*See* USCCR, *Federal Title VI Enforcement*, pp. 387–88; U.S. Department of the Interior, FY 1994 Civil Rights Implementation Plans and Supporting Workload and Performance Data, p. 3). Specifically, DPES develops policy and designs, manages, and directs enhancement programs to promote full diversity within the Department, which include affirmative action planning and implementation. CPA, is responsible for issuing final agency decisions on all complaint of discrimination filed against the Department on the basis of race, color, sex, national origin, religion, age, disability or sexual orientation.

[19] DOI Interrogatory, p. 11.

[20] U.S. Department of the Interior, *FY 2002 Information and Reporting Requirements for Agencies Covered by Executive Order 12,250, (October 1, 2001–September 30, 2002)*, p. 3 (hereafter cited as *DOI FY 2002, Information and Reporting Requirements*); Stith Interview.

[21] USCCR, *Federal Title VI Enforcement*, p. 405.

[22] DOI Interrogatory, p. 4.

[23] Department of the Interior, "Departmental Manual," Feb. 3, 1996, <http://elips.doi.gov/elips/release/3051.html> (hereafter cited as *Departmental Manual, Feb. 3, 1996*).

Case 1:05-cv-01175-RWR     Document 18-14     Filed 07/26/2007     Page 113 of 133

**Figure 3.2**
**Department of Interior, Office for Equal Opportunity Organization Chart**
**Effective 1991 to October 5, 1998**



Source: USCCR, *Federal Title VI Enforcement*, pp. 387–92.

**Figure 3.3**
**Department of Interior, Office for Equal Opportunity Organization Chart Effective**
**October 6, 1998**



Source: Department of Interior, Office for Equal Opportunity Organization chart, Jan. 31, 2003.

In 2003, OEO's Title VI compliance and enforcement efforts continue to be hindered by its placement with PMB.[24] Specifically, OEO is included in PMB and, within that, subsumed under the DASHR WD. OEO's subordinate position within PMB may negate its ability to ensure

---

[24] U.S. Department of the Interior, Office of Policy, Management and Budget, "PMB Offices," *n.d.*, <http://www.doi.gov/policy-management-budget.html> (hereafter cited as *PMB Offices*); *See* USCCR, *Federal Title VI Enforcement*, pp. 387, 405.

Confidential Draft
Not for Public Release: 5/20/2003

that PMB projects required to adhere to laws enforced by OEO do so.[25] Included among the many duties of ASPMB, for example, are special-emphasis programs such as equal opportunity, small and minority business utilization and minority educational institutions, programs subject to civil rights compliance.[26] This deficiency is especially stark because among OEO's objectives is providing "department-wide oversight . . . for the various Interior . . . civil rights compliance programs."[27]

### Resources—Funding and Staffing

The Commission's 1996 evaluation found that DOI annually distributed approximately $900 million in federal financial assistance. Between 1964 and 1994, DOI provided 12,414 recipients more than $22 billion in financial assistance through 62 programs. Although DOI's bureaus operated all of its federally assisted programs, only NPS, FWS, and WBR had responsibility for implementing and enforcing Title VI in the federal financial assistance programs they administered.[28] At that time, DOI's other bureaus did not have active Title VI programs but operated federally assisted programs.[29] Despite the responsibilities assigned to NPS, FWS and WBR, OEO was ultimately responsible for enforcing Title VI in all DOI's federally assisted programs and activities.[30] Specifically, OEO oversees and offers policy direction, guidance, training and support to bureaus in Title VI activities. Moreover, OEO is charged with reporting noncompliance and enforcement actions against recipients to other federal agencies, including termination of funding.[31] In FY 1993, DOI's total civil rights budget was $5.2 million.[32] Of this amount, OEO was allocated $1.6 million, which also sustained its oversight of the equal employment opportunity program within the Department.[33]

In 2003, the Commission finds that OEO received a steady increase in funding between FYs 1998 and 2002. Specifically, OEO's average annual funding was $1.3 million from FY 1996

---

[25] *DOI FY 2002 Information and Reporting Requirements*, p. 1; *PMB Offices*.

[26] U.S. Department of the Interior, "Office of Policy, Management and Budget," n.d., <http://www.doi.gov/policy-management-budget.htm>.

[27] U.S. Department of the Interior, Office for Equal Opportunity, *FY 2002 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-95 (hereafter cited as *OEO FY 2002 Budget Submission and Appropriation*).

[28] USCCR, *Federal Title VI Enforcement*, pp. 385, 389.

[29] USCCR, *Federal Title VI Enforcement*, pp. 388, 390. In addition to the National Park Service, the Fish and Wildlife Service, and the Bureau of Reclamation, in 1996 the bureaus were the Bureau of Indian Affairs, Bureau of Land Management, Office of Surface Mining Reclamation and Enforcement, Minerals Management Service, U.S. Geological Survey, and U.S. Bureau of Mines.

[30] USCCR, *Federal Title VI Enforcement*, p. 387.

[31] *Departmental Manual*, Feb. 3, 1996.

[32] USCCR, *Federal Title VI Enforcement*, pp. 385, 391. This amount also included expenditures; U.S. Department of the Interior, *FY 1994 Civil Rights Implementation Plans and Supporting Workload and Performance Data*, p. 4 (hereafter cited as *DOI FY 1994 Information*).

[33] U.S. Department of the Interior, Office for Equal Opportunity, *FY 1994 Budget Submission and Appropriation, Justification of Program and Performance*, p. SEC-26; USCCR, *Federal Title VI Enforcement*, p. 387.

through the FY 2002 budget request.[34] The only decrease during this period occurred in FY 1997 when funding was $150,000 below the previous year (see figure 3.4)[35]

In 1996, OEO had neglected to develop a mechanism for managing, allocating or tracking Title VI funds and expenditures. In fact, no formal tracking system existed for any of its external civil rights activities. Because OEO did not know how its Title VI expenditures compared with its other program areas, its ability to systematically plan its Title VI activities was impeded.[36] Moreover, failing to monitor external civil rights expenditures may have caused the reductions in OEO's budget, staffing and resources that occurred at that time.[37] The Commission recommended that OEO develop an information management system that would permit it to isolate Title VI outlays from those for all other civil rights activities. The Commission said both OEO's and the bureaus' expenditures should be tracked in order to accurately account for costs.[38] In 1996 the Commission also found that DOI's budget did not designate funds for OEO.[39]

---

[34] U.S. Department of the Interior, Office for Equal Opportunity, *FY 1997 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-61 (hereafter cited as *OEO FY 1997 Budget Submission and Appropriation*); U.S. Department of the Interior, Office for Equal Opportunity, *FY 1998 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-54 (hereafter cited as *OEO FY 1998 Budget Submission and Appropriation*); U.S. Department of the Interior, Office for Equal Opportunity, *FY 1999 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-58; U.S. Department of the Interior, Office for Equal Opportunity, *FY 2000 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-99; U.S. Department of the Interior, Office for Equal Opportunity, *FY 2001 Budget Submission and Appropriation, Justification of Program and Performance*, p. DM-98; *OEO FY 2002 Budget Submission and Appropriation*, p. DM-95. The FY 2002 figure is based on OEO's budget request for that fiscal year.

[35] *OEO FY 1997 Budget Submission and Appropriation*, p. DM-61; *OEO FY 1998 Budget Submission and Appropriation*, p. DM-54.

[36] USCCR, *Federal Title VI Enforcement*, p. 408.

[37] USCCR, *Federal Title VI Enforcement*, p. 391.

[38] USCCR, *Federal Title VI Enforcement*, p. 408.

[39] USCCR, *Federal Title VI Enforcement*, p. 391.

**Figure 3.4**
**Office for Equal Opportunity Budget History, FYs 1996–2002**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996–2002 Budget Submissions and Appropriations.

The forgoing has not changed in 2003. Funding for OEO is contained in the Departmental Management portion of DOI's budget, thus, funds are still not being designated for OEO. Consequently, the director is responsible for obtaining funds from the Department and distributing them to each civil rights functional area.[40] Matters are further clouded by OEO's continued failure to institute an information management system for tracking civil rights expenditures.[41] The situation is especially troublesome since more than five years ago, DOI spent in excess of $1.5 million and staff to further develop the Accessibility Data Management System.[42] The system would have allowed the review, reporting, monitoring, and tracking of DOI's civil rights compliance and enforcement.[43] Failing to implement such a system has likely prevented OEO from assessing the impact of funding on Title VI enforcement. Lack of funding also has negatively affected DOI's systematic planning for Title VI activities.

In 1996, the Commission found that OEO's work was further compromised by the lack of a dedicated unit for policy development and programmatic guidance.[44] At that time OEO devoted only five staff members to external civil rights activities. However, only one employee

---

[40] DOI Interrogatory, p. 11.

[41] DOI Interrogatory, p. 11.

[42] U.S. Department of the Interior, *FY 1997 Civil Rights Information and Reporting Requirements*, p. 8 (hereafter cited as *DOI FY 1997 Civil Rights Information*).

[43] *DOI FY 1997 Civil Rights Information*, p. 8.

[44] USCCR, *Federal Title VI Enforcement*, p. 406.

Confidential Draft
Not for Public Release: 5/20/2003

performed work for OEO because FWS used three staff while NPS used one.[45] Still, increasing the number of staff was only half the battle, as OEO had to adequately train, monitor, and guide them.[46]

The 2003 study reveals that OEO staff is responsible for policy development and programmatic guidance, dissemination of guidance to bureaus, and monitoring and overseeing bureaus' civil rights enforcement.[47] Consequently, OEO is still lacking a unit dedicated to policy development and programmatic guidance. Furthermore, since OEO only dedicates five civil rights program staff to external activities, including the four assigned to individual bureaus, staff are still greatly overburdened despite being periodically supplemented by personnel temporarily detailed to Title VI activities from other OEO sections (see figure 3.5).[48]

**Figure 3.5**
**Office for Equal Opportunity and Bureau Title VI Staffing History, FY 1996–FY 2002**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1994–2002 Civil Rights Implementation Plans and Supporting Workload and Performance Data.

Bureau civil rights staff work in dedicated internal and external enforcement units with the director overseeing staffing levels. But, the director does not have authority to influence the

---

[45] USCCR, *Federal Title VI Enforcement*, p. 408.

[46] USCCR, *Federal Title VI Enforcement*, p. 409.

[47] DOI Interrogatory, p. 5.

[48] DOI Interrogatory, pp. 12, 16; Stith Interview, p. 5. The four CRPS not working directly for OEO are assigned to the National Park Service, Fish and Wildlife service, Office of Surface Mining, and U.S. Geological Survey, respectively.

number of staff dedicated to external duties. Although all bureaus have an equal opportunity office, civil rights enforcement specialists are only in NPS, FWS, Office of Surface Mining (OSM), and the U.S. Geological Survey (USGS). Bureaus without civil rights enforcement specialists are the Bureau of Land Management (BLM); Bureau of Indian Affairs (BIA); WBR; and the Minerals Management Service (MMS).[49] Finally, bureaus with civil rights program management staff may or may not assign civil rights specialists to Title VI duties, and the director has no authority to instruct them to do so.[50]

## Planning

According to the Commission's 1996 report, OEO's civil rights implementation plans (CRIP) failed to meet the Department of Justice's (DOJ) requirements. OEO was not providing enough information to permit DOJ to assess the program's quality. OEO's CRIP also failed to provide the public with an understanding of DOI's federally funded programs. Moreover, since the goals and objectives of the plans were not specific and lacked timetables and standards for accomplishment, as prescribed by DOJ, the Commission found that they did not serve as a management tool.[51] Because the plans were not meeting DOJ's standards, the Commission recommended that OEO develop plans that fulfilled DOJ's specified objectives. It also recommended that the plans clearly explain DOI's Title VI enforcement program and be readily available to the public. Because these plans needed to be used as a management tool, OEO had to present its "methods for selecting recipients and its compliance reviews."[52] Furthermore, complaint handling procedures and the provisions for providing outreach and education, training, and technical assistance also had to be included in the plans. OEO's civil rights implementation plans also had to include a description of DOI's Title VI quality assurance programs and specific long-range and short-term goals and objectives, with timeframes for accomplishing them.[53] To ensure that goals and objectives were met, OEO had to develop them by accounting for available staff and resources as well as directing enough of both to that end.[54]

During the Commission's 2003 study, OEO indicated that the CRIP has always been developed with the Department of Justice's guidance.[55] According to OEO, it has been developing these plans since 1972. OEO further states that DOJ has never provided any feedback on the sufficiency of the implementation plans and the DOI interpreted DOJ's silence as approval.[56]

---

[49] Department of the Interior, "Workforce Diversity," *DOI EO Offices*, May 30, 2002, <http://www.doi.gov/diversity/8doi_ceo.html>.

[50] DOI Interrogatory, pp. 9–10, 16.

[51] USCCR, *Federal Title VI Enforcement*, p. 414. In 1996, the Department of Justice included specific objective for civil rights implementation plans in its "Guidelines for Agency Implementation Plans Required by Executive Order 12,250, 'Leadership and Coordination of Nondiscrimination Laws."

[52] USCCR, *Federal Title VI Enforcement*, p. 414.

[3] USCCR, *Federal Title VI Enforcement*, p. 414.

USCCR, *Federal Title VI Enforcement*, p. 414.

DOI Interrogatory, p. 6.

DOI Interrogatory, p. 6.

In 2003, the Commission finds that DOI last modified its Title VI regulations in FY 2002.[63] Although the regulations were updated to include the Civil Rights Restoration Act's definition of a covered "program" and "program or activity," it neglected to incorporate the act's clarifications to Title VI's coverage and funding termination provisions.[64] Furthermore, DOI failed to provide appropriate model regulations or examples, instead choosing to maintain those developed by DOEd.[65] Finally, DOI has not published an annual list of its federally assisted programs in the *Federal Register*.[66]

In 1996, the Commission also found that DOI's Title VI guidelines were outdated. Once more, the Commission asked DOI to immediately remedy the situation since existing regulations did not accurately reflect the agency's current Title VI enforcement structure and process. Perhaps more disturbing was DOI's failure to issue guidelines for its other federally assisted programs.[67]

The Commission recommended that DOI clearly outline the "relative responsibilities of OEO, the bureaus, civil rights offices, the bureaus' program offices, and recipients [in] ensuring Title VI compliance in the areas of pre-award and post-award compliance reviews; complaints processing; data collection, reporting, and analysis; technical assistance; and outreach and education" in the guidelines.[68] Guidelines also needed to clearly describe the specific types of data that recipients were required to collect and provide to OEO and supply clear and relevant examples of the actions that violated Title VI.[69]

The Commission also recommended that guidelines provide state recipients receiving funding under continuing programs with an explicit understanding of Title VI compliance responsibilities. It was also recommended that guidelines require states to seek DOI approval for their methods of administration and to submit regularly self-assessments and compliance plans to DOI.[70]

The 2003 study finds that OEO develops guidelines "on an as need basis" and when DOJ provides new Title VI standards.[71] Although OEO proposed revising DOI civil rights guidelines in FY 1998, this was for Title IX (education) not Title VI (grants).[72] The Title VI guidelines used by OEO in 2003 continue to be badly outdated as they do not even incorporate the Civil Rights

---

[63] DOI Interrogatory, p. 6.

[64] *DOI FY 2002 Information and Reporting Requirements*, p. 7; U.S. Department of Justice, "Joint NPRM Incorporating the CRRA," Dec. 6, 2000, <http://www.usdoj.gov:80/crt/cor/byagency/crranprm.htm> (hereafter cited as *DOJ NPRM*).

[65] *DOI FY 2002 Information and Reporting Requirements*, p. 7; *DOJ NPRM*.

[66] An exhaustive search of the *Federal Register* at http://www.access.gpo.gov/su_docs/aces/aces140.html on February 11, 2003, provided no such listing.

[67] USCCR, *Federal Title VI Enforcement*, p. 409.

[68] USCCR, *Federal Title VI Enforcement*, p. 409.

[69] USCCR, *Federal Title VI Enforcement*, p. 409.

[70] USCCR, *Federal Title VI Enforcement*, p. 409.

[71] DOI Interrogatory, p. 7.

[72] *DOI FY 1998 Information and Reporting Requirements*, p. 4.

Restoration Act. One set of guidelines is included as part of the *Land and Water Conservation Fund Grants Manual* and is very general. Although it incorporates some of the areas mentioned by the Commission, it neglects just as many. Moreover, it is only directed at the NPS and its recipients, and thus is of little if any use to other DOI bureaus.[73] The other set of guidelines is developed by the FWS and is equally vague and covers the same general areas as the manual.[74]

The Commission found in its 1996 review that DOI's Title VI enforcement procedures were also in need of immediate updating and revision. The Commission noted that the existing Title VI enforcement manual made no mention of OEO's current Title VI enforcement procedures. Instead, the manual described an outdated Title VI enforcement structure.[75] To correct the situation, the Commission recommended that the manual be updated and revised to explain (1) every civil rights implementation and enforcement procedure; (2) how to conduct pre-award and post-award compliance reviews; (3) how to process and investigate complaints correctly; (4) how to perform community outreach, public education, and technical assistance; and (5) how to negotiate and monitor compliance agreements.[76]

To strengthen OEO's reviews and investigations, the Commission also recommended that OEO provide staff with detailed instructions and elaborate on the types of information to be considered during reviews and investigations. In addition, the manual should provide examples of whom staff should contact for information throughout compliance reviews and complaint investigations.[77] A final recommendation was the inclusion of a Title VI compliance analysis outline for the staff's erudition.[78]

The Commission finds that in 2003, OEO has no Title VI enforcement manual. According to OEO, it issues equal opportunity memoranda to distribute enforcement procedures.[79] However, the Commission received no documentation supporting the assertion that DOI was fulfilling this requirement.[80]

**Technical Assistance**

DOI's bureaus depended on technical assistance from OEO for effective Title VI enforcement. OEO's mandate to coordinate and oversee the bureaus' Title VI efforts also required it to provide bureaus with this assistance. OEO's ability to provide technical assistance, however, was a function of staff.[81] When the Commission reviewed OEO in 1996, external

---

[73] U.S. Department of the Interior, Office for Equal Opportunity, *Land & Water Conservation Fund Grants Manual*, n.d., pp. 1–11; *DOI FY 1997 Civil Rights Information*, p. 12.

[74] U.S. Fish and Wildlife Service, *Federal Aid Toolkit* (2002) (hereafter cited as *Toolkit*).

[75] USCCR, *Federal Title VI Enforcement*, p. 410.

[76] USCCR, *Federal Title VI Enforcement*, p. 410.

[77] USCCR, *Federal Title VI Enforcement*, p. 410.

[78] USCCR, *Federal Title VI Enforcement*, p. 410.

[79] DOI Interrogatory, pp. 6, 23.

[80] Because OEO did not provide any memorandums to the Commission, as many as could be found on the Internet were obtained.

[81] USCCR, *Federal Title VI Enforcement*, pp. 412–13.

enforcement staff consisted of only six full-time-equivalent positions (FTEs).[82] The Commission concluded that the number was insufficient to handle the workload.

Because of insufficient staffing, the Commission recommended that OEO maximize its resources by providing technical assistance during its regular on-site monitoring reviews of bureaus' programs. Delivery of technical assistance could also be improved by developing a regular and systematic program for those bureau staff performing Title VI enforcement procedures. In addition to assisting bureau staff, OEO needed to begin providing periodic assistance to all its recipients via the bureaus. To avoid taxing resources, bureaus could accomplish this over the telephone, through written communications and civil rights conferences, and other appropriate forums. Prior to delegating this responsibility, however, OEO had to provide comprehensive training to bureau staff on external civil rights enforcement. The quality of this and other civil rights work had to be supervised by OEO to avoid the shortfalls of the previous effort.[83]

In 2003, the Commission finds that OEO and the bureaus provide recipients with technical assistance on request and during compliance reviews and complaint investigations.[84] Recipients, as well as public entities, routinely receive expert technical assistance from DOI bureaus and offices aimed at resolving noncompliance.[85] However, FY 2000 was the last time OEO provided recipients with technical assistance.[86] OEO, NPS, FWS, OSM, and USGS each have one full-time staff member to perform all Title VI enforcement duties, including technical assistance. The BIA provides technical assistance to Native American and Alaska Native communities concerning limited-English-proficiency (LEP) and race discrimination issues despite not having an established Title VI compliance review program.[87]

The Commission also finds that OEO annually reviews bureaus to assess their plans and accomplishments in enforcing the provisions of Title VI, including the effectiveness of the technical assistance they provide.[88] However, OEO has not provided technical assistance to bureaus having compliance and enforcement responsibilities since FY 1999.[89] Training for DOI's equal opportunity personnel at the NPS, FWS, WBR, and OSM on providing effective technical assistance was last provided in FY 2000.[90]

OEO further states that when subrecipients receive federal funds, primary recipients are responsible for providing them with technical assistance. Although DOI requires primary recipients to have continuing technical assistance programs, the quality of these programs is not

---

[82] USCCR, *Federal Title VI Enforcement*, p. 385.

[83] USCCR, *Federal Title VI Enforcement*, p. 413.

[84] DOI Interrogatory, p. 19.

[85] *DOI FY 2000 Information and Reporting Requirements*, p. 5.

[86] *DOI FY 2000 Information and Reporting Requirements*, p. 5.

[87] DOI Interrogatory, pp. 16, 19–20.

[88] DOI Interrogatory, p. 19.

[89] *DOI FY 1999 Civil Rights Information*, p. 5.

[90] *DOI FY 2000 Information and Reporting Requirements*, p. 2.

monitored nor are recipients required to submit self-evaluation reports on their program.[91] However, the last time OEO acknowledges training primary recipients was in FY 1997. Even then, only primary recipients receiving funds through the NPS, FWS, and WBR received technical assistance.[92]

OEO needs to provide recipients more frequent technical assistance, minimally once a year, and not wait for them to request it or receive it during compliance reviews and complaint investigations. Bureaus must also be provided technical assistance at least once a year because their Title VI enforcement performance depends on this. Lastly, OEO must ensure that primary recipients meet their obligation to provide technical assistance to subrecipients. Again, a minimal baseline for this assistance should be once every year.

## Education and Outreach

The Commission's 1996 evaluation revealed that education and outreach efforts were essentially limited to the development and distribution of a multilingual civil rights poster and several brochures. Apart from these publications, neither OEO nor the bureaus provided meaningful outreach and education. In fact, although three bureaus had active Title VI enforcement programs, only the FWS did more than display the poster.[93] The Commission recommended that DOI immediately develop a comprehensive Title VI community outreach and public education program under the direction of OEO.[94]

In 2003, the Commission finds that OEO continues to rely on civil rights posters as the primary means of informing the public of DOI's Title VI civil rights obligations. Recipients are required to place a reasonable number of these posters in prominent locations throughout all areas of their operations. The posters explain the procedures for filing complaints with DOI, and are supplemented with pamphlets that describe DOI's civil rights policies and procedures. These pamphlets are made available to all public entities.[95] Recipients are further obligated to notify the public of their nondiscrimination policies in publications describing program availability.[96] Additionally, bureau civil rights staff regularly participate in natural-resources-related conferences at both the state and local levels and hold training and discussion workshops that cover Title VI policies. DOI has five FTEs overseeing outreach and education, the same ones charged with all other civil rights duties.[97]

Education and outreach efforts must greatly improve if OEO is to meet its Title VI obligations. Posters and pamphlets should be complimentary to concerted education and outreach efforts, not the primary means of providing these services. OEO should enhance its education and outreach efforts to include participation in civic events and presentations for community

---

[91] DOI Interrogatory, p. 19.

[92] *DOI FY 1994 Information*, p. 17.

[93] USCCR, *Federal Title VI Enforcement*, p. 412.

[94] USCCR, *Federal Title VI Enforcement*, p. 412.

[95] DOI Interrogatory, p. 17. OEO did not provide pamphlets for the Commission to review.

[96] DOI Interrogatory, p. 17.

[97] DOI Interrogatory, pp. 16–18.

groups, areas where existing and future beneficiaries are present. Finally, OEO must be proactive in its efforts, initiating contact with targeted groups and not rely on chance to alert these groups to DOI's Title VI programs and obligations.

## Complaints Processing

In 1996, the failings of DOI's Title VI enforcement program were also evident in OEO's methods for conducting complaint investigations. Generally, OEO's Title VI complaint investigations did not detect discrimination, leading the Commission to conclude that perhaps they were not sufficiently comprehensive. There was no question they were rudimentary because neither OEO or the bureaus had developed or implemented procedures for conducting them. Moreover, investigations were not reviewed to verify their thoroughness.[98]

To remedy this lack of investigative vigor, in 1996 the Commission recommended that OEO and the bureaus develop and implement clear and comprehensive complaint investigation procedures. The Commission also recommended that a quality assurance review process be established to certify the thoroughness of investigations before providing complainants and recipients with decisions.[99]

OEO's internal Title VI complaint investigation procedures are currently found in DOI's *Equal Opportunity Directive No. 1998-13, Internal Civil Rights Complaints Processing Procedures, September 30, 1998*.[100] The procedures detailed in this directive are generally clear and detailed in explaining OEO's and the bureaus' responsibilities in investigating and processing Title VI complaints. Unfortunately, these procedures do not provide steps for verifying the thoroughness of a complaint investigation.[101] Furthermore, external procedures are nonexistent except for requiring recipients to report any complaints or lawsuits against them alleging they discriminated because of race, color, or national origin.[102] OEO, and specifically the director, is charged with overseeing and monitoring the entire complaints process, including resolution.[103] Complaint investigations are still conducted by the five aforementioned civil rights FTEs.[104]

The Commission's 2003 study further finds that DOI's complaints process may also continue to be hindered by its relatively weak education and outreach efforts since, on average, it annually received a mere eight Title VI violation complaints from FY 1996 through FY 2001. Although OEO does not specify the annual number of Title VI complaints left unresolved, over this same period it had approximately 175 unresolved civil rights complaints (see figures 3.6 and

---

[98] USCCR, *Federal Title VI Enforcement*, p. 412.

[99] USCCR, *Federal Title VI Enforcement*, p. 412.

[100] DOI Interrogatory, p. 15.

[101] U.S. Department of the Interior, Office for Equal Opportunity, "Equal Opportunity Directive No. 1998-13, Internal Civil Rights Complaints Processing Procedures," Sept. 30 1998, <http://www.doi.gov/diversity/doc/eod98_13.htm>.

[102] DOI Interrogatory, p. 15.

[103] DOI Interrogatory, p. 14; *Directive No. 1998-13*.

[104] DOI Interrogatory, p. 16; Stith Interview.

3.7).[105] DOI's complaint investigation procedures are vague on bureau time limits for processing complaints. Specifically, the procedures state that the "most egregious complaints should be reported to the Departmental Office for Equal Opportunity within five (5) days [of] receipt."[106] Complaints other than the most egregious are to be reported to OEO at the established monthly intervals with the resolution of "all complaints of alleged discrimination [to be resolved] promptly and appropriately whenever possible."[107]

**Figure 3.6**
**Department of Interior Title VI Complaints, FY 1996 through FY 2001**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996 through 2001 Civil Rights Workload and Performance Data.

Unfortunately, the procedures rely on individual interpretations of what "most egregious" means. While a complaint may strike one equal opportunity officer as not egregious enough to warrant immediate action, another staff member may view it as egregious and worthy of immediate processing. Moreover, procedures for resolving complaints promptly and appropriately whenever possible are imprecise and do not specify how and on what timeframe duties must be accomplished.

---

[105] U.S. Department of the Interior, *FY 1996 Civil Rights Workload and Performance Data*, p. 15; U.S. Department of Interior, *FY 1997 Civil Rights Workload and Performance Data*, p. 13; U.S. Department of Interior, *FY 1998 Civil Rights Workload and Performance Data*, p. 15 (hereafter cited as *DOI 1998 Civil Rights Data*); U.S. Department of Interior, *FY 1999 Civil Rights Workload and Performance Data*, p. 12; U.S. Department of Interior, *FY 2000 Civil Rights Workload and Performance Data*, p. 19; U.S. Department of Interior, *FY 2001 Civil Rights Workload and Performance Data*, p. 15 (hereafter cited as *DOI 2001 Civil Rights Data*).

[106] *Directive No. 1998-13.*

[107] *Directive No. 1998-13.*

Confidential Draft
Not for Public Release: 5/20/2003

**Figure 3.7**
**Department of Interior Unresolved Civil Rights Complaints, FYs 1996–2001**



Source: Department of Interior, Office for Equal Opportunity, Fiscal Years 1996 through 2001 Civil Rights Workload and Performance Data.

## Compliance Reviews

During the Commission's 1996 review of OEO, it was discovered that no uniform policy existed requiring pre-award reviews of all applicants before deciding whether to approve federal funding. In fact, at that time only the NPS and FWS were conducting pre-award reviews. Even this, however, was questionable as these bureaus were merely administering a Title VI checklist, not conducting "comprehensive assessments" of Title VI compliance.[108]

OEO's failings prompted the Commission to recommend that it implement pre-award reviews in "each of its major federally assisted programs" that carefully evaluate "program data and other information supplied by applicants" before authorizing federal funding.[109] Only if applicants were in compliance with Title VI and DOI's Title VI regulations, would federal funding be furnished.[110]

The Commission's 2003 study finds that OEO still only conducts cursory pre-award reviews of an applicant's program and takes a passive posture, assuming compliance will prevail upon a recipient's signature on a civil rights assurance form.[111] Pre-award reviews are not guided by uniform policies and thus differ between bureaus with the result that some conduct less

---

[108] USCCR, *Federal Title VI Enforcement*, p. 411.

[109] USCCR, *Federal Title VI Enforcement*, p. 411.

[110] USCCR, *Federal Title VI Enforcement*, p. 411.

[111] DOI Interrogatory, p. 13.

comprehensive ones. Responsibility for conducting reviews belongs to bureau program specialists and not civil rights personnel. DOI believes that limited pre-award reviews focusing on the applicant's operations and requiring them to sign a civil rights assurance form are more efficient because grants are awarded more quickly and do not overburden the grant-making process with protracted and unnecessary delays. Consequently, DOI collects no additional program data during pre-award reviews and some bureaus may conduct more lenient reviews. DOI identifies and resolves civil rights problems through a fall back process. If noncompliance is found during an applicant's pre-award review, the director is notified and an investigation is initiated.[112] DOI should be proactive and conduct expanded pre-award reviews, as resources permit, and thus address a problem before it becomes a violation.

Despite the shortcomings of OEO's pre-award reviews, both NPS and FWS had implemented them by 1996. Conversely, OEO had never implemented a system of post-award desk-audit reviews. Such a failure indicated a waste of resources, both staff and monetary, since desk audits permit agencies to evaluate more recipients with fewer staff and resources than on-site reviews.[113] To address this problem, in 1996 the Commission recommended that OEO develop and implement procedures that would allow it to make post-award desk-audit reviews an integral part of its enforcement process. The process was to include the regular collection of enough relevant information to perform adequate reviews of recipients. Relevant information included data on individuals participating in the program and those eligible to participate by race, color, national origin, and ethnic group membership.[114]

DOI now relies extensively on post-award desk-audit reviews because costs are low compared with on-site reviews. Furthermore, OEO has established procedures for conducting reviews at numerous DOI programs, including park and recreation programs and historic preservation activities.[115] These procedures were established in FY 1998 according to documents.[116] In FY 2001, OEO conducted 1,503 post-award reviews of a total 13,256 estimated covered recipients, slightly more than 11 percent of recipients. Of the 1,503, only three recipients were found to be in noncompliance, slightly less than 0.2 percent, and only two were reviewed with more than desk audits. All three cases of noncompliance were resolved through corrective action commitments by the recipients.[117]

Although DOI's bureaus conducted on-site compliance reviews during the Commission's 1996 review, they fell far short of the comprehensive reviews required by the DOJ. Their lack of investigative depth was rooted in OEO's failure to assign civil rights staff to conduct them. Regrettably, program management staff, lacking understanding of Tile VI requirements and the experience to uncover discrimination, was conducting on-site reviews. Reviews were further hindered by being limited to readily identifiable forms of discrimination, examples of which

---

[112] DOI Interrogatory, pp. 12–13. OEO states that pre-award reviews are part of the federal financial assistance process.

[113] USCCR, *Federal Title VI Enforcement*, p. 411.

[114] USCCR, *Federal Title VI Enforcement*, p. 411.

[115] DOI Interrogatory, p. 14.

[116] *DOI 1998 Civil Rights Data*, p. 1.

[117] *DOI 2001 Civil Rights Data*, p. 19.

could be easily marked off on a civil rights checklist.[118] OEO's on-site reviews also focused on specific projects and not the entire system thus not adhering to a Title VI requirement under the Civil Rights Restoration Act of 1987.[119]

In its 1996 report, the Commission concluded that OEO needed to develop and implement specific procedures for reviewing the civil rights compliance status of DOI's federal funding recipients. These external reviews needed to be comprehensive and geared toward both Title VI and other civil rights statutes. Furthermore, these reviews had to complement the monitoring performed during civil rights project reviews, not replace it.[120]

As a result, the Commission recommended that such reviews include a liberal examination of a recipient's programs and practices and not be limited to those funded directly by DOI. Information was to be gathered from a "recipient's staff, program participants, affected parties, and interested community groups" via extensive interviews.[121] Data collected by the recipient and obtained by OEO were to be thoroughly analyzed. Reviews were to be performed by trained civil rights personnel from DOI's bureaus or OEO, and not by program management staff lacking the training or knowledge for such work.[122]

In 2003, while on-site compliance reviews are comprehensive in nature, the majority still focus on isolated problems and practices due to limited civil rights staff. Both OEO and the bureaus now assign civil rights staff to conduct on-site compliance reviews.[123] Documents and interviews, however, do not reveal an expanded review process. One document, a *Federal Aid Toolkit*, is limited to the FWS and simply lists a number of documents to be examined during an FWS on-site compliance review. No interviews of recipients or beneficiaries is mandated and recipients may not even be required to submit all the documents.[124] The effectiveness of an on-site review is not present in the process incorporating this document.

The second document, *Civil Rights Post-Award Review Checklist*, continues to be limited to readily identifiable forms of discrimination and is predominantly aimed at recipients, thus addressing very few of the Commission's 1996 recommendations. Although community representatives and program beneficiaries are to be interviewed, the instructions designate people with hearing impairments as the target group. Consequently, the document is limited to programs geared toward or in which hearing-impaired individuals participate. Yet, if it is a limited scope review, community representatives and program beneficiaries may not be interviewed.[125] In sum, program participants, affected parties, and interested community groups may be excluded from participating in the review process even if involved in the program under review.

---

[118] USCCR, *Federal Title VI Enforcement*, pp. 411–12.

[119] USCCR, *Federal Title VI Enforcement*, pp. 411–12.

[120] USCCR, *Federal Title VI Enforcement*, p. 412.

[121] USCCR, *Federal Title VI Enforcement*, p. 412.

[122] USCCR, *Federal Title VI Enforcement*, p. 412.

[123] DOI Interrogatory, p. 14.

[124] *Toolkit.*

[125] U.S. Department of the Interior, *Civil Rights Post-award Review Checklist*, n.d.

**Staff Training**

The Commission's 1996 evaluation found a lack of staff training. Perhaps the most prominent example was the bureaus' administration staff, which was frequently assigned Title VI enforcement responsibilities despite having little if any training in this area. The intrinsic nature of this moribund condition, led the Commission to declare "OEO's Title VI enforcement activities [as] generally performed by poorly trained staff at the expense of the quality of its Title VI enforcement program."[126]

In 2003, the Commission finds that funding for staff training has not increased and remains inadequate.[127] Despite the funding freeze, OEO states that all equal opportunity staff are provided adequate training and that no staff have been "denied the opportunity for work-related training …."[128] Moreover, training is regularly provided across all program areas with Title VI training periodically conducted during each fiscal year. OEO was in the process of planning Title VI training for mid-2003. Training is accomplished both at OEO and the bureaus with bureau-level training directed at regional civil rights staff, federal grants personnel and recipient officials.[129]

Despite OEO's assertion that Title VI training is periodically conducted during each fiscal year, the Commission finds that the last time Title VI training was provided was in FY 2000. No documentation for subsequent fiscal years reports Title VI training under activities accomplished for that year.[130] Title VI training is an ongoing process, initial and follow-up training is crucial for external civil rights staff to grasp and effectively conduct their assigned duties. Training, in fact, should be conducted twice a year, resources permitting, or, at the very least, annually.

**Delegation**

In 1996, the Commission found that OEO had failed to implement active Title VI programs at each of the bureaus providing federal financial assistance. Since bureau civil rights staff dealt directly with concerned parties, enforcement would have been improved if they were entrusted with primary responsibility for complaint investigations, compliance reviews, technical assistance, and public outreach and education. The Commission noted that by judiciously delegating Title VI responsibilities to bureaus, OEO could enhance DOI's civil rights enforcement work. The foundation for this was already laid as OEO had existing arrangements with the NPS, FWS and WBR.[131]

[126] USCCR, *Federal Title Enforcement*, p. 413.
[127] DOI Interrogatory, p. 16.
[128] DOI Interrogatory, p. 20.
[129] DOI Interrogatory, pp. 20–21.
[130] *DOI FY 2000 Information and Reporting Requirements*, p. 2; *DOI FY 2002 Information and Reporting Requirements*.
[131] USCCR, *Federal Title VI Enforcement*, pp. 407–08.

The Commission's 2003 study reveals that DOI currently has one equal opportunity office in each bureau in addition to the main OEO. According to OEO, bureau offices serve as focal point for effectuating Title VI compliance among each bureau's respective recipients.[132] OEO further states that bureaus were authorized to perform Title VI functions starting in February 1996. Currently, however, only the NPS and FWS have active Title VI programs with OSM, USGS and WBR having marginal programs, according to OEO.[133]

OEO justifies DOI's bureau enforcement system by stating that: (1) creating an active program at BLM would waste resources because it has the same types of programs and funds the same recipients as NPS; (2) those BLM programs not shared with NPS are covered by Title VI enforcement programs at other federal agencies; (3) the DOI views the BIA as dealing with sovereign entities, namely Native American nations and Native Alaska villages, who when federally recognized are not generally bound by the provisions of Title VI; and (4) the "abstract nature" of the programs and activities administered by MMS "do not sufficiently lend themselves to Title VI coverage."[134]

Despite OEO's claims, BLM must have distinct duties from NPS and other federal agencies or there would be no need for its existence. Accordingly, its federal funding recipients and programs' beneficiaries must be distinct, at least on some level, from those of NPS and other federal agencies. It only follows that BLM needs to implement a Title VI compliance and enforcement program geared toward its recipients, and not depend on NPS and other agencies to ensure compliance on the part of its recipients because they may not posses the ability to do so. It is also important that MMS implement a Title VI compliance and enforcement program because a review of its FY 2000 through FY 2005 strategic plan clearly shows that its programs and activities require it.[135]

**Oversight and Quality Assurance**

In 1996, the Commission found that despite being ultimately responsible for ensuring DOI's external civil rights enforcement, OEO had not implemented a "systematic oversight and monitoring program of [the] Title VI enforcement work" the bureaus performed.[136] The lack of such activity, the Commission noted, further eroded OEO's ability to ensure DOI met its civil rights enforcement obligations. The Commission recommended the creation of a unit that would be responsible for the "operational planning and overall development of fiscal year goals and objectives for DOI's civil rights enforcement efforts."[137] This unit would regularly and thoroughly evaluate bureau civil rights staff performance. The close monitoring of staff would reveal defects in Title VI implementation and enforcement procedures at the bureaus and provide

[132] DOI Interrogatory, p. 8.
[133] DOI Interrogatory, p. 9.
[134] DOI Interrogatory, p. 9.
[135] Department of Interior, Minerals Management Service, *Strategic Plan, FY 2000–FY 2005.*
[136] USCCR, *Federal Title VI Enforcement*, p. 406.
[137] USCCR, *Federal Title VI Enforcement*, p. 406.

Confidential Draft
Not for Public Release: 5/20/2003

the opportunity to assess how efficiently and effectively the bureaus were meeting the fiscal year goals and objectives.[138]

## Bureaus

Because of a decentralized civil rights enforcement structure, in 1996 the Commission recommended that OEO develop a system to oversee and monitor the bureaus' Title VI enforcement activities.[139] The Commission concluded that the effectiveness of OEO's oversight and monitoring would be greatly enhanced if periodic on-site reviews of the bureaus' efforts were undertaken. During these assessments it was suggested that OEO evaluate a bureau's complaint and compliance review files along with appraising a bureau's data collection efforts. It was also suggested that OEO take this opportunity to interview program staff and recipients concerning pertinent issues and "issue a report with findings and recommendations for improvement."[140]

In addition to these periodic reviews, the Commission further recommended that OEO "conduct annual reviews of Title VI self-assessments provided by the bureaus."[141] To remedy any deficiencies, it was requested that OEO provide bureaus with regular Title VI staff training and technical assistance.[142]

The Commission now finds that DOI's program is decentralized, thus bureau EEO officers supervise Title VI work. OEO provides: policy guidance to bureaus on Title VI enforcement; oversight and evaluation of bureaus' programs; staff training; and programmatic direction to ensure uniform enforcement.[143] However, OEO lacks any authority to determine the number of bureau personnel who perform Title VI duties.[144]

Clearly, this is not an effective way to ensure Title VI compliance among recipients. Simply stated, bureaus may not assign enough personnel to Title VI duties thus not permitting pro-active monitoring of recipient's programs nor adequate pre-award review of an applicant's program. Regardless of whether it is pre- or post-award review, the director must be given the resources and authority to ascertain and ensure that bureaus assign sufficient personnel to Title VI duties.

## Continuing State Programs

In 1996, DOI conducted very limited oversight of continuing state programs. Its efforts consisted of Title VI regulations requiring state recipients to submit their methods of administration for maintaining compliance with Title VI and DOI's Title VI regulations.

---

[138] USCCR, *Federal Title VI Enforcement*, p. 406.

[139] DOI decentralized OEO in 1991 and redirected its focus towards coordination and policy development.

[140] USCCR, *Federal Title VI Enforcement*, p. 411.

[141] USCCR, *Federal Title VI Enforcement*, p. 411.

[142] USCCR, *Federal Title VI Enforcement*, p. 411.

[143] DOI Interrogatory, pp. 8–10.

[144] DOI Interrogatory, p. 9.

Guidelines for the land and water conservation fund provided somewhat more detailed state requirements.[145] However, apart form this program, the guidelines included no Title VI responsibilities for state recipients. Furthermore, OEO had no active monitoring program of states' Title VI compliance and thus did not know whether or not states were complying. This was a major lapse at DOI because most of its funds were distributed via continuing state programs.[146]

The Commission's 1996 evaluation revealed that OEO and the bureaus could remedy this situation by reviewing and approving, or not, a state's methods of administration. To accomplish this, states operating continuing state programs would be required to submit such data along with "annual Title VI self-assessments reporting on their compliance with Title VI."[147] The Commission also recommended that trained bureau staff review data, thus limiting the possibility that noncompliance would be overlooked.

To further reduce noncompliance, the Commission asked OEO to monitor and evaluate the work of bureau staff. Conditions also warranted periodic on-site compliance reviews of continuing state programs by bureau civil rights staff. Noncompliance could be further reduced and resources maximized if technical assistance were provided during on-site reviews along with a report appraising Title VI compliance status and suggestions for eliminating any deficiencies.[148]

During the 2003 review, the Commission finds that OEO continues to falter in its oversight of continuing state programs due to DOI's organizational structure. Specifically, OEO states that DOI is not structured to hold states accountable for their Title VI enforcement programs. As such, there are no adequate resources to require states to perform annual self-assessment reports.[149]

**Conclusion**

Despite minor improvements to Title VI enforcement in DOI's federal financial assistance programs, these efforts are negligible in the face of a Title VI program that has not met its obligations since the early 1980s, if ever.[150] The Department and OEO must make a determined effort to drastically improve their Title VI enforcement program by increasing funding, assigning more staff, and dedicating themselves to, generally, raising its stature within DOI. Simply put, Title VI must be prioritized at DOI if recipients and beneficiaries are ever to receive the commitment they deserve and, more importantly, is their right.

---

[ ] The National Park Service administers the Land and Water Conservation Fund. *See* .nttp://www.nps.gov/programs/lwcf>.

[146] USCCR, *Federal Title VI Enforcement*, p. 413.

[147] USCCR, *Federal Title VI Enforcement*, p. 413.

[148] USCCR, *Federal Title VI Enforcement*, p. 413.

[149] DOI Interrogatory, p. 20.

[150] Stith Interview.

The department and OEO can take a first step on this road by committing themselves to ensuring that the nine key elements and six strategies presented in the Commission's *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations? Volume I: A Blueprint for Civil Rights Enforcement* report (September 2002), are promptly incorporated into DOI's civil rights enforcement program. Specifically, the nine key elements are:

- a high priority for civil rights enforcement, established through sufficient resources consisting of funding and staffing;
- an organizational structure that expresses the priority of civil rights, for example, by having the top civil rights official reporting directly to the agency head;
- planned civil rights goals and activities, such as a strategic plan for which and how many enforcement activities are needed to fulfill the agency's civil rights obligations and what resources will be allocated to accomplish them;
- clear and pertinent policy guidance, including internal procedures, external policy, and current regulations;
- technical assistance, such as helping employers and service providers establish policies and procedures that comply with antidiscrimination laws;
- education and outreach, such as helping victims of discrimination and the public understand their civil rights and how to obtain assistance if discrimination occurs;
- effective complaint processing systems to ensure that those who believe they have been discriminated against have a means of resolution;
- systems to review all federal funding recipients' compliance with antidiscrimination laws both before and after awards are made and to correct deficiencies; and
- regular staff training on civil rights statutes and enforcement policies and procedures.[151]

The six strategies are:

- integrating civil rights enforcement throughout every part of the agency, including all its agency components, programs, and field offices, and in every program that receives federal funding;
- delegating enforcement activities, such as responsibility for reviewing civil rights compliance, from agency headquarters to agency components, field offices, contracting organizations, and recipients with subrecipients;
- implementing oversight and quality assurance procedures to ensure that delegated responsibilities are carried out properly and consistently;
- coordinating civil rights enforcement activities with other federal agencies;
- streamlining enforcement procedures to ensure that they are conducted effectively and efficiently with the fewest resources; and
- involving advocacy groups and community organizations in designing civil rights enforcement activities.[152]

---

[151] U.S. Commission on Civil Rights, *Ten-Year Check-Up: Have Federal Agencies Responded to Civil Rights Recommendations?, Volume I: A Blueprint for Civil Rights Enforcement* (September 2002), pp. x–xii (hereafter cited as USCCR, *Ten-Year Check-Up, Vol. I*).

[152] USCCR, *Ten-year Check-Up, Vol. I*, pp. xii–xiii.

If DOI and OEO incorporate these elements and strategies into their Title VI enforcement program, they will have taken a critical step toward making civil rights an integral part of the department and meeting their Title VI enforcement obligations.