```
                                                         1
```

U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, NW, Suite 100
Washington, D. C.

- - - - - - - - - - - - - -x

ROMELLA J. ARNOLD,          :

       Complainant,         : EEOC
                              No. 100-2004
       -vs-                 :      -00843X
                              Agency No.
GALE A. NORTON, Secretary:  LLM 04-002
Department of the             Judge
Interior,                   : Richard Schneider

       Agency.              :

- - - - - - - - - - - - - -x

                     Reston, Virginia

                     Wednesday, March 10, 2005

   Deposition of:

       MARILYN H. JOHNSON

called for examination on behalf of counsel

for the Complainant, at the offices of Roy J.

Bucholtz, Esquire, of:  Bucholtz &

ANN FIELDER - Court Reporters
P.O. BOX 11404
ALEXANDRIA, VIRGINIA 22312
PHONE: (703) 750-3455



DEPOSITION EXHIBIT
Johnson 2005
Deposition

1    and 1994?
2        A.  Between 1990 and 1994, I was in
3    Arizona as the support services supervisor.
4        Q.  I may be mistaken, but I did not
5    think I heard anything between 1994 and 1996.
6        A.  1994 and 1996, I was the assistant
7    director for human resources, in essence.
8        Q.  In Washington, D.C.?
9        A.  In Washington, D.C.
10       Q.  In September 2002, you said you
11   became acting director, and approximately
12   June 1, 2003, you got that on a permanent
13   basis.
14           Is that the position you hold now?
15       A.  Yes, sir.
16       Q.  Ms. Brown, do you believe in
17   affirmative action?
18       A.  My name is --
19       Q.  I'm sorry; I'm sorry.
20       A.  -- Johnson.
21       Q.  I was looking at something else.
22           Ms. Johnson, do you believe in
23   affirmative action?

14

1  rotation finished, then I was still given the
2  duties and responsibilities of the position.
3      Q.  And you were a GS-13, isn't that
4  correct?
5      A.  Exactly.
6      Q.  You talk about the fact that you
7  accuse -- your allegation of discrimination
8  is that Ms. Johnson accused you of money
9  laundering?
10     A.  Yes.
11     Q.  Did she ever say to you at any point:
12 you, Romella Arnold, are laundering money to
13 Langston University?
14     A.  She asked the question, "Romella
15 Arnold, why are you money laundering all this
16 money to Langston University?"
17     Q.  And those are her exact words?
18     A.  Yes.  "I want to speak to you about
19 your program.  Why are you laundering all
20 this money to Langston?"
21         That occurred on September 12.  I was
22 in the foyer area of her office.  I said,
23 "Hi, Marilyn."  She said, "Come on in.  I

15

1  want to talk to you about your program." So
2  I had a seat. I said, "What's up?"
3        She said, "I want to know why you are
4  laundering all this money to Langston." My
5  initial response was --
6        MR. BUCHOLTZ: Excuse me. Just
7  answer the question, which you have already
8  answered. Listen to the question and answer
9  the question fully.
10       THE WITNESS: Okay.
11       MR. BUCHOLTZ: But only the question.
12       THE WITNESS: Okay.
13       BY MS. ARMSTRONG:
14    Q. Anyone else who was present at that
15 meeting?
16    A. It wasn't a meeting. I was in the
17 hallway, in her foyer area. It was not a
18 formal meeting.
19    Q. Was that the only time she allegedly
20 used the term "money laundering" to you?
21    A. No.
22    Q. Would the next time be the September
23 19 meeting, where Sylvia Felder and Connie

28

1  Q.  Was it a college, a high school?

2  A.  It was a college.

3  Q.  A college.

4  A.  Yes.

5  Q.  You say he taught at a college?

6  A.  Yes.

7  Q.  What subject did he teach?

8  A.  I don't know.

9  Q.  When was Mr. Brown -- I'm sorry;
10 strike that.

11      At what grade was Mr. Brown hired
12 into the Federal Government?

13 A.  A 14.

14 Q.  That was his first grade with the
15 Federal Government?

16 A.  I believe so.

17 Q.  You said you were in human resources
18 for a long time, right?

19 A.  Yes, sir.

20 Q.  Is that unusual to be hired in, first
21 job, as a GS-14?

22 A.  It happens sometimes.  It depends
23 upon their qualifications.

29

1   Q.  So you are saying Mr. Brown was
2   never, ever a 13 in the Federal Government?
3   A.  I don't recall.  I hired him as a 14.
4   He was a 14 when I brought him from Arizona.
5   Q.  Tell us, please, what Mr. Brown did
6   that constitutes his so-called extensive
7   knowledge as a manager when he was out
8   working at national monuments?
9   A.  Well, he was managing the monument.
10  It's very difficult to manage a national
11  monument.  But I cannot tell you specifically
12  activity by activity what he did.
13  Q.  You don't know, then, what his
14  responsibilities were?
15  A.  He managed the monument.
16  Q.  What does that mean?
17  A.  He supervised people who looked after
18  the monument.
19  Q.  Are you talking about maintenance
20  people?
21  A.  No.  There were professionals,
22  fisheries biologist, recreation people.  He
23  had a staff.

60

1   Q.  Did you give Francis Cherry anything
2   in writing to justify the termination of this
3   relationship?
4   A.  No, sir.
5   Q.  Did he ask you for anything?
6   A.  No.
7   Q.  Was it simply an oral conversation,
8   where you said one day, "By the way, Mr.
9   Cherry, I'm going to terminate it", and he
10  said, "Fine"?  Is that it?
11  A.  We had an oral discussion about the
12  Langston agreement.
13  Q.  How long did that discussion last?
14  A.  An hour.
15  Q.  Was it just one time that you
16  discussed that with Mr. Cherry?
17  A.  No, sir.
18  Q.  How many times?
19  A.  I don't recall the number of times.
20  Q.  How many years has it been that you
21  thought, or have thought, rather, that the
22  agreement with Langston University should be
23  terminated?

1   A.   I was asked to look at the Langston
2   agreement when I came on board in June of
3   2003.
4   Q.   That's when you became permanent, but
5   you were acting in September 2002.
6   A.   Right.
7   Q.   Were you asked to look at it in
8   September 2002?
9   A.   Yes.
10  Q.   Who asked you?
11  A.   Fran Cherry.
12  Q.   What did he ask you to do?
13  A.   He asked me to see if we were getting
14  a return on investment for the monies we were
15  spending with Langston University.
16  Q.   Did he ask you to look at return on
17  investment from any other colleges or
18  universities?
19  A.   No, sir.
20  Q.   Did he tell you why he wanted to know
21  only specifically about one college?
22  A.   Because Langston was receiving
23  centrally funded monies.

1      They took money off the top each year
2  to fund Langston, where they didn't do it for
3  any of the other schools.  So it was part of
4  our centrally funded initiatives.
5      He was receiving questions as to the
6  return on investment for the agreement with
7  Langston.
8      Q.  What do you mean when you say "return
9  on investment"?
10     A.  How many students we were actually
11 hiring, what we were doing with the money,
12 was our diversity profile changing, were they
13 delivering the products that they said they
14 would deliver under the original agreement?
15     Q.  "Products" meaning students?
16     A.  "Products" meaning -- there was
17 supposed to be curriculum development.  There
18 was supposed to be a development of a range
19 management curriculum.
20     Q.  Did you look into Langston University
21 only because Mr. Cherry told you to?
22     A.  Yes, sir.
23     Q.  Had he not told you to, would you

63

1  have done that?
2     A.  Eventually.
3     Q.  Did you examine any other of the
4  colleges and universities that were getting
5  aid to see if there was a return on
6  investment?
7     A.  They were the only school receiving
8  actual monies to the school.  The rest of the
9  monies went to the program managers to deal
10 with the school.
11    Q.  Did Mr. Brown give you any
12 recommendation regarding Langston University?
13    A.  No.
14    Q.  Didn't you assign -- or strike that.
15       Did you assign Mr. Brown to look into
16 this issue that you are telling us about?
17    A.  Yes.
18    Q.  Did he do any work on it?
19    A.  Yes, sir.
20    Q.  What did he do?
21    A.  He attempted to set up several
22 meetings with Sherman Lewis, who was the
23 liaison with Langston, to talk to him about

1   from them of what they were doing with the
2   money.
3       So in the correspondence that I wrote
4   them, I terminated the agreement because I
5   could not get a clear picture.
6       Q.  Did you ever accuse Langston
7   University of receiving funds improperly?
8       A.  I never accused them, no.
9       Q.  Did you ever accuse Ms. Arnold of
10  somehow being involved in transferring funds
11  or providing funds to Langston University
12  improperly?
13      A.  No.
14      Q.  Did you ever tell Ms. Arnold that
15  Langston University's receipt of funds was
16  money laundering?
17      A.  What I said was I could not see what
18  the funds were being used for.
19          I was flipping through the assistance
20  agreements.  My question was, "I don't see
21  what the funds are for."
22          Ms. Arnold said, "They are being used
23  to pay for baby sitting services, apartments,

68

1    bus tickets for the STEP students."
2         I said, "Well, why aren't we giving
3    them the money directly?" She said, "We
4    can't legally do that."
5         So I said, "When we are giving money
6    to an organization that we can't legally give
7    the money for," I said, "it looks like money
8    laundering to me." It was an off-the-cuff
9    comment. It was not directed at her.
10        Q. When you said "STEP students", is
11   that an abbreviation S-T-E-P?
12        A. Yes.
13        Q. What does it stand for?
14        A. Student Temporary Employment Program.
15        Q. What did Ms. Arnold then say to you?
16        A. She said, "I didn't launder money."
17   I said, "I wasn't talking to you."
18        Q. Who were you talking to? Was anyone
19   else there?
20        A. It was an off-the-cuff; yes, there
21   was other people there, and it was an off-
22   the-cuff comment not directed at Ms. Arnold
23   or anybody else in the room.

179

1   that the program is status quo.
2       Q.  Right now, then, you do not have any
3   other historically black college or
4   university west of the Mississippi in your
5   program, correct?
6       A.  No.
7       Q.  Isn't it true that more money is
8   spent in that recruiting program -- strike
9   that.  I don't mean in that program, because
10  that's the only historically black college or
11  university.
12          Isn't it true that more money is
13  spent on white universities in recruiting
14  than is spend on the black universities?
15      A.  That may be the case.
16      Q.  Do you know if it is or not?
17      A.  Personally, I don't know the exact
18  number.
19      Q.  Right.
20      A.  But to clarify, the white
21  universities' relationships with the Bureau
22  are based on state relationships.
23          Langston's money was taken off the

180

1   top of our budget.  They did not have a
2   relationship with a specific state.
3       When we budgeted for Langston, we
4   took money from all the programs, every
5   program in the Bureau, and gave them money.
6   That's why Langston got special scrutiny.
7       But the white universities have
8   individual relationships with the individual
9   states, and they set up the task orders with
10  the individual colleges in the states.
11      The states spend the money based on
12  the task order that they give the university.
13  So I have no control over the relationships
14  that the states have with the white
15  universities.
16      Q.  Did you ever express your concern
17  about Langston University with Warren Johnson
18  when you worked under him?
19      A.  No.
20      Q.  Why not?
21      A.  Because I wasn't in charge of that
22  program.  He was in charge.
23      Q.  So he didn't have a problem with