## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ROMELLA J. ARNOLD

                                 Civil Action No. 05-CV-01475 (RWR)

     Plaintiff,
        v.

DIRK KEMTHORNE, DEPARTMENT
OF THE INTERIOR,

     Defendant.

_____

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

Comes now Plaintiff Romella Arnold, by and through counsel, and files this opposition to the Defendant's motion for summary judgment and in support thereof states as follows.

### Introduction

Plaintiff Romella Arnold, an African American female, employed in a GS-13 position at the U.S. Department of the Interior, filed this complaint of race, gender and age discrimination, and retaliation after she was subjected to disparate treatment in the terms and conditions of employment and a hostile work environment when she was removed from her team leader position which had promotion potential to the GS-14 level and reported to a GS-15 Associate Director at the Agency and reassigned to a position without promotion potential and reporting to a GS-13 peer of Ms. Arnold.

Defendant has filed a motion for summary judgment. Ms. Arnold has over thirty years of federal service, most of which has been in the equal employment opportunity program or in programs designed to promote affirmative action and diversity within the

work place. While working in the National Student Education Employment Program (NSEEP) for the Bureau of Land Management, Ms. Arnold distinguished herself as an outstanding employee whose program accomplishments were modeled by other agencies within DOI, and highlighted in Office of Personnel Management (OPM) publications. Ms. Arnold was also an outspoken advocate for equal employment who opposed violations of equal opportunity laws and affirmative action policies.  Despite her outstanding performance, Ms. Arnold's manager, Ms. Marilyn Johnson, Associate Director, Human Resource Management (AD/HRM) for the BLM, subjected her to continued verbal insults and abuse, harassment and intimidation that created a hostile work environment.   These acts culminated in Ms. Arnold being removed from her position as Manager, NSEEP and Historically Black Colleges and Universities Program. Ms. Arnold's NSEEP/HBCU position had clearly defined duties and responsibilities, promotion potential to the next higher grade level, and reported directly to the AD/HRM. The position to which Ms. Arnold was reassigned was a brand new position with no clearly defined duties and responsibilities in BLM's previously non-existent Title VI program, had no promotion potential, and she reported to a peer.  As a result, Ms. Arnold was denied an opportunity to advance to the GS-14 level, - a level she had been temporarily promoted to and had worked at for almost two years.

In its motion for summary judgment, Defendant contends that Ms. Arnold's case should be dismissed because she allegedly did not timely contact an EEO counselor concerning some of her claims, and that Ms. Arnold has not met her burden of establishing all essential elements of her claims.  Defendant also contends there are no

material facts in genuine dispute.  Defendant's arguments must fail for the following

reasons:

1) a reasonable jury could find that Johnson's repeated accusations of money laundering against Arnold were calculated to maliciously discredit Arnold and her record as an effective program manager, created a hostile work environment and were evidence of  discriminatory and retaliatory intent on the part of Johnson.

2) a reasonable jury could find that Johnson's lateral reassignment of Arnold from a position with  clearly defined duties and responsibilities, promotion potential, reporting to the AD/HRM, to a position with no promotion potential, reporting to a peer, and resulting in significantly different and diminished program responsibilities is an adverse employment action that creates an inference of discrimination and reprisal.

3) a reasonable jury would find Johnson's rationale for replacing Arnold with Mr. Michael Brown, (a younger male, no prior involvement in protected EEO activity) in the NEESP/HBCU Manager position to be unworthy of credence because of the inconsistencies and inaccuracies contained in Johnson's statements that is evidence of pretext.

4) Johnson's rationale for demoting Brown and removing him from the NEESP/HBCU position barely one year after Johnson had reassigned him into that position are directly contradicted by Brown, raise serious credibility issues concerning Johnson, and are evidence of pretext.

5) The statement of Ms. Michelle Stroman regarding having received permission to fill the Title VI position, from the Departmental Director, OEO, Ms. Melodee Stith, is not consistent with Ms. Stith's statement raising credibility issues and is evidence of pretext.

6) The DOI's vague and contradictory explanation of why Arnold was reassigned from the position of NEESP/HBCU Manager to the Title VI non-existent position (Ms. Arnold had worked in a Title VI program over 20 years ago) is insufficient to satisfy its burden of articulating a legitimate non-discriminatory reason for its action and evidence of pretext.

7) There is additional evidence that will establish Johnson acted with a discriminatory intent.[1]

---

[1] Plaintiff filed a second formal complaint in July 2005, that provides additional evidence of Defendant's intent to discriminate and retaliate against Plaintiff.  It has been well over the 180 day statutory time frame since Plaintiff filed her formal complaint and therefore, in accordance with Title VII, Plaintiff has exhausted her administrative remedies.

8) Ms. Arnold did timely contact an EEO counselor on all substantive claims in her case.

Moreover, recent decisions by the U.S. Court of Appeals for the D.C. Circuit, Czekalski v. Peters, Secretary of Transportation, 475 F.3d 361 (D.C. Cir. 2007), and Judge Kessler, in Maiso Bryant v. Leavitt, U.S.D.C. 05CA0250 (Feb. 22, 2007), confirm that reassignment of an employee to another position with significantly diminished duties, including lateral transfers and transfers to undefined positions with less significant duties, raises an inference of discrimination.

## **STATEMENT OF FACTS**

**Background**

Romella Arnold is a 55-year old African American woman who was born on May 9, 1952. (Plaintiff's Exhibit 1, page 1). She had been employed by the U.S. DOI for thirty-one years. She is currently on a detail from the BLM's Office of Equal Opportunity to the Recreation Resource Management Office, BLM/DOI. In 1998 Arnold assumed the duties of the NSEEP Manager which included the duties of the Student Temporary Employment Program (STEP) and the Student in Career Employment Program (SCEP) in the Office of Human Resource Management (HRM) BLM. In that position Arnold subsequently reported directly to Mr. Warren Johnson, AD/HRM. After six months of highly successful performance and increased responsibilities Arnold was given an accretion of duties promotion to the GS-13 level. The NSEEP Manager position is identified as a full performance GS-14 level in accordance with the Bureau's Table of Organization and Classification issued in 2001 during the tenure of the then Director, BLM Kathleen Clark (Exhibit 2, page 29).

Prior to Arnold assuming the NSEEP Program Manager position the recruitment of minority students within the BLM had been practically non-existent.  The BLM's student employment programs were the subject of both a Congressional Report (commonly referred to as the Wynn Report) (Exhibit 3) and Congressional testimony given by Arnold in September 1997, (Exhibit 4).  These programs were found to be seriously deficient and African Americans severely underrepresented. Under Arnold's management the student employment programs began to thrive.  As a direct result of Arnold's hard work, the BLM led the Department in the number of diversity students recruited in 2001 (Exhibit 5, Warren Johnson st. pg.6).

From 1994 to 1996, Ms. Marilyn Johnson had served as the AD/HRM and the student employment programs. During this same time period Johnson was named in numerous EEO complaints for taking retaliatory actions against African Americans, specifically those involved in advancing affirmative employment programs and opposing EEO violations (Exhibits 6, Lee Allen st. pages 2-4, Ed Weathersby st., (13), &  Exhibit 10, Richard Redmond st. pages 4-5 ).  Mr. Warren Johnson, the AD/HRM from 2000 until 2002, stated that under Ms. Johnson's tenure the student employment programs were not very productive nor cost effective (Exhibit 5, Warren Johnson st. page 6).  According to Mr. Allen, fifty-six years old in 2004, Johnson discriminated against African Americans and took actions against Ms. Arnold to "humiliate" her and force her into retirement.  Id. at 6.  Allen commented that Johnson "a tendency to make statements and take adverse actions particularly against African Americans when she has not investigated the matter thoroughly."  Id. at 7.  According to Mr. Allen, Johnson personally flew to Denver to personally hand deliver to him a letter of removal which was later overturned. Id. at 8.

He described Johnson as "vindictive" and one who attempts to intimidate and if that fails, takes reprisal.  Id at 7.  Mr. Weatherby recalled an incident where Mr. Allen expressed his opinion on a diversity matter at a seminar with more than 50 Agency employees and Johnson interrupted him and initiated an argument with Mr. Allen and berated him, and the program had to be ended so that order could be restored. Id. at 2.  Mr. Redmond provided a statement that he was constructively discharged from the agency after forty-two years of successful service.  He commented that Ms. Arnold had done an excellent job with her program and Johnson had a "pathetic need to ingratiate herself with BLM's white dominated power structure at the expense of Blacks."  Id. at 4. He remarked that Johnson had employed discriminatory tactics to remove African American women from federal service, such as Marilyn Daniels, and stated based on personal experience, Johnson was capable of "lying and is vicious and brutal toward African American employees, particularly those who manage to reach professional levels, while favoring whites and not taking disciplinary or other actions for egregious, racist behavior by whites.  Id. at 4-5

   In October 2001, the HBCU Manager, Mr. William Nunn, passed away.  The HBCU Manager position was classified at the GS-14 level. (Exhibit 7, National Program Manager/HBCU Position Description).  Mr. Warren Johnson asked Arnold to assume the HBCU program management function on a rotational assignment with Steve Shafran, another program manager in student employment programs.  That rotational assignment included a temporary promotion to the GS-14 level for 120 days.  After one rotation each by Arnold and Shafran, Warren Johnson asked Ms. Arnold to assume the HBCU Manager position in addition to her ongoing duties as the NSEEP Manager.  Arnold

continued to serve in this consolidated position until her removal by Marilyn Johnson in August 2003.  As the NSEEP and the NPM/HBCU Manager Arnold received outstanding performance appraisals every year from 1998 through Sept 2001.

Based on Arnold's outstanding performance, Warren Johnson recommended she be permanently promoted, based on accretion of duties, to the GS-14 level, (Exhibit 9).  Due to a freeze on hires and promotions in BLM at that time, Warren Johnson's recommendation for promotion was not acted upon.  Warren Johnson stated that Ms. Arnold position had significantly expanded in scope and duties and warranted the GS-14 full performance level. (Exhibit 5, Warren Johnson statement page1-2).

**Protected EEO Activity**

Arnold has a long and distinguished history of promoting equal employment opportunity and affirmative action programs and of opposing illegal violations of equal opportunity laws.  Conversely, Ms. Marilyn Johnson has a reputation as being anti-affirmative employment programs and for engaging in retaliatory activities against EEO and affirmative employment advocates.  (Exhibits (6 Lee Allen pgs. 2-4), (10 Richard Redmond, pgs. 4&5), (11 Ivy Garcia, pg. 2), (12 Clark Collin's pgs. 1&2)& (13 Ed Weathersby pgs.1&2) [2]

---

[2] Arnold's documented EEO protected activity, under both the participation and opposition clauses of Title VII, began in 1994 when she became of charter member and Vice President of the National Association for the Advancement of Black Federal Employees (NAABFE). As a NAABFE official Arnold routinely met with the Secretary and Assistant Secretaries of the DOI on matters concerning systemic discrimination. In September 1997, Arnold testified before a Congressional committee on the severe under-representation of African Americans within the DOI in general, and specifically the BLM.  During her Congressional testimony Ms. Arnold testified that an African American woman, who was the BLM's Deputy Director and originally scheduled to testify, had been intimidated by the former BLM Director, Mr. Pat Shea, into not appearing before Congress, (Exhibits 14 & 4). Arnold's testimony led the Congressional

As the NSEEP Manager, Arnold continued in her advocacy of affirmative employment programs and opposition to violations of equal opportunity laws and regulations.   In March 2002, Arnold received the National Association for Equal Opportunity in Higher Education President's (NAFEO) citation and medal of honor for her work in recruiting and hiring from the HBCU community.  In February 2003, Ms. Arnold's NSEEP program was highlighted in a widely distributed report by the Performance Institute entitled , "Strategic Recruitment for Government" for its advocacy and innovative practices in recruitment initiatives in government.  This report was widely distributed throughout the DOI Bureaus Human Resource offices and other agencies.

---

Committee to request a "thorough investigation" into the allegation of witness intimidation raised by Arnold, (Exhibit 15). Arnold subsequently provided testimony to the DOI Office of the Inspector General, (OIG).  As a result of this investigation there was a finding of witness intimidation by the DOI OIG and the report and findings sent to the Department of Justice, (DOJ).  DOJ made a recommendation to the Secretary, DOI to take disciplinary action against the offending official BLM Director Pat Shea.  As a result Mr. Shea was removed as the Director BLM in November 1997.  In October 1997 Arnold appeared in a Federal Times article titled "Interior Officials admit need for attention to Racial Discrimination," (Exhibit 16).  In October 1997 Arnold also helped organize a March Against Federal Government Workplace Discrimination at the DOI which was the subject of a nightly T.V. news broadcast, (Exhibits 17&18).  In December 1997, Arnold appeared in another Federal Times article entitled "Interior Pushes for Diversity," (Exhibit 19).  In December 1997, Arnold reported to Warren Johnson, BLM AD/HRM about a racially offensive skit performed at the BLM Phoenix Training Center in Phoenix, Arizona, (Exhibit 1, Arnold investigative interview, pgs. 28-34) and (Exhibit 21).  As a result of Arnold's report there was an investigation by BLM's EEO office that found racial insensitivity and ordered the entire Training Center Staff to receive Diversity Training. In addition to ordering Diversity Training, the Director of the Training Center, Gary Drier, was removed and the employee, Mr. Ron Tucker (White male),who put on the offensive skit was suspended. Although Ms. Marilyn Johnson was not at the Phoenix Training Center when this incident occurred, because of the level of personnel involved, this incident was common knowledge throughout the BLM and DOI.  Immediately following Mr. Drier's removal Ms. Johnson was reassigned into his position as Director, National Training Center.  Within weeks of her arrival, Ms. Johnson promoted Mr. Ron Tucker, to a GS-14 position.

Ms. Arnold continued her EEO program advocacy and opposition to EEO violations of EEO law throughout her assignment to the NSEEP/HBCU program.  Arnold's advocacy of EEO programs and opposition to what she believed was a discriminatory double standard is evident in her stalwart defense of the affirmative employment agreement with Langston University, an HBCU.  Arnold defended, on numerous occasions the Langston University grant program that Marilyn Johnson had targeted to dismantle, (Exhibit 25, Marilyn Johnson investigative interview, pg.6) and (Arnold's Deposition 3-10-05 pgs.16-18).   Arnold questioned why monies to the Langston program should be held to a different standard than BLM monies going to white colleges and universities. (Exhibit 1, Arnold investigative statement, pgs. 16 &72).

**Marilyn Johnson is again assigned as BLM's Associate Director, Human Resources Washington, D.C. and Targets the Langston University Agreement with BLM**.

Marilyn Johnson, (African-American female, d.o.b. 8/15/50, no prior involvement in protected EEO activity) began Acting in the position of Associate Director, Human Resource Management (AD/HRM) in September 2002, and permanently obtained the position in June 2003. (Exhibit 22, MJ depo, pg.6).  From September 2002 until she was removed in August 2003, Arnold reported directly to Johnson, (Exhibit 29, Connie Stewart st. pgs. 5&6).

Marilyn Johnson has a well documented history of targeting African American employees for reprisal and discrimination, who have engaged in protected EEO activities and opposed illegal discrimination. (Exhibits (10 Redmond pgs. 4&5), ( 6 Allen pgs. 2-4), (13,Weathersby pgs. 1&2) and (1 Arnold investigative statement, pgs. 37-51).  The BLM student employment programs criticized by the Wynn report for severe under-representation of African Americans were programs that had been dismantled or

otherwise rendered ineffective under Marilyn Johnson's tenure as AD/HRM. Arnold had

singled out these programs in her meetings with senior Interior officials and members of

Congress.

Immediately upon her arrival, Johnson began raising the issue of BLM's agreement

with Langston University with Arnold.[3] Marilyn Johnson accused Arnold of the federal

crime of money laundering on five separate occasions, both when she was alone with Ms.

Arnold, and in the presence of third parties. (Exhibit (1) Arnold investigative interview,

pgs.12, 13, 19,& 20) (Ex.20 Arnold's deposition, pgs.15, 18, 20, &22).[4]

---

[3] Langston University is a Historically Black college located in Langston, Oklahoma.
The Langston agreement with BLM began under the tenure of former BLM Director Tom
Frye and other senior level BLM officials in 1999. Because of its rural location, west of
the Mississippi, the BLM felt students attending Langston would better understand the
BLM's mission as more rural focused. In addition, Langston had entered into a
partnership with Utah State, considered by the BLM the Harvard or Yale for natural
resource management. The agreement with Langston became the centerpiece of the
BLM diversity program. The agreement with Langston University met all of the
statutory and regulatory requirements because the BLM procurement office approved,
handled, and monitored the agreement, (Exhibit 5, W. Johnson st. pg.3). Arnold was not
involved in any of the discussions or decision making concerning Langston. Marilyn
Johnson was aware of the Langston University agreement because Warren Johnson had
frequent discussions on the agreement in his staff meetings when Marilyn was his
subordinate and serving as the Director of the Training Center. Ms. Johnson never raised
any concerns about the Langston agreement with Warren Johnson or anyone else at that
time, (Exhibit 5, W. Johnson st. pg.3).

The Langston agreement and program became so successful that it was replicated by two other agencies
within the DOI, the Office of Surface Mining and the Minerals Management Service, (Exhibit 26, Diane
Wood-Medley st. pg.1), (Exhibit 27, MMS). Within the same time period that Marilyn Johnson chose to
target Langston for scrutiny, approximately, $22, 814.616 had gone to majority colleges and universities
from the BLM budget, while only $443,000, 2%, was granted to HBCUs to include Langston, (Exhibit 28).

[4]    On September 12, 2002, Johnson then Acting AD/HRM for less than one month
confronted Arnold in the hallway outside Johnson's office and accused Arnold of
laundering money to Langston University. Arnold, astounded by this accusation,
categorically denied the accusation and requested a meeting with Johnson to clarify
Arnold's role in the BLM partnership with Langston, (Exhibit 1 Arnold interview, pg. 12)
(Exhibit 20, Arnold's deposition pg.16).

On September 19, 2002, Arnold met with Ms. Johnson, Ms. Sylvia Felder, (black
female) Program Analyst, and Connie Stewart, (black female), to discuss the budget and
the NSEEP program. During the meeting Marilyn Johnson again accused, by implication,

Arnold of being involved with money laundering as it pertained to Langston University (Exhibit 1 pgs. 13-16).[4]

Arnold vigorously protested Johnson's use of the term money laundering and explained that the Langston agreement permitted the BLM to pay students directly to cover housing and transportation needs. Arnold explained that the partnership with Langston included a grant that had been approved by the prior AD/HRM Warren Johnson and other senior management officials. Arnold further explained that the partnership with Langston was a part of BLM's diversity initiative in accordance with the President's Executive Order 13256 and well established EEO and procurement laws and regulations (Exhibit 1, Arnold's interview, pg. 14). Arnold also stated to Connie Stewart that she vehemently opposed Marilyn's accusation and that she had raised the double standard with Johnson of monies that were going to majority schools versus minority schools, (Exhibit 57, Arnold's 3/6/07 st. pg.5).

On July 18, 2003, during a meeting between Johnson and Arnold, Johnson again accused Plaintiff, by implication, of laundering money to Langston University. Johnson, in an angry tone confronted Arnold asking, "Why are we laundering money to Langston, I still don't understand why we are giving all this money to Langston." Arnold once again tried to explain the Langston agreement to Johnson to no avail, (Exhibit 20, Arnold's deposition, pg. 18-20).

On August 12, 2003, during a staff meeting with Student Employment Program Managers, Shafran (Students with Disabilities and Native American Students) and Marcie Briones (Hispanic Student Program), and Michael Brown, Connie McGriff, and Michelle Goodwin, Johnson again referred to the partnership initiative with Langston University as "money laundering." Arnold was not in attendance at this meeting because she had already been removed from her position by Johnson. Shafran stated: During this meeting I recall Ms. Johnson again made reference to the term money laundering in connection with Langston university. Everyone in attendance knew that this remark was being directed at Ms Arnold, and I felt it was very unprofessional of Ms. Johnson to make this accusation when Ms. Arnold was not there to defend herself. After the meeting ended I went to Ms. Arnold's office and informed her about Ms. Johnson's comment on money laundering, (Exhibit 30, Steve Shafran st.)

On October 2, 2003, during an attempted mediation of Arnold's informal EEO complaint, Johnson admitted that she had used the term money laundering in connection with Arnold. This was said in the presence of the mediator, Arnold, Arnold's attorney, and the agency attorney (Ex.20, Arnold's deposition pg. 22), (Ex.22, M. Johnson's depo. pg. 77).

During a staff meeting on November 23, 2003, Johnson once again raised the issue of money laundering through the newly reassigned NEESP Manager, Mr. Mike Brown. Ms. Tracey Bodner, an attendee at that meeting stated: Brown said we are having changes in SCEP, and will deal with different schools. Then MJ (Marilyn Johnson) told Brown, "Tell them why, tell them why". Brown (said) we are not using Langston anymore because there are some discrepancies with the funds. It was left vague and led you to believe that something wrong had been going on with the money. At the staff mtg

**Proposal of Lead State Concept**

In May 2003, Johnson directed a subordinate to send an e-mail to all the BLM state offices offering to reassign Arnold's program function, the NSEEP, and the other student employment program functions, to any state office interested in assuming this function Ex. Taylor & Stewart e-mails).  Johnson proposed this action without any prior consultation with Arnold and the other Program Managers, and without any study of the ramifications of this proposed decision on the program and program personnel.  The NSEEP, because of its national focus, had always been administered at the BLM Headquarters level. All of the Program Managers were over fifty years of age.  Shafran as well as Arnold were dismayed at the fact that there had been no effort by Ms. Johnson to consult with existing staff that stood to be affected by this move. (Ex.30, Steve Shafran st. pg. 2). Shafran stated he was concerned because he knew this could result in a forced move to another location based on which state decided to accept the offer. Shafran stated Johnson's action was very disconcerting and caused anxiety to co-workers Briones and Arnold.  Mr. Shafran stated: **"Moreover, everyone involved in the Student Employment programs was over fifty, so it seemed as though this was an effort to force older workers out so that they could be replaced by younger workers at a**

---

(meeting), everyone knew what was going on, (that MJ (Marilyn Johnson) was changing the system that MJ had accused RA (Romella Arnold) of money laundering, that MJ was reducing the HBCU effectiveness and especially by cutting out Langston, and that MJ was trying to support her allegation of money laundering.

  Johnson's continued accusations against Arnold had a chilling effect on the employees within her office.  Regarding this issue Ms. Bodner stated: Now people are kissing up to MJ to get on her good side. They should have given RA more money (promotion), Warren Johnson liked RA and was going to promote her…. I was a temp for 3 years, now (I'm a ) permanent E. (employee) Ido not want to do anything to mess up my employment. (Exhibit 31, Tracy Bodner st.)

**lower grade level.  However, none of the state offices accepted Ms. Johnson's**

**offer."[5]**

**Student Employment/HBCU Recruitment Tracking System (SERTS)**

On January 22, 2003, Johnson instructed a subordinate to delete the SERTS system

from the AD/HRM information data-base (Ex. 33, M. Johnson's e-mail).[6]  Arnold

prepared and submitted a business case and the quarterly report via e-mail attachment on

May 20, 2003, to Kurt Ballantyne and cc: to Johnson (Exhibit 34, business case, quarterly

report).[7]

---

[5] Nine months later Johnson directed the reassignment of Shafran (over 50) and Briones (over 60)  from Denver to Washington, D.C., forcing both individuals into retirement

[6]  Johnson claimed the decision to delete the SERTS was based on Ms. Arnold's alleged failure to submit a "business case" to the Information Technology Investment Board (ITIB), (Ex.25, M. Johnson's st. pg. 9, & Ex. 22 depo. pg. 80).

[7]     Mr. Clark Collins, Information Resource Advisor for HRM states that Johnson decided not to use SERTS.  Johnson assigned Gail Colbert to replace him, to drop SERTS. Neither Johnson nor Colbert knew how the system worked before SERTS, neither knew how to work SERTS, neither knew how to replace SERTS with a better system, and neither gave a valid reason for dropping SERTs, (Exhibit 12, C. Collins statement).

SERTS was a direct result of the September 1997, Congressional Hearing that Arnold testified before and U. S Representative Albert Wynn's inquiry into BLM's EEO program in 1995. The "Wynn Report", issued in early 1996, found there was no effective mechanism for monitoring and tracking the recruitment and hiring of students through the Student Employment and HBCU programs.  SERTS had cost the BLM approximately $70,000 to design and develop and was ready for deployment and implementation.

While preparing to go on leave, Arnold stated that she would arrange for a conference call meeting with Kurt Ballantyne and Colbert once she returned to the office the week of July 14, 2003.  In Ballantyne's e-mail to Arnold dated 7-03-2003, he stated that he will be on leave from July 10-21, 2003. Arnold was on scheduled leave following the July 3, 2003, e-mails written between she and Ballantyne. Arnold prearranged that she would follow-up with Ballantyne upon her return to the office on July 14, 2003. Arnold was not working on July 8, 2003, therefore could not send anything to Ballantyne.  Arnold did not return until July 14, 2003, (Exhibit 35).  One missed deadline of a report would not have been cause to delete the SERTS given the fact that both Arnold and Ballantyne were on leave and Arnold believed Ballantyne would grant an extension for submitting the report because he had done so for the quarterly report due on April 15, 2003. Ballantyne stated he remembered that **he had forgotten to include Arnold's name on the distribution**

**Request for report on July 18, 2003**

At approximately 9:30 a.m., on Friday July 18, 2003, Arnold was informed by Johnson's secretary that Johnson wanted a statewide report from Arnold for a 10:00 a.m. meeting with Ray Brady.  Arnold contacted Johnson immediately and explained that without SERTS, she would have to gather the program data manually by telephoning each individual state office and request submission of the program data, (Exhibit 1, Arnold's interview st. pg. 64).  Johnson reiterated her need for the program report.

Approximately at 2:00 p.m., on July 18, 2003, Arnold met with Johnson in her office to discuss several issues.  Arnold provided Johnson with the status of the information she was required to provide by 10:00 a.m. the same day. Arnold informed Johnson that she was not able to reach all of the field offices, and the information was not complete. Johnson stated, "get it to me when you can". Also, during the July 18, 2003, meeting Johnson bought up the Langston initiative and again asked Ms. Arnold "why are we laundering money to Langston"?  Ms. Arnold again denied the accusation and attempted to explain the SEEP program to Johnson. Despite Arnold's explanation Johnson continued to make accusations regarding monies to Langston. Arnold wrote an e-mail to

---

**list for an e-mail he sent to all WO-700 project managers reminding them that their quarterly reports were due April 15th ·** ( Exhibit 36)

Johnson states:

**"It just had to die because it wasn't viable and there was no business case for it."** (Exhibit 25, M. Johnson interview, pgs. 9&10)

By deposition March 10, 2005, Johnson states that Ms. Arnold did not submit a business case and that she had not seen such a thing, ( Ex. 22, depo. page 80), adding, Ballantyne told her he had not received a copy of the business case, ( Ex.22, depo. page 81).  Johnson stated as of March 10, 2005, she still did not have a system to replace SERTS.

Johnson at 6:21 p.m. that evening. Arnold's e-mail reflects her frustration with Johnson's false accusations. (Exhibits 39).

**Denial of Request to Travel in Advance of the Student Career Experience Program (SCEP) Training and Orientation**

Arnold submitted a travel request to Johnson on June 9, 2003, to travel to Phoenix Arizona on Thursday, June 12, 2003 to facilitate the SCEP training. This training program was under Arnold's program responsibility and it had been Arnold's practice to travel to the training site in advance of the training start date. The SCEP training began on Monday, June 16, 2003. Arnold was informed by Johnson on June 11, 2003, that her training request had been denied. Arnold was told that Johnson would only approve Arnold's travel on Sunday June 15, 2003. [8]

**Letter of Counseling**

During a conference call meeting with the student employment initiatives staff on July 30, 2003, Johnson announced her decision to place Michael Brown, a GS-14 in Arnold's position as the NSEEP/HBCU Program Manager. Arnold spontaneously uttered the words, "I'll be damned." (Exhibit 1, Arnold's interview statement, page 56). [9]

---

[8]  The Phoenix Training Center had assigned a new employee, unfamiliar with the SCEP orientation training program and to ensure quality control, Arnold believed it was necessary to have a few days lead time. Johnson's action forced Arnold to travel on Sunday June 15, 2003, to Phoenix and then because of time constraints, Arnold had to work through the night to ensure all training materials were in order, and the training coordinator was made aware of the course curriculum.

Johnson claimed that BLM budgetary constraints were the reason she denied Arnold's travel request to go to Phoenix in advance, (Ex.22, Johnson's deposition pages 89- 96). During the nine months preceding the June 2003, training, Johnson had expended approximately $30,000 of BLM's funds for Johnson's own travel (Exhibit 37). The cost for Arnold to have traveled to Phoenix on June 12, 2003, instead of June 15, would have been approximately $277.00 for the additional three days per-diem and lodging. Johnson did have the same concern for "tight budgets" when Brown traveled to Phoenix for the SCEP training the following year, because Johnson never inquired of Brown what the travel would cost, (Ex. 22. M. Johnson deposition pgs. 95-96)

[9] Shafran gave a detailed account of what transpired. (Exhibit 30, Steve Shafran's st.):

On August 1, 2003, Johnson issued Arnold a Letter of Counseling. This Letter of

Counseling was to serve notice that Johnson considered Arnold's reaction to be abusive

behavior and inappropriate use of cursing in the work place.  Johnson warned Arnold that

Arnold's alleged behavior "will no longer be tolerated."  Johnson writes:

**"This is not the first time that I have experienced this unprofessional and abusive behavior by you. In addition, you have been overheard cursing and showing abusive behavior in your work surroundings.  This creates and promotes a hostile work environment", ( Exhibit 50).**

Johnson claimed she had been getting feedback from "people" in Arnold's work area

that when Arnold was upset it was her practice to use offensive language, but "they" were

afraid to confront Arnold about her language.

**Johnson said, "when she used it in front of me that was an opportune time to put her on notice that that was not appropriate behavior".**

> **Johnson states:**
> "**I got about three, but they don't want their names".  That's why I didn't give them to her, they don't want their names put out because they were concerned that she would come back and get them", (Exhibit 25, M. Johnson interview statement, page 10-11).**

Johnson recanted her allegation of three employees who had allegedly been offended

by Arnold's alleged use of offensive language and instead claimed that there was one

employee, Tracey Bodner, who complained to her about Arnold, (Ex.22, Johnson

deposition, pg 104).  Johnson stated that she met with Tracey in her office with no one

---

**"Ms. Johnson stated that the person she had identified for the Team Leader, SEEP/HBCU job was Mr. Mike Brown.  I was surprised by this announcement, and I remember Ms. Arnold saying something like I'll be damned". "I'm sure Ms. Arnold must have been equally shocked, and Ms. Arnold being a direct person reacted in a spontaneous manner".**

**"I remember Ms. Johnson admonishing Ms. Arnold by saying something like why are you cursing". "Ms. Johnson was the only person who made any comment about what Ms. Arnold had said." "I did not find Ms. Arnold's comment at all offensive. It was clear given the context that Ms. Arnold was shocked by Ms. Johnson's announcement."….**

else present and Tracey was concerned about the language and tone Plaintiff would use when Plaintiff would talk to students.  Johnson didn't know any of the student's names, nor did she ever ask Tracey the student's name (Ex. 22, depo. pages 106-108).  Johnson admits the student never complained about Arnold's use of abusive language. (Ex. 22, page 111). Johnson also admits Bodner only complained on one occasion.  Bodner did not provide a statement in support of Johnson's allegations, however Bodner did provide a statement in support of Arnold (Exhibit 31, Tracey Bodner st).

   **Reassignment of Dr. Mike Brown**

   On July 30, 2003, Johnson during a conference call staff meeting announced that she was replacing Arnold as the NSEEP/HBCU Program Manager with Michael Brown who would assume the position as a GS-14.  Brown a former government contractor was hired into the federal service with the BLM on December 3, 2000 at the GS-13 level.  When Brown was reassigned into the NSEEP/HBCU Program Manager position, he had fewer than three years of federal government experience and no experience in the NSEEP or HBCU programs. Johnson claims Brown's former employer was an HBCU, but she could not recall the school he came from.  Johnson could not recall when Michael Brown was hired as a Contractor in DOI, (Exhibit 22, Johnson depo, pgs. 19-21) Johnson said she hired Brown to be team Leader and Brown had extensive knowledge in dealing with special initiatives programs.  Johnson said at that time she talked to Brown about becoming a team lead, he was the monument manager in Arizona and based on that position Johnson concluded Brown had extensive management experience. Johnson stated that between Brown's experience with special initiatives and being the monument manager, Johnson thought Brown would be an ideal team leader.  Johnson claims Brown

had worked with the BLM program managers and established extensive networks with

HBCUs and other schools, however, Johnson states she was not familiar with how many

schools. Johnson stated she did not know the number of students Brown had recruited

from HBCUs.  (Ex. 22,dep. Pgs. 17-24).  Johnson did not know exactly how many people

Brown had ever supervised nor did she ever check. Johnson admits that before she hired

Brown in 2003, she did not read his credentials or application.  Johnson also admits that

Brown had never done any work for her before hiring him in 2003. Johnson states that

Brown taught at a college, but she did not know what subject.  Johnson incorrectly said

Brown was hired into the Federal Government as a GS-14.

**Arnold's Reassignment; Move to Another Office; Issuance of Performance Standards**

On August 1, 2003, Johnson issued Arnold a letter of reassignment to the GS-13

Title VI EEO Specialist position. This position was not comparable to the NSEEP/HBCU

position Arnold had formerly held.  The NSEEP/HBCU Program Manager position has a

GS-14 full performance level, while the Title VI EEO Specialist position has a full

performance level GS-13.  Had Arnold  remained in the NSEEP/HBCU she would have

had the opportunity to advance to the GS-14 full performance level based on her

continued successful performance.

Johnson's reassignment of Plaintiff to the Title VI position contravened a June 13,

2002, directive by Michael Trujillo, DOI, Deputy Assistant Secretary for Human

Resources and Workforce Diversity that had placed a moratorium on all personnel

actions within EEO and Civil Rights programs. (Exhibit 41, Trujillo memo). Johnson's

reassignment of Plaintiff to the Title VI program position prompted Melodee Stith,

Departmental Director of the Office for Equal Opportunity, to e-mail Deputy Assistant

Secretary Trujillo on August 6, 2003, stating in pertinent part:

> It appears Marilyn Johnson is moving ahead to reassign employees into the EEO
> office.  However, it is my perception that she's not acting responsibly…
> I think that we should ask Marilyn to stop all assignments to the EEO Office until
> she gives us a plan on what she is doing. It appears she is acting arbitrary and
> capricious on this..(Exhibit 42, Stith's e-mail)

## ARGUMENT

**II.    Arnold's Evidence Establishes a Prima Facie Case of Discrimination,
Reprisal, and Hostile Work Environment**

Defendant does not challenge the first element of Arnold's prima facie case of

discrimination and reprisal, and specifically that Arnold is a member of  protected

classes based on her race (African American) sex (female), age (over 40) , and that

Arnold engaged in protected EEO activities.(Exhibit 25, M. Johnson interview pg. 5)

(Exhibit 5,  W. Johnson st. pg.5 ).  Defendant asserts that Arnold's claim should fail,

however, based on the following assertions: 1) Arnold has not demonstrated that she

suffered an adverse employment action; 2) Arnold has not demonstrated that she was

subjected to a hostile work environment; 3) Arnold has not demonstrated a causal

connection between the adverse action and her race, age, sex, or statutorily protected

EEO activity.

**A.    Arnold suffered an adverse employment action when she was laterally
reassigned to a position of significantly different and diminished responsibilities**.

"An employee suffers an adverse employment action if she experiences

materially adverse consequences affecting the terms, conditions, or privileges of

employment or future employment opportunities such that a reasonable trier of fact could

find objectively tangible harm." *Forkkio v. Powell,* 306 f.3d 1127, 1131 ( D.C. cir.

2002).(*citing from Brown v. Brody,* 199 F.3d 446, at 457 (D.C. Cir. 1999). Reassignment with significantly different responsibilities, or ….a significant change in benefits' generally indicates an adverse action. *Id. (quoting Burligton Indus., Inc., v. Ellerth,* 524 U.S, at 724, 761 (1998)). A lateral reassignment is considered an adverse employment action when the reassignment results in significantly different job responsibilities. *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D,.C. Cir. 2002). (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). D.C. Circuit reiterated this principle in *Holcomb v. Powell*, 433 F.3d. 889 (D.C. Cir. 2006), where it held that a reasonable jury could find that the plaintiff suffered objectively tangible harm because her duties "dramatically declined in both quality and quantity."*Id* at 902. The D.C. Circuit also found in *Czekalski v Peters, Secretary of Transportation*, 475 F.3d 361, 364 (D.C. Cir. 2007) that a court may not take the question of whether a particular reassignment of duties constitutes an adverse action of purposes of Title VII away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities. *Czekalski quoting Holcomb*, 433 F.3d at 902.

Prior to her lateral reassignment Arnold was performing at an outstanding level as the NSEEP/HBCU Program Manager. (Exhibit 9, Performance standard). This position combined the duties and responsibilities of the NSEEP program and the HBCU program, and the duties and responsibilities of this position were clearly defined in the respective position descriptions for the NSEEP and the HBCU program positions, (Exhibit 20, Arnold's depo. page 10-12) (Exhibit 5, W. Johnson st. pg.1&2). The authority for Arnold's NSEEP/HBCU position was derived from Title VII of the Civil Rights Act, and the President's Executive Order 13256. The NSEEP/HBCU Manager position had a

career ladder to the GS-14 level, thereby providing Arnold, a GS-13, promotion potential

to the next higher grade level, (Exhibit 2, pg 29).  Arnold had received one temporary

promotion to the GS-14 level and had been recommended by her supervisor, the

AD/HRM, for a permanent promotion to the GS-14 grade level, (Exhibit 7). Arnold's

responsibilities included serving as the Team Leader for the NSEEP, which included

Arnold's reviewing the work, program budget submissions, and recruitment plans of

three team members who were at the GS-13 grade level. (Exhibit 20, Arnold's Depo pgs.

11-13).  In her capacity as Team Leader Arnold reported directly to the Associate

Director for Human Resource Management (AD/HRM) a GS-15 level position, (Exhibit

5, W. Johnson's st. pg 1).

   Arnold was laterally reassigned to a position with no clearly defined duties and

responsibilities.  The position to which Arnold was laterally reassigned was the Title VI

EEO Specialist position.  When Arnold was initially reassigned Arnold was not given a

position description.   Prior to Arnold's reassignment there had been no operative Title

VI program within the BLM, and as a result there were no program files, directives,

guidelines or copies of compliance reviews to assist Arnold in knowing and carrying out

her duties and responsibilities.(Exhibit 45).  The position description for the Title VI

position was subsequently developed by Arnold's peer and supervisor in the Title VI

position Michelle Stroman.  The authority for the Title VI program is derived from Title

VI of the Civil Rights Act that addresses equal opportunity compliance with federally

assisted programs, an entirely different set of duties and responsibilities from Arnold's

prior position as NSEEP/HBCU Program Manager, (Exhibit 7, NPM/HBCU, PD)

(Exhibit 45, Title VI, PD) for comparison. The Title VI position is not a Team Leader

position, nor does it provide Arnold any promotion potential because the Title VI position

is dead-ended at the GS-13 grade level, ( Exhibit 45, SF-50 for Title VI position). In the

Title VI position Arnold reported to a peer, another EEO Specialist at the GS-13 grade

level. Arnold believed she was not qualified to perform at the GS-13 level in a Title VI

program[10], and that Johnson would use this as a way to justify a poor performance rating

(Exhibit 1, Arnold's interview st. pg. 106).  Arnold believed that it was Johnson's intent

to terminate her from the federal service for poor performance[11] (Exhibit 1, Arnold st.

pgs. 47-48). The reassignment caused Arnold to experience extreme stress, anxiety,

depression and sleeplessness, (Exhibit 20, Arnold's depo, pgs. 82, 87). (Exhibit 42,

Stith's stat. pg. 17).  The one-day training that Arnold received was insufficient to

prepare Arnold for a program with the scope and difficulty of Title VI. Stith, then

Director DOI OEO commented on this in her statement:

> **….This (Title VI) was a very complicated area we had given some training last
> year, conducted by the Department of Justice as  well as the Department of
> Education and our own Office of the Solicitor to give employees a familiarity with
> the training, but this program area is one of those areas you don't send somebody to
> a class and say, okay, sit down and do it.**

In Maiso Bryant v. Leavitt, U.S.D.C. 05CA0250 (Feb. 22, 2007), the Plaintiff

alleged discrimination based on his race and age when he was transferred from his

supervisory position to a significantly different position with fewer duties.  In denying the

Defendant's motion for summary judgment, the Honorable Judge Gladys Kessler found

evidence sufficient to raise an inference of discrimination based on race and age when the

---

[10] Arnold hadn't worked in a Title VI program for over 25 years, and when she had worked in Title VI it
was at the GS-7/9 grade level.

[11] Arnold believed Johnson would terminate her for poor performance in the Title VII program because of
Johnson's history of retaliation.  Arnold also based this belief on having observed Johnson terminate
Marilyn Daniels, who had over 25 years of federal service, for poor performance in the Title VI program.
.Similar to Arnold, Daniels had been reassigned to the Title VI program to "build a program."

Plaintiff Bryant established that his performance was at the outstanding level when he was reassigned, and his Caucasian supervisor made comments about his age, talked to him like a child, berated and blamed the Plaintiff for the mistakes of a white co-worker, conferred with the co-worker on issues under the purview of the Plaintiff, and allotted additional staff to the white co-worker but would not allocate any to Plaintiff. That matter proceeded to a jury trial and a jury returned a verdict in favor of the Plaintiff Maiso Bryant in the amount of $560,000.00. Ms. Arnold has offered similar evidence that she was operating at the outstanding level when she was reassigned and has established she was subjected to an adverse action with this reassignment.

**B.     Defendant's Proffered Legitimate Non-Discriminatory Rationale for its Actions is Vague, Inconsistent, and a Pretext for Discrimination and Retaliation**

To successfully rebut a plaintiff's prima facie case of discrimination, a defendant is required to set forth **clearly articulated** non-discriminatory reasons. The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the Plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. (*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981). " ….One way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered for its decision was false" *Czekalski* at 365 quoting *Lathram v. Snow,* 336 F.3d 1085, 1089 (D.C.Cir.2003), see e.g., *Murray v. Gilmore,* 406 F.3.d 708, 716 (D.C.Cir. 2005); *Salazar v. Washington Metro. Transit Auth.,* 401 F.3d 504, 511-512 (D.C.Cir. 2005); *Anderson v. Zubieta,* 180 F.3d 329, 348 (D.C.Cir. 1999).

Johnson's rationale for the reassignment of Brown into the NSEEP/HBCU position is pretext, and designed to mask Johnson's discriminatory and retaliatory intent. Defendant's rationale for Plaintiff's reassignment to the Title VI position was that it was in response to a May 20, 2003, **Draft** Report issued by the Commission on Civil Rights. Defendant alleges that the Commission Report cited the BLM for not having a Title VI program and that this was their legitimate basis for reassigning the Plaintiff.  In fact, Johnson's reassignment of Plaintiff to the newly created Title VI position contravened a June 13, 2002, Departmental Directive issued by Michael Trujillo, DOI's Deputy Assistant Secretary for Human Resources and Workforce Diversity  which cited in pertinent part:

> …we are in process of reviewing the organizational structure of the Equal Opportunity/Civil Rights Offices throughout the Department.  **In anticipation of some restructuring in the near future, please do not make any changes to your current Equal opportunity organization, structure, location, or personnel until we have completed our review and initiated whatever changes to these offices that are deemed necessary to improve the efficiency of these very important functional areas.**

This Directive was in effect when Melodee Stith, Departmental Director, OEO responded to the Civil Rights Commission's Draft report in a letter dated June 3, 2003, stating in pertinent part;

> The Department of the Interior is currently embarking upon A major restructuring of its internal and external civil rights Compliance and enforcement functions. ….We thank you for Your comments and observations.  We will use this valuable Information as **guidance** and incorporate your recommendations Into the processes we develop for the new organization.

Clearly, Ms. Stith's memo does not have the sense of urgency about filling a Title VI program position and "correcting this deficiency" (See Defs MFSJ pg 44) that the

Defendant suggests. Stith's letter suggests that the major restructuring of the EEO/Civil

Rights programs throughout the DOI  was proceeding in a methodical and planned

manner.   Stith's reaction to Johnson's reassignment of Arnold to the newly created Title

VI position, evidences a belief by Stith that Johnson was acting in a contrary manner.

(See Stith e-mail).

> It appears Marilyn {Johnson} is moving ahead to reassign
> employees into the EEO office.  However, it is my perception
> that she is not acting responsibly…
>
> I think that we should ask Marilyn to stop all assignments to
> the EEO office until she gives us a plan on what she is doing.
> it appears she is acting arbitrary and capricious on this.

Defendant also rationalizes the reassignment of Plaintiff by stating that "Plaintiff had

experience in Title VI and had occupied the position of EEO Specialist (Title VI) from

1979 to 1981 in the Office of Compliance, DOI.  (See Defs MFSJ pg 44)   In fact, it had

been over twenty years since Plaintiff had served in a Title VI program as a GS-7.

Plaintiff had never served in a Title VI program at the full performance GS-13 level.

Plaintiff's anxiety and stress about her lack of qualifications and experience were evident

in Ms. Stith's observation of Plaintiff during the Title VI training; (Stith, pg 17):

> **It is my perception that Miss Arnold was very overwhelmed by**
> **what was being discussed.  At one point I looked up and Miss**
> **Arnold was sitting in the back of the room crying.  She had to be**
> **taken out of the room by another peer who indicated that she**
> **was just so overwhelmed with the information she felt that she**
> **that she was being set up for failure because she was put in, in**
> **a program area that she was very unfamiliar with and she was**
> **overwhelmed by all the information that was being discussed and,**
> **you know, felt very uncomfortable with that.**

    Stith also comments on fact that Title VI was a very complicated program area and not

one where you could send someone for a one-day training and expect them to be able to

"sit down and do it."   This would be especially true when that person is expected to

perform at the GS-13 full performance level.

   Defendant also states as fact that Johnson's functionary, Michelle Stroman acting at

Johnson's behest went to Melodee Stith to seek permission to fill the new Title VII

position and that Stith gave her permission.  (Stroman Stat.):

> I met with Melodee Stith because she was our contact on the
> staff of Mr. Trujillo.  I explained that our office needed
> permission to fill a new Title VI position due to the report.
> **I reported back to Ms. Johnson that Ms. Stith had approved
> us filling the Title VI position.**

Ms. Stith contradicts the Defendant's version of the facts. Ms. Stith makes no mention of

Stroman seeking permission to fill the Title VI when Stroman went to Stith's office. (See

Ex. 58. (Stith invest pg. 18-19).

> …Michelle Stroman who was, I believe, the Acting EEO Officer
> for the BLM came down to me to ask about a position description
> for the Title 6 area and she was going to write a position description.
> and I indicated to Miss Stroman, you know, that, that no, I was not
> going to do that because you don't put somebody in a job, then write
> a position description afterwards, after the per - - you have the person
> quote, reassigned to that. **So I did not provide that kind of assistance
> to Ms. Stroman because, you know, that's not how I carry out
> business…**

           In appropriate circumstances, the trier of fact can reasonably infer from the

falsity of the explanation that the employer is attempting to cover up a discriminatory

purpose.  Arnold avers that this is such a circumstance, and that Defendant's legitimate

non-discriminatory rationale has been discredited, and revealed as pretext for

discrimination and retaliation.  Further, action taken in violation of Agency regulations is

evidence of discrimination. See, e.g., Salazar v. Wash. Metro. Area Transit Auth., 401

F.3d 504, 509 (D.C. Cir. 2005) (appeal after remand, motion granted, Salazar v. Wash.

Metro. Area Transit Auth., 2006 U.S. Appl LEXIS 14792 (D.C. Cir., June 13, 2006)),

citing Latham v. Snow, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury

could infer discrimination when the agency departed from its normal procedures without

justification); Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that an

employer's failure to follow its normal procedures, standing alone, may not be sufficient

to support a finding of discrimination, but an employer's failure to follow its procedures

"is a factor that the trier of fact may deem probative ... in determining the true motivation

behind the hiring decision of the prospective employer").

        With respect to the retaliation claim, at the prima facie stage of a retaliation claim, a

plaintiff's burden is not great.  She merely needs to establish facts adequate to permit an

inference of retaliatory motive. It had been over twenty years since Arnold had served in

a Title VI program, and there had never been an operative Title VI program in the BLM.

The NSEEP/HBCU program was an affirmative employment program addressing

recruitment and hiring in the federal workforce.  Conversely, the Title VI program is a

compliance program addressing federally assisted state and local governmental actions.

While Arnold was highly qualified to perform at the GS-13 level in the NSEEP/HBCU

program, Arnold  knew she was not qualified to perform at the GS-13 level in the Title

VI program. Arnold believed that the reassignment was one further step in Johnson's

discriminatory and retaliatory pattern of behavior, and was designed to set Arnold up for

failure. A reasonable belief in light of Johnson's prior actions.  Johnson's also intended to

send a message to other employees not to engage in protected EEO Activities.  Arnold's

fellow employees had observed the adverse actions taken against Arnold, who was

known for her vocal advocacy of affirmative employment and EEO programs and

opposition to violations of EEO laws and regulations, (Exhibit statements 10, 6, 12, 5, 31).  In reviewing cases of retaliatory adverse actions courts have stated that adverse actions need not qualify as "ultimate employment actions" or materially affect terms and conditions of employment to constitute retaliation. (*Burlington Northern and Santa Fe Railway Co. V. White,* 126 S. Ct. 2405 (2006) (finding that the anti-retaliation provision protects individuals from a retaliatory action that a reasonable person would have found "materially adverse", which in the retaliation context means that the action might have deterred a reasonable person from opposing discrimination, or participating in the EEOC charge process.))  Arnold's removal from her position as the NSEEP/HBCU Program Manager had a materially adverse effect on other employees within Arnold's office as evidenced by the statement of Tracy Bodner.  Bodner, when asked about Arnold's reassignment stated:

Now people are kissing up to MJ (Johnson) to get on her good side.  They should have given RA (Arnold) more money (promotion).  Warren Johnson (prior AD/HRM) liked RA (Arnold) and was going to promote her…. I was a temp for 3 years now (I'm) a permanent employee.  I do not want to do anything to mess up my employment. (Exhibit 31.

   Clearly Ms. Bodner would be deterred from engaging in protected EEO activities for fear she would lose her status as a permanent employee.

## C.    Arnold was Subjected to a Hostile Work Environment and Retaliation

   Several Agency employees provided detailed statements of how Johnson attacked diversity programs and discriminated against African Americans in general and Ms. Arnold in particular, and managed by intimidation and discrimination, including Lee Allen, Ed Weathersby, Richard Redmond, and Warren Johnson.

In the case of <u>Leatherman v. Secretary of the Navy</u>, EEOC Appeal No. 01983615 (April 26, 2000), the EEOC found that an agency had created a hostile work environment when it engaged in a pattern of retaliatory harassment that included making harassing and embarrassing comments about complainant in the presence of her co-workers and at staff meetings, treating complainant in a demeaning and harsh manner when complainant was attempting to perform an assignment, thereby causing complainant a great deal of stress and humiliation, and issuing complainant an unjustified letter of reprimand.

 Johnson began her acting assignment as AD/HRM some time in August 2002 and immediately began created a hostile work environment through acts of retaliatory harassment against Arnold. Johnson's actions bespeak of someone who came to her assignment with an agenda, and quickly began to act on that agenda.  In this case Johnson's agenda was to harass and intimidate Arnold in an effort to force Arnold into early retirement, absent that, to remove Arnold from the NSEEP/HBCU program area. Less than one month after assuming the acting AD/HRM position, on September 12, 2002, Johnson made the first accusation of money laundering against Arnold.  Johnson again alleged Arnold was involved with illegal money laundering at the September 19 meeting where Felder and Stewart were present.  These accusations were made over the vigorous protests of Arnold who felt the need to defend her position by defending Langston University's agreement with the BLM. (Exhibits 22, M. Johnson depo)( Exhibit 29, C. Stewart statement) (Exhibit 20, Arnold's depo).

   From September 2002 through August 2003 Johnson took every opportunity to harass and belittle Arnold.  Each adverse action taken by Johnson was another thread in a well woven pattern of retaliatory harassment.   These actions took the form of continued false

allegations of money laundering in connection with Arnold and her program area, threatening to transfer Arnold's program function to a State office, denying Arnold program resources needed to effectively perform in her position, issuing Arnold an unjustified letter of counseling, reassigning Arnold to a position with significantly different and diminished  program responsibilities, and making material changes in Arnold's terms and conditions of employment. Taken together, these actions constitute a pattern of retaliatory harassment. EEOC precedent clearly establishes that an agency should not ignore the "pattern aspect" of a complainant's claims and define issues in a piecemeal manner where an analogous theme unites the claims. *Leatherman v. Dalton, Secretary of the Navy*, EEOC Appeal No. 01983615 (April 26 2000).

**D.  Arnold Established a Causal Connection Between the Adverse Action and Her and Involvement in Protected EEO Activity**

A Plaintiff must initially establish a prima facie case of discrimination by demonstrating through a preponderance of the evidence that she was subjected to adverse employment actions under circumstances which, if left unexplained, would raise an inference of discriminatory animus, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, at 253 101 S.Ct. 1089, 67 L.Ed. 2d. 207 (1981), *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 579-80 (1978).  While one way to establish the causal connection element is to prove Plaintiff was treated differently from similarly situated employees who are not members of Plaintiff's protected class…this is not the only way. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  An employee may establish a discriminatory inference by demonstrating that the action taken was not attributable to the most common legitimate reasons for taking that action. *Id* at 413

**E.   Johnson's Took Actions Against Arnold that Raise an Inference of Discrimination Based on Arnold's  Age and Sex.**

**i.        Johnson Threatens to Transfer Arnold's Function to a State Office**

Although Johnson had returned to her office in Denver in February 2003 and would return as the permanent AD/HRM until June 2003, Johnson continued to take discriminatory and retaliatory actions through a subordinate, Constance Stewart.  In May 2003, Stewart, at Johnson's behest issued an e-mail offering to transfer the National Student Education Employment Program (NSEEP) function to any state office interested in assuming this function.( See e-mail Ex).  In addition to Plaintiff, who was 51 years of age at the time action was taken, the other two NSEEP program managers were Steven Shafran (over 50)(See Ex) and Marciano Briones, (over 60) (See Ex) and similar to Plaintiff had over 28 years of federal employment.  Johnson took this action without any consultation with Plaintiff, the other two program managers, or the State offices (See Ex stat.).  Johnson took this action without having studied the ramifications of this decision on the NSEEP, the program personnel, or the BLM.  Johnson took this action not having conducted any cost/benefit analysis to determine if this action would improve the efficiency of the BLM.  (See MJ depo ).  Prior to Johnson's action, the NSEEP, as a national program, had always been administered at the BLM headquarters.  There is no evidence that Johnson had any legitimate rationale for proposing this move. When asked about this proposed action Johnson appeared to suffer from a selective memory regarding this action and could not recall her efforts to send this function to the field office. Johnson 2005, pg 84 –85.

This transfer of function by Johnson would have resulted in a directed reassignment of three older employees, Plaintiff, Shafran, and Briones.  Had Plaintiff or the other two

program managers been unable to move to the state office they would have been forced

to resign or retire.  Johnson's actions were motivated by age discrimination and an intent

to harass and intimidate Arnold by giving her an untenable choice – relocate or resign.

The action by Johnson had no other legitimate purpose.  Johnson intent was to force

Plainiff, as an older employee out of her position so that Johnson could replace Plaintiff

with a younger employee.  Shafron also believed Johnson's action was motivated by age

discrimination.  In his statement to the EEO investigator Shafron observed:

> Sometime in June of 2003, soon after Ms. Marilyn
> Johnson returned as AD/HRM, I became aware that
> Ms. Johnson had an e-mail sent to all State Directors
> Asking if any of them would be interested in acquiring
> The National Student Employment program function. I
> Knew from past experience that a national function does
> Not work properly at the state level, and I was dismayed
> At the fact that there had been no effort by Ms. Johnson
> To consult with existing staff that stood to be affected by
> This move.  I was concerned because I knew this could
> result in a forced move to another location based on
> which state decided to accept the offer.  The action
> by Ms. Johnson wase very disconcerting and caused
> anxiety on the part of my co-workers Mr. Briones and
> Ms. Arnold.  Moreover, everyone involved in the Student
> Employment programs was **over 50, so it seemed as
> though this was an effort to force older workers
> out so they could be replaced by younger workers
> at a lower grade level.**
>   I

Not one State office acted on Johnson's offer (See SS, MJ), which is a further testament

to the fact that Johnson's proposed action was not based on a legitimate rationale, but

rather a discriminatory intent to remove older workers.  Despite Johnson's failure to

effectuate the transfer of function in May 2003, Johnson persisted to take actions that

reveal a discriminatory and retaliatory intent[12].

---

[12] Johnson also continued to discriminate against Shafran and Briones.  At Johnson's July 30, meeting with
Arnold,  Shafran and Briones, Johnson announced her intent to move Shafran and Briones  positions from

**ii.      Johnson Reassigns a Younger, Significantly Less Qualified Male into Arnold's NSEEP/HBCU position and Reassigns Arnold to a Position with Significantly Different and Diminished Responsibilities**

To establish a prima facie case of discrimination, an employee need not present evidence that a similarly situated employee outside of Plaintiff's protected class was treated differently. An employee could pursue a different method of proving a *prima facie* by showing that a reassignment was not attributable to the unavailability of work or the lack of objective qualifications or other legitimate reasons. *Czekalski v. Secretary of Transportation,* 475 F.3d 361, 365 (D.C. Cir. 2007). Johnson removed Plaintiff from her position as the NSEEP/HBCU Manager and replaced Arnold with Brown, who was significantly less qualified than Plaintiff. Johnson's reassignment of Arnold was not based on Arnold's poor performance. In fact, the record is replete with evidence of Arnold's outstanding performance (See WJ)(Johnson depo 2005 pg 38).

By Mr. Bucholtz

> Q. Hadn't Ms. Arnold been working in the
> recruiting area with HBCUs and related programs
> for many years.
> A. Yes sir.
> Q. Hadn't Ms. Arnold been successful in that area.
> A.   Yes sir.

Johnson didn't reassign Arnold from the NSEEP/HBCU program so she could hire Brown as a supervisor for that program, as [13]Johnson's states, because Brown had no supervisory experience in federal student employment programs at the national level(See

---

Denver to Washington, D.C. Johnson acted on that intent in April 2004 when she had Brown send them both a letter reassigning them from Denver, Colo.to Washington, D.C. and giving them 15 days to either accept or reject the reassignment. As a result Briones and Shafran were forcec into retirement.

[13] While Johnson states she hired Brown as a supervisor she continually refers to him as a Team Leader, the same title Arnold worked under while serving as the NSEEP/HBCU program manager

Brown depo 2006). Johnson didn't replace Arnold with Brown because Brown had general "extensive supervisory experience" as she claims (See MJ depo pag 38) because his record and work history reflect otherwise. (See Brown depo 2006).   Johnson's designation of the NSEEP/HBCU position as Supervisory, was form over content, since the substantive duties and responsibilities of the position remained unchanged.  ( See comparison  Arnold NSEEP/HBCU pds and Brown's Supervisory NSEEP/HBCU pd). In fact, Brown's title in the NSEEP/HBCU position was Team Leader, and he functioned as a Team Leader,  the same title that Arnold had as the NSEEP/HBCU manager.  This was evident from Johnson's deposition .

> By Bucholtz
>
> Q.  When you brought Mr. Brown to Washington as a GS-14,
> did you make him a supervisor
> A.  Yes sir
> Q.  I think you called it **"team leader"**
> A.  **Yes sir**
> Q.  **Team Leader of what?  That's not a formal title or**
> **Position, is it.**
> A.  **Yes**

The entire time that Arnold served in the NSEEP/HBCU position she was the Leader over the National Recruitment team comprised of Shafran and Briones.  The same team Brown was leader of when he was reassigned into the NSEEP/HBCU position.

A read of Brown's position description (Ex --) will show that it is a combination of the duties and responsibilities contained in the NSEEP and HBCU position descriptions.

Arnold's service as Team Leader is evident from Shafran's statement:

**   The Team Leader NSEEP/HBCU function had formerly been held by Mr. William Nunn After Mr. Nunn died the Team Leader function had been rotated between Ms. Arnold and myself and eventually Ms.  Arnold assumed the Team Leader position.**

Mr. Brown was not reassigned by Johnson because he was better qualified than Arnold to fill the NSEEP/HBCU Team Leader position. Although Johnson claims Brown had "extensive knowledge in dealing with special initiatives" (See MJ depo pg18), his work experience shows Brown had little to no federal experience in special initiatives. In fact, Mr. Brown was significantly less qualified than Ms. Arnold. When he was reassigned into the NSEEP/HBCU Team Leader Brown had less than three years of federal experience, and no experience serving in a federal NSEEP or HBCU program. (Brown depo November 2006 pg 13-14 )

Conversely, Ms. Arnold started her federal career in 1973 as Cooperative Education student, GS-3. Upon graduating from Cheney University, Arnold was converted to a full-time federal employee in an EEO Specialist GS-5 position. Throughout the intervening thirty years Arnold rose to the level of GS-12 and has held a succession of EEO and Special Initiatives positions. From 1987 Arnold became a program specialist in the DOI Office of Historically Black Colleges and Universities and worked there until 1995. In 1995 Arnold worked in the Department's Office for Equal Opportunity program, and was also elected as the first Vice President of the National Association of Black Federal Employees. In 1997, Arnold went to work for the BLM's Office for Equal Employment Opportunity as an Title VII EEO Investigator. In 1998, Arnold was offered the position of Student Employment Program Manager, and received an outstanding performance rating and a promotion to the GS-13 level. In July 2001 Arnold assumed the NSEEP/HBCU position and was temporarily promoted to the GS-14 level. Her supervisor, Mr. Warren Johnson, ADHRM recommended Arnold for a permanent promotion to the GS-14 level based on Arnold's outstanding performance.

Johnson did not reassign Arnold and replace Arnold with Brown for any cost saving purposes.  Although Johnson claims to be concerned about BLM's fiscal budget, in fact the cost of reassigning Brown was considerable.  In addition to BLM's paying Brown's relocation costs, BLM also paid the cost of Brown making numerous trips to Washington, D.C. from Phoenix related to Brown's reassignment to the NSEEP/HBCU position.

Arnold was ready and available for a promotion to the GS-14 level. Johnson could have promoted Arnold to the GS-14, as her prior supervisor Warren Johnson intended, through accretion of duties.  In the alternative, Johnson could have opened the position to competition thereby giving two older, experienced workers, Arnold and Shafran, an opportunity to compete for the GS-14.  Instead, Johnson chose to do neither.  Rather, Johnson chose, at considerable cost to the BLM, to reassign a younger male with barely three years of federal service, and no experience working in federal student employment programs or HBCUs.  Clearly, Johnson was not motivated by what was in the best interests of the NSEEP/HBCU program, or by improving the efficiency of the BLM.  Rather, Johnson was carrying out what she had intended with the proposed transfer of function, namely to remove Arnold from the position and replace her with a younger, male employee.  All that considered, Arnold has established that a reasonable juror could draw a discriminatory inference from Johnson's actions.

**F.    Defendant's Proffered Legitimate Non-Discriminatory Rationale for its Actions is Vague, Inconsistent, and a Pretext for Discrimination and Retaliation**

**i.    Attempted Transfer of Functions**

Defendant suggests that because Johnson's proposal to transfer Plaintiff's function was thwarted by the lack of State Office interest, it should not count as harassment. Moreover, Defendant argues since the proposal was not sent directly to Plaintiff by Johnson or her functionary Stewart, and that Plaintiff came to learn of the proposal through a third party, it somehow diminishes the proposal's effect. This argument is disingenuous at best. From the time Plaintiff and the two other program managers came to know about Johnson's proposal, until it became evident that the State Offices were not buying into Johnson's scheme, Plaintiff suffered undue stress, anxiety, and harm at the thought of having to choose between a federal career of over thirty years and the disruption of a major move to another location. This is evident from Shafran's description of the event:

> I was concerned because I knew this could result in a forced move to another location based on which state decided to accept the offer. This action by Ms. Johnson was very disconcerting and caused anxiety on the part of my co-workers Mr. Briones and Ms. Arnold.

**ii.    Johnson's Termination of the NSEEP/HBCU Information System**

Johnson's decision to terminate the SERTS information system for the NSEEP/HBCU program resulted in Arnold having to manually collect data on a national program. Curiously, even Johnson admitted her decision had created an unsatisfactory situation. Johnson's depo, pg. 82, 88.[14]

---

[14]    By Attorney Bucholtz

        Q.  Did you actually terminate the use of the SERTS system.
        A.  Yes, sir I did.
        Q.  When
        A   I don't recall the date

The Defendant argues that Johnson's calling for Plaintiff to produce a statewide report in 30 minutes for a staff meeting, did not create any harassment.  In fact, Johnson placed Plaintiff in a traditional Catch 22.  First, Johnson dismantles the information system for the NSEEP/HBCU program and then she calls for a report that could only be produced, in that time frame, by an automated information system.   These actions were part of Johnson's continuous pattern of harassment and intimidation, not isolated incidents as the Defendant would have one believe.  These actions were intended to punish Plaintiff for  her program advocacy, by demoralizing and frustrating Plaintiff in her efforts to effectively  perform her program function.

### iii.    Johnson's Issuance of a Letter of Counseling to Arnold

Defendant's articulated rationale is to repeat that "Johnson gave plaintiff a letter of counseling for using inappropriate language in a staff meeting and that Plaintiff admits she used the word "damn" during a tele-conference staff meeting after hearing the announcement that Brown was being reassigned". (See Def pg 41.)  Defendant's articulated rationale is so abbreviated as to gloss over the actual language and intimidating tone used by Johnson.  Aside from the use of the word "damn" to which

---

Q  Do you remember the year
A  It was in 2004

By Attorney Bucholtz

Q  So what are you doing meanwhile, since you terminated it, to
    Track the records
A.  The specialists go into a system called ":FPPS" . Its Federal Personnel
    Payroll System and they manually take out the data and do the reports
    at this time.
Q.  Manually
A    Yes, sir.
Q    Is that satisfactory to you.
A    No, its not, I would like to have a system.

Plaintiff concedes, Johnson falsely accuses Plaintiff of "abusive behavior" and "use of cursing in the work place". The only witness concerning Plaintiff's alleged use of offensive language Defendant was able to cite was Tracy Bodner  Ms. Bodner did not provide a statement in support of Johnson's allegations.  Ms. Bodner did produce a statement in support of Plaintiff in which she substantiates Johnson's use of retaliation and harassment (See Bodner stat).  Moreover, the circumstances surrounding the issuance of the letter, together with the letter's threatening tone, and false allegations constituted adverse harm to Plaintiff.  Specifically, the Letter of Counseling produced adverse harm because; the letter of counseling was issued contemporaneous with Johnson's notice to Arnold of Arnold's reassignment to the non-existent Title VI position; threatened further disciplinary action; and most particularly, contained false statements and gross exaggerations by Johnson.  Johnson's Letter of Counseling, titled "Inappropriate Language and Abusive Behavior" stated in pertinent part:

> This memorandum is to serve notice that your abusive behavior
> and inappropriate use of cursing in the work place will no longer
> be tolerated.  On July 29, 2003, (sic was July 30) during a conversation
> with the Recruitment Team, Sylvia Felder, Administrative Officer and
> myself you reacted to action items in our conversation with curse words
> abusive tones. This is not the first time that I have experienced this
> unprofessional and abusive behavior by you.  In addition, you have been
> overheard cursing and Showing abusive behavior in your work surroundings.
> **This creates a hostile environment.**
>
> **You are on notice that this behavior will no longer be tolerated by me or
> your co-workers.  If you display further outbursts of hostile and abusive
> behavior or language, it may result in disciplinary action against you**

Also in attendance at the July 30, 2003 tele-conference were Shafran and Briones, the other two student initiative program managers. Shafron's recollection of Arnold's statement is at odds with Johnson's gross mischaracterization.[15]

The EEOC has found that a letter of counseling sufficiently aggrieved an employee for purposes of stating a claim. *Norris v. Secretary of Veterans Affairs,* EEOC Request No. 01965766 (1997). In *Norris* the Commission stated:

> …appellant alleged that he was subject to discrimination when he received a letter of counseling dated March 26, 1996.According to the agency, appellant did not establish that he was harmed with respect to term, condition, or privilege of his employment with the agency. We note however, that the letter of counseling indicated that any further occurrences of unacceptable behavior on appellant's part might result in a letter of admonishment. In addition, although the letter of counseling was not placed in appellant's official personnel file, the letter of counseling was placed in Supervisor A's own files. Finally, according to appellant, his performance rating was lowered because of the counseling letter. Based on the foregoing, it appears that the letter of counseling was a consideration in future employment actions and could be a factor in future disciplinary actions. **Accordingly, we find that appellant has established that the issuance of the letter of counseling constituted harm to a term, condition, or privilege of employment within the agency.**

---

[15] (See Shafran stat ) Eventually, Ms. Johnson stated that the person she had identified for the Team Leader SEEP job was Mr. Mike Brown. I was surprised by this announcement, and I remember Ms. Arnold saying something like I'll be damned. I'm sure Ms. Arnold must have been equally shocked, and Ms. Arnold being a direct person reacted in a spontaneous manner. I remember Ms. Johnson admonishing Ms,. Arnold by saying something like why is (sic) you cursing. **Ms. Johnson was the only person who made any comment about what Ms. Arnold had said. I did not find Ms. Arnold's comment at all offensive.** It was clear given the context that Ms. Arnold was shocked by Ms. Johnson's announcement and responded in a spontaneous manner by making that exclamation. Mr. Briones was also an attendee, via teleconference, and he never mentioned the matter of Ms. Arnold's comment to me.

**iv.    Johnson' Reassignment of Brown to the NSEEP HBCU position.**

Johnson did not reassign Brown (younger male with no prior involvement in EEO

protected activity) to the NSEEP/HBCU position for his "extensive experience" (See

Johnson depo 2005 pg. 18,) as Johnson alleges, because Brown did not have extensive

experience in the federal system in general, or specifically in the federal and/or BLM

student initiatives program. Brown depo 2006, pg. 40.

By Attorney Branch

> Q.  Now prior to becoming the Special Initiative Manager had
>      served at the BLM as a Special Initiatives Manager.
> A.  No
> Q.  Have you served in any capacity for any employer as a
>      special Initiative Manager
> A   I don't understand your question
> Q   Had you served or had you worked for any employer as a Special
>      initiative Manager where you were responsible for the duties
>      that you performed at BLM as a Special Initiative Manager.
> A    No

Nor was it because of Brown's prior experience as a teacher at an HBCU, (See Johnson

2005 depo pg 18-19, because Brown was not employed by an HBCU, he was a professor

at Old Dominion University, a majority university. (See Brown's depo 2006 pg 27 & 33)

Johnson did not reassign Brown because of Brown's "extensive management

experience", because with the exception of managing two Park Rangers (GS-7 and GS-

12) at a monument site for barely a year, Brown had no management or supervisory

experience in the federal government.  Moreover, if we believe Johnson, that she wanted

to reassign Brown to assume the Team Leader role over the NSEEP/HBCU program,

Arnold already had considerable  experience acting in the Team Lead role, while Brown

had none. Arnold, was available to be promoted to the GS-14 through accretion of duties, or in the alternative to compete for the GS-14 NSEEP/HBCU position.

**The fact that Johnson's rationale is pretext is also established by the fact that barely one year from the date Johnson reassigned Brown into the NSEEP/HBCU position; Johnson removed Brown from the NSEEP/HBCU position, demoted Brown to a GS-13 level, and relocated Brown back to Phoenix, Arizona at considerable expense to the BLM.  Although Johnson denies that she had any involvement in Brown's removal from the NSEEP/HBCU position and demotion to a GS-13, Brown directly contradicts Johnson on this point.**

By Attorney Bucholtz

Q.  You, Ms. Johnson, put Mr. Brown in that position and then you took him out, didn't you.
A  (No response)
Q  Are you thinking  - Is he currently a Team Leader
A   No
Q  He has been demoted hasn't he
A  I did not demote him
Q  Isn't he not a Grade 13
A  I did not demote him

By Attorney Bucholtz

Q  Why is Mr. Brown now a GS-13
A  He took a demotion.

Brown contradicts Johnson's version and provides further evidence of Johnson's penchant for intimidation and harassment.  Brown depo 2006 pg 63-66.

By Attorney Branch

Q  How long were you in the position of Special Initiatives Manager
A  Roughly, I think, a year
Q  Were you evaluated in your performance over that year
A  Yes
Q  What type of evaluation did you receive
A   I guess I have two evaluation, which is on paper which was

satisfactory or above and the other evaluations I got which was orally was stated that Marilyn stated she had no confidence in me, that she felt I wasn't the right person to lead the student programs

By Attorney Branch

Q  After you received this oral evaluation that she had no confidence in you and you were not the right person for the position, how did this affect your job.

A  I was demoted

Q  And who demoted you

A  I was told by her {Johnson's} associate Bob Renton to write a voluntary letter for demotion

Q  You were told to write a voluntary letter of demotion

A  Correct

Q  Did Marilyn Johnson discuss with you before Bob Renton that you were going to be demoted

A  Correct

Q  What did Marilyn tell you

A  If I didn't write the letter, that she would do everything in her power to remove me from federal service.

Q  That's what Marilyn Johnson told you

A  Yes

Q  Did you believe that Marilyn Johnson was threatening your Employment

A  Yes

By Attorney Branch

Q  What did you think about the fairness on how you came to be demoted.

A  I thought, and I still do, very unfair.  And I was there roughly one year at that point .  And how can I put it?  I felt probably like the new Romella Arnold

Arnold has proffered evidence from which a reasonable jury could conclude that the rationale offered by Defendant in support of Johnson's actions was false.

## G.      Arnold was timely in contacting an EEO Counselor on all her substantive issues.

Defendant asserts that Arnold did not exhaust administrative remedies on some of her claims because they were not timely filed.  Specifically, Defendant contends that Arnold

did not meet the 45-day time limit on any claim of discrimination and retaliation that

occurred prior to May 20, 2003, and any claim of age discrimination that occurred prior

to January 5, 2003.  Under the continuing violation theory, Defendant's discriminatory

actions were part of a continuing pattern of discriminatory and retaliatory activity that

were connected to a timely complaint.  *United Airlines v Evans,* 431 U.S. 553, 97 S.Ct.

1885, 52 L.Ed.2d 571 (1977).  To show a continuing violation and to have an otherwise

untimely claim of discrimination, be timely, a claim must concern a "present" alleged

violation.  A nexus must exist between the present and otherwise untimely claims that

evidences a pattern or course of conduct.  The actions taken by Johnson, beginning

September 12, 2002 with the first accusation of money laundering made by Johnson

against Arnold, and continuing through Arnold's contact with an EEO Counselor, and

beyond, were not isolated incidents but a series of interrelated acts.  In this case Arnold

asserts that she was subjected to on-going unlawful employment practices that continued

into the 45-day period for EEO counselor contact.  The EEOC has consistently held:

> Evidence showing that a complainant had, or should
> Have had a reasonable suspicion of discrimination more
> Than 45 days prior to initiating EEO Counselor contact,
> Will not preclude acceptance of an otherwise timely
> Claim of ongoing discrimination.  *Howard-Grayson v.*
> *United States Postal Service,* EEOC Request No. 05990160
>  (Dec. 3, 1999)(improper fragmentation of a continuing
>  violation claim) *accord Treschitta v. Department of*
> *Transportation,* EEOC Request No. 05990600 (Jan. 13,
>  2000)(timely hostile work environment claim involving
>  incidents spanning an 18 month period).

 The claims that Defendant alleges are outside of their "deadlines" were 1) the money

laundering allegations made on September 12, and September 19, 2002, 2) the

termination of the SERTS system, and 3) the proposed action to transfer Arnold's

function to a State office ((2) and 3) apply only to the race and sex discrimination and reprisal claims). Even if Defendant's contention had merit, which we strongly aver does not, all other claims have been timely filed.

Conclusion

The Agency argues, in its Motion, that Ms. Arnold is unable to establish that the Agency's stated reason for the actions taken against her is a pretext for discrimination. Ms. Arnold's burden at this stage of the proceeding is not to establish that the Agency's stated reason for the action taken against her is a pretext for discrimination. Rather, it is the Agency's burden, having moved for summary judgment, to establish that the state of the evidence is such that no reasonable jury could find that the Agency's stated reason for the actions taken against Ms. Arnold is a pretext for discrimination.

This is not a case where Ms. Arnold, and only she, disputes the Agency's contention that her treatment was justified. That contention is also disputed by several coworkers who had interacted with Johnson, including Lee Allen, Ed Weathersby, Richard Redmond, and Warren Johnson, who observed Johnson's interaction with Ms. Arnold and other minority and age protected employees. According to these individuals Johnson discriminated against Ms. Arnold and created a hostile work environment. Given this evidence, it certainly cannot be held, as a matter of law, that no reasonable jury could find that the Agency's action against Ms. Arnold was not a pretext for discrimination. The Agency's motion must, therefore, be denied.

The Agency has not established that no reasonable fact finder could find that its proffered, legitimate, non-discriminatory reasons for the actions against Ms. Arnold are a pretext for discrimination. Therefore, the Agency's motion must be denied.

Respectfully submitted,

/s/

By:  _____

David A. Branch #438764
Law Office of David A. Branch, P.C.
1825 Connecticut Avenue, NW #690
Washington, D.C.  20009
(202) 785-2805
Attorney for Plaintiff

**Certificate of Service**

I hereby certify this 23rd day of August 2007, that a copy of the foregoing Plaintiff's Opposition to Motion for Summary Judgment  was sent electronically to counsel for Defendant listed below.
Rhonda C. Fields
United States Attorney's Office
555 4th Street, NW 10th Floor
Washington, D.C. 20530

/s/

_____

David A. Branch