UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ROMELLA J. ARNOLD

        Plaintiff,
          v.

DIRK KEMTHORNE, DEPARTMENT
OF THE INTERIOR,

        Defendant.
_____

Civil Action No. 05-CV-01475 (RWR)

**Plaintiff's Response to Defendant's Statement of Material Facts to Which it contends there is no Genuine Dispute**

Plaintiff submits that Defendant's Statement of Material Facts which it contends are not in dispute omits many relevant facts in the record. Plaintiff incorporates her statement of facts, and submits that there are disputed facts which remain for trial

1. No dispute.

2. Dispute. Plaintiff had not worked in the Title VI twenty-three years before the assignment in 2003, and when she worked in the Title VI area she was a GS-7 employee.

3. No dispute.

4. No dispute.

5. Dispute. In 1998 Arnold assumed the duties of the NSEEP Manager which included the duties of the Student Temporary Employment Program (STEP)

   and the Student in Career Employment Program (SCEP) in the Office of Human Resource Management (HRM) BLM. In that position Arnold subsequently reported directly to Mr. Warren Johnson, AD/HRM. After six months of highly successful performance and increased responsibilities Arnold was given an accretion of duties promotion to the GS-13 level. The NSEEP Manager position is identified as a full performance GS-14 level in accordance with the Bureau's Table of Organization and Classification issued in 2001 during the tenure of the then Director, BLM Kathleen Clark (Exhibit 2, page 29).

6.  No dispute.

7.  No dispute.

8.  Dispute. In October 2001, the HBCU Manager, Mr. William Nunn, passed away. The HBCU Manager position was classified at the GS-14 level. (Exhibit 7, National Program Manager/HBCU Position Description). Mr. Warren Johnson asked Arnold to assume the HBCU program management function on a rotational assignment with Steve Shafran, another program manager in student employment programs. That rotational assignment included a temporary promotion to the GS-14 level for 120 days. After one rotation each by Arnold and Shafran, Warren Johnson asked Ms. Arnold to assume the HBCU Manager position in addition to her ongoing duties as the NSEEP Manager.

9.  No dispute.

10.  No dispute.

2

11. No dispute.

12. Dispute. In December 1997, Arnold reported to Warren Johnson, BLM AD/HRM about a racially offensive skit performed at the BLM Phoenix Training Center in Phoenix, Arizona, (Exhibit 1, Arnold investigative interview, pgs. 28-34) and (Exhibit 21). As a result of Arnold's report there was an investigation by BLM's EEO office that found racial insensitivity and ordered the entire Training Center Staff to receive Diversity Training. In addition to ordering Diversity Training, the Director of the Training Center, Gary Drier, was removed and the employee, Mr. Ron Tucker (White male),who put on the offensive skit was suspended. Although Ms. Marilyn Johnson was not at the Phoenix Training Center when this incident occurred, because of the level of personnel involved, this incident was common knowledge throughout the BLM and DOI. Immediately following Mr. Drier's removal Ms. Johnson was reassigned into his position as Director, National Training Center. Within weeks of her arrival, Ms. Johnson promoted Mr. Ron Tucker, to a GS-14 position.

13. No dispute.

14. No dispute.

15. Dispute. From September 2002 until she was removed in August 2003, Arnold reported directly to Johnson, (Exhibit 29, Connie Stewart st. pgs. 5&6).

16. Dispute. Immediately upon her arrival, Johnson began raising the issue of BLM's agreement with Langston University with Arnold. On September 12, 2002, Johnson then Acting AD/HRM for less than one month confronted Arnold in the hallway outside Johnson's office and accused Arnold of laundering money to Langston University. Arnold, astounded by this accusation, categorically denied the accusation and requested a meeting with Johnson to clarify Arnold's role in the BLM partnership with Langston, (Exhibit 1 Arnold interview, pg. 12) (Exhibit 20, Arnold's deposition pg.16).

17. Dispute. Within the same time period that Marilyn Johnson chose to target Langston for scrutiny, approximately, $22, 814.616 had gone to majority colleges and universities from the BLM budget, while only $443,000, 2%, was granted to HBCUs to include Langston, (Exhibit 28).

18.    Dispute. On September 12, 2002, Johnson then Acting AD/HRM for less than one month confronted Arnold in the hallway outside Johnson's office and accused Arnold of laundering money to Langston University. Arnold, astounded by this accusation, categorically denied the accusation and requested a meeting with Johnson to clarify Arnold's role in the BLM partnership with Langston, (Exhibit 1 Arnold interview, pg. 12) (Exhibit 20, Arnold's deposition pg.16).

19. No Dispute.

20. Dispute. The agreement with Langston University met all of the statutory and regulatory requirements because the BLM procurement office approved, handled, and monitored the agreement, (Exhibit 5, W. Johnson st. pg.3).

21.    Dispute. The agreement with Langston University met all of the statutory and

4

    regulatory requirements because the BLM procurement office approved, handled, and monitored the agreement, (Exhibit 5, W. Johnson st. pg.3).

22. No dispute.

23. No dispute.

24. No dispute.

25. No dispute.

26. No dispute.

27. No dispute.

28. No dispute.

29. No dispute.

30. Dispute. The program functions were not transferred to a state office because no one was willing to participate in Johnson's efforts to move the program functions.

31. No dispute.

32. No dispute.

33. No dispute.

34. No dispute.

35. No dispute.

36. No dispute.

37. No dispute.

38. No dispute.

39. No dispute

40. No dispute

41. No dispute.

42. No dispute.

43. No dispute.

44. No dispute.

45. No dispute.

46. No dispute.

47. No dispute.

    48. Dispute. Mr. Clark Collins, Information Resource Advisor for HRM states that Johnson decided not to use SERTS. Johnson assigned Gail Colbert to replace him, to drop SERTS. Neither Johnson nor Colbert knew how the system worked before SERTS, neither knew how to work SERTS, neither knew how to replace SERTS with a better system, and neither gave a valid reason for dropping SERTs, (Exhibit 12, C. Collins statement).

SERTS was a direct result of the September 1997, Congressional Hearing that Arnold testified before and U. S Representative Albert Wynn's inquiry into BLM's EEO program in 1995. The "Wynn Report", issued in early 1996, found there was no effective mechanism for monitoring and tracking the recruitment and hiring of students through the Student Employment and HBCU programs. SERTS had cost the BLM approximately $70,000 to design and develop and was ready for deployment and implementation.

While preparing to go on leave, Arnold stated that she would arrange for a conference call meeting with Kurt Ballantyne and Colbert once she returned to the office the week of July 14, 2003. In Ballantyne's e-mail to Arnold dated 7-03-

2003, he stated that he will be on leave from July 10-21, 2003. Arnold was on scheduled leave following the July 3, 2003, e-mails written between she and Ballantyne. Arnold prearranged that she would follow-up with Ballantyne upon her return to the office on July 14, 2003. Arnold was not working on July 8, 2003, therefore could not send anything to Ballantyne. Arnold did not return until July 14, 2003, (Exhibit 35). One missed deadline of a report would not have been cause to delete the SERTS given the fact that both Arnold and Ballantyne were on leave and Arnold believed Ballantyne would grant an extension for submitting the report because he had done so for the quarterly report due on April 15, 2003. Ballantyne stated he remembered that **he had forgotten to include Arnold's name on the distribution list for an e-mail he sent to all WO-700 project managers reminding them that thei**r **quarterly reports were due April 15th.** ( Exhibit 36)

Johnson states:

**"It just had to die because it wasn't viable and there was no business case for it."** (Exhibit 25, M. Johnson interview, pgs.

By deposition March 10, 2005, Johnson states that Ms. Arnold did not submit a business case and that she had not seen such a thing, (Ex. 22, depo. page 80), adding, Ballantyne told her he had not received a copy of the business case, ( Ex.22, depo. page 81). Johnson stated as of March 10, 2005, she still did not have a system to replace SERTS.

7

49. Dispute. See 48

50. Dispute. See 48.

51. Dispute. See 48.

52. Dispute. See 48.

53. Dispute. See 48.

54.   Dispute.  Arnold submitted a travel request to Johnson on June 9, 2003, to travel to Phoenix Arizona on Thursday, June 12, 2003 to facilitate the SCEP training. This training program was under Arnold's program responsibility and it had been Arnold's practice to travel to the training site in advance of the training start date. The SCEP training began on Monday, June 16, 2003.  Arnold was informed by Johnson on June 11, 2003, that her training request had been denied.  Arnold was told that Johnson would only approve Arnold's travel on Sunday June 15, 2003. The Phoenix Training Center had assigned a new employee, unfamiliar with the SCEP orientation training program and to ensure quality control, Arnold believed it was necessary to have a few days lead time.  Johnson's action forced Arnold to travel on Sunday June 15, 2003, to Phoenix and then because of time constraints, Arnold had to work through the night to ensure all training materials were in order, and the training coordinator was made aware of the course curriculum.

   Johnson claimed that BLM budgetary constraints were the reason she denied Arnold's travel request to go to Phoenix in advance, (Ex.22, Johnson's deposition pages 89- 96).  During the nine months preceding the June 2003, training, Johnson had expended approximately $30,000 of BLM's funds for Johnson's own travel (Exhibit 37).  The cost for Arnold to have traveled to Phoenix on June 12, 2003,

8

instead of June 15, would have been approximately $277.00 for the additional three days per-diem and lodging. Johnson did have the same concern for "tight budgets" when Brown traveled to Phoenix for the SCEP training the following year, because Johnson never inquired of Brown what the travel would cost, (Ex. 22. M. Johnson deposition pgs. 95-96)

55. Dispute.  See 54.

56.  Dispute.     During a conference call meeting with the student employment initiatives staff on July 30, 2003, Johnson announced her decision to place Michael Brown, a GS-14 in Arnold's position as the NSEEP/HBCU Program Manager. Arnold spontaneously uttered the words, "I'll be damned." (Exhibit 1, Arnold's interview statement, page 56). [1]

On August 1, 2003, Johnson issued Arnold a Letter of Counseling. This Letter of Counseling was to serve notice that Johnson considered Arnold's reaction to be abusive behavior and inappropriate use of cursing in the work place.  Johnson warned Arnold that  Arnold's alleged behavior "will no longer be tolerated."  Johnson writes:

**"This is not the first time that I have experienced this unprofessional and abusive behavior by you. In addition, you have been overheard cursing and**

---

[1] Shafran gave a detailed account of what transpired. (Exhibit 30, Steve Shafran's st.):

**"Ms. Johnson stated that the person she had identified for the Team Leader, SEEP/HBCU job was Mr. Mike Brown.  I was surprised by this announcement, and I remember Ms. Arnold saying something like I'll be damned". "I'm sure Ms. Arnold must have been equally shocked, and Ms. Arnold being a direct person reacted in a spontaneous manner".**

**"I remember Ms. Johnson admonishing Ms. Arnold by saying something like why are you cursing". "Ms. Johnson was the only person who made any comment about what Ms. Arnold had said." "I did not find Ms. Arnold's comment at all offensive. It was clear given the context that Ms. Arnold was shocked by Ms. Johnson's announcement."….**

9

**showing abusive behavior in your work surroundings.  This creates and promotes a hostile work environment", ( Exhibit 50).**

Johnson claimed she had been getting feedback from "people" in Arnold's work area that when Arnold was upset it was her practice to use offensive language, but "they" were afraid to confront Arnold about her language.

**Johnson said, "when she used it in front of me that was an opportune time to put her on notice that that was not appropriate behavior".**

Johnson states:

"**I got about three, but they don't want their names".  That's why I didn't give them to her, they don't want their names put out because they were concerned that she would come back and get them", (Exhibit 25, M. Johnson interview statement, page 10-11).**

Johnson recanted her allegation of three employees who had allegedly been offended by Arnold's alleged use of offensive language and instead claimed that there was one employee, Tracey Bodner, who complained to her about Arnold, (Ex.22, Johnson deposition, pg 104).  Johnson stated that she met with Tracey in her office with no one else present and Tracey was concerned about the language and tone Plaintiff would use when Plaintiff would talk to students.  Johnson didn't know any of the student's names, nor did she ever ask Tracey the student's name (Ex. 22, depo. pages 106-108).  Johnson admits the student never complained about Arnold's use of

abusive language. (Ex. 22, page 111). Johnson also admits Bodner only complained on one occasion. Bodner did not provide a statement in support of Johnson's allegations, however Bodner did provide a statement in support of Arnold (Exhibit 31, Tracey Bodner st).

57.  Dispute.  See 56.

58. Dispute.  See 56

59.  Dispute.  On July 30, 2003, Johnson during a conference call staff meeting announced that she was replacing Arnold as the NSEEP/HBCU Program Manager with Michael Brown who would assume the position as a GS-14.  Brown a former government contractor was hired into the federal service with the BLM on December 3, 2000 at the GS-13 level.  When Brown was reassigned into the NSEEP/HBCU Program Manager position, he had fewer than three years of federal government experience and no experience in the NSEEP or HBCU programs. Johnson claims Brown's former employer was an HBCU, but she could not recall the school he came from.  Johnson could not recall when Michael Brown was hired as a Contractor in DOI, (Exhibit 22, Johnson depo, pgs. 19-21) Johnson said she hired Brown to be team Leader and Brown had extensive knowledge in dealing with special initiatives programs.  Johnson said at that time she talked to Brown about becoming a team lead, he was the monument manager in Arizona and based on that position Johnson concluded Brown had extensive management experience. Johnson stated that between Brown's experience with special initiatives and being the monument manager, Johnson thought Brown would be an ideal team leader.  Johnson claims Brown had worked with the BLM program managers and established extensive networks with

11

HBCUs and other schools, however, Johnson states she was not familiar with how many schools. Johnson stated she did not know the number of students Brown had recruited from HBCUs. (Ex. 22,dep. Pgs. 17-24). Johnson did not know exactly how many people Brown had ever supervised nor did she ever check. Johnson admits that before she hired Brown in 2003, she did not read his credentials or application. Johnson also admits that Brown had never done any work for her before hiring him in 2003. Johnson states that Brown taught at a college, but she did not know what subject. Johnson incorrectly said Brown was hired into the Federal Government as a GS-14.

72.     Dispute. On August 1, 2003, Johnson issued Arnold a letter of reassignment to the GS-13 Title VI EEO Specialist position. This position was not comparable to the NSEEP/HBCU position Arnold had formerly held. The NSEEP/HBCU Program Manager position has a GS-14 full performance level, while the Title VI EEO Specialist position has a full performance level GS-13. Had Arnold remained in the NSEEP/HBCU she would have had the opportunity to advance to the GS-14 full performance level based on her continued successful performance.

Johnson's reassignment of Plaintiff to the Title VI position contravened a June 13, 2002, directive by Michael Trujillo, DOI, Deputy Assistant Secretary for Human Resources and Workforce Diversity that had placed a moratorium on all personnel actions within EEO and Civil Rights programs. (Exhibit 41, Trujillo memo). Johnson's reassignment of Plaintiff to the Title VI program position prompted Melodee Stith, Departmental Director of the Office for Equal Opportunity, to e-mail Deputy Assistant Secretary Trujillo on August 6, 2003, stating in pertinent part:

12

It appears Marilyn Johnson is moving ahead to reassign employees into the EEO office. However, it is my perception that she's not acting responsibly…

I think that we should ask Marilyn to stop all assignments to the EEO Office until she gives us a plan on what she is doing. It appears she is acting arbitrary and capricious on this..(Exhibit 42, Stith's e-mail)

73.   Dispute. See 72.

74.   Dispute. See 72.

75.   Dispute. See 72.

Respectfully submitted,

By:   /s/
David A. Branch #438764
Law Office of David A. Branch, P.C.
1825 Connecticut Avenue, NW #690
Washington, D.C. 20009
(202) 785-2805