UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROMELLA ARNOLD,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. 05-1475 (RWR) |
| ) | |
| SALLY JEWELL,  ) | |
| ) | |
| Defendant.  ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Romella Arnold, an employee of the United States Department of the Interior ("DOI"), brings this action against the Secretary of the DOI[1] alleging race, sex, and age discrimination, retaliation, and hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a. At the close of discovery, the Secretary moved for summary judgment. Because there is a genuine issue of material fact as to whether Arnold was discriminated against on the basis of race, sex, and age when she was laterally transferred to a Title VI position, the Secretary's motion will be denied as to this claim. Arnold failed to exhaust timely her administrative remedies for her claims that she was discriminated against on the basis of race,

---

[1] Secretary Jewell is substituted as the defendant under Federal Rule of Civil Procedure 25(d).

sex, age and retaliation when she was twice accused in September 2002 of money laundering and that she was discriminated against on the basis of race, sex and retaliation when her former supervisor deleted a records tracking system and attempted to transfer Arnold's job to another office. She also failed to show that the latter two actions, the 2003 accusations against her of money laundering, the denial of a travel request, a short work deadline imposed, a counseling letter issued to her, her office relocation and re-defined performance standards, and a program termination were adverse employment actions. Thus, the Secretary's motion will be granted as to these disparate treatment claims. Because Arnold failed to establish a prima facie case of retaliation and hostile work environment, judgment will be entered for the Secretary on these claims.

<u>BACKGROUND</u>

Arnold is an African-American woman who was born in 1952. Compl. ¶ 3. In 1975, Arnold was employed by the DOI as an Equal Employment Opportunity ("EEO") Specialist and, for approximately two years, worked on both Title VI and Title VII programs. Def.'s Stmt. of Material Facts ("Def.'s Stmt.") ¶¶ 1, 2. In 1997, Arnold was reassigned to the DOI's Bureau of Land Management ("BLM") where she worked as an EEO Specialist. <u>Id.</u> ¶ 4. The next year, Arnold took on the duties and responsibilities of the National Student Education Employment

Program ("NSEEP") Program Manager, which included running the
Student Temporary Employment Program and the Student in Career
Employment Program ("SCEP").  Id.  In 1999, Arnold was promoted
to a GS-13 SCEP Program Manager position, although she continued
to fulfill the duties of the NSEEP Program Manager.  Id. ¶ 5;
Pl.'s Resp. to Def.'s Stmt. ("Pl.'s Resp.") ¶ 5.

     "In 2002, Marilyn Johnson was hired as the Assistant
Director for Human Resources for the BLM.  In this capacity,
Johnson served as Arnold's second-level supervisor."  Arnold v.
Salazar, Civil Action No. 09-964 (RWR), 2013 WL 5273369, at *1
(D.D.C. Sept. 19, 2013).  Johnson's duties included overseeing a
funding agreement between BLM and Langston University
("Langston").  Def.'s Stmt. ¶¶ 15-17.  Arnold was involved in the
Langston agreement and alleges that twice in September 2002 and
thrice between July and October 2003, Johnson accused her of
laundering money to Langston.  Compl. ¶¶ 16-22; Def.'s Stmt.
¶¶ 18-19, 25.  Under Johnson's leadership, BLM's partnership with
Langston ultimately was terminated in March 2004.  Def.'s Stmt.
¶ 26.

     Arnold alleges that on May 8, 2003, Johnson caused her
assistant, Connie Stewart, to send an e-mail to the BLM Field
Committee proposing that the committee adopt the "Lead State
Concept."  Compl. ¶ 25; Def.'s Stmt. ¶ 27.  Under the Lead State
Concept, a state would become responsible for the BLM's student

recruiting programs, including the SCEP.  Id. ¶ 29.  Arnold alleges that if effectuated, the proposal "would have resulted in a directed reassignment of Plaintiff" to a state office.  Compl. ¶ 26.  The program functions were never transferred to a state office.  Def.'s Stmt. ¶ 30.

Arnold alleges that she used the Student Employment/Historically Black College and University ("HBCU") Tracking System ("SERTS"), an automated system that was developed to monitor the recruitment and hiring of students in the HBCU program, to complete some of her duties.  Compl. ¶ 28; Pl.'s Resp. ¶ 48.  In January 2003, Johnson decided to terminate SERTS, and instructed a subordinate to delete the system.  Compl. ¶ 29; Def.'s Stmt. ¶ 38.  After she terminated the system, Johnson asked Arnold to prepare a program report on July 18, 2003.  Def.'s Stmt. ¶ 52.  Johnson gave Arnold only 30 minutes to complete the report although Arnold alleges that she had to manually collect the data from other employees because SERTS had been terminated, which made it more difficult to prepare a program report.  Id.; see also Compl. ¶ 31.

In June 2003, Arnold submitted a travel request to Johnson to travel on June 12, 2003 to a training that was to begin on June 16, 2003.  Def.'s Stmt. ¶ 54.  Johnson denied Arnold's request to travel on June 12, but approved Arnold's travel for June 15.  Id. ¶ 55.  Arnold alleges that, as a result of having

to travel later, she "had to work through the night to ensure [that] all training materials were in order" before the training began.  Compl. ¶ 35.

During a meeting in late July 2003, Johnson announced that Dr. Mike Brown, a man who was younger than Arnold, would be laterally reassigned to the GS-14 position of NSEEP/HBCU Program Manager.  Def.'s Stmt. ¶¶ 56, 59; Compl. ¶ 44.  In response to the announcement, Arnold said "I'll be dammed [sic]."  Def.'s Stmt. ¶ 57.  On August 1, 2003, Johnson issued Arnold a letter of counseling for "Inappropriate Language and Abusive Behavior," id. ¶ 58, warning that such behavior "will no longer be tolerated," Pl.'s Resp. ¶ 56.

In addition, on August 1, 2003, Johnson reassigned Arnold to a GS-13 Title VI EEO Specialist position.  Def.'s Stmt. ¶ 72.  Following her reassignment, Arnold was given a different office and different telephone number.  Id. ¶ 74.  Arnold alleges that her new office was "considerably smaller than her previous office."  Compl. ¶ 58.  On October 1, 2003, Arnold was given new performance standards for her Title VI EEO Specialist position, Def.'s Stmt. ¶ 75, and a position description, both of which Arnold alleged were "fallacious."  Compl. ¶ 53.

Arnold alleges that throughout her tenure with the DOI, she engaged in protected EEO activity.  For instance, Arnold alleges that in March 2002, the EEOC's Federal Sector Programs Director,

R. Edison Elkins, wrote that she was serving on a committee that worked with the EEOC to identify problems with BLM's EEO practices.  <u>See</u> Def. Errata [ECF No. 18], Ex. 9 (Pl.'s Answers to Objns. to Def.'s 1st Set of Interrogs. & Reqs. for Prod. of Docs. ("Pl.'s Answers to Interrogs.") at 18-19).

On August 4, 2003, Arnold contacted an EEO counselor, complaining of disparate treatment, retaliation, and a hostile work environment.  Comp. ¶ 7.  Arnold filed a formal administrative complaint on October 15, 2003, <u>id.</u> ¶ 8, and brought suit against the Secretary in July 2005.

The Secretary now moves for summary judgment arguing that Arnold failed to exhaust her administrative remedies for several of her disparate treatment and retaliation claims.  The Secretary also argues that Arnold failed to state a disparate treatment, retaliation, and hostile work environment claim, and that even if she had, Arnold did not rebut the legitimate, non-discriminatory reason for the DOI's employment decisions about Arnold.  Arnold opposes.

DISCUSSION

Summary judgment is properly granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue "is present in a case where the 'evidence is such that a reasonable jury could return a verdict

for the non-moving party,' a situation separate and distinct from a case where the evidence is 'so one-sided that one party must prevail as a matter of law.'" <u>Dozier-Nix v. District of Columbia</u>, 851 F. Supp. 2d 163, 166 (D.D.C. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "'A fact is "material" if a dispute over it might affect the outcome of a suit under governing law.'" <u>United States v. Sci. Applications Int'l Corp.</u>, Civil Action No. 04-1543 (RWR), 2013 WL 3791423, at *4 (D.D.C. July 22, 2013) (quoting <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006)). "In considering a motion for summary judgment, a court is to draw all justifiable inferences from the evidence in favor of the nonmovant." <u>Hairston v. Boardman</u>, 915 F. Supp. 2d 155, 159 (D.D.C. 2013) (alterations and internal quotation marks omitted) (quoting <u>Fields v. Geithner</u>, 840 F. Supp. 2d 128, 133 (D.D.C. 2012)).

I.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

A federal employee raising Title VII and ADEA claims must timely exhaust her administrative remedies before bringing a civil action. <u>See</u> <u>Rann v. Chao</u>, 346 F.3d 192, 195 (D.C. Cir. 2003); <u>Bowden v. United States</u>, 106 F.3d 433, 437 (D.C. Cir. 1997). Before bringing a Title VII or ADEA claim, a federal employee must initiate informal contact with an EEO counselor within 45 days of the alleged discriminatory conduct. 42 U.S.C.

§ 2000e-16(c); 29 U.S.C. §§ 633a(b), (c)[2]; 29 C.F.R.

§ 1614.105(a)(1); see also Rann, 346 F.3d at 195 (stating that

under the ADEA, a federal government employee "may invoke the

EEOC's administrative process, and then sue if dissatisfied with

the results"); Johnson v. Vilsack, 815 F. Supp. 2d 221, 226

(D.D.C. 2011) (stating that "procedures governing discrimination

complaints brought by employees of the federal government under

the ADEA are set forth in 29 C.F.R. Part 1614").[3]  The defendant

---

[2] The Secretary incorrectly identifies 29 U.S.C. § 626(d)(1) as the governing statute.  Govt.'s Mem. at 20.  However, a federal government employee's age discrimination claims are governed by 29 U.S.C. § 633a, while 29 U.S.C. § 626(d)(1) applies to non-federal employees.  See Forman v. Small, 271 F.3d 285, 296 (D.C. Cir. 2001).  Thus, Arnold must have contacted the EEO counselor within 45 days of the discriminatory conduct, as stated in 29 C.F.R. Part 1614, rather than within 180 days, as stated in 29 U.S.C. § 626.  Additionally, even if the Secretary were correct that Arnold's age discrimination claims that were filed 180 days before Arnold initiated informal contact with an EEO counselor were timed-barred, 180 days before August 4, 2003 is February 5, 2003, not January 5, 2003, as the Secretary states.  However, because the Secretary miscalculated the date and uses the incorrect statute, the Secretary argues only that "any alleged acts that occurred prior to January 5, 2003, are barred for age discrimination claims."  Def.'s Mem. at 20.  Because the 45-day time limit is not jurisdictional, but rather a statute of limitation defense subject to waiver, see Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Johnson v. Vilsack, 815 F. Supp. 2d 221, 227 (D.D.C. 2011), the Secretary waives the argument that Arnold's age discrimination claims premised on acts after January 5, 2003 are time-barred.

[3] Alternatively, a federal employee "may bring a claim directly to federal court so long as, within 180 days of the allegedly discriminatory act, [she] provides the EEOC with notice of [her] intent to sue at least 30 days before commencing suit." Rann, 346 F.3d at 195 (citing 29 U.S.C. §§ 633a(c), (d)).  Arnold does not allege that she sent a notice of intent to sue to the EEOC.  Accordingly, Arnold's age discrimination claims are

bears the burden of proving that the plaintiff failed to exhaust
her administrative remedies.  See Colbert v. Potter, 471 F.3d
158, 165 (D.C. Cir. 2006).

Arnold contacted an EEO counselor on August 4, 2003.  The
Secretary argues that several of Arnold's disparate treatment and
retaliation claims are time-barred.[4]  See Def.'s Mem. at 19-20;
Def.'s Reply at 18.  Arnold counters that even though she did not
initiate contact with an EEO counselor within 45 days of the
allegedly discriminatory conduct, all of her claims were timely
exhausted because "[u]nder the continuing violations theory,
Defendant's discriminatory actions were part of a continuing
pattern of discriminatory and retaliatory activity that were

_____

untimely if she did not consult with an EEO counselor within 45
days of the allegedly discriminatory acts.

[4] The Secretary miscalculates May 20, 2003 as the operative
date for determining if Arnold exhausted timely her claim, Def.'s
Mem. at 20.  Forty-five days before August 4, 2003, the date
Arnold made initial contact with an EEO counselor, is June 20,
2003.  This mistake does not affect the Secretary's argument that
Arnold's claims premised on Johnson's acts before May 20, 2003 --
such as the money laundering accusations in 2002, and Johnson's
termination of SERTS in January 2003 and attempt to transfer
Arnold's job to a state office in May 2003 -- are untimely.
There is, however, one allegedly discriminatory act that occurred
in June 2003, more than 45 days before Arnold's first contact
with an EEO counselor: on June 11, 2003, Johnson denied Arnold's
travel request.  Nevertheless, because the Secretary bears the
burden of establishing that Arnold failed to exhaust timely her
administrative remedies, and the Secretary made no argument that
Arnold's sex, race, and age discrimination claims premised on the
June conduct is untimely, this claim will not be dismissed as
time barred.  See supra n.2 (explaining that the statute of
limitations defense is subject to waiver).

connected to a timely complaint."  Pl.'s Corrected Opp'n to
Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 44.

The Supreme Court has rejected the continuing violations
theory for discrete discriminatory and retaliatory acts raised in
Title VII claims.  See Nat'l R.R. Passenger Corp. v. Morgan, 536
U.S. 101, 122 (2002).  There, the Court "held that 'a Title VII
plaintiff raising claims of discrete discriminatory or
retaliatory acts must file his charge within' 45 days of the day
that the act occurred.  This is so 'even when [the discrete
discriminatory acts] are related to acts alleged in timely filed
charges.'"  Arnold, 2013 WL 5273369, at *4 (alteration in
original) (quoting Morgan, 536 U.S. at 113, 122).  The D.C.
Circuit also applies Morgan in suits alleging age discrimination
in violation of the ADEA.  See Law v. Cont'l Airlines Corp.,
Inc., 399 F.3d 330, 333 (D.C. Cir. 2005).

"Each [discrete] incident of discrimination and each
retaliatory adverse employment decision constitutes a separate
actionable 'unlawful employment practice.'"  Morgan, 536 U.S. at
114.  Title VII and the ADEA make "all [discriminatory] personnel
actions" affecting federal government employees illegal.  See 42
U.S.C. § 2000e-16(a); 29 U.S.C. § 633a.  "Discrete acts such as
termination, failure to promote, denial of transfer, or refusal
to hire are easy to identify."  Morgan, 536 U.S. at 114.
Discrete acts also include an employee's claims that she was

wrongfully suspended from work, denied training, or falsely
accused of a workplace infraction.  See id.

Arnold complains that in September 2002, Johnson twice
accused her of money laundering, instructed a subordinate to
terminate SERTS in January 2003, thereby making it more difficult
to complete her job duties, and tried to transfer Arnold's job to
a state office by having Stewart send an e-mail on May 8, 2003
regarding the Lead State Concept.  Compl. at 6.  Each of these
events is easy to identify and had the potential to alter a term
or condition of Arnold's employment.  Moreover, none of these
acts by "[t]heir very nature involves repeated conduct."  Morgan,
536 U.S. at 115.  Thus, these are discrete acts.  Because Arnold
did not timely initiate informal contact with an EEO counselor
for her claims of intentional discrimination on the basis of
race, sex, and age and retaliation based on Johnson's allegedly
false accusations in September 2002, and intentional
discrimination on the basis of race and sex and retaliation based
on Johnson causing SERTS to be terminated in January 2003 and
Johnson's attempt to transfer Arnold's job to a state office in
May 2003, the Secretary's motion for summary judgment will be
granted as to these claims.  Arnold's claims of intentional
discrimination on the basis of age based on Johnson's termination
of SERTS in January 2003 and Johnson's attempt to transfer
Arnold's job to a state office in May 2003, as well as Arnold's

claims of intentional discrimination on the basis of race, sex, and age and retaliation for Johnson's denial of Arnold's travel request in June 2003 survive the Secretary's exhaustion challenge since the Secretary did not challenge these claims as untimely.

## II. DISPARATE TREATMENT

Title VII and ADEA disparate treatment claims are analyzed under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Krodel v. Young, 748 F.2d 701, 705 (D.C. Cir. 1984) ("Courts have generally applied the tripartite evidentiary scheme developed in the context of Title VII litigation to suits brought under the ADEA."). Under the three-part McDonnell Douglas framework, the plaintiff has the burden to establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To make out a prima facie case of discrimination, "a plaintiff must show [(1)] that [she] 'is a member of a protected class,' [(2)] that [she] 'suffered an adverse employment action,' and [(3)] that 'the unfavorable action gives rise to an inference of discrimination.'" Youssef v. FBI, 687 F.3d 397, 401 (D.C. Cir. 2012) (quoting Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002)); see also Cuddy v. Carmen, 694 F.2d 853, 857 (D.C. Cir. 1982) (discussing a plaintiff's initial burden in an ADEA case). "An 'adverse employment action' . . . is 'a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). "An employee must 'experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009) (alteration omitted) (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

If a plaintiff makes out a prima facie case, the burden then shifts to the employer to "produc[e] a non-discriminatory explanation for the challenged personnel action." Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010).

If the employer provides a legitimate, non-discriminatory reason for the action, then the plaintiff must show "that discriminatory animus was the determining or but-for cause of the personnel action." Id. "The plaintiff may satisfy this burden 'either indirectly by showing the employer's reason is pretextual or directly by showing that it was more likely than not that the employer was motivated by discrimination.'" Id. (quoting Forman v. Small, 271 F.3d 285, 292 (D.C. Cir. 2001)). One way for a plaintiff to "show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for

a discriminatory reason" is to "show[] that the nondiscriminatory explanation the defendant proffered for its decision was false." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

Arnold's complaint alleges numerous timely exhausted intentional discrimination claims.  Specifically, it alleges that the Secretary discriminated against her on the basis of age when Johnson instructed a subordinate to terminate SERTS and tried to transfer Arnold's job to a state office.  It also alleges that the Secretary discriminated against Arnold on the basis of race, sex, and age when Johnson accused Arnold of money laundering in July and August 2003, denied Arnold's travel request, set an unreasonable deadline for Arnold's work, issued a letter of counseling to Arnold, reassigned Arnold to the Title VI position, required Arnold to work under a false position description, moved Arnold to a smaller office, and did not allow Arnold to retain her phone number after she was moved to the smaller office.  The Secretary argues that Arnold cannot establish a prima facie case of intentional discrimination because none of the allegedly discriminatory actions was an adverse employment action.  The Secretary further argues that even if Arnold could meet her initial burden, the Secretary has legitimate nondiscriminatory reasons for her employment decisions.

A.   Termination of SERTS

The Secretary contends that Johnson's decision to terminate SERTS is "clearly not an adverse personnel action since it did not affect the terms and conditions of plaintiff's employment." Def.'s Mem. at 25.  Arnold argues that Johnson's decision to delete the system "resulted in Arnold having to manually collect data on a national program."  Pl.'s Opp'n at 37; see also id., Ex. 22 (Marilyn H. Johnson EEOC Test. at 87:19-88-4) (Johnson testifying that after she terminated SERTS, employees had to manually collect the data they needed from another system). While changing the method Arnold had to use to track records may have made it more difficult for Arnold to complete her work assignments, Arnold offers no evidence, legal authority, or argument demonstrating that terminating SERTS led to an objectively tangible harm.  Thus, Arnold did not meet her initial burden to show that terminating SERTS was an adverse employment action, and judgment will be entered for the Secretary on this claim.

B.   Proposal to transfer student recruitment programs to state office

The Secretary argues that the proposal to transfer the student recruitment programs to a state office was never implemented and "Plaintiff's speculation of what might or could have happened if the proposal had been accepted by a state, does not establish a material adverse action."  Def.'s Mem. at 25.

Arnold argues that the e-mail proposing that the student recruitment programs, including the SCEP, be transferred to a state office caused her to "suffer[] undue stress, anxiety, and harm at the thought of having to choose between a federal career of over thirty years and the disruption of a major move to another location."  Pl.'s Opp'n at 37.  However, "purely subjective injuries," such as stress and anxiety suffered as a result of a discriminatory program transfer proposal, "are not sufficient to establish an adverse employment action for the purposes of Title VII."  Augustus v. Locke, Civil Action No. 09-1003 (EGS), 2013 WL 1290839, at *9 (D.D.C. Mar. 30, 2013) (citing Forkkio, 306 F.3d at 1130–31).  Because Arnold has not shown that the proposal to transfer the student recruitment programs to a state office was an adverse employment action, the Secretary's motion will be granted as to this claim.

        C.   Money laundering accusations

     The Secretary argues that Arnold cannot show that Johnson's alleged accusations that Arnold was engaging in money laundering were adverse employment actions.  Def.'s Mem. at 22.  "[F]alse accusations without negative employment consequences are not employment decisions actionable under Title VII."  Mack v. Strauss, 134 F. Supp. 2d 103, 113 n.6 (D.D.C. 2001) (internal quotation marks omitted).  The Secretary contends that the alleged verbal accusations caused Arnold no harm, and that Arnold

admitted as much in her investigative interview.  Arnold stated in the interview that she did not complain about Johnson's verbal accusations at the time they happened "because at the time it was still a verbal accusation" and that Arnold had yet to "'suffer[] harm'" or "'an adverse impact.'"  Def.'s Mem. at 22 (quoting Pl.'s Opp'n, Ex. 1 (Romella J. Arnold Investigative Interview at 121:7-18).  Arnold does not address the Secretary's arguments in her opposition.  "If a party fails to address an argument that is put forth in a dispositive motion, that argument may be deemed conceded."  <u>Antoine v. U.S. Bank Nat'l Ass'n</u>, 821 F. Supp. 2d 1, 6 (D.D.C. 2010).  Thus, Arnold has conceded that Johnson's money laundering accusations were not adverse employment actions, and the Secretary's motion for summary judgment will be granted as to this claim.

    D.   <u>Denied travel request</u>

While not being able to travel to the training session as early as Arnold would have liked may have been an inconvenience, the Secretary argues that denying Arnold's travel request did not affect the terms and conditions of Arnold's employment.  Def.'s Mem. at 26.  Arnold asserts that "Johnson's action forced Arnold to travel on Sunday[,] June 15, 2003, to Phoenix and then because of time constraints, Arnold had to work through the night to ensure all training materials were in order[.]"  Pl.'s Opp'n at 15 n.8.  However, Arnold makes no legal argument that restricting

travel and causing an employee to work all night is an adverse
employment action, and thus concedes the Secretary's argument
that limiting work related travel does not alter the terms or
conditions of her employment or limit her job performance.  In
any event, delaying Arnold's work-related travel "did not have a
materially adverse effect on the terms or conditions of
plaintiff's employment -- [Arnold] simply carried out [her] work
responsibilities at the time . . . dictated by [her]
supervisor[.]"  See Rattigan v. Gonzales, 503 F. Supp. 2d 56, 74
(D.D.C. 2007) (emphasis omitted).  Because Arnold has not shown
that denying her request for early travel is an adverse
employment action, the Secretary will be granted judgment on this
claim.

     E.   Unreasonable deadline

    The Secretary argues that Johnson asking Arnold to prepare a
program report in 30 minutes was not an adverse employment
action.  Def.'s Mem. at 25.  The Secretary provides evidence that
when Arnold told Johnson that she could not deliver the report at
the requested time, Johnson's only response was that Arnold
should deliver the report to Johnson whenever Arnold could do so.
Def.'s Errata [ECF No. 18], Ex. 5 (Romella Arnold Dep. at
46:5-20).  Arnold does not address this argument in her
opposition, and thus concedes the Secretary's argument that the

short deadline was not an adverse employment action.

Accordingly, the Secretary is entitled to judgment on this claim.

F.   Lateral transfer to Title VI position

Arnold claims that she was discriminated against when she was laterally reassigned from the GS-13 SCEP Program Manager position to the GS-13 Title VI EEO Specialist position.  Pl.'s Opp'n at 19-23.  The Secretary argues that this lateral transfer was not an adverse employment action because the transfer did not involve "a significant change in responsibilities."  Def.'s Mem. at 29-30.

> [A] plaintiff who is made to undertake or who is denied
> a lateral transfer -- that is, one in which she suffers
> no diminution in pay or benefits -- does not suffer an
> actionable injury unless there are some other
> materially adverse consequences affecting the terms,
> conditions, or privileges of her employment or her
> future employment opportunities such that a reasonable
> trier of fact could conclude that the plaintiff has
> suffered objectively tangible harm.

Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999), abrogation on other grounds recognized by Steele v. Schafer, 535 F.3d 689 (D.C. Cir. 2008).  While overseeing the HBCU recruitment program, Arnold provided "guidance and direction for BLM's External (Public) and Internal (DOI) Civil Rights Program," served "as the advisor and internal consultant to BLM's management officials," and developed, reviewed and recommended policies and procedures. See Pl.'s Opp'n, Ex. 45 (Employee Performance Plan and Results Rep.).  In the Title VI position, however, Arnold provides

evidence that she was vaguely directed to develop the Title VI
program, but was given no program files, directives, guidelines,
or copies of compliance reviews in the position. See Pl.'s
Opp'n, Ex. 45 (Mtg. with R. Arnold (Fri. Oct. 23, 2003)). Arnold
also alleges that, unlike the SCEP position, the Title VI
position did not have any leadership opportunities or promotion
potential. Pl.'s Opp'n at 20-22. Thus, although Arnold's
reassignment did not involve a decrease in salary or grade level,
Arnold has alleged sufficient facts to create a genuine dispute
concerning whether the reassignment was an adverse employment
action involving materially different job responsibilities and
opportunities.

The Secretary further argues that she had a legitimate,
nondiscriminatory reason for transferring Arnold to the Title VI
EEO Specialist position. The Secretary explains that Arnold was
transferred to the new Title VI position because in May 2003, the
U.S. Civil Rights Commission ("Commission") issued a report
criticizing "BLM for not having a Civil Rights Specialist to
handle Title VI issues" and concluding that the BLM needed to
establish a Title VI program. Def.'s Mem. at 43 (citing Def.'s
Errata [ECF No. 18], Ex. 10 (Blue Exs. at Ex. 28)). In response
to the Commission's report, Johnson decided to develop a BLM
Title VI program. Johnson reassigned Arnold to the program
because Arnold had "occupied the position of EEO Specialist

(Title VI) from 1979 to 1981." Id. at 44; see also Def.'s Stmt.
¶¶ 1-2.

Arnold argues that the Secretary's articulated legitimate
nondiscriminatory reason is false because creating the Title VI
program and reassigning Arnold to a position within the program
was contrary to a DOI Directive. On June 13, 2002, the Deputy
Assistant Secretary for Human Resources and Workforce Diversity
sent a memorandum to all of the DOI Bureau and Office Directors
requesting that "[i]n anticipation of some restructuring in the
near future[,]" the Directors "not make any changes to [their]
Equal Opportunity organization, structure, location or
personnel." Pl.'s Opp'n at 24-25; id. Ex. 41 (Memorandum from J.
Michael Trujillo, Department Asst. Secretary for Human Resources
and Workforce Diversity, DOI, to Bureau and Office Directors
(June 13, 2002)). The Deputy Director of the Office for EEO also
stated that she believed that Johnson's reassignment of Arnold to
the Title VI position was contrary to the DOI's then-policy. See
Pl.'s Opp'n at 25; id. Ex. 42 (E-mail from Melodee Stith, to Mike
Trujillo (Aug. 6, 2003, 9:06 a.m.) ("Stith E-mail") "'[T]he
trier of fact may deem [Johnson's failure to follow the DOI's own
procedures] probative in determining the true motivation behind
the hiring decision of the prospective employer.'" See Salazar
v. Wash. Metro. Transit Auth., 401 F.3d 504, 509 (D.C. Cir. 2005)

(alteration omitted) (quoting <u>Johnson v. Lehman</u>, 679 F.2d 918, 922 (D.C. Cir. 1982)).

Contrary to the Secretary's assertion that Johnson was reasonably addressing a problem that the Commission had identified, <u>see</u> Def.'s Mem. at 44, Arnold also provides evidence that the Deputy Director believed that Johnson was "not acting responsibly" and was "acting arbitrar[ily] and capricious[ly]" in assigning Arnold to the Title VI position.  <u>See</u> Stith E-mail. Arnold further contends that although she had some prior experience in Title VI, "it had been over twenty years since [she] had served in a Title VI program," and even then she served at the GS-7 level.  Pl.'s Opp'n at 25.  As such, Arnold argues that she lacked the qualification and experience needed to serve as a Title VI EEO Specialist.  <u>Id.</u>

Arnold also provides evidence that Brown had little experience with the NSEEP position duties, and thus was not better qualified than she was for the position.  <u>See</u> Pl.'s Opp'n at 33-34; <u>id.</u> Ex. 43 (Mike Brown Dep. at 40:14-25).  Although the Secretary has offered a legitimate nondiscriminatory reason for transferring Arnold to the Title VI position, Arnold has put forward sufficient evidence for a reasonable jury to find that the Secretary's proffered reason is false and is not the actual reason she was transferred.  Accordingly, summary judgment will be denied for the Secretary on Arnold's claim that she was

transferred to the Title VI position because of intentional discrimination on the basis of race, sex, and age.

G.    Letter of counseling

The Secretary contends that Arnold has not demonstrated that the letter of counseling for inappropriate behavior and language was an adverse employment action.  "[F]ormal criticism . . . [is not] necessarily [an] adverse action[]" and it should not be considered such if it did not "affect[] the [employee's] grade or salary."  Brown, 199 F.3d at 457-58; see also Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding that a letter of counseling that "contained no abusive language, but rather job-related constructive criticism, which can prompt an employee to improve her performance" was not retaliatory under the "materially adverse employment action" standard (internal quotation marks omitted)).

Here, the letter of counseling explained that Arnold's language and behavior were unprofessional, discussed the impact that Arnold's behavior was having on the work environment, and cautioned her that similar behavior in the future might result in disciplinary action.  See Def.'s Errata [ECF No. 18], Ex. 10 (Blue Exs. at Ex. 23).  Thus, the letter contains only job-related constructive criticism.  Nevertheless, Arnold argues that the letter of counseling caused adverse employment actions because the letter was "issued contemporaneous with Johnson's

notice to Arnold of Arnold's reassignment to the non-existent
Title VI position; threatened further disciplinary action; and
most particularly, contained false statements and gross
exaggerations."  Pl.'s Opp'n at 39.  However, Arnold provides no
evidence or argument to demonstrate that the letter of counseling
was a consideration in reassigning her to the Title VI position
or that it otherwise caused an adverse employment action.  Arnold
also fails to provide evidence to support her assertion that the
letter contained false statements.  Because Arnold has not
demonstrated that the letter of counseling was an adverse
employment action, judgment will be entered for the Secretary on
this claim.

      F.   <u>False position description, smaller office and new
           telephone number, BLM-Langston agreement</u>

     The Secretary asserts that Arnold has not shown that
presenting Arnold with allegedly false and impractical
performance standards and causing Arnold to move to a smaller
office and giving her a new telephone number were adverse
employment actions.  Def.'s Mem. at 37-38.  The Secretary further
asserts that Arnold cannot show that Johnson terminating BLM's
agreement with Langston was an adverse employment action because
terminating the agreement did not affect the terms and conditions
of Arnold's employment, in part because the agreement was
terminated several months after Arnold was transferred from the
SCEP Program Manager position.  Def.'s Mem. at 24.  Arnold

conceded these arguments by failing to address them in her
opposition.  Accordingly, judgment will be entered for the
Secretary on Arnold's claims that she was discriminated against
when she was given allegedly false and impractical performance
standards, when she was moved to a smaller office and not allowed
to retain her old telephone number, and when Johnson terminated
BLM's agreement with Langston.

III. RETALIATION

Both Title VII and the ADEA make it unlawful for an employer
to retaliate against a federal government employee for engaging
in protected EEO activity.  See Forman, 271 F.3d at 297-98.  To
establish a prima face case of retaliation, a plaintiff must show
"(1) that [she] engaged in statutorily protected activity;
(2) that [she] suffered a materially adverse action by [her]
employer; and (3) that a causal link connects the two."  Jones v.
Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009).  "A plaintiff may
show causation through direct evidence or circumstantial
evidence, such as by showing that the employer had knowledge of
the employee's protected conduct and a close temporal proximity
between the employer's knowledge and the adverse actions."
Clayton v. District of Columbia, 931 F. Supp. 2d 192, 202 (D.D.C.
2013).  "The cases that accept mere temporal proximity between an
employer's knowledge of protected activity and an adverse
employment action as sufficient evidence of causality to

establish a prima facie case uniformly hold that the temporal proximity must be 'very close[.]'" <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001). "Although neither the Supreme Court nor the D.C. Circuit has established a bright-line rule, 'the cases cited by the <u>Breeden</u> Court seem to suggest that if a plaintiff relies upon temporal proximity *alone* to establish causation, the time span must be under three months.'" <u>Lee v. Mabus</u>, Civil Action No. 05-1335 (BJR), 2013 WL 3835627, at *11 (D.D.C. July 26, 2013) (quoting <u>Buggs v. Powell</u>, 293 F. Supp. 2d 135, 148 (D.D.C. 2003)).

The Secretary argues that Arnold cannot establish a causal connection between her protected conduct and her remaining retaliation claims. In her response to the Secretary's interrogatory, Arnold asserted that she was retaliated against because she engaged in protected conduct through March 12, 2002.[5] Arnold alleges that on March 12, 2002, the EEOC's Federal Sector

---

[5] Arnold also states that she was retaliated against because in a December 4, 2003 letter to the Secretary, Representative Albert Wynn "address[ed] the accusation of 'money laundering' against [her] and her removal from a critical occupation where she was most valued and successful," and because in a June 24, 2004 letter to the Secretary, the president of a company "address[ed] the continued pattern and practice of racial discrimination in the DOI." <u>See</u> Def. Errata [ECF No. 18], Ex. 9 (Pl.'s Answers & Objns. to Def.'s 1st Set of Interrogs. & Reqs. for Prod. of Docs. at 18-19). Because most of the Secretary's allegedly retaliatory conduct pre-dates these letters, that allegedly retaliatory conduct could not have been in retaliation for these letters. <u>Arnold</u>, 2013 WL 5273369, at *5 (citing <u>Booth v. District of Columbia</u>, 701 F. Supp. 2d 73, 79 (D.D.C. 2010)).

Programs Director wrote that Arnold served on a committee that worked with the EEOC to identify problems with the BLM's EEO practices.  See Pl.'s Answers to Interrogs. at 18-19.  As a result of her protected conduct, Arnold claims that she was retaliated against from January 2003 to October 2003, and in March 2004.[6]  Because the allegedly retaliatory conduct occurred well over ten months after March 2002 -- when Arnold's purported protected conduct ended -- temporal proximity between the protected conduct and retaliatory acts alone cannot establish causation.  Moreover, Arnold did not respond to the Secretary's argument that Arnold "has offered no evidence that Ms. Johnson was aware of [the March 12, 2002] letter or plaintiff's committee work in relation to it."  Def.'s Mem. at 21.  Thus, this argument is conceded.  Since Arnold has not demonstrated that the temporal proximity between her protected conduct and the allegedly retaliatory actions alone is sufficient to establish causation,

---

[6] Specifically, Arnold alleges that she was retaliated against when Johnson (1) terminated SERTS in January 2003, (2) directed Stewart to send an e-mail regarding the "Lead State Concept" on May 8, 2003, (3) denied Arnold's request to travel in June 2003, (4) set an unreasonable deadline for Arnold in July 2003, (5) transferred Arnold from the SCEP Program Manager position to the Title VI position in July 2003, (6) falsely accused her of money laundering on July 18, 2003 and August 12, 2003, (7) issued a letter of counseling in August 2003, (8) moved Arnold to a smaller office and did not allow Arnold to keep her phone number in September 2003, (9) gave Arnold a false position description for her Title VI EEO specialist position on October 1, 2003, and (10) terminated BLM's agreement with Langston in March 2004.  Pl.'s Answers to Interrogs. at 2-14.

and she does not provide an alternative theory to establish
causation, the Secretary is entitled to judgment as a matter of
law on Arnold's retaliation claims.[7]

IV.  HOSTILE WORK ENVIRONMENT

"[A] hostile work environment can amount to retaliation
under Title VII."  Hussain v. Nicholson, 435 F.3d 359, 366 (D.C.
Cir. 2006).  "To prevail on a retaliatory hostile work
environment claim, 'a plaintiff must show that her employer
subjected her to discriminatory intimidation, ridicule, and
insult that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment.'"  Ramseur v. Perez, Civil Action No. 13-
0169 (ESH), 2013 WL 4483511, at *6 (D.D.C. Aug. 23, 2013)
(alterations and internal quotation marks omitted) (quoting
Baloch, 550 F.3d at 1201).  In determining whether a hostile work
environment exists, courts "'look[] at all the circumstances,'

_____

[7] In her opposition, Arnold also asserts that her "defense
of the affirmative employment agreement with Langston University,
an HBCU" was protected conduct.  See Pl.'s Opp'n at 9.  Protected
conduct is opposition to an employment practice that violates
Title VII or the ADEA.  See 42 U.S.C. § 2000e-3; 29 U.S.C.
§ 623(d)); see also Forman, 271 F.3d at 297-98 (explaining that
42 U.S.C. § 2000e-16 and 29 U.S.C. § 633a bar the forms of
discrimination identified in 42 U.S.C. § 2000e-3 and 29 U.S.C.
§ 623(d)).  However, Arnold has not demonstrated that Johnson's
questions about the DOI's agreement with Langston or Johnson's
decision to terminate the agreement are unlawful employment
practices under Title VII and the ADEA.  Thus, Arnold has not
shown that retaliation because Arnold defended the BLM-Langston
agreement violates Title VII or the ADEA.

including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).

Arnold claims that the Secretary subjected her to "a hostile work environment through acts of retaliatory harassment against Arnold." Pl.'s Opp'n at 29. Specifically, Arnold argues that Johnson's acts, including making false accusations that Arnold was laundering money, threatening to transfer Arnold's position to a state office, terminating SERTS, issuing a letter of counseling, and reassigning Arnold to the Title VI position "constitute a pattern of retaliatory harassment." <u>Id.</u> at 29-30.

The Secretary argues that these acts were not sufficiently severe and pervasive to create a hostile work environment. Def.'s Mem. at 39-40. Arnold counters that Johnson's repeated accusations that Arnold was involved in illegal money laundering are evidence of "Johnson's agenda . . . to harass and intimidate Arnold." Pl.'s Opp'n at 29. Arnold also asserts that Johnson's "actions constitute a pattern of retaliatory harassment." <u>Id.</u> at 30.[8] However, Arnold does not confront the Secretary's argument

---

[8] Arnold also asserts that Johnson made other "material changes in Arnold's terms and conditions of employment." <u>Id.</u> However, Arnold does not point to any evidence to support this

that Johnson's allegedly discriminatory actions were not sufficiently severe and pervasive to alter the terms or conditions of Arnold's employment.  For instance, Arnold does not argue that Johnson's actions occurred so frequently as to unreasonably interfere with her work performance.  Moreover, Arnold does not dispute the Secretary's argument that "during the time Ms. Johnson was [Arnold's] supervisor she met or spoke with Ms. Johnson only about eight times."  Def.'s Mem. at 39.  Because Arnold has not made out a prima facie case of hostile work environment, judgment will be entered for the Secretary on this claim.

## CONCLUSION AND ORDER

Arnold did not timely exhaust her administrative remedies for her Title VII and ADEA claims that the Secretary discriminated and retaliated against her by accusing her of money laundering in September 2002, and her Title VII claims that the Secretary discriminated and retaliated against her by instructing a subordinate to terminate SERTS in January 2003, and causing Stewart to send an e-mail about the "Lead State Concept" in May 2003.  Arnold has demonstrated that there is a disputed issue of

---

assertion and "[c]onclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment."  Crummey v. Soc. Sec. Admin., 794 F. Supp. 2d 46, 55 (D.D.C. 2011) (citing Ass'n of Flight Attendants -- CWA v. U.S. Dep't of Transp., 564 F.3d 462, 465-66 (D.C. Cir. 2009)).

material fact regarding whether she was discriminatorily transferred to the Title VI program, but has failed to establish a prima facie case for her other intentional discrimination claims.  Arnold also failed to establish a prima facie case for her timely filed retaliation claims, and did not make out a prima facie case of hostile work environment.  Accordingly, it is hereby

ORDERED that the Secretary's motion [17] for summary judgment be, and hereby is, GRANTED IN PART and DENIED IN PART. Summary judgment is denied as to Arnold's claim that she was discriminated against on the basis of race, sex, and age when she was transferred to the Title VI EEO Specialist position.  Summary judgment is granted as to Arnold's other intentional discrimination claims and her retaliation and hostile work environment claims.  It is further

ORDERED that the parties appear for a scheduling conference on February 7, 2014 at 12:30 p.m.

SIGNED this 23rd day of December, 2013.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge